**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

| | | |
|---|---|---|
| JOHN BARNHARDT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Civil Action No. 4:65-cv-01300-HTW-LRA |
| | ) | 1300(E) |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MERIDIAN MUNICIPAL SEPARATE | ) | |
| SCHOOL DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## CONSENT ORDER

## I.    BACKGROUND

This school desegregation case originated on May 10, 1965, when Private Plaintiffs John

Barnhardt, *et al.*, then minor students, by their parents, initiated this lawsuit against the Meridian

Municipal Separate School District (the "District" or "Meridian") seeking disestablishment of its

racially dual school system.  On June 28, 1965, this Court granted leave to the United States to

intervene as a plaintiff.

On May 29, 1967, the Court ordered the immediate desegregation of the District's

schools and approved a freedom of choice attendance plan.  On November 7, 1969, the Court of

Appeals for the Fifth Circuit issued an Order ("November 7, 1969 Order") enjoining the District

from operating a dual school system based on race or color.  The Fifth Circuit ordered the

immediate implementation of a desegregation plan (the "Plan") prepared by the United States.

The November 7, 1969 Order allowed modifications to the Plan after consideration by this Court,

subject to further order by the Fifth Circuit.

Beginning in the 2007-2008 school year, the United States initiated a case review of the District and requested data, policies, and other information regarding the District's compliance with its desegregation obligations.  In February 2008, the United States conducted a site visit of several of the District's schools and requested supplemental information regarding the District's progress toward unitary status.  In 2010, the United States received new complaints from black parents and other community members in Meridian alleging that the District had implemented a new harsh and punitive student discipline policy, which was resulting in the disproportionate suspension, expulsion, and school-based arrest of black students in the Meridian schools, often for minor offenses or rule violations.

For two years, the United States conducted an investigation of the allegations of racially disparate student discipline.  In 2011 and 2012, the United States visited Meridian, Mississippi and conducted community meetings and private interviews with parents and students regarding the District's student discipline policies and practices and the effects of those policies and practices on black students.  The United States also served the District with document requests and interrogatories regarding the District's administration of student discipline, to which the District responded.

In March 2012, the United States toured the school district with a student discipline practices expert, and as part of that tour interviewed the Superintendent, the principal of each school, and the Chief of the Meridian Public School District Police Department ("MPSDPD"). In June, July, and August 2012, the United States deposed current and former school officials under Rule 30(b)(6) of the Federal Rules of Civil Procedure regarding student discipline policies and practices, training of teachers and staff on student discipline policies, and District practices

and procedures for referring students to law enforcement agencies.

The United States has completed its review of the District's student discipline policies and practices, as well as discipline data, referral forms, and other documents produced by the District. Based upon its review, the United States notified the District of its conclusion that the District relies on school exclusions to punish misbehavior after it occurs, and that during the first half of the 2011-2012 school year, in-school and out-of-school suspensions accounted for nearly 79 percent of all disciplinary consequences in the District. The United States also concluded that the District's discipline data show significant racial disproportionality in disciplinary referrals and exclusionary consequences and that in the 2009-2010, 2010-2011, and 2011-2012 school years, black students frequently received harsher consequences, including longer suspensions, than white students for comparable misbehavior, even where the students were at the same school, were of similar ages, and had similar disciplinary histories.

The parties have conferred in good faith and negotiated the terms of this Consent Order, which amends the November 7, 1969 Order and all subsequent orders in this matter, and resolves the United States' and Private Plaintiffs' concerns regarding the District's student discipline practices and racial disparities in the imposition of disciplinary sanctions, including exclusionary sanctions such as suspension, expulsion, and referrals to law enforcement agencies. This Consent Order is not, and shall not be construed as, an admission of liability by the District. The United States and the Private Plaintiffs acknowledge that the District has made positive changes to its policies and practices since the United States initiated its investigation, including steps to implement positive behavior interventions and supports ("PBIS").

After reviewing the terms of this Consent Order, and finding them fair, just, and reasonable under all of the circumstances, it is the opinion of this Court that entry of the Consent

Order comports with federal law and the Fourteenth Amendment to the United States Constitution and will further the orderly desegregation of the Meridian Municipal Separate School District.  The United States, the District, and Private Plaintiffs (collectively, the "Parties") agree that the entry of this Consent Order, without further litigation, is in the public interest and agree to all terms and conditions below.  Accordingly, this Court amends the November 7, 1969 Order and all subsequent orders in this matter to include the terms and conditions stated below.

It is therefore ORDERED, ADJUDGED and DECREED:

## II.    GENERAL REQUIREMENTS

1.      This Consent Order reflects the District's obligations under Title IV of the Civil Rights Act of 1964 to administer discipline without discrimination on the basis of race and in a manner that does not perpetuate or further the segregation of students on the basis of race.

2.      The Meridian Public School District agrees to the terms of this Consent Order and agrees to comply with its provisions to address and resolve the issues raised by the United States Department of Justice, Civil Rights Division (the "United States"), consistent with its desegregation obligations under *Barnhardt & United States v. Meridian Municipal School District, et. al.*  This Consent Order shall be binding upon the successor members of the School Board and successor District Superintendents.

3.      The signatories undertake this Consent Order as a means of alternative dispute resolution to avoid further litigation, and for the purposes of judicial and governmental economy.

## III.    DEFINITIONS

4.      "Alternative Placement" refers to the removal of a student from his or her regular classroom to an alternative school setting established by the District.

5.      "Central Office" refers to the central administrative office for the District, located at 1019 25th Avenue, Meridian, MS 39301, or such office at any successor locations.

6.      "Child with a disability" and "Student with a disability" refer to a student who would qualify to receive disability-related services under the Individuals with Disabilities Education Act or Section 504 of the Rehabilitation Act of 1975.

7.       "Corporal punishment" refers to any physical contact with a student by any school personnel for the purpose of administering a disciplinary consequence.

8.      "Corrective Strategies" refer to teacher and administrator behavior management techniques designed to prevent the occurrence of student infractions, teach alternative or replacement behaviors, or motivate students to demonstrate compliance with established school expectations outlined in the Code of Conduct.  These may include, but are not limited to, in-school detention, behavior contracts and/or Behavior Support plans, conflict resolution, de-escalation strategies, and reflective activities.

9.       "District PBIS Director" refers to the person in the District PBIS Office assigned to track and assist with implementation of the PBIS model, including analyzing classroom, grade, and school-level discipline data; developing corrective action plans; coordinating professional development on PBIS; and serving as a contact for parent and student complaints regarding discipline.

10.      "District PBIS Office" refers to the component of the Central Office with responsibility for the implementation of PBIS in the District.

11.      "Effective Date" is the date that this Consent Order is approved and entered by the Court.

12.    "Exclusionary discipline" refers to any disciplinary consequence that removes a student from classroom instruction in his or her home school, including, but not limited to, in-school suspension, out-of-school suspension, placement in an alternative setting or program, and expulsion.  Exclusionary discipline does not refer to positive interventions or corrective strategies, including in-school detention.

13.    "Expulsion" refers to an out-of-school consequence of more than 10 days imposed by the School Board for violations of the Code of Conduct.

14.    "In-School Detention" and "ISD" refer to a consequence for violations of the Code of Conduct during which a student receives positive interventions using corrective strategies.  Assignment to ISD cannot exceed one hour per day or remove a student from core academic instruction.

15.    "In-School Suspension" and "ISS" refer to a consequence for violations of the Code of Conduct that removes a student from the regular classroom to a different in-school setting during the course of the regular school day.  In-school suspension does not include in-school detention.

16.    "Instructional Staff" refers to certificated staff (*e.g.*, teachers, counselors) and non-certificated staff (*e.g.,* teacher aides) who work directly with students.

17.    "Meridian Public School District" and "the District" refer to the Meridian Municipal Separate School District, the School Board, and the public schools it operates.

18.    "Out-of-School Suspension," "Suspension," and "OSS" refer to a consequence of 10 days or less for violations of the Code of Conduct that removes a student from his or her regular classroom and school.[1]

---

[1] The District may opt to require a student to serve such a short-term consequence in an alternative setting.

19.     "Parent" refers to either or both biological or adoptive parent(s) of the student, the student's legal guardian, or other person legally responsible for a student under state law.

20.     "Positive Behavior Interventions and Supports" and "PBIS" refer to a system of evidence-based strategies and structures which, if implemented effectively and with fidelity, assist schools and school personnel in establishing a positive school culture by constructively teaching school rules and social-emotional skills; positively reinforcing appropriate student behavior; using effective classroom management strategies to provide early intervention for misbehavior; and developing a continuum of graduated and appropriate consequences for more serious and continuous misbehavior.

21.     "PowerSchool" refers to the District-wide data system used for academic and behavioral data, or any similar system by any name used by the District for this purpose.

22.     "Response to Intervention" and "RTI" refer to methods by which school discipline administrative teams and other relevant personnel at schools identify students at risk for poor learning and/or behavioral outcomes, monitor student progress, teach social-emotional skills, provide evidence-based interventions, and adjust the intensity and nature of those interventions depending on a student's individual needs.

23.      "Restorative Practices" refers to an approach to student discipline that focuses on resolving conflict, repairing relationships, and assisting students to redress harms caused by their conduct, and may include positive interventions and processes such as mediation, family group counseling, and peer mentoring.

24.     "School discipline administrative team" refers to the individual or group of faculty, staff, and administrators at each school, designated by the Superintendent, the PBIS

Office, and the school principal, who are authorized to administer or assign disciplinary consequences at the school.

26. "Teacher Support Team" and "TST" refer to the school-wide team responsible for developing and monitoring research-based interventions to improve students' academic and behavioral progress.

26. "Uniform Code of Conduct" and "Code of Conduct" refer to the District-level policy for student behavior and discipline.

## IV.   SPECIFIC REQUIREMENTS

### A.   Purpose

27. This Consent Order reflects the Parties' shared goals of ensuring that the District administers student discipline in a fair and non-discriminatory manner,  reduces the disproportionate assignment of exclusionary sanctions to black students, and provides all students with an equal opportunity to learn in a safe, orderly, and supportive environment.  The Parties acknowledge that the unnecessary use of exclusionary discipline can have serious, long-term, detrimental effects on student engagement and success.

28. The District shall ensure that students remain in the regular classroom environment to the greatest extent possible under the Uniform Code of Conduct ("Code of Conduct").  The District shall not administer exclusionary discipline consequences prior to attempting and documenting non-exclusionary corrective strategies and interventions except in emergency situations involving serious and immediate threats to safety.  Further, the District shall request the involvement of law enforcement agencies, including the Meridian Public School District Police Department ("MPSDPD") and the Meridian Police Department ("MPD"), only when required by Mississippi Code § 37-11-29(6); when necessary to protect the physical safety

of students or school personnel, or public safety; or when appropriate to address the criminal conduct of persons other than students.

29.     The District's discipline practices shall incorporate culturally responsive techniques, support and reinforce positive behavior and character development, employ corrective strategies and interventions to keep students in the classroom, and resort to exclusionary discipline only in limited circumstances.

**B.**     **Positive School Climate**

30.     The District shall continue to phase in a Positive Behavior Interventions and Supports ("PBIS") approach to classroom management and student behavior.  The District shall provide sufficient resources and training to implement the PBIS model at each District school in accordance with this Consent Order.  To support these efforts, the United States shall assist the District in identifying technical assistance resources available from the National Technical Assistance Center on PBIS, the United States Department of Justice, and other sources.

31.     The District shall select, within 45 days of the Effective Date, qualified consultants to provide ongoing assistance to the District in the areas of (a) classroom management, including culturally responsive instruction; and (b) school discipline and race, including practices for identifying and reducing racially disparate discipline.  The District shall provide the United States with 15 days to either approve or object to the consultants selected before formally retaining their services.  The United States shall confer with Private Plaintiffs in the approval process.  The District and the United States shall work together in good faith to resolve any disagreements regarding the selection of qualified consultants.  If the District and the United States are unable to resolve any disagreements in a reasonable period of time, either party may request that the Court mediate the dispute.

32.     The District shall, within 90 days of the Effective Date, create a PBIS Office within the Central Office with responsibility for implementing PBIS in all District schools.  The District shall hire or designate a full-time District PBIS Director to lead the PBIS Office within 90 days of the Effective Date.  The District PBIS Director shall perform the following duties, unless the District determines that it is necessary to assign some of these duties to other members of the PBIS Office or Central Office staff under the supervision of or in close collaboration with the PBIS Director:

(a)     coordinate with representatives from the National Technical Assistance Center on PBIS and other technical assistance providers, as well as the consultants described in Paragraph 31;

(b)     assist schools to adopt and approve behavior and discipline data reporting mechanisms and self-monitoring practices;

(c)      review and analyze the District's behavior and discipline data to identify areas of concern, including concerns regarding racial disparities;

(d)     work with assistant superintendents and school discipline administrative teams to develop corrective action plans in response to concerns raised by disciplinary data or narratives;

(e)     review all referrals to the alternative school, all recommendations of expulsion, and all referrals to law enforcement;

(f)     coordinate and implement a comprehensive multi-year schedule of PBIS-related professional development for all Instructional Staff and administrators, appropriate to each person's job responsibilities, and annual professional development on these topics for all other employees;

(g)     develop model behavior assessments and interventions and integrate them into the Response to Intervention model; and

(h)     serve as a direct contact for all student and parent complaints and concerns regarding the administration of discipline, and work with District- and school-level administrative staff to resolve these concerns.

33.     Each District school shall, within 45 days of the Effective Date, designate a school discipline administrative team to be responsible for all student discipline decisions.  This team shall coordinate with faculty and staff at the school and at the Central Office, including the District PBIS Office.

34.     Each District school shall, within 45 days of the Effective Date, hire or designate a school PBIS coordinator, who shall serve as part of the school discipline administrative team. Each school's PBIS coordinator shall work with school staff, District administrators, and the District PBIS Office to, among other duties, assist Instructional Staff to effectively communicate school rules, reinforce appropriate student behavior, use constructive classroom management and positive behavior support strategies, provide early intervention for misbehavior before the use of disciplinary consequences, and determine fair and consistent disciplinary consequences when appropriate.

35.     The District shall communicate to Instructional Staff their roles and responsibilities in creating and supporting positive classroom environments and schools, and provide them with sufficient training and support to carry out those responsibilities.  These responsibilities shall include:

(a)     defining, teaching, modeling, and consistently applying positive behavior approaches inside and outside the classroom, including explaining behavioral expectations and the Code of Conduct;

(b)      providing constructive feedback, re-teaching, and skill-building to students when behavior concerns arise, and using such corrective strategies for all low-level misbehaviors;

(c)      communicating to students behavior concerns and how to address them, prior to contemplating any disciplinary consequence, except in emergencies involving serious and immediate threats to safety;

(d)     attempting all appropriate intervention techniques before referring a student to the school discipline administrative team, and documenting those attempts;

(e)     attending required PBIS trainings and team meetings at schools and at various district offices;

(f)     utilizing data in collaboration with school and District administrators to consistently monitor student behavior, inform intervention practices, and perform quarterly self-checks regarding intervention and referral patterns; and

(g)     responding appropriately to data, including where data show disparities in the administration of consequences on the basis of race or other protected characteristics.

36.     The District shall provide Instructional Staff with formal professional development that communicates the expectations and requirements of Paragraph 35, and shall reinforce the formal professional development through informal teacher training and mentoring, regular school site meetings, and regular performance checks and reviews.  Principals shall take appropriate remedial action to address a teacher's failure to follow District discipline policy.

37.     The District shall communicate to administrators their roles and responsibilities in creating and supporting positive classroom environments and schools, and provide them with sufficient training and support to carry out those responsibilities.  These responsibilities shall include:

(a)     ensuring that faculty and staff communicate and model positive behavior approaches and the Code of Conduct to the entire school community;

(b)     ensuring that faculty and staff receive sufficient training and support on PBIS to build and maintain a positive, supportive, and inclusive school climate;

(c)     regularly evaluating classroom- and school-level discipline data;

(d)     responding appropriately to data, including where data show disparities in the administration of consequences on the basis of race or other protected characteristics;

(e)     working with Instructional Staff and the school PBIS coordinator, as appropriate, to evaluate and recommend solutions to student behavior and discipline problems;

(f)     assembling Teacher Support Teams with appropriate Instructional Staff, including the student and student's parent(s), to respond if a student engages in ongoing and escalating misbehavior in spite of appropriate interventions;

(g)     consistently and fairly applying the Code of Conduct to ongoing and escalating student misbehavior after all appropriate interventions have been attempted; and

(h)     informing and, as appropriate, including parents regarding all major decisions related to student behavior and discipline, including the imposition of any exclusionary discipline consequence.

38.     The District shall provide administrators with formal professional development that communicates the expectations and requirements of Paragraph 37, and shall reinforce the

formal professional development through informal training and mentoring, regular meetings with the District PBIS Director, and quarterly performance checks and reviews.

**C.**     **Student, Parent, and Community Engagement**

39.     The District shall appoint a Discipline Advisory Committee ("Committee") to advise the District on: (a) institutionalizing positive behavior practices in all school settings; (b) promoting culturally responsive and non-discriminatory discipline strategies; (c) reducing racial disproportionality in discipline referrals and consequences; (d) improving dialogue about discipline among students, parents, teachers, and administrators; and (e) developing structures and strategies that reflect restorative justice principles.  The Committee shall include diverse representatives from the District's pool of teachers and administrators, the District's pool of PBIS coordinators, students, parents, and community members.  The District shall submit the names of its proposed Committee members and their professional or community affiliations to the United States for review and approval.  The United States shall confer with Private Plaintiffs in the review and approval process.  Approval shall not be unreasonably withheld.  This Committee shall meet at least quarterly each school year.

40.     The Committee shall, among other duties:  (a) consult with the District on revision of the Code of Conduct and other disciplinary policies; (b) identify training needs; (c) review discipline data and, if racial disparities in referrals and consequences are identified, make recommendations to the District for setting measurable objectives for reductions in those disparities; and (d) make recommendations to the District on an ongoing basis to assist the District in implementing its behavior and discipline system and in fostering and maintaining safe and orderly schools.  The Superintendent shall transmit all formal Committee recommendations to the School Board.

41.     In consultation with the Committee, the District shall develop and deliver an informational program to assist students and parents in understanding their roles and responsibilities under PBIS, the District's disciplinary policies and procedures, and school and classroom rules.

42.     As part of its informational program, the District shall host student assemblies at each school twice per school year to communicate positive core values and behavioral expectations and to explain in an age-appropriate manner the District's discipline policies and Code of Conduct.  The District shall begin hosting these student assemblies at the beginning of the 2013-2014 school year, after the United States' approval of the District's revised discipline policies and Code of Conduct, as provided by this Consent Order.

43.     The District shall hold informational sessions for parents twice per school year at each school regarding PBIS and the District's discipline policies.  These informational sessions shall include a clear explanation of the school's system of classroom corrective strategies and consequences, the Code of Conduct, due process and appeal procedures, and discussion of the District's efforts to reduce exclusionary discipline and racial disparities in discipline referrals and consequences.  The District shall provide an opportunity at these sessions for parents to raise any questions or concerns about the fairness, equity, or clarity of the District's administration of discipline, and provide guidance on how parents may ask questions or make complaints about student discipline.

44.     In consultation with the Committee, the District shall develop and implement a straightforward complaint process by which students and parents can submit complaints to the PBIS Office regarding the administration of student discipline.  This complaint process shall include an appropriate investigation and response mechanism.  The District shall include

information on how to make a complaint about discipline and contact information for the PBIS Office on its website, in its student handbooks, and in the Code of Conduct.

45.     At the beginning of the 2013-2014 school year and after, the School Board's approval of the revised Code of Conduct and any other policy or procedure required by this Consent Order, the District shall (a) provide written notice of the revised policy or procedure to all parents in the District by sending the notice and a copy of the revised document home with each student, or by email when practicable, and by posting all revised documents on the District's website; and (b) provide written copies of all revised policies and procedures to all school- and District-level faculty, instructional staff, and administrators.

**D.     Discipline Policies and Procedures**

46.     During the Spring 2013 semester, the District shall revise its disciplinary policies, including its Code of Conduct, and submit the revised policies to the United States for review, comment, and approval prior to submission to the School Board for approval.  The United States shall confer with Private Plaintiffs in the review, comment, and approval process.  In making revisions to the policies, the District shall solicit and consider input from its retained consultants on PBIS, its consultants or other experts on race and student discipline, and the Committee.  The United States' approval of the District's revised policies shall not be unreasonably withheld, and the United States shall complete its review as quickly as possible, but within thirty calendar days of receipt of the proposed revisions.  The District and the United States shall work together in good faith to resolve any disagreements regarding the revised Code of Conduct.  If the District and the United States are unable to resolve any disagreements in a reasonable period of time, either party may request that the Court mediate the dispute.

(i)      **Uniform Code of Conduct**

47.     The District's Code of Conduct shall apply at each District school, including the vocational school, to ensure consistency of practices.  The District shall, consistent with the Code of Conduct, administer consequences that are non-discriminatory, fair, age-appropriate, and correspond to the severity of the student's misbehavior.  The District may adopt and apply a separate code of conduct at its alternative school.  If the District chooses to use a separate code of conduct at its alternative school, it shall submit the alternative school code of conduct to the United States for review, comment, and approval prior to submission to the School Board for approval.  The United States shall confer with Private Plaintiffs in the review, comment, and approval process.  The United States' approval of any alternative school Code of Conduct shall not be unreasonably withheld, and the United States shall complete its review as quickly as possible, but within thirty calendar days of receipt of the proposal.  The District and the United States shall work together in good faith to resolve any disagreements regarding the alternative school Code of Conduct.  If the District and the United States are unable to resolve any disagreements in a reasonable period of time, either party may request that the Court mediate the dispute.

48.     The revised Code of Conduct shall:  (a) clearly communicate expected positive behaviors, (b) objectively define behavioral infractions at every level as defined in Paragraph 50 (including whether the behavior should be handled in the classroom or through referral), (c) incorporate culturally responsive and developmentally appropriate tiered prevention and intervention strategies, (d) incorporate a continuum of alternatives to exclusionary discipline (including behavior contracts, reflective writing assignments, conflict resolution, and restorative justice practices), (e) limit the use of exclusionary consequences and the involvement of law

enforcement to the most severe and disruptive behaviors that threaten school safety or violate criminal codes,  (f) communicate policies on the use of exclusionary discipline in a straightforward manner, (g) incorporate protections for students with disabilities as outlined by federal and state law, and (h) include guidelines for communication with parents to address the infraction and assist with transition back to the school and/or classroom environment.

49.     The revised Code shall provide classroom teachers with a wide variety of classroom management and corrective strategies that do not remove students from valuable instructional time and from their home school.  These strategies shall be designed to prevent the occurrence of student infractions, provide constructive feedback, teach alternative or replacement behaviors, and motivate students to demonstrate compliance with established school expectations outlined in the Code.  Examples of corrective strategies include a reflective activity, parent contact, letter of warning, a loss of privileges, in-school detention, referral to the TST to develop a behavior plan, and restorative justice practices.  The use of all corrective strategies shall be documented.

50.     The District's revised Code of Conduct shall include a system of graduated infractions, corrective strategies, and consequences as follows:

(a)     Misbehaviors that are low in intensity, passive, and/or non-threatening in nature (*e.g.*, dress code violations) shall be classified as Level 1 infractions.  Teachers shall manage Level 1 infractions by using a range of corrective strategies.  Students will not receive exclusionary discipline for Level 1 infractions.

(b)     Misbehaviors that are moderate in intensity and non-threatening in nature (*e.g.*, possession of tobacco, excessive tardiness) shall be classified as Level 2 infractions. Teachers, in collaboration with the school discipline administrative team as appropriate, shall

18

manage Level 2 infractions by using a range of corrective strategies.  Students will not receive exclusionary discipline for Level 2 infractions.

(c)     Misbehaviors that are more serious in intensity but non-threatening in nature (*e.g.*, continued open defiance, vandalism) shall be classified as Level 3 infractions.  The school discipline administrative team shall manage Level 3 infractions by using a range of intensive in-school corrective strategies, which may include direct instruction, re-teaching, reinforcing feedback, and referral to the TST to develop a behavior plan.  The District may assign in-school suspension for a Level 3 infraction, but may not assign an out-of-school suspension.  The District may assign placement in the alternative school for repeated Level 3 infractions consistent with the requirements of Paragraph 67.

(d)     Misbehaviors that significantly interfere with others' safety and learning and/or are of a threatening or harmful nature (*e.g.*, fighting that results in physical injury) shall be classified as Level 4 infractions.  The District may, but is not required to, assign an out-of-school suspension for a Level 4 infraction.  The school discipline administrative team shall utilize other corrective strategies as appropriate, except in emergency situations involving serious and immediate threats to safety.  The school discipline administrative team shall ensure that a behavior plan is developed for students after a Level 4 infraction, if appropriate.

(e)     The most serious misbehaviors that require immediate response from the school discipline administrative team and/or the Central Office (*e.g.*, battery of a staff or faculty member, possession of drugs with intent to sell) shall be classified as Level 5 infractions.  The District may, but is not required to, assign an expulsion for a Level 5 infraction.  The school discipline administrative team shall ensure that a behavior plan is developed for students after a Level 5 infraction, if appropriate.

(f)    The District shall treat misbehavior such as defiance, disrespect, and insubordination that are non-threatening in nature as Level 1, Level 2, or Level 3 infractions, depending on the intensity of the behavior.  The District's professional development on PBIS shall include specific instruction on how to identify and de-escalate such behaviors.

51.    The revised Code shall prohibit the administration of out-of-school suspension as a disciplinary consequence: (a) to students under the age of 10, except for Level 5 infractions or in emergency situations involving a serious and immediate threat to student, teacher, or public safety; or (b) for conduct that occurs off school property or outside the school day unless the conduct occurs at a school-sponsored activity or on a school bus, or the conduct substantially disrupts, or will substantially disrupt, the school environment, or seriously endangers the welfare or safety of other students or school personnel.

52.    When considering exclusionary sanctions, the District shall provide students with disabilities all protections required by the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1975, and other applicable federal and state law.  This shall include holding a manifestation determination review for any proposed exclusion of a student with a disability that exceeds 10 consecutive school days or will result in a change of placement. During this review, the District shall determine whether the student's conduct:  (a) was a manifestation of the student's disability, or (b) the direct result of the school's failure to implement the student's Individualized Education Plan ("IEP").  If either condition is met, the District shall not administer the disciplinary consequence.  If the conduct was the direct result of the failure of the school to implement the student's IEP, the District shall take immediate steps to properly implement the IEP.  Also, the IEP team shall be convened and shall conduct a functional behavioral assessment to determine if a behavioral intervention plan should be

implemented.  If a behavioral intervention plan has already been developed, the IEP team shall review the plan and modify it as necessary to address the student's behavior.  The student shall be returned to the placement from which the student was removed unless the parents and the District agree to a change in placement as part of the modification to the behavioral intervention plan.  The District shall inform the parents of their right to challenge a manifestation determination or the District's proposed change in placement, including the right to legal counsel and the right to review the student's records.

53.     The District shall not assign any student to in-school suspension for more than 3 school days for 1 offense, or for more than 5 school days in one 9-week school quarter, unless specifically approved by the Superintendent or his designee using the process that follows.  If the school discipline administrative team recommends a consequence that exceeds these limits, the team shall document the recommendation in writing, including the reasons for the recommendation and the interventions that were attempted prior to the recommendation, and shall send the recommendation to the Superintendent or his/her designee for approval.  If the Superintendent or his/her designee approves the recommendation, the District PBIS Coordinator shall be informed and shall work with the school discipline administrative team to develop targeted interventions to assist the student in successfully returning to school.

54.     The District shall not assign any student to out-of-school suspension for more than 3 school days for 1 offense, more than 10 school days in one 9-week school quarter, or more than 15 days cumulatively per school year, unless specifically approved by the Superintendent or his/her designee using the process that follows.  If the school discipline administrative team recommends a consequence that exceeds these limits, the team shall document the recommendation in writing, including the reasons for the recommendation and the interventions

that were attempted prior to the recommendation, and shall send the recommendation to the Superintendent or his/her designee for approval.  If the Superintendent or his/her designee approves the recommendation, the District PBIS Coordinator shall be informed and shall work with the school discipline administrative team to develop targeted interventions to assist the student in successfully returning to school.

55.     Each school PBIS coordinator shall track the number of days of exclusionary discipline given to each student, and shall immediately report to the District PBIS Director when any student accumulates 10 total days of exclusionary discipline.

**(ii)     Policies on In-School and Out-of-School Suspension**

56.     The District shall provide students assigned to in-school suspension or out-of-school suspension with an opportunity to complete their regular academic work during the suspension.  The District shall take all necessary steps to make school work accessible, including by providing it over the Internet for students who have Internet access.

57.     The District shall permit students assigned to in-school or out-of-school suspension to work with qualified staff if the student's IEP requires such assistance.

58.     The District shall provide students assigned to in-school or out-of-school suspension with the opportunity to earn equivalent grades and credits as other students during the course of the suspension, and with the ability to make up tests, final examinations, and complete class and homework assignments without penalty while on suspension or within a reasonable period of time following the completion of the suspension.  The District shall provide students who are suspended during the administration of local, state, or national assessments with an opportunity to take the assessments and to participate in related preparation activities.

59.     The District shall not require students to complete punitive or non-academic writing assignments while assigned to in-school or out-of-school suspension.  If a student completes his or her class work before the end of the school day, the school shall provide additional relevant content to make sure that the student has enough academic work to continue to progress in his or her school work.  In addition to providing the student's class work, the District shall provide opportunities for behavior remediation, including the completion of computerized behavior instruction, behavior packets, behavior contracts, and the use of restorative justice practices.

60.     Prior to a student's return to the school after an out-of-school suspension, the school shall attempt to schedule a telephonic or in-person conference with the student's parent(s) to assist the student's transition back to school.  The failure of the parent to participate in the conference shall not affect the student's ability to return to classes.

**(iii)   Dress Code Policy**

61.     The District shall develop and clearly communicate policies on student dress code within the revised Code of Conduct.  The District shall not suspend, expel, assign in-school suspension, or assign any other exclusionary disciplinary consequence for a dress code violation. The District shall allow a student to remain at school and demonstrate compliance with the dress code by providing extra clothes at each school, and allowing parents to bring clothes to school.

62.     If a principal determines that a student is violating the dress code policy in a way that significantly disrupts the educational process, the principal shall consider alternatives that do not include exclusion from core academic instruction, which may include positive behavioral interventions and counseling.  The District may also consider in-school detention for continued non-compliance with the dress code.

(iv)    **Tardy and Truancy Policy**

63.     The District shall develop and incorporate into the revised Code of Conduct a tardy and truancy policy that prohibits exclusionary discipline consequences for tardiness or truancy except under limited and enumerated circumstances. The policy shall require documentation of at least three separate interventions, including, but not limited to, student conferences, parent conferences, changes to class schedules and locker locations, child welfare and attendance intervention, reflective activities, and problem solving activities, prior to considering any exclusionary discipline consequences for tardiness or truancy, or the assignment of detention. The policy shall prohibit students who are tardy from being locked out or otherwise excluded from the classroom upon arrival.

64.     For extreme habitual tardiness or truancy that has not been responsive to any of the measures described above, the District may assign in-school detention, in conjunction with the types of behavior remediation techniques described in Paragraph 63. The District shall report all exclusionary discipline consequences administered to students for tardiness or truancy to the District PBIS Office.

65.     The District's tardy and truancy policy shall require teachers and school discipline administrative teams to assign tardies or truancies flexibly, including by taking into account reasonable explanations of why the student was late, and by providing temporary or permanent accommodations for certain reasons for tardiness or truancy (*e.g.*, family responsibilities that prevent the student's timely arrival), to be reviewed by the school PBIS coordinator. If a student requests an accommodation in the tardy or truancy policy and the accommodation is denied, the student may appeal this denial to the District PBIS Office.

E.     <u>**Alternative School Placement**</u>

66.     The District shall develop a policy for placement in the alternative school that includes: (a) clear entry criteria for placement; (b) guidelines on length of placement; (c) guidelines for the provision of culturally sensitive tiered behavioral supports including restorative justice practices; (d) guidelines for provision of mental health or rehabilitation services; (e) guidelines for review of student behavior progress; and (f) provisions for transition back to the home school environment and generalization of intervention strategies within the home school environment.

67.     The District may assign an alternative school placement only for the following categories of students:

(a)     students suspended for more than 10 days or recommended for expulsion, except for students expelled for possession of a weapon or other felonious conduct;

(b)     students referred by the parent or guardian due to disciplinary concerns;

(c)     students referred to the alternative school by the dispositive order of a chancellor or youth court judge, with the consent of the Superintendent;

(d)     compulsory school-age students who significantly disrupt the educational environment, in the determination of the school superintendent, school PBIS coordinator, and principal, such that the placement is necessary for the safety and welfare of the class as a whole. Before the District considers alternative school placement for students in this category, the school principals must verify and document in PowerSchool evidence the student failed to respond successfully to formal Tier 2 and/or Tier 3 behavioral interventions and supports that were implemented with adequate fidelity.  All alternative school placements in this category shall be reviewed by the District PBIS Office and approved by the Superintendent or his/her

designee before they are finalized, and the District shall report annual aggregations of these placements to the United States.  The United States shall provide a copy of the annual aggregations to counsel for the Private Plaintiffs, subject to the requirements of the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g *et seq*. ("FERPA").

68.     The goal of the alternative school shall be to improve the student's behavior so that he/she can return to his/her home school in a timely fashion.  Alternative school placement shall be for a set period of time (*e.g.*, 30 days, 60 days), and a system of points or scores shall not be the sole determining factor for exit from the alternative school placement.  Further, alternative school placement shall not exceed one semester except in extraordinary circumstances, which must be approved by the alternative school PBIS coordinator, the alternative school principal, and the District PBIS Office.

69.     The alternative school shall operate under the same academic requirements and standards as any District school, including, but not limited to: having the same academic calendar as the District's public schools; using positive behavior interventions and restorative practices; and offering physical education activities if required for graduation.  The District shall attempt to offer students who are enrolled in honors courses or advanced placement courses prior to the alternative school placement continuation of their coursework via the Internet, Skype, or other online media.  The alternative school shall ensure educational compliance with federal and state guidelines for students with disabilities.  Additionally, as appropriate for each individual student's needs, the alternative school shall also offer additional approaches to foster academic and behavioral success, including, but not limited to: curricula addressing cultural and learning style differences; the development of individual academic plans; and counseling services for parents and students.

70.     Every 30 days, the principal of the alternative school, the school PBIS coordinator, the principal of the home school, the student, the student's parent, and one representative of the student's choice, as requested, shall meet to review and assess the student's progress.  If the student has performed successfully in the alternative school, the District shall consider returning the student to the home school.

71.     Once the student's term of placement in the alternative school is complete, the District must return the student to the home school, unless the principal of the alternative school, the school PBIS coordinator, and the principal of the home school request that the student remain for an additional 30 days at the alternative school.  The District PBIS Office shall review all such requests.

**F.      Due Process**

72.     The District shall provide students with due process before excluding them from their home school for any length of time, including through suspension, expulsion, or alternative placement.  For purposes of this section, alternative placement does not include voluntary placement in the alternative school.  The District shall provide students and their parents with a fair and impartial proceeding before imposing exclusionary discipline, with a right to appeal the exclusionary discipline consequence.

73.     If an emergency requires immediate removal of the student from school, all required proceedings shall follow as soon after the student's removal as practicable.  If such removal is necessary, the school shall immediately notify the parent to determine the best way to transfer custody of the student to him or her.  If possible, the District shall provide the removed student with school work (*e.g.*, via email) during the pendency of the removal.

74.     Prior to imposing an out-of-school suspension or recommending expulsion or alternative placement, the District shall provide students with an informal hearing with the school principal or a neutral decision maker designated by the principal, who may be an administrator not involved in the underlying incident.  At the informal conference, the principal or his/her designee shall:

> (a)     permit the student to call his or her parent and permit the parent to attend the conference if he or she is able to within a reasonable amount of time;

> (b)     inform the student of the charges and evidence against him or her;

> (c)     provide the student with an opportunity to respond to the charges, verbally or in writing, and present his or her version of events;

> (d)     inform the student of his or her right not to submit a written statement, if a written statement is requested; and

> (e)     provide the student with an opportunity to present evidence in his or her defense, including the right to have his or her witnesses interviewed by the principal or designee.

75.     If after the informal conference the school principal decides to impose the suspension or recommend expulsion or alternative placement, the school must make a reasonable attempt to contact the parent(s) by phone if they were not present for the conference.  The school shall also provide the student and parent(s) with a written notice stating that the student has received a particular consequence, and providing the grounds for the consequence, the period or duration of the consequence, and an offer to schedule a time and place for the parent(s) to meet with the principal or designee to review the consequence prior to or concurrent with reinstatement.  The notice shall also state that make-up work shall be provided during the period

of the consequence, as appropriate, that the student has the right to appeal the consequence, and how the student may appeal.

76.     Students who are suspended from school shall have the opportunity to appeal the suspension at a hearing before a neutral hearing officer(s), who may be an administrator not involved in the underlying incident, designated by the Superintendent.  The District shall schedule the hearing within a reasonable time from the date of the suspension.  The student shall have the right to be represented at the hearing by anyone that the student or parent chooses.  At the hearing, the hearing officer shall consider the following:

        (a)     whether the District complied with the procedural requirements regarding notice, and the student's opportunity to have a meaningful hearing;

        (b)     whether the evidence was fully and fairly considered;

        (c)     whether the District complied with the requirements in the Code of Conduct;

        (d)     whether the school tried non-exclusionary alternatives before imposing the suspension;

        (e)     mitigating factors that should be considered; and

        (f)     additional facts that were not heard at the original hearing.

77.     The Superintendent or his/her designee shall provide a written decision within three days of the hearing.  If the Superintendent or his/her designee determines that no violation occurred, the District shall expunge all school records pertaining to the suspension from the student's file.  If the Superintendent or his/her designee determines that the penalty was not appropriate to the violation, all school records shall be revised to reflect the Superintendent or his/her designee's determination.

78.     Prior to imposing an expulsion or alternative placement, the District shall provide students recommended for expulsion or alternative placement and their parents with a written notice of the recommendation. The notice shall contain a statement of the reasons for the recommended action; a notice that the student will receive a due process hearing on the question of expulsion or alternative placement, unless the student and parent affirmatively waive their right to a hearing; the  date, time, and location of the hearing; information regarding whom the student and/or his or her parent(s) should contact if they need to reschedule the hearing to a mutually agreeable date and time; and a statement that the student may be present at the due process hearing to hear the evidence against him or her, may present relevant evidence, may call student and adult witnesses to testify on his or her behalf, and may be accompanied by parents, counsel, and/or a representative of their choice.

79.     Students who are expelled or receive an alternative placement shall have the opportunity to appeal the discipline decision to the School Board.  The School Board shall consider such factors as:

(a)     whether the District complied with the procedural requirements regarding notice, and the student's opportunity to have a meaningful hearing;

(b)     whether the evidence was fully and fairly considered;

(c)     whether the District complied with the requirements in the Code of Conduct;

(d)     whether the school tried non-exclusionary alternatives before imposing the consequence;

(e)     mitigating factors that should be considered; and

(f)     additional facts that were not heard at the original hearing.

80.     The School Board shall provide a written decision within three days of the hearing.  If the School Board determines that no violation occurred, the District shall expunge all school records pertaining to the expulsion from the student's file.  If the School Board determines that the penalty was not appropriate to the violation, all school records shall be revised to shall be revised to reflect the School Board's determination.

81.     The District shall provide the parents of every expelled student information regarding educational alternatives available during the period of expulsion.

82.     Upon reinstatement from any exclusionary consequence, the school principal shall attempt to confer with the student's parents or guardians in person or by telephone to discuss the student's behavior and methods of appropriate intervention in an effort to prevent further disciplinary action.  The failure of the parent to attend the conference shall not affect the ability of the student to return to classes.

G.     **Relationship with Law Enforcement Agencies**

(i)     **Meridian Police Department and Juvenile Justice Agencies**

83.     The District shall develop a written policy regarding notifications and referrals of students to the Meridian Police Department ("MPD") for school-based conduct.  Under this policy, the District shall request the involvement of MPD only when specifically required by Mississippi Code § 37-11-29; when necessary to protect the physical safety of students or school personnel, or public safety; or when appropriate to address the criminal conduct of persons other than students.  District personnel shall contact MPD only after receiving authorization from the Superintendent or the Assistant Superintendent of Student Services, except in an emergency situation involving a serious and immediate threat to students, school personnel, or public safety.

84.     The District shall not request MPD involvement to respond to any situation that can be safely and appropriately handled by the District's internal disciplinary procedures. Incidents involving public order offenses committed by students, including disorderly conduct, disturbance/disruption of schools or public assembly, loitering, trespass, profanity, dress code violations, and fighting that does not involve physical injury or a weapon, shall be considered school discipline issues to be handled by school officials, rather than criminal law issues warranting MPD involvement, unless MPD involvement is necessary to protect the physical safety of students or school personnel, or public safety.

85.     In the event of a student's arrest by MPD at school, school personnel shall notify the student's parent(s) as soon as practicable.

86.     The District shall not communicate any information regarding a student's school discipline record to any external entity, including the MPD, the Lauderdale County Youth Court or Juvenile Center, the Rankin County Juvenile Detention Center, or the Mississippi Division of Youth Services, unless ordered by a court or required by state law.

(ii)     **Meridian Public School District Police Department and School Safety Officers**

87.     The District shall develop written policies and operating procedures that clearly define the roles and responsibilities of the District's School Resource Officers ("SROs") and the District's School Safety Officers ("SSOs").  The District shall consult with the Committee in developing these policies.  These policies shall be consistent with Mississippi Department of Education's ("MDE") requirements, and shall address, at a minimum: youth-appropriate policing techniques; use of restorative approaches to address student behaviors; arrests of District students; notification to parents when students are arrested; searches of students; use of force; procedures to receive and respond to complaints regarding SROs and SSOs; selection of SROs

and SSOs and assignments; training requirements; weapons qualifications; required equipment and supplies; opportunities for community stakeholder meetings; and the collection, analysis and use of data regarding law enforcement activities in District schools.  The District shall submit the policies and operating procedures to the United States for review, comment, and approval prior to submission to the School Board for approval.  The United States shall confer with Private Plaintiffs in the review, comment, and approval process.  Approval shall not be unreasonably withheld.

88.     SROs shall provide for and maintain a safe, healthy, and productive learning environment while acting as positive role models for students by working in a cooperative, proactive, and problem-solving manner with school administrators.  SROs shall continue to contribute positively to their school communities by serving as educators in addition to their responsibilities to protect the safety of students and school personnel.  Nothing in this Consent Order limits or is intended to limit SROs' role in providing mentoring, informal counseling, education, and support to District students.

89.     District personnel shall not request SRO involvement to respond to any situation that can be safely and appropriately handled by the District's internal disciplinary procedures. Incidents involving public order offenses committed by students, including disorderly conduct, disturbance/disruption of schools or public assembly, loitering, trespass, profanity, dress code violations, and fighting that does not involve physical injury or a weapon, shall be considered school discipline issues to be handled by school officials, rather than criminal law issues warranting SRO involvement, unless SRO involvement is necessary to protect the physical safety of students or school personnel, or public safety.

90.     SROs and SSOs who witness a fight involving physical injury or the serious and immediate risk of physical injury shall employ age-appropriate conflict resolution techniques to de-escalate the situation whenever possible, as detailed in the operating procedures, and shall locate and refer the matter to school personnel at the earliest opportunity.

91.     Only members of the school discipline administrative team shall be authorized to request intervention by SROs or SSOs, except in an emergency situation involving a serious and immediate threat to student, teacher, or public safety.

92.     The District shall seek a Memorandum of Understanding ("MOU") between MPSDPD and the MPD that delineates authority and specifies procedures for effectuating arrests of District students while on school grounds.  This MOU shall prohibit arrests of students on school grounds, except where a student poses a serious and immediate threat to student, teacher, or public safety and the requirements of Mississippi Code § 99-3-7 are satisfied; or a judicial warrant specifically directs the arrest of a student in a school; in all other instances the arrest warrant shall be executed at a location other than a school.

93.     The District shall incorporate into its policies and shall train its SROs that no arrest shall be made without establishing probable cause that the student has committed an unlawful activity, as defined in Mississippi Code § 37-11-29(6).  SROs shall not conduct arrests of students without prior authorization of the Superintendent or the Assistant Superintendent of Student Services or obtaining a warrant, except in an emergency situation involving a serious and immediate threat to student, teacher, or public safety.

94.     In the event of a student's arrest by SROs, the District shall notify the student's parent(s) as soon as practicable.

95.     SROs shall not become involved in administrative (*i.e.*, school-related) searches or request that school personnel conduct such searches.  Any search by MPSDPD shall be based on probable cause that the student has committed or is committing an unlawful act, as defined in Mississippi Code § 37-11-29(6), and when legally required, a search warrant shall be obtained.

96.     SROs may use physical force or restraints on a student only if there is a serious and immediate threat to student, teacher, or public safety.  As part of the operating procedures for the MPSDPD, the District shall develop use of force policies and procedures that comply with state and Federal law.  These policies shall comply with MDE regulations and procedures, and shall, at a minimum, describe the precise types of force officers may use; enable officers to rely primarily on non-force techniques to effectively police; use force only when necessary and use the minimal level of force necessary; and de-escalate the use of force at the earliest possible moment.  All uses of force must be reported in writing and reviewed by the MPSDPD Chief and the Superintendent.  This review and any corrective actions taken in response to this review must be documented in writing.

97.     As part of the operating procedures for SROs and SSOs, the District shall develop and implement a simple and straightforward complaint process by which students, parents, and others can submit complaints regarding the actions of SROs and SSOs.  This complaint process shall include an appropriate investigation and response mechanism.

98.     The District shall ensure that all SROs and all SSOs receive pre-service and in-service training as required by the MDE, with supplementary training on:

> (a)     bias-free policing, including implicit racial bias and cultural competence;
>
> (b)     working with youth, including de-escalation techniques, conflict resolution, child and adolescent development, and age-appropriate responses;

(c)     practices proven to improve school climate;

(d)     mentoring, counseling, and classroom presentation skills;

(e)     working with children with disabilities;

(f)     the consequences of student involvement in the criminal and juvenile justice systems; and

(g)     working collaboratively with school administrators.  Additionally, the District shall require SROs and SSOs to attend the training provided to teachers on the District's system of PBIS and disciplinary policies and procedures.

99.     The District acknowledges that cooperation among public agencies that handle school-based referrals to law enforcement agencies is critical to prevent the negative effects of juvenile and criminal justice system involvement on students' engagement and success.  The District commits to remain open to discussion and engagement with relevant state and local public agencies on these matters.

**H.     <u>Professional Development</u>**

100.     The District shall designate, hire, or contract for appropriate trainers, in consultation with the United States, to provide all staff with training on PBIS.  The United States shall assist the District in identifying federal technical assistance resources for this purpose. Trainers will work with all faculty, staff, and administrators to develop the requisite skills necessary to effectively implement PBIS in all District schools.  The training shall communicate that a primary goal of PBIS is to reduce the use of punitive and discriminatory discipline practices.  This professional development shall begin in the summer before the 2013-2014 school year.  All newly-hired or promoted instructional staff in the District, or staff who did not attend the initial program, shall do so by the beginning of the fall semester of the academic year

subsequent to the academic year during which they were hired or promoted or missed such training.

101.    In addition to training on PBIS, the District shall provide all instructional staff and administrators with professional development that includes the following elements:

(a)    The District's prohibitions on discrimination and harassment on the basis of race;

(b)    Practical and detailed descriptions of the Code of Conduct, including explanations of each misbehavior and level, descriptions of the alternatives to exclusionary discipline available at every level, explanations of the requirement to use interventions and corrective practices before assigning exclusionary discipline; and training on entering and using related discipline data;

(c)    Discussion of the limited role that law enforcement is to play in the discipline process, with a focus on when it is appropriate to refer a student to law enforcement, and the educational impact of student involvement in the juvenile justice system;

(d)    Clear and concrete strategies for applying tools gained in professional development to classroom management and student discipline, including methods for teachers to reach out to network(s) of identified collegial and other professional supporters to assist in making discipline decisions;

(e)    Training on cultural awareness in the provision of classroom management and student discipline, including interactive dialogue about the relationship between discipline and race; and

(f)    An explanation of the requirements of this Agreement appropriate to the job or position of the District employee.

102.    The District's school PBIS coordinators shall receive specialized training on PBIS, restorative justice, and other behavior management techniques; youth mental health needs; special disciplinary concerns (*e.g.*, discipline of students with disabilities), and other training as necessary to perform their duties.

**I.      Data Collection, Data Review, and Self-Assessment**

103.    By May 1, 2013, the District shall identify the database that it will use to meet the data collection, reporting, and evaluation requirements of this Consent Order.

104.    The District PBIS Office shall collect and review disaggregated discipline data from each school on at least a quarterly basis on the imposition of exclusionary discipline consequences (in-school suspensions, out-of-school suspensions, referrals to alternative placement, recommendations for expulsion); corporal punishment; and restraint and seclusion. The District's data collection and review shall capture, at a minimum, the following information: the student's name (or unique student identifier), race, sex, school, grade level, disability status, name and race of the referring staff member, infraction, date the incident occurred, description of the incident, student's prior disciplinary history, consequence, date the consequence was imposed, description of interventions that were attempted prior to imposing the consequence, and whether the parent appealed any aspect of the disciplinary decision.  The District PBIS Office shall analyze and evaluate the data to identify any racial disparities or disproportionality in the use of disciplinary referrals and exclusion or the severity of disciplinary consequences.  The data shall be presented to the Committee.  If disparities or disproportionality are identified, the District PBIS Office and the Committee shall develop a responsive action plan, which shall include recommending to the Board measurable objectives for reductions in identified disparities and disproportionality.  The Board shall be responsible for setting measurable objectives for

reductions in disparities, with appropriate consideration of the recommendations presented by the PBIS Office and the Committee.

105.    The District PBIS Office shall collect and review disaggregated data on at least a quarterly basis regarding referrals to law enforcement agencies and school-based arrests. The District's data collection and review shall capture, at a minimum, the following information: the student's name (or unique student identifier), race, sex, school and grade, disability status, infraction, description of the incident, student's prior disciplinary history, name of the law enforcement agency and officer that was involved, name and race of the referring staff member, whether the referral to law enforcement was mandatory under state law, whether the student was arrested, and on what charge(s). The District PBIS Office, in consultation with the Committee, shall analyze and evaluate the data to identify any racial disparities or disproportionality in referrals to law enforcement or school-based arrests. If disparities or disproportionality are identified, the District PBIS Office and the Committee shall develop a responsive action plan, which shall include recommending to the Board measurable objectives for reductions in identified disparities and disproportionality. The Board shall be responsible for setting measurable objectives for reductions in disparities based upon such recommendations and other appropriate considerations.

106.    The District PBIS Office shall review every instance in which an officer of the MPSDPD, the MPD, or any other law enforcement agency intervened in response to school-based acts that resulted in exclusionary discipline, restraint, or arrest. The District's PBIS Office shall determine whether the District's involvement of law enforcement was appropriate based on federal and state law requirements, and the Code of Conduct, and whether the law enforcement officer acted in a manner consistent with the District's expectations, District policy, and law

enforcement standards.  If the District PBIS Office determines that the actions of either school personnel or the law enforcement officer were inappropriate, the District shall take remedial measures such as: expunging the student's educational records; providing the student with compensatory work for the time missed from school; and re-training of District personnel.

107.    The District PBIS Director or his/her designee shall meet semi-annually with each school principal to review the school's discipline data.  The District PBIS office shall provide particularized assistance to those principals and schools whose data indicate the existence of racial disparities, or that PBIS is not being implemented effectively.  This assistance may include revision of policies and practices, retraining, and making personnel changes as necessary.

108.    By December 1, 2013, and by each December thereafter for the duration of this Agreement, the District shall conduct a school discipline survey of a representative sample of District families to determine whether its discipline policies and procedures are (a) being effectively communicated, and (b) being appropriately implemented by Instructional Staff and administrators.  The District shall provide the surveys confidentially to families, and shall incorporate the feedback from the surveys into any responsive action plans developed under this Consent Order.  The United States shall assist the District in obtaining any resources available through federal sources to assist in the survey's design and implementation.

## V.    MONITORING AND ENFORCEMENT

109.    The District shall submit semi-annual reports to the United States demonstrating its efforts to comply with the provisions of this Agreement.  The United States shall provide a copy of each semi-annual report to counsel for the Private Plaintiffs, subject to the requirements of FERPA.  The District shall provide the first semi-annual report by August 1 of each year, and the second semi-annual report by February 1 of each year, with the first report due August 1,

2013.  If any of the information required for the annual report in a particular year is available in a document that the District has already prepared to comply with the No Child Left Behind Act (20 U.S.C. § 6301, et seq.) or other federal law, state law, or regulation, the District may include that document in its semi-annual report and indicate the section of the annual report to which the document applies.  The semi-annual reports shall include the following information about the preceding school semester:

(a)     All District policies and procedures related to student discipline implemented since the previous semi-annual report.  Include a description of all edits, revisions, modifications, adjustments, and changes made to the policies and procedures since the date of the previous semi-annual report and the reasons for each edit, revision, modification, adjustment, or change made;

(b)     Documentation of all trainings conducted or provided by or for school or District personnel regarding student discipline.  Include for each such training the date the training was conducted, the title of the training, the length of each training, the identity of the individual(s) or entity that conducted the training, and the name and position of all individuals in attendance at each training;

(c)     Data collected reviewed, and analyzed in Paragraphs 104-106 of this Consent Order, and copies of any responsive action plans developed and implemented as a result of that review and analysis.

(d)     Copies of all complaints made to the Central Office or the School Board whether reported by a student, parent, guardian, or concerned member of the community regarding discriminatory discipline for the school year that just ended and a brief description of the resolution of each complaint.

(e)     Copies of all parent surveys conducted pursuant to Paragraph 108 of this Consent Order; and

(f)     A copy of the District's plan required by Paragraphs 41-43 of this Consent Order, and information about each student assembly and parent informational session held over the preceding semester, including the date(s), location, length, general description of content, number of attendees, school personnel present, agenda, and any handouts.

110.    The District acknowledges that the United States, through its representatives and/or any consultant or expert it may retain, may conduct on-site reviews of the District's schools to evaluate compliance with the terms of this Consent Order upon giving reasonable notice and consultation with the District to minimize any disruption to the educational process in the schools.

111.    If any part of this Consent Order for any reason held to be invalid, unlawful, or otherwise unenforceable by a court of competent jurisdiction, such decision shall not affect the validity of any other part of the Consent Order.  Furthermore, the Parties shall meet within 15 days of any such decision to determine whether the Consent Order should be revised or supplemented in response to the court's decision.

112.    The District understands and acknowledges that in the event of a breach by the District of this Consent Order, the United States may initiate judicial proceedings to enforce Title IV, and the United States and Private Plaintiffs may initiate judicial proceedings to enforce the specific commitments and obligations of the District under this Consent Order; provided that, the United States and Private Plaintiffs agree that they will not initiate or pursue any enforcement action without first attempting to resolve issues by negotiating in good faith for 30 days, or until

the Parties reach an impasse, whichever comes sooner, over adequate measures to correct any alleged shortcomings in the District's compliance with this Consent Order.

113.    This Consent Order shall become effective on the date of its entry and shall remain in effect until the District complies with its obligations under the Order, which the Parties anticipate will be at the end of the 2016-2017 school year.  However, the District may seek early termination of the Consent Order following its submission of the second 2015-2016 semi-annual report, if it has successfully and in good faith implemented the terms of the Consent Order.  The United States and Private Plaintiffs shall have 60 days from the receipt of the second 2015-2016 semi-annual report to raise concerns or objections regarding the District's compliance.  The Parties shall work in good faith to resolve concerns or objections.

Dated this 21st day of March, 2013.

**For the United States:**

GREGORY K. DAVIS
United States Attorney

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

ANURIMA BHARGAVA, Chief
SHAHEENA SIMONS, Deputy Chief
Educational Opportunities Section

/s/  Alfred R. Jernigan_____
ALFRED B. JERNIGAN, JR.
Assistant U. S. Attorney
Mississippi State Bar No. 3088
Civil Division
Southern District of Mississippi
501 E. Court Street, Ste. 4.430
Jackson, MS  39201
(601) 973-2820 direct
(601) 965-4032 fax
al.jernigan@usdoj.gov

/s/  Ryan C. Wilson_____
RYAN C. WILSON
ZOE M. SAVITSKY
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Educational Opportunities Section
Patrick Henry Building, Suite 4300
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 514-4092
ryan.wilson@usdoj.gov
zoe.savitsky@usdoj.gov

**For Private Plaintiffs:**

/s/ Fred L. Banks_____
FRED L. BANKS, JR.
Mississippi State Bar No. 1733
Phelps Dunbar LLP
111 East Capitol Street, Suite 600
Jackson, Mississippi 39201-2122
Tel: (601) 360-9356
Fax: (601) 360-9777
banksf@phelps.com

LETICIA SMITH-EVANS
RACHEL M. KLEINMAN
NAACP Legal Defense & Educational Fund, Inc.
99 Hudson Street, Suite 1600
New York, New York 10013
Phone: (212) 965-2200
Facsimile: (212) 226-7592

**For the Meridian Public School District:**

/s/ Holmes S. Adams_____                /s/ John G. Compton_____
HOLMES S. ADAMS                                JOHN G. COMPTON
Mississippi State Bar No. 1126                 Mississippi State Bar No. 6433
Adams and Reese LLP                            Witherspoon and Compton LLC
1018 Highland Colony Parkway, Suite 800        1100 23rd Avenue
Ridgeland, Mississippi  39157                  Meridian, Mississippi  39302
Phone: (601) 353-3234                          Phone: (601) 693-6466
Facsimile: (601) 355-9708                      Facsimile: (601) 693-4840