**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

| | | |
|---|---|---|
| JOHN BARNHARDT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Civil Action No. 4:65cv1300-HTW-LRA |
| | ) | 1300(E) |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MERIDIAN MUNICIPAL SEPARATE | ) | |
| SCHOOL DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION TO APPROVE PROPOSED CONSENT ORDER**

**I.     INTRODUCTION**

Plaintiffs Barnhardt, *et al* ("Private Plaintiffs") and Plaintiff-Intervenor United States of America (the "United States") (together, the "Plaintiffs") submit this Memorandum of Law in Support of the Joint Motion to Approve Proposed Consent Order. This Consent Order ("Consent Order") is intended to further the District's compliance with its desegregation obligations under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c-6 ("Title IV"), which, *inter alia*, prohibit the District from administering discipline in a manner that perpetuates or furthers the segregation of students on the basis of race, frustrates the District's ability to meet its desegregation obligations, or otherwise constitutes a vestige of the District's former *de jure* segregated system by erecting barriers or excluding students from the classroom or school on the basis of their race. The proposed Consent Order is also fair, reasonable, adequate, and in the

1

public interest, as set forth below. The Plaintiffs therefore request that this Court enter the proposed Consent Order and order its implementation.

## II. PROCEDURAL HISTORY

### a. Original Litigation

This school desegregation case originated on May 10, 1965, when private Plaintiffs John Barnhardt *et al.*, then minor students, by their parents, initiated this lawsuit against the Meridian Municipal Separate School District seeking disestablishment of its racially dual school system. On June 28, 1965, this Court granted leave to the United States to intervene as a plaintiff.

On May 29, 1967, the Court ordered the immediate desegregation of the District's schools and approved a freedom of choice attendance plan. On November 7, 1969, the Court of Appeals for the Fifth Circuit issued an order enjoining the District from operating a dual school system based on race or color (the "November 7, 1969 Order"). The Fifth Circuit ordered the immediate implementation of a desegregation plan prepared by the United States Department of Health, Education, and Welfare. The November 7, 1969 Order, which is still in effect, allowed modifications to the Plan after consideration by this Court. On June 19, 2009, the Court modified the Plan to change student attendance zones, permit school closures, and allow construction at the high school.

### b. United States' Case Review and Investigation of Student Discipline Complaints

Beginning in the 2007-2008 school year, the United States initiated a case review of the District and requested data, policies, and other information to evaluate the District's compliance with its desegregation obligations. In February 2008, the United States conducted a site visit of several of the District's schools and requested supplemental information regarding the District's progress toward unitary status. In 2010, the United States received new complaints from black

parents and other community members in Meridian alleging that the District was implementing harsh and punitive student discipline policies, which were resulting in the disproportionate suspension, expulsion, and school-based arrest of black students in the Meridian schools, often for minor offenses or rule violations.

For two years, the United States conducted an investigation of the allegations of racially disparate student discipline. In 2011 and 2012, the United States visited Meridian and conducted community meetings and private interviews with parents and students regarding the District's student discipline policies and practices and the effects of those policies and practices on black students. The United States also served the District with document requests and interrogatories regarding the District's administration of student discipline, to which the District responded.

In March 2012, the United States toured the school district with a student discipline practices expert, and, as part of that tour, interviewed the Superintendent, the principal of each school, and the Chief of the Meridian Public School District Police Department ("MPSDPD"). In June, July, and August 2012, the United States deposed current and former school officials under Rule 30(b)(6) of the Federal Rules of Civil Procedure regarding student discipline policies and practices, training of teachers and staff on student discipline policies, and District practices and procedures for referring students to law enforcement agencies.

Following the site visit and the review of documents and data produced in discovery, the United States' student discipline expert prepared a report that the United States shared with the District. The report contained findings regarding the District's administration of student discipline, including the conclusion that under the District's discipline code, students could receive severe penalties for accumulating minor infractions, resulting in an extremely high suspension rate for low-level misbehavior. Further, black students received a significantly larger

share of discipline referrals than their proportion of District enrollment, and the majority of these referrals were for minor misbehaviors such as defiance, disobedience, and disruption, categories that rely on subjective interpretation. Racial disproportionality in referral was present in every misbehavior category except major, non-subjective violations such as referrals for drugs or weapons.

Once referred, black students were over three times more likely to receive a disciplinary consequence, and, specifically, nearly five times more likely to receive an out-of-school suspension. Black students received longer and more severe consequences even when such consequences were outside of District discipline policy. These disparities persisted even when the students were at the same school, were of similar ages, and had similar disciplinary histories. Additionally, the District had no system in place to monitor, identify, and respond to racial disparities in student discipline referrals and consequences.

Although not admitting liability, the District has engaged cooperatively in settlement discussions to resolve the identified student discipline concerns. In addition, prior to this Court's approval of the proposed Consent Order, the District has taken encouraging steps to improve its discipline and behavior policies and practices, including by beginning to implement positive behavior interventions and supports ("PBIS") with the assistance of two consultants on classroom management.

### III. LEGAL STANDARDS

#### a. The Proposed Consent Order Resolves Desegregation Concerns With Respect To Student Discipline

The provisions in the proposed Consent Order resolve student discipline concerns that impact the District's compliance with this Court's November 7, 1969 Order. *See Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO CLC v. City of Cleveland*, 478 U.S. 501, 525 (1986)

4

(holding that consent decrees should "further the objectives of law upon which the complaint was based").

"The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system." *Freeman v. Pitts*, 503 U.S. 467, 485 (1992); *see also Green v. Cty. Sch. Bd. of New Kent Cty.,* 391 U.S. 430, 437-38 (1968).  The affirmative duty to desegregate is a continuing responsibility, and "[p]art of the affirmative duty . . . is the obligation not to take any action that would impede the process of disestablishing the dual system and its effects." *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 538 (1979).

Eliminating racial discrimination in student discipline is part of establishing a "truly unitary school system." *See, e.g., Tasby v. Estes,* 643 F.2d 1103, 1104 (5th Cir. 1981) (ordering a school district under a desegregation order to alter its student discipline practices in order to achieve unitary status); *Quarles v. Oxford Mun. Sep. Sch. Dist.,* 868 F.2d 750, 755-56 (5th Cir. 1989) (holding that discipline practices which resulted in both direct and statistical evidence of discriminatory punishment may be a vestige of the dual school system); *Berry v. Sch. Dist. of City of Benton Harbor*, 515 F.Supp. 344, 357 (W.D. Mich. 1981) (requiring a school district to develop a uniform code of conduct and attendant procedures as part of remedial measures for school desegregation); *U.S. v. Bd. of School Com'rs of City of Indianapolis*, 506 F.Supp. 657, 672 (S.D. Ind. 1979) (ordering in-service training on the administration of discipline as "essential" to the desegregation process), *aff'd in part, rev'd in part on other grounds*; *Reed v. Rhodes*, 455 F.Supp. 569, 601-602 (N.D. Ohio 1978) (requiring changes to disciplinary procedures to prohibit the discriminatory application of discipline in a school desegregation case); *Bradley v. Milliken*, 402 F.Supp. 1096, 1118 (E.D. Mich. 1975) (holding that "in a

segregation setting many techniques deny equal protection to black students, such as . . . discriminatory application of student discipline"). In addition, discriminatory discipline that results in the exclusion of black students from school without educational services for significant amounts of time, or the placement of students in an alternative school that offers inferior education services, can affect the quality of education that black students receive. *See Freeman,* 503 U.S. at 492-493. Through its review of the District's student discipline data, student and parent interviews, and depositions and other discovery, the United States concluded that black students receive harsher punishment than white students for comparable misbehavior. *See supra.*

### b. The Proposed Consent Order Is Fair, Adequate, Reasonable, And In The Public Interest

The provisions in the proposed Consent Order are fair, adequate, reasonable, and in the public interest. *See Horne v. Flores*, 557 U.S. 433, 450 (2009); *Union Asset Management Holding A.G. v, Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012); *Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004); *U.S. v. City of Alexandria,* 614 F.2d 1358, 1361 (5th Cir. 1980); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *Metro. Housing Dev. Corp. v. Vil. Arlington Hts*., 616 F.2d 1006, 1014 (7th Cir. 1980). The Fifth Circuit utilizes a six-factor test to assess the fairness, adequacy, reasonableness, and public interest in a proposed consent order, examining: (1) any evidence that the agreement was the result of fraud or of collusion; (2) the nature (*i.e.*, complexity, likely duration, and expanse) of the litigation at bar; (3) the present stage of the litigation and discovery already produced; (4) the probability of plaintiffs' prevailing on the merits; (5) the range of possible recovery and the certainty of damages; and (6) the opinions of counsel and other relevant stakeholders. *Newby*, 394 F.3d at 301; *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).

First, the proposed Consent Order is not the result of fraud or collusion. A court may find fraud or collusion when the parties to an agreement did not negotiate at arm's length, and where there is evidence or allegations of collusion. *Altier v. Worley Catastrophe Response, LLC*, 2012 WL 161824, *15 (E.D. La. 2012). In the absence of such concerns, courts "should be hesitant to substitute [their] own judgment for that of counsel." *Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984). Here, the negotiations on the proposed Consent Order were conducted at arm's length: interactions were limited to formal discussion and correspondence between counsel and certain relevant stakeholders (*e.g.*, District leadership). Moreover, this settlement comes after months of adversarial litigation (*e.g.*, requests for written discovery, depositions), and there have been neither allegations nor evidence of collusion.

Second, the proposed Consent Order is preferable to continued, protracted litigation. When litigation relates to fact-intensive claims and requires expert testimony, and relief is therefore likely to be significantly delayed, settlement is appropriate. *In re Oil Spill by the Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 2012 WL 6652608, *32-33 (E.D. La. 2012). The United States and the District have been engaged in informal and formal discovery over the issue of student discipline for the past 18 months; experts and consultants have been hired as part of this process. Settlement is now appropriate to prevent further protracted litigation and further deferral of relief.

Third, the proposed Consent Order is timely and appropriate at this stage of litigation. Where discovery has been extensive and is complete, and the parties have obtained sufficient information to evaluate the claims, settlement may be proper. *Altier*, 2012 WL at *16-17.

Fourth, the proposed Consent Order is appropriate because the Plaintiffs are likely to prevail on the merits. In determining the fairness of the proposal, courts should not engage in a

trial on the merits, as the purpose of the settlement is to avoid the cost and delay of a trial. *Reed*, 703 F.2d at 172. Instead, courts merely review the law and facts to assess the probability of success on the merits. *Id.* Here, the United States conducted a two-year review of the District's policies and practices and discipline referral data; participated in community meetings with hundreds of community members; conducted depositions and other discovery; and interviewed dozens of parents and students. As set forth above, based on this evidence, the United States concluded that the District administered discipline in a manner that perpetuated or furthered the segregation of students on the basis of race.

Fifth, the proposed Consent Order is proper based on the range of possible relief.[1] Where relief is not speculative and there are no legal reasons (*e.g.*, a statute of limitations, a cap on damages) why relief might be limited further than the terms of the agreement, settlement is appropriate. *In re Oil Spill*, 2012 WL at 34; *In re Lease Oil Antitrust Litigation (No. II)*, 186 F.R.D. 403, 433 (S.D. Tx. 1999). In a desegregation case, the Supreme Court has long recognized that district courts have broad authority to fashion a remedy to address the vestiges of segregation and eliminate racial discrimination "root and branch." *Green v. County Sch. Bd. of New Kent Cty.*, 391 U.S. 430, 437-38 (1968). Indeed, the Supreme Court has regularly encouraged the adoption of desegregation remedies that take into account the context and history of a school district, and that are effective means to address discrimination and segregation within that district's bounds. "In fashioning and effectuating [desegregation] decrees, the courts will be guided by equitable principles . . . characterized by a practical flexibility in shaping . . . remedies." *Brown v. Bd. of Educ.*, 349 U.S. 294, 300 (1955).

---

[1] The case law on this factor typically refers to "possible recovery," but because this is a suit in equity, the question is not one of monetary damages but rather of equitable relief.

The proposed Consent Order addresses only the areas of the District's student discipline practices where the United States' review identified compliance concerns: 1) classroom management, 2) the student code of conduct, 3) alternative placement, 4) due process, 5) referral to law enforcement, and 6) training.  And because the District has already started to take steps to implement certain remedies set forth in the proposed Consent Order, including employing consultants on classroom management and implementing a system of positive behavioral interventions and supports, the relief proposed is concrete and achievable.  The negotiated relief includes the following measures:

    a.  implementation of an evidence-based positive behavior and discipline management approach  ("PBIS");

    b.  engagement of qualified consultants to provide ongoing assistance in implementing PBIS and reducing racially disparate discipline;

    c.  creation of a District-level PBIS Office and hiring of a PBIS Director to help schools adopt discipline data self-monitoring practices, review discipline data to identify racial disparities and develop plans to respond, and coordinate PBIS and discipline professional development;

    d.  revision of the District's discipline code and related policies to clearly define offenses, to eliminate exclusionary discipline for low-level misbehaviors such as dress code violations and tardiness, and to provide teachers and administrators with strategies to maintain safe and orderly learning environments while keeping students in the classroom;

    e.  revision of the alternative school placement process, and revision of student discipline hearing procedures to increase due process protections;

   f. revision of policies to ensure that school personnel do not contact the Meridian Police Department unless: required by state law; necessary to protect the physical safety of students or school personnel, or public safety; or to address the conduct of persons other than students;

   g. revision of procedures regarding school resource officers ("SROs") to encourage SROs to contribute positively to their school communities, and to ensure that school personnel do not engage SROs to manage behavior that can be safely and appropriately handled by internal disciplinary procedures;

   h. measures to engage families and community members, including creating a new Discipline Advisory Committee and providing information about new policies and practices through regular school and community informational forums;

   i. professional development to school personnel on: non-discrimination; PBIS and communicating and modeling positive behavior approaches; applying the discipline code; and understanding relationships between school and police personnel; and

   j. implementation of data-based self-monitoring and review systems to improve accountability and reduce racial disparity in the administration of discipline.

The Parties believe that the above measures are both adequate and well-tailored to remediate the specific concerns in this case, when fully implemented by the District.

Sixth, the proposed Consent Order is fair and appropriate in the opinions of counsel and of the stakeholders they represent. Where, as here, counsel and relevant stakeholders have worked in good faith to reach a reasonable compromise, and where no parties to the litigation have raised objections to the proposal, settlement is appropriate. *Reed*, 703 F.2d at 174-175;

*Altier*, 2012 WL at *18-19.  The District, while not admitting liability, participated fully in negotiating and developing this proposed Consent Order.  Relevant stakeholders, including the District Superintendent, the Assistant Superintendent, and the School Board President, contributed significantly to negotiations, and support the final agreement.  No party has raised objections.

Finally, the proposed Consent Order is also in the public interest because it will ensure that the District administers student discipline in a fair and non-discriminatory manner, with the goals of reducing the disproportionate assignment of exclusionary sanctions to black students and providing all students with an equal opportunity to learn in a safe, orderly, and supportive environment.  Moreover, it is squarely in the public interest to reduce students' unnecessary exclusion from school and contact with the juvenile and criminal justice systems, which have been shown to have starkly negative impacts on educational attainment and long-term success. [2]

## IV.    CONCLUSION

The proposed Consent Order will advance the educational opportunities for all students in the District by prohibiting racial discrimination in the District's discipline policies and practices. The Private Plaintiffs, the United States, and the Meridian Public School District are committed to working collaboratively and cooperatively throughout the life of the proposed Consent Order to improve the experience of District students.  Accordingly, the Private Plaintiffs, the United

---

[2] *See, e.g.,* Robert Balfanz et al., *Sent Home and Put Off-Track: The Antecedents, Disproportionalites, and Consequences of Being Suspended in the Ninth Grade* (Dec. 2012); Tony Fabelo et al., *Breaking Schools' Rules: A Statewide Study of How School Discipline Relates to Students' Success and Juvenile Justice Involvement* (2011); Marsha Weissman et al., *The Use of Criminal History Records in College Admissions* (2010) *available at:* http://www.communityalternatives.org/pdf.Reconsidered-criminal-hist-recs-in-college-admissions.pdf; Russell Skiba et al, *Are Zero Tolerance Policies Effective in the Schools? A Report by the American Psychological Association Task Force* (2006), available at http://www.apa.org/pubs/info/reports/zero-tolerance-report.pdf; Gary Sweeten, *Who Will Graduate? Disruption of High School Education by Arrest and Court Involvement*, 23 Justice Quarterly 462, 473-477 (2006); Holman & Zeidenberg, November 2006, *The Dangers of Detention: The Impact of Incarcerating Youth in Detention and Other Secure Facilities*, Justice Policy Institute, available at www.justicepolicy.org/images/upload/06-11_REP_DangersOfDetention_JJ.pdf; Advancement Project and the Civil Rights Project, Harvard University. *Opportunities Suspended: The Devastating Consequences of Zero Tolerance School Discipline* 13 (July 2002) available at http://b.3cdn.net/advancement/8d91c72205a1b9d955_ujm6bhguv.pdf.

States, and the Meridian Public School District respectfully request that the Court enter the proposed Consent Order and order its implementation.

Dated: March 22, 2013                                    Respectfully submitted,

Counsel for the United States of America:

| | |
|---|---|
| GREGORY K. DAVIS<br>United States Attorney | THOMAS E. PEREZ<br>Assistant Attorney General<br>Civil Rights Division<br>ANURIMA BHARGAVA, Chief<br>SHAHEENA SIMONS, Deputy Chief<br>Educational Opportunities Section |
| /s/_Alfred R. Jernigan_____<br>ALFRED B. JERNIGAN, JR.<br>Assistant U. S. Attorney<br>Mississippi State Bar No. 3088<br>Civil Division<br>Southern District of Mississippi<br>501 E. Court Street, Ste. 4.430<br>Jackson, MS  39201<br>(601) 973-2820 direct<br>(601) 965-4032 fax<br>al.jernigan@usdoj.gov | /s/_Ryan C. Wilson_____<br>RYAN C. WILSON<br>ZOE M. SAVITSKY<br>Trial Attorneys<br>U.S. Department of Justice<br>Civil Rights Division<br>Educational Opportunities Section<br>Patrick Henry Building, Suite 4300<br>950 Pennsylvania Ave., NW<br>Washington, D.C. 20530<br>(202) 514-4092<br>ryan.wilson@usdoj.gov<br>zoe.savitsky@usdoj.gov |

Counsel for Private Plaintiffs:

/s/_Fred L. Banks_____
FRED L. BANKS, JR.  (MSB No. 1733)
Phelps Dunbar LLP
111 East Capitol Street, Suite 600
Jackson, Mississippi 39201-2122
Tel: (601) 360-9356
Fax: (601) 360-9777
banksf@phelps.com

LETICIA SMITH-EVANS
RACHEL M. KLEINMAN
NAACP Legal Defense & Educational Fund, Inc.
99 Hudson Street, Suite 1600
New York, New York 10013
Phone: (212) 965-2200
Facsimile: (212) 226-7592