**U.S. Department of Justice**
**Civil Rights Division**
**Educational Opportunities Section**

SS:RW:NS:AV:AC
DJ 169-41-11

| | |
|---|---|
| U.S. Mail: | 950 Pennsylvania Avenue, NW |
| | Patrick Henry Building, Suite 4300 |
| | Washington, DC  20530 |
| Overnight Mail: | 601 D Street, NW |
| | Suite 4300 |
| | Washington, DC  20004 |
| Telephone: | (202) 307-6880 |
| | (202) 616-2166 |
| Facsimile: | (202) 514-8337 |
| E-mail: | natane.singleton@usdoj.gov; |
| | aria.vaughan@usdoj.gov |

March 30, 2017

**VIA U.S. MAIL AND EMAIL**

Holmes S. Adams, Esq.              John Compton, Esq.
Adams and Reese, LLP              1100 23rd Avenue
111 E. Capitol Street, Suite 350    P.O. Box 840
Jackson, MS 39225                 Meridian, Mississippi 39302

Dear Holmes and John:

We would like to thank Dr. Amy Carter for her March 9, 2017 letter to Attorney General Sessions and Acting Assistant Attorney General Wheeler.  We agree with Dr. Carter that the Meridian Public School District ("MPSD" or "District") has made great progress in implementing the May 30, 2013 Consent Order ("Order") with the Civil Rights Division of the United States Department of Justice ("United States") and the Private Plaintiffs, represented by the NAACP Legal Defense Fund (collectively, "Parties").  We write to provide substantive feedback on the status of the District's compliance with the Order based on our review of the District's compliance reports through August 2016 and our onsite visit May 17-19, 2016.  We discussed some of this feedback with you in person with our expert during our May site visit, as well as in a subsequent conference call in August 2016.  We appreciate the efforts of the District leadership and staff, including Dr. Carter and Howard Hagwood, in compiling and providing these reports, as well as the District's continued cooperation.  In monitoring the District's compliance with the Order, we have also received information from parents, advocates, and other members of the community.

The District has made progress in implementing many of the Order's requirements, particularly in the area of policy changes, professional development, and some aspects of its administration of exclusionary discipline.  We also found several areas where additional work is needed to implement the Order.  This letter describes these areas and provides recommendations to build on the District's progress and improve implementation of the Order.  The sequence of this follows the structure of the Order, although it does not include all provisions of the Order.

1

**EXHIBIT 8**

## A.  POSITIVE SCHOOL CLIMATE

Paragraph 30 of the Consent Order requires the District to phase in a positive behavior interventions and supports (PBIS) approach to classroom management and student behavior. Paragraph 31 states that the District will work with qualified consultants on an ongoing basis in the areas of classroom management and student discipline and race.  We commend the District for its continued compliance with these paragraphs. The District's reports and our May 2016 visit confirmed that the District has implemented a PBIS approach to classroom management and student behavior at all of its schools.  In addition, it is clear from the reports and from our visit that the District works with consultants, such as FluencyPlus and REACH Mississippi, on a continuing basis.

Paragraph 32 requires the District to create a PBIS Office within the Central Office with responsibility for implementing PBIS in all schools.  The PBIS Director, Mr. Hagwood, and his staff have implemented and complied with these provisions.

In addition, Paragraphs 33 and 34 require each school to designate a school discipline administrative team ("SDAT") that is responsible for all student discipline decisions and to hire a school PBIS coordinator, who will serve as part of the SDAT.  We commend the District for complying with these paragraphs.  During our May 2016 site visit, we met with PBIS Coordinators and members of several SDATs at Meridian High School ("MHS"), Northwest Middle School ("NWMS"), Magnolia Middle School ("MMS"), Carver Middle School ("CMS"), Parkview Elementary School ("PES"), Poplar Springs Elementary School ("PSES"), and West Hills Elementary School ("WHES").  The PBIS Coordinators and SDATs participated extensively in professional development trainings over the past two years.  Furthermore, all of the District's reports show that PBIS Coordinators met on a regular basis with the Superintendent and PBIS Director to discuss PBIS implementation at each school.

## B.  STUDENT, PARENT, AND COMMUNITY ENGAGEMENT

### 1.  Discipline Advisory Committee

Paragraphs 39 and 40 require the District to appoint a Discipline Advisory Committee ("DAC") that meets regularly and advises the District on PBIS implementation in all school settings, promoting culturally responsive and non-discriminatory discipline strategies, reducing unwarranted racial disproportionality in discipline referrals and consequences, improving communications regarding discipline between school personnel and their communities, and developing structures and strategies that reflect restorative justice principles.

In our June 10, 2015 letter ("June 2015 letter"), we observed that the District had met the initial requirements of Paragraphs 39 and 40.  In the summer of 2013, the District created the DAC after consultation with the United States and Private Plaintiffs.  Since that time, the records indicate that the DAC has met regularly, as required.  Records of the meetings also illustrate that the District has provided information and consulted with the DAC.  The District provided straightforward and informative presentations and brought DAC-proposed changes to the

2

**EXHIBIT 8**

plaintiffs for approval.[1]  In addition, on April 7, 2016, the DAC recommended changes to the MPSD Pre-K-12 Code of Conduct & Handbook ("Code of Conduct" or "Code"), concerning students with disabilities, which the District adopted.[2]  We noted, however, that DAC membership does not adequately represent a cross-section of the community – students, parents, teachers, and community leaders – and attendance at the quarterly meetings has decreased significantly since its inception.  The DAC now consists primarily of District employees, which does not foster a diverse environment for meaningful dialogue on improving disciplinary practices.  Our June 2015 letter discussed this concern, and our observations from the May 2016 DAC meeting, conversations with PBIS officials, and recent attendance records underscore the continuing nature of this issue.

In our June 2015 Letter, we recommended a variety of strategies to improve DAC membership and attendance.  These suggestions included: surveying past and present members of the DAC about their experiences and, based on survey feedback, developing a responsive plan that includes strategies ranging from providing small stipends to DAC members to holding DAC meetings in conjunction with Board meetings in order to improve attendance and the experience of DAC members.  We encourage the District to consider these measures to encourage broader participation on the DAC.

2.  <u>Informational Programs for Students</u>

Paragraph 42 requires the District to hold bi-annual student assemblies at each school to inform students about behavioral expectations and discipline policies in a positive, age-appropriate manner.  As mentioned in our June 2015 Letter, the District has made substantial efforts to comply with this requirement by holding assemblies on every school campus each semester.  However, NWMS, CES, and MMS provided limited information regarding their presentations, and as such it was difficult to determine whether the assemblies were age-appropriate.  These schools might consider borrowing or building upon the successful agenda plans from T.J. Harris Upper Elementary School ("TJHUES") and/or WHES, whose presentations were both informative and age-appropriate.[3]

3.  <u>Informational Programs for Parents</u>

Paragraph 43 requires the District to hold bi-annual parent assemblies at each school to inform families about student behavior expectations and discipline policies, including due process and appeal procedures.  The District has consistently held bi-annual assemblies on every school campus.  However, because limited information has been provided about the content of these sessions at MMS, it is difficult to assess whether this school has complied fully with the Order.  We recommend that the District provide additional information about the programs being offered in future reports.

In addition, in the 2015 fall semester, 22 parents at CMS and 17 parents at Parkview

---

[1] Community Discipline Advisory Committee Quarterly Meeting_1-11-16
[2] MPSD Discipline Advisory Committee Recommendations 7 April 2016
[3] Harris Upper_Student Informtional_January 8 & 11, 2016; West Hills_Student Informational_January 8 & February 22 & 24, 2016

**EXHIBIT 8**

Elementary School ("PES") attended parent assemblies.[4]  In the 2015 spring semester, 14 parents at WHES, eight parents at MMS, and only four parents at NWMS attended such assemblies.[5] The District may wish to consider having schools with low attendance couple their parent information sessions with events that will already be highly attended, such as back-to-school days, open houses, prominent sports games, school concerts, and/or pep rallies.  Schools with low parental attendance may also benefit from reviewing the practices of PSES, which increased attendance from 12 parents in the September 2013 meeting to 141 parents at the August 2015 meeting.[6]

4.   Development and Distribution of a Discipline Complaint

Paragraph 44 requires the District to develop a complaint process for the administration of discipline and to make information about this process available on the District's website and in student handbooks and the Code of Conduct.  The District has taken important steps to comply with this provision by making a complaint form available on the District's website and in the Code of Conduct and Student Handbook.  The District has also created a written procedure for handling complaints in the PBIS Handbook for 2015-16.[7]  The District should make this procedure readily available on its website and in the Code of Conduct and Student Handbook.

5.   Notice to Families of Changes to the Code or Other Policies

Paragraph 45 requires the District to provide written notice to parents and District personnel of any changes made to the Code or other District policies.  The District has complied with this provision by documenting that each school collected and filed receipts for the MPSD Code of Conduct and Student Handbook in the fall of 2015.

C.  DISCIPLINE POLICIES AND PROCEDURES

1.   Uniform Code of Conduct

Paragraphs 46-51, 61, and 63, among others, include requirements for a revised Code.  In December 2015, the District proposed an additional Code section regarding gang-related behavior and activity.  We provided feedback on this proposal and the District opted to emphasize student education rather than add the proposed section.  The District also forwarded for approval DAC recommendations to make minor revisions to the Code related to constructive intervention strategies, parental participation in discipline-related meetings, and the tardy and truancy policy.  We did not object to the DAC recommendations.  Because the DAC did not recommend changes to the section of the Code related to discipline and students with disabilities ("SWDs"), we reiterated the suggestion from our June 2015 letter that the District expand this section of the Code.  In response, the District incorporated into the Code the language from

---

[4] Carver_Parent Information Session_8-24-15; Parkview_Parent Informational Session_8-25-15

[5] 6.20 Northwest_Parent Informational Session_4-14-15; 6.18 Magnolia_Parent Informational Session_2-24-15; 6.21 West Hills_Parent Informational Session_5-12-15

[6] Poplar Springs_Parent Informational Session_9-15-15

[7] Dep't of Student Services, Office of Positive Behavioral Intervention and Supports, PBIS Handbook/Administrative Procedures Guide Excerpts, (2015-16) at p. 33; Dep't of Student Services, Office of Positive Behavioral Intervention and Supports, PBIS Handbook, (2015-16) at p.

**EXHIBIT 8**

Paragraphs 52 and 57 of the Consent Order, per an April 2016 DAC recommendation.  This language requires the District to take various actions before imposing exclusionary sanctions on SWDs and to permit suspended students to work with qualified staff if required by their Individualized Education Programs ("IEP").  We look forward to working cooperatively with the District to continue to refine the Code as necessary.

   2.  Disciplinary Consequences

   Paragraphs 50, 51, 53, 54, 55, 56, 58, and 59 address several aspects of disciplinary consequences.  Paragraph 50 provides that exclusionary consequences will not be assigned for Level 1 and 2 infractions, and that ISS is the only exclusionary consequence that may be assigned for Level 3 infractions.  The District appears to be in substantial compliance with the Order with regard to not assigning OSS for Level 1, 2, or 3 infractions.   The extent of the District's compliance with regard to ISS is unclear based on the information provided.[8]  Because the District did not explicitly assign a level to each infraction, 252 infractions could be classified as either Level 2 or 3 because the infraction code assigned fit within both levels in the PBIS Handbook.  Of these 252 infractions, 197 resulted in ISS.[9]  Because Paragraph 50 provides for ISS for Level 3 but not Level 2 infractions, the District's compliance with Paragraph 50 is unclear.  For future reports, we ask the District to add a column to its discipline data spreadsheet that lists a level for each infraction so that compliance with the Order's requirements can be ascertained.

   In addition, Paragraph 50(d) provides that Level 4 infractions, for which OSS can be assigned, are limited to "[m]isbehaviors that significantly interfere with others' safety and learning and/or are of a threatening or harmful nature."  Under Paragraph 50(f), the District will "treat misbehavior such as defiance, disrespect, and insubordination that are non-threatening in nature as Level 1, Level 2, or Level 3 infractions, depending on the intensity of the behavior."  Yet we identified numerous incidents of this type that appeared to be inappropriately coded as Level 4 infractions.  For example, at CMS, a student received OSS for walking out of the classroom after his teacher told him to "man up" when he complained of stomach and foot pain.  Another MMS student received OSS for profanity to staff for yelling "hell naw."  A third incident at MMS involved a student who said a curse word in class and ignored an administrator's repeated instruction to tuck in his shirt; this was classified as a "serious campus disturbance," which is behavior that "compromises the safety of others and disturbs or interrupts the daily routine(s) of school operations . . . ."  Meridian Public School District, *Code of Conduct and Student Handbook for Grades Pre–K–12*, 15 (2015-16).   Although the majority of these incidents occurred at CMS, MMS, and MHS, we found similar examples at every school.

   We do not have sufficient information to determine whether the SDATs develop behavior plans for students when appropriate after a Level 4 or 5 infraction, per Paragraph 50(d)-(e).  The PBIS Handbook instructs that schools should develop a "Behavior Strategies Plan" when a

---

[8] The District reported 2,101 Level 2 infractions, 22 of which resulted in ISS in violation of Paragraph 50.  In five of these 22 instances, the "description of the incident" states that they resulted in ISD, which contradicts the "consequences" column in the spreadsheet the District provided.
[9] Three of the 252 incidents resulted in OSS in violation of Paragraph 50.

**EXHIBIT 8**

student moves to Tier 3.  On our upcoming site visit, we would like to discuss the SDATs'
procedures for identifying students who need behavior plans.

### a.  Limits on OSS for Students Under Age 10

Paragraph 51(a) prohibits OSS for students under age 10 except in "emergency situations
involving a serious and immediate threat to student, teacher, or public safety."  According to the
data the District provided, 61 students in grades four or below received OSS for 72 infractions
characterized as Level 4 or below during the 2015-16 school year.[10]  Even assuming that all 55
instances of fighting constituted emergencies that fall into the exception, 17 infractions remain
for which students under 10 received OSS.  Fifteen of these infractions were classified as serious
campus disturbances and two were classified as profanity to staff.  A closer look at the
descriptions of these 17 incidents suggests that many did not in fact constitute emergency
situations warranting OSS.  For example, at PES a student received OSS when he "got upset and
sat on the floor[,]…threw his milk and food[,]…and sat there about 20 minutes."  At Oakland
Heights Elementary School ("OHES") two students received OSS for leaving class without
permission and going to another teacher's room and walking the halls without permission after
being sent to the office.  At WHES a student received OSS for "constantly talking and making
noises," "refus[ing] to do his work," and "[a]rguing with another student."  These examples
suggest that the District is overusing the "serious campus disturbance" category, resulting in
unnecessary and inappropriate exclusionary discipline of the District's youngest students.[11]
During our site visit, the PBIS Director acknowledged that schools overuse this category.  On
our upcoming site visit, we would like to discuss the steps the District has taken to address this
issue.

### b.  Off-Campus Conduct

Paragraph 51(b) prohibits OSS for conduct that occurs off-campus or outside of the
school day unless it occurs at a school-sponsored activity, substantially disrupts the school
environment, or seriously endangers the safety of other students or school personnel.  Based on
the 2015-16 school year data, instances of students receiving OSS for off-campus incidents
appear to be rare.  Therefore, it appears the District has substantially complied with Paragraph
51(b).  We encourage the SDATs to continue to review discipline data to ensure continued
compliance.

### c.  Approval of the Superintendent or her Designee for Extended ISS or OSS

Paragraphs 53 and 54 of the Order limit the length of time students can be assigned to
ISS or OSS without the approval of the Superintendent or her designee.  The District's SY 2015-
16 data shows inconsistent compliance with these provisions.  Two hundred seven (207) students

---

[10] Because the District did not list students by age, we used grades four or below as a proxy for students under 10
years of age.

[11] The overuse of this category does not only occur at the elementary level.  Indeed, the data contains myriad
examples of students who leave class without permission, a Level 2 offense, but are given ISS or OSS because the
incident is labeled a "serious campus disturbance."  This underscores the importance of SDATs and the PBIS Office
reviewing the narratives to avoid improper coding and corresponding discipline.

**EXHIBIT 8**

received more than three days of OSS for a single offense, but the Superintendent or her designee approved suspensions for only 84 of these students (40.6%).  This leaves 123 students who were suspended out of school for more than three days without superintendent approval in violation of Paragraph 54.[12]  This is a particular problem at MHS, where the Superintendent or her designee granted approval for only 10 of the 105 students who received more than three days of OSS per offense.  In addition, although administrators at NWMS appear to seek superintendent approval for all students who receive more than three days of OSS per offense, the sheer number of such students compared to the other two middle schools (60 compared to 17 at CMS and eight at MMS) is cause for concern.  Moreover, the District's superintendent approval policy appears to be implemented inconsistently.  The data shows that in some schools, administrators received superintendent approval for any referral resulting in ISS or OSS days in excess of the maximum.  In other schools, as long as the Superintendent previously approved any infraction – whether ISS, OSS, or another punishment, and whether under or in excess of the maximum – additional approval was not received.[13]

School administrators appear to seek superintendent approval more often in cases involving large numbers of OSS days per quarter or per school year.  Half (six of 12) of students who received more than 10 days OSS per quarter received superintendent approval.  In addition, administrators received approval for 14 of the 18 students who received more than 15 days of OSS in a school year.  Still, a handful of students were suspended out-of-school for more than 15 days during the 2015-16 school year without superintendent approval.

### d.  Tracking Exclusionary Discipline

Paragraph 55 requires each school PBIS coordinator to track the number of days of exclusionary discipline given to each student and immediately report to the District PBIS Director when any student accumulates 10 total days of exclusionary discipline.  The District's Annual Discipline Data Report for SY 2016-16 indicates that the District is tracking the number of students who received "10 or more dates of OSS removals."  Because the Consent Order defines exclusionary discipline to include ISS, it appears that the District may not be including all instances of exclusionary discipline in its tracking and reporting.  Please confirm whether ISS days are included in the District's monitoring and reporting under Paragraph 55.

### 3.  Policies Related to In-School and Out-of-School Suspension

Under Paragraphs 56 and 58, the District is to provide students assigned ISS and OSS an opportunity to complete their regular academic work during the suspension and to make up tests, examinations, and assignments without penalty during or after their suspension.   Paragraph 59 prohibits the District from requiring students to complete punitive or non-academic writing assignments while assigned to ISS or OSS and requires opportunities for behavior remediation.

---

[12] Nine students who received ISS in excess of the rule and attended multiple schools were excluded from the analysis.

[13] While our analysis counted any instance of approval as "superintendent approval," we encourage the District to train SDATs on the appropriate practice.

**EXHIBIT 8**

During our May 2016 site visit, we observed students in ISS who appeared able to complete their regular academic work.  As requested in our June 2015 letter, we ask that the District include samples of documents used in ISS classrooms – behavior packets, behavior contracts, and restorative justice materials – in future reports.

    4.  <u>Other Discipline-Related Policies</u>

Paragraphs 61-65 require the District to develop new dress code and tardy/truancy policies, and to incorporate these policies into the Code of Conduct.  Under the Order, the District's dress code policy is to impose only non-exclusionary consequences; the tardy and truancy policy is to allow for exclusionary consequences only in limited circumstances, and take into account students' individual situations (e.g. health, family responsibilities).  For tardy/truancy related exclusionary consequences, SDATs are also to document at least three separate prior interventions.  Under this provision, the policy must specify that students who are tardy will not be locked out or otherwise excluded from the classroom upon arrival.

We encourage the District to review its discipline data to determine how schools are applying the dress code policy in practice.  Our analysis of the SY 2015-16 discipline data shows that students still receive ISS and OSS for dress code violations.  Although there were no instances of exclusionary discipline when infractions were labeled as "Dress Code" violations, the "description of incident" reveals that SDATs gave exclusionary discipline for dress code violations, albeit under a different label – often "Campus Disturbance" or "Defiance."  For example, there were several incidents in which MHS students did not pull up their sagging pants.  The SDATs coded these incidents as "Defiance" instead of "Dress Code" infractions and sent students to ISS for one or two days.  We identified at least 25 similar incidents in which students received exclusionary discipline for what were essentially dress code violations during the 2015-16 school year.[14]

Similarly, students received exclusionary discipline for tardy and truancy-related offenses that were coded as more serious infractions.  When the District labeled infractions as "Tardies" or "Truancy," the District did not assign exclusionary discipline.  However, as in the dress code context, when examining the narratives, there were many tardy/truancy-related offenses coded as "Defiance," "Campus Disturbance," or "Disrespect."  For example, a student at MHS received OSS for skipping class; however, because it was labeled as a "Campus Disturbance," the disciplinary outcome appeared appropriate.  In SY 2015-16 there were 34 truancy/tardy-based infractions that resulted in exclusionary discipline.  Several students received ISS or OSS for being tardy or truant repeatedly, which could be permissible under the Order if the school had tried and documented three interventions.  However, these incidents did not include information on prior interventions and were classified as "Defiance."

We encourage the PBIS Office to work with SDATs to re-examine their dress code and tardy/truancy coding practices, including reviewing both the infraction codes and the narratives to ensure that students are not inappropriately excluded for dress code, tardy, or truancy infractions.

---

[14] The District may consider ISS for continued non-compliance with the dress code.  Consent Order ¶ 62.  However, the discipline data does not identify these instances as such.

**EXHIBIT 8**

In addition, although the District has made several important revisions to the Code, it should update the Code to expressly prohibit students who are tardy from being locked out or otherwise excluded from the classroom upon arrival, as required by Paragraph 63.

5.  Application of Discipline Policies

Paragraph 47 requires the District to apply the revised Code, including all of the policies described above, at each school, and to "administer consequences that are non-discriminatory, fair, age-appropriate, and correspond to the severity of the student's misbehavior."  In reviewing the District's data for MHS, we found that black students were 2.28 times as likely to receive at least one referral, 4.09 times as likely to receive ISS, and 2.2 times as likely to receive OSS as their white peers during the 2015-16 school year.  At our upcoming site visit, we hope to discuss this data for MHS, along with any steps the District has taken to determine the reasons for such disparities.

In addition, there is significant variation in exclusionary discipline practices across schools.  For example, 26 students at NWMS received more than five days of ISS per quarter during SY 2015-16, compared to six at CMS and three at MMS.  Sixty (60) NWMS students received more than three days of OSS for a single offense, compared to 17 at CMS and eight at MMS.  We learned during our May 2016 site visit that it is NWMS's policy to give students five days of OSS for fighting, which may partly explain why far more NWMS students received more than three days of OSS for a single offense compared to students at the other two middle schools.  According to the District's own summary of its discipline data, instances of exclusionary discipline at NWMS more than doubled between SY 2014-15 and SY 2015-16, from 351 to 721, whereas they declined at CMS and increased slightly at MMS over the same period.[15]  At the elementary school level, two schools accounted for 57.5% of all alternative placements: 26 students at T.J. Harris Elementary School ("TJHES") and 20 students at PES received alternative placement, compared to five, eight, 10, and 11 students at the District's other elementary schools.  Of the nine elementary school students who received ISS for Level 2 offenses in violation of the Consent Order, seven attended PES.  Three elementary schools (OHES, PES, and WHES) accounted for 13 of the 16 students in grades four or below who received OSS for behavior that does not appear to have constituted an "emergency situation involving a serious and immediate threat to student, teacher, or public safety" per Paragraph 51 of the Consent Order.[16]

We also observed numerous instances in which the District assigned consequences that did not "correspond to the severity of a student's misbehavior."  This appears to be related to the District's frequent use of the "serious campus disturbance" and "severe campus disturbance" categories.  At the District level, 390 students received 531 Level 4 campus disturbance referrals and 182 students received 285 Level 5 campus disturbance referrals during the 2015-16 school year.  This means that one out of every 10 students enrolled in the District (572 out of 5,664) received at least one Level 4 or 5 campus disturbance referral during the 2015-16 school year.  More than 97% of these students were black.  The District's frequent reliance on these categories

---

[15] See MPSD 2015-16 Discipline Report, May 25, 2016.
[16] See supra Section C2a.

**EXHIBIT 8**

appears to result in consequences that are disproportionate to the behavior it seeks to address, inconsistent with Paragraph 47.  This is a particular issue at PES, which had 89 Level 5 campus disturbance referrals, nearly twice as many as the school with the second highest number of such referrals.  Several of the Level 5 severe campus disturbance referrals at PES involved behavior in ISS.

Indeed, the District's elementary schools were the most likely to use the Level 5 campus disturbance category: five of the six elementary schools had at least 20 such referrals, compared to between six and nine at the middle schools.  These Level 5 campus disturbance referrals included referrals for such behaviors as whistling, refusing to complete work, arguing with a teacher or other students, and leaving the classroom without permission.  During our last site visit, the PBIS Director acknowledged that schools overused these categories, resulting in students being excluded from the classroom for low-level behavior.  During our upcoming call, we would like to address the steps, if any, the District has taken to address this practice.

Additionally, the overall numbers of students receiving exclusionary discipline at some schools remains cause for concern.  According to the District's own summary of its discipline data, more than half of all students at MHS, NWMS, and CMS received at least one disciplinary referral during the 2015-16 school year.  Nearly 29% of MHS students received at least one ISS, and over 22% received at least one OSS.  The rates of exclusionary discipline at the District's middle schools are even higher, with 40.8% of NWMS students and 37.7% of CMS students receiving one or more ISS. One in four middle school students received at least one OSS during the school year; at CMS, the rate of OSS was nearly one in three (31.6%)  One out of every 10 CMS students received an alternative school placement during SY 2015-16.

Finally, in terms of trends from SY 2014-15 to SY 2015-16, the District reported that the numbers of disciplinary referrals and instances of exclusionary discipline have largely remained constant: 6899 referrals in SY 2015-16 compared to 6960 in SY 2014-15, and 4019 instances of exclusionary discipline in SY 2015-16 compared to 4052 in SY 2014-15.  Although rates of OSS have decreased by three percentage points and rates of referrals are down slightly, the percentage of students receiving one or more ISS has increased by three percentage points, from 20.1% to 23.0%.  In addition, slightly more students received alternative placement and expulsion in SY 2015-16 compared to the previous school year.

6.  Discipline of Students with Disabilities

Paragraph 52 requires the District to provide federal and state law protections to SWDs when administering disciplinary consequences, including conducting a manifestation determination review ("MDR") whenever the District considers a consequence that excludes a student for more than 10 days or will result in a change of placement.

We did not find any instances in which the District assigned a SWD to 10 consecutive days of exclusionary discipline.  However, the District does not appear to hold MDRs consistently before assigning SWDs to the alternative school.  According to data the District provided, the District assigned 32 SWDs to the alternative school on 38 occasions during the 2015-16 school year.  In the "description of incident" column of the data spreadsheet, the District

**EXHIBIT 8**

noted that it held MDRs in 18 of those 38 instances (47.4%). In an additional four instances, the description states that the District held an IEP meeting, but not specifically an MDR. In the remaining 16 instances, the description did not contain information about any interventions that took place prior to placing a SWD in the alternative school. During our upcoming site visit we would like to review student files to ascertain whether the District is providing SWDs the protections to which they are legally entitled before placing them in the alternative school.

Paragraph 57 requires the District to provide SWDs with qualified educators when schools assign ISS or OSS to SWDs if their IEPs requires such assistance. We do not have sufficient data to determine whether the District has complied with this provision of the Order.

### D. ALTERNATIVE SCHOOL PLACEMENT

Paragraphs 66-71 require various changes to District policy for referral to, length of placement and provision of supports in, and transition out of the alternative school. The Consent Order requires the District to develop a policy for alternative school placement (Paragraph 66), operate under the same academic requirements and standards as any District school (Paragraph 69), and review student progress every 30 days (Paragraph 70). The Order also requires the District to return students to their home school at the end of the term of placement unless the District PBIS Office approves a request from the principals of the alternative and home schools and the school PBIS directors to extend the placement for 30 days (Paragraph 71). Finally, the Order sets limits on the categories of students whom the District may assign to the alternative school (Paragraph 67) and on the length of time a student may spend at the alternative school (Paragraph 68).

We continue to have difficulty assessing the extent to which the District has complied with the requirements of Paragraphs 66 through 71. First, the District does not clearly report alternative school placement. In 10 instances, recommendation for alternative school and alternative school placement were noted in the "consequence" column of the District's SY 2015-16 discipline spreadsheet. In 228 other instances, recommendation for or placement in the alternative school were reported in the "description of the incident" column only, coded as RALSC or ALSC. Counting both types of notation when analyzing alternative school placement, we identified 193 students whom the District recommended for alternative placement, 189 of whom were black.[17] The breakdown by school is as follows: CES (10 black, 1 white); CMS (21 black); MHS (83 black, 3 white); MMS (7 black); NWMS (17 black); OHES (1 black); PES (16 black); PSES (6 black); TJHES (25 black); and WHES (4 black). Because the District does not list alternative school placement as a consequence in its discipline spreadsheet, our analysis undercounts by 85 the number of students who received alternative placement according to the District's SY 2015-16 summary analysis. In future reports, please indicate in the "consequences" column of the discipline data spreadsheet whether a student has been assigned to the alternative school so that we can assess the full extent of the District's use of this disciplinary consequence.

---

[17] Because the "consequence" and "description of incident" columns do not consistently record whether students who were recommended to alternative placement actually were assigned to alternative placement, we focused our analysis on the recommendation for alternative placement data.

**EXHIBIT 8**

Second, the District's reporting also does not explain the reason for referral to the alternative school. As such, we are unable to determine whether any students were referred by parents/guardians or by a youth court judge, pursuant to Paragraphs 67(b) and (c). This also makes it difficult to determine whether the District has complied with Paragraph 67(d), which allows for referral to the alternative school for students who "significantly disrupt the educational environment, such that the placement is necessary for the safety and welfare of the class as a whole." Future reports should clearly list the reason for alternative placement in each instance in which the District assigns that consequence.

Third, we cannot ascertain from the data the District has provided whether schools are complying with Paragraph 67(d)'s requirement that principals document evidence that a student failed to respond successfully to formal Tier 2 and/or Tier 3 behavioral interventions and supports before considering alternative school placement. We also cannot tell from the District's reporting data whether the District PBIS Office reviews and the Superintendent or her designee approves alternative school placements before they are finalized, per Paragraph 67(d). During our upcoming site visit we would like to review student files to evaluate whether the District is taking the necessary steps before placing students in the alternative school per the Consent Order.

Finally, the District has not provided information on the duration of assignment to the alternative school, nor has it provided evidence of monthly meetings to review and assess each student's progress or of requests to extend a student's placement. **To enable us to better evaluate the District's compliance with the Consent Order's alternative placement provisions, please provide by April 20, 2017, in Excel, a list of all students assigned to the alternative school during the past three school years (2013-2016) and the first semester of SY 2016-2017**. Please include the student's identification number, home school, reason for placement, date the Superintendent or her designee approved the placement, and dates of placement (including multiple dates if there have been multiple placements). During our upcoming site visit, we request the opportunity to review documentation of monthly meetings between the principal of the alternative school, the school PBIS coordinator, the principal of the home school, the student, the student's parents, and a representative of the student's choice, if requested. We would also like to review documentation of any requests for a 30-day extension of a student's placement (indicating whether the District PBIS Office reviewed the request).

In spite of the limitations of the District's reporting on alternative placement, we identified several areas of concern with respect to the District's use of this disciplinary consequence. The District's "Annual Discipline Data Report 2015-2016" reveals that the District sends large numbers of students – 278 during the 2015-16 school year – to the alternative school. This is a particular problem at CMS, where one in 10 students received alternative placement. The number of students receiving alternative placement has also increased from SY 2014-15 to SY 2015-16, from 271 to 278.

The District's frequent use of the "serious campus disturbance" category, discussed above, appears partly responsible for the high number of referrals of students to the alternative school. Of the students referred to the alternative school for Level 4 or 5 infractions, 79 were for

**EXHIBIT 8**

serious campus disturbance, compared to 30 for staff assault, 16 for fighting, 13 for influence (alcohol/drug), 12 for group/gang fight, and 11 for drug possession.

Our analysis further revealed that, in a few cases, students are being recommended for alternative placement for lower level infractions in violation of the Consent Order. Six (6) students were recommended for alternative placement for Level 2 and 3 infractions: truancy, campus disturbance, defiance, and excessive inappropriate physical contact. Several of these infractions do not appear to rise to the level of a significant disruption for which placement is "necessary for the safety and welfare" of students. For example, a ninth grader at MHS was recommended for alternative placement for saying "no" when told to remove his earbuds and for being "very disrespectful . . . all the time never wants to do what he is being told." The description of the incident suggests that the alternative placement recommendation was based on the student's failure to respond to interventions. Another MHS ninth grader was recommended for alternative placement for "being disrespectful" when he came out of the restroom after being told to leave. In a third example, a ninth grader was recommended for alternative placement for skipping class; it is not clear from the description whether the student had skipped class before and whether the district attempted at least three separate interventions per Paragraph 63 of the Consent Order prior to considering exclusionary discipline. As discussed previously, the Order bars exclusionary discipline for tardy- and truancy-related incidents except in limited circumstances.

During our site visits, we also learned of a WHES kindergartener whom the District sent to the alternative school for throwing his shoe at a teacher. At PES, we learned that the District placed another kindergartener in the alternative school for "staff assault" because he "jumped at his teacher." This child had been at the alternative school before and was back at his home school less than a week when he was sent back to the alternative school for another 45 days.

*Reporting*

None of the 7,119 disciplinary incidents the District reported for the 2015-16 school year were recorded under the alternative School, although it is likely that incidents occurred there. It appears, therefore, that incidents occurring at the alternative school were recorded under a student's home school. Indeed, PBIS monthly reports to schools reflect large numbers of alternative school referrals recorded under a student's home school. As a result, counts of incidents at schools are likely inaccurate. **By April 20, 2017, we request that the District resubmit the discipline data spreadsheet, adding a column labeled "occurred at alternative school" and marking this box to indicate that an incident occurred at the alternative school. Please include this column in the discipline data spreadsheets in future reports**.

### E. Due Process

Paragraphs 72 through 82 require the District to provide students with due process prior to a suspension, expulsion, or alternative placement and with the right to appeal a suspension to a neutral hearing officer.

The District has provided verification forms from each school that affirm that they have provided due process to students who receive exclusionary discipline and District-level

**EXHIBIT 8**

verification reports that assess each school's compliance.  The District also notes in PowerSchool when it provides due process by entering "Y" for yes and "N" for no in students' disciplinary records.

Nonetheless, the District's documentation suggests continuing concerns about compliance with the Consent Order's due process provisions, which we also raised in our June 2015 letter.  First, the District's verification forms show that some schools do not hold informal hearings consistently and sometimes not at all.  For example, in the second semester of the 2015-16 school year, WHES reported three months during which it did not consistently provide students with due process.  Second, the District's 2015-16 school year discipline data shows 118 instances in which students received exclusionary discipline but no due process.

Third, while it is helpful that the District outlines the Consent Order's requirements with respect to due process and appeals in the Code of Conduct, it appears that the process may not be implemented with fidelity at the school level.  With the exception of one administrator, those interviewed during our May 2016 site visit largely considered due process to be satisfied when they inform a student's parent or guardian of the disciplinary consequence.  Parents with whom we spoke confirmed that administrators informed parents of the administrator's decision to suspend a child from school but did not give the parent a meaningful opportunity to participate in an informal hearing.  Indeed, the District's discipline data from the 2015-16 school year documents parent contact in 41% of all instances of due process and school-level or student contact in only 5% of the same.  Paragraph 74 of the Consent Order requires that the District provide students with an informal hearing "*prior* to imposing an out-of-school suspension or recommending expulsion or alternative placement . . .  [and] permit the student to call his or her parent and permit the parent to attend the conference if he or she is able to . . . ." Consent Order ¶ 74 (emphasis added).  Therefore, simply informing a parent of what the administrator has decided without giving the parent an opportunity to attend a conference where the student may respond to the charges before that decision is finalized is not adequate.

We have not received sufficient information to evaluate compliance with paragraphs 76-80, which outline the appeals procedure.  Though a parent reported that the District offered her child online courses during expulsion, the District has not provided information about the educational alternatives students receive during the period of expulsion, as required by paragraph 81.  Likewise, we do not have sufficient information to determine whether principals confer with parents about appropriate interventions upon a student's reinstatement.  We look forward to discussing how the District complies with these requirements on our upcoming call.

## F.  Relationship with Law Enforcement

Paragraphs 83 through 98 require changes to the District's involvement of law enforcement to address school-based conduct.

### 1.  Meridian Police Department and Juvenile Justice Agencies

Paragraph 83 requires that the District develop a written policy limiting referral of students to the Meridian Police Department ("MPD") for school-based conduct under certain delineated circumstances.  The District must also refrain from involving MPD in any situation

**EXHIBIT 8**

that can be safely and appropriately handled through the District's internal disciplinary procedures.  Consent Order ¶ 84.

The District and the Meridian Public School District Police Department ("MPSDPD") have not yet provided a written policy that guides referral of students to MPD, consistent with Paragraph 83.  We have consistently heard from District personnel and community members that MPD officers are no longer on school property as frequently as before the Parties entered into the Consent Order; it is not clear whether this is because MPD does not respond to calls from the schools, or because District staff contact MPD less often.

We have not received any report of MPD arresting a student at school[18] and therefore cannot determine whether the District has complied with Paragraph 85, which requires that school personnel contact a student's parents if MPD arrests a student.  However, our interviews with administrators revealed confusion about the process.  Thus, the District should ensure that its policy also clarifies that administrators must notify parents of arrests by MPD, if they occur.

Paragraph 86 prohibits the District from communicating a student's school discipline record to any external entity.   The administrators and School Resource Officers ("SROs") we interviewed did not demonstrate knowledge of this requirement and our review of incidents in arrest and citation records raised concerns about what information SROs share with MPD and Lauderdale County Juvenile Court ("LCJC").  In particular, the arrest records indicate and our interviews confirmed that when an SRO observes or becomes aware of a potentially arrestable offense, he contacts the LCJC to receive instructions regarding whether to arrest the student and transport him or her to the juvenile center.  We are concerned that these conversations convey information regarding students' discipline records in violation of paragraph 86.

Paragraph 92 states that the District "shall seek a Memorandum of Understanding ("MOU") between the MPSDPD and the MPD that delineates authority and specifies procedures for effectuating arrests of District students while on school grounds. . . . [and] prohibits arrests on school grounds, except where a student poses a serious and immediate threat to student, teacher, or public safety and Mississippi Code § 99-3-7[19] are satisfied or judicial warrant specifically directs the arrest of a student in a school."  We have provided feedback on various versions of the MOU during the past six months.[20]  Please provide an update regarding the status of the MOU.

During our upcoming site visit, we look forward to discussing the District's progress in drafting a written policy consistent with Paragraphs 83, 84, 85, and 86.

---

[18] MPD did assist with an arrest of a juvenile on school property in March 2016; however, the juvenile was not a student at the school.

[19] MS Code § 97-3-7 defines simple and aggravated assault.

[20] We also learned that two SROs also work as MPD officers, which underscores the need for an MOU that clearly delineates their responsibilities while working for each police force.

**EXHIBIT 8**

2. <u>Meridian Public School District Police Department and School Safety Officers</u>

   a. *Policies and Operating Procedures*

Paragraphs 87, 90, 93, 96, and 97 require the District to develop written policies and operating procedures that clearly define the roles of SROs and School Safety Officers ("SSOs") and address other issues likely to arise in the school setting.

On August 8, 2016, we held a conference call with the District, Private Plaintiffs, and our school policing expert to discuss the policy we received during our site visit.[21]  During that call, we expressed concern that the policy was written for a municipal police department, rather than a school-based police department.  Although the policy addresses some subjects required by the Consent Order, those discussions are not tailored to the school environment and did not address important considerations when dealing with children in schools.[22]

For example, Paragraph 96 requires the District to develop a use of force policy that, *inter alia*, describes the precise types of force SROs may use, and enables SROs to rely primarily on non-force techniques and de-escalate the use of force at the earliest possible moment.  However, as currently written, the policy includes de-escalation techniques that are inappropriate for use with children in schools and includes a use of force continuum intended for city policing using weapons that the District does not issue to its SROs.  Likewise, it does not adequately acknowledge (a) the District's expectation that most issues can and should be resolved without the use of force; (b) that force should not be used to enforce school disciplinary rules; or (c) that the use of force in an educational environment requires special thoughtfulness, concern, and training.  Our interviews with SROs also revealed confusion about what constitutes a use of force, when and how to report a use of force, as well as a lack of knowledge of age-appropriate techniques.

In addition, the policy does not define the roles of SROs and SSOs relative to administrators, educators, and other non-MPSDPD staff, nor does it limit when SROs may arrest a student, as provided for in Paragraph 93.  The policy also does not address many other subjects required by Paragraph 87, such as youth-appropriate policing techniques, use of restorative approaches to address student behaviors, notification to parents when students are arrested, opportunities for community stakeholder meetings, and the collection, analysis, and use of data regarding law enforcement activities.

Similarly, the policy does not include a complaint process by which parents, students, and others can submit complaints regarding the actions of SROs and SSOs that includes an appropriate investigative and response mechanism, as required by Paragraph 97.  In the August 2015 report, the District provided what appears to be an internal form that it will use once the District receives a complaint.  However, our interviews with SROs and administrators demonstrated confusion over how a student or parent would file a complaint to begin with.  The District should ensure that the complaint process is accessible to members of the school community and provide additional information regarding how it would respond to a complaint.

---

[21] The SROs we interviewed stated that they had not received any training on these policies.
[22] Relatedly, the policies address many subjects not applicable to school policing.

**EXHIBIT 8**

We would like to schedule a call to discuss the District's plan to draft written policies and operating procedures consistent with Paragraphs 87, 90, 93, 96, and 97, and to train MPSDPD personnel on those policies.

    *b.*   *Practices*

Although SROs reported that they act as positive role models for students and serve as educators, as required by Paragraph 88, they gave limited examples of how they do so. We encourage the District to identify opportunities for SROs in addition to acting as D.A.R.E. facilitators and to provide training on how SROs can fulfill their roles as positive role models.

Our interviews with administrators and SROs underscored the staff's uncertainty about when it was appropriate to involve SROs in school matters. Consistently, both groups explained that administrators call SROs when a student has weapons or drugs,[23] which are important elements of the Consent Order's requirements, but not comprehensive. *See, e.g.*, Consent Order ¶¶ 89 (listing public order offenses that shall be treated as school discipline issues rather than criminal law issues warranting SRO involvement); 93 (SROs may arrest a student only when they have probable cause to believe he or she committed unlawful activity, as defined by Mississippi Code § 37-11-29(6)). Indeed, arrest reports and discipline records illustrate incidents in which SROs became involved in school-discipline incidents that could have been safely handled by administrators.

During the 2014-2015 and 2015-2016 school years, there were nine arrests of students for disorderly conduct. According to Paragraph 89 of the Consent Order, public order offenses, such as disorderly conduct, "shall be considered school discipline issues to be handled by school officials, rather than criminal law issues warranting SRO involvement, unless SRO involvement is necessary to protect the physical safety of students or school personnel, or public safety." The arrest reports for eight of these nine incidents do not contain sufficient facts to demonstrate that SRO involvement was necessary to protect school safety. Three incidents contain no indication that there was a safety concern. Another five disorderly conduct arrest reports indicate that SROs became involved in school discipline matters and only *after* the SRO became involved the students became combative, which, presumably, was the basis for an arrest for disorderly conduct. However, the limitation on when SROs may become involved in student disciplinary incidents does not allow for this backwards-looking justification. Instead, there must be a safety concern at the outset of the incident that warrants law enforcement intervention. *See* Consent Order ¶ 89. In addition, these incidents underscore the need for training on and employment of age-appropriate de-escalation techniques. *See* Consent Order ¶¶ 87, 90.

Paragraph 89 provides that District personnel will not involve SROs to respond to any situation that can be safely and appropriately handled by internal disciplinary procedures. Further, Paragraph 91 states that only the SDAT can request SRO or SSO intervention unless there is an emergency. While not all arrest records make clear who contacted the SRO, several

---

[23] One SRO reported that teachers and administrators call SROs if there is a "law enforcement issue," which he defined as anything outside of disorderly conduct. This clearly does not reflect a sufficient understanding of the Consent Order's requirements and indicates a need for further training.

**EXHIBIT 8**

indicate that SROs responded at the request of a teacher, athletic coach, or SSO, who are not members of the SDAT.  At least one student was arrested after a teacher notified a SRO that the student was disrupting class, which clearly violates the Consent Order.  In addition, the discipline data also includes incidents in which non-SDAT staff contacted SROs to handle disciplinary matters.  The District should ensure that it is reviewing all records of law enforcement contact, including arrest and citation records and discipline data, to ensure compliance with paragraphs 89 and 91.  When these records indicate that persons other than the SDAT are requesting SROs and SSOs in non-emergency situations, the District should follow up with those persons to ensure that they understand the appropriate protocol and provide additional training and classroom support as necessary.

Once law enforcement responds to situations involving students, Paragraph 93 limits when an arrest can be made on school grounds, stating "no arrest shall be made without establishing probable cause that the student has committed an unlawful activity, as defined by Mississippi Code § 37-11-29(6)."  Mississippi Code § 37-11-29(6) defines unlawful activity as possession of a deadly weapon; possession, sale, or use of any controlled substance; aggravated assault; simple assault; rape; sexual battery; murder; kidnapping; or fondling, touching, handling a child for lustful purposes.  In the 2014-15 school year, 10 out of 18 arrests involved charges for offenses not defined as unlawful activity.  In the 2015-16 school year, one student was arrested for disorderly conduct.  All of these students are black.  Our expert also identified at least one arrest record that did not contain information regarding probable cause for the arrest.  Although such non-compliant arrests appear to have decreased over these two school years,[24] we are concerned that this trend may not continue unless the District implements sufficient training and procedures on when law enforcement may arrest students for school-related activity.

We are alarmed to see that a single SRO conducted 29 of the 32 arrests that took place during the 2014-15 and 2015-16 school years.  The documentation we have received also indicates that the District suspended this same SRO at least once for becoming "aggressive" during an arrest of a student.  On our upcoming call, we would like to discuss any additional steps the District has taken with respect to this SRO.

We also were concerned to learn that SROs often contact LCJC, which directs the SROs to arrest and transport a student.  This process interferes with the important role the Superintendent, Assistant Superintendent of Student Services, and SDATs play in determining when school police become involved in school matters.  Additionally, SROs were generally unaware that Paragraph 93 requires them to receive permission from the Superintendent or Assistant Superintendent of Student Services or obtain a warrant,[25] unless it is an emergency, as required by Paragraph 93.

---

[24] Although there was a decrease in arrests that did not meet the definition of unlawful activity, the total number of arrests by SROs has increased since we entered into the Consent Order.  In the 2013-14 school year, there were nine arrests; in 2014-2015, there were 17 arrests; and in 2015-16, there were 15 arrests.  Because we have not received citation records beyond the 2015-16 school year, we do not know how many citations SROs issued in prior school years.  However, following our onsite request we received documentation of 10 citations in 2015-16.

[25] There is no arrest record indicating that a SRO obtained a warrant for an arrest in the 2014-15 and 2015-16 school years.

**EXHIBIT 8**

During our site visit, we learned that when the LCJC declines to have an SRO transport a student, the SRO will issue a citation to the student. Until the August 2016 report, we had received no record of these citations. Because we have not received records for prior school years, we cannot determine whether SROs issued citations for student behavior that school administrators could safely and appropriately address through the District's internal discipline policies. *See* Consent Order ¶¶ 89, 91, 93. Two of the 10 citations that we have had the opportunity to review are for behavior that does not constitute unlawful activity as defined by Mississippi Code § 37-11-29(6).

Paragraph 94 requires the District to notify parents if their child is arrested at school. District employees we spoke with were inconsistent about the protocol. Three principals indicated they will notify parents when their child is arrested. Two principals reported that SROs have arrested students on school grounds without their knowledge and when that happens, they do not notify parents. Accordingly, we are also concerned that when arrests happen, the District does not always "notify the student's parent(s) as soon as practicable." Consent Order ¶ 94.

Paragraph 90 requires that SROs and SSOs who witness fights use age-appropriate conflict resolution techniques to de-escalate the situation and refer to school personnel at the earliest opportunity. The SROs with whom we met did not demonstrate knowledge of age-appropriate de-escalation techniques. Although SROs reported receiving training on such techniques, they could not recall any specific technique beyond separating the students who were fighting. This lack of training is apparent from the discipline data and arrest records that show that once an SRO or SSO becomes involved, often an incident will escalate rather than de-escalate. For example, one arrest record states when that a student was involved in an argument with another student, an SSO grabbed one student's arm, who then pulled away from the SSO. The incident escalated, culminating with an SRO restraining the student on the ground and then arresting the student for disorderly conduct. This incident raises questions about SROs' ability to deescalate situations and whether they have adequate training to know when it is appropriate to restrain a student and how to do so, which is required by Paragraph 96.

Paragraph 96 requires that SROs use physical force or restraints on a student only if there is a serious and immediate threat to safety. Although the District submitted a document entitled, "MPSD Police Department Use of Force Quarterly Log," that document is blank and therefore does not show that the District is reviewing instances of force. When asked about its restraint practices, the District submitted a letter stating, "Restraint . . . [is] not [a] disciplinary consequence[] permitted by the Meridian Public School District's Code of Conduct." While it may be the case that the District does not permit restraints under the Code, the arrest and citation records and discipline data indicate that restraints continue to take place in the District's schools. Many of these reports do not contain sufficient details to demonstrate that the restraint or force was appropriate under the Order and therefore demonstrate an urgent need for the District to train its SROs on how to properly document such incidents, so that they may be regularly reviewed by the Chief of Police and the Superintendent.

During our interviews, SROs and administrators acknowledged that SROs should not conduct administrative searches, as required by Paragraph 95. However, there are several discipline records indicating that SROs have searched students during the last two school years.

**EXHIBIT 8**

We encourage the District to review all arrest records to ensure continued compliance with this provision and that the records contain sufficient detail of compliance.

**By April 20, 2017, we request that the District provide records of all citations given to students during the pendency of the Consent Order and a copy of the incidents of service log for school year 2014-15, 2015-16, and 2016-17.** We would also like to schedule a call to discuss the steps the District will take to improve implementation of these provisions and to discuss any updates the District has on these issues.

### c. Training

Paragraph 89 requires that SROs and SSOs must receive training as required by Mississippi Department of Education and supplemental training on bias-free policing; working with youth; practices to improve school climate; mentoring, counseling, and classroom presentation skills; working with children with disabilities; the consequences of student involvement in the criminal/juvenile justice system; working collaboratively with school administrators; and school training on PBIS and discipline policies. We have not received sufficient documentation of these trainings and the SROs we spoke to could not recall the substance of any training they received. One SRO reported that he had received no training on the Consent Order. On March 25, 2016, we provided the District with information about how it can request training and technical assistance from the Department of Justice's Office of Juvenile Justice and Delinquency Prevention ("OJJDP"). Please provide an update regarding whether the District requested those resources and whether there are any upcoming OJJDP-related trainings.

**By April 20, 2017, we request that the District provide additional information regarding the training SROs and SSOs have received, including sign-in sheets, agendas, copies of presentations, and the name(s) of presenters. To the extent any of the above topics are not covered in that training, please provide a plan for providing training as required by the Consent Order.**

### d. Data Collection, Review, and Self-Assessment

Paragraph 105 requires that the District PBIS Office collect and review disaggregated data on at least a quarterly basis regarding referrals to law enforcement agencies and school-based arrests. Paragraph 106 requires the District to "review every instance in which an officer of the MPSDPD, the MPD, or any other law enforcement agency intervened in response to school-based acts that resulted in exclusionary discipline, restraint, or arrest" and determine whether the District's involvement of law enforcement was appropriate. The District must take remedial steps to address incidents in which such involvement was not appropriate. *Id.*

As discussed above, both the number of arrests that occurred in contravention of the Order – and the fact that a single SRO conducted almost all of these arrests – raise concerns. We encourage the District to revisit its processes for reviewing arrest and citation records as well as other instances of exclusionary discipline that involve law enforcement.

**By April 20, 2017, we request that the District should provide a plan for reviewing arrests, citations, and exclusionary discipline that involved law enforcement, to determine**

**EXHIBIT 8**

**whether steps to remedy inappropriate actions of either school personnel or the law enforcement officer are warranted.  The District should also develop a procedure for reviewing all incidents involving SROs and SSOs to ensure compliance with the Consent Order.**

### G.  Professional Development

1.  PBIS Training

   a.  *Administrators and Instructional Staff*

Paragraphs 35-38 and 100 require the District to provide administrators and instructional staff with professional development on tools and techniques needed to create and support positive classrooms and school environment.  Paragraphs 37-38 and 100 require the District to provide administrators with professional development on practices and skills necessary to foster a supportive school environment.

The District has made progress in complying with these requirements and has sufficiently documented staff trainings for each school and offered trainings to administrators during the Administrative Retreat, SWIFT Leadership Team Meetings, and the Administrators Meeting.[26] In particular, during the administrators' October meeting, the District did a commendable job addressing the Order's requirements.   During our May 2016 visit, some of the administrators and instructional staff we interviewed struggled to identify a broad range of appropriate intervention techniques.  Likewise, several members of SDATs, who are responsible for identifying disparities in their schools' discipline, had difficulty understanding that schools with predominantly black student populations could still have racial disproportionality in the administration of disciplinary consequences.  The District should continue to work with its consultants to identify employees who need additional training and provide it to them.

We also commend MHS, OHES, and NWMS for taking additional steps to train instructional teachers,[27] and encourage other schools to consider taking similar action.

   b.  *For PBIS Coordinators*

Paragraph 102 requires PBIS coordinators to receive specialized training on PBIS, restorative justice, and other behavior management techniques; youth mental health needs; special disciplinary concerns, and other training as necessary to perform their duties.  We commend the District for fully complying with Paragraph 102, as it is clear from the District's submissions that that the PBIS coordinators receive extensive training on all of these requirements.[28]

---

[26] "Administrative Retreat", 7/27-29/2015; "Administrators-SWIFT Leadership Team Meeting", 8-15-15; "Administrators-SWIFT Leadership Team Meeting", 9-23-15; "Administrators Meeting", 10-20-15
[27] NW_Site-Specific PD; MHS_Site-Specific PD_Advisory Training_October & November 2015; Oakland Heights_Site-specific PD_November 3 & 10, 2015
[28] PBIS Coordinators & Behavior Counselors Meetings_2-10-16; PBIS Coordinators & Behavior Counselors Meetings_4-13-16; PBIS Coordinators & Behavior Counselors Meetings_5-11-16

**EXHIBIT 8**

*c.  Other Training*

The Consent Order does not explicitly require the District to provide PBIS to non-instructional staff, such as cafeteria workers and bus drivers.  We commend the District for taking these extra steps to engage all of its personnel in the PBIS process.

2.    Training Related to the Code, Consent Order, and Race-Related Issues

Paragraph 101(b) requires the District to provide administrators and instructional staff with practical and detailed descriptions of the Code of Conduct.  Paragraph 101(e) requires the District to provide training to all administrators and instructional staff on cultural awareness in the provision of classroom management and student discipline, including interactive dialogue about the relationship between discipline and race.  Paragraph 101(f) requires the District to provide an explanation of the Order's requirements to all instructional staff and administrators that is appropriate to their job or position.

The District has taken substantial steps to comply with these provisions.  Every school had a staff presentation on the Code of Conduct, Consent Order, and cultural awareness in the provision of classroom management and student discipline.  We also commend the District for offering trainings on these issues every year to new staff members.  However, many of the presentations provided to us contained little content.  As such, we request the opportunity to review some of the training materials during our upcoming site visit.

3.    Law Enforcement-Related Training for Administrators and Instructional Staff

Paragraph 101(c) requires the District to provide administrators and instructional staff with professional development on the limited role of law enforcement in discipline, with a focus on when it is appropriate to refer a student to law enforcement, and the educational impact of student involvement in the juvenile justice system.

The District has made progress in its efforts to provide training to all administrators and instructional staff on the requirements of Paragraph 101(c).  On July 29, 2015, the District provided professional development training on Paragraph 101(c) requirements to all school administrators, and in the fall of 2015, Chief Clayton visited each school and spoke to the faculty and staff about the role of SSOs and SROs.  However, as discussed in Section F, the administrators and staff did not demonstrate consistent knowledge of the proper procedures for when and how to refer students to SSOs and SROs.  Because the District did not provide the content of these trainings, it is unclear if they fulfill Paragraph 101(c)'s requirements.[29]  As such, we recommend that the District refine its training to address these issues and provide detailed content of these presentations, such as PowerPoints, summary notes, and handouts.

## H.  DATA COLLECTION, DATA REVIEW, AND SELF-ASSESSMENT

Paragraph 104 requires the District PBIS Office to collect and review on at least a quarterly basis disaggregated discipline data from each school on the imposition of exclusionary

---

[29] "Meridian High School SSO-SRO Training" 9-28-15; "Poplar Springs_SSO-SRO Training" 10-26-15.

**EXHIBIT 8**

discipline, corporal punishment, and restraint and seclusion and identify racial disparities or disproportionality.  If disparities or disproportionality are identified, the District PBIS Office and the DAC must develop a responsive action plan and make recommendations to the Board.  The District calculates risk ratios for each disciplinary consequence by school in its quarterly discipline data reports and has developed school-wide Responsive Action Plans that address racial disproportionality.  As such, it has substantially complied with this provision of the Consent Order.

Paragraph 107 requires the District PBIS Director or his designee to meet semi-annually with each school principal to review the school's discipline data and to provide particularized assistance to school principals when needed.  Paragraph 108 requires the District to annually survey a representative sample of families about its discipline policies and procedures, and to use the results of those surveys to inform any policy changes and the responsive action plans described in the previous subsection.  The District has substantially complied with these sections of the Consent Order.

We look forward to continuing to work with the District to address the issues identified in this letter.  Please contact Natane Singleton (Natane.Singleton@usdoj.gov; 202-307-6880) or Aria Vaughan at (Aria.Vaughan@usdoj.gov; 202-616-2166) to schedule a call to discuss next steps.

Sincerely,


*/s/ Natane Singleton*                                    */s/ Aria S. Vaughan*
Natane Singleton                                          Aria S. Vaughan


CC:     Victorien Wu, NAACP Legal Defense and Educational Fund, Inc.
        Natasha Merle, NAACP Legal Defense and Educational Fund, Inc.

**EXHIBIT 8**