**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**JOHN BARNHARDT, ET AL.**                                             **PLAINTIFFS**

**and**

**UNITED STATES OF AMERICA**                          **PLAINTIFF INTERVENOR**

**v.**                                         **CIVIL ACTION NO. 4:65-cv-01300–HTW-LRA 1300(E)**

**MERIDIAN MUNICIPAL SEPARATE**
**SCHOOL DISTRICT, ET AL.**                                           **DEFENDANTS**

_____

**MEMORANDUM IN SUPPORT OF MOTION**
**FOR DECLARATION OF UNITARY STATUS**

The Meridian Public School District (the "District") formerly known as the Meridian Municipal Separate School District, submits this memorandum in support of its motion for declaration of unitary status.  The District has complied in good faith with this Court's desegregation orders and has eliminated, to the extent practicable, all vestiges of discrimination resulting from the former racially dual system.  The District is unitary because each of the following areas is fully desegregated: student assignment, faculty, staff, student transportation, facilities, extracurricular activities, and discipline.  The District respectfully requests the Court grant its motion and declare the District unitary, dissolve all injunctions entered in this case, and dismiss this case with prejudice.

# I.    Summary of the Case

On May 10, 1965, private plaintiffs John Barnhardt, *et al.*, then-minor students, by their parents, initiated this lawsuit against the District, seeking disestablishment of its *de jure* racially dual school system.  On June 28, 1965, this Court allowed the Government to intervene as a plaintiff.

On May 29, 1967, the Court ordered the desegregation of the District's schools and approved a freedom of choice attendance plan.  On November 7, 1969, the Court of Appeals for the Fifth Circuit issued an Order enjoining the District from operating a dual school system based on race or color and requiring the District to operate a unitary school system.  Exhibit 1.[1] The Fifth Circuit ordered the immediate implementation of a desegregation plan (the "Plan") prepared by the United States Department of Health, Education, and Welfare.  The November 7, 1969, Order allowed modifications to the Plan after consideration by District Court Judge Dan M. Russell, Jr., subject to further order by the Fifth Circuit Court of Appeals.

By Order of November 19, 1969, the Fifth Circuit approved amendments to the Plan, redrawing attendance zones for seventh, eighth, and ninth-grade students to attend four schools: Carver Junior High School (7th grade) and Kate Griffin Junior High (8th and 9th), Magnolia Junior High School (7th grade) and Northwest Junior High School (8th and 9th).

By Order of March 30, 1970, the Fifth Circuit required the District to file reports with the Court setting out certain information about school operations.

On July 14, 1970, Judge Russell issued findings of fact and recommendations for additional amendments to the Plan's geographical attendance zones for assignment of students in grades one through six to ten elementary schools.  The amendments to the Plan were necessary, because Magnolia Elementary was being used as a junior high school and Chalk Elementary had

---

[1]    All Exhibits are attached to the Motion for Unitary Status, filed contemporaneously.

been destroyed by fire.  On July 20, 1970, the Fifth Circuit approved these amendments to the Plan.  The amendments were effective for the 1970-71 school year, establishing ten elementary schools each serving grades one through six within a specific geographical student attendance zone as described in the Order.  Exhibit 2 (the "Amended Plan").

By Order of March 20, 1974, the Fifth Circuit, finding the District "has been and is being maintained as unitary school system" in compliance with its desegregation orders,  transferred jurisdiction of the case to the District Court to be placed on its inactive docket.  Per the Order, reports to the Fifth Circuit were discontinued.  Instead, reports were to be filed with the District Court and retained for two years for examination by counsel for plaintiffs.

On June 19, 2009, this Court entered an Order modifying the Desegregation Plan permitting closing of Kate Griffin Junior High School and constructing a new ninth-grade facility for all ninth-grade students.  Attendance zones for students in grades six through eight were also reconfigured providing for three middle schools (Carver Middle, Magnolia Middle, and Northwest Middle).  Witherspoon Elementary School was closed, and its attendance zone was divided between Crestwood Elementary and Parkview Elementary.

On March 22, 2013, in response to concerns raised by the Government and Private Plaintiffs' regarding the District's student discipline practices and racial disparities in the imposition of disciplinary sanctions, including exclusionary sanctions such as suspension, expulsion, and referrals to law enforcement agencies, this Court approved entry of a Consent Order regarding the District's disciplinary practices and providing for implementation of positive behavior interventions and support ("PBIS") to reduce exclusionary discipline.  [36]. The purpose of the Consent Order is to ensure student discipline is administered in a fair and non-discriminatory manner,  to reduce the disproportionate assignment of exclusionary sanctions to

black students, and to provide all students with an equal opportunity to learn in a safe, orderly, and supportive environment.  [36].

## II.      The Meridian Public School District is unitary.

The District has complied in good faith with this Court's desegregation orders for a reasonable period of time, and has eliminated the vestiges of racial discrimination resulting from the former racially dual system to the extent practicable.  The District is unitary because, as explained below, each of the following areas is fully desegregated: student assignment, faculty, staff, transportation of students, facilities, extracurricular activities, and disciplinary practices.

## A.      Legal standard and burden of proof

The end purpose of a desegregation order is to remedy the constitutional violation to the "extent practicable" and to restore the school system to the control of the local school board. *Missouri v. Jenkins*, 515 U.S. 70, 102 (1995).  A school district is not required to achieve "maximum desegregation."  *Anderson v. Canton Municipal Separate School District*, 232 F.3d 450, 455 (5th Cir. 2000) (quoting *Monteilh v. St. Landry Parish School Board*, 848 F.2d 625, 632 (5th Cir. 1988)).  The U.S. Supreme Court has rejected the idea that a school district must eliminate vestiges of segregation "to the maximum extent practicable."  *Missouri v. Jenkins,* 515 U.S. at 101.  Rather, the proper judicial inquiry is whether a school district has remedied the vestiges of *de jure* segregation "to the extent practicable," not to the maximum potential.  *Id.*

The remedial powers of a federal equity court are not unlimited, and "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions."  *Id.*

There must be a Constitutional violation before a federal court's authority to fashion a remedy is triggered:

> The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation itself. Because of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation, or if they are imposed upon units that were neither involved in nor affected by the constitutional violation.

*Milliken v. Bradley*, 433 U.S. 267, 281-82 (1977) (citing *Pasadena City Board of Education v. Spangler*, 427 U.S. 424 (1976); *Hills v. Gautreaux*, 425 U.S. 284, 292-296 (1976)). In other words, any desegregation decree "must directly address and relate to the constitutional violation itself." *Id*.

Second, the decree must be remedial in nature, that is, it must be designed as nearly as possible to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct. *Milliken v. Bradley,* 433 U.S. at 280-81 (internal quotations omitted).

Third, courts "must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Id*. "School authorities have the primary responsibility for elucidating, assessing, and solving these problems. . ." *Brown v. Board of Education of Topeka, Kansas*, 349 U.S. 294, 299 (1955).

To prevail on its motion for unitary status, the District must show that it has 1) eliminated all vestiges of *de jure* discrimination to the extent practicable; 2) complied with this Court's desegregation orders for a reasonable period of time; and, 3) demonstrated its good-faith commitment to the constitutional rights that were the original predicate for the injunctive relief this Court awarded. *Freeman v. Pitts*, 503 U.S. 467, 491 (1992); *Board of Education v. Dowell*,

498 U.S. 237, 249-50 (1991).  The District must demonstrate compliance with respect to student assignment, faculty, staff, transportation, facilities, and extra-curricular activities.  *Green v. County School Board of New Kent County*, 391 U.S. 430, 435 (1968).  Additionally, the District must demonstrate compliance with respect to student discipline under the 2013 Consent Order.

**B.**    **The District has eliminated, to the extent practicable, all vestiges of past discrimination and has complied with this Court's orders.**

   **1.**    **Student assignment**

The District operates a school system "where schools are not white schools or Negro school—just schools."  *United States v. Jefferson County Board of Education,* 372 F.2d 836, 890 (1966), *aff'd. en banc*, 380 F.2d 385 (5th Cir. 1967).

In 1969, the District enrolled 10,823 students of which 6,418 (59%) were white and 4,405 (41%) were black.  Ex. 1, p. 3.  Reports filed by the District with the Fifth Circuit for school years 1971 through 1973 show the District complied immediately with the student assignment requirement of the Plan.  A chart showing student enrollment by school, by race, for school years 1970-71, 1971-72, and 1972-73, follows:

**Enrollment for 1970-71 through 1972-73:**

| School Year | School | Black | White | Other Races | Total |
|---|---|---|---|---|---|
| **1970-71** | Crestwood Elementary | 141 (38%) | 227 (62%) | 0 | 368 |
| | Highland Elementary | 159 (48%) | 174 (52%) | 0 | 333 |
| | Marion Park Elementary | 160 (49%) | 169 (51%) | 0 | 329 |
| | Mount Barton Elementary | 236 (57%) | 180 (43%) | 0 | 416 |
| | Oakland Heights Elementary | 207 (39%) | 323 (61%) | 0 | 530 |
| | Parkview Elementary | 203 (40%) | 309 (60%) | 0 | 512 |
| | Poplar Springs Elementary | 291 (46%) | 345 (54%) | 0 | 636 |

|  | School | Black | White | Other Races | Total |
|---|---|---|---|---|---|
|  | West End Elementary | 363 (48%) | 391 (52%) | 3 (<1%) | 757 |
|  | West Hills Elementary | 259 (42%) | 362 (58%) | 0 | 621 |
|  | Witherspoon Elementary | 236 (52%) | 222 (48%) | 0 | 458 |
|  | East End Kindergarten | 140 (84%) | 27 (16%) | 0 | 467 |
|  | Wechsler Kindergarten | 150 (83%) | 31 (17%) | 181 |  |
|  | Carver Junior High | 226 (49%) | 235 (51%) | 0 | 461 |
|  | Magnolia Junior High | 211 (49%) | 218 (51%) | 0 | 429 |
|  | Kate Griffin Junior High | 333 (45%) | 402 (55%) | 0 | 735 |
|  | Northwest Junior High | 401 (46%) | 467 (54%) | 0 | 868 |
|  | Harris Campus | 277 (45%) | 345 (55%) | 0 | 622 |
|  | Meridian High School | 560 (38%) | 898 (62%) | 0 | 1,458 |
|  | **Total** | 4,553 (46%) | 5,325 (54%) | 3 (<1%) | 9,881 |

| 1971-72 | **School** | **Black** | **White** | **Other Races** | **Total** |
|---|---|---|---|---|---|
|  | Crestwood Elementary | 128 (39%) | 200 (61%) | 0 | 328 |
|  | Highland Elementary | 165 (53%) | 144 (47%) | 0 | 309 |
|  | Marion Park Elementary | 131 (47%) | 149 (53%) | 0 | 280 |
|  | Mount Barton Elementary | 191 (52%) | 173 (48%) | 0 | 364 |
|  | Oakland Heights Elementary | 292 (49%) | 299 (51%) | 1 (<1%) | 592 |
|  | Parkview Elementary | 333 (69%) | 151 (31%) | 484 |  |
|  | Poplar Springs Elementary | 251 (41%) | 364 (59%) | 4 (.6%) | 619 |
|  | West End Elementary | 285 (47%) | 316 (52%) | 3 (.5%) | 604 |
|  | West Hills Elementary | 223 (41%) | 322 (59%) | 0 | 545 |
|  | Witherspoon Elementary | 332 (62%) | 204 (38%) | 0 | 536 |
|  | Carver Junior High | 318 (46%) | 366 (54%) | 0 | 684 |

| | School | Black | White | Other Races | Total |
|---|---|---|---|---|---|
| | Kate Griffin Junior High | 385 (49%) | 404 (51%) | 0 | 789 |
| | Magnolia Junior High | 207 (50%) | 210 (50%) | 0 | 417 |
| | Northwest Junior High | 386 (46%) | 446 (54%) | 0 | 832 |
| | Meridian High – Harris | 320 (45%) | 391 (55%) | 0 | 711 |
| | Meridian High School | 582 (43%) | 773 (57%) | 0 | 1,355 |
| | **Total** | 4,529 (48%) | 4,912 (52%) | 8 (<1%) | 9,449 |
| **1972-73** | **School** | **Black** | **White** | **Other Races** | **Total** |
| | Crestwood Elementary | 129 (41%) | 183 (59%) | 0 | 312 |
| | Highland Elementary | 153 (52%) | 138 (47%) | 0 | 291 |
| | Marion Park Elementary | 152 (54%) | 131 (46%) | 0 | 283 |
| | Mount Barton Elementary | 180 (53%) | 158 (47%) | 0 | 338 |
| | Oakland Heights Elementary | 275 (49%) | 281 (50%) | 1 (.2%) | 557 |
| | Parkview Elementary | 335 (72%) | 130 (28%) | 0 | 465 |
| | Poplar Springs Elementary | 246 (43%) | 332 (57%) | 0 | 578 |
| | West End Elementary | 283 (47%) | 317 (53%) | 2 (<1%) | 602 |
| | West Hills Elementary | 237 (42%) | 326 (58%) | 3 (<1%) | 566 |
| | Witherspoon Elementary | 335 (65%) | 181 (35%) | 0 | 516 |
| | Carver Junior High | 310 (48%) | 331 (52%) | 0 | 641 |
| | Kate Griffin Junior High | 415 (48%) | 449 (52%) | 0 | 864 |
| | Magnolia Junior High | 170 (43%) | 229 (57%) | 0 | 399 |
| | Northwest Junior High | 371 (49%) | 382 (51%) | 1 (<1%) | 754 |
| | Meridian High – Harris | 289 (45%) | 348 (55%) | 0 | 637 |
| | Meridian High School | 525 (41%) | 741 (59%) | 0 | 1,266 |
| | **Total** | 4,405 (49%) | 4,657 (51%) | 7 (<1%) | 9,069 |

During these first three years of Plan implementation, total white enrollment was slightly in the majority (54% declining to 51%).  Although there is no specific racial quota for student assignment, all of the District's schools had student enrollment within +/- 20% of the District's enrollment by race, with the exception of Parkview Elementary which fell out of deviation by 1% for school years 1971-72 and 1972-73.[2] [3]  No school was racially identifiable; therefore, the District complied immediately with the Plan as to student assignment.

Students in grades 10-12 were perfectly integrated with all students in those grades attending Meridian High (grades 11 and 12) and Harris (grade 10).  Students in grades 7-9 were divided into two attendance zones, with one zone attending Carver Junior High for grade 7 and moving to Kate Griffin Junior High for grades 8 and 9, and students in the other zone attending Magnolia Junior High for grade 7 and moving to Northwest Junior High for grades 8 and 9.   All of the schools for grades 7-9 were integrated.  The amended Plan included ten elementary schools (Crestwood, Highland[4], Marion Park, Mount Barton, Oakland Heights, Parkview, Poplar Springs, West End, West Hills, and Witherspoon) and two kindergartens, East End and Wechsler.  The kindergarten schools were closed after the 1970-71 school year.

Over the forty-five years of operation under the Plan, the District's student enrollment has decreased by half.  The District converted Marion Park Elementary into an alternative school serving all students in the District, closed Mount Barton Elementary, and moved the tenth grade to Meridian High.  By Order of this Court in 2009, the District constructed a new school for all ninth-grade students on the Meridian High campus.  The 2009 Order also approved closing Kate

---

[2]       Further, all schools were within +/- 15 percent of the district-wide average for all three years with the exception of Witherspoon in 1972-73 and Parkview Elementary as mentioned above.

[3]       Because the kindergarten schools were closed after the first year of Plan implementation, they are not included in this analysis.

[4]       Highland Elementary was later closed and its population absorbed by Marion Park and West End Elementary.  Highland burned in the late 1970s or early 1980s, while unoccupied.

Griffin Junior High and reconfiguring the attendance zones for the remaining three junior highs

for grades 6-8.  The 2009 Order approved closing Witherspoon Elementary and reconfiguring its

attendance zone between the adjoining zones for Parkview and Crestwood Elementary schools.

**Enrollment for 2017-18**:

For the current school year, 2017-18, the District's total student enrollment is 5,371:

4,864 African-American (91%); 328 white (6%), and; 179 other ethnicities (3%).  Below is a

chart showing student enrollment by school and by race for the 2017-18 school year.

| School | Black | White | Other Races | Total |
|---|---|---|---|---|
| Crestwood Elementary | 307 (89%) | 14 (4%) | 24 (7%) | 345 |
| Harris Lower and Upper Elementary | 589 (96%) | 13 (2%) | 10 (2%) | 612 |
| Oakland Heights Elementary | 427 (89%) | 28 (6%) | 26 (5%) | 481 |
| Parkview Elementary | 432 (97%) | 10 (2%) | 4 (1%) | 446 |
| Poplar Springs Elementary | 306 (64%) | 132 (28%) | 38 (8%) | 476 |
| West Hills Elementary | 501 (96%) | 12 (2%) | 10 (2%) | 523 |
| Carver Middle | 302 (93%) | 11 (3%) | 10 (3%) | 323 |
| Magnolia Middle | 287 (91%) | 14 (4%) | 15 (5%) | 316 |
| Northwest Middle | 428 (91%) | 28 (6%) | 12 (3%) | 465 |
| Meridian High School | 1,288 (93%) | 66 (5%) | 30 (2%) | 1,384 |
| **Total** | 4,864 (91%) | 328 (6%) | 179 (3%) | 5,371 |

In the original HEW Plan, all schools were projected to have a majority white enrollment.

Since 1969, however, the District has experienced a 49% loss in total enrollment, with white

student loss outpacing black student loss.  Today, every school has majority black enrollment,

ranging from 64% to 97%.  No school is racially identifiable.

2.        **The District's faculty is integrated.**

The Plan requires the District to assign staff who work directly with students so that in no case will the racial composition of the staff indicate that a school is intended for black or white students.  Ex. 1, p. 16.  The Plan does not set a quota or percentage for black faculty and staff working directly with children.  The Plan also requires the District to hire, assign, promote, pay, demote and dismiss employees without regard to race except to the extent necessary to correct discrimination.

Following is a chart showing the full-time faculty at each school, by race, for the initial years of implementation of the Plan.

**Full-time Teacher Assignment for 1970-71 through 1972-73**:

| School Year | School | Black | White | Other Races | Total |
|---|---|---|---|---|---|
| **1970-71** | Crestwood Elementary | 4 (31%) | 9 (69%) | 0 | 13 |
| | Highland Elementary | 5 (29%) | 12 (71%) | 0 | 17 |
| | Marion Park Elementary | 4 (36%) | 7 (64%) | 0 | 11 |
| | Mount Barton Elementary | 7 (35%) | 13 (65%) | 0 | 20 |
| | Oakland Heights Elementary | 8 (33%) | 16 (67%) | 0 | 24 |
| | Parkview Elementary | 8 (33%) | 16 (67%) | 0 | 24 |
| | Poplar Springs Elementary | 6 (29%) | 15 (71%) | 0 | 21 |
| | West End Elementary | 14 (50%) | 14 (50%) | 0 | 28 |
| | West Hills Elementary | 9 (32%) | 19 (68%) | 0 | 28 |
| | Witherspoon Elementary | 5 (29%) | 12 (71%) | 0 | 17 |
| | East End Kindergarten | 5 (62.5%) | 3 (37.5%) | 0 | 8 |
| | Wechsler Kindergarten | 4 (57%) | 3 (43%) | 0 | 7 |
| | Carver Junior High | 10 (43%) | 13 (57%) | 0 | 23 |

|  |  | Black | White | Other Races | Total |
|---|---|---|---|---|---|
|  | Magnolia Junior High | 10 (40%) | 15 (60%) | 0 | 25 |
|  | Kate Griffin Junior High | 10 (26%) | 28 (74%) | 0 | 38 |
|  | Northwest Junior High | 12 (29%) | 30 (71%) | 0 | 32 |
|  | Harris Campus | 13 (32.5%) | 27 (67.5%) | 0 | 40 |
|  | Meridian High School | 18 (24%) | 57 (76%) | 0 | 75 |
|  | **Total** | 152 (33%) | 309 (67%) | 0 | 461 |

| **1971-72** | **School** | **Black** | **White** | **Other Races** | **Total** |
|---|---|---|---|---|---|
|  | Crestwood Elementary | 4 (31%) | 9 (69%) | 0 | 13 |
|  | Highland Elementary | 5 (42%) | 7 (58%) | 0 | 12 |
|  | Marion Park Elementary | 4 (36%) | 7 (64%) | 0 | 11 |
|  | Mount Barton Elementary | 5 (36%) | 9 (64%) | 0 | 14 |
|  | Oakland Heights Elementary | 7 (33%) | 14 (67%) | 0 | 21 |
|  | Parkview Elementary | 8 (35%) | 15 (65%) | 0 | 23 |
|  | Poplar Springs Elementary | 6 (27%) | 16 (63%) | 0 | 22 |
|  | West End Elementary | 10 (43%) | 13 (56%) | 0 | 23 |
|  | West Hills Elementary | 8 (40%) | 12 (60%) | 0 | 20 |
|  | Witherspoon Elementary | 6 (33%) | 12 (67%) | 0 | 18 |
|  | Carver Junior High | 14 (54%) | 12 (46%) | 0 | 26 |
|  | Kate Griffin Junior High | 9 (26%) | 26 (74%) | 0 | 35 |
|  | Magnolia Junior High | 8 (42%) | 11 (58%) | 0 | 19 |
|  | Northwest Junior High | 10 (29%) | 25 (71%) | 0 | 35 |
|  | Meridian High – Harris | 11 (34%) | 21 (66%) | 0 | 32 |
|  | Meridian High School | 16 (25%) | 48 (75%) | 0 | 64 |
|  | **Total** | 130 (34%) | 257 (66%) | 0 | 387 |

| 1972-73 | School | Black | White | Other Races | Total |
|---|---|---|---|---|---|
| | Crestwood Elementary | 6 (37.5%) | 10 (62.5%) | 0 | 16 |
| | Highland Elementary | 6 (40%) | 9 (60%) | 0 | 15 |
| | Marion Park Elementary | 6 (40%) | 9 (60%) | 0 | 15 |
| | Mount Barton Elementary | 8 (47%) | 9 (53%) | 0 | 17 |
| | Oakland Heights Elementary | 8 (32%) | 17 (68%) | 0 | 25 |
| | Parkview Elementary | 7 (28%) | 18 (72%) | 0 | 25 |
| | Poplar Springs Elementary | 6 (25%) | 18 (75%) | 0 | 24 |
| | West End Elementary | 10 (37%) | 15 (56%) | 2 (7%) | 27 |
| | West Hills Elementary | 8 (28%) | 17 (61%) | 3 (11%) | 28 |
| | Witherspoon Elementary | 9 (39%) | 14 (61%) | 0 | 23 |
| | Carver Junior High | 11 (50%) | 11 (50%) | 0 | 22 |
| | Kate Griffin Junior High | 9 (21%) | 33 (79%) | 0 | 42 |
| | Magnolia Junior High | 7 (30%) | 16 (70%) | 0 | 23 |
| | Northwest Junior High | 13 (31%) | 28 (67%) | 1 (2%) | 42 |
| | Meridian High – Harris | 12 (32%) | 26 (68%) | 0 | 38 |
| | Meridian High School | 14 (20%) | 56 (80%) | 0 | 70 |
| | **Total** | 140 (31%) | 306 (68%) | 6 (1%) | 452 |

In assessing compliance with faculty and staff assignment plans, courts generally permit a deviation up to +/- 20%. *Flax v. Potts,* 725 F. Supp. 322, 328 (N.D. Tex. 1989), *aff'd,* 915 F.2d 155 (5th Cir. 1990). All schools were within the range of deviation of +/- 20 percentage points of the faculty racial makeup for the District for the immediate three years following

implementation of the Plan.[5]  Exhibit 3, Court Reports for 1970-71, 1971-72, and 1972-73.  The

data for these three years illustrates the District operated a unitary system and achieved full

compliance with its obligations.  *Singleton v. Jackson Municipal Separate School District.*, 419

F.2d 1211 (5th Cir. 1969).

Over the following years, the District has hired without regard to race.  For the current

school year 2017-18, principals, teachers, and non-certified staff who work with children are

61% black and 37% white.  They are distributed among the schools as follows:

| School | Black | White | Other Races | Total |
|--------|-------|-------|-------------|-------|
| Crestwood Elementary | 29 (60%) | 19 (40%) | 0 | 48 |
| Harris Lower Elementary | 34 (65%) | 17 (33%) | 1 (2%) | 52 |
| Harris Upper Elementary | 29 (74%) | 10 (26%) | 0 | 39 |
| Oakland Heights Elementary | 33 (60%) | 20 (36%) | 2 (4%) | 55 |
| Parkview Elementary | 36 (59%) | 25 (41%) | 0 | 61 |
| Poplar Springs Elementary | 17 (30%) | 38 (67%) | 2 (3%) | 57 |
| West Hills Elementary | 43 (72%) | 17 (28%) | 0 | 60 |
| Carver Middle | 28 (65%) | 15 (35%) | 0 | 43 |
| Magnolia Middle | 32 (71%) | 13 (29%) | 0 | 45 |
| Northwest Middle | 24 (49%) | 23 (47%) | 2 (4%) | 49 |
| Meridian High School | 111 (69%) | 47 (29%) | 2 (1.25%) | 160 |
| Marion Park Alternative | 4 (44%) | 5 (56%) | 0 | 9 |
| Ross Collins Career/Technical | 11 (46%) | 13 (54%) | 0 | 24 |
| **Total** | 431 (61%) | 262 (37%) | 9 (1.3%) | 702 |

---

[5]      In fact, all schools were within +/- 15 percentage points of the faculty racial makeup for the same years with the exception of West End for 1970-71, Carver Middle for 1971-72 and 1972-73, and Mount Barton for 1972-73.  At each of these schools, the faculties were evenly split white and black and, therefore, not indicative that the schools were intended for black or white students.

The assignment of certificated and non-certificated employees who work directly with children in no way indicates that a school is intended for black students or white students.

The Board of Trustees is majority black.  The Board President is black.  The District's Superintendent is black, as were her two predecessors.  The Central Office staff under the Superintendent is 69% African-American and 29% white.

Finally, although not required by the Plan, the District actively recruits African-Americans for teaching and administrative positions.  *See,* Exhibit 4, 2017-18 Recruitment Plan.

### 3. Majority-to-Minority Student Transfers.

Section VI of the Plan provides for majority-to-minority student transfers ("M-to-M"), by which a student who attends a school in which his race is in the majority may opt to attend another school in which his race is in the minority.  The District's reports to the Fifth Circuit Court of Appeals in the early years of implementation of the Plan contain information on the M-to-M student transfers and the sending and receiving schools.  Because all schools in the District are now majority black, this provision is moot.

### 4. Inter-District Transfers.

Section VII of the Plan requires the District to forbid student transfers into or out of the District that would result in reducing desegregation in the school district or reinforcing the old dual school system.  In the District's reports to the Court following implementation of the Plan, the District reported no inter-district student transfers.  Currently, the District allows children of certified District employees to attend school in the District if their parents elect to do so.  The District also allows students whose parents are certified employees of another public school district to attend school in the district where their parents are employed.  *See,* Miss. Code Ann. § 37-15-29

### 5.    Transportation

Consistent with Mississippi Code Ann. § 37-41-3, the District provides transportation to all students who reside more than one mile from the school to which they are assigned.  As the District consistently reported to the Court, the transportation system is desegregated.  Black and white students are transported daily on the same buses.  Bus routes are designed with the use of software from Edulog (Education Logistics) Transportation Company based on efficiency in getting students to and from school.  The District is unitary with respect to transportation.

### 6.    Facilities

The Plan requires the District construct or consolidate schools and select sites for schools in a manner that prevents the recurrence of the old dual school system.  Ex. 1, p. 17.  All schools in the District have majority black student enrollment.  There is no issue in this case as to whether the District discriminates against black students by providing them inferior school facilities in comparison to white students.  All schools, except for the new ninth-grade facility approved by this Count in 2009, existed when the Plan was adopted.  Further, the Plan obviates the possibility of racial inequality among school facilities at the high school level, because there is only one district-wide school for grades 9-12.

### 7.    Extracurricular activities

All extracurricular activities offered by the District are available to all students regardless of race.  The District encourages participation in every activity without regard to race.  No racial barriers exist which preventing any student from participating in extracurricular activities.  *See,* Exhibit 5, pages from the high school and middle school annuals for the 2014-15 through 2016-17 school years.

### 8.      Bi-Racial Committee

Section VIII of the HEW Plan suggested the District or some other appropriate governmental unit establish a bi-racial advisory committee to advise the Board of the District throughout the implementation of the Plan.  The District reported to the Court in years 1971-79 that it had a Bi-Racial committee.  African-Americans have been integrally involved in all aspects of governance and operations of the District for many years.  Implementation of the Plan has long been accomplished.

### 9.      Reports to Court, Government, and Private Plaintiffs

After entry of the 1969 Order, the District filed nine reports with the Court during the years 1971-1979.  The District likely interpreted the Fifth Circuit's Order of March 20, 1974, to release it from the need to file reports.[6]  The District has provided information of the type required in the report to opposing parties during informal discovery requested by the NAACP Legal Defense Fund ("LDF") for the past three years.

Additionally, the District provided information regarding student assignment, faculty and staff assignment, transportation, facilities, and extracurricular activities for the 2016-17 school year to opposing parties in August, 2017, in response to a request for information from the Government.  The District has also provided this same information for the 2017-18 school year in response to requests for information from the Government and LDF counsel.  The District provided hundreds of pages of information in response to requests for information received from both the Government and LDF counsel.

Further, the Government conducted site visits in the District in 2012, 2016, and 2017.  LDF counsel joined the Government for the 2016 and 2017 site visits.  Both the Government and

---

[6]      The District is prepared to file formal reports with the Court for the last three schools years.

LDF counsel have been actively involved in monitoring the District's compliance with its desegregation obligations.

### 10.     Student Discipline

In addition to the 1969 Plan, the District and the Parties entered into a Consent Order in 2013 to ensure "that the District administers student discipline in a fair and non-discriminatory manner, reduces the disproportionate assignment of exclusionary sanctions to black students, and provides all students with an equal opportunity to learn in a safe, orderly, and supportive environment."  [36], ¶ 27.  The District has worked in good faith to achieve these purposes to the extent practicable.  The chart below demonstrates the District's effectiveness in reducing the use of exclusionary discipline under the Consent Order.

**Students receiving exclusionary discipline for 2012-13 through 2017-18[7]:**

| Year | Total Enrollment | 1 or More ISS | 1 or More OSS | 10+ Days OSS | Alternative Placement | Expulsion | Arrest |
|---|---|---|---|---|---|---|---|
| **2012-13** | 6,209 | 1,449 | 1,154 | 479 | 203 | 7 | 2 |
| **2013-14** | 6,166 | 1,164 | 1,135 | 16 | 380 | 63 | 16 |
| **2014-15** | 5,908 | 1,189 | 1,083 | 13 | 271 | 53 | 20 |
| **2015-16** | 5,664 | 1,302 | 875 | 4 | 278 | 58 | 15 |
| **2016-17: 1st Semester** | 5,541 | 577 | 468 | 3 | 136 | 9 | 5 |
| **2016-17: 3rd Quarter** | 5,465 | 479 | 352 | 3 | 83 | 7 | 5 |
| **2016-17: 4th Quarter** | 5,447 | 379 | 375 | 0 | 68 | 17 | 1 |
| **2017-18 1st Quarter** | 5,444 | 252 | 267 | 0 | 55 | 2 | 8 |
| **2017-18 2nd Quarter** | 5,223 | 380 | 335 | 0 | 56 | 14 | 2 |

---

[7]      Data provided is through the first semester of the 2017-18 school year.

Former Superintendent Dr. Alvin Taylor and the current Superintendent Dr. Amy Cater have made implementation of the Consent Order a priority of their administrations.  As a result, the U.S. Department of Education and Department of Justice invited the District to attend a day-long conference at the White House on July 22, 2015, where the U.S. Secretary of Education Arne Duncan and U.S. Attorney General Loretta Lynch recognized the District's work in decreasing the number of student discipline infractions:  "Earlier today, you heard about a landmark agreement, and I couldn't be more proud, that the Civil Rights Division reached with the school district in Meridian, Mississippi, which is already reducing exclusionary discipline and fostering a more positive climate in the Meridian Schools. . . ."  [U.S Attorney General Lynch].[8]  *See,* Exhibit 6.

The District had already embarked on a PBIS program before the Consent Order was entered.  In compliance with the Consent Order, the District created the position of PBIS Director and appointed Mr. Howard Hagwood, a long-time administrator in the District, to fill the position.  The Superintendents and Mr. Hagwood have worked together to implement the Consent Order.  During a period when funds for public education are being cut and resources are in short supply, the District has devoted substantial funds to the PBIS program and the mandates of the Consent Order.  The District engaged Fluency Plus, a consulting group with extensive experience with PBIS and the objectives of the Consent Order, to provide professional development and guidance to administrators and faculty at all schools.  Fluency Plus, represented by Tony Doggett, Ph.D., Dale Bailey, Ph.D., and Ken Swindol, M.Ed., was expressly approved by the Government as consultants under the Consent Order.  In addition, the District sought the assistance of Ms. Selina Merrell, the PBIS Coordinator for REACH MS.  REACH MS is

---

[8]

http://design.meridianps.schoolinsites.com/Default.asp?PN=%27News2%27&SubP=%27DNewsStory%27&gn=0&DivisionID=0&DepartmentID=0&SubDepartmentID=0&NewsID=78097&ShowNav=&StoryGroup=Archived

Mississippi's State Personnel Development Grant that focuses on supporting district-wide implementation of PBIS at elementary, middle, and high school levels.  Under the guidance of these professionals and the work of the administrators and PBIS teams at each school, twelve of the thirteen schools in the District have achieved "Model PBIS" school status.  In its biannual reports to the Government, the District has documented the professional development provided to its faculty about PBIS, racial sensitivity, and other subjects relevant to effective PBIS.  With approval of the opposing parties, the District also engaged the American Institutes for Research ("AIR") to provide consulting services regarding culturally responsive instruction, pursuant to paragraph 31 of the Consent Order.  [36, ¶ 31].  AIR began working with the District during the 2013-14 school year and continues assisting the District today.

The District's reports submitted under the Consent Order demonstrate the District's compliance with and success in implementing the Consent Order.  As required by the Consent Order, the District developed a new Code of Conduct for student discipline, which was approved by the Government.  The District formed the Disciplinary Advisory Committee and Teacher Disciplinary Advisory Committee which function to assist the Board and the Central Office team with disciplinary issues.  All committees are functioning, and counsel for the Government and the NAACP LDF met with these committees during site visits in 2016 and 2017.

All schools in the District have a PBIS coordinator and a school discipline administrative team (SDAT) working with principals to collect and study monthly data on student discipline.  All disciplinary determinations are made by the school SDAT, not by an individual.  The District's reports show a 57% decline in exclusionary discipline since entry of the Consent Order.  The District has changed the paradigm for discipline.  Teachers and administrators must involve parents early on in student misbehavior.  Each school studies its discipline data.  From

this analysis, administrative teams respond when and where incidents occur and provide monitoring or interventions that may resolve incidents.  Teachers who have excessive office referrals are counseled and are required to engage in further training to assist them in better classroom management.  If teachers do not respond, they are subject to improvement plans and non-renewal of their employment contracts.

As demonstrated by the District's reports, since implementation of PBIS as set out in the Consent Order, discipline referrals have declined 40% overall, and exclusionary discipline has decreased 57% in the same period.  The chart below illustrates the effectiveness with which the District has implemented PBIS:

**PBIS implementation annual data[9]:**

| Year | Exclusionary Discipline Incidents |
|------|-----------------------------------|
| **2011-12** | 8,179 |
| **2012-13** | 6,090 |
| **2013-14** | 4,230 |
| **2014-15** | 4,401 |
| **2015-16** | 4,115 |
| **2016-17** | 3,522 |

The Consent Order sets no standard by which to measure racial disproportionality with regard to student discipline.[10]  Furthermore, when one delves into the student records to explore why particular students received specific remedies, one finds that administrators fulfilled the

---

[9]     The District has not included data for the 2017-18 school year here, because the school year has not concluded.

[10]     To calculate disproportionality, at least ten members of a racial/ethnic group within a subset of a specific category of discipline are required.  *See, e.g.*, "Racial and Ethnic Disparities in Special Education," Office of Special Education and Rehabilitation Services, U.S. Department of Education, Feb. 2016, p. 5 (https://www2.ed.gov/programs/osepidea/618-data/LEA-racial-ethnic-disparities-tables/disproportionality-analysis-by-state-analysis-category.pdf).

Consent Order and the principles of PBIS, and the remedy chosen was appropriate and reasonable, not racially discriminatory.

The Consent Order provides the Government and Private Plaintiffs with sixty days from the receipt of the second report for the 2015-16 school year, which was submitted on August 26, 2016, to raise any concerns or objections regarding the District's compliance. Although the Government and Private Plaintiffs conducted an extensive three-day site visit to the District on May 17-19, 2016, neither raised any concerns or objections by the sixty-day deadline of October 25, 2016.

The 2013 Consent Order expressly anticipates that the District will have complied with the Order by the end of the 2016-17 school year and may seek release from the Consent Order at that time. [36], ¶ 113. Therefore, on March 20, 2017, District Superintendent Amy Carter wrote Attorney General Sessions and Acting Assistant Attorney General Wheeler, stating that the District had complied with the Consent Order and asking that the District be released. Exhibit 7, March 20, 2017, Letter.

On March 30, 2017, more than five months after the Consent Order's deadline had passed, the Government (but not the Private Plaintiffs who have never interposed an objection per the Order) wrote counsel for the District, expressly agreeing with Dr. Carter that the District had made "great progress" in implementing the Order and admitted that this was the first feedback from the Government based on its review of the District's reports through August, 2016, and its onsite visit in May, 2016. Exhibit 8, March 30, 2017, "Compliance" Letter. Nowhere in the letter does the Government explain its failure to file a timely response as required by the Order.

The District submitted its response to the allegations of non-compliance in the Government's letter on September 7, 2017, showing compliance in all areas complained of by the Government.  The District also noted the Government's tardiness in submitting the "compliance" letter under the terms of the Consent Order.  Exhibit 9, September 7, 2017, Response.

Under the 2013 Consent Order, the District is required to file extensive reports in February and August of each school year.  The District has been diligent in filing the reports which now number ten.  Each report is voluminous; thousands of pages have now been produced.  The District has coordinated with the Government and LDF counsel to submit the reports in electronic format.

## III.   Conclusion

"[U]nitariness represents a finding 'that the school district has eliminated all aspects of *de jure* segregation . . . .'"  *Price v. Austin Independent School District,* 945 F.2d 1307 (5th Cir. 1991) (quoting *Ross v. Houston Independent School District,* 699 F.2d 218, 219 (5th Cir. 1983)).  "[T]he appropriate measure of unitariness [is] 'whether the past has been eradicated so far as it remains in the power of school officials and courts to do so . . . .'"  *Id.* at 1314 (quoting *Ross,* 699. F.2d at 227).  The District has worked continuously to implement the Court's desegregation orders and to remove, to the extent practicable, all vestiges of *de jure* segregation.  The District has timely submitted its annual reports to the Court describing its progress in complying with the Consent Order.  The District has eliminated all vestiges of *de jure* segregation and is unitary in every respect.

WHEREFORE, PREMISES CONSIDERED, the Meridian Public School District respectfully requests that the Court enter an Order

Respectfully submitted, this 29th day of March, 2018.

**MERIDIAN PUBLIC SCHOOL DISTRICT**


/s/  John S. Hooks


OF COUNSEL:

Holmes S. Adams
MS Bar No. 1126
John S. Hooks
MS Bar No. 99175
Adams and Reese LLP
1018 Highland Colony Parkway, Suite 800
Ridgeland, Mississippi 39157
Telephone: 601.353.3234
Facsimile: 601.355.9708
E-mail: Holmes.Adams@arlaw.com
        John.Hooks@arlaw.com

And

John G. Compton
MS Bar No. 6433
Witherspoon and Compton LLC
1100 23rd Avenue
Meridian, Mississippi 39302
Telephone: 601.693.6466
Facsimile: 601.693.4840
E-Mail: JCompton@witherspooncompton.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this date, I filed electronically the foregoing with the Clerk of this Court using the CM/ECF system which will send notification of filing to all registered counsel of record.

Dated:  March 29, 2018.

/s/  John S. Hooks