

**Attorneys at Law**
Alabama
Florida
Georgia
Louisiana
**Mississippi**
South Carolina
Tennessee
Texas
Washington, DC

**John S. Hooks**
Admitted in Mississippi
and District of Columbia
Direct: 601.292.0708
E-Fax: 601.944.9037
john.hooks@arlaw.com

September 7, 2018

*Via Electronic Mail*

Alexis Hoag
Natasha C. Merle
Kristen Johnson
NAACP Legal Defense and Educational Fund, Inc.
*Via Electronic Mail:*   ahoag@naacpldf.org
                         nmerle@naacpldf.org
                         kjohnson@naacpldf.org

Re:   *Barnhardt v. Meridian Municipal Separate School District*, USDC Southern District of Mississippi, Civil Action No. 4:65cv01300-HTW-LRA

Dear Alexis:

On behalf of the Meridian Public School District (the "District"), we respond to the Private Plaintiffs' August 28, 2018, "Meet and Confer" Letter.

Two themes common throughout your letter are 1) quality of education factors are appropriate for consideration in evaluating a school district for unitary status under *Freeman v. Pitts,* 503 U.S. 467, 492 (1992); and, 2) Poplar Springs Elementary is a "racially identifiable school." Both arguments are flawed.

First, as the District has maintained throughout its exchange with LDF over discovery, *Freeman v. Pitts* is inapplicable to the District with respect to quality of education factors.

In *Freeman,* the parties agreed as part of the original desegregation order to obligations regarding "School Equalization," which included a requirement that the school district "take prompt steps necessary to provide physical facilities, equipment, courses of instruction and instructional materials of quality equal to that provided in schools previously maintained for white students." *See attached,* June 12, 1969, Order and Judgment. Further, as the district court in *Freeman* recognized, the parties "*requested* this court review one other area [in addition to the *Green* factors], quality of education" when making a determination regarding unitary status. *See attached,* June 30, 1988, Order (emphasis added). *See, also, Freeman,* 503 U.S. at 492 ("Both parties *agreed* that quality of education was a legitimate inquiry" in analyzing the school district's compliance) (emphasis added).

Here, there are no requirements regarding quality of education factors in the District's desegregation orders. Nor has the District consented to consideration of quality of education factors in evaluating its compliance with its desegregation orders. Further, to the extent to the District has produced

1018 Highland Colony Parkway, Suite 800 | Ridgeland, Mississippi  39157 | 601.353.3234 | Fax 601.355.9708
www.adamsandreese.com

**EXHIBIT 2**

information regarding retention, graduation dates, free and reduced lunch, etc., in the past, it did so in an effort to cooperate with LDF, not because it "recognized the relevance of such data" in evaluating its compliance with its desegregation obligations.

Next, regarding Poplar Springs, the District disputes your identification of Poplar Springs as a "racially identifiable" school.

In 1969, the District enrolled 10,823 students of which 6,418 (59%) were white and 4,405 (41%) were black. Poplar Springs was a historically white school. Poplar Springs immediately desegregated following implementation of the District's Plan. During the first three years of implementation of the Plan—although there is no specific racial quota for student assignment—Poplar Springs had student enrollment within +/- 15% of the District's enrollment by race; therefore, the District complied immediately with the Plan for student assignment as to Poplar Springs (and all other schools). Since 1969, the District has experienced a 51.7% loss in total enrollment, with white student loss outpacing black student loss at all schools, although the decline has been slightly less steep at Poplar Springs. Nevertheless, Poplar Springs was a historically white school before desegregation, immediately desegregated following implementation of the District's Plan in 1970-71, has remained desegregated, and now has majority African-American enrollment, as demonstrated by the chart below. There is no vestige of the former *de jure* system remaining at Poplar Springs in any area of operations, including student assignment.

| School Year | School | Black | White | Other Races | Total |
|---|---|---|---|---|---|
| 1970-71 | Poplar Springs Elementary | 291 (46%) | 345 (54%) | 0 | 636 |
| 1971-72 | Poplar Springs Elementary | 251 (41%) | 364 (59%) | 4 (.6%) | 619 |
| 1972-73 | Poplar Springs Elementary | 246 (43%) | 332 (57%) | 0 | 578 |
| 2017-18 | Poplar Springs Elementary | 306 (64%) | 132 (28%) | 38 (8%) | 476 |
| 2018-19 | Poplar Springs Elementary | 309 (66%) | 123 (26%) | 35 (7.5%) | 467 |

Although the District's Plan does not set a quota for student assignment, the District notes its current total enrollment is 5,231 of which 4,713 (90%) are black, 313 (6%) are white, and 205 (4%) are other races. Poplar Springs' current enrollment at 26% white is, therefore, within +/- 20 percentage points of the District's white student enrollment. *See*, 2018-19 Student Enrollment by school / grade / race, attached.

Although LDF is mistaken in its characterization of Poplar Springs as a "racially identifiable" school, the Supreme Court's analysis in *Freeman* regarding racial imbalance in student assignment is instructive here:

> In the case before us the District Court designed a comprehensive plan for desegregation of DCSS in 1969, one that included racial balance in student assignments. The desegregation decree was designed to achieve maximum practicable desegregation . . . The plan accomplished its objective in the first year of operation . . . For the entire 17-year

period respondents raised no substantial objection to the basic student assignment system, as the parties and the District Court concentrated on other mechanisms to eliminate the *de jure* taint. That there was racial imbalance in student attendance zones was not tantamount to a showing that the school district was in noncompliance with the decree or its duties under the law. Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation. Once the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors.

*Freeman,* 503 U.S. at 493-94.

The law does not require "'awkward,' 'inconvenient,' and 'even bizarre' measures to achieve racial balance in student assignments in the late phases of carrying out a decree, when the imbalance is attributable to neither the prior *de jure* system nor to a later violation by the school district but rather to independent demographic forces." *Freeman,* 503 U.S. at 493.

Any student assignment imbalance traceable to the *de jure* system in the District has long been remedied. LDF can point to no evidence that Poplar Springs' maintenance of 26% white student enrollment is a result of any constitutional violation by the District.

The District will now respond to the individual items set out in your letter. The District incorporates its arguments above in its supplemental responses below.

**Plaintiffs' June 19, 2018 Request for Information No. 1**

Percentage of students at each school with free and reduced-price lunch ("FRL"), broken down by race, from school year ("SY") 2015-2016 to present.

**District Objection 6.22.18**: The District objects to this request as outside the scope of the District's operative desegregation orders and not relevant to any party's claim or defense in this case. Fed. R. Civ. P. 26(b)(1).

**Private Plaintiffs' Response 7.5.18**: To determine whether the District has reached unitary status, Plaintiffs require information to assess, among other things, student assignment, including in-school assignment and racial disparities in discipline, quality of education, and the racial impact of high concentrations of low-income children on quality of faculty and student achievement gap. The request is also narrowly focused in time, from SY 2015-16 to SY 2017-18. Please confirm whether the District is withholding responsive materials based on this objection. Fed. R. Civ. Pro. 34(b)(2)(C).

**District's Reply 7.31.18:** Having carefully reviewed your response, the District maintains its objections for the following reasons:

a. Student assignment: The District's student assignment plan has long been in place. Several court orders established geographic attendance zones whereby students are assigned to

schools based on the attendance zones in which they live. The original zones were established by the HEW plan of August 11, 1969, with modifications to the junior high zones quickly following by order of the Fifth Circuit in November 1969. The District Court ordered changes in July 1970 to address the destruction by fire of Chalk Elementary, as well as issues created by the Fifth Circuit's designation of Magnolia Junior High as a seventh-grade facility, as opposed to a school for grades 3 and 4, as contemplated by the original HEW plan.

According to the 1970 Order, the District Court specifically found that, "the plaintiffs and the intervenors have approved the revised proposed modifications of defendants that are referred to hereinabove." For almost forty years, the student assignment plan operated according to the orders of the case until June 2009, when the District Court approved the creation of a new District-wide ninth-grade school, the closure of Kate Griffin Junior High, and the closure of Witherspoon Elementary. According to the Court's order, "[n]either the United States nor private plaintiffs have filed responses to or objections to the District's motion."

The existing student assignment plan is the law of the case and has operated since its inception without objection from either the Private Plaintiffs or the United States. To the extent the Private Plaintiffs now seek to challenge the District's long-standing student assignment plan, the Private Plaintiffs are not acting in good faith. Further, information regarding students on free and reduced lunch could in no way relate to the student assignment plan. The District has never been required to furnish this information in reports. Until now, the Private Plaintiffs have never sought information regarding the free and reduced lunch program or acted as if the information were relevant to the desegregation plan. The historic conduct of the Private Plaintiffs proves this has never been considered part of the desegregation plan.

b. In-school assignment / racial disparities in discipline: You have not shown how information regarding free and reduced lunch is related to your evaluation of in-school assignment or racial disparities in discipline. You have been provided with the races of students by class, as well as voluminous data regarding discipline as part of the consent decree regarding discipline. You have not previously asked for this information in connection with monitoring the compliance of the District with the desegregation plan, including the consent decree regarding student discipline. The historic conduct of the Private Plaintiffs proves this has never been considered part of the desegregation plan.

c. Quality of Education: "Quality of education" is not a *Green* factor. The desegregation orders of the case do not impose desegregation obligations on the District to monitor or assess educational outcomes of black students verses white students. The District has never been required to furnish this information in reports. Until now, the Private Plaintiffs have never sought this information or acted as if the information were relevant to the desegregation plan. The historic conduct of the Private Plaintiffs proves this has never been considered part of the desegregation plan. Further, you have not shown how statistics regarding the racial

- percentages of students who receive free and reduced lunch are related to "quality of education."
    d. The racial impact of high concentrations of low-income children on quality of faculty and student achievement gap: Despite our best efforts, we are not certain what is meant by this statement. Regardless, we are certain this is not a *Green* factor. The District has an African American enrollment of more than 93%. Even assuming there were a correlation between race (*i.e.,* black) and enrollment in the free and reduced lunch program, African American students are not clustered in a few schools. All students in the District attend schools composed primarily of African American students. All high school students attend the same high school. No order in this case identifies a desegregation obligation relating to the economic circumstances of students. No order in this case identifies a desegregation obligation regarding "the racial impact of high concentrations of low-income children on quality of faculty and student achievement gap." The District has never been required to furnish this information in reports. The historic conduct of the Private Plaintiffs proves this has never been considered part of the desegregation plan. Until now, the Private Plaintiffs have never sought this information or acted as if the information were relevant to the desegregation plan.

**District's Supplemental Response:** The District maintains its objections to this request. The District previously provided this data as a courtesy, not because the data are relevant to the District's desegregation obligations. Additionally, the District notes the following:

1. The Consent Decree not only does not "affirmatively require" the District to provide this data, it does not require it *at all.*

2. The District has not argued that "racial disparities in school discipline are due to socio-economic status." It is the District's position that it has achieved compliance for a significant period of time as to all of its desegregation obligations.

3. The District has not claimed that "demographic shifts [are] the sole cause of racially isolated schools." The District adamantly denies it has any racially isolated schools. With respect to Poplar Springs, the District has stated that white student enrollment has declined at a slower pace than other schools.

### Plaintiffs' June 19, 2018 RFI No. 3 and July 25, 2018 RFI No. 13

Excel spreadsheet, in native format, showing scores of Advanced Placement ("AP") student test takers by race.

**District Objection 6.22.18**: The District objects to this request as outside the scope of the District's operative desegregation orders and not relevant to any party's claim or defense in this case. Fed. R. Civ. P. 26(b)(1).

Alexis Hoag
September 7, 2018
Page 6 of 9

**Private Plaintiffs' Response**: To determine whether the District has reached unitary status, Plaintiffs require information to assess quality of education and student assignment. Scores of AP student test takers, by race, is relevant to assessing actual access to rigorous curricula and measuring performance of Black and white students. *See, e.g., Hereford v. United States,* No. 5:63-CV-00109-MHH, 2017 WL 5483734 (N.D. Ala. Nov. 14, 2017). The request is narrowly focused in time, from SY 2015-16 to present. Please confirm whether the District is withholding responsive materials based on this objection. Fed. R. Civ. Pro. 34(b)(2)(C).

**District's Reply:** Having carefully reviewed your response, the District maintains its objections. Unlike the *Hereford* decision, the parties here have not agreed to additional desegregation obligations beyond the *Green* factors that would require "measuring the performance of black and white students," as was the case in *Hereford*. Student academic performance is not a requirement of the desegregation orders of this case. No desegregation order in this case addresses comparisons of student academic performance by race. The District has never been required to furnish this information in reports. The historic conduct of the Private Plaintiffs proves this has never been considered part of the desegregation plan. Until now, the Private Plaintiffs have never sought this information or acted as if the information were relevant to the desegregation plan. Finally, scores of AP student test takers are not required to determine "access to rigorous curricula." Student enrollment by class and race has been provided.

**District's Supplemental Response:**   The District maintains its objections to this request. Additionally, the District notes the following:

1.   LDF is not entitled to track individual students' class assignments to make determinations regarding quality of education and resources provided by the District.

2.   Advanced placement and honors classes are not "remedial education programs."

3.   The District is under no obligation to "monitor and address racial disparities in AP or gifted classroom enrollments and in academic performance" as in *Little Rock School District v. Arkansas,* 664 F.3d 738 (8th Cir. 2011).

### Plaintiffs' June 19, 2018 RFI No. 5

For SY 2016-2017 and SY 2017-2018, an Excel spreadsheet, in native format, showing retention data. If the document titled "Retention 2016," does not reflect retention data for SY 2015-2016, provide that data.

**District Objection 6.22.18**: The District objects to this request as outside the scope of the District's operative desegregation orders and not relevant to any party's claim or defense in this case. Fed. R. Civ. P. 26(b)(1).

**EXHIBIT 2**

**Private Plaintiffs' Response**: To determine whether the District has reached unitary status, Plaintiffs require information to assess quality of education, including student retention. *See, e.g., GI Forum Image De Tejas v. Texas Educ. Agency*, 87 F. Supp. 2d 667 (W.D. Tex. 2000). This data allows for an analysis and comparison of retention rates by race. Plaintiffs' request is narrowly focused in time, SY 2016-17 and SY 2017-18, to allow analysis of student retention for the last three school years. The District has previously produced this data reflecting a different time period, see above Request number 4, and has thus waived its objection. Please confirm whether the District is withholding responsive materials based on this objection. Fed. R. Civ. Pro. 34(b)(2)(C).

**District's Reply:** Having carefully reviewed your response, the District maintains its objections. The case you cite in support of your position, *GI Forum Image De Tejas*, 87 F. Supp. 2d 667 (W.D. Tex. 2000) is not a desegregation case. That matter dealt with whether the State of Texas could impose an examination requirement for high school graduation. A "comparison of retention rates by race" is not a *Green* factor and is not the subject of any desegregation order of this case. In fact, the District has never been required to report to you information regarding student retention. The Private Plaintiff's historic conduct in this case shows there has never been an understanding that retention has ever been an obligation of the desegregation decree.

**District's Supplemental Response:**   The District maintains its objections to this request. The District further notes your statement "the federal government routinely collects retention data of school districts," which indicates the data is equally accessible to you as to the District.

### Plaintiffs' June 19, 2018 RFI No. 6 and July 25, 2018 RFI No. 11 and 12

An Excel spreadsheet, in native format, showing cohort graduation data beginning SY 20152016 to present.

**District Objection 6.22.18**: The District objects to this request as outside the scope of the District's operative desegregation orders and not relevant to any party's claim or defense in this case. Fed. R. Civ. P. 26(b)(1). Subject to and without waiving its objection information on graduation cohort data is publicly available at
http://mdereports.mdek12.org/pdf/a/2018/Grad%20Dropout%20Rates%20%202018%20Report%2009FEB2018.pdf

**Private Plaintiffs' Response**: To determine whether the District has reached unitary status, Plaintiffs require information to assess quality of education, including cohort graduation data. *See e.g., Hereford v. Huntsville Bd. of Education*, No. 5:63-cv-00109 (N.D. Ala. June 30, 2014) and *GI Forum Image de Tejas v. Texas Educ. Agency*, 87 F. Supp. 2d 667, 676 (W.D. Tx. 2000). The District has previously produced this relevant cohort data for SY 2012-13 and SY 2013-14, and therefore waived its objection. In its previous production, the District represented that "nothing [is] reported for 14-15 and 1516." Please confirm whether the District is withholding responsive cohort graduation data for SY 2014-2015 through present based on this objection. Fed. R. Civ. Pro. 34(b)(2)(C).

**EXHIBIT 2**

For the link provided by the District, please explain how and which students are included within the calculation for graduation.

**District's Reply:** Having carefully reviewed your response, the District maintains its objections. The case you cite in support of your position, *GI Forum Image De Tejas*, 87 F. Supp. 2d 667, 676 (W.D. Tx. 2000) is not a desegregation case. That matter dealt with whether the State of Texas could impose an examination requirement for high school graduation. Cohort graduation data is not a *Green* factor and is not the subject of any desegregation order of this case. The District has never been required to report to you information regarding cohort graduation data. The link provided is to a report compiled and prepared by the Mississippi Department of Education.

**District's Supplemental Response:** The District maintains its objection to this request. The District has no desegregation obligations regarding educational outcomes.

With respect to the initial link provided by the District not working, the District notes the MDE completed a redesign of its website following the District's initial and first supplemental responses to this request.

https://www.mdek12.org/sites/default/files/Offices/MDE/OEA/OPR/2018/Grad%20Dropout%20Rates%20-%202018%20Report%2009FEB2018.pdf

### Plaintiffs' June 19, 2018 RFI No. 8

Teacher quality metrics by school for SY 2015-2016 through present, including counts of both experienced faculty (with at least three years of experience) and novice teachers (with less than three years of experience), in which subject areas they are certified and in which school they are located.

**District Objection 6.22.18:** The District objects to this request as outside the scope of the District's operative desegregation orders and not relevant to any party's claim or defense in this case. Fed. R. Civ. P. 26(b)(1).

**Private Plaintiffs' Response:** To determine whether the District has reached unitary status, Plaintiffs require information to assess quality of education, including the provision of certain educational resources (for example, teachers with advanced degrees, teachers with more experience). The placement of experienced/novice faculty, as well as faculty teaching outside of the certification area in each school is relevant to this assessment. *Freeman v. Pitts*, 503 US 467 (1992); *see also Davis v. East Baton Rouge Parish Sch. Bd.*, 570 F.2d 1260, 1264 (5th Cir. 1978). Plaintiffs request a narrowly focused time, SY 2015-16 to present. Please confirm whether the District is withholding responsive materials based on this objection. Fed. R. Civ. Pro. 34(b)(2)(C).

**District's Reply:** The District maintains its objection. In *Freeman v. Pitts*, "both parties agreed that quality of education was a legitimate inquiry in determining [the school district's] compliance with the desegregation decree." 503 US at 492. Here, the District does not agree that educational outcomes have

Alexis Hoag
September 7, 2018
Page 9 of 9

ever been considered a part of the obligations contained in the desegregation orders of this case. In fact, the parties to the case (including the Private Plaintiffs) have never treated educational outcomes or performance as an objective of the desegregation plan. The other case you cite, *Davis v. East Baton Rouge Parish,* 570 F.2d at 1264, dealt with the manner in which teachers had been reassigned immediately following desegregation. Those issues are not present here. There is no possibility more experienced teachers have been assigned to "black" schools, because there are no racially identifiable schools in the District. All schools have at least 64% African American enrollment.

**District's Supplemental Response:** The District maintains its objections to this request. The District specifically denies it operates a racially identifiable school at Poplar Springs. Additionally, the District notes in *Freeman,* the court did not find quality of education to be "worthy of consideration" in connection with consideration of unitary status as you state. The Court found "[b]oth parties *agreed* that quality of education was a legitimate inquiry in determining DCSS' compliance with the desegregation decree, and the trial court *found it workable* to consider the point in connection with its findings on resource allocation." *Freeman,* 503 U.S. at 492 (emphasis added).

All parties to a desegregation case have an obligation to ensure that the requirements of the Court's orders are met. Plaintiff Parties have an obligation to participate in the litigation and provide feedback and concerns in real time, not at the end of fifty-year period of court supervision. None of the information you seek in discovery relates to any obligations imposed on the District under its desegregation orders. Nor is the information relevant to any feedback or concerns the Private Plaintiffs have offered the District over the fifty-year long history of this case. Your demands are not reasonable, relevant, nor are they made in good faith.

Please be advised the District intends to submit these objections to the Court through a formal pleading according to the Court's instructions during the August 22, 2018, telephonic conference.

Sincerely,

*John S. Hooks /w-permission*

John S. Hooks

JSH/jbd

Cc: Natane Singleton (via electronic correspondence)
Aria Vaughn (via electronic correspondence)

52743405_1

**EXHIBIT 2**