FILED IN CLERK'S OFFICE
JUN 8 1969
CLAUDE L. GOZA, CLERK
BY: [signature]
Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WILLIE EUGENE PITTS, et al. ) | CIVIL ACTION |
| ) | |
| vs. ) | |
| ) | |
| JIM CHERRY, Superintendent of ) | |
| Schools, DeKalb County, Georgia; ) | NO. 11946 |
| et al. ) | |

## ORDER AND JUDGMENT

This case began as an in-depth undertaking to desegregate the public schools of DeKalb County, including students, faculties, and school activities. Since some 75,000 students are involved, occupying 77 elementary schools, 20 high schools, and nine special schools, a number of problems were presented. Happily for our task, however, at the very time the action was filed and since that time the DeKalb County Board of Education was and has been working with the Department of Health, Education and Welfare to come up with what was to be a final and "terminal" plan of desegregation, which plan was to go into effect not later than the 1969-70 school year and which was to cover all aspects of the County's desegregation problems. After the suit was filed a preliminary hearing was held on October 11, 1968, at which time the plan proposed by the School Board had been given general approval by HEW, subject to one exception to which reference will presently be made. A second hearing was held on April 9, 1969, by which time the proposed plan was substantially complete, and at that time counsel for all parties indi-

cated their general approval of the plan except as it related to the Robert Shaw Elementary School.

Since the overall plan appears to be satisfactory to the School Board, to HEW, and to the plaintiffs, it would serve no useful purpose to catalog its details here. The court therefore addresses itself to the one problem remaining open, viz.: the disposition to be made of the Shaw school, the plan proposed for that school being unsatisfactory both to HEW and to plaintiffs.

The school population of DeKalb County is roughly 94.4% white and 5.6% Negro, and at the heart of the entire problem were six schools, the populations of which were all predominantly Negro.[1] In brief, what the Board proposed with respect to all of these schools except Shaw, was to close them entirely and distribute their students among other schools in their respective neighborhoods. The plants of the closed schools would then be converted into special schools for advanced and retarded children, etc., on an integrated basis. With respect to the Shaw school, however, the Board proposed to retain it in operation, despite its predominantly Negro population. In support of this proposal the Board contended that housing and apartment developments in the neighborhood showed some promise of bringing more whites into the school area by September, 1969. They also promised to end a previously established policy permitting whites to transfer out of the Shaw attendance area, so that between these two proposals it was hoped that the

---

[1] These schools were Bruce Street, Linwood, Victoria Simmons, County Line, and Robert Shaw, all of which were elementary schools, and Hamilton High School.

-2-

Shaw situation would remedy itself at or during the 1969-70 school year. It was also pointed out in support of this proposal that the school had a fine physical plant, an excellent faculty, a good PTA, and very good community relations. Both HEW and the plaintiffs questioned this proposal as respects Shaw.

At subsequent hearings, held on April 30, 1969, and on May 28, 1969, evidence was taken as to the best disposition to be made of the Shaw school. Again all parties were in substantial agreement. Witnesses for the School Board admitted, for example, that their hopes for a racially balanced school population in the Shaw area were greatly optimistic, if not illusory. No single witness was of the opinion that the proposal advanced by the Board would or could put the Shaw school in compliance by the beginning of the 1969-70 school year. All parties, including counsel for plaintiffs and witnesses from the School Board and from HEW, did agree, however, that the Shaw school could be put in compliance in either one of two ways: (1) by abolishing the school and redistributing its population, as was being done with respect to the other five predominantly Negro schools, or (2) by either redrawing attendance lines or "pairing" Shaw with some other school so as to encompass larger white residential areas within its attendance zone. No one disputed or now disputes that either one of these proposals would bring Shaw into compliance.

The School Board still asks that it be allowed to retain Shaw in the hope that the population would balance itself, either at the beginning of or during the 1969-70 school year. The evidence, however, simply does not support this conclusion, and the court finds

that the proposal by the Board to let the school continue on this basis is unsatisfactory. The only question presented, therefore, is which of the two workable alternatives shall be adopted.

Since either, under the evidence, will get the job done, the court concludes that as between closing the school on the one hand or redrawing its attendance lines or pairing it with another school on the other, the court should defer to the preference of the school authorities. HEW officials seem to feel that a redrawing of school lines would be the better solution. They agree, however, that under these circumstances the views of the School Board should be respected, and the Board prefers to close the school. In making this choice the Board contends, and the court agrees, that a redrawing of school lines in this area or a pairing of Shaw school with some other school, while bringing about desegregation on a temporary basis, would almost certainly lead to resegregation within one to two years by reason of the white population moving out of the area. The court concludes, therefore, that the only solution offering any promise of permanency is to close the Shaw school as the Board suggests and distribute its pupils among neighboring schools, and an order to this effect will be entered.

There may be other details in the overall DeKalb County plan which will require further attention of the court, but as of the moment, this concludes the only issue of any consequence now to be decided.

JUDGMENT

It is therefore CONSIDERED, ORDERED, ADJUDGED, and DECREED that the defendants, their agents, officers, employees, successors,

and all those in active concert and participation with them, be and they are hereby permanently enjoined from discriminating on the basis of race or color in the operation of the DeKalb County school system. As set out more particularly hereinafter, they shall take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system:

### I. SPEED OF DESEGREGATION

Commencing with the 1969-70 school year, in accordance with this decree, all grades, including kindergarten grades, shall be desegregated and pupils assigned to schools in these grades without regard to race or color.

### II. PUPIL ASSIGNMENT

A. <u>Zones</u>.  All students in the system shall attend classes at schools located within the zone where they reside.  Said zones shall be drawn so as to disestablish the dual school system.  For the 1969-70 school year, the zones in effect shall be those previously approved by the United States Department of Health, Education and Welfare.  At all grades in schools within each zone, students will be assigned to home rooms and classes without regard to race.

B. <u>School Closings</u>.  The following schools will be closed during the 1969-70 school year and thereafter until further order of the court:  Robert Shaw elementary; Victoria Simmons elementary; County Line elementary; Lynwood Park elementary; Bruce Street elementary; and Hamilton High School.  Students attending the schools to be closed will be placed in new attendance zones to be drawn

without regard to race. The zones for all of the closed schools except Robert Shaw will be those previously filed with the court. The zone for Robert Shaw will be established no later than July 15, 1969, and submitted to the court. Defendants shall arrange for the conspicuous publication of a notice describing the new zones to be established in the newspaper most generally circulated in the community. Parents of children presently attending the schools to be closed shall be notified by letter of the new zone in which they reside. Such letters shall issue no later than July 20, 1969. Publication as a legal notice will not be sufficient. Copies of the notice must also be given to all radio and television stations located in the community. Copies of this decree shall be posted in each school in the school system and at the office of the Superintendent of Schools.

C. <u>Transfers</u>. No students will be permitted to transfer from schools within their attendance zones to other zones. Exceptions may be granted for non-racial reasons in the case of overcrowding, in the case of students who are physically handicapped and desire to attend a school designed for their special needs, and for students requiring a course of study not offered at the school serving their zone. However, if more than 30 students request transfer outside their zones to pursue a course of study, such transfers shall not be permitted; rather, a teacher or teachers shall be supplied within the zone to teach said courses.

D. <u>Overcrowding</u>. In case of overcrowding at any school, preference shall be given on the basis of proximity of the school to the homes of the students without regard to race or color.

Standards for determining overcrowding shall be applied uniformly throughout the system.

### III.  CONSTRUCTION

To the extent consistent with the proper operation of the system, the County Board will, in locating and designing new schools, in expanding existing facilities, and in consolidating schools, do so with the objective of eradicating segregation and perpetuating desegregation.

### IV.  FACULTY AND STAFF ASSIGNMENTS

A.  *Faculty Employment*.  Race or color shall not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members, including student teachers, except that race may be taken into account for the purpose of counteracting or correcting the effect of the segregated assignment of faculty and staff in the old dual system. Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race.  Wherever possible, teachers shall be assigned so that more than one teacher of the minority race (white or Negro) shall be on the desegregated faculty.  The County Board will continue positive and affirmative steps to accomplish the desegregation of its school faculties and to achieve substantial desegregation of faculties in its schools for the 1969-70 school year notwithstanding teacher contracts for 1969-70 may have already been signed and approved.  The tenure of teachers in the system shall

000033

**EXHIBIT 3**

not be used as an excuse for failure to comply with this provision. The County Board shall establish as an objective that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or white pupils in school.

B. <u>Dismissals</u>. Teacher and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color. A report containing any such proposed dismissals, and the reasons therefor, shall be filed with the Clerk of the court, serving copies upon opposing counsel, within five days after such dismissal, demotion, etc., as proposed.

C. <u>Past Assignments</u>. The County Board shall take steps to assign and reassign teachers and other professional staff members to eliminate the effects of the dual school system.

V. REPORTS

A. On June 10 of each year, beginning in 1970, defendants will submit a report to the court and serve copies on opposing

counsel, showing the number of teachers by schools, grade (where appropriate), and race they anticipate will be employed for the fall quarter or semester. Within one week after the day classes begin for the fall quarter or semester in 1969 and each succeeding year defendants will submit a report to the court and serve a copy on opposing counsel, showing the number of teachers actually working at each school by grade (where appropriate) and race.

B. On the same dates set forth in A. above, reports will be submitted to the court, and a copy served on opposing counsel, showing the number of students by school, grade, home room, and race expected (in June report) and actually enrolled (in fall report) at the schools in DeKalb County.

C. Within one week after the opening of each school year, defendants shall submit a report to the court and serve copies on opposing counsel, showing the number of faculty vacancies, by school, that have occurred or been filled by defendants since the order of this court or the latest report submitted pursuant to this subparagraph. This report shall state the race of the teacher employed to fill each such vacancy and indicate whether such teacher is newly employed or was transferred from within the system. The tabulation of the number of transfers within the system shall indicate the schools from which and to which the transfers were made. The report shall also set forth the number of faculty members of each race assigned to each school for the current year.

VI. <u>SERVICES, FACILITIES, ACTIVITIES AND PROGRAMS</u>

No student shall be segregated or discriminated against on account of race or color in any service, facility, activity, or

000035

**EXHIBIT 3**

program (including transportation, athletics or other extra-curricular activity) that may be conducted or sponsored by the school in which he is enrolled. A student attending school for the first time on a desegregated basis may not be subject to any disqualification or waiting period for participation in activities and programs, including athletics, which might otherwise apply because he is a transfer or newly assigned student except that such transferees shall be subject to long-standing, nonracially based rules of city, county or state athletic associations dealing with the eligibility of transferred students for athletic contests. All school use or school-sponsored use of athletic fields, meeting rooms and all other school related services, facilities, activities, and programs such as commencement exercises and parent-teacher meetings which are open to persons other than enrolled students, shall be open to all persons without regard to race or color. All special educational programs conducted by the County Board shall be conducted without regard to race or color. Athletic meets and competitions and other activities in which several schools participate shall be arranged so that formerly white and formerly Negro schools participate together.

VII. SCHOOL EQUALIZATION

A. *Inferior Schools*. In schools heretofore maintained for Negro students, the defendants shall take prompt steps necessary to provide physical facilities, equipment, courses of instruction, and instructional materials of quality equal to that provided in schools previously maintained for white students. If for any rea-

son it is not feasible to improve sufficiently any school formerly maintained for Negro students, where such improvement would otherwise be required by this paragraph, such school shall be closed as soon as possible, and students enrolled in the school shall be reassigned.

B. <u>Remedial Programs</u>. The defendants shall provide remedial education programs which permit students attending or who have previously attended segregated schools to overcome past inadequacies in their education.

## VIII. <u>JURISDICTION</u>

This court retains jurisdiction for the purpose of implementing this order.

This 12th day of June, 1969.

_____
NEWELL EDENFIELD
United States District Judge

000037

**EXHIBIT 3**