**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| JOHN BARNHARDT, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | Civil Action No. 4:65-cv-01300-HTW-LRA |
| ) | 1300(E) |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | |
| ) | |
| MERIDIAN MUNICIPAL SEPARATE ) | |
| SCHOOL DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM IN SUPPORT OF PRIVATE PLAINTIFFS' MOTION
<u>TO COMPEL PRODUCTION OF INFORMATION</u>**

## INTRODUCTION

Private Plaintiffs John Barnhardt *et al.* (collectively, "Plaintiffs") hereby move this Court to compel Defendant Meridian Municipal Separate School District (the "District") to respond to Plaintiffs' outstanding requests for information, which relate to three categories of relevant material: (1) teacher assignment, (2) ability grouping, and (3) academic achievement.

The District seeks to avoid discovery on relevance grounds, primarily contending that it operates no racially-identifiable schools and that the information sought falls outside the scope of the operative desegregation order. ECF 77 at 2. The District's objections fundamentally misunderstand the low relevance threshold applicable during discovery: All of the information sought is relevant because the requests are reasonably calculated to lead to the discovery of admissible evidence as to whether the District is in fact unitary. The District's conclusory contention that it is unitary cannot justify denying Plaintiffs discovery on this contested factual issue.

## FACTUAL BACKGROUND

The District filed a motion for Declaration of Unitary Status on March 29, 2018. ECF 53. Plaintiffs served Requests for Information ("RFIs") [1] on June 19, 2018. Merle Decl. ¶ 3. The District responded on June 22, 2018, objecting to the relevance of seven of the Plaintiffs' RFIs. Merle Decl. ¶ 4. On July 5, 2018, Plaintiffs responded to these objections, and on July 25, Plaintiffs propounded supplemental information requests ("Suppl. RFIs"). Merle Decl. ¶¶ 5–6. The District replied, maintaining all its objections, on July 31, 2018. Merle Decl. ¶ 7.

---

[1] Unless otherwise noted, "RFI" refers to the Requests for Information set out in Plaintiffs' June 19, 2018 letter.

2

On August 22, 2018, the Court held a telephonic scheduling conference, at which the Court ordered Plaintiffs to provide the District with a good faith letter specifying their outstanding RFIs. The Court further ordered the District to either produce the requested information or to submit its objections to the Court. ECF 77. On August 28, 2018, Plaintiffs sent a good faith letter to the District. Merle Decl. ¶ 8. The District responded on September 7, 2018, with written objections to five of Plaintiffs' outstanding RFIs. ECF 77. The District filed these objections with the Court on September 13. ECF 77. On September 21, 2018, Plaintiffs filed a response to the District's objections. ECF 81.

The Court held a status conference on September 24, 2018, at which Plaintiffs raised the issue of their outstanding RFIs. The parties informed the Court that they had reached an impasse regarding the RFIs after conferring several times in good faith. At the conference, the Court ordered the Plaintiffs to file a motion to compel and set a briefing schedule. Merle Decl. ¶ 12.

## ARGUMENT

At bottom, each of the District's objections is the same: The information sought is "outside the scope of the District's operative desegregation orders and not relevant to any party's claim or defense in this case." ECF 77 at 5, 8, 10, 12, 14. These objections disregard the broad scope of relevancy during discovery.

The Federal Rules of Civil Procedure permit "discovery regarding any matter not privileged, which is relevant to the subject matter in the pending action." Fed. R. Civ. P. 26(b). In the discovery context, "[c]ourts have traditionally construed 'relevance' broadly: information is relevant if it 'encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991) (quoting *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978)).

"Discoverable information is not limited to admissible evidence, but includes anything reasonably calculated to lead to the discovery of admissible evidence." *Id.* "[A] request for discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party." *DAC Surgical Partners P.A. v. United Healthcare Services, Inc.*, No. 4:11-cv-1355, 2014 WL 585750, at *3 (S.D. Tex. Feb. 14, 2014) (quoting *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 470 (N.D. Tex. 2005)). "[O]pen disclosure of all potentially relevant information is the keynote of the Federal Discovery Rules." *Burns v. ThickolChem. Corp.*, 483 F.2d 300, 307 (5th Cir. 1973).

The burden here is on the District to "show specifically how each [request] is not relevant." *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990). The District must make "clear that the information sought has *no possible bearing* on the claim or defense of a party." *Allen v. Priority Energy Servs., L.L.C.*, No. MO16CV00047, 2017 WL 7789280, at *5 (W.D. Tex. Jan. 30, 2017) (emphasis added).

**I.    The District's Conclusory Objections Fail to Meet its Burden to Establish the Irrelevance of the Requested Information.**

First, the District contends that all of Plaintiffs' requests concerning the racial identifiability of its schools are irrelevant. The District specifically disputes Private Plaintiffs' prima facie contention that Poplar Springs Elementary School is racially identifiable. The District's position, however, is based solely on its own assertion that "[t]here is no vestige of the former *de jure* system remaining at Poplar Springs [Elementary School]" in student assignment or faculty assignment. ECF 77 at 3. But the District's argument goes to the heart of the parties' dispute; it is not the basis for resisting discovery.

The racial identifiability of Poplar Springs is a question of fact that Plaintiffs contest and that is centrally relevant to the parties' claims and defenses. *See Price v. Denison Indep. Sch. Dist.*, 694 F.2d 334, 364 (5th Cir. 1982) (holding that whether a school is racially identifiable is a question of fact). Indeed, the District makes the same argument about Poplar Springs in its reply brief in support of its motion for declaration of unitary status as it does in resisting discovery. ECF 62 at 3-4. But, as the Court noted at the September 24, 2018 hearing, the ultimate question of whether the District is unitary is not before the Court at this early stage. The District may "adamantly den[y]" that Poplar Springs is racially identifiable, but its position on the merits is not a justification for resisting discovery. *Id.*

The District even goes so far as to argue that Plaintiffs "can point to no evidence that Poplar Springs' . . . white student enrollment is a result of any constitutional violation," while withholding data that goes directly to this disputed fact. ECF 77 at 4. The District cannot fault Plaintiffs for failing to point to evidence while refusing to respond to the Plaintiffs' request for that evidence. And, it is not Plaintiffs' burden to come forward with such evidence.[2] Rather, at the unitary status hearing, it is the District's burden to demonstrate that Poplar Springs is *not* racially identifiable

---

[2] Even though Plaintiffs are not obligated to produce evidence of racial identifiability before obtaining discovery on that factual issue, Plaintiffs explained the prima facie basis for their factual contention in their August 28, 2018 Meet and Confer Letter:

> Poplar Springs Elementary School currently operates as a racially-identifiable school. According to the District, for the 2017-2018 SY, the student body is 91% Black students, Poplar Springs student body is at least 28% white students. This is far outside the commonly used plus or minus 15% (or even 20%) standard. [*See Davis v. E. Baton Rouge Par. Sch. Bd.]*, 721 F. 2d 1425, 1431 (5th Cir. 1983) (applying the plus or minus 15% standard to identify single-race school).]

Ex. 4.

5

and that the District has made every reasonable effort to address the issue. *Cowan v. Cleveland Sc. Dist.*, 748 F. 3d 233, 238 (5th Cir. 2014). Allowing the District to shirk its discovery obligations based on a conclusory denial of the allegations against it would "contradict[] the basic tenets of the discovery process." *Alvarez v. Wallace*, 107 F.R.D. 658, 660 (W.D. Tex. 1985) (rejecting defendants' contention that "if they swear at deposition that a fact does not exist, then Plaintiff is foreclosed from seeking documentary verification").

## II. All Information Requested is Relevant to Determining Whether the District has Achieved Unitary Status.

The District objects to the relevance of three categories of information: (1) teacher assignment, (2) ability grouping, and (3) academic achievement. Each category of information is reasonably calculated to lead to the discovery of admissible evidence and therefore relevant under Rule 26(b)(1).

### A. Teacher Assignment: RFI 8

RFI 8 seeks "teacher quality metrics by school for [school year ("SY")] 2015-2016 through present, including counts of both experienced faculty (with at least three years of experience) and novice teachers (with less than three years of experience), in which subject areas they are certified and in which school they are located." Ex. 2 at 2.

Data on teacher assignments are relevant to determining whether a school district is unitary. "[S]tudent segregation and faculty segregation are often related problems." *Freeman v. Pitts*, 503 U.S. 467, 497 (1992); *see also Dayton Bd. of Ed. v. Brinkman*, 443 U.S. 526, 536 n.9 (1979) (emphasis in original) (acknowledging "the relevance of segregated faculty assignments as one of the factors in proving the existence of a school system that is dual for teachers *and* students"). Moreover, when evaluating a district's progress towards unitary status, the Fifth Circuit has

recognized that the relevance of how a district assigns its most qualified and experienced teachers. *See Davis v. E. Baton Rouge Par. Sch. Bd.*, 570 F.2d 1260, 1264 (5th Cir. 1978) (remanding for consideration of whether the assignment of more experienced teachers in white schools hampered the quality of education at Black schools).

The District implicitly acknowledges the relevance of teacher assignment and qualifications to the unitary status inquiry under *Davis*, but it attempts to distinguish that case because the teacher reassignment in *Davis* was temporally closer to the end of *de jure* segregation. ECF 77 at 15. When it comes to whether such information is discoverable, however, the District's purported distinction based on timing is beside the point. *Davis*'s discussion of teacher qualifications and assignments makes clear that such information is, at the very least, *relevant* to the unitary status determination, even if the circumstances in the 1980s are not precisely identical to those here.

Moreover, as explained above, the District's conclusory assertion that it is not operating any racially identifiable schools goes to the merits of their claim and does not render teacher assignment data irrelevant. ECF 77 at 15 ("There is no possibility more [in]experienced teachers have been assigned to 'black' schools, because there are no racially identifiable schools in the District."). Poplar Springs is in fact racially identifiable by student enrollment, *see supra* note 2, but that is merely a starting point for the analysis. "What is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors, such as the racial and ethnic *composition of faculty and staff* and the community and administration attitudes toward the school, must be taken into consideration." *Price*, 694 F.2d at 358 (emphasis added).

7

Data on teacher quality and assignment are relevant, and the District should be compelled to produce them.

### B. Ability Grouping: RFIs 1, 3, and Supplemental RFI 13

Plaintiffs seek information relating to ability grouping within schools, including (1) "the percentage of students enrolled at each school with free and reduced price lunch ("FRL"), broken down by race, from [SY] 2015-2016 to present" (RFI 1); (2) an "Excel spreadsheet, in native format, showing scores of Advanced Placement ("AP") student test takers by race" (RFI 3); and (3) Advanced Placement ("AP") "exam results (passing or not passing), disaggregated by race, from SY 2015-16 to 2017-18" (Supplemental RFI 13). Ex. 2 at 1; Ex. 3 at 2. The District objects that these requests are all "outside the scope of the District's operative desegregation orders and not relevant." ECF 77 at 5, 8.

In fact, racial disparities in student tracking and ability grouping are evidence that the vestiges of discrimination remain. *See Vaughns by Vaughns v. Bd. of Educ. of Prince George's Cty.*, 758 F.2d 983, 991 (4th Cir. 1985) ("Because the County's school system had not attained unitary status, it is settled law that plaintiffs were entitled to a presumption that current placement disparities were causally related to prior segregation and that the burden of proving otherwise rested on defendants."); *United States v. Gadsden Cty. Sch. Dist.*, 572 F. 2d 1049, 1050-51 (5th Cir. 1978) (holding that statistical evidence of racial disparities in classroom assignments was sufficient to demonstrate that ability grouping "has caused segregation"); *Cowan v. Bolivar Cty. Bd. of Educ.*, 186 F. Supp. 3d 564, 610 (N.D. Miss. 2016) (citing *Montgomery v. Starkville Mun. Separate Sch. Dist.*, 665 F. Supp. 487, 496 (N.D. Miss. 1987)) (same).

And, in any event, the information requested regarding ability grouping is directly relevant, to whether the District has complied with its obligations regarding ability grouping under the

8

operative desegregation order. The order mandates that "[g]rouping procedures . . . be reviewed and revised as necessary to assure they support the spirit as well as the letter of [the] desegregation plan." Ex. 1 at 25.

The requested AP data are thus relevant because disparities in ability grouping are relevant both in determining whether vestiges of prior segregation remain and because they are relevant under the operative desegregation decree in this very case. *See also Little Rock Sch. Dist. v. Arkansas*, 664 F. 3d 738, 756-57 (8th Cir. 2011) (holding that test scores can be relevant to whether a district has met it desegregation obligations); *Hoots v. Pennsylvania*, 118 F. Supp. 2d 577, 597 (W.D. Pa. 2000) (holding that a district failed to comply with its desegregation order requiring it to "detrack" in secondary school mathematics).

Lastly, with respect to FRL data, it is foreseeable that the District may argue that disparities in tracking and academic achievement are explained by socio-economic factors rather than race. *See id.* ("As to the defendant's contention that socio-economic factors account for the disparate treatment of minorities in track placement in the District, there is little, if anything, in the record supporting the defendant's position."). This possibility alone suffices to meet the broad standard of relevance that governs in discovery disputes.[3]

---

[3] FRL data may also be necessary to analyze whether any racial disproportionality in discipline can be explained by socioeconomic status. The fact that "the District has not argued that 'racial disparities in school discipline are due to socio-economic status'" does not render the requested FRL data irrelevant. ECF 77 at 8. If the District were willing to stipulate that any racial disproportionality in tracking, student achievement, and discipline cannot be attributed to socioeconomic status, then perhaps production of this data would not be necessary. Without such stipulations, however, the data is likely to lead to the discovery of admissible evidence and is therefore relevant. The District cannot simultaneously withhold discovery of FRL data *and* maintain the availability of socioeconomic status as a defense to any racial disparities in its schools.

9

The District should be compelled to produce the requested FRL and AP data.

### C.     Academic Achievement Data: RFIs 5, 6, and Supplemental RFIs 11, 12

Finally, Plaintiffs seek production of the following metrics of student achievement and quality of education: (1) "For SY 2016-2017 and SY 2017-2018, an Excel spreadsheet, in native format, showing retention data" (RFI 5); (2) an "Excel spreadsheet, in native format, showing cohort graduation data beginning SY 2015-2016 to present" (RFI 6); (3) "the graduation rate, disaggregated by race, from SY 2014-15 through SY 2016-2017" (Suppl. RFI 11); and (4) "the dropout rate, disaggregated by race, from SY 2013-14 through SY 2017-2018" (Suppl. RFI 12). Ex. 2 at 1; Ex. 3 at 2.

These data are relevant to determining whether the District has discharged its duty to implement effective remedial programs for all students: If so, one would expect to see relatively low retention and dropout rates and high graduation rates, without significant racial disparities in any of these areas. The operative desegregation order explicitly requires the District to provide remedial and culturally responsive educational programs and to regularly revise its curriculum to assure better learning opportunities for all students. Ex. 1 at 25. Present racial disparities in student achievement demonstrate that the District has failed to meet its duty to provide such opportunities. *See also Milliken v. Bradley*, 433 U.S. 267, 283 (1977) ("In light of the mandate of *Brown I* and *Brown II*, federal courts have, over the years, often required the inclusion of remedial programs in desegregation plans to overcome the inequalities inherent in dual school systems.").

Even if the operative desegregation order had not expressly established the relevance of academic achievement data, courts have long recognized the relevance of educational quality to the unitary status inquiry. Contrary to the District's arguments, the six *Green* factors are not an exhaustive list of the discoverable topics in a school desegregation case. *See Freeman v. Pitts*, 503

U.S. 467, 493 (1992) (stating that "the *Green* factors need not be a rigid framework" and accepting "quality of education" as a relevant factor for analysis). It is well established that any racial disparities in student achievement are relevant to determining whether a district has eliminated the vestiges of segregation, root and branch. *See, e.g.*, *Jenkins v. Missouri*, 122 F.3d 588, 594 (8th Cir. 1997) (holding that the defendant bore the burden of showing that racial disparities in achievement were not causally related to past discrimination); *United States v. State of Texas*, 447 F. 2d 441, 448 (5th Cir. 1971) (ordering "specific educational programs designed to compensate minority group children for unequal educational opportunities resulting from past or present racial and ethnic isolation"); *United States v. Yonkers Bd. of Educ.*, 123 F. Supp. 2d 694, 702 (S.D.N.Y. 2000) ("If statistical data demonstrates a racial disparity in academic achievement, . . . then an explanation is required" from defendants). To the extent the District disputes whether the academic achievement gap is a vestige of segregation, Plaintiffs are at least entitled to discovery in order to present evidence on the issue. *Tasby v. Wright*, 713 F. 2d 90, 95-96 (5th Cir. 1983).

     Finally, production of this requested information would not unduly burden the District. In fact, the District already provided retention data for SY 2014-15 and SY 2015-2016 and cohort graduation data, disaggregated by race, for SY 2012-13 and SY 2013-14. Ex. 4 at 3, 5. The District also cited a publicly available website, which provides a report of graduation rate data, disaggregated by race, for all Mississippi districts serving students who enrolled in Grade 9 for the first time during SY 2013-14 (i.e., students graduating in SY 2016-17). ECF 77 at 14. The District has failed to provide any justification for its failure to provide a complete production of data for

SYs 2014-15 and 2015-16.[4]

Retention rates, graduation rates, and dropout rates are meaningful measures of student achievement and educational quality. *See, e.g.*, *Lee v. Autauga Cty. Bd. of Educ.,* No. 2:70CV3098, 2004 WL 1699068, at *7 (M.D. Ala. July 30, 2004) (examining student dropout data); *Yonkers Bd. of Educ.*, 123 F. Supp. 2d at 711-12 (using graduation rates and dropout rates to evaluate vestiges of discrimination). Thus, even if it were not made explicitly relevant by the desegregation order, all of the requested information would nonetheless remain relevant to whether the District has eliminated the vestiges of segregation.

The District should be compelled to produce this information.

---

[4] Presumably, graduation data is for SY 2017-18 is also now available, though it may not have been available when Plaintiffs' RFIs were first propounded. Plaintiffs also request production of graduation data for SY 2017-18. *See* Ex 3 at 1 (RFI 6 requesting an "Excel spreadsheet, in native format, showing cohort graduation data beginning SY 2015-2016 to *present*") (emphasis added).

**CONCLUSION**

For the foregoing reasons, the Court should compel the District to produce all the information requested.

Dated: October 1, 2018

                                              Respectfully Submitted,

| /s/ Fred L. Banks, Jr. | /s/ Natasha Merle |
|---|---|
| Fred L. Banks, Jr. | Natasha Merle |
| Phelps Dunbar LLP | Alexis Hoag |
| Mississippi State Bar No. 1733 | Kristen Johnson |
| 4270 I-55 North | Louis Fisher |
| Jackson, MS 39211-6391 | NAACP Legal Defense and |
| Tel: (601) 360-9356 |    Educational Fund, Inc. |
| Fax: (601) 360-9777 | 40 Rector Street, 5th Floor |
| fred.banks@phelps.com | New York, New York 10006 |
| | Tel: (212) 965-2200 |
| | Fax: (212) 226-7592 |
| | nmerle@naacpldf.org |
| | ahoag@naacpldf.org |
| | kjohnson@naacpldf.org |
| | lfisher@naacpldf.org |

*Counsel for Private Plaintiffs*