THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

| | |
|---|---|
| **JOHN BARNHARDT, ET AL.** | **PLAINTIFFS** |
| and | |
| **UNITED STATES OF AMERICA** | **PLAINTIFF INTERVENOR** |
| v. | **CIVIL ACTION NO. 4:65-cv-01300–HTW-LRA** |
| **MERIDIAN MUNICIPAL SEPARATE SCHOOL DISTRICT, ET AL.** | **DEFENDANTS** |

**Response to Private Plaintiffs' Motion to Compel Production of Information**

On March 29, 2018, the Meridian Public School District (the "District') filed its Motion for Declaration of Unitary Status. [53]. Since filing its Motion, Private Plaintiffs ("LDF") have sent informal Requests for Information to the District on two occasions, June 19, 2018 and July 25, 2018. The Private Plaintiffs sent a letter requesting supplementation of the District's responses to its June 19, 2018 requests on July 5, 2018. The Private Plaintiffs sent a "meet and confer" letter regarding certain of their requests for information on August 28, 2018. The LDF did not submit its requests under the Federal Rule of Civil Procedure as official interrogatories or requests for production of documents. Rather, the LDF made its requests informally through letters to the District. The District has responded to all of the Private Plaintiffs' requests in a timely manner. On September 13, 2018, the District submitted its Objections to Private Plaintiffs' Requests for Information, [77], to this Court. The District incorporates those Objections in this response.

I.      **Legal Argument and Authority**

A school district is entitled to a precise understanding of its obligations under its desegregation plan. *Missouri v. Jenkins*, 515 U.S. 70 (1995) (*citing Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 246 (1991)).  Here, the District's desegregation orders do not set out obligations regarding "quality of education," *e.g.* ability grouping, academic achievement, and teacher quality metrics. In the fifty-year history of this Desegregation Plan, LDF has never alleged that differences in educational outcomes between black students and white students are a subject of the District's Desegregation Plan. To argue an inquiry into these factors is now relevant to evaluating the District's progress towards unitary status is inconsistent with the Desegregation Plan and is contrary to the Supreme Court's admonition in *Dowell*  that the parameters of desegregation plans provide school districts with a clear understanding of what is required for unitary status.  *Id*.

One theme common throughout LDF's requests is the idea that quality of education is appropriate in evaluating the District for unitary status under *Freeman v. Pitts,* 503 U.S. 467, 492 (1992).  Teacher assignment (including qualitative assessment of teachers), information regarding student ability grouping, and student achievement fall under this category of the LDF's demands.  A second theme is that Poplar Springs Elementary is a "racially identifiable school."   The LDF employees this argument to buttress its claim that evaluating the quality of teachers should be part of the analysis of unitary status here.  Both arguments are flawed.

**A.** First, *Freeman v. Pitts* does not say that quality of education is a factor in the Desegregation Plan of the Meridian Public School District.

In *Freeman,* the parties agreed as part of the original desegregation order to obligations regarding "School Equalization," including a requirement that the school district "take prompt steps necessary to provide physical facilities, equipment, courses of instruction and instructional materials of quality equal to that provided in schools previously maintained for white students." Exhibit 3*,* 6.12.69, Order and Judgment.

Further, as the district court in *Freeman* recognized, the parties "*requested* this court review one other area [in addition to the *Green* factors], quality of education" when making a determination regarding unitary status.  Exhibit 4, 6.30.88, Order (emphasis added).  *See, also, Freeman,* 503 U.S. at 492 ("Both parties *agreed* that quality of education was a legitimate inquiry" in analyzing the school district's compliance) (emphasis added).

Here, there are no requirements regarding quality of education factors in the District's desegregation orders.  Nor has the District consented to consideration of quality of education factors in evaluating its compliance with its desegregation orders.  Further, to the extent to the District has produced information regarding retention, graduation dates, free and reduced lunch, etc., in the past, it did so in an effort to cooperate with LDF, not because it "recognized the relevance of such data" in evaluating its compliance with its desegregation obligations.

**B.**     Next, regarding Poplar Springs, the District disputes LDF's identification of Poplar Springs as a "racially identifiable" school.

In 1969, the District enrolled 10,823 students of which 6,418 (59%) were white and 4,405 (41%) were black.  Poplar Springs, an historically white school, immediately desegregated following implementation of the District's Desegregation Plan.  During the first three years of the Plan—although the Plan contains no specific racial quota for student assignment—Poplar Springs had student enrollment within +/- 15% of the District's enrollment by race; therefore, the District complied immediately with the Plan for student assignment as to Poplar Springs.  Since 1969, the District has experienced a 51.7% loss in total enrollment, with white student loss outpacing black student loss at all schools, although the decline in white student enrollment has been slightly less steep at Poplar Springs.  Nevertheless, Poplar Springs has remained desegregated and now has majority African-American enrollment, as demonstrated by the chart below.  Today, there is no vestige of the former *de jure* system remaining at Poplar Springs in student assignment.

| School Year | School | Black | White | Other Races | Total |
|---|---|---|---|---|---|
| 1970-71 | Poplar Springs Elementary | 291 (46%) | 345 (54%) | 0 | 636 |
| 1971-72 | Poplar Springs Elementary | 251 (41%) | 364 (59%) | 4 (.6%) | 619 |
| 1972-73 | Poplar Springs Elementary | 246 (43%) | 332 (57%) | 0 | 578 |
| 2017-18 | Poplar Springs Elementary | 306 (64%) | 132 (28%) | 38 (8%) | 476 |
| 2018-19 | Poplar Springs Elementary | 309 (66%) | 123 (26%) | 35 (7.5%) | 467 |

In fact, although the District's Plan does not set a racial quota for student assignment, the District's current total enrollment is 5,231 of which 4,713 (90%) are black, 313 (6%) are white, and 205 (4%) are other races.  Poplar Springs' current enrollment at 26% white is, therefore, within +/- 20 percentage points of the District's white student enrollment.  *See, United States v. Tex. Educ. Agency,* 679 F.2d 1104, 1114 (5th Cir. 1982); *United States v. Georgia,* 171 F.3d 1333, 1338 (11th Cir. 1999); *Williams v. Kimbrough,* Civ.A. 65-11329, 2010 U.S. Dist. LEXIS 51963 (W.D. La. May 3, 2010); *Andrews v. City of Monroe,* Civ.A. 65-11297, 2010 U.S. Dist. LEXIS 85604 (W.D. La. June 20, 2012).  *See,* Exhibit 5, 2018-19 Student Enrollment.

Although LDF is mistaken in its characterization of Poplar Springs as a "racially identifiable" school, the Supreme Court's analysis in *Freeman* regarding racial imbalance in student assignment is instructive here:

> In the case before us the District Court designed a comprehensive plan for desegregation of DCSS in 1969, one that included racial balance in student assignments.  The desegregation decree was designed to achieve maximum practicable desegregation . . . The plan accomplished its objective in the first year of operation . . . For the entire 17-year period respondents raised no substantial objection to the basic student assignment system, as the parties and the District Court concentrated on other mechanisms to eliminate the *de jure* taint.  That there was racial imbalance in student attendance zones was not tantamount to a showing that the school district was in noncompliance with the decree or its duties under the law.  Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation.

> Once the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors.

*Freeman,* 503 U.S. at 493-94.

Even if Poplar Springs were outside the constitutionally accepted deviation of +/- 20%, the law does not require "'awkward,' 'inconvenient,' and 'even bizarre' measures to achieve racial balance in student assignments in the late phases of carrying out a decree, when the imbalance is attributable to neither the prior *de jure* system nor to a later violation by the school district but rather to independent demographic forces." *Freeman,* 503 U.S. at 493. Any student assignment imbalance traceable to the *de jure* system in the District has long been remedied since the first three years of Plan implementation (1970 – 1973). LDF can point to no evidence that Poplar Springs' student enrollment is unconstitutional.

The Private Plaintiffs' assertion the District has relied on "conclusory" statements regarding Poplar Springs to avoid relevant discovery is disingenuous. The District's actual enrollment figures are not "conclusory" statements; they are facts. The Private Plaintiffs' have never responded to the District's arguments set out above supporting its objections to these requests for information.

## II.     Response to arguments regarding specific requests

Although the Private Plaintiffs did not technically propound under Federal Rule of Civil Procedure 34, the Private Plaintiffs seek relief under the Federal Rules governing discovery. The Private Plaintiffs have failed to comply with L.U.Civ.R. 37(b) requiring the party moving to compel compliance to "quote verbatim each interrogatory, request for production, or request for admission to which the motion is addressed, and must state: (1) the specific objection; (2) the grounds assigned for the objection (if not apparent from the objection itself), and (3) the reasons assigned as supporting the motion. The objections, grounds and reasons must be written in immediate succession to the quoted discovery request." The Private Plaintiffs have failed to comply with these requirements in their motion to compel; therefore, dismissal is appropriate under L.U.Civ.R. 27(c).

Nevertheless, for the Court's convenience, the District has set out the specific requests at issue and the various responses and replies to each below.

### A. Plaintiffs' June 19, 2018 Request for Information No. 1

Percentage of students at each school with free and reduced-price lunch ("FRL"), broken down by race, from school year ("SY") 2015-2016 to present.

**District Objection 6.22.18**: The District objects to this request as outside the scope of the District's operative desegregation orders and not relevant to any party's claim or defense in this case. Fed. R. Civ. P. 26(b)(1).

**Private Plaintiffs' Response 7.5.18**: To determine whether the District has reached unitary status, Plaintiffs require information to assess, among other things, student assignment, including in-school assignment and racial disparities in discipline, quality of education, and the racial impact of high concentrations of low-income children on quality of faculty and student achievement gap. The request is also narrowly focused in time, from SY 2015-16 to SY 2017-18. Please confirm whether the District is withholding responsive materials based on this objection. Fed. R. Civ. Pro. 34(b)(2)(C).

**District's Reply 7.31.18:** Having carefully reviewed your response, the District maintains its objections for the following reasons:

a. Student assignment: The District's student assignment plan has long been in place. Several court orders established geographic attendance zones whereby students are assigned to schools based on the attendance zones in which they live. The original zones were established by the HEW plan of August 11, 1969, with modifications to the junior high zones quickly following by order of the Fifth Circuit in November 1969. The District Court ordered changes in July 1970 to address the destruction by fire of Chalk Elementary, as well as issues created by the Fifth Circuit's designation of Magnolia Junior High as a seventh-grade facility, as opposed to a school for grades 3 and 4, as contemplated by the original HEW plan.

According to the 1970 Order, the District Court specifically found that, "the plaintiffs and the intervenors have approved the revised proposed modifications of defendants that are referred to hereinabove." For almost forty years, the student assignment plan operated according to the orders of the case until June 2009, when the District Court approved the creation of a new District-wide ninth-grade school, the closure of Kate Griffin Junior High, and the closure of Witherspoon Elementary. According to the Court's order, "[n]either the United States nor private plaintiffs have filed responses to or objections to the District's motion."

The existing student assignment plan is the law of the case and has operated since its inception without objection from either the Private Plaintiffs or the United States. To the extent the Private Plaintiffs now seek to challenge the District's long-standing student assignment plan, the Private Plaintiffs are not acting in good faith. Further, information regarding students

on free and reduced lunch could in no way relate to the student assignment plan. The District has never been required to furnish this information in reports. Until now, the Private Plaintiffs have never sought information regarding the free and reduced lunch program or acted as if the information were relevant to the desegregation plan. The historic conduct of the Private Plaintiffs proves this has never been considered part of the desegregation plan.

b. In-school assignment / racial disparities in discipline: You [LDF] have not shown how information regarding free and reduced lunch is related to your evaluation of in-school assignment or racial disparities in discipline. You [LDF] have been provided with the races of students by class, as well as voluminous data regarding discipline as part of the consent decree regarding discipline. You [LDF] have not previously asked for this information in connection with monitoring the compliance of the District with the desegregation plan, including the consent decree regarding student discipline. The historic conduct of the Private Plaintiffs proves this has never been considered part of the desegregation plan.

c. Quality of Education**:** "Quality of education" is not a *Green* factor. The desegregation orders of the case do not impose desegregation obligations on the District to monitor or assess educational outcomes of black students verses white students. The District has never been required to furnish this information in reports. Until now, the Private Plaintiffs have never sought this information or acted as if the information were relevant to the desegregation plan. The historic conduct of the Private Plaintiffs proves this has never been considered part of the desegregation plan. Further, you [LDF] have not shown how statistics regarding the racial percentages of students who receive free and reduced lunch are related to "quality of education."

d. The racial impact of high concentrations of low-income children on quality of faculty and student achievement gap: Despite our best efforts, we are not certain what is meant by this statement. Regardless, we are certain this is not a *Green* factor. The District has an African American enrollment of more than 93%. Even assuming there were a correlation between race (*i.e.,* black) and enrollment in the free and reduced lunch program, African American students are not clustered in a few schools. All students in the District attend schools composed primarily of African American students. All high school students attend the same high school. No order in this case identifies a desegregation obligation relating to the economic circumstances of students. No order in this case identifies a desegregation obligation regarding "the racial impact of high concentrations of low-income children on quality of faculty and student achievement gap." The District has never been required to furnish this information in reports. The historic conduct of the Private Plaintiffs proves this has never been considered part of the desegregation plan. Until now, the Private Plaintiffs have never sought this information or acted as if the information were relevant to the desegregation plan.

**Private Plaintiffs' Renewed Request 8.28.18:**   Plaintiffs seek this information to address a variety of issues relevant to determining whether the District has eliminated the vestiges of segregation "root and branch." *Cowan v. Cleveland School Dist.*, 748 F.3d 566, 238 (5th Cir. 2014). In addition to

student assignment and discipline, high concentrations of low-income children can impact faculty quality and student achievement.

The District has already recognized the relevance of such data. It previously provided data specific to students that the District characterized as "economically disadvantaged." The District reported that 61% of economically disadvantaged students graduated from high school in SY 2012-13, while 56.4% of economically disadvantaged students graduated in SY 2013-14.

The District's position that such data is irrelevant is untenable.

First, FRL is relevant to racial disparities in discipline within the context of in-school student assignment. Although the Consent Decree does not affirmatively require the District to provide data regarding FRL in its bi-annual reports, that does not make this information irrelevant. This is especially true to the extent the District intends to argue that racial disparities in school discipline or in school assignment are due to socio-economic status and not race. For example, on May 17, 2016, when questioned about the number of referrals at Meridian High School, Principal Hubbard stated he believed "root causes" of referrals, including for "defiance," were "children being from the inner city" and a result of "poverty." Plaintiffs seek information regarding FRL so that we may control for socio-economic status as part of the discipline data analysis to determine whether socio-economic status contributes to the racial disparities in student discipline.

Second, the data is relevant to addressing the District's argument that it is unitary in the area of student assignment. To the extent the District argues that its attendance zones have remained substantially the same since the Court ordered the District to end school segregation, *see* District's July 31,2018 Objections at 2, that contention alone does not resolve the issue of whether the District is unitary. Even where a school District has complied with a desegregation plan, courts may modify student assignment plans to address ongoing vestiges of segregation. *See, e.g., Cowan v. Bolivar Cty. Bd. Of Ed.,* 186 F. Supp. 3d 564, 567 (N.D. Miss. 2016); *Thomas v. St. Martin Par. Sch. Bd.,* No. 6:65-cv-11314, 2016 U.S. Dist. LEXIS 8580, at *8-11 (W.D. La. Jan. 21, 2016); *United States v. West Carroll Par. Sch. Dist.,* 477 F. Supp. 2d 759, 763 (W.D. La. 2007). "[A] school board's present racial neutrality does not suffice to eliminate the effect of its past de jure segregative actions, correcting post-injunction racially segregative measures does not eliminate their effect. *United States v. Lawrence Cty. Sch. Dist.,* 799 F.2d 1031, 1044-45 (5th Cir. 1986). Desegregation plans are judged by their effectiveness. *Id.* Ineffective plans must be rejected in favor of those plans that "achieved the desired effect: desegregation." *Cowan,* 748 F.3d at 240.

When the Court required the District to end racial segregation, the Court also established a continuing obligation on the District to eliminate the vestiges of that discrimination and prevent re-segregation. *Anderson v. Canton Mun. Separate Sch. Dist.,* 232 F.3d 450, 453 (5th Cir. 2000). Purported demographic shifts are not necessarily independent of or current unconstitutional practices. *Davis v. East Baton Rouge Par. Sch. Bd.,* 721 F.2d 1425, 1435 (5th Cir. 1983). Thus, Plaintiffs must closely examine the District's claim of demographic shifts being the sole cause of racially isolated schools and determine whether the District has instigated such shifts. Thus, Plaintiffs' requests seek data to show that the District has made a good faith attempt to address issues around student assignment.

**District's Supplemental Response 9.7.18:** The District maintains its objections to this request. The District previously provided this data as a courtesy, not because the data are relevant to the District's desegregation obligations. Additionally, the District notes the following:

1. The Consent Decree not only does not "affirmatively require" the District to provide this data, it does not require it *at all.*

2. The District has not argued that "racial disparities in school discipline are due to socio-economic status." It is the District's position that it has achieved compliance for a significant period of time as to all of its desegregation obligations.

3. The District has not claimed that "demographic shifts [are] the sole cause of racially isolated schools." The District adamantly denies it has any racially isolated schools. With respect to Poplar Springs, the District has stated that white student enrollment has declined at a slower pace than other schools.

The District reincorporates all arguments and objections set out above.

### B. Plaintiffs' June 19, 2018 RFI No. 3 and July 25, 2018 RFI No. 13

Excel spreadsheet, in native format, showing scores of Advanced Placement ("AP") student test takers by race.

**District Objection 6.22.18**: The District objects to this request as outside the scope of the District's operative desegregation orders and not relevant to any party's claim or defense in this case. Fed. R. Civ. P. 26(b)(1).

**Private Plaintiffs' Response 7.5.18**: To determine whether the District has reached unitary status, Plaintiffs require information to assess quality of education and student assignment. Scores of AP student test takers, by race, is relevant to assessing actual access to rigorous curricula and measuring performance of Black and white students. *See, e.g., Hereford v. United States,* No. 5:63-CV-00109-MHH, 2017 WL 5483734 (N.D. Ala. Nov. 14, 2017). The request is narrowly focused in time, from SY 2015-16 to present. Please confirm whether the District is withholding responsive materials based on this objection. Fed. R. Civ. Pro. 34(b)(2)(C).

**District's Reply 7.31.18:** Having carefully reviewed your [LDF] response, the District maintains its objections. Unlike the *Hereford* decision, the parties here have not agreed to additional desegregation obligations beyond the *Green* factors that would require "measuring the performance of black and white students," as was the case in *Hereford*. Student academic performance is not a requirement of the desegregation orders of this case. No desegregation order in this case addresses comparisons of student academic performance by race. The District has never been required to furnish this information in reports. The historic conduct of the Private Plaintiffs proves this has never been considered part of the desegregation plan. Until now, the Private Plaintiffs have never sought this information or acted as if the

information were relevant to the desegregation plan. Finally, scores of AP student test takers are not required to determine "access to rigorous curricula." Student enrollment by class and race has been provided.

**Private Plaintiffs' Renewed Request 8.28.18:** In an attempt to compromise with the District, Plaintiffs amended this RFI No. 13 from our July 25, 2018 letter. RFI No. 1 reads as follows:

Please provide the AP exam results (passing or not passing), disaggregated by race, from SY 2015-16 to 2017-18.

The District objected to RFI No. 13 on August 14, 2018. We will address the relevance of both RFI No. 3 and No. 13 here.

Plaintiffs seek to determine the racial/ethnic composition of the portion of the student body that is enrolled in AP courses. The request for production of exam results by race is also intended to assist in this calculation. Specifically, Plaintiffs want to determine the percentage of students enrolled in AP courses by race and by gender. Although the District has provided "[s]tudent enrollment by class and race," in the document labeled "LDF Req. I.H – AP Enrollment by Gender-Ethnicity 15-18," it does not allow the Plaintiff to calculate the relevant percentages. The data provided by the District does not indicate which individual students took more than one AP course. Plaintiffs therefore request an Excel spreadsheet, in native format, containing the following information for each individual student enrolled in an AP course for SY 2015-16 to present: (1) student identifying number, (2) race of student, (3) gender of the student, and (4) the AP courses the student is enrolled in.

The District has objected and argued that student academic performance is not relevant because it was not contemplated in the Court's prior desegregation orders. This is incorrect.

In its May 29, 1967 [p. 9, ¶ VI(b)] order, the Court explicitly required the District to provide "remedial education programs" for Black students to "overcome past inadequacies in their education."[1] Furthermore, in the HEW plan of August 11, 1969, the Court ordered that "grouping procedures" must "support the spirit as well as the letter of the desegregation plan."[2] August 11, 1969 HEW Plan, at 21, ¶4. A core aspect of successful desegregation plans include academic programs for Black students, and prohibitions on unfair academic tracking that leads to in-school segregation. *Milliken v. Bradley,* 433 U.S. 267, 281-82 (1977); *United States v. Gadsden Cty. Sch. Dist.,* 572 F.2d 1049, 1052 (5th Cir. 1978). This requires districts to monitor and address racial disparities in AP or gifted classroom enrollments and in academic performance. *See, e.g., Little Rock Sch. Dist. V. Arkansas,* 664 F.3d 738, 750-51 (8th Cir. 2011); *Cowan v. Bolivar Cty.*

---

[1] On November 7, 1969, the Fifth Circuit entered a new desegregation order governing the District and superseding prior court orders. The provision quoted by Private Plaintiffs here is not included in the November 7, 1969, Order and any following order regarding the District.

[2] The August 11, 1969, HEW Plan was not a court order, but rather a proposed plan submitted by HEW to the Court, which contained some number of "Suggestions for Plan Implementation," including the language on remedial programs cited by LDF. Although the District recognizes the HEW Plan was ultimately ordered by the Fifth Circuit, the "Suggestions for Plan Implementation," are just that, suggestions.

*Bd. Of Educ.,* 186 F. Supp. 3d 564, 609-10 (N.D. Miss. 2016). "[S]tudent achievement is an appropriate consideration in determining whether a school district is entitled to a declaration of unitary status." *Tasby v. Woolery,* 869 F. Supp. 454, 476 (N.D. Tex. 1994) (citing *Freeman,* 503 U.S. at 492).

**District's Supplemental Response 9.7.18:** The District maintains its objections to this request. Additionally, the District notes the following:

1.  LDF is not entitled to track individual students' class assignments to make determinations regarding quality of education and resources provided by the District.

2.  Advanced placement and honors classes are not "remedial education programs."

3.  The District is under no obligation to "monitor and address racial disparities in AP or gifted classroom enrollments and in academic performance" as in *Little Rock School District v. Arkansas,* 664 F.3d 738 (8th Cir. 2011).

The District reincorporates all arguments and objections set out above.

**C.   Plaintiffs' June 19, 2018 RFI No. 5**

For SY 2016-2017 and SY 2017-2018, an Excel spreadsheet, in native format, showing retention data. If the document titled "Retention 2016," does not reflect retention data for SY 2015-2016, provide that data.

**District Objection 6.22.18**: The District objects to this request as outside the scope of the District's operative desegregation orders and not relevant to any party's claim or defense in this case. Fed. R. Civ. P. 26(b)(1).

**Private Plaintiffs' Response 7.5.18**: To determine whether the District has reached unitary status, Plaintiffs require information to assess quality of education, including student retention. *See, e.g., GI Forum Image De Tejas v. Texas Educ. Agency*, 87 F. Supp. 2d 667 (W.D. Tex. 2000). This data allows for an analysis and comparison of retention rates by race. Plaintiffs' request is narrowly focused in time, SY 2016-17 and SY 2017-18, to allow analysis of student retention for the last three school years. The District has previously produced this data reflecting a different time period, see above Request number 4, and has thus waived its objection. Please confirm whether the District is withholding responsive materials based on this objection. Fed. R. Civ. Pro. 34(b)(2)(C).

**District's Reply 7.31.18:** Having carefully reviewed your [LDF] response, the District maintains its objections. The case you cite in support of your position, *GI Forum Image De Tejas*, 87 F. Supp. 2d 667 (W.D. Tex. 2000) is not a desegregation case. That matter dealt with whether the State of Texas could impose an examination requirement for high school graduation. A "comparison of retention rates by race" is not a *Green* factor and is not the subject of any desegregation order of this case. In fact, the District has never been required to report to you information regarding student retention. The Private Plaintiff's historic

53146388_1                                                    11

conduct in this case shows there has never been an understanding that retention has ever been an obligation of the desegregation decree.

**Private Plaintiffs' Renewed Request 8.28.18:** The District provided retention data for the 2014-2015 SY and 2015-2016 SY. The District now refuses to furnish such data. At no point before the instant objection has the District asserted that such data was not relevant to determining unitary status. The District cannot now make this argument in good faith simply because it has moved for a declaration of unitary status. Indeed, the Court's May 29, 1967 [p. 9, ¶ VI(b)] order and the 1969 HEW Plan both required the District to provide "remedial education programs" for Black students to "overcome past inadequacies in their education." Analysis of the District's retention rates provides relevant information as to whether the District [is] complying with the Court's mandate of remedial education programs.

Based on the retention data Plaintiffs have been able to examine thus far, the percentage of Black students being retained throughout the District were in the double digits as recently as SY 2014-2015 and remained nearly so in SY 2015-2016, even when IEP students are not included. Black students were disproportionately retained compared to white students. As the District is aware, students who are retained are more likely to drop out of school. Plaintiffs seek this information to determine whether these alarming rates of retention remain or have improved. Once this is determined, the parties can work together to determine how to ensure that the District is not disproportionately retaining Black students.

Case law does not support the District's position that quality of education, including retention data, is not relevant to whether the District has eliminated the vestiges of segregation. Quality of education encompasses retention data. Retention data is relevant to Private Plaintiffs' analysis of whether the District has complied with the Court's desegregation orders. *See, e.g., GI Forum Image De Tejas,* 87 F. Supp. 2d 667 (W.D. Tex. 2000). Contrary to the District's attempt to distinguish *GI Forum Image De Tejas*, in that case the court explained that the "case require[d] the application of law from a number of diverse areas," including "desegregation law." *Id.* at 669. Further, even if the District does not consider "quality of education" a relevant *Green* factor, the *Green* factors are a starting point from which the Court begins its evaluation of whether a District has eradicated the vestiges of segregation. The *Green* factors do not constitute the entire universe of such an evaluation. *See Freeman v. Pitts,* 503 U.S. 467, 492-93 (consideration of "the Green factors need not be a rigid framework," courts may also consider equity); *see also Cowan v. Bolivar Co. Bd. of Ed.,* 186 F. Supp. 3d 564 (N.D. Miss. 2016) (courts commonly consider *Green* factors, in addition to equitable principles, in determining whether districts have eliminated vestiges of *de jure* segregation).

Retention data is an "objective measure[] typically utilized"—along with subjective measures—to "determin[e] whether [a District's] actions have been and are currently effective" in ridding itself of racial segregation. *Ayers v. Fordice,* 1995 WL 1945428, at *46 (N.D. Miss. Mar. 7, 1995); *see also* FRE 401 (evidence is relevant if it has "any tendency to make a fact more or less probable that it would be without the evidence"). Indeed, the federal government routinely collects retention data of school districts. *See* https://ocrdata.ed.gov.

**District's Supplemental Response 9.7.18:**   The District maintains its objections to this request.  The District further notes LDF's statement "the federal government routinely collects retention data of school districts," which indicates the data is equally accessible to LDF as to the District.

The District reincorporates all arguments and objections set out above.

### D.   Plaintiffs' June 19, 2018 RFI No. 6 and July 25, 2018 RFI No. 11 and 12

An Excel spreadsheet, in native format, showing cohort graduation data beginning SY 20152016 to present.

**District Objection 6.22.18**:  The District objects to this request as outside the scope of the District's operative desegregation orders and not relevant to any party's claim or defense in this case.  Fed. R. Civ. P. 26(b)(1). Subject to and without waiving its objection information on graduation cohort data is publicly available at
http://mdereports.mdek12.org/pdf/a/2018/Grad%20Dropout%20Rates%20%202018%20Report%2009FEB2018.pdf

**Private Plaintiffs' Response 7.5.18**:  To determine whether the District has reached unitary status, Plaintiffs require information to assess quality of education, including cohort graduation data. *See e.g., Hereford v. Huntsville Bd. of Education*, No. 5:63-cv-00109 (N.D. Ala. June 30, 2014) and *GI Forum Image de Tejas v. Texas Educ. Agency*, 87 F. Supp. 2d 667, 676 (W.D. Tx. 2000). The District has previously produced this relevant cohort data for SY 2012-13 and SY 2013-14, and therefore waived its objection. In its previous production, the District represented that "nothing [is] reported for 14-15 and 1516." Please confirm whether the District is withholding responsive cohort graduation data for SY 2014-2015 through present based on this objection. Fed. R. Civ. Pro. 34(b)(2)(C).

For the link provided by the District, please explain how and which students are included within the calculation for graduation.

**District's Reply 7.31.18:**  Having carefully reviewed your [LDF] response, the District maintains its objections.  The case you [LDF] cite in support of your position, *GI Forum Image De Tejas*, 87 F. Supp. 2d 667, 676 (W.D. Tx. 2000) is not a desegregation case.  That matter dealt with whether the State of Texas could impose an examination requirement for high school graduation.  Cohort graduation data is not a *Green* factor and is not the subject of any desegregation order of this case.  The District has never been required to report to you information regarding cohort graduation data.  The link provided is to a report compiled and prepared by the Mississippi Department of Education.

**Private Plaintiffs' Renewed Request 8.28.18:**   The District provided cohort graduation data for SY 2012-13 and SY 2013-14 disaggregated by race.  In its previous production, the District represented that "nothing [is] reported for 14-15 and 15-16."  Given that the District has calculated the overall cohort graduation rate and the cohort graduation rate for students with disabilities and produced such information to Mississippi Department of Education ("MDE") it is hard to believe the District does not also calculate this

information disaggregated by race.  *See attached* 2017 Accountability System District Graduation and Dropout Rates.pdf.  At no point before the instant objection has the District asserted that cohort graduation data was not relevant in determining unitary status.  The District cannot now make this argument in good faith after it has moved for a declaration of unitary status.

While Plaintiffs appreciate the District pointing to a report compiled and prepared by the MDE, that does not negate Plaintiffs' need for data directly from the District.  First, the link provided by the District does not land on a functioning webpage.  However, Plaintiffs searched the MDE website and were only able to gather graduation rate for SY 2016-2017 disaggregated by race.  Plaintiffs therefore request cohort graduation data disaggregated by race for the missing SY 2014-2015 and SY 2015-2016.  Without this information, the District is impeding Plaintiffs' ability to accurately analyze the entire picture of the changes in the District's graduation rates.

Based on the graduation data Plaintiffs have been able to examine thus far, which do not allow for analysis of three consecutive school years, it appears 25% of the District's students are not achieving the basic goal of graduating high school in four years.  For some school years, the District is unable to graduate nearly 40% of its Black students.  As the District is aware, being able to graduate from high school contributes to employment and college opportunities for students.  Further, it is a factor parents consider when determining whether to enroll their student into a district.  Plaintiffs seek this information to get a full picture of the pattern of the District's graduation rates.  Once the pattern is determined, the parties can work together to determine how to ensure that the District is not failing to graduate its students.

Plaintiffs also require the District's dropout rate disaggregated by race.  The District currently has the 9th highest dropout rate in Mississippi at 18.3%.  Plaintiffs searched the MDE website and were only able to gather total dropout rates, not dropout rates disaggregated by race.  Plaintiffs therefore request dropout rate disaggregated by race for SY 2013-14 through SY 2017-18.  Without this information, the District is impeding Plaintiffs' ability to accurately analyze whether Black students in the District are disproportionately dropping out.  Once the pattern is determined, the parties can work together to determine how to ensure that students do not continue to dropout at alarmingly high rates.

Quality of education encompasses cohort graduation and dropout rates and such data is relevant to Private Plaintiffs' determination of whether the District has complied with the desegregation orders.  *See Hereford v. Huntsville Bd. of Educ.,* No. 5:63-cv-00109 (N.D. Ala. June 30, 2014).  The Court's May 29, 1967 [p. 9, ¶ VI(b)] order and the 1969 HEW Plan both required the District to provide "remedial education programs" for Black students to "overcome past inadequacies in their education."  Analysis of the District's graduation and dropout rates provides relevant information as to whether the District [is] complying with the Court's mandate of remedial education programs.

Even if the District does not consider "quality of education" a relevant *Green* factor, the *Green* factors are a starting point from which the Court begins its evaluation of whether a District has eradicated the vestiges of segregation.  The *Green* factors do not constitute the entire universe of such an evaluation.  *See Freeman v. Pitts,* 503 U.S. 467, 492-93 (consideration of "the Green factors need not be a rigid framework," courts may also consider equity); *see also Cowan v. Bolivar Co. Bd. of Ed.,* 186 F. Supp. 3d

564 (N.D. Miss. 2016) (courts commonly consider *Green* factors, in addition to equitable principles, in determining whether districts have eliminated vestiges of de jure segregation); *see also* FRE 401 (evidence is relevant if it has "any tendency to make a fact more or less probable that it would be without the evidence").

**District's Supplemental Response 9.7.18:** The District maintains its objection to this request. The District has no desegregation obligations regarding educational outcomes.

With respect to the initial link provided by the District not working, the District notes the MDE completed a redesign of its website following the District's initial and first supplemental responses to this request.

https://www.mdek12.org/sites/default/files/Offices/MDE/OEA/OPR/2018/Grad%20Dropout%20Rates%20-%202018%20Report%2009FEB2018.pdf

The District reincorporates all arguments and objections set out above.

### E.   Plaintiffs' June 19, 2018 RFI No. 8

Teacher quality metrics by school for SY 2015-2016 through present, including counts of both experienced faculty (with at least three years of experience) and novice teachers (with less than three years of experience), in which subject areas they are certified and in which school they are located.

**District Objection 6.22.18**: The District objects to this request as outside the scope of the District's operative desegregation orders and not relevant to any party's claim or defense in this case. Fed. R. Civ. P. 26(b)(1).

**Private Plaintiffs' Response 7.5.18**: To determine whether the District has reached unitary status, Plaintiffs require information to assess quality of education, including the provision of certain educational resources (for example, teachers with advanced degrees, teachers with more experience). The placement of experienced/novice faculty, as well as faculty teaching outside of the certification area in each school is relevant to this assessment. *Freeman v. Pitts*, 503 US 467 (1992); *see also Davis v. East Baton Rouge Parish Sch. Bd.*, 570 F.2d 1260, 1264 (5th Cir. 1978). Plaintiffs request a narrowly focused time, SY 2015-16 to present. Please confirm whether the District is withholding responsive materials based on this objection. Fed. R. Civ. Pro. 34(b)(2)(C).

**District's Reply 7.31.18:** The District maintains its objection. In *Freeman v. Pitts*, "both parties agreed that quality of education was a legitimate inquiry in determining [the school district's] compliance with the desegregation decree." 503 US at 492. Here, the District does not agree that educational outcomes have ever been considered a part of the obligations contained in the desegregation orders of this case. In fact, the parties to the case (including the Private Plaintiffs) have never treated educational outcomes or performance as an objective of the desegregation plan. The other case you [LDF] cite, *Davis v. East Baton Rouge Parish,* 570 F.2d at 1264, dealt with the manner in which teachers had been reassigned immediately following desegregation. Those issues are not present here. There is no

possibility more experienced teachers have been assigned to "black" schools, because there are no racially identifiable schools in the District. All schools have at least 64% African American enrollment.

**Private Plaintiffs' Renewed Request 8.28.18:** The District currently operates a racially-identifiable school, Poplar Springs Elementary School. According to the District, for the 2017-2018 SY, the student body is 91% Black students, Poplar Springs' student body is at least 28% white students. This is far outside the commonly used plus or minus 15% (or even 20%) standard. *See Davis,* 721 F.2d at 1431 (applying the plus or minus 15% standard to identify a single-race school). The District's refusal to recognize that it operates a racially identifiable school is contrary to their position that it has attempted to comply in good faith with the desegregation orders.

An analysis of the placement of experienced versus novice teachers, and certified teachers is relevant to determining whether the District has eliminated the vestiges of segregation. This is particularly relevant given that, according to the District, for SY 2017-2018, 61% of principals, teachers, and non-certified staff were Black, while at Poplar Springs, only 67% are white. It is Plaintiffs' understanding that placement of faculty is at the discretion of the District. Thus, analyzing how the District places its faculty is relevant to a determination of whether it has achieved unitary status.[3]

The District's interpretations of *Freeman v. Pitts,* 503 U.S. 467 (1992) and *Davis v. East Baton Rouge Par. Sch. Bd.,* 570 F.2d 1260 (5th Cir. 1978) are inaccurate. In *Freeman* the court's decision to consider quality of education as a relevant factor did not hinge solely on the parties' agreement of its relevancy. Rather, the court, in its exercise of discretion, found quality of education to be worthy of consideration "in connection with its findings on [the District's] resource allocation." *Id.* at 92. Regarding *Davis,* the District relies on the Fifth Circuit's earlier 1978 decision, prior to the appellate court's remand to the district court. In the Fifth Circuit's 1983 opinion, holding that the school district's 1980 plan violated the Constitution, recency (sic) of the district's desegregation plan was not a factor in concluding that the district's teacher reassignment "plan…left the more experienced teachers in the white schools and sent those with comparatively less experience to the essentially all-black schools." *See Davis v. E. Baton Rouge Par. Sch. Bd.,* 721 F.2d 1425, 1430 (5th Cir. 1983). It is without refute that teacher assignment in an integral part of the court's analysis of whether the District has achieved unitary status. *See Swann v. Charlotte-Mecklenburg Bd. of Ed.,* 402 U.S. 1, 19 (1971) (holding the U.S. Constitution does not require teachers be assigned on 'colorblind' basis in order to achieve faculty desegregation).

**District's Supplemental Response 9.7.18:** The District maintains its objections to this request. The District specifically denies it operates a racially identifiable school at Poplar Springs. Additionally, the District notes in *Freeman,* the court did not find quality of education to be "worthy of consideration" in connection with consideration of unitary status LDF as states. The Court found "[b]oth parties *agreed* that quality of education was a legitimate inquiry in determining DCSS' compliance with the desegregation decree, and the trial court *found it workable* to consider the point in connection with its findings on resource allocation." *Freeman,* 503 U.S. at 492 (emphasis added).

---

[3] During the Parties' August 30, 2018, conference regarding LDF's August 28, 2018, letter, Superintendent Dr. Amy Carter explained to LDF that its "understanding" regarding placement of faculty as a centralized process is mistaken. Individual school administrators are responsible for interviewing and recommending faculty and staff for hire, consistent with Mississippi law.

**III. Conclusion**

All parties to a desegregation case have an obligation to ensure that the requirements of the Court's orders are met. The Private Plaintiffs have had a continuing obligation to participate in the litigation and provide feedback and concerns in real time, not at the end of a fifty-year period of court supervision. None of the information Private Plaintiffs seek in discovery relates to any obligations imposed on the District under its desegregation orders. Nor is the information relevant to any feedback or concerns the Private Plaintiffs have offered the District over the fifty-year long history of this case. The Private Plaintiffs' demands are not reasonable, relevant, nor are they made in good faith. Rather, the requests at issue are made for one reason; the Private Plaintiffs' seek to continually expand the scope of the desegregation obligations in this case so that the case continues on indefinitely.

The District requests the Court deny Private Plaintiffs' motion to compel production of information and all further relief the Court deems appropriate.

Respectfully submitted, this 8th day of October, 2018.

**MERIDIAN PUBLIC SCHOOL DISTRICT**

/s/ John S. Hooks

OF COUNSEL:

Holmes S. Adams
MS Bar No. 1126
John S. Hooks
MS Bar No. 99175
Adams and Reese LLP
1018 Highland Colony Parkway, Suite 800
Ridgeland, Mississippi 39157
Telephone: 601.353.3234
Facsimile: 601.355.9708
E-mail:  Holmes.Adams@arlaw.com
        John.Hooks@arlaw.com

And

John G. Compton
MS Bar No. 6433
Witherspoon and Compton LLC
1100 23rd Avenue
Meridian, Mississippi 39302
Telephone: 601.693.6466
Facsimile: 601.693.4840
E-Mail: JCompton@witherspooncompton.com

## CERTIFICATE OF SERVICE

I do hereby certify that on this date, I filed electronically the foregoing with the Clerk of this Court using the CM/ECF system which will send notification of filing to all registered counsel of record.

Dated:  October 8, 2018.

/s/  John S. Hooks