FILED IN CLERK'S OFFICE
.U.S.D.C. - Atlanta

JUN 3 0 1968

LUTHER D. THOMAS, Clerk
By:
Deputy Clerk

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WILLIE EUGENE PITTS, et al.        :
                                   :
VERSUS                             :        CIVIL NO. 11946
                                   :
ROBERT FREEMAN, et al.             :

## O R D E R

The DeKalb County School System (DCSS) was historical-
ly segregated by law. "Dual" school systems were maintained in
the County, one for black students and another for white
students.  In 1954, the Supreme Court's landmark decision in
Brown v. Board of Education, 347 U.S. 483 (1954), signaled the
end of dual systems with its pronouncement that "in the field of
public education the doctrine of 'separate but equal' has no
place.  Separate educational facilities are inherently unequal."
Id.  at 495.  The Supreme Court's decision imposed upon all
school systems, which were maintaining dual systems at that
time, the duty to dismantle the dual system, avoid the rees-
tablishment of the dual system, eliminate the vestiges of the
dual system and replace the dual system with a system in which
all students, regardless of their race, are provided the same
educational opportunities.

In 1968, the plaintiffs, certain black school children
in Dekalb County and their parents, filed this class action on
behalf of all black school children in Dekalb County claiming
that the defendants had operated a racially segregated school

**EXHIBIT 4**

system in violation of the United States Constitution. After this action was filed, the DCSS voluntarily undertook to work with the Department of Health, Education and Welfare (HEW), to develop a final and terminal plan of desegregation. In June, 1969, the court entered a consent order which approved the proposed plan and enjoined the defendants from discriminating on the basis of race in operating the DCSS. The court maintained jurisdiction over the case to implement its order. In the two decades that this case has been pending, the court has rarely been asked to intervene.[1] Both parties have worked together in

---

[1] There was no significant action in this case until September, 1975. At that time, plaintiffs sought to have the DCSS declared out of compliance with the 1969 order. Plaintiffs challenged the M-to-M program, assignment of staff, and changes in attendance zones. In 1976, the court entered an order requiring the DCSS to modify the M-to-M program to provide free transportation, to reassign faculty and staff to approximate the system-wide percentages, and created a Bi-racial Committee to oversee future boundary line changes, the M-to-M program, etc.

In 1977, the DCSS requested the court to approve a boundary line change for Flat Shoals Elementary School. After a hearing, the court held that the school's plan met constitutional standards and approved it.

In 1978, the DCSS filed a motion asking that kindergarten and special education programs be excluded from the M-to-M program. The court denied the motion.

In 1979, the DCSS, at the Bi-racial Committee's request, moved the court to amend its 1976 order to modify the M-to-M program, such that the only schools that would be eligible to receive transferring blacks would be those schools whose black populations did not exceed the system-wide percentage of black students. The Bi-racial Committee had suggested that such a limitation might help stop white flight from transitional schools and neighborhoods. The court denied modification of the order, finding that the transition of the southern schools was caused by the changing complexion of the neighborhoods, rather than the effect of the M-to-M program.

In 1983, the plaintiffs sought supplemental relief. Plaintiffs alleged that the DCSS had conspired to limit M-to-M transfers to Lakeside High School, that Knollwood Elementary School had been improperly expanded, and that Redan High School

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

the best interest of the school system.

On January 16, 1986, the defendants filed a motion for final dismissal. The defendants seek a declaration that the DCSS has achieved unitary status. When a federal court maintains jurisdiction over a school desegregation case, the school system must show that it is unitary before it can be dismissed from court supervision. Green v. County School Board, 391 U.S. 430, 439 (1968).

The meaning of unitary status has not been clearly defined by the Supreme Court. As there is no binding precedent in this circuit which articulates a precise definition for the term[2], this court will use the definition espoused by Judge

---

was also improperly increased. Plaintiffs later dropped their claim as it concerned Knollwood Elementary School. Separate hearings were held on the Lakeside and Redan issues. With regard to the Lakeside High School issue, the court ruled against the defendants. The court held for the defendants on the Redan issue. Although the court's first order on the Redan issue was reversed by the Eleventh Circuit, the order issued by this court following remand also held for the defendants. The parties did not appeal that order.

[2] In Georgia State Conference of Branches of the NAACP v. Georgia, 775 F.2d 1403, 1413 n. 12 (11th Cir. 1985), the court noted "[s]ome confusion has been generated by the failure to adequately distinguish the definition of a "unitary" school system from that of a school district which has achieved "unitary status....[A] unitary school system is one which has not operated segregated schools as proscribed by cases such as Swann and Green for a period of several years. A school system which has achieved unitary status is one that is not only unitary but has eliminated the vestiges of its prior discrimination and been adjudicated as such through the proper judicial procedures. Unfortunately, the terminology used to refer to these concepts is not universal."

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

Rogers in Brown v. Board of Education (Brown III), 671 F. Supp. 1290, 1292-93 (D. Kan. 1987), to determine whether the defendants have met their burden of proof.  The following principles for determining unitary status were set forth in that case. First, "the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. Milliken v. Bradley, 433 U.S. 267, 280 (1977).  No one plan can achieve unitary status in all school districts.

The court also must be mindful that it is only segregation caused by the intentional segregative acts of the defendants that comprise the constitutional violation in this case.  "De facto segregation (segregation caused by private choice) and segregation caused by authorities other than those sued in this case, are not part of the constitutional violation...."  Brown III, 671 F. Supp. at 1292 (citing Keyes v. School District  Number 1, 413 U.S. 189 (1973); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1 (1971)).

Because separate but equal schools violate the Constitution, the racial mix of students in a school is an important factor.  The Court has emphasized on many occasions that while racial mix is important, racial balancing is not required. E.g. Swann v. Board of Education, 402 U.S. 1, 24 (1971).  Even the existence of a small number of one race or virtually one race schools is not necessarily violative of the Constitution.  Id. at 26.

In Brown III, Judge Rogers further recognized that

4

**EXHIBIT 4**

"[s]egregative motive or the absence of such intent is relevant but not controlling in determining unitariness. 'The measure of the post-Brown I conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system.' Dayton II, 443 U.S. at 538." Brown III, 671 F. Supp. at 1293.

In the Brown III opinion, Judge Rogers summarized by stating that a school system that has obtained unitary status is "one in which the characteristics of the 1954 dual system either do not exist or, if they exist, are not the result of past or present intentional segregative conduct of the defendants or their predecessors." Id. This court finds the definition of unitary status articulated by Judge Rogers to be the clearest and most serviceable definition of that term espoused by any court. It combines all of the essential requirements from the Supreme Court opinions with a workable standard for a court to apply to the facts of a given case.

In Green, the Court delineated six pertinent areas that courts should examine in deciding whether a school system has met its burden of abolishing the former dual system. These areas include: student assignment, faculty, staff, transportation, extracurricular activities and facilities. The parties have requested that this court review one other area, quality of education, when determining if these defendants have met their burden of proof regarding whether the DCSS is now a unitary

5

EXHIBIT 4

system.   The court agrees that quality of education should properly be addressed.

The court held a hearing on the motion for final dismissal (or declaration of unitary status) on July 6 - 22, 1987.   On November 22, 1987, after the parties had submitted their post-trial briefs and proposed findings of fact and conclusions of law, the court heard closing arguments on this motion.   Earlier, plaintiffs filed motions for supplemental relief and to compel the DCSS to file a junior high plan.   The court deferred ruling on those motions until it addressed the motion for final dismissal.   All three motions are now ripe for decision.

### STUDENT ASSIGNMENT

Much of the evidence submitted during the hearing on the motion for unitary status properly concerned student assignment.   Indeed, the separation of the races is the primary indicator of a de jure segregated school system.   Plaintiffs accurately stated this court's duty, with regard to this issue, in their proposed findings of fact and conclusions of law at pages 54-55.   Plaintiffs stated "[t]he court's task, in reviewing Defendants' progress in these areas, is to determine whether the remedies implemented by the Defendants have been effective in dismantling the old dual system. If they have, then the system should be declared unitary; if they have not, then further relief must be ordered so that the duty to desegregate is fully and finally discharged.   <u>Davis v. East Baton Rouge</u>

**EXHIBIT 4**

<u>Parish School Board</u>, 721 F.2d 1425, 1434 (5th Cir. 1983); <u>Lee v.</u>
<u>Macon County Board of Education</u>, 616 F.2d 805, 808-09 (5th Cir.
1980).   See also <u>Swann v. Charlotte-Mecklenberg Board of</u>
<u>Education</u>, 402 U.S. 1 (1971)."

<u>DEFENDANTS' CONTENTIONS</u>

The DCSS' position in this motion for unitary status
is that it fulfilled its duty regarding student assignment in
the 1969-70 school year when it closed the remaining de jure
black schools and reassigned all students to their neighborhood
schools under a bona fide neighborhood attendance plan.   The
DCSS argues that this action placed all students in the atten-
dance zones they would have occupied in the absence of the
constitutional violation.   Although the DCSS concedes that the
school system has undergone some resegregation since the
implementation of the plan and the filing of the instant motion,
the DCSS contends that shifting demographic factors and other
factors beyond the DCSS' control caused this resegregation and
that the DCSS is not legally responsible.

<u>PLAINTIFFS' CONTENTIONS</u>

Plaintiffs contend that the DCSS has the continuing
duty to combat all resegregation until this court declares that
the DCSS has achieved unitary status.   Their goal was to produce
evidence showing that the implementation of the 1969 order did
not eradicate all of the vestiges of the prior dual system, and
that the DCSS missed opportunities to fulfill its affirmative
duty to eradicate all of the vestiges of the former dual

7

**EXHIBIT 4**

system.

To support their argument that the implementation of the 1969 order did not desegregate the DCSS, plaintiffs asked the court to examine the resegregation that has occurred in the DCSS. Plaintiffs improperly place great emphasis on the concept of racial balance[3]. Plaintiffs point to these 1986-87 school year statistics: (1) 47% of the students attending the DCSS are black; (2) 50% of the black students attended schools that were over 90% black; (3) 62% of all black students attended schools that had more than 20% more blacks than the system-wide average; (4) 27% of white[4] students attended schools that were more than 90% white; (5) 59% of the white students attended schools that had more than 20% more whites than the system-wide average; (6) of the 22 DeKalb County high schools, five have student populations that are more than 90% black, while five

---

[3]   In <u>Swann</u>, the Court emphasized that racial balance is not the test of an unitary system.

> If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved. ... The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

<u>Swann</u>, 402 U.S. at 24.

[4]   For purposes of this order all white and minority students other than blacks will be referred to as whites. There was no evidence presented that at the time this action was instigated that non-black minority students composed even one percent of the student population of the DCSS. Thus, 94.4% of the students attending the DCSS in 1969-70 school year were white.

**EXHIBIT 4**

other schools have student populations that are more than 80% white; and (7) of the 74 elementary schools in the DCSS, 18 are over 90% black, while 10 are over 90% white.

Plaintiffs also contend that the DCSS missed opportunities to fulfill its duty regarding student assignments. Plaintiffs' primary evidence in this regard was the testimony of Dr. Robert Dentler[5] about the DCSS' failure to take advantage of certain desegregative tools: (1) the DCSS did not subdistrict, that is, the DCSS did not break this large county into subdistricts and racially balance all of the subdistricts; (2) the DCSS did not expend sufficient funds to target minority learning opportunities; (3) the DCSS did not put in place community advisory mechanisms bearing on equalization of treatment, other than the bi-racial committee that was established by the court; (4) the DCSS could have modified the old "freedom of choice" plan to use it for desegregative purposes; (5) the DCSS could have clustered schools, placing children at different grade levels in different schools; thus, establishing a feeder pattern; (6) the DCSS could have used magnet schools earlier than DCSS chose to use them; and (7) the DCSS could have used urban to suburban exchanges of students. (Transcript Vol. IX at 43-47)

While the DCSS had an affirmative duty to eradicate

---

[5] Dr. Dentler was qualified as an expert in the areas of student assignment, educational administration, staff desegregation, program development and evaluation, specifically in the areas of desegregation, demographics, human relations and transportation. (Transcript Vol. IX at 12-13)

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

the vestiges of the former dual system during this period, it is undisputed that plaintiffs did not seek court intervention to require the DCSS to implement any of the desegregative tools described above.   In fact, plaintiffs did not seek further judicial intervention in this case until 1975, long after plaintiffs claim that other desegregative tools should have been utilized by the DCSS.   Even then, the plaintiffs did not seek implementation of the changes that they now seek.

DISCUSSION

Prior to the 1966-67 school year, the DCSS maintained dual attendance zones for both blacks and whites.   Beginning with the 1966-67 school year, DCSS replaced the dual zones with a system of geographic zones with a "freedom of choice" transfer plan.   While this plan resulted in a number of black students attending de jure white schools, the system had no significant impact on the former de jure black schools.   The majority of black students still attended the de jure black schools.   While neutral on its face, the "freedom of choice" plan did not dismantle the dual systems.   In Green v. County School Board, 391 U.S. 430 (1968), the Supreme Court held that "in desegregating a dual system a plan utilizing 'freedom of choice' is not an end in itself. ... Rather than further the dismantling of the dual system, the plan has operated simply to burden children and their parents with a responsibility  which Brown II placed squarely on the School Board." Id. at 440-42.

Within two months of the Supreme Court's decision in

10

EXHIBIT 4

<u>Green</u>, the plaintiffs filed this action.  By order of June 12, 1969, the consent desegregation plan for DCSS was implemented. That order was designed to be a final and terminal plan for desegregation.  The order abolished the "freedom of choice" plan and implemented a single neighborhood school attendance policy. All of the remaining de jure black schools from the previous dual system were closed.  In 1969, the school population of DeKalb County consisted of 74,741 students of which 3,754, or 5.6% were black.

Plaintiffs concede that "the closing of the black schools in 1969 did, for a time, result in the desegregation of the schools of DeKalb County...." (Plaintiffs' trial brief at 7) The court agrees with plaintiffs' concession.  Plaintiffs further contend that the DCSS has become resegregated and that the defendants are responsible for that segregation.  While the court agrees that the DCSS has become largely resegregated since the 1969-70 school year, the court does not find that the defendants are legally responsible for the resegregation.

Plaintiffs concede that the racial segregation in DeKalb County is the result of demographic shifts.  In fact, plaintiffs' leading expert, Dr. Dentler, testified that "there were profound changes taking place demographically [from 1969 until 1986 in DeKalb County]."  (Transcript Vol. IX at 38) Plaintiffs' correctly contend that not "until all vestiges of the dual system are eradicated can demographic changes constitute legal cause for racial imbalance in the schools."  <u>Lee</u>

11

**EXHIBIT 4**

v. Macon County Board of Education, 616 F.2d 805, 810 (5th Cir. 1980)(citing Flax v. Potts, 464 F.2d 865 (5th Cir.), cert. denied, 409 U.S. 1007 (1972)). Plaintiffs seemingly further contend, however, that until the school system is declared unitary, not all vestiges of the former dual system will be eradicated. Such a contention, of course, is erroneous. It is axiomatic that all vestiges of a dual system must be eradicated at a point in time before the school system is declared to have unitary status or the school system must be declared to have achieved maximum possible desegregation.

It is clear that the simple act of implementing a constitutionally accepted plan does not make a school system desegregated. United States v. Texas Education Agency, 647 U.S. 504 (5th Cir. 1981)(Unit A), cert. denied sub nom., South Park Independent School District v. United States, 454 U.S. 1143 (1982) (citing Henry v. Clarksdale Separate School District, 579 F.2d 916, 921 (5th Cir. 1978)); see Thompson v. Madison County Board of Education, 496 F.2d 682 (5th Cir. 1974). At points in their briefs, the defendants seemingly make the argument that such an implementation does relieve the school system of its affirmative obligations. To the extent that the defendants arguments can be read as supporting this contention, the court rejects their arguments. This court is mindful of the Fifth Circuit's guidance in Lemon v. Bossier Parish School Board, 444 F.2d 1400 (5th Cir. 1971), that "'[o]ne swallow does not make a spring.'"

12

**EXHIBIT 4**

The court will now examine the evidence presented at trial concerning the vestiges of the former dual system after the desegregation order was implemented in this case. When the June, 1969 order was initiated, all children were assigned to their neighborhood school. As the court noted above, plaintiffs concede that this action effectively desegregated the DCSS for a period of time. The evidence that plaintiffs presented at the hearing which tends to show that the implementation of the June, 1969 order did not effectively desegregate all of the schools for a time period was presented by Roger Mills. Mr. Mills has been involved with this case in several different capacities. His initial involvement was as a named plaintiff in 1974, he subsequently became involved as co-counsel, and later served as a member of the bi-racial committee. He testified that "there were two schools that were majority black despite the implementation of the court order. The first school was Terry Mill Elementary School which was 76 percent black, and the second school was Stoneview Elementary which was 51 percent black." (Transcript Vol. VII at 190)

The court will accept the witness' contentions regarding these schools, because plaintiffs' exhibit number 95, which contained the same information, was admitted into evidence. The court notes, however, that plaintiffs did not show that Mr. Mills had a basis for personal knowledge of the school system during the 1969-70 school year. Mr. Mills did not enter this case until 1974, and he testified that he moved into DeKalb

13

**EXHIBIT 4**

County on January 1, 1974.  (Transcript Vol. VII at 188).

The court has some concern that two of the formerly de jure white schools were majority black at the time the desegregation plan for DeKalb County was implemented.  The court views one race schools in the DCSS, both now and then, with suspicion. "The existence of a small number of one race, or virtually one-race, schools [however] within a district is not in and of itself the mark of a system that still practices segregation by law."  Swann, 402 U.S. at 26.  The court was presented with no evidence that these schools are a vestige of the dual system. The evidence presented at the hearing showed that demographic shifts in the Atlanta Metropolitan Area began in the 1950s.  In the 1950s, the population of DeKalb County was basically white; but as more and more blacks moved into the Atlanta Metropolitan Area, the rapidly growing black population began to move into the southwest DeKalb County area.  The area surrounding Terry Mill School was one of the first areas to be effected by a rapid shift in the minority population.

Dr. David Armour testified about why Terry Mill was a majority black school at the time the desegregation plan was implemented in DeKalb County.  Dr. Armour is an expert in the areas of the educational and social effects of desegregation plans, including academic achievement; the effects of demographics on school enrollment trends; the evaluation of alternative desegregation plans; the causes of residential segregation; assignment of faculty and staff in school desegregation plans;

14

EXHIBIT 4

research methods and survey methods; and statistical analysis of data. Armour testified that in 1966 Terry Mill had only two black students, and 590 white students. By 1967, due to the population shifts of black residents from the City of Atlanta into DeKalb County, 23% or 140 out of 613 students at the school were black. In 1968, when the plan was adopted, the percentage of blacks and whites was equal. By 1969, when the plan was implemented, the percentage of black students at the school was 76%. (Transcript Vol. V at 120-21)

There was no evidence presented that the former dual system in any way contributed to the rapid racial transition of that school. Nor was there evidence that a formerly de jure black school was located within that area. Terry Mill was, of course, a formerly de jure white school. For these reasons, the court cannot find that the prior unconstitutional acts of the defendants were responsible for the high percentage of minority students in Terry Mill School in 1969.

The court is not as concerned with the racial im-balance in 1969 in the Stoneview Elementary School. The racial mix at that school was practically 50-50. There was only one percent more black students in the school than white students. That mix represents perhaps the ideal racial integration situation. Practically equal numbers of black and white children attended school together. The court notes that, unlike the majority of the County, this area has been characterized as a stable integrated area since the inception of the integration

15

**EXHIBIT 4**

plan. The racial mix of the same school in the 1986-87 school year, according to plaintiffs' evidence, was 53% black.

There was insufficient evidence presented to this court from which it can make a determination, as defendants urge, that the implementation of the 1969 order resulted in full eradication of the vestiges of the dual system that would entitle them to a declaration of unitary status on this issue. While the court is satisfied that the two majority black schools that were in place when the order took effect in the 1969-70 school year are not vestiges of defendants' prior unconstitutional conduct, there was insufficient evidence presented about how long the school system remained relatively desegregated before demographic changes had the effect of resegregating certain schools. There is considerable evidence that the defendants actions in 1969 resulted in elimination of most of the vestiges of segregation. The achievement of unitary status in the area of student assignment cannot be hedged on the attainment of such status for a brief moment. For this reason, the court finds it necessary to examine the actions of the DCSS over the last two decades.

<u>HISTORY OF THE DEMOGRAPHIC CHANGES IN DEKALB COUNTY</u>

A true understanding of the problems and successes of the DCSS cannot be found without an examination of the demographic changes experienced by DeKalb County in the period between 1969 and 1986. DeKalb County has experienced phenomenal growth since 1950. In 1950, the County's population was a mere

16

**EXHIBIT 4**

77,0000.  By 1985, the population was in excess of 450,000.

In 1970, there were 7,615 non-whites[6] living in the northern part of DeKalb County and 11,508 non-whites living in the southern part of the county.  By 1980, there were 15,365 non-whites living in the northern part of DeKalb County and 87,583 non-whites living in the southern portion.  Between 1975 and 1980, approximately 64,000 black citizens moved into southern DeKalb County, most moving from the City of Atlanta.  Meanwhile, approximately 37,000 white residents moved from southern DeKalb County to surrounding counties, mostly Gwinnett County.  While there was some growth of the white population in southern DeKalb County from 1950 until 1975, in northern DeKalb County, the number of whites grew tremendously during that period.

As the result of these demographic shifts, the population of the northern half of DeKalb County is now predominately white and the southern half of DeKalb County is predominately black.  Evidence presented at the hearing indicates that racially stable neighborhoods are not likely because whites prefer a racial mix of 80% white and 20% black, while blacks prefer a racial 50% - 50% mix.  (Transcript Vol. V at 53)  The demographic shifts have also had an immense effect on the racial compositions of the DeKalb County schools.  From the period of 1976-1986, at the elementary level, the DCSS experienced an

---

[6]  In this context, the evidence presented to the court distinguished between whites and non-whites, that is, minority students including non-blacks.

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

enrollment decline of 15%, and within this change, an increase in black student enrollments of 86%. At the high school level, during the same period, DCSS experienced an enrollment decline of 16%, while the number of black students rose by 119%.

### STEPS TAKEN BY THE DCSS TO COMBAT DEMOGRAPHIC CHANGES

Since 1976, a bi-racial committee, appointed by the court, has reviewed all proposed boundary line changes, all proposed school openings and closings, and the M-to-M program. Since the implementation of court-ordered desegregation in this case, there have been approximately 170 boundary line changes. Dr. William Clark, an expert in the areas of urban geography, demographic processes, statistics methodology, housing patterns and survey analysis, testified that the boundary line changes had no significant impact on the school populations, given the tremendous demographic shifts that were taking place at the same time. He opined that if no boundary lines had been changed, the shifting demographics still would have resulted in a significant increase in black population in many schools, especially those located in the southwest DeKalb area. Although the defendants' evidence showed that three boundary changes had at least a partial segregative effect, Dr. Clark testified, and this court finds, that even if a boundary change might have had a short-term effect on segregation, in the long run these boundary changes did not have a significant impact on the racial mix of the school populations. (Transcript Vol. I at 73-74)

To combat the shifting demographics, the DCSS volun-

18

**EXHIBIT 4**

tarily implemented a Minority-to-Majority program[7] in the 1972 school year. Using approximate numbers, 4,500 students of the 72,500 enrolled in the DCSS in the school year 1986-87 participated in that program. Participation has grown steadily in the program over the last decade at the rate of about 500 students per year. (Transcript Vol. V at 61) Dr. Armour testified that the impact of the M-to-M students goes far beyond the number of students transferring under the program. He testified that at the receiving school approximately two whites students for every black student is exposed to an integrated learning experience. (Transcript Vol. V at 61-62) Thus, approximately 19% of the students attending the DCSS had an integrated learning experience as a result of this program.

In the 1980s, the DCSS also instigated a magnet school program in schools located in the middle of the County. The location of these programs in the middle of the County is of critical importance for desegregative purposes. As was discussed above, the southern half of the County is predominately black, while the northern half of the County is predominately white. Only special academic programs located in schools in the middle of this rather large county have much potential for attracting both black and white students.

The magnet school programs in effect at the time of the hearing include: a performing arts program at Avondale High

---

[7] The M-to-M transfer policy allows a student to transfer from a school in which his race was in the majority to one in which his race was in the minority.

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

School; the Scientific Tools and Techniques program at Fernbank Science Center; a science program for gifted and talented elementary children at Snapfinger Elementary School; a foreign language program at Briarcliff High School. At the hearing, Dr. Robert Freeman, Superintendent of the DCSS, testified that the DCSS also had plans to maintain programs at three other schools as magnet programs: the open campus located at Briarcliff; the Occupational Educational Center North; and the Occupational Educational Center Central. The DCSS has two other magnet programs on the drawing board: a school for the gifted and talented at Kittridge Elementary School and a program for four-year-olds at Evansdale Elementary School. The DCSS also operates a number of integrated experience programs: the writing center programs for both fifth and seventh graders that are racially controlled; the driving range school is racially controlled; summer school programs are racially controlled as much as possible; and a racially controlled dialectical speech program was to be implemented in the 1987-88 school year.

## HAS THE DCSS ACHIEVED MAXIMUM DESEGREGATION?

The court has examined the efforts that plaintiffs contend defendants should have taken to achieve unitary status in the area of student assignment, the steps that the DCSS has taken to accomplish their goal, the dynamics of the changing demographics, and the effects of the changing demographics on student attendance. With these factors in mind, the court must decide if the defendants have accomplished maximum practical

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

desegregation of the DCSS or if the DCSS must still do more to fulfill their affirmative constitutional duty.

Most of plaintiffs' efforts to convince this court that defendants must do more to fulfill their constitutional duty centered on Dr. Dentler's testimony about what desegregative tools were at the defendants' disposal during the time that the resegregation of the County was taking place. Dr. Dentler summarized his testimony in this manner:

> [The DCSS] is racially imbalanced, it has schools that are extremely isolated racially, that continue to be identifiably black and identifiably white. It has failed to comply even in the broadest interpretation I could make with the single standard on certificated stat [sic]. It does not have a bi-racial committee which engaged [sic] in advising and guiding on desegregated strategies and race relations. It has an M-to-M program which has done about as much as it can do, which is very little, to desegregate the system. It has the barest bones beginnings of magnet programs, affecting in my count about 500 students at present, and there are some good ideas going, but they have a very long way to go, and they are in shortfall right now.
>
> So even on my briefest list, this district is segregated and has not offset the vestiges of discrimination as they impact on the child's daily learning experience, and that's the essence of the school treatment. It's not a unitary district, and its got some exciting good intentions which I have tried to note and honor, but...they don't bear on this assessment.

(Transcript Vol. IX at 123-24)

To rebut this evidence, the defendants presented the testimony of Dr. Christine Rossell, an expert in the areas of evaluation of alternative desegregation plans, the design and

21

**EXHIBIT 4**

implementation of desegregation plans, the effect of desegrega-
tion plans on learning, the effect of desegregation plans on
demographics and statistical analysis of data. When asked
whether she agreed with Dr. Dentler that the DCSS did not
properly respond to the population shifts occurring during the
1970s and 1980s, Dr. Rossell testified:

> I am sure that [the DCSS] could have done
> something to make marginal adjustments, but
> these trends are so massive that [the DCSS]
> could only have had a marginal effect. The
> basic trend was racial transition, blacks
> moving from Atlanta into DeKalb County, and
> ...there is nothing that would have changed
> that basic factor.

(Transcript Vol. XI at 85) When asked whether magnet schools
would have worked in the mid-1970s, the period of time when Dr.
Dentler advocates that such programs should have been started in
the DCSS, Dr. Rossell testified that all studies available at
that time, concerning the effectiveness of magnet programs,
indicated that magnet programs were not very effective.
(Transcript Vol. XI at 86-87)

To rebut Dr. Dentler's testimony that the M-to-M
Program as implemented in the DCSS is ineffective, Dr. Rossell
testified that, in 1987, the M-to-M transfers will reduce
"racial imbalance by 18 percentage points if you use the index
of dissimilarity comparing blacks to non-blacks, by 20 per-
centage points if you use the relative exposure index comparing
blacks to non-blacks. That is a fairly large reduction in
racial imbalance." (Transcript Vol. XI at 87) Dr. Rossell
further testified that the magnet programs and integrated

22

**EXHIBIT 4**

learning experience programs implemented by the DCSS have had positive effects on desegregation and racial exposure. (Transcript Vol. XI at 95).

Once again this court is faced with the "battle of the experts." The testimony of the opposing experts in this case is so contradictory that to accept the testimony of plaintiffs' experts necessitates that the court discredit most of the testimony of the defendants' experts, and vice-versa. Faced with this decision, the court finds the evidence presented by the defendants' experts to be more reliable on this issue. The defendants' experts were more familiar with the DCSS. They had spent more time than plaintiffs' experts in the DCSS, learning about the inner workings of the DCSS and its problems and successes, rather than treating the DCSS as a hypothetical situation. The court notes that Dr. Walberg, Dr. Armour, Dr. Rossell and Dr. Clark are leading experts in their respective fields and all have had considerable experience in the desegregation area.

Plaintiffs' desegregation expert, Dr. Dentler, did not base his testimony on an empirical study of the school system. Due to his lack of personal knowledge of the DCSS, he was forced to treat the DCSS as a hypothetical situation. Based upon data made available by the school system, his testimony centered on the failure of the DCSS to achieve racial balancing. The court found more compelling testimony about what is being and can be done to improve the quality of education for all students and

23

**EXHIBIT 4**

achieve maximum practical desegregation at the same time.

Based upon the evidence presented at the hearing, the court finds that the DCSS has done everything that was reasonable under the circumstances to achieve maximum practical desegregation in DeKalb County. Plaintiffs request the court to go back in time and ask the question "what if the defendants had tried this then?" That time has passed. While there may be some case authority for approaching desegregation cases in that manner, this court will not dwell on what might have been, but what else should be done now. "At any time, more could have been done to achieve racial balance in the schools. But, it begs the issue of this case to argue that racial balancing must be done today because it was not done yesterday." <u>Brown III</u>, 671 F. Supp. at 1309.

Although the defendants might have been able to do something more to maintain desegregation while the dramatic population shifts were occurring, the court, based on the evidence presented at the hearing and the court's long involvement[8] in this case, finds that defendants' actions achieved maximum practical desegregation from 1969 to 1986. The rapid population shifts in DeKalb County were not caused by any action on the part of the DCSS. These demographic shifts were inevitable as the result of suburbanization, that is, work opportunities arising in DeKalb County as well as the City of

---

[8] The undersigned was assigned to this case on January 8, 1981, approximately twelve years after its filing. Prior to that time, Judge Newell Edenfield supervised this case.

24

**EXHIBIT 4**

Atlanta, which attracted blacks to DeKalb; the decline in the number of children born to white families during this period while the number of children born to black families did not decrease; blockbusting of formerly white neighborhoods leading to selling and buying of real estate in the DeKalb area on a highly dynamic basis; and the completion of Interstate 20, which made access from DeKalb County into the City of Atlanta much easier. (Transcript Vol. IX at 33) There is no evidence that the school system's previous unconstitutional conduct may have contributed to this segregation. This court is convinced that any further actions taken by defendants, while the actions might have made marginal adjustments in the population trends, would not have offset the factors that were described above and the same racial segregation would have occurred at approximately the same speed.

This court does not dismiss lightly plaintiffs allega- tions that the defendants could have done more to desegregate the DCSS. "The failure to take desegregative action by a district that had an affirmative duty to desegregate should be carefully examined by the court. If a district has consistently dragged its feet on desegregation then the vestiges of the segregated system may remain." Brown III, 671 F. Supp. at 1308. Although the plaintiffs, defendants, and the HEW all consented to the June, 1969 order implementing a race-neutral neighborhood school system, the Court later made it clear in Swann and Green that such plans would not satisfy the duty to desegregate

25

**EXHIBIT 4**

unless it did effectively desegregate the system. Even though a student assignment plan may be racially neutral, unless the former vestiges have been removed, a race-neutral plan can perpetuate the former dual system.

To reiterate, this court finds that the implementation of the June, 1969 order eradicated most of the vestiges of the former dual system. Defendants' efforts to desegregate this system did not end there, however. When faced with rapid resegregation of the system, the DCSS implemented both a M-to-M program and a magnet program. Both of these programs were implemented without the prompting of this court or the plaintiffs. Both of these programs have achieved a degree of success in desegregation and racial exposure.

Although defendants did not implement all programs described as permissible in Swann, this court cannot find that it neglected its constitutional duty to eradicate the vestiges of the former dual system. The great weight of the evidence indicates that the segregation that occurred in DeKalb County would have taken place at approximately the same speed whether or not defendants had implemented the desegregative tools described by plaintiffs. While racial mixture is a proper goal of a formerly segregated school system, there is no constitutional right for any student to attend a school having any particular degree or racial balance or mixing." Milliken v. Bradley (Milliken II), 433 U.S. 267, 280 n. 14 (1977); Pasadena Board of Education v. Spangler, 427 U.S. 424, 434 (1976). At

26

**EXHIBIT 4**

this juncture, the court is convinced that, absent massive bussing, which is not considered as a viable option by either the parties or this court, the magnet school program and the M-to-M program, which the defendants voluntarily implemented and to which the defendants obviously are dedicated, are the most effective ways to deal with the effects on student attendance of the residential segregation existing in DeKalb County at this time.

Based upon the dramatic effect the implementation of the June, 1969 order had on eradicating the vestiges of the prior dual system, the DCSS' continuing efforts to battle resegregation by implementation of voluntary M-to-M and magnet school programs, the absence of any persuasive evidence indicating that the actions of the DCSS in any way promoted the resegregation that occurred in the County, and the evidence that indicates that other efforts by the DCSS would not have effectively stopped or even slowed the rapid demographic changes that brought residential segregation to the County, this court finds that the DCSS has achieved maximum practical desegregation as of the 1986-87 school year. The goal in desegregation cases is to achieve the "greatest possible degree of actual desegregation, taking into account the practicalities of the situation." United States v. DeSoto Parish School Board, 574 F.2d 804 (5th Cir. 1974), cert. denied, 439 U.S. 982 (1978). The DCSS has become a system in which the characteristics of the 1954 dual system have been eradicated, or if they do exist, are not the

**EXHIBIT 4**

result of past or present intentional segregative conduct by defendants or their predecessors. <u>Brown III</u>, 671 F. Supp. at 1293.

Plaintiffs argue that further desegregation may be accomplished by, <u>inter alia</u>, establishing a magnet school program or grade reorganization plan, such as a comprehensive junior high school plan. The court agrees with plaintiffs contentions in this regard. As the court discussed above, the defendants are obviously dedicated to the magnet program and the court does not find that court supervision is necessary to insure that magnet programs are used to bring about maximum practical desegregation.[9]

The court is concerned that the defendants are not seizing the opportunity of implementing a junior high program to bring about further desegregation, if possible. The parties agreed that in the area of student assignment, the cut-off date for evidence in this area would be the 1986-87 school year. All evidence presented to the court indicates that the DCSS obtained maximum practical desegregation through that cut-off date. Thus, the defendants have fulfilled their constitutional obligations in this area. For that reason, the court denies the motion of plaintiff to compel the defendants to file a junior

---

[9] In the defendant's post-trial brief at page 36, defendants state: "[a]s the court heard, Defendants remain committed to providing all students the opportunity for an integrated education, and will continue to devote significant resources to the M-to-M program, integrated experience programs, and magnet programs with or without court supervision."

**EXHIBIT 4**

high plan.

## STAFF ASSIGNMENTS

The assignments of both teachers and principals have been challenged in this case as violative of the dictates of Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969), cert. denied, 396 U.S. 1032 (1970). The court will first address the issue as it concerns teachers.

While the DCSS maintained a dual system, only black teachers were hired to teach black students in all-black schools, and only white teachers were hired to teach in the all-white schools. Of course, a segregated faculty is vestige of the former dual system, and all school systems that maintained a dual system have the affirmative duty to eradicate this vestige. As long as schools have faculties that are identifiably of one race, it is unlikely that the schools will be able to success-fully assimilate students of another race.

Plaintiffs do not contend that the defendants have not fulfilled their constitutional obligation with respect to hiring and retaining minority faculty. The proper gauge of the defendants' conduct in respect to hiring minority teachers is the racial composition of a district's teacher work force as compared to the racial composition of the qualified public school teacher population in the relevant labor market. Hazelwood School District v. United States, 433 U.S. 299, 308 (1977); Fort Bend Independent School District v. City of Stafford, 651 F.2d 1133, 1137-38 (5th Cir. 1981) (Unit A).

29

**EXHIBIT 4**

Plaintiffs concede that defendants have actively recruited qualified black applicants, and that the result of their efforts has allowed the defendants to hire a significant number of black teachers, even though the number of black students graduating from colleges in the United States with bachelor degrees in the field of education has declined since 1975 and is still decreasing. While the state-wide average percentage of black teachers within a school system was 21% in 1986, the DCSS percentage was 26.92%. In the last five years, the DCSS has continuously employed a greater percentage of black teachers, than was the state-wide average. The court notes that the DCSS has an equally exemplary record in retention of black teachers.

Plaintiffs do contend, however, that the defendants have not complied with one of Singleton's requirements. Singleton pronounced three governing principles with respect to faculty employment practices during the desegregation process. Plaintiffs challenge only the first pronouncement, that is, plaintiffs contend that the defendants have failed to follow the requirement that "principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students." Id. at 1217-18.[10] The court agrees that the defen-

---

[10] The other two requirements of Singleton follow. Singleton prohibits a school system from discriminating in the hiring, assignment, promotion, pay, demotion or dismissal of faculty members and staff. Finally, Singleton requires that in school districts in which the process of desegregation effects a

AO 72A
(Rev. 8/82)

EXHIBIT 4

dants have not complied with <u>Singleton</u> with regard to assignment of minority faculty.

The court notes, that in 1976, while Judge Newell Edenfield supervised this case, the defendants were found to be out of compliance with the first <u>Singleton</u> requirement. In his order of November 3, 1976, Judge Edenfield made the following findings of fact and conclusions of law on this issue:

> The court finds that the defendants have not taken adequate steps to utilize reassignment of teachers to reduce the racial identifiability of faculty in accordance with the standard set out in <u>Singleton v. Jackson Municipal Separate School District</u>, <u>supra</u>. In <u>Singleton</u>, the Court of Appeals for the Fifth Circuit held that in order to reduce racial identifiability of a faculty, staff should be assigned so that the ratio of black to white teachers in each school is "substantially the same" as the ratio throughout the entire system. 419 F.2d at 1218.

> Defendants ask that the court compare the facts in the instant case with <u>Ellis v. Board of Public Instruction of Orange County</u>, 423 F.2d 203, 205 (5th Cir. 1970), where the court found the school system to be in compliance with <u>Singleton</u>, despite the existence of racial ratios in individual schools twelve percentage points higher than the racial ratio of the entire school system. While the court is aware of the problems inherent in requiring that the teachers at any school be maintained at an exact arbitrary racial ratio, [cite] the current 40-48% of black teachers in some of the more predominantly black elementary schools does not even "approximate" the 15% system-wide ratio [cite].

reduction in the number of teachers or other professionals employed by the district, the school district must select the staff members to be dismissed or demoted on the basis of valid non-discriminatory reasons. 419 F.2d at 1218.

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

> A significant reason for the wide disparity
> in the racial ratios amongst schools in
> DeKalb County is the reliance on the
> replacement process, and the avoidance of
> reassignments to even out the distribution
> of faculty.   The court finds that this
> system does not comply with the Singleton
> standard, nor with this court's 1969 order
> which required reassignment of teachers to
> eliminate the effects of the dual school
> system.   Accordingly, reassignment of
> teachers must be utilized to make the racial
> ratio of the faculty in individual schools
> truly substantially similar to the system-
> wide ratio.   [cite]

Order of November 3, 1976 at 15-16.

There was no evidence presented at the hearing that after Judge Edenfield issued the order referenced above that the defendants reassigned their teachers to make the racial ratio of the faculty in individual schools truly substantially similar to the system-wide ratio. All evidence indicates that the DCSS has continuously relied upon the replacement process to achieve Singleton requirements and avoided using mandatory reassignment. The result of this policy is that defendants have never satisfied their duty to comply with Singleton.

Defendants argue that if the court views the system as a whole they have complied with Singleton. Defendants contend that plaintiffs improperly look at particular schools. Defendants obviously misread the requirement of Singleton in this regard. The pertinent language from that opinion follows:

> For the remainder of the 1969-70 school year
> the district shall assign the staff de-
> scribed above so that the ratio of Negro to
> white teachers in each school, and the
> ratio of other staff in each, are substan-

**EXHIBIT 4**

tially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system.

419 F.2d at 1218 (emphasis added). The proper focus for both the court and the parties are whether individual schools deviate substantially from the system-wide average.

Plaintiffs presented evidence that in the 1984-85 school year, seven schools deviated more than 10% from the system-wide average of 26.4% minority teachers in the elementary schools and 24.89% minority teachers in the high schools.

| School | % Black Students | % Black Faculty | % Deviation |
|---|---|---|---|
| Briarlake Elem | 17.1% | 14.29% | -12% |
| Chapel Hill Elem | 96.9% | 38.89% | +12.5% |
| Gresham Park Elem | 98.2% | 39.29% | +13% |
| Kelley Lake Elem | 98.7% | 38.46% | +12% |
| Leslie Steele Elem | 99.0% | 37.04% | +11% |
| Wadsworth Elem | 95.5% | 47.83% | +21.5% |
| Gordon High | 99.4% | 39.22% | +14.4% |

For the 1985-86 school year, the system-wide percentage teachers rose to 26.7% minority teachers in the elementary schools and 26.36% in the high schools. The evidence shows that the number of schools deviating more than 10% from the system-wide average rose also.

| School | % Black Students | % Black Faculty | % Deviation |
|---|---|---|---|
| Briarlake Elem | 18.9% | 13.79% | -13% |
| Hightower Elem | 18.2% | 12.50% | -14% |
| Kingsley Elem | 2.8% | 16.67% | -10% |
| Medlock Elem | 34.4% | 15.79% | -11% |
| Chapel Hill Elem | 97.5% | 41.46% | +15% |
| Sky Haven Elem | 98.0% | 39.13% | +12.5% |
| Leslie Steele Elem | 99.2% | 39.29% | +12.5% |
| Wadsworth Elem | 96.7% | 41.67% | +15% |
| Gordon High | 99.6% | 39.58% | +13% |
| Walker High | 99.0% | 41.27% | +14.5% |

In the 1986-87 school year, the numbers increased

33

EXHIBIT 4

again.    During  that  year  15  elementary  schools  and  2  high
schools  fell  outside  the  10%  range.   Again,  the  ratio  of
minority  faculty  rose,  reaching  27.3%  in  the  elementary  schools
and  25.95%  in  the  high  schools.

| School | % Black Students | % Black Faculty | % Deviation |
|---|---|---|---|
| Hooper Alex. Elem | 94.0% | 37.5% | +10.2% |
| Austin Elem | 1.1% | 13.33% | -14% |
| Chapel Hill Elem | 98.5% | 39.53% | +12% |
| Gresham Park Elem | 98.0% | 43.75% | +15.5% |
| Hightower Elem | 30.5% | 15.0% | -12% |
| Kelley Lake Elem | 98.8% | 46.67% | +19.5% |
| Kingsley Elem | 2.9% | 15.38% | -12% |
| Meadowview Elem | 82.4% | 42.31% | +15% |
| Oakcliff Elem | 14.9% | 17.14% | -10.2% |
| Sky Haven Elem | 97.3% | 40.43% | +13% |
| Smoke Rise Elem | 12.9% | 13.51% | -14% |
| Leslie Steele Elem | 99.6% | 37.93% | +10.5% |
| Terry Mill Elem | 98.4% | 47.06% | +20% |
| Toney Elem | 97.7% | 38.46% | +11% |
| Wadsworth Elem | 96.8% | 40.0% | +13% |
| Columbia High | 98.4% | 36.0% | +10.1% |
| Redan High | 33.2% | 15.71% | -10.2% |

Although  the  DCSS  is  not  legally  responsible  for  where
black  and  white  families  chose  to  live  in  DeKalb  County,  the  law
of  this  circuit  makes  it  legally  responsible  for  the  allocation
of  minority  teachers.   Defendant  offers  two  excuses  for  its
failure  to  achieve  perfect  Singleton  compliance.   First,
defendant  argues  that  competition  among  local  school  districts
is  very  stiff  and  that  it  is  difficult  to  attract  and  keep
qualified  teachers  if  the  DCSS  requires  that  the  teachers  work
far  from  their  homes.   The  former  Fifth  Circuit  Court  of  Appeals
rejected  a  similar  argument  in  United  States  v.  DeSoto  Parish
School  Board,  574  F.2d  804  (5th  Cir.),  cert.  denied,  439  U.S.
982.   In  DeSoto,  the  court  said:

34

**EXHIBIT 4**

Pointing to the difficulties DeSoto Parish faces in competing with nearby, wealthier school systems in attracting and keeping qualified teachers, the board asserts that measures such as reassignment to achieve compliance with Singleton will lead to large numbers of faculty resignations. The fear of faculty resistance to desegregation measures, like the fear of community resistance, cannot be allowed to defeat an effective desegregation plan in favor of a plan that is unlikely to achieve a unitary system.

Id. at 817. The court is not unsympathetic to the difficulties that the DCSS faces in this regard; however, the law of this circuit requires the DCSS to comply with Singleton's requirements now.

The DCSS maintains a transfer program. Under this program, if a teacher has taught at the same school for a period of three years, the teacher may request a transfer to another school. (Defendants' exhibit 83) The predominant reason given by both black teachers and white teachers when requesting transfers is that they have a desire to work closer to their residence. This allows the teacher to coordinate classroom activities with community and civic activities and alleviates travel inconvenience. (Transcript Vol. II at 19-22) The court notes that since DeKalb is such a large and densely populated county, the ability to work close to home can save an individual significant daily travel time. While the number of transfer requests received by the County is relatively high, the number

**EXHIBIT 4**

of transfer request that are granted is relatively low.[11] Since the teachers requests are to transfer to schools near their home, however, the transfers that are granted deter the DCSS from achieving its Singleton goal.[12]

Plaintiffs further contend that the DCSS' placement of principals violates Singleton. Plaintiffs do not contend that the DCSS has failed to fulfill its constitutional obligation concerning the hiring and retention of minority administrators. As in the faculty area, the DCSS has an exemplary record in hiring and maintaining minority professional staff. Blacks now compose 26.5% of the administrative staff of the DCSS. Blacks are represented throughout all levels of the administrative structure of the DCSS.

Plaintiffs' concern about the assignment of principals is that principals are assigned in a manner such that the number of black principals at a school is a strong indication of the black student population of that school. The court must

---

[11] At the high school level in the 1986-87 school year, 79 requests were made. Seventy of the requests were made by white teachers, and 9 by black teachers. Of the 79 requests, 26 were granted, 24 to white teachers and 2 to black teachers. At the elementary level, 103 requests were made, of which 57 were granted, 40 to white teachers and 17 to black teachers.

[12] Defendants argue that they achieved Singleton compliance in every school at some point in time over the course of this case; therefore, it has been relieved of its constitutional burden. It would be ludicrous for this court to accept such an argument. Acceptance of compliance with Singleton under that argument, would permit situations such as a school system having 20% of its schools in compliance with Singleton during a particular year would achieve Singleton compliance even though the other 80% substantially deviated from the system-wide ratio, as long as the other 80% eventually complied with Singleton.

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

agree.

This court does not consider the evidence of principal assignments in a vacuum, however.   In United States v. South Park Independent School District, 566 F.2d 1221 (5th Cir. 1978), cert. denied, 454 U.S. 1143 (1982), the court briefly considered the allegation of the plaintiff that principals were assigned based upon the race of the individuals involved.   The court stated:   "We are not ready to hold that each particular level of employment in a school system must have a particular racial composition.   At the same time, however, we also recognize that in a community individuals might attach a certain degree of importance to the position of principal, and that it would be unconstitutional for a school district to assign principalships based upon the race of the individuals involved." Id. at 1226.

In Singleton, the court did not differentiate between teachers or principals, but required that all "staff who work directly with the children at school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students." Singleton, 419 F.2d at 1218.   The principals and assistant principals are only two of the members of a schools staff that interact on a daily basis with the children.   Singleton requires that the staff be considered as a whole.   When the evidence concerning both teacher and principal deviations are considered, the need for further action by the defendants to comply with

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

<u>Singleton</u> becomes obvious.

Construing the evidence presented by the parties concerning the assignments of principalships, the court finds the majority black schools have a high percentage of black principals assigned to them, while the majority white schools have a deficient percentage of black principals assigned to them. Plaintiffs' evidence focuses on the 1985-86 school year. There was no evidence presented that the 1985-86 school year was an anomaly. Plaintiffs showed that during the 1985-86 school year, five of the 22 high school principals, and 18 of the 74 elementary school principals were black. Of those black principals, four of the five black high school principals were assigned to schools that have student populations of over 95% black. Only one of the five high schools with black student populations over 90% had a white principal.[13] Thirteen of the 18 black elementary school principals were assigned to schools at which the black student population exceeded 90% black. Conversely, only four of the elementary schools with black student populations over 90% had a white principal. (Plaintiffs exhibit 3)

There is also an obvious racial skew in the total number of administrators (principals, assistant principals, lead teachers) at the majority black schools. The court will first examine the elementary schools during the 1985-86 school year.

---

[13] Gyuri Nemeth, who testified during the July, 1987 hearing, is a white principal at majority black Walker High School (now McNair Senior High).

38

EXHIBIT 4

At this time the system-wide average of black administrators at the elementary school level was 30.1%. In the 43 majority white schools the number of black administrators were less that 10%. In the 11 schools in which the black student population ranged between 41% and 80%, the number of black administrators increased to approximately 38.5%. In the 20 schools in which the black student population was greater than 81%, the percentage of black administrators increased to 60%.

At the high school level, the racial skew of administrators was equally as startling. The system-wide average of black administrators at the high school level was 27.2%. In the 12 schools that were majority white, the percentage of black administrators was only approximately 22%. In the schools that had black student populations ranging from 41% to 80%, the percentage of black administrators was roughly 45%. In the majority black schools with black student populations of over 81%, the percentage of black administrators increased to 63.2%.

The court also analyzed an exhibit presented by defendants which depicted the race and sex of all in-school administrators for the 1987 school year. At the elementary school level, 27 out of the 77 elementary schools had black principals. In the 27 schools in which the principal was black, 60% of the in-school administrators were black. At the high school level, only four of the twenty-nine high schools had black principals. In those four schools, 75% of the in-school administrators were black.

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

Such obvious deviations between percentage of black administrators in the majority black schools cannot satisfy the _Singleton_ requirements. Again the court rejects any contention by the defendants that if a particular school met the _Singleton_ requirement at one time, the DCSS is relieved of the _Singleton_ requirement as to that school. At a minimum, _Singleton_ contemplates an initial reassignment of staff that will achieve a system-wide balance of minority staff and then a neutral maintenance program afterwards.

Defendants complain that this court has not given the DCSS guidance on what acceptable deviation from the system-wide average would comply with the _Singleton_ requirement of "substantial compliance." This court has endeavored to be flexible by not setting a certain percentage deviation that will satisfy _Singleton_ in this district. The court, however, will comply with the defendants request for guidance by establishing an iron-clad rule. This court will adopt as this rule the previous guidance established by Judge Edenfield in the November 3, 1976 order. When the school staffs (faculty and administrators) of all schools vary from the system-wide minority staff average by no more than 15%, the DCSS will have obtained substantially compliance with _Singleton_. Any school that deviates by more than 15% will presumptively be a violation of _Singleton_. Absent extenuating circumstances justifying deviations of more than 15%, the court will not find _Singleton_ compliance until all school staffs fall within the established parameters. At trial,

40

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

the defendants did not offer an explanation for the existing substantial deviations.

This court will maintain jurisdiction over this case at least through September, 1988. Before that time period ends, the DCSS will have the option of implementing a plan that will achieve compliance with <u>Singleton</u> and submitting a report showing that they have so complied to the court. Due to the late date of this order, if compliance with <u>Singleton</u> within that short period of time will be unduly burdensome on the DCSS, the DCSS may file a report with this court in September, 1989 showing that it has achieved compliance with <u>Singleton</u>. It would appear that such compliance will necessitate reassignment of both teachers and principals.

While this court shares the concern of other courts of requiring strict mathematical ratios, as the former Fifth Circuit recognized in <u>DeSoto</u>, such ratios are necessary "as a starting point in eliminating the vestiges of segregation in ... faculty assignment.... Moreover, <u>Singleton</u> does not require that such ratios be maintained permanently; rather, it 'contemplates an initial reassignment so that the racial ratio at every school reflects the system-wide ratio, followed by the utilization of a non-discriminatory hiring, firing, and assignment policy thereafter.'" <u>Desoto</u>, 574 F.2d at 819 (quoting <u>United States v. Wilcox County Board of Education</u>, 494 F.2d 575, 580 (5th Cir.), <u>cert. denied</u>, 419 U.S. 1031 (1974)). Achieving compliance with <u>Singleton</u> should not be difficult for the DCSS

41

**EXHIBIT 4**

in the area of faculty assignments. In their brief, the defendants argue that any "school's faculty could be brought into line with a narrowly construed racial balance standard by moving, at most, two or three teachers." (Defendants' post trial brief at 50)

## PHYSICAL FACILITIES, TRANSPORTATION, & EXTRA-CURRICULAR ACTIVITIES

The defendants achievement of unitary status in the areas of physical facilities, transportation and extra-curricular activities were not contested by the plaintiffs. The court agrees with plaintiffs' concession that the defendants have fulfilled their constitutional obligations in these areas and that no further relief is required.

Although the parties have stipulated that some clubs meet at certain receiving schools of the M-to-M program before the M-to-M buses arrive in the morning, plaintiffs do not contend that further relief is needed in the areas of transportation and extracurricular activities. It appears that this problem was brought to the courts attention to alert the court that the DCSS does not have a perfect record in the area of transportation and extra-curricular activities. Transportation must be provided for M-to-M students. The activity buses provided by the DCSS are more than adequate to provide all students with an opportunity to participate in extracurricular activities. The time for the club meetings are set by the students not the DCSS. The DCSS provides activity buses late into the night, and will provide bus service for only one

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

student, if necessary.   The court finds that the DCSS provides opportunities to all students, including M-to-M students, to participate in a wide range of extra-curricular activities without regard to race.

The plaintiffs also have some concern about overcrowding in the southern schools.   Plaintiffs claim that portable classrooms are used more in the majority black schools than the majority white schools.   All evidence at the hearing on this motion, indicated that the DCSS has a race-neutral policy with regard to the use of portable classrooms.   The DCSS is constantly attempting to deal with the growing population of southern DeKalb County by building new schools and adding permanent additions to existing schools.

## QUALITY OF EDUCATION

The court considers this area of dispute to be of utmost importance.   The crux of the Supreme Court's decision in Brown was that the maintenance of separate but equal facilities for black students did not assure that black children obtained a quality education.   Although quality of education is not one of the six classic areas of inquiry in school desegregation cases[14], the defendants did not protest litigation of this area. The defendants acknowledge that a school system that is not

---

14   Plaintiffs contend that quality of education can be considered a part of the facilities area, one of the six areas specified in Green as a proper area of inquiry for the purposes of deciding if a school system has obtained unitary status.   The court finds that the labelling of the dispute concerning quality of education is irrelevant.

43

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

fulfilling its obligation of providing quality education to all school children should not be entitled to unitary status.

The parties contest who should bear the burden of proof on this issue. As the defendants concede that this area of inquiry is important to a determination of whether the DCSS has achieved unitary status, the court finds that defendants should properly bear the burden of showing that all students in the DCSS are receiving a quality education.

Plaintiffs concede that the DCSS is a wonderfully innovative system.[15] (Transcript Vol. I at 101) Plaintiffs contend, however, that defendants have racially skewed the provision of certain education resources, such that black

---

[15] The court was impressed by the number of innovative programs implemented by the DCSS. Examples of these innovative programs include: (1) effective schools program (a program initiated in 12 majority black schools to focus the resources of the school system on schools that will benefit most significantly); (2) parenting programs (providing parents with techniques and methodologies to help their children achieve in school); (3) lead teacher for student services (lead teachers work with individual students to improve their self-concept; they work with teachers to develop alternative strategies for working with children of various backgrounds; and they work with parents to help them facilitate the education of their children); (4) human relation supplements (a program instigated in the receiving schools of the M-to-M program, the goal of the program is to improve race relations); (5) homework helpline (provides immediate help for students and parents who are encountering difficulties in the completion of homework); (6) adopt-a-school (designed to use the resources of businesses to enhance education by encouraging companies to adopt a school and become its benefactor); (7) staff development programs; (8) latchkey program (in conjunction with the local YMCA, the DCSS provides a program for parents who cannot afford private day care services); (9) remedial education programs (e.g., a partially state-funded program for students in grades 2 - 5, who are half a year or more below grade level in reading); and (10) the writing-to-read program.

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

students are not given an equal educational opportunity in the DCSS. In particular, plaintiffs argue these tangible factors have been skewed: (1) teachers with advanced degrees; (2) more experienced teachers; (3) per pupil expenditure; (4) number of library books per student; and (5) that there is higher teacher turnover in the black schools. Plaintiffs seemingly argue that a prima facie showing that these resources are skewed is sufficient for the court to find that the DCSS has not achieved unitary status. Defendants, however, focus on the effect such factors have had on educational gains by black students. It is the defendants contention that the black students in the DCSS have made greater advances educationally than white students. The parties difference of opinion on what factors influence quality of education make it difficult for the court to compare the voluminous data presented on this issue. In effect, the parties compare apples and oranges and ask this court to decide which is better.

Both the allocation of educational resources and the achievement of students are interrelated issues that must be examined to determine whether black students are receiving the same quality education as white students. The court will first examine the evidence presented by the defendants concerning achievement of black students in the DCSS.

The focus of the DCSS evidence on this issue was that it offered the same educational opportunities to all students. The DCSS presented extensive evidence about the uniformity of

45

**EXHIBIT 4**

its curriculum in all schools.   The DCSS requires teachers to prepare lesson plans that conform to the curriculum.   (Transcript Vol. VI at 85-91)  Defendants' expert Dr. Walberg spent a considerable amount of time in the DCSS examining the curriculum and the conformity of the various schools to the curriculum. Based upon his examination of the DCSS, Dr. Walberg testified that "the District provides an exceptionally effective educational program.   It provides a uniform curriculum, and it provides equality of educational opportunity in the schools. The District ... provides continuous progress mastery learning. I think this is an exceptionally effective program.   They do this by aligning the curriculum and the tests, by concentrating very heavily on academic learning.   They use curriculum guides. They have in my opinion very careful lesson plans and extraordinary attention to the match of the total district curriculum to what the lesson plans are in fact.   In most cases, although there are some exceptions to this, the teachers actually have those lesson plans in their classes and they are teaching them pretty much on task."  (Transcript Vol. IV at 91)[16]

---

[16]  Plaintiffs attempted to prove that the curriculum of the predominately black schools was not the same as the predominately white schools by presenting the evidence of a M-to-M student, Norma Denise Jones, who testified that another transfer student did very poorly while he attended Lakeside High School through the M-to-M program, but when he transferred back to his home school he did very well.   Defendants successfully rebutted this testimony with the testimony of Melvin Johnson, the assistant superintendent for area one (an area in southern DeKalb County).   Mr. Johnson testified that the transcript of the student in question showed that the students grades were substantially the same at both the M-to-M receiving school and the students' home school.   (Transcript Vol. XI at 25-27)

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

The court found particularly significant the evidence that black students who have been in the DCSS for two years achieve greater gains than white students on the Iowa Tests of Basic Skills (ITBS). The DCSS compared students who entered the DCSS in 1985 and took the ITBS for the first time in the 1985 school year then took the ITBS when it was administered in 1987. Although whites scored higher than blacks on the test, the percentage gain of black students was significantly greater than white students. The students who were selected for the comparison were 546 white students and 778 black students. In 1985, the average score for white students was 73.3%, while their score increased to 80.5% in 1987, a difference of 7.2%. For black students, the average score for the 1985 exam was 40.8% and their score increased to an average score of 51.2% in 1987, a difference of 10.4%. The fact that blacks score lower than whites cannot be attributed in any way to the DCSS. These students all entered the DCSS in 1985. The black students entering the schools system scored lower than entering white students. The progress of the black students and the white students can be attributed to the DCSS. It is significant to this court that black students, many of whom attend majority black schools made greater gains on this test than the white students, many of whom attended majority white schools. (Defendants' exhibit 114)

The latest results from the ITBS that were available before the hearing establish that both black and white students

47

**EXHIBIT 4**

AO 72A
(Rev. 8/82)

who have been totally educated in the DCSS score higher on the ITBS than students who entered the DCSS in the year of the test. Again black students score lower on the ITBS as a group than white students.  (Defendants' exhibit 115)

Blacks students in the DCSS also are more successful than other black students nationally on the Scholastic Aptitude Test (a college entrance examination test), while white students in the DCSS scored below the national average.  The information on the SAT presented to the court was for the 1984-85 school year.  (Defendants' exhibit 119)

The evidence presented to this court shows that the socio-economic status of a child affects his potential for academic success to a much greater extent than racial exposure. In fact, much of the evidence presented to this court showed that racial exposure did not effect a child's academic success. There was considerable testimony on that subject.  (testimony of Walberg in unnumbered volume of the transcript at 40-62, and testimony of Dr. Rossell in Vol. XI at 99-100)  The court found the evidence presented in this regard to be compelling.

Several of the defendants' exhibits illustrated this point as well.  Defendants' exhibit 137 shows that black children entering kindergarten score much lower on the California Achievement Test than white students.  Of course, only the child's home environment, including socio-economic factors, could bear on a child's achievement at that point in a child's academic development.

48

**EXHIBIT 4**

Both black and white students who are participants in the free and reduced lunch program score lower on the ITBS than students who are not on the free and reduced lunch program. (Defendants' exhibit 117) The type dwelling in which a child lives is predictive of scores on the ITBS. Children living in single family dwellings score highest, followed by children who live in condominiums, duplexes, apartments, mobile homes, while children who live in institutions have the lowest scores. The exhibit further showed that a greater percentage of white students than black students live in single family dwellings and condominiums. (Defendants' exhibit 112)

Defendants' exhibit 110 shows that students who come from professional homes (that is, a home in which at least one parent is a professional) score highest on the ITBS. These students are followed by children from two-parent homes. The lowest achievers are from single-parent households. A much higher percentage of black children come from single-parent homes than white children.

The court will now consider the evidence presented by plaintiffs that certain of the resources of the DCSS are racially skewed. Plaintiffs presented evidence on these school treatment characteristics: (1) per pupil expenditure, (2) library books per student, (3) teacher experience; (4) teacher education; (5) teacher turnover; and (6) student retentions. Plaintiffs divided the schools into three different types for purposes of showing a comparison of the resources: (1) type I

49

**EXHIBIT 4**

schools - schools that have been majority white over the last decade; (2) type II schools - schools that have undergone a racial transition from majority white to majority black over the last decade; and (3) type III schools - schools that have been majority black over the last decade.  Plaintiffs then analyzed the data to determine if the differences were statistically significant.   Under plaintiffs analysis, differences were considered statistically significant when there was less than a 5% probability that the pattern of data is happening by chance alone.  (Transcript Vol. VIII at 12)

The plaintiffs presented the following data on teacher experience:

| ELEMENTARY SCHOOLS | Average Number of Years Teaching | | |
| --- | --- | --- | --- |
| | Fall 1984 | Fall 1985 | Fall 1986 |
| Type I | 9.55 | 10.22 | 9.79 |
| Type II | 6.45 | 6.90 | 6.36 |
| Type III | 5.24 | 5.46 | 5.19 |
| HIGH SCHOOLS | | | |
| Type I | 7.99 | 8.74 | 8.90 |
| Type II | 6.83 | 7.14 | 7.08 |
| Type III | 5.34 | 5.68 | 4.91 |

(Plaintiffs exhibits 97(a), (b) and c; 98(a), (b) and (c))

Using plaintiffs analysis, at the elementary level during both 1984 and 1985, all three types were statistically significant.  In 1986, Type I differed significantly from Types II and III.  At the high school level, Type I differed significantly from Type III for all three years.

With regard to graduate degrees held by the DCSS faculty during the 1986-87 school year, plaintiffs presented the following evidence:

50

**EXHIBIT 4**

AO 72A  ⊕
(Rev. 8/82)

## Percentage of Teachers Having Graduate Degrees

| | ELEMENTARY SCHOOLS | HIGH SCHOOLS |
|---|---|---|
| Type I | 75.76 | 76.05 |
| Type II | 61.84 | 64.34 |
| Type III | 52.63 | 64.32 |

(Plaintiffs' exhibit 86 at 13-14, exhibits 99 and 100)   At the elementary level, all three types are statistically significant from each other.   At the high school level, Type I differed significantly from Types II and III.

The court is, of course, concerned by the differences between teacher experience and teachers with graduate degrees in the different "type" schools.   The defendants concede that there are differences and both attempt to explain the differences away and argue that the differences should not matter because they do not affect a student's potential for academic success.   While the court does not find convincing the plaintiffs evidence that such skews affect students' learning potential, the court finds that any school system should consciously make efforts to assure that resources are distributed equally to all students.   This includes insuring that all students are taught by well-educated, experienced teachers.   A previous dual system has an additional burden of assuring that any school predominately attended by minority students is given the same, if not superior, resources. All evidence submitted by the defendants shows that, due to socio-economic factors, a black student's potential for academic success is less than a white student's potential; thus, making their need for "resources" greater.

Whether a racial skew of resources affects a child's

51

EXHIBIT 4

learning potential is irrelevant to this court. Even before the Supreme Court's decision in Brown, the law required that minority students be given the same resources as white students. Accordingly, when the defendants revise their assignments of teachers and principals to meet the requirements of Singleton, they shall make the assignments in a manner that will equalize the experience and education of faculty and staff among the different "types" of schools.

The plaintiffs presented evidence and the defendants concede that the degree of teacher turnover is higher in the Type II and III schools than in the Type I schools. (Plaintiffs exhibits 101 and 102) Defendants presented evidence that steps are being taken to control the teacher turnover in the majority black schools. The DCSS has instigated a program in the majority black Columbia, Gordon, and Walker High Schools that requires teachers to teach only four classes per day as opposed to five. This program led to a tremendous decrease in the turnover of teachers at these schools. (Transcript Vol. I at 177-78, Vol. V at 183).

The court applauds the efforts of the DCSS to maintain its experienced teachers. The DCSS, like any other school system, cannot control how many of its employees chose to leave the system to teach elsewhere or pursue other opportunities. For that reason, the court will not impose an obligation on the DCSS to slow teacher turnover in its majority black schools. The DCSS is obviously interested in this objective and will take

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

all necessary steps without this court's intervention.

Plaintiffs also contend that the number of books per pupil in the DCSS is racially skewed among the "types" of schools. While there is a difference between the number of books in the "types" of schools, the court found the defendants explanation for this difference satisfactory. Several factors effect the number of library books in a particular school's library: (1) how often weeding (the removal of out-dated or duplicative material) occurs; (2) the shift of enrollment of a school (in the northern "type I" schools, population has decreased, while the southern "type II and type III" schools populations have increased); (3) how media resources are allocated by the media specialists of the different schools; and (4) the number of "lost" books at a particular school.

Defendants presented the testimony of Frank C. Winstead, the Director of Educational Media for the DCSS, and Helen Ruffin, the Library Media Specialist at Sky Haven Elementary school, a majority black elementary school. (Transcript Vol. X at 175-200) The testimony of these witnesses convinced the court that any skew of library books is a result of the four factors listed above and was not the result of purposeful conduct by the defendants. The court also does not find that the number of books in a library is indicative of the quality of the media materials available at the school. There was insufficient evidence presented to this court to convince it that black students are in any way handicapped academically by the number

AO 72A
(Rev. 8/82)

EXHIBIT 4

of books per pupil in their school libraries.

Plaintiffs presented evidence that black students are not as academically successful on the California Achievement Test, have higher elementary failure rates, and are more often retained (not promoted) than white students. The defendants evidence showed the same results. Plaintiffs argue that their evidence proves that children assigned to majority black schools are denied equal educational opportunity. The court cannot accept this contention.

The parties do not dispute that black students, both in the DCSS and elsewhere, are not as successful generally in academics as white students. As the court discussed above, the court finds that socio-economic differences between the two groups influences academic success. The DCSS would not be acting in the best interest of black students by promoting them to a higher grade, until they have achieved a level of academic success that justifies the promotion.

Plaintiffs' arguments in this regard seem to hedge on the language of the June, 1969 order that required the DCSS to implement remedial educational programs for students attending or who have previously attended segregated schools to overcome past inadequacies in their education. (Order of June, 1969 at 11). It is undisputed that at the time of the unitary hearing, there were no children attending the DCSS who formerly attended a de jure black school before the implementation of the 1969 order. That order referred only to de jure segregated schools.

54

**EXHIBIT 4**

While there will always be something more that the DCSS can do to improve the chances for black students to achieve academic success, the court cannot find, as plaintiffs urge, that the DCSS has been negligent in its duties to implement programs to assist black students. The DCSS is a very innovative school system. It has implemented a number of programs to enrich the lives and enhance the academic potential of all students, both blacks and whites. Many remedial programs are targeted in the majority black schools. Programs have been implemented to involve the parents and offset negative socio-economic factors.[17] If the DCSS has failed in any way in this regard, it is not because the school system has been negligent in its duties. Indeed, Dr. Edward Bouie, Sr., Associate Superintendent for Program Development and Staff Assessment, testified that the DCSS has implemented a total management system designed to focus on the achievement of children. He further testified that Dr. Freeman, the Superintendent of the DCSS, has instructed him that any program that can be found to improve student achievement, should be researched, piloted, and placed in the DCSS. (Transcript Vol. III at 41) The DCSS spends in excess of $12,500,000 of exclusively local funds on supplementary instructional personnel, such as contingency teachers, instructional lead teachers, lead teachers for student services, and remedial reading specialists. (Transcript Vol. III at 183-88) The court does not find that further court

---

[17]   See footnote 15, supra.

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

supervision is necessary to insure that the DCSS implements remedial programs to facilitate the potential for academic success by black students.

The last resource differential that the plaintiffs brought to this court's attention is that per pupil expenditures are higher in the Type I schools than in the Type II and III schools. This differential is of great concern to the court. In the 1984-85 school year, the expenditure per student in type I schools was $2,833, type II schools was $2,540, and type III schools was $2,492. Certain factors such as lower enrollment in the type I schools explains some of the difference in expenditures. While there was no compelling evidence presented that the amount of money expended per student results in a greater potential for academic achievement, this court is puzzled by the DCSS' practice of allocating what appears to be a larger percentage of its financial resources in the type I schools, when all evidence indicates that the needs of the type II and III schools are more significant. The DCSS shall endeavor to equalize spending among the three types of schools.

The defendants argue that this court cannot properly order relief in the quality of education area because the prior constitutional violation did not extend into this area. The court finds this contention to be without merit. A district court properly has broad discretion in desegregation cases to order relief that will facilitate the speedy eradication of all vestiges of the former dual system. Improving the quality of

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

education for all children, especially black children, is the underlying purpose of all desegregation cases.

## SUMMARY

The DCSS is an innovative school system that has travelled the often long road to unitary status almost to its end. While much of the court's order was spent on problems that still exist in the DCSS, the court has continuously been impressed by the successes of the DCSS and its dedication to providing a quality education for all students within that system. As Judge Edenfield recognized in his order of October 6, 1977 in this case: "Quality educational systems are a fragile blessing, as many metropolitan areas have learned to their sorrow. When one is found it should not be harassed out of existence to satisfy fractional technicalities."

The DCSS has eliminated most of the vestiges of the former dual system. The court finds that the DCSS is a unitary system with regard to the areas of student assignments, transportation, physical facilities, and extra-curricular activities. Before the court will declare that the DCSS has obtained unitary status, however, certain changes must be made. The DCSS shall have the option of either implementing a plan by September, 1988, or implementing such a plan by September, 1989, to achieve Singleton compliance with regard to both teacher and principal assignments. The DCSS shall file a report with this court detailing the plan. This plan should also equalize the number of teachers with advanced degrees and more experienced teachers

57

**EXHIBIT 4**

among the types of schools.

The DCSS shall attempt to equalize per pupil expenditures among the types of schools during the 1988-89 school year. Within two months of the end of the 1988-89 school year, the DCSS shall file a report with this court showing per pupil expenditures among the various schools. For purposes of this report, the schools shall be grouped in the same manner as plaintiffs grouped them for purposes of the hearing held on this motion.

In 1976, this court established a Bi-racial Committee to give guidance to the DeKalb County School Board regarding certain decisions. The court finds based upon the evidence presented during the hearing that there is no longer a need for the committee. Not only is there now a black school board member, but blacks are well represented throughout the administrative levels of the DCSS, including the position of assistant superintendant. Accordingly, the DeKalb County Bi-racial Committee is hereby abolished. The DeKalb County School Board, of course, may establish its own bi-racial committee.

The court denies the motion of defendants to dismiss. While the court is satisfied that the DCSS is a unitary system with regard to the areas of student assignments, transportation, physical facilities and extra-curricular activities and will order no further relief in those areas, the defendants must comply with the dictates above before this court will declare that the DCSS has obtained unitary status. The court grants in

AO 72A
(Rev. 8/82)

**EXHIBIT 4**

part the motion of plaintiff for supplemental relief and denies
the motion to require the defendants to file a junior high plan.

IT IS SO ORDERED this ___30ᵗʰ___ day of June, 1988.

WILLIAM C. O'KELLEY
United States District Judge

ENTERED ON DOCKET

JUN 3 0 1988

BY _____ L.D.T. CLERK
DEPUTY CLERK

72A
(. 8/82)

**EXHIBIT 4**