# EXHIBIT 2

# Meridian Public School District



## Campus Police Department
## Law Enforcement Policies & Procedures
## with Associated Forms

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement Policies & Procedures**
**with Associated Forms**

## TABLE OF CONTENTS

**1. Introduction:**

    1.01   Letter from Agency Head [Sample]
    1.02   Receipt for Policies & Procedures Manual
    1.03   How to Use This Manual
    1.04   Mission Statement
    1.05   Objective Statements
    1.06   Orders & Instructions
    1.07   Oath of Office
    1.08   Request for Review or Comment
    1.09   Suggestion Form


**2. Standards, Ethics & Management:**

    2.01   Policy & Procedure Management System
    2.02   Staffing Analysis **[Repealed]**
    2.03   Management Philosophy & Goals
    2.04   Delegation of Authority
    2.05   Critical Incident Reporting
    2.06   Communications
    2.07   Civil Litigation
    2.08   Internal Compliance Enforcement  – ICE
          a.  2.08b-1 ICE Garrity Rights Form
    2.09   Employee Selection & Placement
    2.10   Quality Assurance **[Repealed]**
    2.11   Canons of Law Enforcement Ethics
    2.12   Professional Conduct
    2.13   Abuse of Position
    2.14   Corruption Prevention
    2.15   Rules of Conduct
    2.16   Racial & Bias Profiling


**3. Personnel:**

    3.01   Workplace Harassment
    3.02   Drug-Free Workplace Program
    3.03   Training & Proficiency Testing
    3.04   Firearms Training & Proficiency Demonstration
    3.05   Discipline & Accountability

3.06   Insubordination
3.07   Grievance Procedures
3.08   Appearance & Grooming
3.09   Disabled Persons
3.10   Court Appearance
3.11   Fitness for Duty
3.12   Field Training & Evaluation Program **[Repealed]**
3.13   Community Relations
3.14   Media Relations
3.15   Employee & Confidential Records
3.16   Uniforms
3.17   Computer Use, Security & Access
3.18   Incentive Step Pay Plan [Sample] **[Repealed]**

**4. General Patrol:**

4.01   Patrol Functions & Tactics
4.02   Radio Procedures
4.03   Communications Center - 911
4.04   Civil Rights & Constitutional Warnings
4.05   Search Warrants
4.06   Search of Motor Vehicles
    a.  4.06b-1 Search of Motor Vehicle - Consent to Search Form
4.07   Interviews & Searches
4.08   Arrest Procedures
4.09   Evidence Collection, Control, & Storage
    a.  4.09b-1 Evidence Form
4.10   Jail Lockup & Intake of Detainees **[Repealed]**
4.11   Transporting Arrested Persons
4.12   Bail Bonds
4.13   Report Writing
4.14   Traffic Stops & Enforcement **[Repealed]**
4.15   Highway Incident Traffic Control **[Repealed]**
4.16   Motor Vehicle Accident Investigation
4.17   Emergency Vehicle Warning Devices
4.18   Vehicular Pursuit:
    a.  Discretionary
    b.  Restrictive
    c.  Prohibitive
4.19   Ride Along Policy
    a.  4.19b-1 Ride Along Program Application Form
4.20   Vehicle Maintenance **[Repealed]**
    a.  4.20b-1 Vehicle Maintenance Form
4.21   Death or Serious Injury Notification
4.22   Post-Shooting Incident
4.23   Blood Borne Pathogens & Other Infectious Diseases

4.24   Off-Duty Conduct & Powers of Arrest
4.25   Secondary or Off-Duty Employment **[Repealed]**
4.26   Use of Agency Vehicles
4.27   Mentally Ill Persons
4.28   Intoxicated Persons **[Repealed]**

**5.  Use of Force:**

5.01   Use of Force & Deadly Force
5.02   Chemical Agent – Oleoresin Capsicum (OC) **[Repealed]**
5.03   Special Munitions – Distraction Devices **[Repealed]**
5.04   Special Munitions – Less Than Lethal **[Repealed]**
5.05   Knives & Edged Weapons
5.06   Active Shooter
5.07   Hostage or Barricaded Suspect

**6. Emergency Events:**

6.01   Emergency Management
       a.  6.01b-1 Emergency Management – Handling a Crisis Attachment
6.02   Emergency Call Out Procedure
6.03   Civil Disturbances
6.04   Strikes & Labor Disputes
6.05   Bombs & Weapons of Mass Destruction [WMD]
       a.  6.05b-1 Bombs & WMD Questionnaire - Attachment I
       b.  6.05c-2 Bombs & Mass Destruction - Attachment II

**7.  Special Operations:**

7.01   Crime Scenes
7.02   Robbery or Alarm Response
7.03   Child Abuse Investigations **[Repealed]**
7.04   Criminal Investigation
7.05   Missing Persons Investigations
       a.  7.05b-1 Missing Persons Investigations Form
7.06   Domestic Abuse Investigations
7.07   Covert Operations & Undercover Investigations **[Repealed]**
7.08   Covert Electronic Recording **[Repealed]**
       a.  7.08b-1 Covert Electronic Recording – Consent to Search Form
7.09   Overt Electronic Recording
7.10   Canine Operations **[Repealed]**
7.11   Special Weapons & Tactics (SWAT) **[Repealed]**
7.12   Juvenile Curfew Violations **[Repealed]**
7.13   Juvenile Procedures
7.14   School Liaison **[Repealed]**
7.15   Roadblocks **[Repealed]**

7.16   Bicycle Patrol

**Meridian Public School District**
**Campus Police Department**

**LETTER FROM AGENCY HEAD**

July 01, 2017

To:  All Officers & Employees

      Re:  Policy & Procedure Manual

Dear Ladies & Gentlemen:

The publication of these updated *policies and procedures* marks an important milestone in our continued development as a local leader in law enforcement. For those of you who participated in creating this document, please accept my hardiest thanks for a *job well done!*  If you did not have an opportunity to provide input, we now ask for your assistance.

Over the next few days and weeks, the entire agency will be learning and applying the details of our new procedures.  As we do so, we will re-visit some of the old practices as well.  Take time to study and learn.  Then give us your ideas on how we can make this an even better guide toward achieving a safer and more efficient operation.  With warmest personal regards to each of you, I remain

Sincerely,


Ogie "Ricardo" Clayton
Chief

**Meridian Public School District**
**Campus Police Department**

## RECEIPT FOR POLICIES & PROCEDURES MANUAL

I, _____, hereby acknowledge receipt of one (1) copy of the Meridian Public School District Campus Police Department *Policies & Procedures Manual*.

It is understood that this manual is entrusted to me for safekeeping, study, and compliance.  I will use my best efforts to study, learn, and comply with the instructions contained in this manual.  The updating, maintenance, and safe storage of this manual are my personal responsibility.

I understand this manual contains ***restricted law enforcement data***, and that release of its contents to anyone not having an official need to know may place residents of this community, and officers and employees of this agency at risk.

I will retain this manual in my possession or safekeeping, and will not allow it to be copied or reproduced in any manner without prior authorization from a superior authorized to permit such duplication.  Further, I will immediately report to the Chief any attempt made by those outside of the agency to borrow, acquire a copy, view, or use this manual.  Likewise, I will immediately report the loss of this manual or portions of its contents to the Chief.

I affirm my commitment to honor this agreement this _____ day of _____, 20_____.


_____
Printed name


_____
Signature



_____
Printed name of Witness


_____
Witness' Signature

**Meridian Public School District**
**Campus Police Department**

## HOW TO USE THIS MANUAL

Contained in this manual are Policies and Procedures of the Meridian Public School District Campus Police Department. This manual deals with the specifics of operating this law enforcement agency both administratively and operationally, and it addresses issues relating to how we manage, supervise, and provide law enforcement services to the community we serve.

Our policies are developed with you and good order in mind. They are of critical importance to your safety, the safety of fellow officers, and the community at large. These policies will be periodically updated. You will be notified when changes are made at roll calls, during training sessions, and by written notice. It is your responsibility to understand these policies and follow the procedures set forth in this manual.

Policies and procedures are written to provide a basis for the day-to-day operations. Their purpose is to standardize the agency's approach and response to recurrent and predictable situations. Policies and procedures are intended to provide you with guidance regarding the performance of your responsibilities as a sworn law enforcement officer or employee of this agency. They contribute to the overall achievement of the mission by defining performance expectations, ensuring conformity to legal standards, defining and institutionalizing *best practices,* and establishing a basis for accountability.

It is an important requirement that each of us be familiar with the details of this manual, and readily apply its guidelines in every aspect of what we do in carrying out our vital mission.  How well you study and use what you learn directly affects the safety and well being of the citizens we are sworn to protect, and ourselves.

Begin your education process by paging through the manual. Familiarize yourself with the format; review how subjects are categorized and numbered; and look for specific topics of interest to you. Next read the *Use of Force* policy, and the *Vehicle Pursuit* policy. Ask yourself, *can I understand and apply these policies?*  Continue and read each policy, and when you come to something you don't understand, find confusing, or simply question, write it down and talk with your supervisor to seek the answers. Repeat the process until you are confident you know the policy well enough to apply it in spirit as well as in practice.

During your reading of the manual, if you find something incorrectly stated, or you have a better idea, we want to know about it.  This is a *living document.* It was put together with change in mind – the kind of change that brings improvement. Your assistance is needed to make it work, and keep it working as a quality guide.

Use the following *Suggestion Form* to make written suggestions. You may use the original in the book to make copies. Then put your suggestions on a copy of the form, and turn it in to your supervisor. No recommendation is too small or unimportant, so please share your ideas.

**Meridian Public School District**
**Campus Police Department**

## MISSION STATEMENT

The Meridian Public School District Campus Police consistently and with uniformity strives to maintain social order and provide professional law enforcement services to Students, Staff and Guest / Citizens of the Meridian Public School District, within prescribed ethical, budgetary, and constitutional constraints. This agency strives to enforce the law and maintain order in a fair and impartial manner, recognizing the need for justice, and the consistent appearance of justice. The Chief recognizes that no law enforcement agency can operate at its maximum potential without supportive input from the citizens it serves. This agency actively solicits and encourages the cooperation of all citizens to reduce and limit the opportunities for crime and to assist in bringing to justice those that break the law.

_____
Chief's Printed Name


_____
Chief's Signature

1

**Meridian Public School District**
**Campus Police Department**

## OBJECTIVE STATEMENTS

The following objectives have been established to accomplish the mission within in the budgetary and manpower constraints imposed on the agency:

A. **Protect Life and Property:**  To provide services that contribute to the preservation of life, the protection of property, and the safety of the Meridian Public School/Community.

B. **Maintain Public Order:**  To maintain peace and public order. To assist during times of natural or technological disasters and/or other critical incidents. To provide for the safe and effective flow of both vehicular and pedestrian traffic and the investigation of traffic related accidents that mat occur on Meridian Public School District Campus.

C. **Prevent, Detect and Investigate Criminal Activity**:  To prevent crime through active and coordinated patrols that limit the opportunity for a crime to occur, and through education of students/staff/citizens that reduces the likelihood of them becoming victims of crime.  To provide a thorough, appropriate, and efficient investigation of criminal activity.

D. **Apprehension of Offenders:**  To provide for the expeditious and prudent apprehension of suspected violators of the law, regardless of an individual's status in the community.

E. **Community Service:**  To provide the resources necessary for assisting students/staff/citizens under special non-criminal circumstances.

F. **Compliance with Ethical Standards and Professionalism**: To ensure integrity and adherence to the professional standards of the Agency by investigating all complaints against Agency personnel.  To provide for the training needs of officers and promote a high rate of proficiency in the officers of the Meridian Public School District Police Department. To address the career development goals of MPSD PD personnel.

**Meridian Public School District**
## Campus Police Department

## ORDERS & INSTRUCTIONS

This law enforcement agency issues orders in several forms.  All agency employees are responsible for knowing, understanding, and complying with all lawful orders. Immediate and consistent compliance with orders is essential to accomplishing our mission and protecting human life.  Orders will be given in the following forms:

### 1.  General Orders

*General orders* reflect the agency's fundamental mission and values. You are expected to know these rules and follow them both in letter and spirit.  No deviations should occur without the expressed personal authorization of the Chief. General Orders will be provided and discussed in your training and widely disseminated. You should immediately ask your supervisor if you have any questions about compliance.  You have the duty to immediately report General Order violations.

### 2.  Special Orders

Special orders are always written.  They are authorized and signed by the Chief. Special orders provide short-term instructions in matters of critical concern to the Chief.  Special orders are numbered, each bearing an effective date, expiration date, and the signature of the Chief. Special Orders are provided and discussed in training, announced at roll call, and published as the need arises. It is your responsibility before starting your tour of duty each day to know what Special Orders are in effect, and to comply with their requirements. Any questions about compliance or known violations of a Special Order should be referred to your supervisor as soon as practical.

### 3.  Policies & Procedures

The senior law enforcement official of a law enforcement organization is charged with the responsibility of establishing policy and determining the procedures that will be followed to accomplish the mission of the agency and maintain effective control. Policies and procedures often vary from organization to organization, depending on the management style of the policy maker, the needs and desires of the students/staff/community, and available resources.

The Chief provides this manual as a detailed guide to performance expectations. Each policy is published separately, and contains a statement of the policy and

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

detailed procedures regarding how to carry it out. *Policies* are the *orders*, and *procedures are the instructions for carrying out the orders.*

Not every situation is foreseeable. It is important for sworn officers and other employees to know and understand these policies and procedures and apply them in a variety of situations. **When faced with a dilemma, ask and answer *. . . what would a reasonable officer do?*** Your Confidence as a law enforcement officer is built on experience, training, careful review, and practiced compliance with the policies and procedures, and other requirements in this manual.

### 4.  Post Orders

Post Orders, sometimes referred to as ***job descriptions****,* are written and published for each job or duty station in the organization. Each job has a published set of post orders, which detail the responsibilities and the job. When assuming a post, duty position, or assignment for the first time, each officer and employee will read, understand, and sign the post orders located at that position, station, or in the patrol unit. The employee reporting for duty will not assume the duties of the position until post orders are read, and fully understood.

During subsequent assignments to the same post, the officer or employee will review the post orders immediately upon arrival at the place of assignment to determine if there have been changes in the duty instructions. In those cases, where another employee or officer is being relieved of the duties at that post, the arriving officer or employee will review the post orders before the other officer is allowed to be relieved or depart the general area. Officers will discuss the activity at this particular post verbally before the relieved officer is free to depart.  Officers being relieved will never leave a post until instructed by the *relief officer*, and after insuring that the newly arrived officer is apprised of prior events, any threats, or other conditions of interest.

If there are any questions about the performance of work required at this duty assignment, the officer or employee will notify the supervisor on duty for immediate help, instruction, or assistance. Employees will not assume or work a duty position without fully understanding the requirements of the position, and satisfying themselves that they are mentally and physically capable of carrying out the responsibilities of the assignment, except in *declared emergencies*.  If an employee is incapable of carrying out the responsibilities of a particular post, the employee will ask their supervisor to be immediately relieved of duty.

### 5.  Direct or Verbal Orders

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Direct orders are most often issued through the spoken word.  These orders may be given at during a meeting, but most often are issued verbally during the course of the shift. Personnel are to respond to verbal orders given by supervisors, and the Chief.  In those cases, where someone who is not your supervisor, gives you a direct or verbal order or command, it is the responsibility of the officer receiving the order or instruction to verify the order through their *post orders* or supervisor **before complying with the order or instruction**.  For example, it is inappropriate for a law enforcement officer of another agency to issue orders to an officer of this organization without prior written approval from the Chief. This includes federal and state officers or agents.

Compliance with direct or verbal orders is only required or appropriate when the officer reasonably believes that the order given is *lawful.* To be a lawful order, the instruction must be in harmony or compliance with the *law, special orders, general orders* and *policies* established by the Chief. For example, management and supervisory personnel are not authorized to order officers to physically abuse suspects or employ excessive or unreasonable force.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**

## GENERAL ORDERS

I. Perform all duties professionally, while keeping on the alert for threats to human life and general student/staff/community safety.

II. Do not abandon, or leave assigned areas until properly relieved.

III. Obey all lawful orders of supervisors and command staff.

IV. Report all violations of orders and established policies of this agency.

V. Protect all members of student/staff/society, especially those that are weak, physically or mentally impaired, those with physical or intellectual disabilities and/or accused of a crime.

VI. Do not allow, encourage, or ignore officers that abuse, threaten, or terrorize any person.

VII. Do not violate the constitutional civil rights of any student, staff, citizen, or suspect, or tolerate others doing so.

VIII. Immediately upon determining an individual is a criminal suspect, and before any interrogation, advise the individual of their constitutional civil rights, to include:

   a. The right to remain silent;

   b. Understanding that anything said by the suspect may be used against them in a court of law;

   c. The right to an attorney; &

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

    d. The right to have an attorney furnished at government expense, if the individual cannot afford an attorney.

IX. Immediately stop all interviews and interrogations, and make provisions to provide a suspect their constitutional rights, upon request.

X. Do not have any personal relationships with suspects, accused, or persons placed in your charge beyond that which is necessary and appropriate in carrying out official duties.

XI. Do not accept money or any other gratuity for performing police or police-related duties, unless expressly approved by the Chief.

XII. Be faithful to the trust and responsibility the public has placed in this profession and you.

XIII. Do not lie, cheat, steal, or condone anyone who does.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 5 of 5

**Meridian Public School District**
**Campus Police Department**

## OATH OF OFFICE

All law enforcement officers of The Meridian Public School District Campus Police Department are, before exercising any type of peace officer powers, required to take and abide by the following oath of office:

*I do solemnly swear / affirm that I, _____*

*will support the Constitution of the United States of America and of the*

*State of Mississippi; that I will in all respects observe the provisions of the*

*policies and directives of the Meridian Public School District Campus*

*Police Department; I will well and truly perform the duties of the office of*

*Peace Officer, and will to the utmost of my skill and ability, endeavor to*

*promote the public interest, and protect the property of said Meridian*

*Public School District, without fear, favor or affection.  So help me God.*

**Meridian Public School District**
**Campus Police Department**

## REQUEST FOR REVIEW OR COMMENT

We are pleased to announce that the Meridian Public School District Campus Police Department has completed an update of our policy and procedures and we request your assistance.  Review this *policies & procedures* set, and provide us with suggestions for improvement. We would appreciate your written comments within the next thirty days.  Submit a written request for additional time to complete your review if necessary.

We appreciate your time and expertise in this matter, and request that you submit any suggestions and recommendations in writing to:

Chief Ogie "Ricardo" Clayton
Meridian Public School District
Campus Police Department
1019 25th Avenue
Meridian, Ms. 39301

**Meridian Public School District**
**Campus Police Department**

## POLICY & PROCEDURE MANUAL
## SUGGESTION FORM

Officer Employee Name_____ Date_____

Policy & Procedure Number _____ Page _____

Recommended Change_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Meridian Public School District**
## Campus Police Department
**Law Enforcement**
**Policies and Procedures**

| Subject: Policy & Procedure Management System | Policy Number: 2.01 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority<br>*Title and Signature:*  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

The Meridian Public School District Campus Police Department provides all employees with guidance regarding policy and procedure issues through written directives.

**DEFINITIONS:**

- ***Policy -*** A written directive that is a broad statement of agency principles.  Policy statements may be characterized by such words as "may' or "should" and usually do not establish fixed rules or set procedures for conduct of a particular activity but rather provide a framework for development of procedures, rules, and regulations.

- ***Procedure -*** A written directive is a guideline for carrying out agency activities.  A procedure may be mandatory in tone through the use of "shall" rather than "should," or "must" rather than "may."  Other procedures may allow or encourage some degree of officer discretion indicated by terms such as "should," or "may."

**PROCEDURES:**

**Responsibility:**
The Chief or designee has reviewed signed, and distributed this uniform body of *policies and procedures* to all employees that convey the agency's philosophy, goals, and operational principles. The Chief or designee has identified an agency employee responsible for overseeing the maintenance of these *policies and procedures*.  The responsible individual maintains:

1. A complete set of all *policies and procedures*;
2. A record of policies deferred for further action;
3. A record of review of each policy to assure compliance with applicable statutes; &
4. Documentation of annual reviews.

The Chief may form, at his or her discretion, a committee of personnel to serve in a policy

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.01 Policy & Procedure Management System

formulation role. Whether done by committee or by an individual, the following functions are performed at least once a year:

1. Review and evaluation of each policy;
2. Consideration of proposals from agency members for modification of existing policy, or for additional policies; &
3. Preparation of recommended new policies and procedures to be forwarded to the Chief, or designee, for review and adoption.

**Organization:**
*Policies and procedures* are divided into topical sections.  There are two *Table of Contents* provided for your use. One table is listed by policy number, the other is Alphabetical. These *policies and procedures* are distributed in the form of separate policies items.  This allows for ease in updating, modification, and review.

**Distribution and Local Implementation:**
The Meridian Public School District Campus Police Department *policy and procedures* manuals are available for review by MPSD PD staff at the time of employment and at any time thereafter.  Distribution may be in the form of notebooks, books, or electronic media.

1. All MPSD PD employees receive and maintain a set of *policies and procedures*.
2. Any new policy will be distributed in advance of its effective date to ensure all agency members are able to implement the instructions in an orderly manner.
3. Any new policy requires, upon receipt by the employee, a full review of the policy and a commitment to follow the directives and guidelines expressed in the document.

**Policy Compliance and Maintenance:**
The Chief is responsible for establishing a system to monitor compliance with *policies and procedures* through regular reviews and inspections.  This includes dissemination of new or revised policies and procedures to staff or others concerned with operations.  Master copies of these procedures will be maintained in the Chief and School Resource Officers' offices, available for review by agency employees and authorized representatives of other agencies having legitimate law enforcement interests in operations.

**Agency Review:**
Subject to any other provisions of law, including those provisions relating to proper public records requests, **members of the public may not review *security related polici*es and procedures** as identified by the Chief. The Chief makes the final determinations regarding any request for policies and procedures release that is not of a strict law enforcement nature.  The release of such law enforcement data into the public domain is prejudicial to the safety and security of agency employees of The Meridian Public School District Police Department.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

| Law Enforcement Policies and Procedures, 2.01 Policy & Procedure Management System |
|---|

**Policy Formulation and Revision:**

The Chief developed a *policy & procedure* review process.  This process observes the distinction between *evaluation of the policy* and *evaluation of compliance* with the policy. Such review is a method of learning whether certain elements of the *policy or procedure* are dysfunctional or no longer needed.  This evaluation process is best performed as part of an ongoing management process.  Nothing in this provision should be construed as requiring a delay in initiating necessary and immediate change to a policy.

Each new and revised *policy or procedure* bears the signature of the Chief and the date approved. The review schedules for various policies are staggered to provide for an orderly review process throughout the year.  The Chief may incorporate any significant findings or situations that have occurred throughout the past year into the revision process.

All employees should participate actively in *policy and procedure* development through suggestions to their supervisor. The Chief is the final point of collection for these suggestions, and may develop a process to include input from other concerned persons.

During the annual policy review process, policy proposal suggestion forms may be distributed for comment.   In the meantime, a policy suggestion form is provided in each policy set for employee use.  If this form cannot be located contact a supervisor for another copy.  When submissions are received, the Chief evaluates submitted recommendations, comment, and/or concerns prior to revision or adoption.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Management Philosophy & Goals | **Policy Number:** 2.03 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>*Title and Signature:  Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

The Meridian Public School District Campus Police Department strives to provide professional law enforcement services to students/staff/citizens within the school/community.

**Philosophy:**

The Meridian Public School District Campus Police Department operates under the principle that all administrative and management decisions either directly or indirectly affect the quality of law enforcement services provided to the community, and the public's perception of our efforts.  Employees are expected to interact with the public in a professional, respectful, and productive manner.

**Mission Statement:**

The mission of The Meridian Public School District Campus Police Department is to maintain social order and provide professional law enforcement services to students/staff/citizens in the school/community, within prescribed ethical, budgetary, and constitutional constraints. This agency strives to enforce the law and maintain order in a fair and impartial manner, recognizing the need for justice, and consistent appearance of justice. The Chief recognizes that no law enforcement agency can operate at its maximum potential without supportive input from the citizens it serves.  This agency actively solicits and encourages the cooperation of all students/staff/citizens to reduce and limit the opportunities for crime and to assist in bringing to justice those that break the law.

**Peel's Principles of Policing:**

The Meridian Public School District Campus Police Department subscribes to the principles that make law enforcement a unique element in society. Sir Robert Peel, the father of modern law enforcement, established some fundamental guiding principles in 1832 that are still hallmarks we follow today.  Whether we are called *police, constables, deputies, officers*, or *agents,* the ideals remain the same. *Peel's Principles of Policing* are:

1. The basic mission for which the police exist is to prevent crime and disorder.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.03 Management Philosophy & Goals

2. The ability of the police to perform their duties is dependent upon public approval of police actions.

3. Police must secure the willing cooperation of the public in voluntary observance of the law to be able to secure and maintain the respect of the public.

4. The degree of cooperation of the public that can be secured diminishes proportionately to the necessity of the use of physical force.

5. Police seek and preserve public favor not by catering to public opinion but by constantly demonstrating absolute impartial service to the law.

6. Police use physical force to the extent necessary to secure observance of the law or to restore order only when the exercise of persuasion, advice, and warning is found to be insufficient.

7. Police, at all times, must maintain a relationship with the public that gives reality to the historic tradition that the police are the public and the public are the police; the police being only members of the public who are paid to give full-time attention to duties which are incumbent on every citizen in the interests of community welfare and existence.

8. Police should always direct their action strictly toward their functions and never appear to usurp the powers of the judiciary.

9. The test of police efficiency is the absence of crime and disorder, not the visible evidence of police action in dealing with it.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Delegation of Authority | **Policy Number:** 2.04 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority** **Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

The Chief recruits, trains, and appoints qualified officers and employees to carry out the law enforcement mandate within this jurisdiction. The Chief has the sole authority to recommend to the Meridian Public School District Board of Trustees, the hiring and appointing of management officials to help carry out this mandate.

**PROCEDURE:**

**Appointments & Delegation of Authority:**
Except as otherwise provided by statute and regulation, the Chief, establishes the qualifications, authority, and responsibility for all officers, support staff, and any would-be contractor entities working on behalf of the Meridian Public School District Police Department.

The Chief oversees all activities of this agency, and has broad authority and responsibility in accordance with applicable state and federal laws to enforce the laws and regulations of this jurisdiction, the state, and the United States as it relates to the Meridian Public School District Campuses/Real Property.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Critical Incident Reporting | **Policy Number:** 2.05 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Officers and employees of the Meridian Public School District Campus Police Department prepare written reports, and document evidence, in order to better manage the agency, memorialize events, and support the criminal justice process through effective communications.

**PROCEDURE:**

Significant law enforcement related incidents taking place within the scope of knowledge, of the officer or employee including but not limited to, *acts of violence, injury to officers or employees, motor vehicle or other accidents, discharge of a firearm, or Level IV or V use of force incident, and any other incident perceived to be of concern* to the Chief, is reported to the Chief, by officers or employees having direct knowledge of the facts. Critical incidents such as the above will be reported verbally with written follow-up reports detailing the facts of the incident.

**Reporting Requirements:**

For reporting purposes, incidents are organized into levels of seriousness, as defined below. As a general rule: **Never let the Chief hear about an incident from someone outside of the agency!** When this occurs, it demeans the integrity and professionalism of the agency, and will ultimately make more work for everyone involved as . . . *they play catch-up.*

**Priority I Incidents** are reported at once to the Chief, or their designee, and include but are not limited to, the following:

1. Death or serious bodily injury of an officer, employee, volunteer, visitor, or detainee;
2. Extensive property damage resulting from fire, man-made or natural disaster, or terroristic threat or action;
3. Actual, suspected, or attempted hostage taking;
4. Anticipated or actual deployment of MPD SWAT or other special operations unit;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.05 Critical Incident Reporting

5. Use of a weapon during a felony act;
6. Assaults where a weapon is involved;
7. Riot;
8. Suicide attempt or perceived expression of intent;
9. Escape from custody;
10. Actual or suspected sabotage threatening major property damage or prolonged disruption of law enforcement services, such as *arson, power loss*, *communications* (i.e., telephone, CCTV , computer, alarm, etc.);
11. Inoperative heating, cooling, ventilation plant within any school facility;
12. Occurrences which the shift supervisor believes may result in an unusual level of public attention;
13. Power outage in excess of one hour, or any time during non-daylight hours;
14. Alleged violent criminal act committed by a person visiting or working in or at a school facility, including acts committed by staff that may result in felony criminal charges;
15. High speed vehicle pursuit;
16. Discharge of a firearm by an employee other than in training, agency qualification, or sporting event; or
17. Injuries requiring major emergency medical attention.

**Reporting Requirements for Employing Deadly Force:**
Each officer involved in the use of force, or who witnessed the incident or responded to the scene completes a written report. Witness reports are completed no later than the conclusion of the shift in which the incident occurred and filed with the Chief or designee.

Officer(s) who used or employ deadly force must refrain from completing any reports or statements for at least twelve [12] hours. Investigators should debrief the officer(s) for basic details only and then transport the officer(s) home, after advising him/her not to discuss the incident with anyone except their legal counsel.  Upon return to duty the next day, the officer(s) involved in the deadly force incident, must first review the Use of Force Policy, then complete his report, and make all required statements. The officer(s) must provide all required information as if they were a witness to the incident, first hand *perception of events* at the time, and the *corresponding force options used*. Special attention is given to any deviation from policy and the officers' training.

All reports completed by the officers using force, other officers, or witnesses, include the following:

1. A description of the events leading to the use of force or deadly force;
2. Original incident that precipitated the actions of the officer;
3. Accurate description of the incident and reasons for employing force;
4. Description of the weapon or device used and the manner in which it was used;
5. Description of any injuries suffered, and the treatment given or received;
6. List of all participants and witnesses to the incident;
7. Alleged or suspected incapacitation of an on-duty officer due to illness, medication,

Law Enforcement Policies and Procedures, 2.05 Critical Incident Reporting

mental illness, drug or alcohol abuse;

8. Allegation of sexual abuse or harassment, alleged against an officer or employee; &,
9. Copy of all incident reports compiled as a result of the incident.

Again, officers are cautioned to review the Use of force policy before writing reports involving the use of force by officers.

**Priority II Incidents** are reported by phone and followed up shortly thereafter in writing and before the end of the shift and include, but are not limited to, the following:

1. Observed or reported suspect or detainee abuse;
2. Use of restraints or physical force that results in injury requiring medical attention;
3. Self-mutilation by a detainee;
4. Seizure of a large quantity of contraband;
5. Physical confrontation between staff members;
6. Substance abuse, possession of illegal substances, or unauthorized possession by students, staff or visitors of substances that could cause serious bodily harm;
7. Reported or suspected illness from highly contagious diseases; &
8. Injuries that do not require emergency room care or hospitalization.

**Priority III incidents** include other acts or situations not covered by Priority I and II. Such incidents are reported through established command channels at the discretion of the School Resource Officer.

If an employee is in doubt concerning whether or not an occurrence should be reported*, err on the side of caution,* and report the incident.

**Report Preparation:**
Reports prepared by employees of the Meridian Public School District Campus Police:

1. Answer the following questions:
   a. **Who** was involved?
      All persons involved are identified by their role, as suspects, victims, witnesses, etc. Obtain names and aliases if one is used.
   b. **What** happened?
      Exactly what type of offense was committed, and what types of items, weapons, tools, or equipment was apparently used. What was the actor's *modus operandi?* Did the actor use direct attack, or were his tactics more indirect or crafty?
   c. **When** did it occur?
      Record the crime discovery time, and the time the crime is likely have occurred. For example, when discovering a body and there is fresh blood nearby; use a term such as *recent,* and look for other clues as to the time of death. Also indicate the time witnesses and victims are contacted, and arrests made.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication
.

Law Enforcement Policies and Procedures, 2.05 Critical Incident Reporting

    d. **Where** did it happen?
Location is to be as exact as possible. Look for evidence that the crime could have started somewhere else, and ended up at the *reported location.*

    e. **Why** did this incident occur?
Was the apparent motive or purpose of the crime *revenge, gang related, personal gain, thrill, drug-related, accidental,* etc.?

    f. **How** did it happen?
Based on reasonable observations at the scene, and information provided by witnesses, explain . . . *how the incident occurred.*

    g. **Follow-up**
What action was taken to correct the situation? Were any officers or employees disciplined?  Was medical attention provided?  Etc.?

2. Never use radio codes or numerical designations in reports;
3. Print or write legibly, except for officer's signature;
4. Be objective and unbiased, recording information whether positive or negative;
5. Place and discuss events in chronological order; &,
6. Keep a copy of the report for future reference.

**Report Style:**

Good reports, even technical reports contain many facts, but should be easy to read and understand.  Remember, the reports you write today may be seen by a jury tomorrow, and you will be judged by the way you write, what you say, and the way it is stated.

1. Write the *way you talk* in a normal conversation.
2. Write in the past tense.
3. Use a dictionary and a thesaurus if necessary.
4. Use everyday words and avoid unfamiliar wording.
5. Avoid using law enforcement jargon.
6. Lastly, read over your report when you are finished.

A good report is always:

**Concise**    Reports are not lengthy or wordy.  The resulting document reports the facts in a clear and concise fashion.

**Accurate**    Spelling and punctuation should be correct.

**Factual**    Reports should only contain factual information.  The writer must be fair and objective. *Opinions* should not be stated in reports.

**Exact**    Reports should always be proofread to ensure that they describe the facts accurately in the right order and sequence.  Have another officer or supervisor read the report.

**Confidentiality of Records:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication
.

Law Enforcement Policies and Procedures, 2.05 Critical Incident Reporting

Records contain critical and potentially life threatening information. Such mundane information as addresses and phone numbers, if released into the wrong hands, can cost an officer or witness their life.  Specific laws protect the release of much of this information. It is the duty of every employee to be familiar with these laws and ensure that protected information is not inadvertently released.  Records and files are collected and disseminated on a need-to-know basis and only after thorough review by individuals trained in such matters including appropriate notifications of requests for information and the materials that may be subject to redaction or judicial review. Just because an officer or employee is an employee of this agency does not mean that he or she needs or should know vital information about issues they are not involved in or investigating. Therefore, information will not be released until after verification of a *need-to-know* is established.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication
.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:**  Communications | **Policy Number:**  2.06 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

MPSD PD maintains systems of communication that:
- Maximize the ability of supervisors to communicate with employees;
- Aid staff in effectively conveying rules, regulations, and procedures; &,
- Provide information to the public on legitimate issues.

**PROCEDURE:**

Communications between policy makers, officers, civilian employees, students, staff, parents and visitors is critical. The agency may use many types of communication processes to facilitate information flow including meetings, press conferences, press releases, memoranda, and formal and informal verbal exchanges.

**Policy Changes:**
Changes to these *policies & procedures* are communicated in writing to employees prior to the effective date of the change. It is the responsibility of every employee to read, understand, and comply with the information provided.  In instances where an employee does not understand, or has questions about a new or revised policy, the employee must seek out answers or clarification from their supervisor immediately.  In the case of major policy changes, employees may be required to provide signatures indicating their understanding of the new information.

New or transferred employees, and employees returning from leave, are informed of changes pertaining to their assigned duties in written *policies & procedures*, or some other format as determined by the Chief. It is the responsibility of the employee to inquire about any new or revised policy, before returning to active law enforcement duties after an absence.

**Staff Visibility:**
Visible patrols and community interaction are important.  During routine patrols and other opportunities to interact with the community, officers and staff will make every reasonable

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 1 of 2

Law Enforcement Policies and Procedures, 2.06 Communications

effort to answer questions from the public, and respond to their concerns. Matters requiring a follow-up action will be handled promptly by the receiving officer or referred to the proper individual.

**Meetings:**
To further enhance the communication process, the Chief, School Resource Officer, or their designee conduct periodic staff meetings with MPSD PD employees. In these meetings, the presenter discusses topics of general interest to the group.  Each participant has the opportunity to present a brief verbal report on their area of responsibility and describe any accomplishments or problems occurring since the last meeting. These meetings are conducted as needed.

**Verbal Exchanges with Suspects or complainants:**
Officers and civilian employees keep communications professional, and non-personal.  The following applies to all suspects, detainees, or complainant contacts:

1. Do not provide any unnecessary or inappropriate personal information such as *addresses, names of family, or off-duty activities*;
2. Do no accept, exchange, or give items of value or gifts;
3. Do not handle or accept money or funds other than as a function of your specific assigned duties;
4. Unless there is a specific job related purpose, do not touch a detainee or allow a detainee to touch you;
5. Do not carry or give suspects or detainees written or verbal communications from other detainees or suspects;
6. Refer to suspect, detainees, or witnesses by their proper name, such as *Mr. Jones, Ms. Smith*, etc.
7. Require suspects and detainees to refer to you and other employees as *Officer Smith, Corporal Jones* etc.;
8. Do not favor one detainee or suspect over another, unless for interrogation, or evidentiary purposes, and only to the degree necessary;
9. Do not listen to gossip or petty complaints about other officers;
10. Report serious and legitimate complaints regarding other officers or employees to your or their supervisor;
11. Do not use law enforcement jargon, when dealing with the public;
12. Do not use street *slang, cuss words, or gutter talk*; &
13. <u>Maintain a professional demeanor, always</u>.

**Other:**
To further aid communication with members of the agency, Meridian Public School District Campus Police Department may use bulletin boards, memos, E-Mails, and other business communication methods. As an employee of this agency such communication is considered official business, and should be responded to reasonably within specified limits.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Civil Litigation | **Policy Number:** 2.07 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

The Meridian Public School District Campus Police Department takes proactive measures to limit the causes and impact of civil litigation filed against its officers, supervisors, and administration.

**DEFINITIONS:**

- ***Civil Law -*** The law of civil or private rights is also known as a *tort law.*  In the case of civil lawsuits brought against officers or administrators, plaintiffs may ask the court to:

    o Award money damages to be paid by the officer, administrators, or Meridian Public School District / MPSD PD, or
    o Force the agency to make changes in the way it operates by granting an injunction or entering into a consent decree [agreement to change].

- ***Discovery -*** The judicial process for compelling production of written records or other evidence for use in civil litigation.

- ***In-camera Inspection -*** Judicial inspection of allegedly privileged information to determine whether the need to present such information as part of the essential proof of the case outweighs the interest in maintaining its confidentiality.

- ***Plaintiff -***   A person or persons who brings a civil case.  A plaintiff may be a detainee, citizen, a group of citizens, or another governmental body.

**PROCEDURES:**

**General Guidelines:**

The costs of litigation are minimized through a system of risk management that

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.07 Civil Litigation

supports:
1. Relevant policies and procedures;
2. Training & demonstrations of proficiency in key officer functions;
3. Documentation and incident review; &
4. Supervision.

**High-Risk Operations:**
The following are some of the operational areas frequently involved in litigation against law enforcement agencies. Officers should be thoroughly familiar with and use particular care to follow agency policies and procedures guiding these operational areas:

1. Use-of-force;
2. Firearms and intermediate weapons;
3. Vehicular pursuits;
4. Patrol driving and response;
5. Domestic violence;
6. Investigatory stops and arrest procedures;
7. Searches;
8. Motor vehicle stops and searches;
9. Workplace harassment and/or discrimination;
10. Transportation of prisoners; &
11. Secondary employment and off-duty powers.

**Response to High-Risk Incidents:**
When responding to, or on the scene of, a high-risk incident:

1. Secure the scene and all evidence;
2. Record the names and addresses of all witnesses on the scene;
3. Obtain a statement at the scene from a relevant source, and from ambulance and emergency room personnel, if applicable;
4. Note all necessary information regarding the incident;
5. Request a supervisor to the scene:
    a. To conduct an independent review of all relevant information prior to *release of the scene*; or
    b. To review a search or arrest that may have been handled improperly.
6. Process crime scenes according to agency procedure, including:
    a. Taking color photographs or video from different angles;
    b. Photographing all witnesses.
    c. *Insuring that each suspect is informed of rights to include Miranda warnings, Juvenile Warnings, and any other required readings.*
7. Document critical information such as:
    a. Whether medical treatment was needed, requested, or received;
    b. Observations regarding suspect(s) general mental and physical health, and presence of any specific health problems requiring special treatment;
    c. Photographs of suspect and victims to include any specific injuries.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.07 Civil Litigation

**Post-Incident Procedures:**
All officers involved in high-risk incidents must report and document the incident to their supervisor before concluding their shift. Supervisors review the reports, obtain necessary supplemental information, and forward reports to the Chief as soon as practicable. The Chief or designee prepares, and submits, a confidential memo to the agency's legal counsel providing an assessment of the incident. Depending on the need, the Chief, or his designee, will meet with legal counsel.

Officers working or involved in the case must understand and adhere to the following:

1. An internal investigation does not necessarily imply misconduct; &
2. Officers are not to discuss incidents with reporters or attorneys not associated with the agency without prior approval of the Chief, or court order.

**Responsibilities of the Chief:**
With the aid of agency's legal counsel, the Chief coordinates all responses to, pending or potential, litigation against the agency. The agency litigation coordinator will:

1. Develop litigation files for each case that include:
    a. Copies of relevant agency policies pertaining to the incident;
    b. Copies of relevant radio communications, computer, or telephone records or tapes;
    c. Relevant photographs pertaining to the incident;
    d. Copies of the disciplinary and training records of all involved personnel; &
    e. Criminal docket, where applicable, from any criminal case arising from the incident.
2. Establish a quality assurance process to confirm that:
3. Documents are routed to appropriate parties for resolution;
4. Documents are processed and completed by due dates; &
5. Records are kept detailing information released in each case and purpose for its release.
6. Policies & procedures are protected from release in accordance with *stated warnings*.
7. Conduct audits and semi-annual reviews of agency litigation to determine whether need for *policy and procedure* revision or training exists;
8. Disseminate updated *policies & procedures* resulting from new case law statutes, or needs analysis to agency personnel; &
9. Update employees involved in civil litigation regarding meaningful developments in and status of the cases, especially cases that have been concluded or settled.

**Responsibilities of Employees:**
Employees named as parties to civil actions for acts or omissions allegedly arising out of their *scope of authority* or *official duties* will:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.07 Civil Litigation

1. Immediately notify the Chief and agency's legal counsel;
2. Request representation from agency legal counsel, or secure representation from a private attorney at the officer's expense, if desired;
3. Maintain accurate and detailed reports; &
4. Avoid making public statements concerning the litigation without prior approval of the Chief.

**Response to Subpoenas and Discovery Requests:**
Employees of the agency must follow these guidelines regarding subpoenas in matters arising out of their official capacity:

1. When receiving a subpoena to testify, provide deposition, or documents employees immediately notify the Chief and the agency's legal counsel. A copy of the subpoena must be provided with the notice.

2. All discovery requests or subpoenas for agency records, reports, or officer notes must be acted upon as directed by the agency's legal counsel and state or federal law.

3. A variety of information might be released to a judge for in-camera inspection with regard to *discovery requests depending upon the determination of legal Counsel* While some information is released in the ordinary course of discovery, officers and employees should not presume how the facts of a particular case might impact the release of such items as:
   a. *Policy & procedure* sections, governing the alleged misconduct;
   b. Personnel records;
   c. Citizen complaints;
   d. Internal investigation files related to the incident;
   e. Responses to requests for past internal investigations into alleged misconduct of officers; &
   f. Responses to requests for internal investigations into officer alleged misconduct or misconduct similar to that being litigated.

4. The following information may or may not be fully discoverable:
   a. Minutes and records of official review boards;
   b. Agency policies and procedures;
   c. Training records; &
   d. Internal memos or notes that do not fall within *attorney work product privilege.*

5. Privileged material generally not subject to discovery includes:
   a. Names of *confidential informants* or *citizens who wish to remain anonymous*;
   b. Records of ongoing internal investigations that would be jeopardized by disclosure;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.07 Civil Litigation

    c.  Investigative files relating to ongoing criminal investigations; &
    d.  Communications subject to any legal privilege.

**Response to Media:**
The Chief, or designated Public Information Officer (PIO), are the only agency employees authorized to make statements to the media regarding critical incidents or litigation involving the agency or agency personnel. [MPSD PD]

The Chief must work with legal counsel to present fair and accurate media statements pertaining to testimony, legal issues, or other concerns arising from litigation or any other incident involving the agency [MPSD PD].  Employees asked to comment or talk with representatives of the news media must, prior to such a meeting or discussion, secure permission from the Chief.

Employees should not respond with "no comment" statements, but rather inform the media representative that they should contact the Chief or the Public Information Officer.

No information regarding juveniles is released to the media or general public (this even includes confirmation that the juvenile is being held in the facility).  Persons requesting information regarding a juvenile(s) is referred to the Youth Court.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Internal Affairs – Internal Compliance Enforcement (ICE) | **Policy Number:** 2.08 |
| **Issue Date:** July 01, 2017 | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

The Meridian Public School District Campus Police Department thoroughly and expeditiously investigates complaints against agency employees who are credibly alleged to have breached good law enforcement practices, policies and procedures, orders and instructions, or criminal law. The Chief, as he/she inquire into these matters endeavor to protect the rights of those making allegations, implicated employees, and witnesses.

**DISCUSSION:**

Public confidence in this agency is vital to the continued accomplishment of our mission. Both perception and actuality play a vital role in maintaining public trust. As a result, this agency diligently investigates allegations of wrongdoing made against any employee of this agency.

Our agency strives to maintain an open channel of communication between the citizens (students, staff and visitors) we serve and our officers. A major part of this communication is constantly reassuring those with a complaint that their voice will be heard, that we listen, and if a wrong has occurred, corrective action will be taken. To do otherwise invites other law enforcement agencies or citizen groups to conduct their own inquiries and pass judgment. In our community, we are expected to police ourselves, and always act professionally.

The public needs to know that we can be relied upon to investigate ourselves, correct deficiencies, and punish violators when necessary. Supervisors are reminded that *internal compliance enforcement* (ICE) processes and compliance investigations are not a substitute for good supervision and management. This policy and procedure is not intended to relieve a supervisor or manager from their responsibility to oversee employee conduct. Nor does it relieve fellow officers from their responsibility to prevent violations of agency policy, the law, or a citizen's constitutional rights.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures,  2.08  Internal Affairs - ICE

**PROCEDURES:**

**Internal Compliance Enforcement (ICE) Function:**
ICE inquiries are performed on a pro-active basis. This agency initiates compliance investigations whenever a concern is raised regarding officer conduct or ethics.  All inquiries are conducted with the direct authority and support of the Chief. Priority is accorded to the more serious events. These complaints may come from individual citizens, government officials, the courts, fellow officers, or as directed by The Chief. On occasion state or federal investigators may request the assistance of internal affairs investigations with inquiries they have initiated.

ICE processes and investigations are **confidential**.  As such they are only divulged with limited distribution and then only a *need to know* basis. ICE files are maintained in secure offices under lock and key with restricted access. This permanent file includes as a minimum the following:

1. ICE inquiry number;
2. Type of complaint;
3. Date received;
4. Name(s) of accused;
5. Name of complainant;
6. Written statement of the complainant (if any);
7. List and identification of witnesses;
8. Results of the investigation;
9. Statements and evidence;
10. External agency review or follow-on inquiry;
11. Criminal referral (if any); &
12. Final disposition.

**Classification of Complaints:**
ICE inquiries and complaints are initially classified under one of the following categories. This classification may change as more information becomes available to investigators. Classifications are:

1. **Class One:**  Serious or criminal misconduct that alleges needless or excessive force, brutality, violations of criminal law, corruption, breach of civil rights, abuse of authority, intentional discrimination or harassment, falsifying documents, accepting a bribe, critical failure to comply with policy or procedures, failing to obey a direct order that results in harm, theft, or fraud, and other instances so classified by the Chief.

2. **Class Two:**  Complaint that alleges inadequate public service, discourtesy, improper procedure, failing to comply with policy or practices, failing to obey a

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures,  2.08  Internal Affairs - ICE

direct order, failing to supervise, and other less serious and non-criminal conduct as classified by the Chief.

3. **Class Three:**  A use of *deadly force* by an officer of this agency is subject to an administrative investigation as a matter of policy, regardless of whether or not a formal complaint has been filed.

**Due Process:**

The agency investigates both formal and informal complaints on a pro-active basis. Investigations follow proper procedures when interviewing an accused employee, and uphold and defend the legal rights of employees as afforded by due process.  If it is determined an accusation may be malicious and false, the Chief may limit the investigation to substantiating that the complaint *is unfounded.*

All complaints made by citizens (MPSD students, staff and/or visitors) or outside authorities are to be in writing, and signed by the person making the original complaint. The Chief will document the initiation of an ICE Investigation writing.

When an employee is issued a formal notice that the employee is the target of an internal compliance investigation, the employee is correspondingly notified of the nature and current disposition of that complaint.  At the discretion of the Chief this or any notice may be withheld based on the depth of the investigation, risk to others, coordination with other law enforcement agencies, or the nature of the alleged violation.

Disciplinary action, based solely on the original complaint will not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee before such action is taken.

**Taking a Complaint:**

Any employee who receives a complaint against them or another employee alleging substandard service, misconduct, or failure to comply with a policy or directive will provide the complainant with procedures to follow to initiate the complaint.  Employees will not attempt to discourage a citizen (student, staff and/or visitor) from filing a complaint.  When presented with a complaint, employees will:

1. If not a supervisor, immediately refer the citizen to the agency to file the complaint with the employee's supervisor;
2. If a supervisor, record complaints on an *Interview Form;*
3. Collect and attach any evidence or documentation the complainant may have or has access to;
4. Never advise a complainant to make the complaint at a later time;
5. Make arrangements for the complainant to talk to the Chief or his designee, if the complainant so wishes;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures,  2.08  Internal Affairs - ICE

6. Request identification, address and phone number from the complainant to be forwarded to the Chief to facilitate a follow-up inquiry;
7. Advise the complainant that the report will be forwarded to the Chief or designee, who will either investigate the complaint, or assign the responsibility to other personnel;
8. Inform the complainant that he/she will be contacted within five [5] days concerning the allegation;
9. Establish whether the complainant is a suspect, witness, or defendant in the matter complained about;
10. Immediately give the complainant a *Constitutional Rights [Miranda] Warning,* if the complainant is a suspect in this or a related crime;
11. Provide the information to an immediate supervisor at the end of the shift in a sealed envelope; &,
12. Not discuss the allegation or the report with anyone until contacted by the Chief. If not contacted within four [4] working days, refer the matter directly to the Chief.

**Relief of Duty & Administrative Leave:**
Employees who are the subject of ICE inquiry may be relieved from duty and placed on *administrative leave.* Pay status will be determined based upon the provisions of law, policies of this agency, as determined by the Chief.

The Chief, Superintendent, Assistant Superintendent and/or Human Resource Director has the authority to relieve an employee from duty with pay.  If the incident for which the employee is relieved involves an allegation the employee is intoxicated or impaired, an on-duty officer (preferably a supervisor) provides transport for the employee to the employee's residence, or jail, depending on the nature of the allegations.  Prior to transport, the employee is relieved of any weapons, and is instructed to not to perform any law enforcement duties until advised otherwise.

Employees and officers placed on administrative leave are notified in writing of their leave status, and the conditions under which leave is to be administered. This correspondence normally details:

1. Effective date(s);
2. Retention, limitation, or termination of law enforcement authority;
3. Disposition or return of agency and law enforcement identification;
4. Disposition or return of any issued equipment or uniform items;
5. Pay status;
6. Clarification or restrictions regarding any off-duty employment;
7. Any limitation or conditions as to movement or contacting witnesses, complainants, or other employees of the agency;
8. A statement confirming that the conditions of the leave are subject to review, and may change; &,
9. Any other condition deemed appropriate by the Chief or designee.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures,  2.08  Internal Affairs - ICE

**Disposition of Complaints:**

Classifications of dispositions determined by the internal compliance enforcement investigation are:

1. **Unfounded** - Allegation is false or not factual;
2. **Sustained** - Enough information to support the allegation as factual;
3. **Not Sustained** - Not enough information to support or refute the allegation;
4. **Exonerated** - Incident happened, but employee's actions were proper, consistent with policy and lawful; or,
5. **Sustained/Other** - There was misconduct by the employee other than that which was alleged.

In those instances, where the investigation determines probable cause to believe that a local, state, or federal law has been violated by an officer or employee, the Chief will make a timely determination regarding the future course of the inquiry, and potential referral to an outside agency for prosecution or further investigation. Likewise, the Chief may acquire the services of an outside entity to conduct compliance reviews or inquiries in support of internal ICE investigation.

**Reporting & Statistical Analysis:**

The Chief and staff monitor complaints against employees, and may direct the compilation of statistical summaries or reports to assist in oversight responsibilities. This report may be provided to command officers, supervisory personnel, officers, or the public at the discretion of the Chief.  Trends or patterns of complaints may indicate the need for officer assistance, discipline, remedial training, or changes to agency policies and procedures or methods of operation.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**

**Garrity Warning**

1. I am being questioned as part of an internal compliance investigation by this agency into potential violations of agency policies, rules, practices, regulations, or for my fitness for duty.  This inquiry concerns:

   _____

   _____

2. I have invoked my Miranda Rights on the grounds that I might incriminate myself in a criminal matter.

3. I have been granted use immunity.  No answers given by me, nor evidence derived from the answers, may be used against me in any criminal proceedings, except for perjury or false swearing.

4. I understand that I must now answer questions specifically, directly and narrowly related to the performance of my official duties or my fitness for office.

5. If I refuse to answer, I may be subject to discipline for that refusal which can result in my dismissal from this agency.

6. Anything I say may be used against me in any subsequent agency charges.

7. I understand I have the right to consult with a representative of my choice, and have them present during the interview(s).

Date: _____

Location: _____

Signature of Employee _____

Name of Employee _____

Witnessed by: _____

Signature of Witness: _____

Approved by: _____

Approval Signature: _____

1

**Meridian Public School District**
## Campus Police Department
**Law Enforcement**
**Policies and Procedures**

| **Subject:** Employee Selection & Placement | **Policy Number:** 2.09 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department places a priority interest in the selection and placement of personnel given the constraints of budget, operational objectives, and economy of force. This agency strives to meet and exceed State standards on officer qualifications for employment while maintaining an equal employment opportunity and discrimination-free environment.

**DEFINITIONS:**

- ***Economy of force -***  The principle of employing available resources in the most effective way possible, in an attempt to allocate a minimum of essential manpower and equipment to any secondary efforts. This allows for the judicious employment and distribution of resources towards the primary objectives of the agency. No part of an agency's team should ever be left without purpose.

- ***Moral turpitude –*** The act of baseness, vileness, or the depravity in private and social duties which man owes to his fellow man or to society in general, contrary to accepted and customary rule of right and duty between man and man. Act or behavior that gravely violates moral sentiment or accepted moral standards of community and is morally culpable quality held to be present in some criminal offenses as distinguished from others. The quality of a crime involving grave infringement of the moral sentiment of the community as distinguished from minor laws.

**PROCEDURE:**

**Equal Employment Opportunity:**

Meridian Public School District is an Equal Opportunity Employer that supports the Americans with Disabilities Act (ADA) and must respond to reasonable requests for job

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 1 of 5

Law Enforcement Policies and Procedures, 2.09 Employee Selection & Placement

accommodations and take reasonable action to employ qualified individuals with disabilities. This agency is committed to making reasonable sustained, diligent efforts to identify and consider such individuals for employment and for possible advancement opportunities arising during employment.

It is the sworn duty of all law enforcement officers to uphold the constitutional rights of all individuals. Meridian Public School District Campus Police Department strictly prohibits any retaliatory action against an employee for opposing a practice which he or she believes to be discriminatory. This includes the filing of an internal complaint or the filing of a complaint with a state or federal civil rights enforcement agency.

Maintaining the ideals of equal opportunity employment, no individual inquiring about employment within Meridian Public School District Campus Police Department may be discriminated against based on:

1. Race,
2. Color,
3. Religion,
4. Sex,
5. Age,
6. National origin,
7. Disability,
8. Honorable military service,
9. Disability,
10. Marital status, or
11. Political affiliation.

All employees are expected to abide by the procedures as outlined within this policy. Violation of this policy will subject an employee to disciplinary action, up to and including dismissal.

**Employment Requirements:**
All persons seeking employment with the agency as a law enforcement officer must:

1. Be a United States citizen;
2. Be a resident of Lauderdale County, Mississippi or become a resident within ninety [90] days of employment;
3. Be at least twenty-three [23] years of age;
4. Possess a valid Mississippi Driver's License;
5. Have a high school diploma or GED
6. Successfully complete the minimum training required for licensure;
7. Successfully complete the MDE School Resource Officer Basic Course;
8. Never have been convicted of a *felony* or *misdemeanor involving moral turpitude* or is not currently under indictment for any criminal offense;
9. Be free of misdemeanor convictions for the last twelve [12] months;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.09 Employee Selection & Placement

10. Have no previous or current charges of *driving while Intoxicated* or *driving under the Influence of drugs or alcohol*;
11. Never been convicted of any family violence offense;
12. Not be prohibited by state or federal law from operating a motor vehicle;
13. Not be prohibited by state or federal law from possessing firearms or ammunition;
14. Be subject to a thorough background investigation and personal interviews by Meridian Public School District Campus Police Department personnel;
15. If served in the armed forces of any country, demonstrate stability, reliability, & integrity, by having an Honorable Discharge [*Dishonorable, General*, or *Medical* discharges are not acceptable];
16. Have never had a commission or peace officer license denied by final order or revoked;
17. Not be currently on suspension, or have a voluntary surrender of a job related license currently in effect;
18. Demonstrate reading and comprehension skills in the English language to at least the 10th grade level through interviews and written testing;
19. Demonstrate honesty and integrity, by successfully completing pre-employment drug testing;
20. Demonstrate good general medical health as determined by a medical doctor, who is licensed by the Mississippi State Board of Medical Examiners, and physical performance testing;
21. Free from illegal drug use, or legal drugs that impair mental or physical performance, for the past 5 years, as determined by interview, medical, testing;
22. Be declared in satisfactory psychological and emotional health by a psychiatrist who is licensed by the Mississippi State Board of Medical Examiners or psychologist, who is licensed by the Mississippi State Board of Examiners of Psychologists; &
23. Be fingerprinted and subjected to a search of local, state, and national records and finger print files.

**Physical & Mental Testing of Sworn Officers:**

Individuals applying for a position as a sworn officer of this agency must continually demonstrate the ability to perform essential job functions under stressful and often confusing circumstances. At time of application and periodically thereafter officers may be required to demonstrate these abilities without assistance. Minimum demonstrations of ability are:

1. Disassembling, reassembling, loading, firing, and performing malfunction drills with a *semi-automatic pistol*;
2. Handcuffing and restraining *resisting suspects*;
3. Giving loud verbal and hand signal commands that can be understood at 50 yards;
4. Standing, walking, sprinting, laying down, rolling-over, and jumping on verbal command, and in rapid order;
5. Dragging 165 pounds of dead weight over 25 yards;
6. Picking up and carrying 100 pounds of dead weight over 25 yards;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.09 Employee Selection & Placement

    7. Accurately and consistently following verbal, written, and hand signal commands, without hesitation, or assistance;
    8. Quickly closing large, heavy doors; &
    9. Running up and down two [2] flights of stairs.

An applicant for a sworn position that cannot perform these minimum tasks will not be accepted. Sworn officers of the agency that cannot demonstrate proficiency in these areas annually may be provided additional training and support to reach established goals, and if not attainable within a reasonable period of time, reassigned to other duties.

## Acceptance of Applications:

Employment applications are accepted at any time, even if all positions are filled, for future evaluation. The completion of a regular application form will ensure that each candidate be considered for all positions within the agency for which he is qualified. Applications are kept on file for at least twelve months, after which the application will be destroyed. Applications of hired individuals are maintained in their employee file. Applicants, at the time of application, will be advised that their application will be kept on file for further review for twelve months unless the applicant request that the application not be maintained for further consideration.

## Disqualification of Applicants:

Applicants may be disqualified for a number of reasons, including, but not limited to:

    1. Not possessing the minimum qualifications for the position;
    2. Failing to be punctual in taking prescribed tests or undergoing evaluation;
    3. Making fraudulent statements during interview, or on any application; or
    4. Failing to properly complete the application in the manner prescribed.

## Guidelines for Filling a Position:

Whenever a vacant position is to be filled within Meridian Public School District Campus Police Department, a number of guidelines to ensure all applicants are treated equally to include the following:

    1. A position vacancy notice will be posted within the agency.
    2. A position vacancy notice will be posted online.
    3. The appropriate agency supervisor will evaluate applications, including:
        a. Any applicant nominated by the Chief,
        b. Qualified persons already employed by the agency or governing body, &
        c. Any other qualified persons; &
    4. After screening, applicants will submit to written, physical, mental, and performance based testing.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.09 Employee Selection & Placement

**Continued Employment Standards:**

To be eligible for continued employment an employee must, in addition to other conditions and standards, meet the requirements as specified in Employment Requirements, above.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
Campus Police Department
**Law Enforcement**

## CANONS OF LAW ENFORCEMENT ETHICS[1] [2]

All sworn law enforcement officers in the Meridian Public School District Campus Police Department or those members vested with law enforcement authority as a result of their employment with Meridian Public School District Campus Police Department will, at all times, abide by the following Canons of Police Ethics.

### Article. 1.
### Primary Responsibility of Job

The primary responsibility of the police service, and of the individual officer, is the protection of the people of the United States through the upholding of their laws; chief among these is the Constitution of the United States and its amendments. The law enforcement officer always represents the whole of the community and it's legally expressed will and is never the arm of any political party or clique.

### Article 2.
### Limitations of Authority

The first duty of a law enforcement officer, as upholder of the law, is to know its bounds upon him or her in enforcing it. Because he or she represents the legal will of the community, be it local, state, or federal, he or she must be aware of the limitations and proscriptions which the people, through law, have placed upon him or her. He or she must recognize the genius of the American system of government, which gives to no man, groups of men, or institution, absolute power, and he or she must ensure that he or she, as a prime defender of that system, does not pervert its character.

### Article 3.
### Duty to be Familiar with the Law and with Responsibilities of Self and other Public Officials

The law enforcement officer shall assiduously apply himself or herself to the study of the principles of the laws, which he or she is sworn to uphold. He or she makes certain of his or her responsibilities in the particulars of their enforcement, seeking aid from his or her superiors in matters of technicality or principle when these are not clear to him or her; make special effort to fully understand his or her relationship to other public officials, including other law enforcement agencies, particularly on matters of jurisdiction, both geographically and substantively.

### Article 4.
### Utilization of Proper Means to Gain Proper Ends

The law enforcement officer shall be mindful of his or her responsibility to pay strict heed to the selection of means in discharging the duties of his or her office. Violations of law or disregard for public safety and property on the part of an officer are intrinsically

---

[1] Composed in 1957 by a Committee of the International Association of Chiefs of Police, Inc.
[2] Updated in 2007, by OSS - Law Enforcement Advisors®, to recognize the meaningful contribution women to law enforcement and our society.

wrong; they are self-defeating in that they instill in the public mind a like disposition. The employment of illegal means, no matter how worthy the end, is certain to encourage disrespect for the law and its officers.  If the law is to be honored, it must first be honored by those who enforce it.

## Article 5.
### Cooperation with Public Officials in the Discharge of Their Authorized Duties
The law enforcement officer shall cooperate fully with other public officials in the discharge of authorized duties, regardless of party affiliation or personal prejudice.  He or she shall be meticulous, however, in assuring himself or herself of the propriety, under the law, of such actions and shall guard against the use of his office or person, whether knowingly or unknowingly, in any improper or illegal action.  In any situation open to question, he or she shall seek authority from his superior officer, giving him or her a full report of the proposed service or action.

## Article 6.
### Private Conduct
The law enforcement officer shall be mindful of his special identification by the public as an upholder of the law.  Laxity of conduct or manner in private life, expressing either disrespect for the law or seeking to gain special privilege, cannot but reflect upon the police officer and the police service.  The community and the service require that the law enforcement officer lead the life of a decent and honorable man or woman. Following the career of a police officer gives no man or woman special perquisites. It does give the satisfaction and pride of following and furthering an unbroken tradition of safeguarding the American republic.  The officer who reflects upon this tradition will not degrade it. Rather, he or she conducts a private life that the public regards as an example of stability, fidelity, and morality.

## Article 7.
### Conduct toward the Public
The law enforcement officer, mindful of this responsibility to the whole community, shall deal in a manner calculated to instill respect for its laws and its police service.  The law enforcement officer shall conduct his or her official life in a manner that inspires confidence and trust.  Thus, he or she is neither overbearing nor subservient, as no individual citizen has an obligation to stand in awe of him or her or a right to command him or her.  The officer gives service where he or she can, and requires compliance with the law.  He or she does neither from personal preference or prejudice but rather as a duly appointed officer of the law discharging his or her sworn obligation.

## Article 8.
### Conduct in Arresting and Dealing with Law Violators
The law enforcement officer shall use his or her powers of arrest strictly in accordance with the law and with due regard to the right of the citizen concerned.  His or her office gives him or her no right to prosecute the violator or to mete out punishment for the offense.  He or she shall, at all times, have a clear appreciation of his responsibilities and limitations regarding detention of the violator; he or she shall conduct himself or herself in such a manner as will minimize the possibility of having to use force.  To this end he or she shall cultivate a dedication to the service of the people and the equitable

upholding of their laws whether in the handling of law violators or in dealing with the law-abiding.

### Article 9.
### Gifts and Favors

The law enforcement officer, representing government, bears the heavy responsibility of maintaining, in his or her own conduct, the honor, and integrity of all government institutions.  He or she shall, therefore, guard against placing himself or herself in a position in which any person can expect special consideration or in which the public can reasonably assume that special consideration is being given.  Thus, he or she should be firm in refusing gifts, favors, or gratuities, large or small, which can, in the public mind, be interpreted as capable of influencing his or her judgment in the discharge of his or her  duties.

### Article 10.
### Impartial Conduct

The law enforcement officer shall be concerned equally in the prosecution of the wrongdoer and the defense of the innocent.  He or she shall ascertain what constitutes evidence and shall present such evidence impartially and without malice.  In so doing, he or she will ignore social, political, and all other distinctions among the person involved, strengthening the tradition of the reliability and integrity of an officer's word.

The law enforcement officer shall take special pains to increase his or her perception and skill of observation, mindful that in many situations his or her testimony is the sole impartial testimony to the facts of the case.

### Article 11.
### Attitude Towards Profession

The law enforcement officer shall regard the discharge of his or her duties as a public trust and recognize his or her responsibility as a public servant.  By diligent study and sincere attention to self-improvement, he or she shall strive to make the best possible application of science to the solution of crime and, in the field of human relationships, strive for effective leadership and public influence in matters affecting public safety.  He or she shall appreciate the importance and responsibility of his or her office, and hold police work to be an honorable profession rendering valuable service to his community and his or her country.

_____
Print Name


_____          _____
Signature                                                                      Date

**Meridian Public School District**
Campus Police Department
**Law Enforcement**

## CANONS OF POLICE ETHICS[1] [2]

All sworn law enforcement officers in the Meridian Public School District campus Police Department or those members vested with law enforcement authority as a result of their employment with Meridian Public School District Campus Police Department will, at all times, abide by the following Canons of Police Ethics.

### Article. 1.
### Primary Responsibility of Job
The primary responsibility of the police service, and of the individual officer, is the protection of the people of the United States through the upholding of their laws; chief among these is the Constitution of the United States and its amendments.  The law enforcement officer always represents the whole of the community and it's legally expressed will and is never the arm of any political party or clique.

### Article 2.
### Limitations of Authority
The first duty of a law enforcement officer, as upholder of the law, is to know its bounds upon him or her in enforcing it.  Because he or she represents the legal will of the community, be it local, state, or federal, he or she must be aware of the limitations and proscriptions which the people, through law, have placed upon him or her.  He or she must recognize the genius of the American system of government, which gives to no man, groups of men, or institution, absolute power, and he or she must ensure that he or she, as a prime defender of that system, does not pervert its character.

### Article 3.
### Duty to be Familiar with the Law and with Responsibilities of Self and other Public Officials
The law enforcement officer shall assiduously apply himself or herself to the study of the principles of the laws, which he or she is sworn to uphold.  He or she makes certain of his or her responsibilities in the particulars of their enforcement, seeking aid from his or her superiors in matters of technicality or principle when these are not clear to him or her; make special effort to fully understand his or her relationship to other public officials, including other law enforcement agencies, particularly on matters of jurisdiction, both geographically and substantively.

### Article 4.
### Utilization of Proper Means to Gain Proper Ends
The law enforcement officer shall be mindful of his or her responsibility to pay strict heed to the selection of means in discharging the duties of his or her office.  Violations of law or disregard for public safety and property on the part of an officer are intrinsically

---

[1] Composed in 1957 by a Committee of the International Association of Chiefs of Police, Inc.
[2] Updated in 2007, by OSS - Law Enforcement Advisors®, to recognize the meaningful contribution women to law enforcement and our society.

wrong; they are self-defeating in that they instill in the public mind a like disposition. The employment of illegal means, no matter how worthy the end, is certain to encourage disrespect for the law and its officers.  If the law is to be honored, it must first be honored by those who enforce it.

## Article 5.
### Cooperation with Public Officials in the Discharge of Their Authorized Duties
The law enforcement officer shall cooperate fully with other public officials in the discharge of authorized duties, regardless of party affiliation or personal prejudice.  He or she shall be meticulous, however, in assuring himself or herself of the propriety, under the law, of such actions and shall guard against the use of his office or person, whether knowingly or unknowingly, in any improper or illegal action.  In any situation open to question, he or she shall seek authority from his superior officer, giving him or her a full report of the proposed service or action.

## Article 6.
### Private Conduct
The law enforcement officer shall be mindful of his special identification by the public as an upholder of the law.  Laxity of conduct or manner in private life, expressing either disrespect for the law or seeking to gain special privilege, cannot but reflect upon the police officer and the police service.  The community and the service require that the law enforcement officer lead the life of a decent and honorable man or woman. Following the career of a police officer gives no man special perquisites.  It does give the satisfaction and pride of following and furthering an unbroken tradition of safeguarding the American republic.  The officer who reflects upon this tradition will not degrade it.  Rather, he or she conducts a private life that the public regards as an example of stability, fidelity, and morality.

## Article 7.
### Conduct toward the Public
The law enforcement officer, mindful of this responsibility to the whole community, shall deal in a manner calculated to instill respect for its laws and its police service.  The law enforcement officer shall conduct his or her official life in a manner that inspires confidence and trust.  Thus, he or she is neither overbearing nor subservient, as no individual citizen has an obligation to stand in awe of him or her or a right to command him or her.  The officer gives service where he or she can, and requires compliance with the law.  He or she does neither from personal preference or prejudice but rather as a duly appointed officer of the law discharging his or her sworn obligation.

## Article 8.
### Conduct in Arresting and Dealing with Law Violators
The law enforcement officer shall use his or her powers of arrest strictly in accordance with the law and with due regard to the right of the citizen concerned.  His or her office gives him or her no right to prosecute the violator or to mete out punishment for the offense.  He or she shall, at all times, have a clear appreciation of his responsibilities and limitations regarding detention of the violator; he or she shall conduct himself or herself in such a manner as will minimize the possibility of having to use force.  To this end he or she shall cultivate a dedication to the service of the people and the equitable

upholding of their laws whether in the handling of law violators or in dealing with the law-abiding.

## Article 9.
### Gifts and Favors

The law enforcement officer, representing government, bears the heavy responsibility of maintaining, in his or her own conduct, the honor, and integrity of all government institutions.  He or she shall, therefore, guard against placing himself or herself in a position in which any person can expect special consideration or in which the public can reasonably assume that special consideration is being given.  Thus, he or she should be firm in refusing gifts, favors, or gratuities, large or small, which can, in the public mind, be interpreted as capable of influencing his or her judgment in the discharge of his or her  duties.

## Article 10.
### Impartial Conduct

The law enforcement officer shall be concerned equally in the prosecution of the wrongdoer and the defense of the innocent.  He or she shall ascertain what constitutes evidence and shall present such evidence impartially and without malice.  In so doing, he or she will ignore social, political, and all other distinctions among the person involved, strengthening the tradition of the reliability and integrity of an officer's word.

The law enforcement officer shall take special pains to increase his or her perception and skill of observation, mindful that in many situations his or her testimony is the sole impartial testimony to the facts of the case.

## Article 11.
### Attitude Towards Profession

The law enforcement officer shall regard the discharge of his or her duties as a public trust and recognize his or her responsibility as a public servant.  By diligent study and sincere attention to self-improvement, he or she shall strive to make the best possible application of science to the solution of crime and, in the field of human relationships, strive for effective leadership and public influence in matters affecting public safety.  He or she shall appreciate the importance and responsibility of his or her office, and hold police work to be an honorable profession rendering valuable service to his community and his or her country.

_____

Print Name

_____          _____

Signature                                                          Date

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| **Subject:** Professional Conduct | **Policy Number:** 2.12 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

All employees of The Meridian Public School District Campus Police Department constantly strive to deal honestly, efficiently, and with integrity while on official duty, and strive to do the same in their personal lives.  Officers and employees of this agency are mindful that their conduct and the public's perception of that conduct effect the willingness of the public to support our critical mission.

**PROCEDURES:**

1. Sworn and civilian employees are always courteous when interacting with the general public (Students, Parents and/or Visitors).
2. Employees avoid behaviors and practices that cause the public to question individual employee or agency integrity.
3. Off-duty officers, while in uniform, conduct themselves as though they were on-duty
4. Employees do not reveal, or make public, any order, or information to any person unless the disclosure is authorized.
5. Officers are governed by reasonable and exemplary rules of good conduct and behavior whether on or off-duty. Officers always demonstrate morals and values expected by the community and will not commit any act that could adversely affect the Meridian Public School District Campus Police Department, their fellow employees, or respect for the rule of law.
6. Officers always remember that they are sworn to uphold the law, abide by the *policies and procedures* of this agency, and the law, while protecting the rights of all people as afforded by the Constitution of the United States of America and the State of Mississippi.

**Law Enforcement Ethics:**

Officers and employees of this agency have read and fully support the *Law Enforcement Code of Ethics* and the *Canons of Police Ethics* as adopted and supported by the Meridian Public School District Campus Police Department, and my fellow

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.12 Professional Conduct

officers. These are found in this *policy and procedure* manual.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| **Subject:** Abuse of Position | **Policy Number:** 2.13 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority** **Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Employees of Meridian Public School District Campus Police Department decline any special privileges or exemptions for themselves or for any:

1. Spouse;
2. Child;
3. Parent;
4. Other family member or relative;
5. Friend;
6. Acquaintance; or
7. Non-acquaintance.

**DEFINITIONS:**

- ***Authoritative position -*** All officers have a position of great authority that is afforded by society. Because of this authority, officers are in a position to influence citizens within a community. With this authority come grave responsibilities.

- ***Conflict of interest -*** A situation for which a person may have more than one specific self interest in the outcome.

**PROCEDURE:**

**Abuse of Position:**
In compliance with agency procedure, members of Meridian Public School District Campus Police Department know the following situations are abuses of position:

1. Becoming involved in a situation that is a conflict of interest; or
2. Use of authority for the purpose of financial gain.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.13 Abuse of Position

**Conflict of Interest Regarding Abuse of Position:**

Officers of the agency must avoid becoming involved in any situation, either on or off duty, for which a conflict of interest is present.  If an officer responds to a call for which a conflict of interest presents itself, the officer must control the situation, request a supervisor to respond, and cease any further involvement in the situation after being properly relieved.  Officers are expected to be familiar with, and abide by, the laws of this State regarding conflicts of interest and ethical constraints present by virtue of their position. These laws relate to both officers and a range of defined family members and business relationships.

**Financial Gain Regarding Abuse of Position:**

Employees of Meridian Public School District Campus Police Department, while in their official capacity, must **NEVER**:

1. Accept payment, cash, or property for services delivered in their capacity as an employee of this agency. Any officer confronted with such a situation must immediately complete a report and forward it to the Chief;
2. Accept any gift or gratuity from a subordinate, unless approved by the Chief;
3. Attempt to negotiate any payment of cash or property from another person or institution in their capacity of official police business. Any abuse of this authority is subject to disciplinary action;
4. Seek, encourage, or exchange sexual favors or contact with anyone while in the performance of their duties;
5. Give testimony or use their name or photograph regarding commercial advertising, unless approved by the Chief;
6. Seek personal publicity, either directly or indirectly, in the course of their employment;
7. Solicit subscriptions; or
8. Sell books, papers, tickets, merchandise, or any other items of value, unless specifically approved by the Chief.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Corruption Prevention | **Policy Number:** 2.14 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority** **Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

The Meridian Public School District Campus Police Department does not condone corruption. Further this agency investigates complaints or allegations of corruption, and takes administrative, disciplinary, and even criminal action when corruption is detected. We are ever mindful that the public expects us to have and maintain high ethical standards.

**DEFINITIONS:**

- **Corruption -** Acts involving the misuse of authority by police officers in a manner designed to produce personal gain for the officer or others.

- **Supervisor -** Employees having day-to-day responsibility for management and oversight of subordinates and/or are responsible for commanding a work element.

**PROCEDURES:**

**Establishment & Maintenance of Professional Standards:**

- *Philosophy, Goals, and Values:* Meridian Public School District Campus Police Department periodically reviews, and updates our statement of goals, values, and general philosophic approach to law enforcement. These statements appear throughout this policy manual and are constantly reinforced.

- *Code of Ethics:* We periodically review, and update if necessary, our *code of ethics.* Each employee is provided with a personal copy of the *code of ethics*, which is contained in this manual.

- *Rules of Conduct:* The Rules of Conduct are included in the policy manual. All employees are required to read, understand, and follow these rules.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

| Law Enforcement Policies and Procedures, 2.14 Corruption Prevention |
|---|

Employees are instructed to seek answers from their supervisors regarding any question regarding *corruption, ethics, procedural*, or *personal conduct.*

**Proactive Prevention Measures:**
The Chief is responsible for managing corruption responsibilities that include:

1. Reviewing citizen and internal complaints for indicators of misuse or abuse of police powers for personal gain.
2. Reviewing the findings of internal affairs investigations for patterns that are indicative of corrupt behavior.
3. Reviewing duty assignments to ensure that periodic rotations occur consistent with agency policy.
4. Investigating citizen complaints in which corruption is suspected.
5. Consistent with applicable laws, codes, and policy, reviewing regular and overtime pay, and off-duty income to determine instances of corruption.
6. Reviewing the findings of inspection reports to identify indicators of corruption.
7. Providing effective means for citizens and employees to report behavior indicative of corruption.
8. Providing reports to the community with regard to the number of corruption cases investigated and the number sustained.
9. Providing public education necessary to promote citizen awareness of corruption prevention.

**Responsibilities of Supervisors:**
Supervisions play a key roll in deterring corruption by:

1. Setting a high moral and ethical standard and example.
2. Being held reasonably accountable for corruption that occurs within their area of supervision or command.
3. Reporting suspicious employee behavior that may indicate corruption, whether on and off-duty activities.
4. Knowing that higher-level supervisors are reviewed when subordinates are charged with corruption violations.
5. Knowing and supporting that internal affairs investigations direct a reasonable portions of inspections toward discovering corruption violations.
6. Rotating assignments in their units to broaden officers' experiences and discourage patterns of corruption.

**Responsibilities of Higher Level Supervisors – School Resource Officers:**
Command level officers must:

1. Set the example for subordinates by word and deed. Corruption violations on the part of managers must be vigorously prosecuted.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.14 Corruption Prevention

2. Monitoring the activities of their subordinate supervisors with special regard to supervisors' concern for responsibility and integrity within respective units.
3. Conduct the recruitment, selection, and training processes with an acute awareness that integrity in the workplace correlates with the quality of the employees.
4. Conduct training in corruption prevention, ethics, integrity, and professional standards for all levels of the agency.
5. Establish a process to recognize employees who exemplify high ideals, integrity of service, and the professionalism of the agency.

**Responsibilities of All Employees:**

Everyone is expected to avoid situations where a temptation to conduct or condone corrupt behavior is likely to occur. Employees are responsible for providing timely information to their supervisors or command-level officers when they suspect or know of corrupt practices.

**Specific and Critical Procedures - Narcotics Enforcement:**

1. Two or more officers should be present during any arrest resulting from a drug incident.
2. Evidence is secured and processed strictly in accordance with agency practices, to include the securing of all suspected controlled substances, money, and other valuables in sealed containers under the security of two or more officers.
3. Inventory of all seized items is conducted with two or more officers, who signify by signed affidavit that all items seized are accounted for.
4. Officers never retain possession of controlled substances, money, or other seized valuables beyond the end of their assigned shift.
5. An unguarded law enforcement vehicle is not a secure location for seized items.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Rules of Conduct | **Policy Number:** 2.15 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**   *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Employees of Meridian Public School District Campus Police Department conduct themselves professionally and responsibly at all times in order to uphold the trust and confidence placed in them by the community.

**DISCUSSION:**

A key ingredient of the law enforcement service we provide is maintaining the trust and confidence of the residents that we serve.  We recognize that officers and employees of the Meridian Public School District Campus Police Department are *high profile* members of our community, and as such are subject to constant scrutiny. As a result, officers and employees must always strive to set an exemplary model of citizenship. This often means using restraint, avoiding conflict, and working well with the public.

For purposes of this policy, the use of such terms *officers, employees, members, or associates*, applies to all employees of the Meridian Public School District Campus Police Department.

**PROCEDURES:**

**General Guidelines:**
Employees follow both the spirit and content of the rules and policies established by this agency, and encourage compliance by fellow officers and employees. Command and supervisory staff are the role models and are expected to demonstrate leadership and set exemplary standards.

**Section One - Obedience to Orders, Rules, & Laws:**

1.1   Obedience to Rules of Conduct

All sworn and civilian employees are governed by the following general rules of

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.15 Rules of Conduct

conduct. Violations of any of these rules are considered sufficient cause for disciplinary action up to and including dismissal.

## 1.2 Obedience to Laws

Officers and other employees must abide by the laws of the United States, the state of Mississippi, and the ordinances or resolutions of Meridian Public School District.

## 1.3 Adherence to Meridian Public School District Campus Police Department Rules

Officers and employees abide by the personnel policy and the general, special, and tactical orders, rules of conduct, and other properly issued internal directives of the agency.

## 1.4 Insubordination

Officers and employees promptly obey all lawful orders and directions given by supervisors and radio dispatchers. The failure or deliberate refusal of officers and employees to obey such orders is insubordination. Flouting the authority of a superior by displaying obvious disrespect or by disputing orders is likewise insubordination.

## 1.5 Issuance of Unlawful Orders

No supervisory officer or employee will knowingly or willfully issue an order that violates a federal or state law, Meridian Public School District ordinance or resolution, or an agency rule or policy.

## 1.6 Obedience to Unjust or Improper Orders

If an officer or employee receives an order believed to be unjust or contrary to ethics, policies and procedures of the agency, or contrary to the rule of law, he must first obey the order to the best of his ability and then may appeal the order to the Chief.

## 1.7 Obedience to Unlawful Orders

No officer or employee is required to obey an order that is contrary to the laws of the United States, the state of Mississippi, the ordinances or resolutions of the Meridian Public School District, or policies established by this agency. If an officer or employee receives an unlawful order, he will report in writing the full facts of the incident and his action to the Chief thru the chain of command.  If the order is perceived as dangerous, or places others at risk, the officer or employee receiving the order will seek immediate clarification from the next higher supervisor available before acting.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

1.8     Conflict of Orders

If an officer or employee receives an order that conflicts with one previously given him/her by a superior officer or employee, the officer or employee receiving the order shall respectfully point this out to the superior officer or employee who gave the second order.  If the superior officer or employee giving the second order does not change the order in a way that eliminates the conflict, the second order stands and is the responsibility of the second superior officer or employee.  If the second superior officer or employee so directs, the second order is obeyed first.  Orders are countermanded when necessary for the good of the agency, and accomplishment of the mission.

1.9     Duty to Read, Understand, and Comply with Orders

Failure to read and comply with laws, rules and regulations, general and special orders, policies and procedures of the agency, or written or verbal orders of a supervisor is prohibited. It *is neglect of duty* to fail to inquire of a supervisor the meaning or application of any directive, policy and procedure, or order that is not clearly understood.

1.10    Issuance of Orders

Orders from supervisors to subordinates are addressed in professional, clear, understandable *English*; civil in tone, and manner; and, issued in pursuit of official business.

1.11    Conduct Unbecoming

Conduct that adversely affects efficiency, erodes public respect, or reduces confidence in government service is unbecoming and is prohibited.  Examples of such conduct include, but are not limited to:

   a. Fraud in securing employment;
   b. Filing a false, incomplete, or misleading report or record;
   c. Giving a knowingly false or misleading location, description of event, or other information during a radio, telephone, or verbal report;
   d. Conviction of any felony or of a misdemeanor involving moral turpitude, or the entry of a plea *of no lo contendere* to either;
   e. Misuse of government funds or property;
   f. Falsification or misuse of government records, including application forms, time and financial records, incident reports, case files, or personnel;
   g. Reporting to work or working under the influence of alcohol or substances that impair job performance, or the use of such substances during working hours; except prescribed medication that does not adversely affect the ability

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 3 of 16

Law Enforcement Policies and Procedures, 2.15 Rules of Conduct

to perform assigned work tasks;

h. Instigation of, participation in, or leadership of a *strike, sit-down, stay-in, sympathy strike, walk-out, slow-down, sick-out*, or any other interference with normal, efficient workflow;

i. Concealment or failure to report any employment, ownership interest, or personal activity in conflict with the legitimate interests of the Meridian Public School District;

j. Engaging in infamous, notorious, or disgraceful conduct that adversely affects the Meridian Public School District legitimate interests;

k. Collecting a debt or conducting private business while on-duty or assigned to duty;

l. Insubordinate, rebellious, disruptive, harassment, or disrespectful behavior toward other employees or government officials; or

m. Fighting.

## Section Two - Attention to Duty:

2.1   <u>Performance of Duty</u>

Officers and employees are to be attentive to their duties at all times, and perform all duties ascribed to them even if such duties are not specifically assigned to them in any rules or procedures.

2.2   <u>Duty of Supervisors</u>

Supervisors enforce the ethics, codes, rules, regulations, policies, and procedures of the agency.  They do not permit or otherwise fail to prevent, violations of these important documents and practices. They take immediate action to correct deficiencies, or report violations to their immediate superiors without delay.  When possible, they actively prevent such violations or interrupt them as necessary to ensure efficient, orderly operations.

2.3   <u>Truthfulness</u>

Officers and employees will not knowingly give any false or misleading information concerning the duties, responsibilities, or actions of the agency or any member thereof, nor withhold any information that is their duty to report, nor falsify any official documents.

2.4   <u>Conduct and Behavior</u>

Officers and employees, whether on-duty or off-duty, follow the exemplary and reasonable rules of good conduct and behavior and will not commit any act in an official or private capacity tending to bring reproach, discredit, or embarrassment to their profession, the agency.  Officers and employees follow established procedures

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

in carrying out their duties as law enforcement officers and employees of the agency.

### 2.5 Responsibility to Serve the Public

Officers and employees consider it their duty to be of service to all students, staff and/or general public; and to render that service in an impartial, considerate, professional, and patient manner. Officers and employees promptly serve the public by providing direction, counsel, and other assistance that does not interfere with the discharge of more critical law enforcement duties.

### 2.6 Respecting the Rights of Others

Officers and employees respect the rights of others and do not engage in discrimination, oppression, or favoritism.  Officers and employees must maintain a strictly impartial attitude toward complainants and violators.  Use of profane, demeaning, or insulting language will not be tolerated, nor will disrespect for the political or religious views of others be accepted.

### 2.7 Officers Always Subject to Call of Duty

Officers respond to lawful orders of supervisors and to the call of citizens in need of law enforcement assistance while on any MPSD Campus. Off-duty officers are expected to take prompt and proper action when human life is perceived to be in danger. Officers and employees are subject to call twenty-four (24) hours a day and may be recalled from vacation, leave, or off-day whenever necessity demands.

### 2.8 Reporting for Duty, & Relief from Duty

Officers and employees must promptly report for duty properly prepared at the time and place required by assignments, subpoenas, or orders.  Officers and employees must remain at their posts or place of assignment until properly relieved by another officer or employee or until officially dismissed by a supervisor.  It is the relieving officers' and employees' responsibility to locate and meet with the officer or employee he/she is relieving. The officer or employee who is being relieved has the responsibility to pass onto his relief any and all pertinent information. The relieving officer or employee must assist the officer or employee he is relieving in any way possible so as to expedite the relief and complete the officer or employee's tour of duty in a timely way.

### 2.9 Availability While on Duty

Officers and employees, while on duty, may not conceal themselves or maintain a hidden or low profile except for some assigned law enforcement purpose. Officers and employees will keep themselves immediately and readily available at all times

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

while on duty.

## 2.10   Prompt Response to All Calls

Employees must respond to all dispatched assignments without argument and unnecessary delay. No officer will fail to aid, assist, or protect a fellow officer, employee, or citizen to the fullest extent of his or her professional capabilities. Calls are answered in compliance with policy and traffic laws.

## 2.11   Duty to Report All Crimes and Incidents

Officers and other employees must promptly report all serious crimes, emergencies, incidents, dangers, hazardous situations and relevant information that come to their attention. Officers and employees may not conceal, ignore, or distort the facts of such crimes, emergencies, incidents, and information.

## 2.12   Responsibility to Know Area of Jurisdiction

Officers and other employees know the boundaries of the Meridian Public School District and must be familiar with the names of schools and buildings within those boundaries. Officers and employees must also be familiar with the names of as many students and staff as possible.

## 2.13   Sleeping on Duty

Officers and employees must be alert throughout their tour of duty. Sleeping or napping while on duty is strictly forbidden.

## 2.14   Assisting Criminals

Officers and employees do not communicate in any manner, directly or indirectly, any information that may delay an arrest or enable persons suspected of criminal acts to escape an interview, interrogation, arrest, or punishment. Nor will officers or employees dispose or convert to their own use any property or goods seized or taken from a suspect, or destroy evidence of unlawful activity.

## 2.15   Reading on Duty

Officers and employees must not read newspapers, books, or magazines while on duty and in the public view unless authorized by a supervisor.

## 2.16   Studying on Duty

Officers and employees must not engage in any studying activity during their regularly assigned working hours that are not directly related to their current job

This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 6 of 16

assignment unless specifically authorized by their supervisor.

### 2.17   Maintaining Communications

Officers must be directly available by normal means of communication while they are on duty or officially on-call, and will promptly respond when called. On-duty officers must maintain radio communications with the agency dispatcher while he/she is on-duty and radio equipped. Should an officer experience a technical malfunction with communications equipment, immediately report the condition and replace or repair the equipment as soon as practical. The use of personal communications devices such as cellular phones, or pagers, is approved – if the numbers of such devices are recorded and accessible by the dispatcher.  Personal use of personal communications devices for other that law enforcement duties is to be limited while on duty.

### 2.18   Keeping Notes on Law Enforcement Activities

Officers and employees are required to maintain written notes on law enforcement matters such as calls, arrests, and other activities to the extent that they may later complete official reports and accurately testify in official proceedings. Officers are not required or encouraged to keep personal notes after the data in the notes have been entered into an official report. The written report is the record of choice.

### 2.19   Completing Official Reports

Unless otherwise directed, officers and employees must promptly submit all reports completed prior to going off duty. All reports, forms, memoranda, citations, or other papers utilized in this agency are completed in ink, computer printed, or typed. Special projects may require deviation from this requirement.

### 2.20   Reporting Accidents, Injuries, & Discharge Events

Officers and employees must immediately report the following types of accidents and injuries:

a.  On-duty traffic accidents in which they are involved.
b.  Personal injuries received in the line of duty no matter how small in nature.
c.  Personal injuries not received in the line of duty but which are likely to interfere with performance of law enforcement duties.
d.  Property damage or injuries to other persons that resulted from the performance of his/her law enforcement duties.
e.  Every discharge of a firearm, less than lethal weapon, except when engaged in agency training exercise, firearms qualifications, or sporting event.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.15 Rules of Conduct

2.21   Reporting Address and Telephone Number

Officers and employees must have a working telephone at their residence and must register their correct residence address and all telephone numbers with the law enforcement agency. This includes cellular phones. Any change in address or cellular number must be reported immediately.

2.22   Testifying in Official Investigations

Officers must cooperate fully, make statements, or furnish materials relevant to an official internal or criminal investigation as required.

2.23   Overtime

Authorized supervisors must approve overtime requests prior to the actual work beginning.

2.24   Duty to be Prompt and Punctual

Employees and officers must be prompt and punctual when reporting to their official duties or assignments.

2.25   Remaining at Duty Station

Employees and officers are required to remain at their duty assignment unless and until they are properly relieved. Absence from assigned workstation or duty without permission is prohibited.

2.26   Excessive Absenteeism

Habitual or patterned use of sick leave or leave without pay, not supported by competent medical evidence or other proof of necessity is prohibited.

2.27   Prohibited Association & Frequenting

Associating with people, organizations, or places known or suspected to be involved in criminal activity is prohibited unless necessary for law enforcement business.

2.28   Subversive Organizations

Officers and employees may not knowingly be members of, or affiliated with, any subversive organization whose avowed purpose advocates the overthrow or disruption of the lawful function of any federal, state, county, or municipal government.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.15 Rules of Conduct

2.29   <u>Duty with Regard to Civil Proceedings</u>

No employee may initiate any civil proceedings arising out of a law enforcement activity without first notifying The Chief.  Private civil actions that have no connection with a member's agency position or official action are not within the scope of this rule.

2.30   <u>Supplies or Services</u>

Officers and other employees may not use agency supplies or resources for personal use. The use of the time, authority, facilities, equipment, or supplies of the Meridian Public School District for private gain or advantage is prohibited.

2.31   <u>Bulletin Boards</u>

Employees and officers will regularly read and comply with notices posted on official bulletin boards and/or emails maintained at the direction of the Chief.

2.32   <u>Refrained from Conducting Personal Business While On-Duty</u>

Employees may not conduct personal business while on-duty without prior approval from their supervisor.

2.33   <u>Use of Tobacco Products</u>

Use of tobacco products while in any Meridian Public School District building, vehicle, or at any time while in personal contact with students, staff and/or the public is prohibited. This policy does not apply to designated smoking areas at government or other public buildings.

2.34   <u>Harassment Reporting & Protection from Retaliation</u>

Persons reporting any form of harassment, discrimination, or unethical conduct are protected to the full extent allowed by law. No employee or officer reporting legitimate harassment, discrimination or unwarranted conduct will be subject to retaliation in any form.

**Section Three - Cooperation with Fellow Employees & Agencies:**

3.1   <u>Respect for Fellow Officers & Employees</u>

Employees and officers treat other employees or officers with respect, as they would prefer to be treated.  Each member of the Meridian Public School District Campus Police Department is courteous, civil, and respectful of their superiors and work associates.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Command and supervisory personnel support subordinates in their actions and orders when they can do so reasonably. They avoid censuring subordinates in the presence of others and may not injure or discredit those under their authority by intentional or abusive conduct. This does not prohibit informal oral reprimands or constructive criticisms directed to a subordinate. Any acts of counseling, disciplining, complaining, or criticizing is most effective if done positively and constructively in an appropriate setting.

### 3.2    Supporting Fellow Employees

Employees and officers must cooperate, support, and assist each other at every opportunity. Employees may not maliciously criticize the work or the manner of performance of another. It is the duty of every officer and employee to refrain from originating or circulating any malicious gossip to the intended detriment of the agency or any member thereof.

### 3.3    Case or Operations Interference

Officers and employees may not interfere with cases assigned to others without receiving clearance from the officer to which the case is assigned or as directed by a supervisor. Should interference occur, the assigned officer must submit a written report to his immediate supervisor.

### 3.4    Cooperation with Other Agencies

Officers and employees of the agency must cooperate with all governmental agencies by providing whatever aid or information such agencies are legally entitled to receive. Any doubts will be passed to a supervisor for approval, before cooperation is rendered.

### 3.5    Disclosing Information Relating to Law Enforcement Activities

Discussion of operations and official business of the agency is prohibited outside of those authorized individuals that have a *need to know.*

### 3.6    Misconduct Known to Personnel

Failure to correct and report an employee's violation of a law, rule or regulation, policy or procedure, or a general or special order is prohibited. Reports are made to the next level supervisor, unless the supervisor is known or suspected to be involved in the alleged misconduct.

## Section Four - Restrictions on Behavior:

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.15 Rules of Conduct

4.1 <u>Interfering with Private Business</u>

Employees of the agency will not interfere with the lawful business of any person.

4.2 <u>Use of Intimidation</u>

Officers and employees may not use their official positions to interfere, intimidate, or support persons engaged in a civil controversy.

4.3 <u>Soliciting and Accepting Gifts and Gratuities</u>

Unless approved in writing by the Chief, officers and employees of the agency will not solicit or accept any *reward, gratuity, gift, or compensation* for services performed as a result of their relationship with the agency. This *restriction applies regardless of whether the service was performed on-duty or* off-duty.

4.4 <u>Soliciting & Accepting Gifts from Suspects, Detainees, or Offenders</u>

Officers and employees are strictly prohibited from soliciting or accepting any *gift, gratuity, loan, fee* or other item of value, or from *lending* or *borrowing*, or from *buying* or *selling* anything of value from or to any suspect, offender, defendant or other person involved in any case, or other persons of ill repute, or professional bondsmen, or other persons whose vocations may profit from information obtained from law enforcement.

4.5 <u>Reporting Bribe Offers</u>

If an officer or employee receives a bribe offer, he must immediately make a written report and submit the report his immediate supervisor.

4.5 <u>Accepting Gifts from Subordinates</u>

Without approval from the Chief, employees may not receive or accept any gift, reward, or gratuity from subordinates.

4.6 <u>Giving Testimonials and Seeking Publicity</u>

As it may pertain to their employment with the agency, officers, and employees will not give testimonials or permit their names or photographs to be used for commercial or political advertising purposes.  Officers and employees will not seek personal publicity either directly or indirectly in the course of their employment.

4.7 <u>Soliciting Business</u>

Officers and employees will not solicit subscriptions, sell books, papers, tickets,

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.15 Rules of Conduct

merchandise or other items of value nor collect or receive money or items of value for any purpose while on duty unless specifically authorized in writing by the Chief.

4.8     Intoxication

Officers and employees will not be under the influence of any intoxicating beverage or substance during their tour of duty or immediately prior to their tour of duty. Nor will officers and employees be intoxicated off duty while in the public view.

4.9     Drinking While in Uniform or On–Duty

Officers or other employees will not consume alcoholic beverages while in uniform, on-duty, on government property, or in an official vehicle of this agency unless specifically authorized to do so in the course and scope of a clandestine investigation.  Officers and other employees will not drive or operate motor vehicles within eight hours after consuming alcoholic beverage(s).

4.10    Liquor on Official Premises

Officers and employees will not bring containers of intoxicating beverages into a building or a vehicle except as *properly sealed and marked* as evidence in a criminal or juvenile case.

4.11    Entering Bars, Taverns, & Liquor Stores

Other than for the purpose of performing their official duties, officers and employees on duty or in uniform will not enter or visit any bar, lounge, parlors, club, store, or any other establishment whose primary purpose is the sale or on-premise consumption of alcoholic beverages. Officers and employees on duty or in uniform will not purchase alcoholic beverages, except as part of a documented investigation.

4.12    Playing Games on Duty

Officers and employees on duty or in uniform will not engage in any game of cards, billiards, pool, chess, dominoes, electronic, or other games.

4.13    Political Activity

Officers and employees will not participate (e.g., make political speeches, pass out campaign or other political literature, write letters, sign petitions, actively and openly solicit votes) in political campaigns while on duty or in uniform. All employees who have *classified* status as defined by state law are expected to be familiar with the prohibitions and the exceptions to those prohibitions imposed upon classified employees relative to partisan political activities. No classified employee will engage in any partisan political activity prohibited by statute.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.15 Rules of Conduct

4.14   Seeking Personal Preferment

Officers and employees will not solicit petitions, influence, or seek the intervention of any person outside the agency for purposes of personal preferment, advantage, transfer, advancement, promotion or change of duty status for themselves or any other person.

## Section Five - Identification and Recognition:

5.1   Giving Name and Badge Number

Officers and employees must give their names, badge number, and other pertinent information to any person requesting such facts.  Exceptions are those conditions when doing so would jeopardize the successful completion of a law enforcement assignment, or when requested to do so by a prisoner.

5.2   Carrying Official Identification

Officers must have official law enforcement identification available at all times unless involved in sanctioned *covert activities*, engaged in athletic or physically challenging activities.

5.3   Personal Cards

Business cards showing connection to the agency are approved by the Agency

5.4   Exchange, Alteration, or Transfer of Badge, Patch, or Logo

The official badge, patch, or logo of the agency will not be altered, transferred, or exchanged except as authorized by the Chief. The exception to this practice is the exchanges of patches, or lapel pin badges with other law enforcement agencies.

## Section Six – Maintenance & Use of Meridian Public School District Property:

6.1   Use of Meridian Public School District Property or Service

Officers and employees will not use or provide any Meridian Public School District equipment or service other than for official Meridian Public School District business unless specifically authorized by the Chief.

6.2   Responsibility for Meridian Public School District Property

Each officer or other employee is responsible for keeping all agency equipment clean and in good working order.  Careful effort is made to protect property from

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.15 Rules of Conduct

loss, damage, or destruction. Employees deemed responsible for the loss or damage of issued items may, in addition to any other disciplinary action may be required to compensate the agency for the loss or damage.  Any equipment that becomes damaged or lost is immediately reported in writing.

## 6.3   Reporting Needed Repairs

Officers and employees must promptly report the need for repair of Meridian Public School District-owned property to their supervisor.  This includes needed repairs to safety equipment and vehicles.

## 6.4   Responsibility for Private Property

Officers and employees are responsible for protecting private property or equipment that has come into their possession by reason of their office against loss, damage, or destruction. The agency assumes no responsibility for any personal property of the officer's in case of loss or damage.

## 6.5   Care of Quarters

Officers and employees keep their offices, vehicles, lockers, and desks neat, clean, and orderly.

## 6.6   Property & Evidence Security

Officers and employees must tag and place all evidence in the custody of the evidence officer as soon as possible. Officers and employees will not convert to their own use, manufacture, conceal, falsify, destroy, remove, tamper with, or withhold any property or evidence held in connection with an investigation or other official action except in accordance with established procedures.

## 6.7   Alteration or Modification of Law Enforcement Equipment

Officers and employees may not use any equipment that does not conform to policy or specifications. All equipment must be carried and utilized only as issued and authorized, and no changes, alterations, modifications, or substitutions will be made to such equipment unless approved by the Chief.

## 6.8   Parking in Unauthorized or Reserved Parking Spaces

Parking in designated *handicap permit* spaces, *reserved or restricted* space, or *marked fire lanes*, unless responding to a declared emergency, is strictly prohibited.

## 6.9   Use of Communications Equipment

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.15 Rules of Conduct

The use of Meridian Public School District computers, telephones, radios, stationary, fax, mails, delivery service, or other communication devices or systems for personal use is forbidden. This includes the use of internet communications, and the downloading of material for personal use or retention.

## SECTION SEVEN: Relationships with Courts and Attorneys

7.1   Attendance in Court

Officers and other employees will arrive on time for all required court appearances and will be prepared to testify.

7.2   Recommending Attorneys or Bondsmen

Officers and other employees may not suggest, recommend, advise or counsel the retention of a specific attorney or bondsman to any person coming to their attention as a result of law enforcement business.

7.3   Testifying for a Defendant

Any officer or employee subpoenaed or requested to testify for a criminal defendant or against the Meridian Public School District or against the interest of the agency in any hearing or trial will immediately notify the Chief through the chain of command. Likewise, employees or officers subpoenaed to judicial hearings will honor said subpoena and notify their immediate supervisor in a timely manner.

7.4   Interviews with Attorneys

Interviews between an officer or employee and a complainant's [criminal] or Plaintiff's [civil] attorney about a case arising from the officer's employment by the agency is done only in the presence of or with the knowledge and consent of the Chief.

7.5   Assisting in Civil Cases

Officers and other employees will not serve civil-process papers nor render assistance in civil cases except as required by law and approved by the Chief. Officers and other employees will not volunteer to testify in any civil action arising from agency duties. Any testimony provided in civil cases, where the agency or Meridian Public School District is not a named party, will be provided by the employee or officer during off-duty time. The officer or employee providing such testimony will state in the record . . . *My appearance and testimony in this civil action, is not authorized by, connected to, or sanctioned by the Meridian Public School District Campus Police Department.*

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.15 Rules of Conduct

7.7 <u>Notice of Lawsuits Against Officers & Employees</u>

Officers and other employees who have had a suit filed against them because of an act performed in the line of duty will immediately notify the Chief in writing and furnish a copy of the complaint as well as a full and accurate account of the circumstances in question.

7.8 <u>Notice of Investigation, Arrest, or Citation</u>

Officers and employees who become the subject of citations or arrest actions will immediately notify the Chief in writing. Any officer or other employee who has reason to know they are the subject of a criminal or civil action will immediately notify their supervisor, who will in turn notify the Chief.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| **Subject:** Racial & Bias Profiling | **Policy Number:** 02.16 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department enforces the law in a proactive manner and aggressively investigates suspected violations. Enforcement actions are made in a responsible and professional manner, without the use of racial or bias based profiling.

**DEFINITIONS:**

- ***Racial or Bias Profiling*** - The interdiction, stopping, detention, or other unequal treatment of any person based on race, ethnicity, gender, sexual orientation, culture, religious affiliation, national origin, or any combination thereof. These are not factors in determining *reasonable suspicion* for a stop, or for determining *probable cause* for an arrest. This applies to both traffic and pedestrian stops. The primary factor to consider is whether *an observable offense was committed.*

- ***Race or Ethnicity*** – Of a particular decent, including, but not limited to, Caucasian, African, Hispanic, Asian, or Native American

- ***Pedestrian Stop*** – An interaction between an officer and an individual who is being temporarily detained for the purpose of a criminal inquiry in which the individual is not under arrest.

- ***Traffic Stop*** – An officer who stops a motorist for a violation of a law or traffic violation.

**Examples of Bias Based Profiling may include**:
1. Stopping a particular driver who is speeding in a stream of traffic where other drivers are speeding because of the driver's apparent race, ethnicity or national origin.

2. Detaining the driver of a vehicle based on the determination that a person of that race, ethnicity, gender, sexual orientation, culture, religious affiliation, or national

**RESTRICTED LAW ENFORCMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this department.
Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 2.16  Bias & Racial Profiling

origin is unlikely to own or possesses that specific make or model of vehicle.

3. Detaining an individual based on a bias profile that an individual does not belong in a specific area or place.

**Two Principles for a Law Enforcement Agency:**
1. Officers of this agency do not use racial stereotypes as factors in selecting whom to stop and search. However, officers may use *race* in conjunction with other known profile factors

2. Race or ethnicity is not normally a profiling factor as it pertains to witness or victim credibility.

**GENERAL PROVISIONS:**

1. Two fundamental rights guaranteed by the United States Constitution and Constitution of this State are *equal protection under the law* and *freedom from unreasonable searches and seizures* by government agents.

2.  Employees of this agency do not engage in bias based profiling.

3. This policy does not inhibit or preclude officers from offering assistance to anyone who appears to be in need of assistance, ill, lost, or confused.

4. This policy does not inhibit or preclude officers from stopping someone suspected of suspicious activity, violation, breach of the peace, or crimes based upon observed actions and/or information received about the person's actions.

**COMPLAINT INVESTIGATION:**

Complaints alleging racial or bias based profiling are taken seriously by this agency. The taking of a complaint, investigating, and final disposition are processed in accordance with policy *Internal Compliance Enforcement – ICE*.

**RESTRICTED LAW ENFORCMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this department.
Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Workplace Harassment | **Policy Number:** 3.01 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Employees strive to maintain and promote a productive working environment free of harassing or disruptive conduct. All employees promptly correct and/or report to management any harassment, disruptive, or inappropriate conduct.

No form of harassment or discrimination is tolerated, including harassment because of, or by inappropriately emphasizing an individual's *race, national origin, religion, disability, pregnancy, age, military status, gender, sex or sexual orientation.*

**DEFINITIONS:**

- ***Harassment, harass, harassed*, *harassing*, *harasses*** - 1. To irritate or torment persistently.  2. To wear out; exhaust.  3. To impede and exhaust an adversary with repeated attacks or raids.

- ***Sexual harassment*** - Unwanted and offensive sexual advances or sexually derogatory or discriminatory remarks, as those made by an employer to an employee, employee to employer, or employee to employee, or the creation of a sexually objectionable environment.

- ***Workplace*** *also* ***work place* -** 1.  A place, such as an office or a factory, where people are employed.  2. The work setting in general.  3. For law enforcement this includes any area, place, or when and where on duty, to include authorized secondary employment where the officer is performing security or law enforcement services, or any activity taken in the course of employment or under the color of law.

- ***Supervisor* -** Any person empowered to make economic decisions, or, decisions affecting the terms, privileges or conditions of employment for other employees under his/her control.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.01 Workplace Harassment

**PROCEDURE:**

**Sexual Harassment:**

Although no form of harassment or discrimination is to be tolerated, *sexual harassment* is also specifically and expressly prohibited.

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment.  When submission to or rejection of such conduct is made a term or condition of employment (expressly or implicitly), or when such conduct unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive working environment.

Sexually harassing conduct includes, but is not limited to the following actions:

1.  Unwelcome sexual flirtations, propositions, offensive touching, or comments on a person's physical characteristics;
2.  Verbal abuse of a sexual nature to include:

    a.  Repetitive use of offensive words of a sexual nature describing body parts or a sexual act; or,
    b.  Telling suggestive ("dirty") stories.

3.  Conversation between employees about subjects which are sexual in nature and perceived as offensive;
4.  Displaying in the workplace sexually suggestive objects, pictures, pornographic magazines, or representations of any action or subject of a sexual nature which can be perceived as offensive; or
5.  Retaliation against employees for complaining about sexually harassing behavior.

Offensive conduct between members of the same gender may constitute harassment, as well as conduct between members of the opposite sex.

**Other Forms of Harassment:**
Forms of harassment or discrimination other than sexual harassment include slurs and other verbal or physical conduct relating to an individual's race, national origin, religion, disability, pregnancy, age, military status, gender or sexual orientation, which creates an intimidating, hostile, or offensive working environment or otherwise adversely affects an individual's employment opportunities.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.01 Workplace Harassment

**Reporting Requirement:**
1. Any employee, who believes that he or she has been subjected to unlawful or inappropriate harassment or discrimination, or has witnessed such conduct while on the job, *must* immediately report the incident to his or her supervisor.

2. If the supervisor is the subject of the alleged complaint, or *if for any reason* the employee does not wish to report such an incident to their supervisor, the employee will immediately report the matter directly to the School Resource Officer.

3. In the event the employee alleges that the School Resource Officer is the subject of the complaint, the report will be made directly to the Chief.

4. In the case the Chief is the subject of the complaint, the report will be made to the Superintendent or Meridian Public School District Human Resources Department.

5. If the employee is unsatisfied with the response at any level, the employee may request the decision be reviewed at the next higher level.

6. In the event the alleged offender is a *Student,* or *Member of Staff* under the control of a School or Meridian Public School District authorities, the Student or Member of Staff's Principal or Supervisor, will take immediate action to stop the harassment action, and report the matter to the controlling agency authority.

**Retaliation:**
Retaliation is forbidden. The Chief does not tolerate any form of retaliation against employees availing themselves of the responsibility to report harassment. The reporting requirement should not be construed, however, as preventing, limiting, or delaying the Meridian Public School District Campus Police Department from taking disciplinary action against any individual, up to and including termination.

This agency does not permit or condone any acts of retaliation against anyone who files legitimate harassment complaints or cooperates in the investigation of such complaints.

**Investigation of Complaints:**
All reported incidents of harassment alleged against an officer, employee, or authorized visitor to the agency are timely investigated by the Chief or designee.

Complaints against fellow employees are treated *confidentially* to the extent that a thorough investigation reasonably allows. Statements of the complaining party and key witnesses are completed on official *witness statement* forms, signed, and witnessed. Prior to any signing,

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.01 Workplace Harassment

each complainant, witness, or subject of an investigation are reminded of the perjury laws of the state, and the consequences of filing a false report. Any individual determined to be a *criminal suspect* is read their *Miranda Warning*, prior to any interrogation.

**Disciplinary Action:**
A violation of this policy may be grounds for disciplinary action, including but not limited to *warning, suspension, discharge, demotion, transfer,* or *probation.* The Chief may also impose other remedial actions including but not limited to *counseling, training, treatment, placing of conditions on continued employment,* and *criminal referral.*

If it is concluded that a complaint or report of harassment was intentionally or knowingly false or that information provided in an investigation was intentionally or knowingly false, the individual(s) providing such false complaint, report, or information are subject to disciplinary action, and possible criminal charges for *filing a false or misleading police report* or *official document.*

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Drug-Free Workplace Program | Policy Number: 3.02 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority<br>Title and Signature:  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department strives to maintain a workforce free from the influence of drugs and other mind altering chemicals.

**PROCEDURE:**

The Chief or designee, has responsibility for the operation of this program, and is the manager of the drug-free workplace program.

Meridian Public School District Campus Police Department operates as a *drug-free workplace*, and employees are expected to remain free from the influence of illegal drugs, abusive reliance on all prescription and non-prescription drugs, and inappropriate alcohol intake. Abstinence from illegal drug use or the excessive use of alcohol is an important requirement for continued employment with this agency.

Employees are prohibited from using or distributing any drug, alcohol, or other controlled substances while on duty, or prior to reporting for duty, if the substance used will in any way affect their mental capacity, or physical ability.

Illegal substances and drugs may be handled in the course of official duties relating to the searches, execution of a warrant and/or incidental to arrests. In each case the substance or evidence seized is controlled and disposed of according to established procedures. Officers and employees are not authorized to possess drugs and illegal substances beyond the time and means that it takes to record and turn-over such items into the evidence room or locker.

**Medications:**
Employees taking prescribed medication that could interfere with proper performance of their duties must notify their supervisor, prior to reporting for duty. The agency may require a written physician's statement verifying the effect of any medication on the employee's ability to perform assigned duties.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.02 Drug-Free Workplace Program

Medications that are the property of staff and have been approved for use on premises will not be stored in any area accessible to any other individual, other than that staff member.

**Testing and Treatment:**

As a result of behavioral observations or random sampling (unless such sampling is otherwise prohibited), employees may be required to submit to drug or alcohol testing as part of the drug-free workplace policy. Employees who are found to be substance-dependent through this and other non-voluntary means may be terminated. Employees who identify themselves to supervisory staff, as *substance-dependent* may be placed on leave without pay, or assigned less critical duties, and referred for counseling and treatment. Resumption of duty is contingent on successful completion of a course of treatment, and may entail a regular drug-testing regime for a period of one [1] year after resumption of duties.

**Criminal & Other Remedies:**

Any officer suspected of possession, or delivery of a controlled substance [or any other medication or mind altering substance] to anyone will be investigated. If found to be in violation of agency policies or the law, the individual officer or employee will be disciplined and prosecuted to the full extent of the law.

**Notification:**

Employees will be notified of the provisions of this policy upon employment with the agency and may be required to sign an acknowledgement.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Training & Proficiency Testing | **Policy Number:** 3.03 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department provides meaningful training that meets or exceeds minimum training requirements mandated by the state to ensure that they and other employees maintain the skills necessary to efficiently and effectively carryout their duty assignments.

**DEFINITIONS:**

- ***Demonstration -*** The act of showing or making evident.

- ***Demonstration of Proficiency -*** Showing through actually performing the task, that the individual is competent.

- ***Proficiency -*** The state or quality of having competence in the performance of a task.

- ***Testing -*** A procedure for critical evaluation; a means of determining the presence, quality, or truth of something.

**DISCUSSION:**

Training is one of the most important activities in any law enforcement agency. Training serves three broad purposes.  First, trained officers are generally better prepared to act decisively in an ever-widening range of situations. Second, effective training results in greater productivity and effectiveness. Third, it fosters cooperation and unity of purpose. An officer's performance is often a direct reflection of the quality and quantity of training.

Adult learning fostered by Meridian Public School District Campus Police Department relies as much as possible on stated learning objectives and testing that allows officers and employees the opportunity to show what they know, and not just answer questions on a testing sheet. We call this *demonstration of proficiency.* Periodically, you will be

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.03 Training & Proficiency Testing

asked and required to show that you can perform or demonstrate mastery of critical tasks.

**PROCEDURES:**

**Goals:**
The goals of the Meridian Public School District Campus Police Department training program include:

1. Meeting mandatory and in-service training requirements;
2. Maintaining better educated, more professional personnel;
3. Each officer receiving no less than forty hours in-service training each calendar year;
4. Maintaining officer *demonstrated proficiency* levels regarding key enforcement tools and procedures such as:
   a. Firearms
   b. Handcuffs and other restraint devices
   c. Emergency vehicles
   d. Cultural diversity
   e. Interviews of witnesses
   f. Interrogations of suspects & constitutional warnings
5. Efficiently and effectively accomplishing agency objectives;
6. Improving law enforcement and community relations;
7. Training in specialized areas of law enforcement;
8. Uniformity of service, response capabilities, and comprehension by employees;
9. Improving officer verbal, and non-verbal communications skills; &
10. Legal updates once a year or as enacted by the state's legislature.

**Objectives:**
General program objectives for training are as follows:

1. Familiarize new employees with the agency facilities and physical plant;
2. Inform new employees of Meridian Public School District Campus Police Department mission and institutional goals;
3. Instruct new employees in agency policies, procedures, and programs;
4. Provide all officers with any mandated specific training;
5. Ensure all officers receive no less than forty hours of in-service training each calendar year;
6. Provide FTO & OJT training to enhance staff understanding and performance;
7. Maintain better educated, more professional personnel;
8. Provide employees with improved skills in their specialties;
9. Develop a motivated and highly trained staff that new employees can access and follow as mentors;
10. Develop human relations skills to aid productive, meaningful, and professional relationships with the community, or others receiving Meridian Public School

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

| Law Enforcement Policies and Procedures, 3.03 Training & Proficiency Testing |
| --- |

District Campus Police Department services;
11. Develop career opportunities within the agency; &
12. Maintain uniformity of service, response capabilities, and understanding for all officers and employees of the agency.

## Training Responsibilities:

Training is a continuous process that involves all members of the agency. The Chief is responsible for the overall training function. In order to achieve this mandate, the Chief appoints a Training Officer whose responsibilities include:

1. Conducting annual training to include analysis based input from line officers, supervisors, and staff representing internal affairs and quality assurance. Other sources such as union and insurance company representatives may also be considered.
2. Developing an annual training plan based on identified needs;
3. Developing a training budget adequate to execute the training plan;
4. Identifying, locating, and developing training opportunities, programs and instructors that meet the need;
5. Implementing and managing the plan;
6. Maintaining records of each training course conducted or sanctioned;
7. Notifying personnel, in writing, of mandatory training and *demonstrated proficiency* examinations, and other approved courses;
8. Assuring that training programs are attended by personnel as required;
9. Maintaining liaison with educational and training resources;
10. Maintaining accurate and up to date individual training records on each employee;
11. Scheduling, and making arrangements, for employees to attend training classes;
12. Setting dates for proficiency training and tests in conjunction with technical instructors [such as firearms, driving, defensive tactics and de-escalation techniques];
13. Initiating disciplinary action against any employee who fails to attend, participate, or conduct themselves in a professional manner during training;
14. Notifying supervisors of officer proficiencies that are about to lapse or have elapsed; &
15. Maintaining a *course and instructor evaluation* process allowing attendees to comment on instructional content, instructor proficiency, and relevance of the material to the job.

## Proficiency Ratings:

No officer or employee may carry or use any of the following items without having completed an initial course in its application, and periodically *demonstrating proficiency* in its application. Officers may have completed basic training in these tasks and tools during their law enforcement academy course. Officers will demonstrate proficiency with the following tools within the time-frame provided:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

| Law Enforcement Policies and Procedures, 3.03 Training & Proficiency Testing |
| --- |

1. Firearms – See and comply with Firearms Training Policy & Procedure
2. Handcuffs and other restraint devices - Every three years or as required by the state;
3. Emergency vehicles – Every five years or as required by the state;

The training coordinator is responsible for setting the dates of proficiency training, supervision of the testing, and the integrity of the *pass or fail* standards. Evaluation is on a pass or fail basis and results are recorded in each officer's training file. Refresher training will generally be provided just prior to evaluation where, and to the extent possible, officers are evaluated by a realistic practical as opposed to written examination.

Officers will be allowed three [3] attempts to demonstrate proficiency in a task. Officers who fail to pass any law enforcement course of instruction or proficiency demonstration during their tenure of law enforcement service are required to attend remedial training. Following participation in remedial training programs, training files are updated to reflect the supplemental training provided, and the results of the proficiency testing.

Officers and employees who cannot *demonstrate proficiency* in a particular necessary and mandatory task, after completion of remedial training are recommended for reassignment to other duties not requiring the particular task. Reassignment may include officer assignment to administrative, or other non-sworn duties until proficiency is demonstrated.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Firearms Training & Proficiency Demonstration | **Policy Number:** 3.04 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority** **Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

All officers or armed employees [regular, part-time, reserve, auxiliary, or guard]**,** of Meridian Public School District Campus Police Department are required, at least quarterly [every 3 months], to demonstrate proficiency with all firearm types [make, model, & caliber] they carry or have occasion to carry on duty. This includes handguns [pistol, or revolver], long guns [shotgun and/or rifle], and any secondary firearms, used as *off-duty*, or *back-up weapons.*

**DEFINITIONS:**

- ***Demonstration of Proficiency -***   The student or officer demonstrates to the satisfaction of the instructor the successful ability to carry out or accomplish the learning objective in the time and manner prescribed. In firearms training, a proficiency demonstration is not limited to just a score on target. The shooter must be able to explain the task, and repeatedly perform the task safely and efficiently in the time and under the conditions imposed.

- ***Cold Range -*** Firing range where all weapons, magazines, clips, or speed loaders are unloaded at all times, except on the verbal command of a range master, firearms instructor, or safety officer. There are no exceptions. This is a very effective method of control for basic shooters, and prior to commencement of any live fire exercise.

- ***Hot Range -***   Firing range where weapons, magazines, clips, or speed loaders are loaded at all times. This method of control requires more instructor control and officer skill. Hot range operations are most effective in teaching tactical, maneuver, and gun advanced handling techniques.

**PROCEDURES:**

**General Provisions of Firearms Training & Use:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.04 Firearms Training & Proficiency Demonstration

The following standards apply to the carrying and use of firearms in training, on-duty, and off-duty status.

1. No individual may carry or use a firearm on-duty who is not a current Certified Peace Officer, or Certified Law Enforcement Instructor.
2. No officer may carry a firearm type that is not approved by the agency, and the officer has not *demonstrated proficiency* with in the last six [6] months.
3. No officer may carry or use ammunition that has not been approved by the agency.
4. No officer is allowed to carry or use a firearm when the officer anticipates the use of, or is under the influence of potentially mind-altering chemicals including alcohol, prescription drugs, or like substances. Casual or recreational use of alcohol while armed is not permitted.
5. The exception to 1, 2, & 3 above is action taken during a *life-threatening emergency.* Exceptions based on an *emergency* declaration will be documented in writing to the officer's immediate supervisor.

**Firearms Instructor & Range Officer Qualifications:**

For purposes of this policy, the titles of *Firearms Instructor*, *Range Master, Range Officer,* and *Range Safety Officer* are interchangeable. Firearms instructors of the agency must meet the following qualifications:

1. Complete an approved *law enforcement firearms instructor course* conducted by certified instructors of a State, the National Rifle Association, or US Military.
2. Demonstrate 90% proficiency with each category of firearm carried by officers and employees of the agency.
3. Be proficient in teaching firearms safety, care and cleaning, safe storage, tactical firearms use, and weapons retention.

**Demonstration of Proficiency Guidelines:**

1. Initial qualification and annual [at least] demonstrations of proficiency include live fire training conducted at specified times at an approved firing range or location, and safe gun handling.
2. Officers wear and use the rig, holsters, weapons, and equipment they normally use on duty. For uniformed officers this includes all equipment normally worn or carried on the person. Detectives and those working primarily in civilian attire that also wear and use holsters, or other ancillary equipment will carry and use only that equipment normally carried on duty. Extra magazines, weapons, or other equipment is not allowed.
3. Officers use and have access to only the number and type of magazines, clips, or speed loads normally carried on the person during normal duty hours.
4. Officers enter the firing range as a COLD RANGE. All weapons and magazines or speed loaders are empty when entering the controlled area.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.04 Firearms Training & Proficiency Demonstration

5. Officers who wear protective body armor while on duty wear the same armor during any live fire exercises.
6. Qualified firearms instructors conduct all firearms training and proficiency demonstrations.
7. Instructors schedule off-duty courses and practice sessions prior to proficiency demonstrations that officers may attend free of cost.
8. Employees who do not qualify have the option of attending a remedial weapons course to be conducted off duty.
9. Minimum firearms proficiency demonstration score for armed employees of Meridian Public School District Campus Police Department is 80% percent of the required courses of fire. This standard applies to all firearms carried or used by individual officers.
10. Officers must also demonstrate proficiency in *tactical loading, reloading, clearing of malfunctions, safe gun handling*, and *care, and cleaning of the firearms.*
11. Officers are authorized two [2] attempts to meet proficiency standards.
12. Officers unable to demonstrate proficiency will be scheduled for a conference with the Chief. The Chief will determine if the officer is eligible for remedial training.  If remedial training is authorized, the officer will have two attempts to meet proficiency standards, after remedial training.  (?)
13. Any officer who is unable to demonstrate proficiency is not eligible to perform duties of an armed employee, and will not carry a firearm until proficiency is demonstrated. Inability to consistently and safely demonstrate proficiency with a firearm will cause the employee or officer to be reassigned or dismissed from the agency.

**Proficiency Course of Fire & Demonstration:**

The firearms instructor determines the course of fire and *demonstration of proficiency* requirements at least three months prior to the date set for firearms proficiency qualifications subject to the approval of the Chief. The firearms instructor then publishes a description of these requirements for all armed personnel to review. The firearms instructor may vary these requirements from time to time to provide officers with innovative and realistic training. *Physical movement, use of cover and concealment, and verbal command responses,* and *firearms retention practices* may also be required and/or included in training scenarios.

All shooting exercises require employees to clear *malfunctions, jams*, and *misfires* in attempts to complete the exercise in the time allotted. Supplemental ammunition reloading is allowed, but employees may not fire more than the required number of rounds.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.04 Firearms Training & Proficiency Demonstration

**Range Safety Rules and Regulations:**

1. Fire the actual weapon and the actual type and make of ammunition carried on the job.
2. Records of all approved firearms training is maintained at the agency level, with a listing of *pass* or *fail only*. Actual scores are not recorded on training records.
3. Weapons must be empty except when instructed.
4. The range officer and officers receiving the training will maintain strict discipline at all times.
5. When picking up a firearm, open the cylinder or action and check to see that it is loaded. Check the weapon a second time to assure that it is safe.
6. Do not give a firearm to anyone unless the cylinder or action is open and no rounds are in the weapon.
7. Do not anticipate a command on the range.
8. Always check the barrel of a firearm for obstructions before loading.
9. Unload when and as instructed.
10. Keep the barrel of your firearm down range in the target area at all times when in your hands.
11. Do not remove a weapon from its holster with your finger on the trigger.
12. The index finger is indexed [placed on the frame of the weapon] until the command to *fire* is given.
13. Smoking, chewing, or dipping tobacco products are absolutely prohibited while at the firing line.
14. Full attention must be given to instructions and commands of the Range Officer.
15. If a firearm is dropped or the muzzle touches the ground, notify the Range Officer immediately. Unload the weapon. Check the barrel for obstructions and follow the commands of Range Officers before resuming a firing exercise.
16. Do not let the hammer down on a live round in the firing chamber without placing your thumb in front of the hammer and releasing the pressure on the trigger.
17. In the event of a misfire, jam, or malfunction, clear the weapon immediately and attempt to complete the firing exercise in the time allowed. Loading additional rounds is permissible to accomplish the proficiency objective [in the time allowed]. Demonstration of proficiency includes prevention and recovery from malfunctions.
18. Do not go in front of the firing line until the Range Officer has given the command to *Cease Fire*, and the line has been cleared and the order to *Go Forward* has been given.
19. Dry firing on the range is prohibited except when under the supervision of the Range Officer.
20. If you are taking any type of medication or have consumed alcoholic beverages within eight (8) hours of firing a weapon, the Range Officer must be notified.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.04 Firearms Training & Proficiency Demonstration

21. Repeated violations of any Safety Rule or Regulation, whether intentional or unintentional, will result in loss of proficiency or removal from the range.

22. Ear and eye protection is required to be worn while firing a weapon during range training.  Equipment will be provided, however, employees are also allowed to use personal items.  Privately owned equipment is subject to approval by the firearms instructor.

23. Firearms instructors, regardless or rank, are in charge of the firearms training.  All officers, including superior officers, must follow the firearms instructor's commands concerning range operation, and demonstration of proficiency procedures.  The firearms instructor reports to the Chief any problems he/she might encounter as a result of this policy provision.

24. Employees attending firearms training will be attentive and cooperative in class and on the firing range.  Misconduct, horseplay, or negligence of any kind will not be tolerated.

25. Any officer has the right to challenge the scoring of his or her target.  The challenge must be made to the Range Officer at the time of the original scoring.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| **Subject:**  Discipline & Accountability | **Policy Number:** 3.05 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority** **Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Officers and civilian employees, to the best of their ability, live up to the ideals expressed in the Mission Statement, Code of Ethics, and Objective Statements of Meridian Public School District Campus Police Department. All employees will obey agency *policies and procedures*, written and verbal orders, rules, directives, and standards of conduct. Noncompliance with these goals and standards results in disciplinary action to improve individual and group performance.

**PROCEDURES:**

Discipline in law enforcement is essential to officer and employee survival, and is the determining factor in promoting a safer work environment. There are many things we can not control while performing our jobs; however, discipline is one thing we can all agree needs to be fostered and enforced.

**General Guidelines - Disciplinary Action:**

Noncompliance or violation of policy, conduct that interferes with operations which discredits the agency–or, is offensive or dangerous, is grounds for disciplinary action. Disciplinary action may be appropriate whether or not such action is specifically prohibited by *written goal, objective, policies and procedures, order, rule or directive*. This policy set does not attempt to define all errant behavior. Employees use their best efforts to comply with both the spirit and word of these guidelines.

Employees are expected to perform assigned tasks efficiently and safely and in accordance with applicable quality standards and safety requirements.

All employees are expected to treat citizens, visitors, employees, managers, supervisors, suspects, and others with courtesy and respect.

Disciplinary actions are based on the concepts of *equality and equity*. Meridian Public

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.05 Discipline & Accountability

School District Campus Police Department does not discriminate or show favoritism on the basis of *sex, ethnicity, race, religion, color, age,* or *physical disability.*

The Chief has the responsibility and right to determine the discipline to be imposed for violations or non-compliance.

Progressive disciplinary measures are generally followed. However, *circumstances, officer and employee attitudes and performance, and any extenuating and mitigating* factors may be considered when determining the discipline to be imposed.

Progressive discipline is generally defined in the Collective Bargaining Agreements and may include, but is not limited to, *counseling, warning, and suspension,* or *any other remedial steps* deemed desirable, such as *demotion, permanent or temporary disqualification, transfer, wage reduction, training* and/or imposing *conditions on continued employment. Discharge* from the agency may be imposed for a first offense and may be imposed at any point in a progressive chain, whether or not any other step(s) of progressive discipline have first been imposed.

In cases of serious misconduct such as major breaches of policy, or violations of law, or threats to human life, procedures contained in this policy may be waived. Disciplinary action on the part of the agency does not shield the officer or employee from criminal or civil charges that may arise out their deliberate or negligent acts.

**General Reasons for Disciplinary Action:**
An officer or civilian employee may be disciplined or terminated for a number of reasons including, but not limited to:

1. Dishonesty, such as falsifying or altering any document, record, or report relating to the agency or law enforcement operations and/or relating to employment, such as a time card, employment application, medical report, or expense reimbursement request; and, providing false or misleading information and/or failing to provide truthful and complete information in a written or verbal report.
2. Repeated or serious violation of policies & procedures.
3. Violation of the law.
4. Conviction of a criminal offense, including a felony, certain misdemeanors, or any offense involving moral turpitude.
5. Insubordination to a superior.
6. Reporting to work under the influence of alcohol or any controlled substance not prescribed by a licensed physician.
7. Offensive conduct or language toward the public, superior, or other employees.
8. Carelessness or negligence in the use of agency property.
9. Accepting or encouraging the taking of a bribe.
10. Encouraging other persons to commit illegal or inappropriate acts.
11. Failing to report to work, court, or official duty assignments without reasonable cause, or excessive tardiness.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.05 Discipline & Accountability

12. Failure to observe starting, quitting, and and/or break times.
13. Horseplay or dangerous acts.
14. Violation of security, health, safety, or environmental standard.
15. Careless workmanship, production, or use of equipment.
16. Competing with the interests of Meridian Public School District Campus Police Department.
17. Allowing or turning a blind eye to criminal activity or criminal plan; or aiding and abetting a criminal plan.
18. Theft, attempted theft, misappropriation, or willful damage to property.
19. Distribution, transfer, sale, possession or consumption at the work place or on government property of any alcohol, intoxicant, or controlled substance which has not been prescribed for the one in possession, the recipient, or the one consuming.
20. Threatening, intimidating, harassment, coercing, abusing, or interfering with a supervisor, manager, independent contractor, supplier, visitor, or co-employee, either by words or action.
21. Unauthorized disclosure of any confidential information or law enforcement work product.
22. Failure to report any accident, misconduct, or rule violation to an immediate supervisor, or the Chief, or
23. Failing to cooperate with and/or failing to provide information requested in connection with any authorized investigation or inquiry.

**Reporting of Disciplinary Action:**
Whenever disciplinary action is used, the employee is at a minimum advised of:

1. Exact offense violated;
2. How the violation affects ability to be an effective, efficient, or safe employer, or adversely effects Meridian Public School District Campus Police department;
3. What the member must do to avoid future disciplinary action;
4. How much time the member has to correct the problem; &,
5. What further disciplinary action, including termination, will occur if performance does not improve?

To the extent that Collective Bargaining provides other additional discussions or that an employee be advised as to other matters in addition to those items set forth above, such Agreements will be followed

**Non-Disciplinary Action:**
Not every supervisory interaction or intervention with a member is to be construed as *discipline.* The following are examples of *non-disciplinary* courses of action:

1. **Supervisory Consulting:** Except in cases of culpability, correcting undesirable conduct may be handled by the Supervisor in an informal atmosphere. This means taking the member aside and discussing the problem, candidly and

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

openly. These actions may or may not be formally documented on the first occasion, depending on the supervisor's discretion, and the seriousness of the errant behavior.  Repeat violations <u>are documented</u> by the supervisor.

2. **Counseling:**   At times, personal problems may interfere with the member's ability to perform normally. When the results are not serious enough for discipline but call for a more formal type of corrective action, *counseling* is an excellent tool to help the member.  Counseling is not a form of discipline but is a tool available to correct problems and refocus on performance priorities.

3. **Administrative Leave:**  Administrative leave occurs any time the member must be removed from duty until an investigation or other administrative proceeding is completed. Usually situations of this nature involve cases of suspected misconduct, such as alleged criminal activity, fighting, continued non-compliance, or being mentally or physically unfit for duty.  In such cases, leaving the member in position would create an unreasonable liability or safety issue for fellow workers or the agency. The Supervisor can order a *relief from duty* and then immediately report the action to the Chief the Chief then initiates an investigation and makes a decision within 24 hours about whether the relief will continue, and for how long. The nature of the leave, (whether with pay or without), is impacted by a number of factors including any restrictions imposed by Collective Bargaining Agreements and is determined on a case by case basis.  Generally, speaking, administrative leave is with pay.

4. **Administrative Absence – Use of Force or injury:**  Following a *deadly use of force* or *major injury to the officer*, a furlough may help the member adjust and handle any personal or emotional needs resulting from traumatic events. Administrative furloughs are mandatory, initiated by the Chief, or the senior management official at the scene. An administrative absence for a major injury or use of deadly force incident may continue until the employee involved has received counseling by the Chief, designee, or a licensed professional.

**Steps of Progressive Disciplinary Action:**

The steps of progressive discipline vary widely and are addressed in Collective Bargaining Agreements. In the absence of specific steps set forth in Collective Bargaining Agreements, the following are progressive steps that can be taken in efforts to discipline employees of Meridian Public School District Campus Police Department. It is not necessary to start at step one if the seriousness of the employee's conduct exceeds that form of discipline. At the discretion of the Chief the following manners of discipline may be pursued:

1. **Written Warning or Reprimand:**  Written warnings or reprimands are a way of recording the employee infraction. Such records are placed in the employee's file and provided to the employee within 48 hours of the infraction.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.05 Discipline & Accountability

2. **Suspension:** An employee may be suspended without pay by the Chief. Suspension is the second step in discipline if the act, and/or the result of the act, is serious enough that a written warning or reprimand would not be sufficient for disciplinary action. The suspended member may appeal a suspension by stating justifiable grounds for their action, in writing to the Chief. The Chief has the option of vacating the suspension, increasing the suspension time or terms, or letting the decision stand.

3. **Demotion:**  The employee may be demoted to a position of a lower grade or lower responsibility. Demotion as a form of discipline is intended to be punitive and can occur concurrently with a suspension.

4. **Termination**:  If all other forms of discipline fail to correct the conduct of the employee, or the actions of the employee are deemed serious termination is the last resort.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Insubordination | **Policy Number:** 3.06 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Employees of Meridian Public School District Campus Police Department understand the command and rank structure of the agency, and carry out their duties and responsibilities with a positive attitude, as directed by their supervisors, within policy guidelines. Any form of insubordination, unless otherwise justified, is not tolerated, and is subject to disciplinary action.

**DEFINITION:**

- ***Chain of Command - A*** system whereby authority passes down from the top through a series of leadership positions or ranks in which each is accountable to the one directly superior.

- ***Insubordination -*** Any act of defiance, disobedience, dissension, or resistance to authority or instruction.

**PROCEDURES:**

**General Guidelines:**
The organizational structure of Meridian Public School District Campus Police Department lists the Chief as the leading authority within the chain of command. This authority is delegated downward to the next level of authority and continues throughout the *chain of command* to the lowest level. In accordance with this structure employees will:

1. Follow orders and instructions issued by supervisory personnel, in a timely and efficient manner;
2. Exceptions to item 1 above are, only if the order or instructions violate:
   a. The constitutional rights of others,
   b. Policies & Procedures of the agency,
   c. The code of ethics, and/or

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.06 Insubordination

       d.  Safety or health of the officer, employee, or others;
3.  Respond in a professional manner to instructions;
4.  Consistently demonstrate respect for those appointed to positions above them, and fellow officers and employees; &
5.  Not use profane or obscene language toward any supervisor, public official, or individual appointed over them.

**Disciplinary Action:**

Violations of this policy, as with other policies are prejudicial to good order and discipline, and like other policy violations, will be dealt with immediately by the observing supervisor. This action may range from a verbal warning to immediate relief of duty and placement on administrative leave, with a referral to next higher supervisor for additional action.

**Supervisor Responsibilities:**

Instances of insubordination are fully documented by the observing supervisor and an *incident report* is submitted to the next higher supervisor.

Supervisors are instructed to be observant to insubordination expressed towards another supervisor, when it occurs *behind the back of* the intended recipient. In such instances the observing supervisor is required to take immediate corrective action.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| **Subject:**  Grievance Procedures | **Policy Number:** 3.07 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department treats all employees fairly regarding employment matters.

**DEFINITION:**

- ***Eligible Employee -*** All permanent, probationary, reserve/auxiliary, or regular part-time employees. Regular part-time employees are those who have worked twenty [20] hours per week or more on a continuous basis for at least six months.

**PROCEDURES:**

Discrimination or retaliation against employees who file grievances is strictly prohibited, and such actions are subject to disciplinary action. The grievance procedures set forth in this policy are only available to *eligible employees*.

**Conditions and Limitations:**
The agency retains the right under law, regulations, and policy to direct employees in the performance of their duties; to take the necessary actions to achieve proper ends under routine and emergency situations; and to hire, promote, transfer, and assign employees as well as to suspend, demote, discharge, or take disciplinary action against such employees for cause.

This grievance procedure is not applicable to matters for which an appeal process is otherwise provided.

**Grievance Procedure:**
The grievance procedure established by Meridian Public School District Campus Police Department consists of three steps which must be followed in order before an appeal is moved to the next step, unless otherwise specified in this policy. These steps include:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.07 Grievance Procedures

1. An employee who believes that their work environment can be made more effective shall present the matter for consideration by:

   a. Discussing the specific problem with their supervisor or the Chief. It is always preferred that employees follow the *chain of command* when practical. A problem that results from a specific event or actions must be presented within seven [7] calendar days of the occurrence.
   b. Decision or action of the supervisor or Chief is rendered to the employee within seven [7] calendar days.
   c. If the opportunity for improvement cannot be resolved through discussions with their supervisor or the employee wishes to document the grievance for additional consideration, he may submit a written grievance to the Chief.

2. Formal grievances are accepted by the Chief. The grievance:
   a. Is in writing;
   b. Clearly defines the situation in question, and the facts upon which it is based;
   c. Specifies the wrongful act or situation, and describe the harm done;
   d. Arises out of an act or failure to act that directly relates to the working conditions of the eligible employee or to the employee's employment relationship;
   e. Addresses a matter within the control of the agency;
   f. Requests a remedy that is within the power of the agency to grant;
   g. Is submitted within seven [7] calendar days following receipt of the first level supervisors Chief's original decision;
   h. Includes a copy of any written supporting documents or pertinent discussion, decision and justification; &
   i. Specifies the requested remedy, if known.

In normal circumstances the Chief responds within seven [7] calendar days of receipt.

**Response from Appeal:**
A written response is provided to the employee within seven [7] calendar days after receipt of the appeal to include:

1. Response to the grievance;
2. Discussion or comments, if any;
3. Affirmation or denial of the allegations; &
4. Identification of any additional remedies or adjustments, if any.

**Time Limits, Extensions, and Withdrawal of Grievances:**
An employee is required to file a grievance within seven [7] calendar days of its occurrence or the grievance is void, unless the employee has requested a time extension in writing, and the extension is *approved*. Involved parties may request one

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

extension not to exceed seven [7] calendar days. If the agency fails to process a grievance, the employee is encouraged to make a reasonable attempt to determine the reason for the delay.

At any time during the grievance process, the employee may withdraw the grievance by making written notification of the withdrawal available to all parties involved in the grievance process.

**Coordination of grievance procedures:**
The Chief may from time to time designate an employee to coordinate grievance procedures. This employee, if designated, will be responsible for:

1. Maintaining and controlling records relating to grievances;
2. Scheduling activities; &
3. Preparing written responses or reports.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Appearance & Grooming | Policy Number: 3.08 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority<br>Title and Signature: *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Employees consistently maintain a neat, clean, and professional appearance during the performance of their official duties, or at any time they are representing Meridian Public School District Campus Police Department.

**DISCUSSION:**

Employees of Meridian Public School District Campus Police Department are authority figures within this agency, and when outside are service representatives of Meridian Public School District. As such, it is essential that employees present a positive, professional image to the public.

**PROCEDURES:**

In the performance of duty, officers are required to wear uniforms as dictated by Meridian Public School District Campus Police Department policy, except in special circumstances authorized by a superior. Determination of compliance with this policy is completely at the discretion of the Chief or designee.

Officers who fail to meet appearance standards may be sent home, and not permitted to work until their appearance meets agency standards, or they may be disciplined in other forms. Failure to comply on repeat occasions is *insubordination*, and disciplinary action will be taken.

**Male Employees:**
Male officers on duty, and in uniform, must keep their hair trimmed according to the following guidelines:

1. Neatly tapered, rounded or squared at the back, and may extend down to the top of the collar.
2. Hair in front may not fall lower than one-half inch above the tops of the eyebrows.
3. Hair on the sides may not extend lower than half way down the ear.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.08 Appearance & Grooming

4. Hair should not be styled or colored in a manner as to be perceived disruptive to the school environment.
5. Officers may maintain a neatly trimmed moustache and/or beard.

Male officers are prohibited from wearing earrings or any body piercing items. Male officers must maintain clean, short, and neatly trimmed fingernails.

**Female Employees:**
While on duty, and in uniform, female officer's hairstyle must be worn according to the following guidelines:

1. Hair should not be styled or colored in a manner as to be perceived disruptive to the school environment.
2. Styled in a fashion that is conducive to type of work and work environment.
3. Conspicuous pins, barrettes, and combs are not authorized.

Female officers are prohibited from wearing body piercing. Female officers may wear earrings small enough as to not be torn off by a suspect. Only one set [one for each ear] may be worn. Nail polish, lipstick, and/or other cosmetics worn while on-duty, will be conservative in nature.

**All Employees:**
Both male and female employees are required to maintain cleanliness by bathing daily, practicing good hygiene, and by wearing clean clothes free from unpleasant odors. In addition, the following guidelines apply:

1. Officers will carry rubber gloves and alcohol towelettes in a pocket or belt pack.
2. All employees are encouraged to wear a minimum amount or no loose jewelry.
3. Do not bring or wear expensive items you are not willing to loose or have stolen.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Disabled Persons | **Policy Number:** 3.09 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department ensures all persons are afforded equal access to employment opportunities and law enforcement services.

**DEFINITIONS:**

- ***Qualified individual with a disability*** - an individual who, with or without reasonable modifications to rules; policies or practices; the removal of architectural, communication, or transportation barriers; or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

- ***Disability*** - a physical or mental impairment that substantially limits one or more of the major life activities of an individual; a record of such impairment; or being regarded as having such an impairment.

- ***Reasonable accommodation*** - includes the modification of existing facilities that are readily accessible to and usable by individuals with disabilities; job restructuring, part-time, or modified work schedules; reassignment of an employee with a disability to a vacant position; acquisition or modification of equipment; and appropriate alteration of examinations, training materials, or policies.

**PROCEDURE:**

The *Americans with Disabilities Act [ADA] of 1990 (Title II)* provides that state or local government may not exclude qualified individuals with disabilities from participation in any program, service, or activity or denying qualified individuals with disabilities the benefits of programs, services, or activities, or otherwise subject them to discrimination on the basis of disability.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.09 Disabled Persons

No single *policy & procedure* can address law enforcement responses to people with disabilities. This *policy & procedure* addresses common interaction with people with disabilities including those who are complainants, victims, witnesses, arrestees, members of the community who desire to participate in agency-sponsored programs, people seeking information, and uninvolved bystanders. Employees must take steps necessary to assist people with disabilities in accessing the full range of services provided by our agency.

**Responsibility of Officers:**
In providing law enforcement services to the public, we provide all rights, privileges, and access to the agency for those with disabilities.

People with disabilities may be suspects or arrestees and require detention, transportation, and processing. Employees confronted with an unfamiliar impairment should seek professional advice regarding the proper methods of transport, arrest, and detention of individuals with a disability.

Employees should recognize the characteristics of various disabilities, including symptoms and physical reactions that may resemble individuals under the influence of alcohol or drugs. At times such traits may be exhibited by people with *diabetes, epilepsy, multiple sclerosis, hearing impairments,* and *other disabilities.* In such instances the appropriate responses are to:

1. Seek the aid of a coworker who has knowledge and/or training in dealing with such issues;
2. Seek emergency medical aid;
3. Protect and/or calm the individual;
4. Use basic sign language; or
5. Locate and enlist support of family and friends.

Officers should use caution in applying restraint to a person with a physical or mental disability when affecting an arrest.  This may include use of interpreters, attorneys, and legal guardians. In all cases, officer safety must prevail. No employee should jeopardize his or her safety or that of others in an attempt to accommodate a person with a disability.

**Routine and Emergency Interaction:**
In providing routine and emergency services, equality in response, support, and protection is provided to all people including those with disabilities. Officers make every effort to access appropriate support organizations when needed.

**Response to routine calls for service:**
1. Agency employees are aware that people with disabilities have special needs that may have to be met in order to provide meaningful response to calls for

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.09 Disabled Persons

service. Employees are sensitive to the fact that some people with disabilities may be targeted as crime victims as a direct result of their disability.

2. Employees should be familiar with techniques they may employ at scenes where disabled persons are involved.

**Response to emergency calls for service:**
1. Dispatchers watch for characteristics of people whose disabilities may require special communications techniques.

2. If the person with the disability is unable to communicate, look for a medical alert bracelet or similar form of ID, or seek input from family, witnesses, and others to aid in identifying the nature of the disability.

3. In cases where the disabled person is deaf and can not read lips, officers should be prepared to print out messages with a pen or pencil, and use patience when communicating.

**Response to criminal and disruptive behavior:**
1. People with disabilities also commit crimes, and exhibit disruptive and threatening behavior. Generally, people with disabilities who commit crimes or engage in disorderly conduct receive no preferential treatment. However, disorderly conduct should not be treated as a criminal activity when it is caused by the disability. For example, when such conduct is the result of a seizure or mental disability, the call for service should be handled as a *medical referral call.* Be aware that it is common for people with disabilities to seek sympathy as a way to lessen the outcome of the law enforcement response.

2. Officers should take reasonable precaution to protect themselves and others. The mere appearance of a disability does not mean that the individual is not capable of inflicting serious injury or death on officers or others.

**Arrest and Incarceration:**
1. Take precautions, and employ safety techniques when arresting and incarcerating all persons. Officers will follow policies and standard techniques for arrest and incarceration when taking a person with disabilities into custody.

2. Consideration can be given to the special needs of some people with disabilities in an arrest situation. Officer response in such situations requires discretion and is based, in great part, on the officer's perception *of characteristics and severity of the disability, the level of resistance and threat exhibited by the suspect,* and *immediacy of the situation.*

3. In arrest and incarceration situations, employees may encounter the following:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.09 Disabled Persons

   a. A person whose disability affects the muscular and/or skeletal system may not be able to be restrained using handcuffs or other standard techniques. Alternative methods (transport vans, seat belts) should be sought.
   b. Some people with disabilities require physical aids (canes, wheel chairs, leg braces) to maintain their mobility. Once the immediate presence of danger has diminished and the suspect is safely incarcerated, reasonable effort should be made to return the device. If mobility aids must be withheld, the prisoner should be monitored to ensure that his or her needs are met.
   c. Prescribed medication may be required at regular intervals by people with disabilities (diabetes, epilepsy, etc.). Medical personnel (the suspect's physician, on-call medical staff, and emergency room medical staff) must be contacted to determine the importance of administering the medication, the potential for overdose, and any other instructions. Follow their instructions.

4. Some people with disabilities may not have achieved communications comprehension levels sufficient to understand their individual rights in an arrest situation. (For people who are deaf, there is no sign language for the term "waive" in regard to the Miranda rights. Yet, in an effort to be cooperative, a suspect who is deaf may acknowledge that he or she is willing to give up his or her rights.) Officers shall take extra care to ensure that the rights of the accused are protected.

5. Lack of speech or other speech impairment may make it difficult for a suspect to notify the arresting officer of an urgent need. Frequent checks should be conducted, or a means of communication provided.

6. <u>Officers are cautioned that persons with disabilities often rely on their disability to attempt to manipulate and control their environment. Do not be lulled into an unsafe practice</u>.

**Visual Disabilities:**
1. One issue facing people in need who are blind or vision impaired is identifying law enforcement officials. Employees should offer detailed information when identifying themselves. Whenever possible, if the presence of a visual disability is known, officers may have dispatch contact the victim or complainant to verify that a member of the agency is present. If needed, badges may be offered to the individual to verify the officer's identity.

2. Knowing what not to do is as important as knowing what to do to assist a person who is vision impaired. Employees do not need to raise their voice when speaking. Employees should not grab the person's arm to lead him or her in a particular direction. Simply describe potential obstacles or ask if they need guided assistance.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.09 Disabled Persons

3. In public access areas, signs and printed information within law enforcement facilities should be in large print in order to assist people with vision impairments. In non-public areas visually and hearing impaired persons should be escorted by the officers in charge or being visited.

**Mental, Emotional, and Psychological Disabilities:**

1. The terms *mental illness, emotional illness,* and *psychological illness*, describe varying levels of mental disabilities causing disturbances in *thinking, feeling, relating,* and *perception.*

2. Employees must ensure that people with mental, emotional, and psychological disabilities are assisted in accessing agency services, which may require time and patience beyond that usually provided. If an individual with a mental, emotional, or psychological disability is taken into custody, officers will take extra precautions, to use those restraints necessary to move the arrestee safely, while protecting the officers, and the arrestee from self-injury.

3. Frequently, a family member or friend is of great value in calming an individual exhibiting unusual behavior as a result of mental or emotional impairment. Conversely, a family member or friend can be a negative influence on a person exhibiting unusual behavior. If needed, steps should be taken to gain placement for the individual in an appropriate emergency medical, health care, or shelter facility, before transporting the impaired detainee.

4. Officers must become familiar with government agencies, nonprofit agencies, volunteer organizations, and emergency medical services that will provide assistance to people with mental, emotional, and psychological disabilities.

**Intellectual Disabilities:**

1. Intellectual Disabilities encompasses a broad range of developmental disabilities from *mild to profound.* Intellectual Disabilities and mental illness are distinct conditions, with no similarity. The largest percentages of people with intellectual disabilities are in the ranges termed "mild" or "moderate."

2. Officers should recognize that people with intellectual disabilities have varied degrees of intellectual function.

3. Ask short questions, be patient when waiting for answers, repeat questions and answers, have individuals repeat the question in their own words, and provide continual reassurance.

4. When dealing with someone who is lost or has run away, officers may gain improved response by accompanying the person through a building or neighborhood to seek visual clues.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.09 Disabled Persons

5. In responding to the needs of people with severe or profound intellectual disabilities, the aid of family, friends, caregivers, and neighbors is invaluable.

**Mobility Impairments:**
1. Among the disabilities that are the most visibly identifiable are mobility impairments. People with mobility-related impairments include those who have difficulty walking, who use a wheelchair or other mobility aid, and those who are immobile.

2. In a critical or emergency situation, officers should use discretionary caution when moving a mobility-impaired person rapidly to a position of safety.

3. In an arrest encounter, once an arrestee with mobility impairment is secured and safety concerns are resolved, an effort should be made to return use of any mobility aids (wheel chair, cane, etc.).

4. As with other disabilities, officers should never assume that a mobility impaired suspect is not capable of inflicting serious injury or death to officers, the public, or themselves. They may be handicapped, but they are not stupid, and expect you to empathize with their overt condition.

5. Public access areas of agency facilities should be accessible to people with mobility impairments. Entrances, interior routes, stairs, drinking fountains, rest rooms, and telephones should accommodate people with mobility impairments including those who use wheelchairs.

**Invisible Disabilities:**
1. Some disabilities are difficult to detect. A law enforcement officer's inability to recognize characteristics associated with certain invisible disabilities could have serious consequences. For example, outward signs of a disability such as epilepsy generally do not exist unless the person with the disability experiences a seizure. People with diabetes may have reactions from either too little or too much insulin. Low blood sugar reactions are common and are usually treated by ingesting sugar. Detaining someone and preventing them from accessing required medication or substances could have serious health implications for the individual and liability consequences for the officer and agency.

2. Realize that involuntary behavior associated with some invisible disabilities may resemble behavior characteristically exhibited by intoxicated or less frequently, combative individuals. For example, a person experiencing a *mild seizure* may appear incoherent and physically imbalanced. The response is temporary.

3. An officer's patience and understanding of the characteristics commonly associated with invisible disabilities will increase the likelihood of a successful

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.09 Disabled Persons

outcome. An inaccurate assessment may lead to unnecessary confrontation, injury, and denial of needed medication and/or medical treatment.

4. As with all encounters, an officer's second obligation, after protecting himself and others, is to protect the individual suspect from unnecessary harm. When aiding a person experiencing a seizure, protection from obstacles, a calm reassuring manner, and patience are important responses.

5. Family members, caregivers, and friends should be sought to provide information and assistance. Their presence may prove invaluable in understanding the needs of the person with the disability and guiding the officer's actions.

**Speech and Hearing Disabilities:**

1. Like other invisible disabilities, officers may confuse the behavior of individuals with hearing and speech disabilities with those of people who intentionally refuse to cooperate or those who abuse illegal substances. Be aware that an individual's failure to comply with or respond to verbal orders does not always constitute resistance, but may be the result of that individual's inability to hear the officer or respond verbally. Before committing to a course of action, officers should attempt to determine if they are dealing with a communication-related disability.

2. Officers take extra measures to protect the rights of suspects who are deaf and hard of hearing, as well as others who may not have educational or communications comprehension levels sufficient to fully understand the basic Constitutional Rights. Simply reading the rights to someone with a hearing disability and having the individual acknowledge that they understood is insufficient.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:**  Court Appearance | **Policy Number:** 3.10 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Court appearance is an integral part of our law enforcement duties. Meridian Public School District Campus Police Department personnel appearing in court in any capacity, must attend at the appointed time without fail, present a well-groomed appearance, be prepared, and behave professionally.

**PROCEDURES:**

**Court Appearance:**

1. Attendance at a court or quasi-judicial hearing, whether notified by subpoena or other notice by the agency, prosecution, or hearing officer is an official duty assignment, and employees and officers must attend without fail. Permission to omit this duty must be obtained from the prosecuting attorney or other competent official, prior to the appearance date and time.
2. All officers must be punctual and attend until dismissed by the prosecution, the person issuing the subpoena or the court.
3. The complete and official uniform must be worn when appearing in court. The prosecuting attorney or presiding judge should be consulted whether or not to wear a side arm. Non-sworn employees may appear in conservative business attire. Officers may substitute such attire for uniforms when approved by the officer's supervisor.
4. Members must avoid mannerisms or expressions, which might imply disrespect to the court, other witnesses, those charged with criminal offenses, or plaintiffs testifying. Employees must have notes and case files prepared, and all evidence suitably arranged for presentation before trial appearance.

**Subpoena Precedence:**
If employees receive more than one subpoena to appear at any court or quasi-judicial hearing on the same date and the same time, the subpoena priority is:  Federal Court,

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.10 Court Appearance

State Court, Municipal Court, City Court, civil cases, and then administrative hearings. Courts must be notified of the conflict if and when this occurs.

**Court Absences:**

If an employee is scheduled to be in court and cannot attend, he/she must notify the court clerk of the reasons for non-attendance in writing at least seventy-two [72] hours or three [3] business days prior to the scheduled court date. In cases of unforeseen emergencies, verification of that emergency must be submitted to the court clerk immediately in writing. If the emergency arises before court and the officer is able to contact the court, the judge determines if the absence is excused. If the officer is unable to contact the court, the Chief must determine if the absence is excused.  Copies of all communications with the court or prosecution regarding appearances must be submitted to Chief.

**Penalties for Unexcused Court Absences:**

All unexcused absences are forwarded to the Chief or his designee by the court clerk. Disciplinary actions for not appearing in court are addressed as with other disciplinary matters and may include the following:

1. First Offense: Letter of written reprimand to be placed in the officer's personnel file.
2. Second Offense: Officer will receive a two [2] day suspension without pay from duty.
3. Third Offense: Officer will receive a four [4] day suspension without pay.
4. Fourth Offense: Review of employment and possible termination.
5. This does not preclude the court from taking whatever action the court deems appropriate for non-appearance.

**Respect and Testimony:**

While in court, the officer must:

1. Always tell the truth when testifying, making reports, or conducting any Law enforcement business;
2. Be respectful of magistrates and judges at all times;
3. Speak calmly and explicitly in a clear, distinct, and audible tone so to be heard by the court and jury when giving testimony.
4. Testify with strict accuracy, limiting testimony to the case before the court, and neither suppresses nor overstates the circumstances with a view for favoring or discrediting any person.
5. Answer defense counsel questions with the same readiness and civility as when testifying in support of the charge, remembering that the ends of justice will be served by showing a desire to tell the whole truth, whether it is in favor of or against the defendant.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.10 Court Appearance

**Testifying for the Defendant:**
Any employee subpoenaed by the defense in any criminal trial or hearing will notify the office of the prosecuting attorney immediately upon receipt of the subpoena.


**Civil Action, Court Appearances – Subpoenas:**
Employees may not volunteer to testify or give deposition in civil actions and may not testify unless subpoenaed. Employees must accept all subpoenas legally served. If subpoenas arise out of agency employment or if employees are informed that they are a party to civil actions arising out of agency employment, they must immediately notify the Chief and the attorney representing the agency. Employees then prepare to discuss the testimony he is prepared to present, if called as a witness.

**Civil Matters Relating to Employment:**

1. Employees confer with the Chief before giving depositions, affidavits, or testimony in civil matters.
2. Employees may not institute any civil action arising out of their official duties without first notifying the Chief.
3. Employees may not use their position with the agency as a means of forcing or intimidating persons with whom they are engaged in civil matters.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Fitness for Duty | Policy Number: 3.11 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority<br>Title and Signature:  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Law enforcement tasks require physical exertion, concentration, and decision-making in various environmental conditions and in situations that are *tense, uncertain,* and *rapidly evolving.* Officers must be mentally and physically capable of performing their duties in order to accomplish the task, while safeguarding themselves, other officers, and members of the public.

**PROCEDURES:**

**Officer Applicants:**
Persons applying for a position within Meridian Public School District Campus Police Department are required to undergo physical and psychological assessments by licensed professionals. This examination is completed after the applicant signs a precondition employment letter. If a physician or mental health professional identifies conditions that could limit physical or emotional ability to cope with the stress of law enforcement duties, the applicant will not be eligible for employment with Meridian Public School District Campus Police Department.

**Law Enforcement and Civilian Personnel:**
The following guidelines are maintained by all sworn and civilian employees of Meridian Public School District Campus Police Department:

1. After employment, the agency may reexamine employees at anytime to determine each individual's continued fitness for duty, including:

   a. For purposes of a criminal or internal investigation; or
   b. For suspicion of emotional or physical problems due to documented accounts of an employee's psychological behavior, or decline in physical health.

2. If a qualified physician or mental health professional indicates the presence of a

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

condition that could limit an employee's physical or emotional ability to perform his or her duties, that employee must be placed on leave and not be allowed to return until:

a.  Released from care of a healthcare professional or facility; &
b.  An authorization letter is received and approved from a healthcare professional indicating the physical or emotional stability of the employee.

**Responsibility:**
It is the responsibility of the Chief to enforce this policy. However, any employee who is witness to a decline in mental or physical stability in themselves or a fellow employee is required to report the behavior to the Chief. Any employee refusing to submit to a physical or psychological examination following the request of the Chief is subject to suspension from duty or discipline, to include dismissal.

Officers are required to use their best efforts to control medical conditions (such as diabetes, etc.) that can adversely affect duty fitness. Some examples of these conditions may include but are certainly not limited to *diabetes, substance or alcohol abuse, high or low blood pressure, excessive amounts of overtime or off-duty employment,* etc.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Community Relations | Policy Number: 3.13 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority<br>Title and Signature: *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

The Chief recognizes that no law enforcement agency can operate at its maximum potential without supportive input from the citizens it serves. Meridian Public School District Campus Police Department actively solicits and encourages the cooperation of all citizens to reduce and limit the opportunities for crime and to assist in bringing to justice those who break the law.

**DISCUSSION:**

This agency is committed to correcting actions, practices, and attitudes, which may contribute to community tensions and grievances. Law enforcement personnel are an integral part of the community. Citizen participation and interaction with law enforcement personnel is necessary for a healthy community. This agency identifies and implements policies, procedures, and programs that enhance the quality of life in the community.

**PROCEDURES:**

**Community Relations Objectives:**

1. Create and maintain liaison with community groups and organizations including:
    a. Exchanging information;
    b. Identifying law enforcement service needs of the community;
    c. Promoting law enforcement and citizen contacts; &
    d. Acquainting each other with mutual problems and encouraging action aimed at solving these problems.
2. Develop community relation's policies for Meridian Public School District Campus Police Department;
3. Publicize agency objectives, problems, achievements and successes;
4. Obtain input from community groups to ensure that agency policies reflect the needs of the community;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.13 Community Relations

5. Build and foster relationships between law enforcement and school community
6. Identify sources of conflict between law enforcement and the community and encourage efforts to resolve them;
7. Identify training needs relating to community relations through input from citizens, groups, supervisors, and complaint reports;
8. Provide the Chief information regarding concerns of the community, potential law enforcement/citizen problems, and recommended actions;
9. Evaluate all agency community relations programs on a semi-annual basis and to participate in an annual survey of citizens' attitudes and opinions with respect to law enforcement service; &
10. Conduct an annual survey of citizen attitudes and opinions with respect to:
    a. Overall agency performance;
    b. Overall competence of agency employees;
    c. Officer attitude and behavior toward citizens;
    d. Concern over safety and security in the school communities; &
    e. Recommendations and suggestions for improvements.

**Public Information Programs:**

These programs seek to publicize agency objectives, problems, achievements, and successes through the media, brochures, guest speakers, news releases, press conferences, and newsletters.

**Community Relations Programs:**

The focus of these programs is to meet with civic groups, minority groups, neighborhood councils, crime watch groups, and individuals to exchange information and convey information back to the agency.  Present programs such as DARE, GREAT, McGRUFF, or other similar programs of interest to all area schools.

**Crime Awareness/Prevention Programs:**

These programs provide citizen groups information on making their families, and schools more secure and work to establish crime watch neighborhoods where none exist to include, but not limited to:

1. Neighborhood Crime Watch [Schools are located in neighborhoods];
2. Burglary Prevention;
3. Rape Prevention;
4. Fraud Prevention;
5. Violence Prevention
6. Emergency Reporting Procedure;
7. Operation ID;
8. Robbery Prevention; &
9. Commercial Burglary Prevention.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Media Relations | **Policy Number:** 3.14 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**   *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department cooperates fully and impartially with authorized media representatives in their efforts to gather factual, public information pertaining to activities of the agency, so long as these activities do not significantly interfere with operations, infringe upon individual rights, or violate the law.

**DISCUSSION:**

A basic philosophy of this agency is to involve the community. It is important for our citizens to have confidence in our ability to fairly, professionally, and impartially enforce laws. The media serves both the agency and the community by reporting our work to the public.

It is important that employees treat media representatives fairly, and with respect. The media industry is very competitive. Most reporters work long hours for little pay under constant pressure to meet deadlines. Reporters can be skeptical, idealistic, or manipulative, but most value responsive, knowledgeable, reliable sources who are sensitive to their needs.

**PROCEDURES:**

**Duties of the Chief:**
The Chief shall:

1. Distribute information to the media and employees within the agency following Meridian Public School District Campus Police Department procedures;
2. Inform the media of major public events requiring an extended presence of agency personnel;
3. Coordinate and authorize release of information about victims, witnesses, and suspects;
4. Develop positive working relationships with local media representatives by:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.14 Media Relations

      a. Establishing working guidelines;
      b. Determining local media deadlines;
      c. Helping media representatives meet their deadlines; &
      d. Preparing and distributing periodic news releases.

5. Coordinate release of authorized information concerning investigations and operations;
6. Coordinate and respond to Freedom of Information Act (FOIA) requests; &
7. Develop and/or contribute to the Agency Crisis Management Plan.

**Other Personnel:**

1. It is important that the Agency "speak with one voice" in providing accurate and consistent information. Line officers may not know all the facts, or may have limited perspectives regarding incidents. Employees should:
      a. Direct media representatives to the Chief or MPSD Public Relations when asked about details regarding an accident, crime, or other incident.
      b. Assist news personnel as directed by Chief in covering routine stories, and at accident or crime scenes;
      c. Not say, "No comment";
      d. Not wear sunglasses when interviewed "on camera";
      e. Not speculate about liability issues or causation;
      f. Use secure communication methods to transmit sensitive information. Many reporters and citizens monitor law enforcement radio frequencies; &
      g. Provide a safe area for the media during situations in which their lives could possibly be placed in danger.
2. Ranking officers at crime or incident scenes may release factual information of a general nature to the media, as governed by this or other policies (i.e. death notifications, juveniles, etc.), or if given prior approval by Chief.

**Cooperation with the Media:**
The following guidelines must be maintained by employees of Meridian Public School District Campus Police Department in cooperating with the media:

1. Authorized media representatives have reasonable access to the Chief, or MPSD Director of Public Relations, and operations of this agency;
2. Public information is released to the media as promptly as circumstances allow without partiality, and in as objective a manner as possible;
4. Information is released either by the Chief or designee; &
5. Press releases, news conferences, and similar events are scheduled to Accommodate media deadlines, if and when possible:
      a. Public information may be provided to media representatives by telephone through the Chief or Director of Public Relations;
      b. If the identity of the media representative is known, or can be authenticated.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.14 Media Relations

**Release of Information:**

Information authorized for release concerning an investigation or crime includes:

1. The type or nature of the event or crime;
2. Any unusual or hazardous road conditions;
3. Location of destruction due to a natural disaster;
4. The location, date and time, injuries sustained, damages, and a general description of how the incident occurred;
5. The type and quantity of property taken;
6. The identity and approximate address of a victim with the exception of sex crime victims, and in other cases where reprisals or intimidation may result;
7. Requests for aid in locating evidence, a complainant, or a suspect;
8. Numbers of officers or people involved in an event or investigation, the length of the investigation, and the different agencies involved; &
9. The name of the officer in charge of a case, unless undercover.

**Non-Release of Information:**

Information that may not be released in connection with an investigation of a crime, unless authorized by the Chief, includes:

1. The identity of a suspect prior to arrest, unless:
   a. The release of information would aid in apprehending the suspect, or warn the public of potential danger; &
   b. Probable cause has been established, and a warrant of arrest has been obtained.
2. The identity of any victim of a sex crime, or any related information which, if divulged, could lead to the victim's identity;
3. The identity of any victims or witnesses which may prejudice an investigation, or place the victim or witnesses in personal danger;
4. No information regarding juveniles is released to the media or general public (this even includes confirmation that the juvenile is being held). Persons requesting information regarding a juvenile(s) is referred to the Youth Court.
5. The identity of any critically injured or deceased person prior to notification of close relatives;
6. The results of any investigative procedure such as lineups, polygraph tests, fingerprint comparison, or ballistics tests;
7. Information that if prematurely released may interfere with the investigation or apprehension of a suspect, such as:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.14 Media Relations

    a. The nature of leads;
    b. Specifics of an "MO";
    c. Details of the crime known only to the perpetrator and law enforcement personnel; or
    d. Information that may cause the suspect to flee or more effectively avoid apprehension.

8. Information that may be of evidentiary value in criminal proceedings;
9. Specific cause of death, unless officially determined by the medical examiner;
10. The home address or telephone number of any agency member; &
11. Information concerning the crime or event in question that is under the issuance of a gag order.

**Release of Arrest Information:**

Following arrests, issuance of arrest warrants, or filing of information or indictment, the Agency may release:

1. The name, age, residence, occupation, and family status of the accused;
2. The time and place of arrest, whether pursuit or resistance was encountered, whether weapons were used, charges placed against the suspect, and description of contraband seized;
3. Identity of arresting officers, unless undercover, and duration of the investigation;
4. The amount of bond, schedule of court dates, or place of detention of the suspect.

**Non-Release of Arrest Information:**

Following arrest and formal charging of a suspect, but prior to adjudication, the following types of information should not be released without the express permission of the Chief to include:

1. Prior criminal conviction record, character, or reputation of a defendant;
2. Existence or contents of any confession, admission, or statement of a defendant, or his failure or unwillingness to make a statement;
3. Performance or results of any tests, or a defendant's refusal or failure to submit to tests;
4. The identity, statement, or expected testimony of any witness or victim;
5. Any opinion about the guilt or innocence of a defendant, or merits of the case; &
6. Any opinion or knowledge of the potential for a plea bargain or other pretrial action.

**Special Considerations - Criminal Matters:**

Personnel of Meridian Public School District Campus Police Department extend reasonable courtesy to media representatives at crime scenes including:

1. Access to crime or incident scenes closer than allowed to the general public so long as:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.14 Media Relations

      a.  It does not interfere with the law enforcement function;
      b.  Evidence is not destroyed or otherwise prejudiced by being published or portrayed; &
      c. Officers and citizens are not endangered.
  2.  Photographing or videotaping if:
      a.  Privacy expectations are not violated;
      b.  Owners of private property give prior approval.

Suspects, or accused persons, in custody may not be posed or arrangements made for photographs, telecasts, or interviews, nor will agency personnel pose with suspects or accused persons in custody.

**Special Considerations – Non-Criminal Matters:**
Media representatives should be allowed access to any area in spite of the possibility of their injury or death.  After being advised of the danger, the media representative should decide whether or not to enter, and on deciding to enter, have an officer escort him through the area to avoid disturbing any physical evidence present. Daily administrative reports of criminal activity are made available on a routine basis to media representatives within this jurisdiction, and to representatives outside this jurisdiction upon request.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Employee & Confidential Records | **Policy Number:** 3.15 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department maintains and provides *limited access* to employee personnel and other confidential records.

**PROCEDURE:**

**Types of Records:**
Current, accurate personnel records will be maintained on all employees.  Records are kept in four [4] separate files to include:

1. Personnel;
2. Training;
3. Disciplinary; &
4. Promotion.

Personnel files contain information needed to conduct agency operations or as required by federal, state or local laws. In addition to these records, other _confidential_ files may be maintained by the agency.

**Record Content:**
Meridian Public School District Campus Police Department maintains the information listed below. This information includes, but is not limited to the following:

1. Initial job application form;
2. High school diploma or GED certificate;
3. DD214, if applicable;
4. New employee information form;
5. Payroll information;
6. Criminal record check data;
7. Reference checks;
8. Insurance information;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

9.  Performance appraisals, commendations, and promotions;
10. Disciplinary and adverse action notices and supporting information;
11. Change of status records;
12. Termination form;
13. Attendance and leave information;
14. Medical records [Medical];
15. Worker's compensation information [Safety];
16. Active or inactive EEO file [EEO Coordinator or counselor]; &
17. Training and education file [Training Officer].

The Training Officer maintains records of each training course attended by officers of Meridian Public School District Campus Police Department, and continually update officer files upon completion of courses.

**Accuracy of Contents:**
Personnel files must be periodically reviewed to ensure they contain only information relevant to the individual's employment.  Each record in the file is examined for accuracy, timeliness, and completeness. Upon receiving approval of the Chief in accordance with regulations, irrelevant, inaccurate, or obsolete material will be purged from the file.

**Retirement of Records:**
Personnel files of former employees shall be retired ninety [90] days after severance, and stored in a secure area appropriately designated. Compliance with state regulations for destruction of such records is the responsibility of the custodian of the files, as assigned by the Chief.

**File Access:**
Only authorized personnel with a legitimate need may inspect personnel records. Employees may review their personnel files at any time by making a request for such review to the Chief in writing. Letters of reference and other reference information, evaluation material used during the hiring process, management records, and other files separate from the official personnel files are considered confidential, and may not be made available for employee review.  Records must be reviewed in the presence of a designated personnel staff member. No marks may be made on any document. After review, the employee must sign a form acknowledging the review. The observer must also date and sign the form, and place it in the employee's personnel file.

**Challenges to File Contents:**
Following a review of the personnel file, an employee may challenge any information in the file by filing a written objection and request for removal or correction with the Chief. The Chief must respond to the request, indicating the decision on that issue within fifteen [15] business days. An employee denied a requested record change of this type may appeal in writing to the Director of Human Resource.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.15 Employee & Confidential Records

**Confidential Files:**
Confidential records maintained at the direction of the Chief or designee may include such vital information as:

1. Policy & Procedure Master Copy;
2. Force Evaluations;
3. Confidential Informer Files;
4. Building and Facility Construction Plans; &
5. Risk and Needs Assessments.

These and other confidential files may be maintained in the same office as staff personnel records; however, they must be secured under separate lock and key.

**General Security of Confidential Records and Files:**
Employee and other confidential files and records are safeguarded under locked storage and fire resistant safes located in an area that assures only authorized personnel may access the room and files.

Anyone authorized to receive or review a confidential file, will sign for the file, and return it in the time specified by the *custodian of records*. Normally, review of these files takes place in the secured area where the files are stored.

At the end of each day or work shift, confidential files are accounted for and returned to the secured container from which they were borrowed.

Requests for personnel or other confidential information from sources outside the agency will be directed to the Chief.

**Security of Personnel Files:**
Upon written approval of the Chief personnel information will be released to non-agency persons whose requests are approved and received in writing.

Requests for information for personnel records other than bona fide criminal investigations must be forwarded to the individual whose records are requested for approval. The following information is considered non-confidential and may be released by the Chief or designee without employee clearance: employment dates; position(s) held; duty stations; and wage and salary verification [only verification of amounts provided by requester]. If additional information is requested in non-criminal cases, the employee must give written consent, which will be retained in the employee's personnel file.

**Security of Confidential Files:**
The Chief must use his/her best efforts to protect this information from release to the public directly or indirectly. The Chief has the authority to release confidential records maintained by this facility, with the exception of portions of personnel records as discussed above.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 3.15 Employee & Confidential Records

Any document discussing or detailing vulnerabilities, standards of performance, response plans, policies and procedures, drills, training methods, or handling procedures is **_confidential restricted law enforcement data_**, and not intended for release to any outside source without the prior written approval of the Chief.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Uniforms | **Policy Number:** 3.16 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

All employees present a professional image to the public by consistently maintaining a neat and clean appearance during the performance of official duties or at any time that he or she is representing Meridian Public School District Campus Police Department in any manner.

**Uniform- Licensed Officers:**
Officers are expected at all times to be dressed in complete and proper uniform. Officers receive regulation uniforms consisting of the following items:

1. Rain coat;
2. Jacket;
3. Short-sleeved or long-sleeved shirt for both summer and winter as appropriate;
4. Pants;
5. Identification plate or embroidered patches;
6. Badge of office; &
7. Meridian Public School District Campus Police department patches.

Additional items that may be considered components of the uniform include:

1. Body armor vest;
2. Service weapon;
3. Building keys
4. Holster;
5. Flashlight;
6. Footwear;
7. Socks
8. Handcuffs;
9. Handcuff pouch;
10. Cartridge pouch or magazine holder;
11. Ammunition;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures,  3.16  Uniforms

12. 'O' ring;
13. Safety reflective vest, or covering [situational]; &
14. Foul weather gear [seasonal & and conditional].

**Uniform- Civilian or probationary employees:**
Civilian employees and new employees wear a similar uniform consisting of:

1. Hat;
2. Jacket;
3. Short-sleeved or long-sleeved shirt for both summer and winter as appropriate;
4. Pants;
5. Identification plate or embroidered patches; &
6. Agency patches.

**Uniform-Plain Clothes Personnel:**
Plain clothes employees dress conservatively as outlined in the Appearance Policy. Male employees wear slacks, a dress shirt, suit or sport jacket, dress shoes, and a tie. Female personnel wear conservative type business suits or ensembles. "Corporate casual" attire is appropriate for certain functions.  Officers must use discretion and dress according to the anticipated audience and the environment.

**Uniform Requirements:**

1. All uniform clothing items must be clean and pressed.
2. No uniform clothing items may be excessively worn, faded, torn, frayed, or patched.
3. All duty gear, belt, holster, handcuff case, etc. must be the appropriate color and style as determined by the Chief.
4. All silver or brass items must be clean and properly polished.
5. When in uniform, all pieces of the uniform and all uniform equipment must be worn.
6. Shoes or boots must be the appropriate color and styles as determined by the Chief and must be cleaned, shined, and polished appropriately on a regular basis.
7. Socks that are exposed must be an appropriate color that matches the uniform.
8. All personnel are held accountable for the return of all agency issued uniform items.
9. No issued item is to become the property of any individual.
10. Items lost or damaged during law enforcement activities must be reported to Meridian Public School District Campus Police Department.
11. Replacement of items of personal purchase, which are lost or damaged in law enforcement activities, must be determined on a case-by-case basis.
12. Property lost or damaged as a result of law enforcement activities must be promptly reported, and replacement costs determined so the officer involved may

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures,  3.16  Uniforms

request to the courts that prosecution of the individual include reimbursement costs to the agency.

**Uniform for special details:**
The Chief will develop uniform guideline as necessary for special patrol details and assignments.

**Uniform for Court Appearances:**
Male officers wear full uniform or may wear suits including dress shirts, slacks, suit or sport jackets, dress shoes, and ties. Female officers wear full uniform or may wear dresses or slacks, coordinated blouse and skirt, or a conservative business suit.

**Uniforms- Visual Aids:**
Following this policy are a number of visual examples which represent proper placement of agency issued items for different ranking officers. The placement of agency insignias must be the same for both the winter and summer shirts.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Computer Use, Security & Access | Policy Number: 3.17 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority Title and Signature:  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Employees of Meridian Public School District Campus Police Department follow established policies and guidelines governing the use and access of information contained in facility computers. Employees will comply with applicable federal laws regarding electronic communications and software copyright regulations, safeguard the facility from computer virus infections, and limit Internet use to official business only.

**PROCEDURES:**

**Authorization and Use:**
The Meridian Public School District computer system is intended solely to aid and assist employees in the performance of their assigned responsibilities. Employees therefore, limit their transactions and activities to necessary assigned responsibilities. Security clearance and access to information is restricted to official business and does not permit employees to access information for personal reasons, financial gain, or unauthorized distribution. Any misuse of the facility computer system is grounds for disciplinary action, and or criminal prosecution. **Access to NCIC, State, or other facility files is restricted to authorized *entries, modifications, research, investigations,* and *inquiries*.**

**Use of information:**
Much of the information obtained through law enforcement computer systems is **confidential, restricted,** or sensitive data which must be carefully controlled to ensure compliance with applicable local, state, and federal guidelines. Any employee accessing files or obtaining information from law enforcement systems is accountable for the appropriate and correct use of the information.

Some sensitive information in our computer or hardcopy files can only be accessed by authorized individuals having a *need to know.* If you have a doubt about your authorization to access certain data, check with your supervisor, <u>before accessing the</u>

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 1 of 3

Law Enforcement Policies and Procedures, 3.17 Computer Use, Security & Access

<u>information</u>. These records normally include *internal affairs, personnel, and intelligence*, and *undercover operations* files.

**Responsibility:**
Employees who use agency computers are accountable for proper operation and each transaction. The computer system administrator will track entries; recording the time, date, person making the entry, and the file entered. Employees operating the system will exercise reasonable care of the equipment, and are responsible for damage resulting from intentional abuse or negligence. Employees violating this policy are subject to disciplinary action up to and including termination; as well as any criminal or civil penalties, allowed by law.

**Software Guidelines:**
In compliance with software piracy laws, no software from this agency may be removed from the premises or copied for personal use. No software may be brought into this agency and installed into agency computers without the express written permission of the Chief or designee. When permission is obtained, the software will be installed by a qualified individual, in accordance with licensing agreements. Requests for new software may be made through the office of the Chief or designee. If approved, the software will be purchased and registered to the agency. Software installed on individual computers is subject to review at any time. Unauthorized software will be removed. No unauthorized personnel are to be allowed access or use of agency computers in the agency or in homes of employees.

**Internet and E-mail Guidelines:**
Access to the Internet and e-mail are for official business only. Messages transmitted or received by e-mail are considered agency property, and not the personal, confidential messages of the employee.

Employees have no expectation of privacy with regard to the use of agency computer systems, software, or files. The following rules apply:

1. Supervisory staff has the right and oversight responsibility to enter agency e-mail system(s) and review, copy, delete, or disclose any message.
2. Passwords will be used to gain access to the e-mail system, and will be changed frequently.
3. E-mail messages should not be left on the computer screen when the employee is away from their desk.
4. No information protected by copyright laws, including software, will be sent, or copied via e-mail.
5. All messages on the e-mail system will be businesslike. Employees will not transmit or received personal messages.
6. Employees will not transmit or receive any message containing profanity, vulgarity, and/or harassing or defamatory language.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

7. Employees will not transmit or receive photographs or images of a pornographic, vulgar, harassing, or defamatory nature.

**Laptop Guidelines:**

Laptop computers are very vulnerable to theft and require extra diligence in safeguarding for travel. Following are guidelines to be followed when agency laptops are carried outside of the agency:

1. Always carry the laptop in its specially padded carrying case.
2. When traveling by air, always carry the laptop on the airplane. Never check the laptop as baggage and never put the laptop inside another case checked as baggage. The only exception to this is that a laptop can be shipped in a special shipping container with padded foam for shipping sensitive electronic items.
3. Always hand-carry the laptop when traveling to and from the airport. Don't put it in the trunk of a cab or on the rack of an airport shuttle.
4. Always make sure that there is no disk in the floppy or in the CD ROM drive.
5. If you carry a computer home to work on agency projects, the computer will be carried to and from the office on a daily basis during the workweek. Under no circumstances is Meridian Public School District Campus Police Department property to be left at your residence while you are at work without express the express permission of Chief.
6. Laptop computers may be assigned individually or signed out at agency discretion as approved by of Chief.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Patrol Functions & Tactics | Policy Number: 4.01 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority<br>Title and Signature: *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department establishes and maintains maximum patrol visibility, and carries out the law enforcement mandate by vigorously patrolling the jurisdiction we serve.

**DISCUSSION:**

Patrol is a primary law enforcement function that includes much more than simply walking or driving a beat, and answering calls for assistance. Patrolling is a key part of the *general duty* employees of this agency owe to the community. During effective patrols, officers engage in a wide variety of activities to include: *rendering aid, preventing crime, enforcing traffic and criminal laws, answering complaints, conducting follow-up investigations, community relations, transporting offenders, crime prevention, homeland security, and a host of other community support activities [Sporting events].*

**PROCEDURES:**

**Communications, Coordination, & Cooperation:**
Patrol officers are the foundation of community policing. In order for the agency to accomplish its mission, patrol officers cooperate and support personnel assigned to other duties. This support includes exchange of information with criminal investigators, crime prevention specialists, and those assigned other tasks, and actual work force assistance. This cooperation and exchange is enhanced by:

1. Attending staff meetings where matters of agency interest are discussed and ideas are exchanged;
2. Daily review of patrol, investigative and offense reports and other information;
3. Sharing of information and assistance;
4. Review of and compliance with new policies and procedures &
5. Making recommendations that improve agency effectiveness or efficiency.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.01 Patrol Functions & Tactics

**Patrol Coverage:**
This agency provides law enforcement services to the Meridian Public School District on a Nine [9] hours a day, 5 days a week basis [School Operational Hours]. Generally, the agency provides the same services at all hours of the day or night in relation to *calls for service, emergency response, crime prevention, alarms* and *crash reports on the Meridian Public School District Campus.*

**Assignment of Officers to Patrol Areas:**
Officer assignments are at the discretion of the Chief and/or designee. Allocation of patrol resources is in part, based on the following criteria:

1. Number of calls for service;
2. Number of offenses & incidents;
3. Number of buildings;
4. Available manpower;
5. Other specific needs such as special events or investigation support; &
6. Special requests for service.

**Area Rotation Frequency:**
Officers are normally assigned to the same area on a *semi-permanent basis* for the following reasons:

1. Officer can become better acquainted with persons, buildings, needs, and hazards; &
2. Helps place accountability for events occurring in a certain area to a specific set of officers.

Partial rotation may be necessary when particular officers are required to perform specific types of assignments in other parts of our jurisdiction. The School Resource Officer rotates area assignments, whenever necessary to maintain high levels of officer interest, responsiveness to the law enforcement needs of the Schools, and to familiarize officers with other areas of coverage.

**Sharing Significant Law Enforcement Information:**
Officers assigned to areas are encouraged to share significant law enforcement information concerning their area with other officers. Such information may be written in an *Informational Memorandum* or passed on verbally.

**Supervision & Scheduling:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.01 Patrol Functions & Tactics

Adequate supervision and support is critical in police work where priorities change constantly. Scheduling is an important part of this responsibility and includes:

1. Ensuring sufficient officers are available to meet minimum staffing levels;
2. Daily inspection of officers for *completeness of uniform, serviceability of equipment,* and *fitness for duty,* (Also see 3.02);
3. Anticipating pre-planned major events to insure adequate coverage;
4. Monitoring compensatory time accumulation and payback;
5. Monitoring of leave time accumulation and scheduling time-off that best meets the needs of the schools;
6. Coordinating officer attendance at required meetings, training, qualification sessions, court appearances, and fitness evaluations;
7. Encouraging officer participation in college and continuing education courses;
8. Requesting MPD auxiliary or reserve officers' assistance in support of Sporting Events, or Graduation;
9. Briefing information to officers before daily patrol activity, with particular attention given to *unusual situations, directed patrol activity, and changes in the status of wanted or banned persons and stolen property,* and *major investigations*;
10. Publishing changes in schedule and assignments;
11. Publishing new directives or changes in directives; &
12. Coaching officers on job performance, compliance with policies & procedures, and ways to improve.

**Safety & Health Procedures:**

Most patrol vehicles are highly visible, even *unmarked units.* Citizens see these vehicles and instinctively know *. . . the police are nearby.* It is critical to the welfare of your fellow officers and the accomplishment of our mission for the public to see our officers as examples of ***safety first.*** Officers must adhere to the following safety procedures:

1. Come to work mentally and physically prepared to assume your duties. If, for any reason, you are not capable of performing your duties, notify your supervisor immediately. In addition to other conditions, officers assuming patrol duties must not be impaired with *sleep deprivation.*
2. Before starting patrol, inspect your patrol vehicle and complete the *Vehicle Maintenance Form* (Also see 4.20-1).
3. Wear seatbelts when the vehicle is moving or sitting on a public street, and require passengers to do the same. See *Transporting Individuals,* below for possible exceptions.
4. Position head rests to fit your physical characteristics.
5. Lock doors when vehicle is in motion.
6. Windows should be up or rolled all the way down when driving.
7. Be aware of surroundings.
8. Never leave the vehicle unsecured or the key in the ignition when away from the vehicle

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.01 Patrol Functions & Tactics

9. <u>Obey all traffic laws</u> including speed limits unless in an *authorized emergency*, with audible and visual emergency equipment activated.
10. When patrolling at night, *protect your night vision*.
11. In the event of known or suspected spilling or release of human body fluids [urine, blood, saliva, or feces] in the patrol vehicle, thoroughly clean the area following blood-borne pathogens protocols with an approved disinfectant.
12. Wear foul weather apparel in during inclement conditions.
13. Wear reflective vests or strips when directing traffic at all times, especially in low-light conditions.
14. Use *blood borne pathogen* safety equipment including *gloves, glasses, hepatitis vaccines, and reporting procedures.*

**Vehicle Inspection Safety Checklist:**
Thoroughly inspect the vehicle and its equipment to ensure that it is ready for service. Whenever vehicles are turned over to other officers for use, both officers should simultaneously complete this checklist and correct deficiencies <u>before</u> commencing patrol (Also see 4.20-1 Vehicle Maintenance). Never operate a police vehicle that has any defect that is critical to the operation including any part of the emergency equipment. The unit should be placed "out of service ".

**Patrol Activities:**
Response to some calls may require several officers to efficiently and safely control the situation. These situations may include:

1. Assault on an officer;
2. On-scene arrest for a violent offender;
3. Potential or actual resistance to arrest;
4. Use of force incident;
5. Violent or potential violent crime in progress;
6. Fleeing suspect;
7. Domestic abuse allegations; or
8. Incident of racial or crowd tensions.

If a second officer is unavailable, the first responder must exercise discretion in determining the best course of action. These options range from *immediate intervention* to *identification and reporting.* The safety of officers and innocent life is always a prime factor when considering options.

**Incidents Requiring Presence of Chief:**
Chief is to be immediately notified of the following types of incidents:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.01 Patrol Functions & Tactics

1. Serious injury to a police officer;
2. Accident involving a police vehicle when an officer or another person is seriously injured, or major damage is involved;
3. Major crimes including *murder, sexual assault, kidnapping, heinous crimes,* and *assaults where death may occur, missing children or staff with certain medical conditions*;
4. A barricaded suspect or hostage situation;
5. Officer discharging their firearm while on duty and personal injury is involved.
6. Disasters, catastrophes, or severe weather producing emergency conditions;
7. A serious complaint or any incident causing a law enforcement officer or another agency personnel serious injury;
8. Other incident when in the discretion of the patrol officer notification is appropriate; or
9. Incident where force has been used on a suspect, causing injury, and requiring a *Use of Force Report.*

**Transporting Individuals:**

Officers may be assigned to transport *witnesses, juveniles, victims, detainees*, offenders *or other persons.* Offenders must be restrained and secured in the patrol vehicle to the extent necessary under the circumstances (Also see 4.11). Officers must use their discretion in determining, when to use restraints while transporting these individuals. Citizen observers, or *ride-a-longs,* must be approved by a supervisor, prior to the event (Also see 4.19).

All persons transported in an agency vehicle must use safety seat belts. Those individuals that are restrained are assisted in securing safety seatbelts prior to movement of the patrol vehicle. This procedure does not apply to individuals who are violent or are non-compliant with officer verbal instructions. In such cases, simply placing the individual in a secure portion of the patrol vehicle may be considered reasonable and prudent under the circumstances. Refer to the policy & procedures for *transport of prisoners* for more details. Any person to be transported in a police vehicle will first be checked for warrants or other criminal activity through the local state computer criminal network and through N.C.I.C.

**Special Notifications:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.01 Patrol Functions & Tactics

Notifying relatives in cases of death, serious injury, or illness is a delicate process. Such messages are delivered in a timely and caring manner. The following procedures must be used whenever practical (Also see 4.21):

1. Notification must be made promptly;
2. Obtain the presence of a minister and a relative whenever possible prior to notification;
3. There is no painless way to make a death notification. Be precise and to the point, showing care and sympathy, without revealing any details of the injuries;
4. Try to remove any small children from the immediate area. Let the surviving spouse inform the children, in your presence, after the initial notification to the closest relative;
5. If notification is made alone, the officer shall offer assistance in contacting a relative, close friend, or minister;
6. Person receiving notification is informed of the means used in transmitting the notification to the agency, i.e., *teletype or call from another law enforcement agency, unverified telephone call to the agency*, etc.; or
7. The notified person(s) is given contact information regarding disposition of their loved one who may be at a hospital, funeral home, morgue, US Armed Forces representative, other law enforcement agency, etc.

**Coroner/Medical Examiner:**
The Coroner/Medical Examiner is notified in situations where a human death has occurred. The dispatcher normally makes the notification at the instruction of the reporting officer. The *name of the victim, location, telephone number, and any preliminary facts pertaining to the death* is provided to the Coroner/Medical Examiner, if known.

Many citizens have police scanners and monitor our frequencies. Communications regarding fatalities are carried out using the most secure means available in order to respect the privacy of deceased persons and their families.

**Public Hazards or Potential Hazards:**
A wide variety of hazardous situations in this jurisdiction such as *bad road or weather conditions, unsafe structures, potentially dangerous calls for service, flooding,* etc., must be identified by the patrol officers on the street/campus, called in to communications by citizens, or announced by local media.  Information regarding these hazardous or potentially hazardous situations must be reported, shared among officers and other agencies, and passed on to all stakeholders.

Information concerning hazardous or potentially hazardous situations that is received by the dispatcher must be passed to all personnel immediately.

**Street, Highway, & Public Utility Hazards:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.01 Patrol Functions & Tactics

Officers must initiate actions to reduce known or potential hazards to the public as they are discovered. Such actions may include *redirection of vehicle or foot traffic, taping off the area, guarding,* or *providing verbal warnings until help arrives.* If officers cannot personally make the needed correction, the communications center should request assistance from the appropriate resource.

Missing stop signs at intersections creates a driving hazard to motorists who may be unfamiliar with the area. Officers must immediately request MPD and the street department to replace downed or missing stop signs, and must remain on the scene to direct traffic at the intersection until the arrival of MPD or LCSD. The communications center must record the time of notification and the time of replacement.

Examples of immediate notification are:

1. Essential traffic lights / signs needing repair;
2. Large holes in road;
3. Electrical power lines down;
4. Large debris etc., in roadway;
5. Breaks in water, gas, or other utility;
6. Weather road hazards such as snow, ice, flooding, damaged bridge;
7. Toxic or chemical spills and releases;
8. Fires or fire hazards; &
9. Vehicular crashes, where fatalities are known to exist, or when there is complete road blockage for an extended period.

Typical notification at beginning of next business day:

1. Non-essential traffic lights in need of repair;
2. Small (non-hazardous) holes in road;
3. Street lights in need of repair;
4. Telephone or video cables down but not creating hazards;
5. Dead animals in road;
6. Potential fire hazards not requiring immediate attention; &
7. Excessive growth of weeds, grass, etc.

Some potentially hazardous situations may demand immediate notification to local news media requesting *public service announcements.* Recommendations for these notices should be passed to the dispatcher as soon as reasonably possible.  Normally, the Chief or senior on-duty supervisor will instruct dispatchers to notify media outlets when such a hazard exists. [As it relates to MPSD PD this applies to hazards on Campus] [The MPD will instruct dispatch for hazards off Campus]

**Patrol & Security Checks of School buildings:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.01 Patrol Functions & Tactics

It is vital to good public order and crime prevention for patrol officers to learn the location, hours of operation, and routines of businesses and public facilities in their area of responsibility. While on routine patrol, officers check the security conditions of District Properties. Hazards or major safety and security deficiencies should be reported to the Principal and/or Maintenance. Observations and notifications might include:

1. Unsecured entrance doors windows;
2. Defective burglar alarms;
3. Safety and security lighting that is out;
4. Loitering on the property;
5. Undesirable use of property after normal business hours; &
6. Potentially hazardous conditions or equipment left unsecured.

**Field Contact Cards**

In the course of patrol duties, officers meet people who either do not fit into the area or are in an unusual place at an unusual time. The officer should try to make contact with the person and obtain as much information as reasonably possible, and record the information on a *field contact card*. Many crimes have been solved and persons located using the *field contact cards*.

This information may include the following:

1. Name;
2. Date of birth;
3. Social Security, state identification or driver's license number;
4. Hair – color, length, style;
5. Height;
6. Weight;
7. Scars, marks, tattoos;
8. Clothing;
9. Type of transportation, complete description, and license plate numbers if vehicle;
10. Address;
11. Work place; &
12. Etc.

Any other persons with them should also be noted on the field contact card. In addition, a separate card should be filled out on each of the accompanying persons with the same notations. Once recorded officers may keep their own filing system and from time-to-time forward selected copies to the criminal investigations division.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.01 Patrol Functions & Tactics

As a practical matter, officers are usually not able to compete all of the information on contact card during one meeting, nor is it necessary. Officers should use reasonable means to obtain the information they consider important.

**Preliminary Court Appearances Not Required:**

Officers attend court on the date scheduled. Court appearance by officers is not required in the following types of cases, unless requested by the court, prosecutor, or Subpoena:

1. Initial appearance, which requires appointment of counsel to the defendant;
2. Initial appearance of *driving under the influence*;
3. Prepaid traffic infraction; &
4. Other instances when notified by the court or prosecutor that presence is not required.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Radio Procedures | **Policy Number:** 4.02 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department employees follow Federal Communications Commission (FCC) regulations regarding the use of police radios. Law enforcement radio use is limited to official business, and should be employed as if the radio system is the officer's and publics' *lifeline*.

**PROCEDURES:**

**Care of Radio Equipment:**
Only technicians authorized by Meridian Public School District Campus Police Department may adjust or repair radios. Any member of this agency who damages agency equipment must notify a supervisor immediately.

**Radio Malfunctions:**
In the event of radio malfunctions, officers should check their radios by:

1. Making sure the radio switch is on and the volume is up;
2. Making sure the visible connections are plugged in securely, and the switches and frequency selector knobs are in proper positions;
3. Removing the radio from the charger and using it in a portable manner; &
4. Changing frequencies and trying to transmit and receive, as a last resort.

If unable to establish contact by the above procedures, use a landline or wireless telephone to make contact. Officers are not to continue patrol without communications. For a limited period, patrol officers may use commercial wireless (mobile) phones to continue their patrol or other duties, if approved by the Chief.

**Instructions for Transmitting Radio Messages:**
The following guidelines are applied to radio transmissions:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.02 Radio Procedures

1. Utilize the frequency designated by Meridian Public School District Campus Police Department.
2. Keep radio on at all times, in or out of the unit.
3. If equipped with a portable radio, make sure it is on and operational when out and away from the unit.
4. Keep radio volume control loud enough to easily be heard.
5. Avoid transmitting Law Enforcement sensitive information on school frequencies.
6. Have a notebook and pencil ready so messages may be written.
7. Do not acknowledge receipt of message until the complete text is accurately known.
8. Pronounce words slowly and distinctly.
9. Whenever transmitting a message to an officer, refer to the officer by call number.
10. Officers in the field use their call numbers prior to transmitting.
11. Speak with as little emotion as possible.
12. Do not transmit until the message is clearly in mind, but don't hesitate in emergency situations.
13. If necessary to transmit a lengthy message and time permits, write it down in logical order before transmitting.
14. Break a lengthy message periodically, especially a message having more than one part.
15. Keep mouth close to microphone and speak as if using a telephone; do not shout.
16. Use the minimum number of words necessary to convey the message.
17. In describing persons, give information in the following order:

   a. Name
   b. Alias
   c. Race
   d. Sex
   e. Age
   f. DOB
   g. Height
   h. Weight
   i. Color of Hair
   j. Color of Eyes
   k. Complexion
   l. Scars or Tattoos
   m. Clothing Description
   n. Home Address
   o. Felony-misdemeanor or reason for broadcast

18. Names of persons and unusual words are spelled using initials coded (A-Adam; B-Boy; C-Charles, etc.).
19. When transmitting numbers, state them in groups of three.
20. Officers with emergency traffic, and the dispatcher, have priority use of the radio until emergency traffic is concluded.
21. Officers not involved in emergencies will not call in requests for information.
22. Uninvolved officers learn by listening.
23. If additional assistance is needed, it will be requested.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.02 Radio Procedures

**Radio Procedures – Traffic Stops [On MPSD Campuses]:**
When stopping a vehicle for any reason, the officer notifies the communications center of the following:

1. Intent to stop a vehicle;
2. Location where vehicle is stopped;
3. Complete description of the vehicle;
4. Number and description of occupants; &
5. Need for back up.

**Radio Procedures - Felony Stop:**
When a vehicle is observed and thought to be occupied by felons or suspected felons, officers notify the communication center and provide the location of the vehicle, if stationary, or the location and direction of travel, if moving. Officers should keep the vehicle in-sight, notify the communications center, and request sufficient back up to maintain or achieve officer-suspect superiority. [If On Campus] [Off Campus belongs to MPD]

**Radio Procedures - Courtesy Messages:**
Law enforcement radio facilities may be used to locate persons for emergency purposes whenever public service facilities have failed, are inadequate, non-existent, or whenever a person sought is enroute to the destination. The following guidelines should be followed regarding use of the police radio for courtesy messages:

1. Courtesy messages should be carefully considered before acceptance. Communications, which are not urgent, should not be transmitted.
2. Employees may not convey the text of the message or the nature of the emergency. Inform the person that an emergency exists, and provide the name and telephone number of the person trying to reach them.
3. The law enforcement radio system is for official law enforcement messages only, and may not be used as a paging system for any private individual or organization.

**Radio Procedures - Disasters and Other Serious Incidents:**
Employees learning of a crime, civil disorder, critical incident, or disaster, such as an explosion, tornado, etc., immediately give the description of what happened to the dispatcher by radio, or any other available means of communication. The dispatcher then contacts and dispatches a supervisor. The employee reporting the incident must continue to evaluate the situation, and provide further communication concerning the

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.02 Radio Procedures

event, including immediately needed resources, back up, street closing, traffic re-routing, etc.

Incidents involving multiple response agencies can result in confusion. Officers will therefore use *clear text* **English**.

**Radio Procedures - Hit and Run:**
An officer reporting hit-and-run incidents transmits the information in the following manner:

1. Location of hit-and-run accident;
2. Any personal injury involved;
3. Date and time of the accident;
4. Color, year, make, body style, accessories, license information;
5. Any Identifying features or damage to the vehicle that left the scene;
6. Description of the driver and passengers, if known, occupying suspect vehicle**;** &
7. Direction of travel of suspect vehicle when last seen.

**Radio Procedures – Car-to-Car Transmissions:**
Employees using law enforcement communications are prohibited from using slang expressions, jokes, humorous remarks, profanity or keying the microphone to music, internal or external noises, and other non-professional uses. Communication is conducted in the performance of official law enforcement business, using as few words as possible to complete transmissions.

**Alphabetical Word Code:**
Employees use the following word code when transmitting by police radio:

| | | | |
|---|---|---|---|
| **A** - Alpha | **H** - Hotel | **O** - Oscar | **V** - Victor |
| **B** - Bravo | **I** - India | **P** - Papa | **W** - Whiskey |
| **C** - Charlie | **J** - Juliet | **Q** - Quebec | **X** – X-Ray |
| **D** - Delta | **K** - Kilo | **R** - Romeo | **Y** - Yankee |
| **E** - Echo | **L** - Lima | **S** - Sierra | **Z** – Zulu |
| **F** - Foxtrot | **M** - Mike | **T** - Tango | |
| **G** - Gulf | **N** -November | **U** - Uniform | |

**Dispatch Codes :**

When dispatching a message to a responding officer, the dispatch unit should give a priority number to every call according to the following;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.02 Radio Procedures

1. **Code 3 (Emergency)** A call of an immediate, life-threatening nature.  Response by the officer requires the use of emergency equipment (lights and siren), except when use of such equipment would likely result in alerting the violator and increasing the likelihood of escape.

2. **Code 2 (Priority or Urgent)** A call which requires an officer to be on the scene as soon as possible.

3. **Code 1 (Routine)** A call of a routine or less serious nature.  The officer responds as soon as possible, or may handle the call while remaining in service.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject:  Communications Center - 911 | Policy Number: 4.03 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority<br>Title and Signature:  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department utilizes a standard operating procedure in response to all 911 emergency telephone calls received. [Most 911 calls will be handled by the Lauderdale County E911 Center]

**DEFINITIONS:**

- ***Call Taker -*** The employee(s), either civilian telecommunications personnel or law enforcement officer(s), who are qualified, by virtue of training or experience, to answer the 911 emergency telephone calls and further manage the calls based on circumstances surrounding each emergency situation.

- ***Computer Aided Dispatch (CAD) -*** All enhanced 911 emergency telephone calls received are aided by computer.  The computer automatically displays an address from where the call originated and the telephone number from which the call is being made onto the computer monitor. The automatic display of the address is referred to as the "ALI" (automatic location indicator). The automatic display of the telephone number is referred to as the "ANI" (automatic number indicator).

**PROCEDURES:**

For detailed procedures on operation of the 911 and telecommunications, refer to the agency *telecommunications policy & procedures manual.*

**Receiving a 911 Call:**
All 911 emergency telephone calls received are answered promptly and on a priority basis. When receiving a 911 emergency telephone call, the call taker must:

1. Answer the telephone, preferably on the first ring;
2. Respond, *911, what is your emergency?*

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

3. Obtain all necessary information for completing an initial dispatch;
4. Remain on the line with the caller if further information is needed or to keep the caller calm;
5. Dispatch appropriate law enforcement, fire, or emergency medical personnel;
6. Notify the appropriate authorities if the call received is from a cellular phone outside of Meridian Public School District Campus Police Department jurisdiction;
7. Dispatch law enforcement personnel to any calls where communication cannot be established or only background noise is heard;
8. Attempt to reestablish contact, using *ANI*, with any terminated calls; &
9. Never provide emergency medical advice to a caller unless qualified to do so through certified training courses.

**Receiving a 911 Call - Non Emergency Situations:**

Should a 911 call be received which is determined not to be an actual emergency, the call taker must:

1. Be courteous and professional in advising the caller that he or she has made contact with the law enforcement agency on an emergency telephone line and that it is necessary for them to hang up their telephone and call back on a non-emergency line; &
2. Provide the caller with the non-emergency phone number and assure them that a member of the law enforcement agency will speak with them on the non-emergency telephone line.

**911 Calls requiring the Call Taker to Remain on the line with the Caller:**

The receiver of a 911 emergency telephone call is not required to stay on the line with the caller on every occasion.  A number of situations, however, require the call taker to remain in contact with the caller in order to complete a "Law Enforcement Call Guide" or "Fire Call Guide", both found at the end of this policy. In that respect, the *call taker* is required to remain on the telephone if:

1. A burglary or robbery has just occurred or is in progress, and the actor is still in the area;
2. A disturbance or domestic situation in which an individual has a weapon, is believed to have a weapon, or is threatening to use violence; and medical assistance is required;
3. An individual is threatening to commit suicide;
4. A structure fire is occurring and the caller is a safe distance from the burning structure;
5. A caller is trapped inside a burning structure and his location is needed for rescue; &
6. Any emergency call where injury has occurred and medical assistance is required.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

## LAW ENFORCEMENT CALL GUIDE

When receiving information on criminal activity, which is currently occurring or has previously occurred, employees of Meridian Public School District Campus Police Department write down the following:

1. Name of Caller: _____
2. Location of Caller: _____
3. Name of Suspect(s): _____
4. Number of suspects:_____
5. Location of Suspect(s): _____
6. Description of Suspect(s) to include:

    a. Sex: _____
    b. Race: _____
    c. Height: _____
    d. Build: _____
    e. Color and Length of Hair: _____
    f. Color of Eyes: _____
    g. Complexion: _____
    h. Presence of Facial Hair: _____
    i. Scars/Marks/Tattoos: _____
    j. Clothing Description: _____
    k. Vehicle Description: _____
    l. Direction of travel:_____

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.03 Communications Center - 911

## FIRE CALL GUIDE

When receiving information about a fire, which is currently occurring or has previously occurred, employees of Meridian Public School District Campus Police Department write down the following:

1. Name of Caller: _____
2. Location of Caller: _____
3. Name of Suspect(s): _____
4. Location of Suspect(s): _____
5. Is there anyone inside the structure, vehicle, etc., and if so, what are their locations?

   _____
   _____

6. Are there any accelerants or hazardous chemicals in the area, and if so, where?

   _____
   _____

7. Do you know how the fire started, and if so, how?

   _____
   _____
   _____
   _____
   _____

8. Description of Suspect(s) to include:

   a. Sex: _____
   b. Race: _____
   c. Height: _____
   d. Build: _____
   e. Color and Length of Hair: _____
   f. Color of Eyes: _____
   g. Complexion: _____
   h. Presence of Facial Hair: _____
   i. Scars/Marks/Tattoos: _____
   j. Clothing Description: _____
   k. Vehicle Description: _____

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| **Subject:** Civil Rights & Constitutional Warnings | **Policy Number:** 4.04 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department subscribes to the principle that law enforcement officers are sworn to protect and defend the civil rights of all persons within their jurisdiction as guaranteed by the United States Constitution. As a part of this responsibility, officers of this agency provide appropriate constitutional warnings and the corresponding protection to all suspects.

**DEFINITIONS:**

- ***In-custody interrogation*** – Contact in which an individual is either under arrest or their movement to come and go as they please is restricted at any agency facility or at any location where, although not physically detained, a law enforcement officer creates a coercive atmosphere.

- ***Interrogation*** - An exchange in which the subject is unwilling to exchange information with the law enforcement interviewer or is being questioned about his involvement in a crime or criminal activity.

- ***Interview*** - A meeting or discussion with a witness or potential witness in which the officer questions, consults with, or evaluates the other person.

- ***Suspect*** - A person suspected of a specific crime, also a person apprehended for but not yet charged with a specific offense.

- ***Witness*** - One who gives or may be capable of giving evidence regarding matters of fact under investigation.

**DISCUSSION:**

The Fifth Amendment to the United States Constitution states that *. . . persons shall not be compelled in any criminal case to be a witness against themselves.* With this in mind,

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures,  4.04  Civil Rights & Constitutional Warnings

any *in-custody* individual suspected of committing a crime and interviewed or interrogated concerning their involvement in that crime is advised of their constitutional rights pursuant to Miranda v. Arizona, 86 S. Ct. 1062; 1966.

It is often recited by professional law enforcement officers that *. . . you interview a witness, and interrogate a suspect.* In many investigations a *witness* may become a *suspect*. When, in an officer's perception, a *witness* turns into a *suspect*, it is appropriate to then and there **read** the individual their constitutional rights, before proceeding with what has now become an *interrogation.*

*Miranda* states that before an in-custody interrogation or interview of a suspect in a criminal case, the suspect must be warned of his right to remain silent, to consult with counsel, to have counsel present during questioning, and if he cannot afford a lawyer one will be appointed to represent him.

If the accused indicates he wants an attorney, the interrogation or interview must cease until the attorney is present. The burden is on the arresting and interrogating officer to show that the accused knowingly and intelligently waived his right to counsel. The failure of an accused to ask for counsel does not constitute a waiver of their rights. Officers are required to affirmatively advise a suspect of their rights, and provide those rights upon request of the suspect.

Once a suspect or accused has been advised of their *Miranda Warnings* and has invoked these rights to have counsel present during custodial interrogation, the suspect or accused is not to be subjected to further interrogation until counsel has been made available or he has himself initiated further communications, exchanges, or conversations (Edwards v. Arizona, 101 S. Ct. 1880; 1981). Once again, the burden is on the officer to prove a voluntary waiver by the suspect or accused.

If the accused is *in-custody* before the interrogation, the accused must be given *Miranda Warnings* before any questioning takes place. In order to use a statement in court, a suspect under arrest must be advised of the *Miranda Warning* and the detective must be able to demonstrate that the suspect understood those rights and made a knowing and intelligent waiver of those rights, prior to any interrogation.

**Note:** Foreign nationals arrested or detained for an offense have additional warning requirements.

**PROCEDURE:**

**The Warnings:**
The Supreme Court of the United States provides *guidelines for law enforcement officers on required* warnings. These *warnings and the corresponding rights all apply before any interrogation of a suspect.* The rights of an accused suspect or person in custody are:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures,  4.04  Civil Rights & Constitutional Warnings

1. Right to remain silent;
2. A clear understanding that anything he/she says may be used against him in a court of law;
3. Right to an Attorney before any questioning; &
4. If he/she can't afford an Attorney, one will be appointed and provided before any questioning.

After reading a suspect their rights, the suspect is asked "*Do you understand your rights?*" If the answer is "yes," the officer questions the suspect to test their understanding such as: "*Do you understand that you don't have to speak or provide your side of the story?*" By this process the officer can reasonably confirm the suspect's comprehension of his rights.

Arresting officers and interrogating officers **read** *Miranda Warnings* to any and all suspects:

1. Before any *interrogation, interview, or questioning* regardless of whether the suspect has been formally arrested or not. A clear rule of thumb is if the officer suspects that an individual has committed a specific crime, there is *probable cause* to arrest, and the individual is coerced or not free to leave, the officer must interrupt the inquiry and read the suspect their rights before proceeding.
2. From a form or pocket card approved from the agency. Officers <u>may not</u> recite the warnings from memory.
3. At the earliest possible opportunity after the suspect and the crime scene is secured.

To carry out this vital duty, officers carry and use a Miranda Warning Card on their person. Officers may not assume that suspects have had their rights read to them, or that they comprehend their rights, regardless of the number of officers that have handled the suspect under this case or previous arrests.

All written statements or confessions of a suspect bear a written confirmation of the suspect's rights, a comprehension of those rights, and the suspect's witnessed signature.

In the event a suspect can not orally speak, the arresting officer asks the suspect to write down their understanding and agreement to proceed on paper. Likewise, if the suspect is not conversant in the English language, the arresting officer secures the services of a qualified interpreter or translator before proceeding with the interrogation.

The reading of these warnings is given in addition to any other required warning such as *juvenile warnings, magistrate warnings*, or *warnings by any other law enforcement agency*.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures,  4.04  Civil Rights & Constitutional Warnings

**Stop Action:**

Suspects may exercise their right to have legal representation or to remain silent at any time, even after previously waiving these rights. This may occur during a conversation, interview, interrogation, or lineup. Whether the person is in or out of custody does not matter. When suspects state a desire to invoke their rights, the interrogation or interview stops and no force or coercion is used to dissuade suspects from exercising their rights. No further interviews or interrogations are made until access to legal counsel or written request has been received *requesting to speak to an investigating officer without an attorney the presence.*

There are no exceptions to this policy. The exercise of constitutional rights by a person or suspect is not an admission or indication of guilt. Officers who fail to comply with this policy are subject to severe disciplinary action, to include dismissal form the force.

State warning guidelines may be more stringent than the standard "Miranda Warning," officers should follow the agency's directions regarding the more restrictive of these guidelines to ensure full compliance with state law.

**Foreign Nationals:**

In addition to the requirements of Miranda Warnings, in regard to an arrest or detention of a foreign national, the suspect must also be informed of their right to contact their country's nearest Consul General before any questioning**.**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Search Warrants | **Policy Number:** 4.05 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department officers exercise due diligences when preparing and executing search warrants. Officers performing these tasks:

1. Have sound knowledge of the legal requirements associated with obtaining a search warrant in order to prevent suppression of evidence;
2. Use techniques to accomplish a thorough and legal search;
3. Observe the constitutional rights of the person(s) the warrant is being served upon;
4. Minimize the level of intrusion experienced by those who are having their premise or property searched;
5. Respect reasonable expectations of privacy;
6. Provide for the highest degree of safety for all persons concerned; &
7. Establish a record of the entire process.

**DEFINITIONS:**

- ***Search Warrant -*** A written order, in the name of the People, signed by a magistrate or other judicial authority, directing a peace officer to search for specified personal property, with instructions to bring it before the magistrate.

**PROCEDURES:**

**Warrant-less Searches:**
The Fourth Amendment to the U.S. Constitution prohibits unreasonable searches. Officers conducting searches without warrants must prove that searches are reasonable. Therefore, officers should consider obtaining search warrants whenever time and circumstances permit. Search warrants are not required if officers are:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.05 Search Warrants

1. Securing weapons or evidence of a crime incident to an arrest; if the evidence is in a vehicle, consent or a warrant should be obtained
2. Assisting individuals under life-threatening situations;
3. Protecting the public from harm;
4. Searching for additional victims at crime scenes;
5. Protecting vital evidence;
6. Pursuing a perpetrator;
7. Searching vehicles based on probable cause that the suspects may contain contraband; &
8. Searching individuals under their voluntary, written consent.

**Legal Basis for Seeking a Search Warrant:**

The following guidelines must be followed by all officials of the agency when obtaining search warrants:

1. Officers must be able to articulate **probable cause** to believe that specific evidence, contraband, or fruits of a crime may be found at a particular location.
2. Any facts that establish probable cause must be clear and specific. Officers may not rely solely on personal opinion, unauthenticated third-party information, or hearsay. The officer bases all facts on:
   a. Personal observation or knowledge, or
   b. Information from a reliable source; &
3. When informants are used, particularly confidential informants, specific information should be provided as to their reliability.

**Affidavit Preparation:**

An affidavit supporting the warrant is prepared on the appropriate agency form before executing a warrant. Affidavits are vital to the search warrant validity. Affidavits should clearly and completely convey the following information:

1. An offense description with reference to the criminal code section, where possible;
2. The place or thing to be searched must be specifically described to include:
   a. The physical address of the location;
   b. A physical description of the premises;
   c. A legal description of the premises;
   d. The name of the owner or occupant;
   e. The geographical location of the property;
   f. Map coordinates or distances from given reference points; &
   g. Photographs, maps, or diagrams that help to specify the location in question.
3. If conducting a complete search of a home and its surroundings, the affidavit should specify a "premises" search and its "curtilage" and should identify any outbuildings such as garages, tool sheds or barns, where appropriate; [**Such would have to be of exigent circumstances ie... whereas there is a "Fresh**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.05 Search Warrants

**Pursuit" stemming from a "Felony" act which occurred on Campus. Even so, MPD and/or LCSD shall be involved.]**

4. Any motor vehicles known to be on the premises that may be searched should be specified and clearly identified;
5. Anyone who is searched, besides being frisked for weapons, should be noted by name in the affidavit;
6. The specific items to be searched for must be detailed in the affidavit, including any alterations made to those items; &
7. Any experts used for the search of computers and related high-technology equipment are noted in the affidavit.

**Time Limitations – Execution of a Search Warrant:**

The agency executes search warrants as soon as possible following the conditions of warrant. Circumstances may warrant execution that include, but are not limited to:

1. The seizable items have not arrived at the search site;
2. The probability that substantial resistance will be encountered; &
3. A particular person(s) is absent from the search site and it is determined that the search would best be conducted if that person is present.

**Preparation – Execution of a Search Warrant:**

Prior to entering the premises, the supervisory officer must:

1. Ensure that the warrant is valid;
2. Confirm that the property about to be searched is the property listed on the warrant;
3. Conduct a pre-entry briefing of the execution process with all search team personnel to include:
    a. Review of the order of operations and procedures,
    b. A simulation of conditions of the search using the appropriate maps, charts and diagrams, &
    c. Tactics and equipment to be used in the event of forced entry;
4. Review the most current intelligence available to determine whether circumstances have changed that may make executing the search warrant at that time undesirable;
5. Include at least one uniformed officer in the execution of the search warrant;
6. Ensure that all non-uniformed officers can be clearly identified as law enforcement officers by distinctive armbands, jackets or other indicators of office;
7. Equip all search team personnel with body armor and a safety holsters; &
8. Document the entire warrant execution process using photographs and videotape from beginning until the search team leaves the premises.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.05 Search Warrants

**Entry Procedures – Execution of a Search Warrant:**
All officers should follow these guidelines:

1. Entry into a property for the purpose of serving a search warrant may occur at any time of the day or night if the affidavit provides good cause and permission is granted in the warrant.
2. Approach the scene without sirens.
3. Make contact with the surveillance team to ensure that the time is appropriate to serve the search warrant.
4. The supervisory officer notifies persons inside the search site, in a voice loud enough to be heard inside the premises, that he/she is a police officer and has a warrant to search the premises, and that he/she demands entry to the premises at once.
5. No-knock entries are used only when necessary. It should be noted in the search warrant prior to entry if officers believe adherence to the knock-and-announce rule would:
   a. Endanger their safety or the safety of others,
   b. Enable wanted persons to escape, or
   c. Likely result in the destruction of evidence before entry could be made.
6. Search team personnel must be positioned so that:
   a. All exits from the property are covered,
   b. Uniformed officers are the most visible and enter the property first, &
   c. Non-uniformed officers enter last;
7. Once inside the property, the supervisory officer ensures that a member of the search team conducts a security sweep of the search site.
8. After the search site has been secured, officers develop a prioritized strategy that details the likely whereabouts of the items to be seized and an order of operation for conducting the search.
9. One [1] officer or evidence technician is designated to collect, preserve and document all items seized from the property.
10. Any property that is damaged during an entry:
    a. Must be secured or guarded until the property is secured, if the property is left vacant; &
    b. Be detailed in a special report prepared on the actions that caused the damage and the nature and extent of the damage.

**Record of the Search Warrant:**
Officers must record and provide a receipt of any property taken during a search, return the warrant and deliver the property inventory to the appropriate judicial authority within specified time limits.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Search of Motor Vehicles | **Policy Number:** 4.06 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department, only conduct searches that are legal and thorough, while strictly observing the constitutional rights of drivers and other occupants. Searches are only conducted with due regard for the safety of officers, other persons, and the property involved.

**PROCEDURES:**

**Officer Safety:**
Officers **must not search vehicles alone**. At least two officers must be present in order to allow one officer to search and one officer to monitor vehicle occupants.  Officers may make all occupants exit the vehicle while interviewing or searching, in order to protect their safety.

**General Provisions for Vehicle Searches:**
There are three conditions under which law enforcement officers may search a vehicle. These conditions are *warrant, warrant-less,* and *consent searches*.  When conducting a vehicle search, officers of Meridian Public School District Campus Police Department must:

1. Request owner or operator's consent regardless of the type of search [*warrant, warrant-less,* or *consent searches*] to be conducted;
2. Obtain a search warrant, if feasible;
3. Avoid vehicle damage unless reasonably necessary to carry out a safe and thorough search; &
4. Search all areas of the vehicle, unless specified otherwise in the warrant or in the consent.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.06 Search of Motor Vehicles

**Warrant Searches:**

Upon *probable cause*, time permitting, officers execute searches of vehicles including cars, trucks, and buses, by means of a duly authorized search warrant. The request for the warrant details the vehicle to be searched, the areas in the vehicle to be searched, and the items to be seized. Additionally, the warrant specifies the information or evidence upon which the search warrant is justified, before taking the search warrant to the judge for approval. Officers' exercise care to ensure that the information in the warrant is correct and presented to the judge in a reasonable amount of time. The judge issuing the warrant is doing so based solely on the credibility of the officer and his representation that the facts presented are true and correct.

Officers must use their best effort to:

1. Obtain a search warrant, if feasible;
2. Request owner or operator's consent regardless of the circumstances involved;
3. Avoid vehicle damage unless reasonably necessary to carry out a safe and thorough search;
4. Search all areas of the vehicle, unless specified otherwise in the warrant, or in the consent;
5. With the exception of the items seized, leave the vehicle and its contents in the same condition as found; &
6. Provide the owner or operator with a receipt of any items lawfully seized.

**Warrant-less Searches:**

If *probable cause* of criminal activity exists, officers may **enter** motor vehicles without warrants or consent in order to specifically:

1. Examine a vehicle identification number or determine ownership of the vehicle;
2. Remove a person from a vehicle in an emergency situation;
3. Seize evidence or contraband that is in plain view; or
4. Perform inventory searches of vehicle to be impounded.

Officers may not abuse warrant-less searches and must ask permission of owners or operators before conducting a warrant-less entry or search, if possible.

**Consent searches:**

Officers may conduct warrant-less searches with or without *probable cause* after obtaining *consent* from the vehicle owner or operator.  The extent of a consent search may be limited to specific areas of a vehicle depending on the terms of the consent.  A person granting consent to search may limit the scope of the consent, or may not consent to a warrant-less search.  This is a constitutional right of the individual.  A receipt is made and delivered to the consenting party regarding seized illegal items.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.06 Search of Motor Vehicles

**Location of Vehicle Searches:**
Officers of this agency must use their discretion regarding the location of warrantless searches in order to protect officers, vehicle occupants, members of the general public, and potential evidence.  Such searches may be conducted at the following locations:

1. On a public way running through MPSD Campus;
2. In a MPSD parking lot; or
3. Off MPSD campus as a result of "Fresh Pursuit".

In cases of searches authorized by search warrants, the warrants specify the location, conditions, and vehicle to be searched.

**Search of Containers Found in a Vehicle:**
The following conditions normally apply to the search of containers observed in or near the vehicle.

1. Containers, including paper bags, cardboard boxes, and wrapped packages, may be searched, under a *warrant* or with *probable cause* if:
   a. Found within the vehicle passenger compartment,
   b. Found during a consent search, or
   c. Discarded from the vehicle.
2. Inventory searches of containers are conducted after lawful, custodial arrests.
3. Locked containers such as attaché cases, suitcases, and footlockers may be opened under a warrant or consent of the owner **only**.
4. Containers must be searched at the location where the vehicle was discovered or detained if safe to do so.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

## SEARCH OF MOTOR VEHICLE
## Consent to Search Form

I, (consenting individuals signature) _____ do hereby

authorize the following officers (Officer's names) _____

_____who are

identified as being employed by Meridian Public School District Campus Police Department to

conduct a search of the following described vehicle:

Year: _____ Color: _____

Make/Model: _____

Additional descriptive information: _____

_____

_____

Registered owner of vehicle: _____

I have also been advised that it is within my right to not allow a search of the vehicle described
above and that I may also withdraw the consent given at any time during the search procedure.
I have been asked by the above named law enforcement officers to allow a search of the above
described vehicle. There have been no threats or promises made to me, and no pressure or
coercion of any kind have been used against me. I make this decision rationally and of my own
free will.

Signature of vehicle owner/operator: _____

Date: _____ Time: _____

Location: _____

Comments, including any items seized (attach additional sheets, if necessary): _____

_____

_____

_____

_____

_____

_____

_____

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Signature of officers: _____
_____
_____

Signature of witnesses: _____
_____
_____

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Interviews & Searches | **Policy Number:** 4.07 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Officers of Meridian Public School District Campus Police Department perform interviews and searches in a professional and courteous manner, without compromising their own safety or the safety of others, and without harassment or undue embarrassment to the public.

**DISCUSSION:**

Interviews, whether performed in the field or office, are an important technique for officers to use in preventing and investigating criminal activity. It may be necessary for officers to search those being questioned in order to protect their own safety.

Field interviews and searches can be perceived by some as unnecessary or discriminatory police harassment even when conducted with respect and in strict compliance with reasonable policies and procedures, and the law. In order to maintain the effectiveness and legitimacy of this practice and to protect the safety of officers who must approach and deal with suspicious individuals, officers conduct field interviews and searches in conformance with procedures set forth in this policy and procedure manual.

**DEFINITIONS:**

- ***Field Interview -*** The brief detainment of an individual, whether on foot or in a vehicle, based on *reasonable suspicion,* for the purposes of determining the individual's identity and resolving the officer's suspicions concerning criminal activity.

- ***Probable Cause -*** Reasonable grounds for belief that a suspect or accused person may be subject to arrest or the issuance of a warrant. Contrast to *reasonable suspicion,* which is a much lower standard.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.07 Interviews & Searches

- **Reasonable Suspicion -** A reasonable officer is lead to suspect that criminal activity has been, is being, or is about to be committed given the facts and circumstances of the situation. *Reasonable suspicion* may also apply to otherwise legal issues, such as a reasonable suspicion that the person being interviewed is in possession of a weapon [legal or otherwise]. Contrast to *probable cause,* which is a much higher standard.

- **Pat-Down Search -** A "frisk" or external feeling of the outer garments of an individual for weapons, contraband, or concealed evidence.

- **Rub Search -** Rubbing of the individual's body including the genitals, buttocks, and breasts, for weapons, contraband, or concealed evidence.

- **Strip Search -** A visual inspection of an unclothed individual for weapons, contraband, wounds, abuse, suicide attempts, or concealed evidence.

- **Body Cavity Search -** A strip search that involves probing the mouth, anus, and genitals of the individual for weapons, contraband, or concealed evidence.

**PROCEDURES:**

**Justification for Conducting a Field Interview:**
Officers may stop individuals for the purpose of conducting a *field interview* only when *reasonable suspicion* is present. In establishing reasonable suspicion an officer must be able to describe facts or observations that, when taken together with common sense, reasonably justify the stop. Such facts or observations may include, but are not limited to the following:

1. Appearance or behaviors that suggest the person is part of a criminal activity or enterprise, or is engaged in a criminal act.
2. Observed behavior or circumstance that suggests the individual is impaired, injured, or otherwise at risk.
3. Hour of day or night is inappropriate for the suspect's presence in the area.
4. Individual's presence or activity in a school building or on a school campus is inappropriate.
5. Suspect is carrying a suspicious object.
6. Suspect's clothing bulges in a manner that suggests he or she is carrying a weapon.
7. Suspect is located in proximate time and place to an alleged crime.
8. Officer has knowledge of the suspect's prior criminal record or involvement in criminal activity.
9. Suspect flees at the sight of a police officer under conditions that suggest a specific criminal activity.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.07 Interviews & Searches

**Procedures for Initiating a Field Interview:**

Officers may stop and interview individuals after observing suspicious behaviors or circumstances following these general guidelines:

1. When approaching individuals, officers should clearly identify themselves as a law enforcement officer and display agency identification, unless clearly dressed in full uniform.
2. Officers observe the stopped individuals carefully for movement to retrieve weapons, conceal, or discard contraband, or any other questionable actions.
3. Before approaching a group of individuals, the observing officer should determine whether the circumstances warrant a request for *backup assistance* and whether contact with the observed group can and should be delayed until assistance arrives.
4. Officers confine their questions to those concerning individual identity, place of residence, and other inquiries necessary to resolve the officer's suspicions. Officers may not detain individual(s) longer than reasonably necessary to resolve outstanding issues.
5. Officers are not required to give Constitutional rights and warnings (*Miranda* and/or *juvenile)* in order to conduct field interviews, unless there is *probable cause* to believe the person is considered a *suspect of a specific crime*, and the individual *is not free to leave the presence of the officer*. When the individual becomes a *suspect* and the officer decides that the individual may not leave, the officer reads all required warnings to the suspect(s), and provides those rights unless specifically waived by the suspect(s).
6. Stopped individuals <u>are not</u> required to answer any questions posed during field interviews. Failure to respond to an officer's inquiries is **not sufficient** grounds for arrest, or to stop the individual(s) from leaving. Likewise, individuals are not required to stay in the presence of an officer unless they are suspects, and you advise them that they are not free to go. Such refusal may be sufficient justification for additional observation and investigation.
7. If the officer has no basis for making an arrest, the officer should record the facts of the interview, in the officer's field notebook or use a Field Contact Card for later reference.

**Justification for Conducting Pat-Down Searches:**

Officer may perform a *pat-down search* of the outer garments of a stopped individual for weapons if and when:

1. Individual has been legitimately stopped with *reasonable suspicion*; &
2. Officer has *reason to believe* that the individual possesses weapons and poses a threat to the officer's or another nearby person's safety. Not every field interview

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.07 Interviews & Searches

poses sufficient justification for conducting a pat-down search, but any of the following factors may justify a search to include:

- a. Type of crime suspected, particularly in crimes of violence where the use or threat of deadly weapons is involved;
- b. A single officer handling more than one suspect;
- c. Hour of the day and the location on campus where the stop takes place;
- d. Prior knowledge of the suspect's use of force and/or propensity to carry deadly weapons;
- e. Appearance and demeanor of the suspects;
- f. Visual indications that suggest the suspect is carrying a firearm or other deadly weapon; &
- g. Age and gender of the suspect.

Whenever possible, pat-down searches should be performed by officers of the same sex as the suspect.

**Procedures for Performing a Pat-Down or Rub Search:**
Pat-down searches should be performed with caution, restraint, and sensitivity. These searches may only be performed to protect the safety of officers and others and may never be used as a pretext for intimidating individuals or groups of individuals, to obtain evidence, or for any other purpose. Pat-down searches should be conducted in the following manner.

1. Pat-down or rub searches should be conducted by at least two officers, one who performs the search while the other provides protective cover.
2. Pat-down or rub searches are performed with:
   - a. Suspect's hands high on the wall or on the patrol vehicle, with extended fingers;
   - b. Feet positioned in a wide stance, approximately three [3] feet apart, to inhibit escape;
   - c. Back arched and in a straight line with the legs;
   - d. The officer's left leg wedged behind the suspect to subdue any attempted escape;
   - e. Hold the suspect by the collar for upper body searches and then by the waistband of the pants for lower body searches, this gives the officer a tactical advantage and leverage to throw or redirect the actor's movement if the actor tries to evade the search; &
   - f. Officer conducts the search in quadrants of the body. Switching hands in the middle of the back, when changing from either side of the body.
3. Officers are permitted only to touch the outer clothing of the suspect. Officers may not place their hands in pockets unless they feel an object that could reasonably be a weapon, or contraband.
4. Officers may require suspects to turnout or empty their pockets.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.07 Interviews & Searches

5. If the suspect is carrying an object such as a handbag, suitcase, briefcase, sack, or other item that may conceal a weapon, the officer should not open the item but instead place it out of the suspect's reach.
6. If the external feeling of the suspect's clothing fails to disclose evidence of a weapon or contraband, no further search may be made. If potential contraband or evidence is present, an officer may retrieve that item only. If the item is a weapon, the possession of which is a crime, the officer at their discretion, may make an arrest and complete a full-custody search of the suspect.

If the officer has a hand held metal detector, this could be used first to scan the body for metal in an area not common on the clothing. Then conduct a pat search.

**Strip Searches:**
In the field environment, strip searches of detainees are only conducted in the rarest of circumstances when officers have *reasonable suspicion* that the detainee may be in possession of criminal evidence or contraband, needs medical attention, or has the potential of harming themselves or others. *Reasonable suspicion* may be based on:

1. Nature of the original offense;
2. Prior arrest and or conviction record;
3. Conduct during the arrest or while being processed;
4. Observed behavior or appearance;
5. Comments made by the detainee;
6. Clothing, possession or appearance;
7. Information passed on by the arresting officers, agency or informants;
8. Law enforcement reports; &
9. Other reasonable beliefs or observations.

Strip searches of detainees, with the explicit approval of a supervisory officer, are conducted:

1. By specially trained and designated personnel;
2. In conformance with approved hygienic procedures and professional practices;
3. In a room specifically authorized for this purpose;
4. By the least number of personnel necessary to maintain privacy and only by those of the same sex as the suspect, unless exigent circumstances exist; &
5. Strip searches should never be conducted at roadside where embarrassment to the individual may occur or exposure to the public eye.

Before *strip-searching* a non-violent detainee officers articulate or state the basis for the *reasonable suspicion*, and document the basis for the strip search in the incident report.

**Body Cavity Searches:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

| Law Enforcement Policies and Procedures, 4.07 Interviews & Searches |
| --- |

Search of an individual's blood stream, body cavities, and subcutaneous tissues are only to be conducted by a physician, licensed nurse, or medical staff specifically trained for this task. Any such search, conducted incidental to arrest, may be made without a search warrant only:

1. With clearly established *probable cause*;
2. If there is a *strong probability* that items will be seized which relate to the offense for which the individual was arrested;
3. If delay in securing a *search warrant* would <u>probably</u> result in the disappearance or destruction of the objects of the search;
4. If it appears that, the search is reasonable under the circumstances of the case, including the seriousness of the offense, and the nature of the invasion of the individual's person; &
5. When significant amounts of drugs are known to have been ingested and physical harm by such action poses a health risk to the suspect.

**Procedures for Performing a Body Cavity Search:**
Should any search lead an officer to believe that the suspect is concealing a weapon, evidence, or contraband within a body cavity; the following procedures are normally followed:

1. Officer consults with his immediate supervisor to determine whether *probable cause* exists to seek a search warrant for a body cavity search. The decision to seek a search warrant is reasonable only *where the suspected offense is of a serious nature and/or poses a threat to the safety of the officer or others*, and/or *the security of the agency's detention operations may be compromised.* If *probable cause* exists for a body cavity search, an affidavit for search warrant will be prepared that clearly defines the nature of the alleged offense and the basis for probable cause.
2. A body cavity search is performed only by an authorized physician, licensed nurse or medical personnel specifically trained to perform these tasks.
3. For safety and security reasons, the search is conducted in a room designated for this purpose at a detention facility, or at a medical clinic or hospital.
4. Body cavity searches are performed with due recognition of privacy and hygienic concerns. Officer presence for security and safety purposes are to be female officer observing female examinations, and male officers observing male suspect examinations.
5. The authorized individual conducting the search must complete a report, and witnesses must cosign the document.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| **Subject:** Arrest Procedures | **Policy Number:** 4.08 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department uses only legal justification and established procedures to initiate and affect an arrest. As a part of the arrest process, officers provide all suspects *legal warning and protection* as required by the United States Constitution and State law.

**PROCEDURE:**

**Officer Responsibilities During All Arrests:**
When making an arrest, officers must:

1. Use caution, planning, and established techniques to help reduce dangers to officers, bystanders, and suspects;
2. Only arrest when there is an *arrest warrant, reasonable belief there is an outstanding arrest warrant*, or *probable cause to believe a crime has been committed.* With warrant arrest in which the warrant originates from another county or state, officers should receive written confirmation by teletype to confirm that the warrant is still active and confirm that jurisdiction in which the warrant was issued will extradite the warrantee before affecting an arrest. This will often require some time elapse; however, it will prevent embarrassment for all parties;
3. Verbally advise the suspect that they are *under arrest, so a reasonable suspect will know they are* under arrest, and not free to leave; &
4. Take some physical action to prevent the suspect from leaving the controlling presence of the officer;
5. Read the suspect of their civil rights in compliance with the United States Constitution and State law, to include Miranda, and any other required warnings, these rights include:
   a. The right to remain silent,
   b. Understanding that anything the suspect says may be used against them in a court of law,

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

      c.  The right to an attorney, &
      d.  If the suspect cannot afford an attorney, one will be appointed by the court before questioning if they wish.

6.  Provide a suspect their civil rights, as requested by the suspect.
7.  Never leave an arrested suspect unsupervised anywhere or at any time. Your patrol vehicle is not a secured detention facility.

After each of these steps has been completed the suspect is *under arrest.* Most citizens who are arrested will comply with the arrest procedure without incident. However, some arrestees become argumentative or violent in their refusal to submit to a lawful arrest.

**Arrest Procedures for Non-Compliant Individuals:**
When suspects become argumentative, violent, or resistant to a lawful arrest the following guidelines must be followed:

1.  Only that force necessary to efficiently and safely make the arrest may be used [See: Use of Force Policy & Use of Force Ladder];
2.  When suspects are *only argumentative* and *passive-resistant*, they are led to more neutral location [generally a police vehicle], by the officer(s) holding the individuals arm as a method of guidance [minimum force necessary].  ***Verbal assault* by itself is not justification to apply additional force**;
3.  If suspects demonstrate active-*resistant* behavior such as *fighting, struggling,* or *attempting to flee* officers may use reasonable non-deadly force to complete the arrest;
4.  If a suspect attempts to use a deadly weapon, officers are authorized to use deadly force to protect themselves or others from what is reasonably perceived by the officer to be an immediate threat to human life;
5.  Officers exercise discretion and use caution whenever reasonably possible. In situations where physical force appears imminent, officers call for back up assistance; &
6.  When the suspect is so combative that the officer has to use restraint devices such as a hobble, the suspect shall be placed in the patrol car in a position that will not obstruct their breathing, such as on their side. The suspect should also be checked frequently to make sure they have not moved onto their stomach or into a position that could obstruct their own breathing.

**Non-Warrant Arrest Procedures:**
Officers may make non-warrant or warrant-less arrests when:

1.  A felony or misdemeanor offense has been committed in their presence or view;
2.  A misdemeanor offense was committed that carries an exception for arrest by state law;
3.  Officers reasonably believe a suspect has committed a felony offense; or

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

4. Officers have **probable cause** to believe a suspect has committed a criminal offense.

## Arrests Outside the Jurisdiction of This Agency:

An officer operating outside the jurisdiction of this agency may make non-warrant arrests for felony or misdemeanor offense when the officer:

1. Observes a felony *or life threatening* offense being committed;
2. After the arrest, immediately notifies the law enforcement agency where the arrest was made. The notified agency takes custody of the suspect; &
3. Completes all reports or documents required by this agency, and the agency having primary jurisdiction.

## Officer Actions Incidental to Arrest:

Officers complete arrest actions by completing the following tasks:

1. Frisk the suspect for any potential weapons, evidence, or extraneous material that could potentially aid in escape;
2. Provide or request first aid or medical treatment, if needed;
3. Secure, bag, and tag any actual or potential evidence;
4. Make arrangements for the security of the suspect's motor vehicle;
5. Transport suspect in an authorized law enforcement vehicle to the jail, investigative office or other secure facility; or when necessary call for an ambulance to have suspect transported to the hospital; &
6. Complete all required reports incidental to the arrest.

## Officer Care & Responsibility:

The care, custody, control, and safety of a suspect are the sole responsibility of the arresting officer. This responsibility remains in effect until the suspect is turned over to other appropriate authority. Arresting officers are required to protect suspects from other suspects, victims, fellow officers, and self-inflicted injuries. In some instances, this may not be an easy task and will require assistance from other officers.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| **Subject:** Evidence Collection, Control, & Storage | **Policy Number:** 4.09 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority** **Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department collects, secure, stores, readily retrieves, and records any change in custody of suspected or actual criminal evidence collected or held under the jurisdiction of this agency.

**DEFINITIONS:**

- **Chain of Evidence -** Sometimes referred to as *chain of custody*. The continuity of the custody of physical evidence from the time of original collection to final disposal, as may be introduced in a judicial proceeding.

- **Impounding Officer -** The law enforcement officer that initially receives evidence and initiates the chain of custody.

- **Physical Evidence -** Any substance or material found or recovered in connection with a criminal investigation.

- **Evidence Custodian -** The agency employee who is accountable for controlling and maintaining all evidence accepted by or stored in the evidence room.

- **Evidence Room -** Facilities used by this agency to store and secure evidence.

**PROCEDURES:**

**Officer Responsibilities, Upon Arrival of Crime Scene:**
When an officer arrives at an actual or suspected crime scene, the responding officer's responsibilities include:

1. Ensuring the scene is secure and that hostile individuals still at the scene are detained or restrained, in order to reduce the threat to officers and civilians at the scene;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

| Law Enforcement Policies and Procedures, 4.09 Evidence Collection, Control, & Storage |
|---|

2. Locating and assisting any person(s) who are injured, ill, or need personal assistance or protection;
3. Summoning medical assistance, as necessary;
4. Determining the area of the potential crime scene to be secured and protected;
5. Initiating security measures to protect the crime scene from destruction or contamination of evidence;
6. Preventing unauthorized persons from entering the crime scene or the immediate area;
7. Restricting access to the crime scene to those law enforcement personnel that have an *absolute need to know*;
8. Not touching, moving, or picking up any article, mark, or impression that may have been made by the person(s) committing the crime; &
9. Maintaining rigid security until all evidence is collected.

**Preservation & Protection of the Crime Scene:**
Selecting the size and shape, protecting the integrity of the crime scene and the manner in which evidence is collected and recorded are keys to good detective work. Officers should not assume that crime scenes are just the immediate area of the event. For example, a murder occurring in a residence probably has a crime scene that includes the room, house, yard, and maybe adjoining lots. When in doubt, officers should expand the size of the protected crime scene area to allow effective collection. The size of the crime scene can be reduced as areas are searched and cleared of potentially valuable evidence.

Support officers and other emergency personnel frequently arrive at a crime scene to *see what is happening.* To eliminate the potentially destructive effects of these actions, each officer at a crime scene should have a specific duty, and should be prohibited from entering critical crime scene areas without proper direction and protective apparel.

A crime scene log should also be initiated at the earliest time. This should record every person that enters the protected crime scene area, date and time entered and leaving, no matter of their status. Each person on the crime scene log should be informed that their name on the log will subject them to court testimony

**Collection, Identification, and Preservation of Evidence:**
Items of potential relevance to the case may not be disturbed until they have been photographed, measured, located on a crime scene sketch, and recorded in the officer's notebook or form.

All recovered evidence must be immediately and properly labeled to ensure proper identification. No identifying marks are made directly on evidence. Proper container selection protects the specimen against damage or contamination. If an item is too large or of an unusual shape, other measures to ensure protection are taken. After the article

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.09 Evidence Collection, Control, & Storage

has been marked, placed in a container, and sealed, a label or tag is affixed. The label tag includes:

1. Description of the contents;
2. A case number
3. Evidentiary tag number (if used);
4. Where it was found;
5. Date and time of sealing; &
6. Name and identification number of officer who sealed the evidence.

All collected evidence is logged in and placed in secure storage until requested for further processing. Evidence is passed to the evidence custodian before the end of the shift. Officers may not keep evidence in their personal possession, vehicles, lockers, or desks after completion of the shift when the evidence was collected.

**Chain of Possession:**
The chain of possession begins when the evidence is first discovered and continues until it is presented in court. It is critical for testifying officers to account for the location and security of evidence in order to prove that it has not been altered or tampered with. Each officer is responsible for maintaining the chain of possession and protecting the integrity of the evidence. To further protect the integrity of the evidence, the storage officer must:

1. Limit the number of persons who handle evidence from the time it is turned-in until it is presented in court;
2. Complete an Evidence *Chain of Possession Form* any time evidence is released to any person;
3. Ensure that all persons who handle evidence affix their name, identification number, and assignment to the package;
4. Verify personal identification and ensure evidence is in the same condition when returned; &
5. Ensure evidence has not been altered as a result of laboratory analysis, and be prepared to report any changes.

**Storage of Evidence:**
Certain items require specific handling. These items are to be stored in the following manner:

1. ***Firearms -*** Impounding officer unloads the firearm and makes a visual inspection to ensure the gun is safe. The firearm and ammunition is stored in the same bag, or enclosed in plastic wrap in the case of long guns. Officers mark the firearm as evidence in a manner that is not observable by a casual inspection. To accomplish this, the grips or stocks may be removed and the evidentiary marks placed inside.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.09 Evidence Collection, Control, & Storage

2. ***Alcoholic beverages -*** open containers that cannot be sealed are emptied after the liquid level has been marked on the outside and a paper towel is placed in the container to prevent mold & mildew.

3. ***Drugs and paraphernalia -*** all drugs are weighed, counted, and placed in an airtight property bag. The count, if applicable and weight (in grams) is noted in the offense report. When submitting an unknown type of substance, officers perform a presumptive test using a small as possible sample of the suspected drug and appropriate test packets. The results of the test are noted in the *offense or supplement report.* Each drug type seized is placed in a separate bag. Drugs are logged in separately from all other evidence seized. Hypodermic syringes are logged into the property room as long as a needle cap is placed over the needle or stored in a *sharps* protective container with ***CAUTION-SHARPS*** written on the outside of the evidence bag.

4. ***Chemicals and or hazardous materials -*** explosives, flammable liquids, or chemicals from clandestine labs may not be brought into an agency building for any reason. Such substances are transported directly to the Meridian/Lauderdale County – MS Crime Lab, service center, or authorized storage area.

5. ***Bloodstained items -*** officers must use caution when handling bloodstained items due to the possibility of disease contamination. Bloodstained items should be allowed to dry before being placed in <u>paper</u> sacks. <u>Plastic bags should not be used for bloodstained items</u>. Officers should mark ***CAUTION*** on sacks containing bloodstained items, and used rubber or plastic gloves when handling these items. As a cautionary note, officers must follow established procedures regarding *blood borne pathogens.*

6. ***Currency -*** all currency, money, or negotiable paper is counted by the submitting officer and a supervisor. The currency is then turned over to the Chief to be placed in a designated safe. If the Chief is not available, the currency is placed in a sealed evidence bag and tagged. The submitting officer fills out the evidence tag completely, showing the amount of currency involved. The storage officer then places the currency into a secure evidence locker.

7. ***Perishable items -*** are placed in an evidence refrigerator until returned to the rightful owner or destroyed.

8. ***DWI, DUI, or DNA blood samples -*** in the event a blood sample is taken, the officer uses a blood or DNA sample kit. Medical personnel taking the sample may also provide the kit. The arresting officer prepares the sample for mailing or transport. The sample is mailed to the appropriate laboratory by registered mail or the sample may be carried by to the lab by a designated staff member or authorized courier.

**Inspections of the Evidence Room:**

The supervisor or the evidence custodian inspects the evidence storage facilities monthly to ensure adherence to appropriate policies and procedures. Additionally, unannounced inspections of evidence storage areas are conducted at least twice each year by The Chief.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

| Law Enforcement Policies and Procedures, 4.09 Evidence Collection, Control, & Storage |
|---|

An annual evidence inventory is conducted by a senior staff officer not routinely or directly connected with evidence control. Similar inventories are conducted whenever a new evidence custodian is assigned.

**Outside Laboratory:**

The officer in charge of the case completes the required transmittal forms when evidence is sent to an outside laboratory. After determining which laboratory facility the evidence will be submitted to, the property room custodian mails or transports the material. The property room custodian keeps a record of all evidence transmitted to an outside laboratory and suspense the evidence item(s) for return. This record includes:

1. Name of the last officer having custody;
2. Date and time of submission or mailing and method of transmission;
3. Date and time of receipt at the laboratory; &
4. Name and signature of the person in the laboratory receiving the evidence; &
5. Written test results.

**Evidence - After Use in Court:**

The disposition of evidence, following release by the court, is as follows:

1. Personal property is returned to the owner.
2. Firearms or other weapons are returned to their lawful owner after requesting and receiving permission from the court or disposed of in accordance with appropriate court order.
3. Evidence ordered destroyed must be destroyed and a certificate of destruction affixed to the order or placed in the case file. The certificate of destruction must be witnessed by a reliable disinterested person (druggist, physician, attorney, or any law abiding citizen) and at least one law enforcement officer. Destruction must comply with Mississippi law.
4. Evidence of unknown ownership is disposed of in accordance with Mississippi law.
5. Under no circumstances is an employee or officer to convert evidence, or any other found or stored property for personal possession or use without documented permission from the court. A copy of this judicial authority is placed in the case file or attached to the incident report.
6. Sometimes evidence which has remained in storage for an extended period of time may require an in house written inquiry to the officer that originally took possession of the evidence. The officer should respond to this inquiry immediately after determining the case status with the prosecuting authority.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

## MPSD PD EVIDENCE FORM
## Chain of Possession

Date out: _____

Time out: _____


Case No: _____

Evidence No: _____


Item Description(s):

_____

_____

_____


Out to:

1.  _____     6.  _____

2.  _____     7.  _____

3.  _____     8.  _____

4.  _____     9.  _____

5.  _____     10. _____


Evidence item(s):

1.  _____     6.  _____

2.  _____     7.  _____

3.  _____     8.  _____

4.  _____     9.  _____

5.  _____     10. _____


Reason:

_____

_____

_____


Date returned: _____

Time returned: _____

Returned by:

1. _____     6. _____
2. _____     7. _____
3. _____     8. _____
4. _____     9. _____
5. _____     10. _____

Received by: _____

Notes:

_____

_____

_____

_____

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Transporting Arrested Persons | **Policy Number:** 4.11 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Personnel of Meridian Public School District Campus Police Department take all reasonable precautions necessary to protect the lives and promote the safety of the officers, the public, and the person in custody while transporting detainees.

**PROCEDURES:**

**Prior to Transport:**

1. All detainees are *thoroughly* searched for any weapons or contraband (See policy regarding Searches) prior to transport.
2. The search should be conducted by an officer of the same sex of the detainee, whenever possible.
3. Transporting officers should search each detainee.
4. Transporting officers provide the dispatcher with the following information when possible:
    a. Identity of the detainee, (this information, along with a DOB, should be given so a warrant check can be completed);
    b. Arrest location and destination of transport; &
    c. Time and mileage readings before and after transport is complete.
5. Assist the detainee into the vehicle for transport.

**Transport Guidelines:**
Detainees are transported in the following manner:

1. **Arrestees should only be transported in vehicles equipped with security screens**. Exceptions require permission of a supervisor, and the assistance of a second officer.
2. The arrestee sits in the rear-right seat and the second officer sits behind the driver. The second officer must secure his weapon prior to transport.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.11 Transporting Arrested Persons

3. Leg restraints are used when detainee's exhibit violent behavior or an officer believes the detainee has a potential for violent behavior.
4. All detainees are secured in the vehicle by proper use of a seatbelt except in situations where circumstances exist that would otherwise present more danger to the officer or the person being transported.
5. Any wheelchairs, crutches, prosthetic devices, and medication should be transported with, but not in the possession of, the detainee.
6. Transport of detainees for any reason after incarceration, is accomplished by sworn officers or specially trained transportation officers.
7. Detainees may not be left unattended during transport.
8. In the event of a detainee escape all information must be immediately reported to the communications center by means of the police radio.

**Vehicle inspection:**

All vehicles regularly used for detainee transport are inspected at the beginning of each shift as follows:

1. The safety screen is securely in place and undamaged;
2. All windows are intact, and outer door latches in proper working order;
3. Rear seat door handles and window controls should be deactivated;
4. The interior must be thoroughly searched to ensure that no weapons or contraband have been left or hidden within the vehicle. Special emphasis is placed on inspecting under the rear seat and floorboard area;
5. Should any problems with the vehicle be discovered or any contraband or property of any kind is located inside the vehicle, the information be documented on the Vehicle (Unit) check sheet as outlined in the agency policy manual; &
6. After each detainee transport, the vehicle is searched again after the detainee has been delivered to the detention facility or other destination.

**Handcuffing:**

1. Officers handcuff (double locked) all detainees with their hands behind their back and palms facing outward.
2. Officers may only handcuff detainees with hands in front, or utilize other appropriate restraining devices if the detainee:
   a. Is in an obvious state of pregnancy;
   b. Has a physical handicap; or
   c. Have injuries that could be aggravated by standard handcuffing procedures.
3. Detainees may not be handcuffed to any part of the vehicle during transport.
4. Additional approved restraint devices may be used to secure a detainee who violently resists arrest or who manifests mental disorders such that he poses a threat to himself, the transporting officer(s), or the public.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Bail Bonds | Policy Number: 4.12 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority<br>Title and Signature:  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

No employee of Meridian Public School District Campus Police Department, directly or indirectly, recommends or arranges for a bondsman or post bond for any person charged with an offense unless the arrested person is a member of the employee's immediate household.

**PROCEDURES:**

**General Guidelines:**
Bail bond procedures are established by the Judges of the State, County, and/or Municipal Courts, and are not a police function. Any questions concerning bond procedures, including recognizance bonds, should be referred to your immediate supervisor. Officers may not recommend a particular bail bondsman, or provide preferential treatment to any particular bondsman.

A complete and updated list of all licensed or approved practicing bail bond companies is kept in the booking or intake processing area and made available for arrestees, incarcerated individuals, and their families. This list is not to be removed from the booking processing area. [Such list is maintained by the Lauderdale County Sheriff's Department at the Lauderdale County Detention Facility.]

Under no circumstances may a bail bond employee be allowed to remain on agency property for other than for official business. Official business includes speaking to arrestees, incarcerated individuals, or their families concerning a bond or actually writing a bond. The only exception to this rule is if the bail bond employee is visiting a family member or acquaintance as a visitor and not as a bondsman.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Report Writing | **Policy Number:** 4.13 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority** <br> **Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department prepares written reports in order to better manage the agency, document events, and support the criminal justice process through effective communications.

**PROCEDURES:**

**Written reports:**
Agency employees are required to initiate, maintain, and safeguard written reports, in appropriate form, for the following situations:

1. Citizen Complaints
2. Citizen reports of crime
3. Follow-up investigations
4. Incidents involving arrests, citations, or summons
5. Situations where an officer is dispatched
6. Situations where an officer is assigned to take action at a later time
7. Criminal and non-criminal cases initiated by officers

In some instances, the agency uses standard forms for the purpose of aiding officers and employees in preparing written communications. However, the failure to have a proper form does not relieve the officer or employee of the responsibility of producing the report. When in doubt, and no standardized form is available, a blank sheet of paper is used.

**Permanent Notebook System:**
All officers and specialized employees of this agency are encouraged to carry and use a permanent notebook. Guidelines for this notebook system are:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.13 Report Writing

1. Write name, badge, or identification number on the notebook for verification that the book contains your original notes. This also serves as a means of identification if the notebook is lost.
2. Keep all notes in the notebook, not on loose scraps of paper.
3. Notes taken must be neat and accurate. When introduced in court, illegible notes may cause a case to be dismissed.
4. Pages should be kept intact. These pages are kept in sequence of date and time with daily inquiry activities included.
5. Information from separate investigations or inquiries is not placed on the same page. This causes confusion.
6. Take complete notes at the time of the incident or inquiry. Too much information is preferred to insufficient information.

**Report Preparation:**
Reports prepared by employees and officers of this agency:

1. Contain correct information based on accurate, observations, notes, and recordings;
2. Are brief and explicit, including relevant information regarding the elements of the crime;
3. Clearly communicate ideas;
4. Answer the following questions:
   a. **Who** was involved?
      All persons involved are identified by their role, as suspects, victims, witnesses, etc. Obtain first, middle, last names, possible aliases, home and work address, telephone numbers, dates of birth, other identifiers and race.
   b. **What** happened?
      Exactly what type of offense was committed, what means of transportation, tools, or equipment was apparently used. What was the actor's *modus operandi?* Did the actor use direct attack, or were his tactics more indirect or crafty?
   c. **When** did it occur?
      Record the crime discovery time and the time the crime is likely to have occurred. Use terms such as *recent*, and look for other clues to time of death. Conversely, if rigor mortis has set in, and blood is dry, it has been *at least hours.* Also indicate the time witnesses and victims are contacted, and arrests made.
   d. **Where** did it happen?
      Location is to be as exact as possible. If unable to obtain an address, record the nearest intersection or permanent landmark. Describe the area as *business, residential, open country, apartment complex*, etc. Look for evidence that the crime could have started somewhere else, and ended up at the *reported location.*
   e. **Why** did this incident occur?

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.13 Report Writing

Was the apparent motive or purpose of the crime *revenge, monetary or personal gain, thrill, drug-related, accidental,* etc.?

f. **How** did it happen?
Based on reasonable observations at the scene, and information provided by witnesses, explain *how entry was made, how property was obtained,* or *how the suspect chose and approached the victim.*

5. Avoid inappropriate language, such as slang or jargon, unless quoting a suspect, witness or victim;
6. Never use radio codes, numerical designations or other terms particular to law enforcement in report narratives;
7. Print or write legibly, except for officer's signature;
8. Be objective and unbiased, recording information whether positive or negative;
9. Contain correct grammar and spelling;
10. Place events in chronological order; &
11. Keep a copy of the report for future reference.

**Report Style:**

Good reports, even technical reports contain a lot of facts, but should be easy to read and understand. Remember, the reports you write today will be seen by a jury tomorrow, and you will be judged by the way you write, what you say, and the way it is stated.

1. Write the *way you talk* in a normal conversation. Add details, the way you speak. Avoid writing *Unit 16 approached the door and spoke to Suspect #2.* Instead use *. . . I walked to the door and spoke with Mr. Doe.*
2. Write in the *first person singular.* Use *. . . I* or *me, not Officer Johnson.*
3. Write in the past tense, if it happened in the past not *. . . approaching the car I see the gun in the back seat.* Instead *I walked along the driver's side of the car and saw the gun in the back seat.*
4. Carry and use a dictionary and a thesaurus. Using the right word to describe your meaning is important.
5. Use everyday words and avoid unfamiliar wording.
6. Avoid using police jargon.
7. Be very careful about using the word *suspect.* Are they really suspects or simply individuals? Suspects must be suspected of something and read their Constitutional Warnings. Get their names and use them in the report.
8. Lastly, read over your report when you are finished. Ask yourself, would a regular citizen clearly understand this report. If the answer is *no,* a jury will not understand it either. Redo it!

**Offense Reports:**

Offense reports are designed to:

1. Provide a means whereby officers can conduct and record a *preliminary investigation* of a criminal offense;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.13 Report Writing

2. Provide complete and accurate information for follow-up investigation and prosecution;
3. Provide patrol officers and investigators with certain decision-making points that enable them to identify follow-up investigative needs;
4. Improve control of the report flow process within the agency thereby improving report access and statistical recording; &
5. Aid other officers in the collection of *crime data, patterns, suspect information, and determine modus operandi*, etc.

Offense reports must be completed for all criminal acts and suspected acts. These reports clearly and concisely report elements of the crime by answering critical *who, what, when, where, how,* and *why* questions. It is the responsibility of the first officer arriving on the scene to complete the first handwritten copy.

Offense reports are timely written, either during or shortly after the shift on which the incident was reported. Preferably as soon after the incident has occurred and before another incident occurs that may require another report. The information is fresh on the officer's mind. Officers turn in the report to their supervisor for evaluation, approval, and further action by the agency. Once approved, the supervisor passes the report to distribution, and notifies the dispatcher for entry or clearance with NCIC and state reporting systems.

**Arrest Reports:**
Arrest reports accurately records the circumstances surrounding the taking of physical custody of a *suspect* or *escapee*. The arresting officer completes the report and includes sex, race, and date of birth, other identifiers, age, home address, specific charge, and probable cause for the arrest. Supervisors review the arrest report for clarity, completeness, and accuracy, and once satisfied, forward the report for action. If a final disposition is reported, the supervisor updates the indexed arrest record. Arrest files are alphabetically filed in the agency arrest index.

**Supplementary Reports:**
Supplementary reports are used when additional information is discovered through an investigation. The officer who discovers this new data is responsible for the supplementary report. The updated portion is attached to the related report with a supplement number and date. Every officer arriving at or entering onto a major crime scene must complete a *supplemental report* detailing the reason for their response, and the actions taken once arriving at the crime scene. These supplemental reports contain the same level of detail as contained in the original *offense report*, but as observed by the officer completing each supplemental report.

**Case Files:**
Case files are primarily designed to assist investigators by collecting all documents relating to a criminal or intelligence case into one location. Case files often consist of the following items:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.13 Report Writing

1. Contents sheet
2. Original offense reports
3. Investigator's field notes
4. Complaint reports
5. Supplementary reports
6. Arrest reports
7. Accident reports
8. Property receipts
9. Vehicle tow slips
10. Autopsy reports
11. Crime scene photos
12. Suspect photographs & data
13. Latent Prints
14. Criminal profiles
15. Statements
16. Record checks & NCIC inquiries
17. State reports

**File Maintenance:**

This agency maintains a comprehensive report filing system. This system includes:

1. Reports are filed and indexed as data is received and approved by supervisors.
2. Case files remain *opened*, until the case is solved by *arrest and accepted by the prosecutor for prosecution*; or, the *statute of limitations* has expired.
3. Some cases may not have enough information for further investigation. These cases may be placed in an inactive file or cold case file and may be reactivated at a later date.
4. When a case is closed, all unneeded copies are destroyed.
5. Master index card is prepared listing each report and filed. When a file is updated such information is entered into the case file and on the offense index card.

**Radio Dispatch Logs:**

Radio dispatch log entries are recorded on all alleged or reported crime, and in some cases, are the only record of law enforcement action taken. The requirements for a radio dispatch log entry include, at a minimum, the:

1. Date and time of the initial report of the incident;
2. Name, address, and telephone number of the officer, citizen, victim or complainant requesting service;
3. Supplemental reports or additional calls for service;
4. Any reported injuries or deaths;
5. Nature of the incident; &
6. Date, time, and type of action taken by the officer.

**Confidentiality of Records:**

Law enforcement records contain critical and potentially life threatening information. Such mundane information as *complainant's address, location and phone number; trial and appearance dates; potential witness lists;* and *status of a case* if released into the wrong hands can cost an officer or resident their life.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.13 Report Writing

Police reports and files are reported, collected, and disseminated on a need-to-know basis. Just because an officer or employee is an employee of the agency does not mean that he or she needs or should know vital information about an open case or a case pending for trial. As a result:

1. Case information may not be discussed or released outside of those officers and employees having a strict **need-to-know.**
2. An officer or employee may not release to non-law enforcement personnel case information until after verification of a **need-to-know** is established.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Investigation of Motor Vehicle Accidents | Policy Number: 4.16 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority<br>Title and Signature:   *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department performs a variety of functions at on campus traffic incidents including providing emergency service to the injured, protecting the accident scene, conducting accident investigations and follow-ups, preparing reports, and taking proper enforcement action relative to incidents.

**DISCUSSION:**

The purpose of accident investigation is to determine the factors that contributed to and affected the crash, and utilizing that information to prosecute traffic law violators. In turn this information is used to develop other strategies that reduce the frequency and severity of accidents.

**PROCEDURES:**

**Response to on Campus Motor Vehicle Accident Scenes:**
Law enforcement officials of this agency respond to any accident:

1. Involving death or injury;
2. Exceeding the reportable property damage amount established by the Mississippi legislature;
3. Involving a hit and run;
4. Caused by the use of either alcohol or drugs;
5. Involving hazardous materials;
6. Involving property, vehicles, equipment, or facilities of Meridian Public School District Campus Police Department;
7. Creating major traffic congestion;
8. Resulting in vehicle damage that requires towing services; or
9. Assisting persons involved with information exchange.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.16 Investigation of Motor Vehicle Accidents

**Officer Responsibilities – On Campus Motor Vehicle Accident Scenes:**

When officers are dispatched to traffic accidents, they:

1. Give priority to accidents involving injuries over accidents involving no injuries;
2. Conduct a "windshield survey" as soon as they arrive on the scene and immediately report observations to dispatch. Information reported should include:
   a. Number and types of vehicles
   b. Extent of damage
   c. Presence of fire or hazardous materials
   d. Conditions and may pose hazardous to other responders such as power lines, etc.
3. Conduct an initial patient assessment to determine the number and extent of injuries and report to dispatch. If there are no serious injuries or hazardous conditions that warrant additional units to continue "code" response, dispatch should be advised.
4. Provide basic emergency medical care to accident victims within the scope of individual officer training and skills;
5. Avoid moving victims from the accident scene unless immediate movement is necessary to protect the victim from further injury;
6. Summon additional help as required by the severity of the accident;
7. Notify the parents or legal guardians of any minors injured in the accident;
8. Protect physical evidence at the accident scene;
9. Preserve, collect, and process evidence including:
   a. Examining and recording vehicle damage, and the effects of the accident on the surrounding environment; &
   b. Taking appropriate photographs.
10. Establish a safe traffic pattern and flow around the accident scene; (refer to 4.17 Highway Incident Traffic Control)
11. Locate witnesses and record their statements;
12. Exchange information among all involved parties;
13. Avoid discussing possible civil action;
14. Remove vehicles from the roadway, when possible, allowing for smooth traffic flow;
15. Take appropriate enforcement actions;
16. File the initial report by end of shift following the investigation; &
17. Notify the public works agency of any downed or damaged traffic control devices or signs and remain on the scene to direct traffic until appropriate repairs are made.

An officer should never recommend a towing service at the scene to anyone. If the persons involved are capable, give them the opportunity to choose their own towing company. If they are not from the area or cannot make a decision, the agency

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.16 Investigation of Motor Vehicle Accidents

investigating the crash should have an established *rotation towing roster*. Any towing service should be able to respond to the scene within a reasonable amount of time.

If a motor vehicle accident involving injuries occurs during the off-duty hours of the MPSD PD, MPD is dispatched to the scene and has the same responsibilities as the MPSD PD.

**Follow-up Investigations:**
A follow-up investigation may be necessary in order to:

1. Collect supplementary scene data;
2. Obtain formal statements from witnesses;
3. Reconstruct the accident scene; [Serious Injury or Death / MPD]
4. Submit evidentiary materials for laboratory examination; &
5. Prepare accident and/or offense reports to support criminal charges arising form the accident.

If a follow-up investigation does identify an offender or offense, an arrest warrant should be obtained.

**Safety Guidelines – On Campus Motor Vehicle Accident Scenes:**
In order to minimize the possibility of further injuries, it is the responsibility of all officers arriving on the traffic accident scene to maintain the following safety guidelines:

1. Park police vehicles without endangering pedestrians, motorists, or citizens. The police vehicle may be used as a shield for the protection of the officer and all accident victims.
2. If reduced visibility or darkness, wear a reflector safety vest. Use Emergency Lights and/or flashlight as a means of notification of accident. The objective is to protect the scene and participants and to temporarily detour traffic safely around the scene.
3. The Fire Department should be called out:
   a. In case of danger of fire from leaking ruptured gas tanks;
   b. Where there is any major crash entanglement of two or more vehicles; or
   c. If extrication of any person is required; or
   d. Where there is any sign of hazardous materials having been transported.
4. Police vehicles should be equipped with a copy of the current Emergency Response Guidebook, which permits both rapid identification of vehicles designed to carry hazardous materials and hazardous materials placards. The Emergency Response Guidebook provides information concerning preliminary emergency procedures, evacuation distances, etc.
5. The Fire Chief assumes control of any scene involving hazardous materials and all law enforcement officers provide support as required. Any investigation of the accident may only occur after approval by the Fire Chief.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.16 Investigation of Motor Vehicle Accidents

6. Any property belonging to accident victims is protected from theft or pilferage, and brought to Meridian Public School District Campus Police Department, properly tagged and held for any accident victims unavailable to receive those items at the time of the accident.

**General Guidelines – Accident Reports:**

All officials of this agency shall maintain the following guidelines regarding accident reports:

1. All motor vehicle accident reports of the agency are open to public inspection at all reasonable times, within two (2) days of the date of occurrence.
2. An accident report is filed on all accidents occurring on public property within this jurisdiction including any highway, roadway, street, or parking lot.
3. Accident reports may not be completed if property damage does not exceed the reportable amount established by the Mississippi legislature for any accident occurring on private property. [For MPSD PD if there is a crash, there is a report]
4. Accidents involving only property damage, occurring during extremely inclement weather, may be handled in the following manner by dispatch if approved by the Chief:
   a. The employee taking report records the name, address, operator license number, and telephone number of all involved drivers.
   b. All involved parties are advised to file an incident report at Meridian Public School District Campus Police Department within forty-eight [48] hours of the accident.

**Accidents Involving Meridian Public School District Equipment:**

All accidents involving Meridian Public School District equipment must be investigated by a certified *accident re-constructionist [MPD]*, if available. If a police vehicle is involved, a supervisor must be called to the scene of the accident, as well as MPD. The driver fills out an accident report, and forwards a copy to the Chief for approval.

In cases where the accident involves a law enforcement vehicle, it is recommended that another law enforcement agency, having jurisdiction to investigate accident be summoned for the investigation. This eliminates the possibility of prejudice.

**DWI or DUI Related Motor Vehicle Accidents:**

When driving while intoxicated or driving under the influence [DWI or DUI] appears to be a causal factor in the accident, officers take immediate action. If the DWI suspect is still available he is arrested and transported for a blood alcohol (breath) test, unless medical treatment is indicated. If the DWI suspect has already been transported to a hospital an officer, in accordance with state law and agency policy, shall attempt to obtain a blood sample from the suspect. If the officer is unable to obtain a sample, he must ask an attending nurse if the hospital is going to perform a toxicology screen for treatment purposes. If so the medical records may be subpoenaed at a later date to determine the

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.16 Investigation of Motor Vehicle Accidents

suspects B.A.C. level. If the arrestee is found to be under the influence of drugs or alcohol, the driver of the other vehicle may sign an affidavit against that individual.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| **Subject:** Emergency Vehicle Warning Devices | **Policy Number:** 4.17 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department officers adhere to statutory and other safety requirements regarding emergency vehicle warning devices. Audible and visual warning devices are employed under prescribed conditions and circumstances and in ways that aid officer and public safety.

**DEFINITIONS:**

- **_Emergency Mode -_**  Operating an emergency vehicle in a serious situation or occurrence that happens unexpectedly and demands immediate action. Except in exigent circumstances, requires operation of all emergency warning devices. Sometimes referred to as Code III, Code 3, or other such name.

- **_Emergency Vehicle -_**  An authorized law enforcement vehicle equipped with emergency lights (red/blue/white), siren, and other emergency warning devices required by law and used for emergency response situations.

- **_Emergency Warning Devices -_**  *Audible and visual signaling* devices placed in/on each agency emergency vehicle that emit audible or visual signals in order to warn others that law enforcement services are in the process of being delivered.

**PROCEDURES:**

**Safety Guidelines:**
As a practical matter, emergency response, patrol, transport, and other vehicles operated by this agency make every reasonable effort to obey all traffic laws. Law enforcement officers employed by Meridian Public School District Campus Police Department are expected and required to display exemplary and safe conduct while operating transportation equipment. This includes obeying all traffic laws and especially

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.17 Emergency Vehicle Warning Devices

traffic warning devices and posted speed limits. Exceptions to this rule is when responding to a declared emergency, and operating the vehicle in *emergency mode.*
It can not be overstated how important it is for officers to set a good example for the public when operating an emergency vehicle.

**Assigning/Determining Response Modes to Calls for Assistance:**
There are several ways to declare an emergency, and operate outside of the traffic law of this state, as these laws relate to speed, turns, and safety warning devices. These means all require declaring an emergency. Those who can declare an emergency are:

1. Patrol officer operating the vehicle;
2. Supervisor; &
3. Dispatch.

Field supervisors or communications personnel assigning officers to respond to calls for assistance normally advise which response mode is appropriate. Dispatchers and field supervisors are responsible for monitoring response modes and have the authority to upgrade or downgrade response modes, based on their knowledge of the changing conditions of the situation or incident.

When officers determine the need to initiate *emergency mode* in response to sudden occurrences, they <u>first</u> activate emergency warning devices and immediately inform communications personnel of:

1. Fact that *emergency signaling* devices have been activated;
2. Nature of the situation; &
3. Location, route, & intended destination.

**Use of Emergency Warning Devices While in Emergency Mode:**
The following conditions normally apply to all vehicles equipped with emergency signaling devices:
1. Emergency lights and/or siren and other emergency signal devices <u>are</u> activated at the beginning of every emergency response or vehicle pursuit.
2. Headlights <u>are</u> also activated to augment the emergency vehicle's visibility when operating in emergency mode.
3. Four-way flashers <u>are not</u> used when the emergency vehicle is in motion because they may interfere with brake lights and turn signals.
4. Vehicle spotlight is primarily used to facilitate building and stationary vehicle checks and <u>is not</u> activated when commencing a pursuit or while driving at high speeds, responding to an emergency. In addition, it is never directed at the windshield or into the vision of oncoming drivers.
5. Emergency signal devices <u>may</u> be deactivated at a reasonable distance from the scene, as determined by the vehicle operator, so as not to alert subjects. When deactivation occurs the patrol driver returns to a safe slower speed and obeys traffic warning devices.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.17 Emergency Vehicle Warning Devices

6. When emergency signal devices are deactivated, the operator of the emergency vehicle will comply with posted speed limits, obey all traffic control devices and signals, and proceed in a manner consistent with normal traffic flow.

It is important to remember that during an emergency response or vehicle pursuit, warning devices assist in the protection of the public by providing warning of potential or approaching danger. As such, officers will give careful consideration to the deactivation of emergency equipment, once an emergency or pursuit is in progress.

**Use of Emergency Warning Devices While Conducting on Campus Vehicle Stops:**
Visible warning devices are used to make adequate notice of intent to stop a motor vehicle and to provide a safe environment for the vehicle operator, officer, and public. On occasions it may be necessary to activate the audible signaling device. When stopped along a public highway, the officer positions his vehicle to the rear of the motorist's vehicle, and the visual signaling devices remain on throughout the stop process.

**Discretionary Use of Emergency Warning Devices:**
Officers may activate emergency signal devices when required to assist in handling any perceived *emergency* situation. The officer will advise communications personnel of the nature of the emergency and the emergency response mode that has been taken.

In other than emergency situations, when expediency is required to effectively eliminate a potential hazard to the public or fellow officers, law enforcement officers may activate emergency warning devices to allow orderly and safe transit. Examples of permissible uses of emergency warning devices during *non-emergency* response situations include, but are not limited to:

1. Using emergency lights as *warning beacons* to protect disabled motorists;
2. When signaling another officer or citizen of their location or movement; &
3. Using emergency lights when it is necessary to use vehicles as protective barriers.

Operators of emergency vehicles will deactivate emergency warning devices when returning to normal patrol activities.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Vehicular Pursuit – <u>Prohibitive</u> | **Policy Number:** 4.18 C |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**   *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

High speed vehicular pursuits are *critical incidents.* The way in which high-speed vehicle pursuits are responded to, performed, terminated, and supervised is an important element of protecting the public we serve. <u>Due to the unique conditions within the community we serve, the Chief has determined that high speed pursuits are generally **prohibited** except in *exigent circumstances,* and when occurring are authorized and controlled as defined by this policy.</u>

**DEFINITIONS:**

- ***Authorized Emergency Vehicle -*** A vehicle equipped with operable emergency equipment as defined by state law, including a siren and emergency signaling lights. The presence of marked units, using its emergency lights and/or sirens minimizes the risk to the public by providing warning.

- ***Boxing-in -*** A technique whereby two or more patrol units move into positions around the fleeing suspect vehicle, forcing a *box. Once the box is formed, all officer units slow, causing the violator in the box to slow as well.* This can also be considered a form of *rolling roadblock.*

- ***Channeling -*** A form of boxing-in, or setting of conditions by emergency vehicles that directs vehicular traffic, or the suspect's vehicle, onto another roadway or into an area of limited escape. Depending on the form, this can also be considered a type of *rolling roadblock.*

- ***Controlled Contact -*** Often referred to as *Pursuit Intervention Technique* [PIT] or *Tactical Vehicle Intervention* [TVI], these tactics are an intentional act of making contact with a suspect's moving vehicle to force it from its course of travel. These are skilled maneuvers that require specific officer training. Generally, *controlled contact* is undertaken at lower speeds, and is frequently intended to

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

cause the violator leave the roadway in a methodical manner. When performed correctly, the suspect's engine may stall out.

- **Controlled Deflation Device** - Sometimes called *spike strips* or *quill strips.* Tire deflation devices when properly deployed may help reduce the speed of the pursuit by disabling one or more of the suspect's tires. Tire deflation devices are not a guarantee, as certain vehicles now have *run-flat tires.*

- **Exigent Circumstance -** An emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a violent suspect, or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the extraordinary situation must be measured by the facts known by officials.

- **High-speed -** In the context of a vehicle pursuit, generally speeds reaching twenty [20] miles-per-hour over the posted speed limit. This is not a rule, but rather a guide. Other factors should be considered such as road conditions, traffic, weather, terrain, etc.

- **Motor Vehicular Pursuit -** An active attempt by an officer in an authorized emergency vehicle to apprehend fleeing suspect(s), who know that an officer is trying to stop them, and who have given some indication of the intent not to stop or yield. The intent not to stop can be by increasing speed, bypassing traffic control devices, or by other means.

- **Offset Position -** Moving the officer's unit approximately one-half the length of either side of the fleeing vehicle while continuing to trail. This offset position allows the officer to see oncoming traffic, and to expose emergency warning lights to the view of oncoming vehicles. From this position officers can more readily anticipate the suspect's actions, and possibly influence suspect turns at intersections.

- **Pursuit Intervention Technique [PIT] -** See the definition of *Controlled contact*, above,

- **Primary Unit -** The law enforcement unit that first joins the pursuit or any unit that assumes the lead pursuit vehicle position.

- **Public Harm Risk -** The degree of risk to the public posed by the actions of a suspect, usually equated to the initial act giving rise to the subject's decision to initiate a pursuit, and subsequent actions of the fleeing suspect. Generally comprised of two elements: the risk inherent in crime(s) committed by the

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

suspect, and the risk faced by the public should the suspect be allowed to continue his/her dangerous activity.

- ***Pursuit Management Continuum -*** A specific type of resistance-control continuum or matrix, reflecting the relationship between pursuit causation factors and the tactics and techniques that may reasonably be used in the apprehension of the fleeing suspect. The continuum supports the decision-making process by outlining tactical initiation, continuation, and termination options and tactics.

- ***Roadblock -*** Placing vehicles or objects in the path of a suspect's moving vehicle to encourage or force it to stop. Roadblocks are generally described as *stationary*, or *rolling* [*moving*]. *Stationary* roadblocks are set at a fixed point, and all elements or equipment are stationary. *Rolling* or *moving* roadblocks move with the flow of the pursuit with the intent of gradually reducing speed or changing direction, thereby supporting the eventual stop.

- ***Secondary Unit -*** Any law enforcement vehicle that becomes involved as a backup to the *primary unit*, and follows in the direct path of the pursuit or supports the *primary unit* at a safe distance.

- ***Tactical Vehicle Intervention [TVI] -*** See the definition of *Controlled contact*, above.

- ***Trailing -*** Simple act of following along behind the suspect vehicle while giving both visual and audible indications that the violator should stop, and advising the public, dispatch, and other units of the suspect's location and actions. *Trailing* provides warning to pedestrians, and other drivers of the potential danger posed by the fleeing suspect. Care is taken to attempt to maintain a safe and extended interval between the suspect vehicle and the following or trailing unit(s).

- ***Uncontrolled Contact -*** Sometimes referred to as *ramming,* this tactic represents a higher level of intentional contact between the suspect's vehicle and the officer's unit. *Uncontrolled contact* is frequently attempted at higher speeds than intentional collisions, is unpredictable, and presents a high degree of risk to the officers involved. Uncontrolled contact may constitute deadly force, depending on the circumstances of the incident.

- ***Vehicle Pursuit -*** A vehicle pursuit begins when a violator drive away or attempts to evade an officer who has signaled for the motorist to stop. Violators initiate a vehicle pursuit, not the officer. The officer may decide to continue or terminate the pursuit; however, the violator's actions start it.

- ***Violent Suspect*** - A known or suspected criminal actor who is perceived by the officer to have committed, or is likely to commit, a violent act against another by

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

means of *deadly force*, to include use of a motor vehicle, while attempting to evade capture.

**DISCUSSION:**

Considering the Chief's commitment to protecting the general public, and specifically innocent life, high-speed vehicular pursuits are conducted under the guidelines of this policy.

Violators fleeing in a vehicle by employing high-speed or reckless conduct present an unpredictable danger to the general public, officers, and the suspects themselves. Of particular importance is the possibility of damage or injury this violator may cause to members of the public who are not involved in the pursuit. This threat to the public may continue or even increase even after a pursuit has been terminated unilaterally by officers. There is no legal or scientific basis to conclude that by officers disengaging from a pursuit, the violator will now follow all traffic laws. Reasonable officers know that most pursuits start when an officer observes a moving violation that if left unchecked will ultimately endanger other motorist at a later date or time.

There are no easy answers when it comes to deciding when to continue or terminate a high-speed pursuit. The U.S. Supreme court has observed that officers making these decisions are often given the . . . *choices between two evils.*

Although most pursuits end in an arrest, and without injury, it is impossible to predict the behavior of others, especially when they are behind the steering wheel of a vehicle. A suspect willing to travel at high-speeds and exhibiting erratic and violent behavior is a serious threat to the general public, with or without the presence of the officer Vehicle pursuit conditions *are tense, uncertain, and rapidly evolving situations.* Under such conditions officers should continually assess the risk to themselves and the general public.

**Exigent Circumstances & Requests to Participate in Vehicle Pursuit:**
High speed pursuits will not be conducted by officers of this agency, nor will officers participate in high speed vehicle pursuits where other agency are attempting to contain a fleeing suspect, without the prior approval of the Chief or his/her designee. Request to conduct or participate in a vehicle pursuit will only be made after the requesting officer has determined *exigent circumstances* exist.

The determination of *exigent circumstances* may be based on observed behavior of the suspect, reports, or officer perception that the fleeing suspect has attempted or committed:

1. Homicide, seriously injured, or aggravated assault, to include such acts with a motor vehicle;
2. Kidnapped another or has a hostage;
3. Violent sexual assault or rape;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 4 of 14

Law Enforcement Policies and Procedures, 4.18 Vehicular Pursuit - C - Prohibitive

4.  Terroristic or active shooter incident;
5.  Armed or aggravated robbery or other imminent life-threatening activity;
6.  Is a reported or suspected violent felon; and/or
7.  If he/she remains at large there is an imminent serious threat to the public.

**PROCEDURES:**

1.  Only officers who have been trained in *pursuit driving* are authorized to request or participate as a driver in a high-speed vehicle pursuit.
2.  A law enforcement officer having determined that *exigent circumstances* exist, will immediately notify the Chief or his/her designee, and ask for permission to engage or continue the pursuit. If affirmative permission is not granted the officer will immediately terminate involvement in the pursuit, and notify dispatch of the decision.
3.  In deciding whether to seek permission to engage in or continue a vehicle pursuit, officers may consider:
    a.  Observed or reported offense(s);
    b.  The continued threat the violator poses to others, if their dangerous conduct continues unchecked;
    c.  Road, weather, and environmental conditions;
    d.  Population density, and vehicular and pedestrian traffic;
    e.  Relative performance capabilities of the pursuit vehicle and the vehicle being pursued;
    f.  Presence of other persons in the police vehicle and vehicle being pursued [if known];
    g.  Skill, training, and experience of the pursuing officer;
    h.  Alternative means or opportunity of apprehending the violator; &/or
    i.  Officer's knowledge of the area and roadways.

Officers are cautioned not to rely solely on a license plate number and vehicle descriptions when determining if the suspect *may be apprehended at a later date*. A license plate may identify the vehicle but does not identify a violator. Officers know that a license plate may be on the wrong vehicle, or be on a stolen vehicle. What's more, once the vehicle is no longer observed by the officer, the *chain-of-evidence* is broken.

**Pursuit Officer Responsibilities:**

1.  Pursuing officer activates appropriate warning equipment, including audible siren and emergency signaling lights to signal the actor to stop, and to provide continued warning to the public.
2.  Notify dispatch that a violator has initiated a high-speed pursuit, and the officer is following. Time and conditions permitting, the officer provides the following information:
    a.  Unit identification;
    b.  Description and license number of the fleeing vehicle, if known;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

     c. Initial and subsequently observed offenses;

     d. Location, speed, and direction of travel of the fleeing vehicle; &

     e. Number of occupants in the fleeing vehicle, and descriptions, if known.

*Failure to provide this information may result in a supervisor decision to terminate the pursuit.*

3. Keep communications updated on the progress of the pursuit.

4. All emergency vehicle operations conform to traffic laws and regulations.

5. Unless circumstances dictate otherwise, a pursuit is limited to no more than two emergency vehicles; a *primary* and a *secondary* (back-up) unit. All other personnel must stay clear of the pursuit, unless instructed to participate by the controlling supervisor or primary pursuit officer. A third unit in the pursuit can be a K-9 unit, and does not require approval of a supervisor.

6. Any *primary* or *back-up* unit sustaining damage or failure of essential vehicular equipment during pursuit must discontinue pursuit. The withdrawing unit notifies communications so that another unit may be assigned to the pursuit.

7. *Primary* pursuit unit will become *secondary* when the fleeing vehicle comes under air surveillance or when another unit has been assigned or assumes *primary* responsibility.

8. When air surveillance is established, all units directly involved in the pursuit follow the directions of the air unit, as long as visual contact is maintained by the aircraft.

9. A *primary* unit will become the secondary unit when the primary unit determines any conditions unfavorable for that unit to be the lead unit.


**Communications Center Responsibilities:**

1. Immediately advise a supervisor of essential information regarding the pursuit, and designate a *controlling supervisor, if available*.

2. Carry out the following activities and responsibilities during the pursuit:

     a. Receive and record relevant incoming information about the pursuit and the pursued vehicle and suspects;

     b. Request another Communications Officer to assist with recording the information and communications on other radio channels involved in the pursuit;

     c. Control radio communications and clear radio channels of all non-emergency calls; instruct non-direct units to use a designated support channel;

     d. Obtain criminal record and vehicle checks of the suspects;

     e. Coordinate and dispatch back-up assistance, as directed or requested;

     f. Notify neighboring jurisdictions, when practical, that the pursuit may extend into their locality;

     g. Place emergency medical, fire, or hazardous materials responders on stand-by for rapid response in case of injury to persons, fire, or hazardous materials incident; &

     h. Verify the location and type of termination.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.18 Vehicular Pursuit - C - Prohibitive

**Chief, Designee, & Supervisor Responsibilities:**
The Chief will designate individuals who can responds to officer requests to conduct high speed vehicle pursuits. This information will be made available to officers and updated periodically as needed. It is the responsibility of the Chief's designees to:

1. Make a determination as to allow or terminate a request to engage in or continue a pursuit;
2. Continually monitor evolving events, and provide direction, leadership, and instructions;
3. Summon additional assistance and resources as needed;
4. Coordinate, direct, and reinforce use of proper procedures;
5. Where possible, respond to the route where a pursuit is occurring, and to the location of the stopped vehicle, once the pursuit has ended;
6. Insure that the Chief is kept appraised of the decision, action taken, and results; &
7. Insure that all *after action reports* are properly documented.

**PURSUIT TACTICS:**

1. Officers will not normally follow the pursuit on parallel streets unless authorized by the controlling supervisor or when it is possible to conduct such an operation without unreasonable hazard to other vehicular or pedestrian traffic.
2. When following the suspect vehicle, officers try to obey the *three to four second rule*, attempting to stay *at least three to four seconds behind the suspect vehicle*, as determined by estimating the passing times of fixed objects.
3. Patrol units with the most prominent markings and emergency lights are used to pursue, particularly as the primary unit.
4. A decision to discharge firearms at or from a moving vehicle is governed by the agency's *use of force* policy [See: 05.01, *Use of Force & Deadly Force].*
5. Officers must use appropriate safety tactics, and must keep in mind the necessity to use only *reasonable and necessary force* to take suspects into custody.
6. Secondary or back-up officers, if available, will affect arrests; the pursuing officer assumes the role of backup, if feasible.

**Pursuit Termination Tactics:**
The decision to terminate a dangerous vehicle pursuit with force, that is, to use a patrol car as a weapon or other deadly force instrument was established by the U.S. Supreme Court in Scott v. Harris, No. 051631 on 30 April 2007. In this decision the court established the following "Rule":

- **The Rule:** *An officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.*

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

The Chief, has determined that such a use of force is a critical use of force incident, and should be employed only when it is perceived that the threat to officers and other innocent life is clearly present.

1. <u>Any officer engaged in or supporting the pursuit may terminate the pursuit at anytime</u>.
2. Generally, once a violator starts a high-speed vehicle pursuit it will be *successfully terminated* because of one or more of four means:
   a. Violator decides to stop the pursuit;
   b. Officer termination due to unfavorable conditions as perceived by an officer;
   c. Officer termination when the suspect is positively identified and may be arrested at a later date; and/or
   d. Successful results from the deployment of termination tactics, techniques, or devices.
3. Primary pursuing unit and supervisor continually re-evaluate and assess the evolving situation, including the violator's actions, and terminate the pursuit whenever he or she reasonably believes the risks associated with continued pursuit are greater than the public safety benefit of stopping the violator's dangerous behavior by making an immediate apprehension.
4. In the event of a collision involving a vehicle or person, a back-up officer stops and renders assistance, including calling for medical assistance as necessary.
5. Intervention tactics short of deadly force [spike strips, roadblocks, low speed tactical intervention techniques, low speed channeling (with appropriate advance warning), etc.] may be used when it is possible to do so in safety, and when the officers utilizing the technique have received appropriate training in the applied tactic. Beyond the discussions contained in other portions of this policy, here are some tactical issues to consider:

   a. **Trailing –** The tactic of *trailing* can be employed at most speeds, however involves no immediate efforts to stop the suspect. Depending on officer perceptions and tactics, an incident may evolve from *pursuit mode* to a *trailing mode*, and back to a *pursuit mode.*

   b. **Channeling –** Can sometimes be effective in redirecting the escaping vehicle away from other traffic or congested areas, or influencing the pursued driver into other desired areas.

   c. **Boxing-In –** Requires a high degree of training and good communications. When using three law enforcement vehicles, the fourth side must be a natural or man-made barrier such as a guard-rail, fence, wall, or tree line.  The *boxing-in* tactic is usually most effective on slow

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

moving vehicles. Boxing-in can be used effectively to slow the speed of a pursuit and force the suspect to stop.

d. **Controlled Deflation Device** – *Spike strips* and similar devices **may not** be used on fleeing motorcycles unless deadly force is otherwise authorized by the agency's *use of force* policy [See: 05.01, *Use of Force & Deadly Force*]. Consider:
   i. When deploying tire deflation devices maintain a position of cover anytime you employ a tire deflation device.
   ii. Tire deflation devices <u>may or may not</u> reduce the speed or halt the pursuit. After deployment, the actor may decide to run on wheel rims, and some vehicles are equipped with *run-flat-tires.*
   iii. Officer(s) deploying deflation systems must immediately remove the system from the roadway after the suspect vehicle passes the deployment location. Failure to do so may cause following units and innocent travelers to suffer damage to their tires, as well.

e. **Controlled Contact -** Intentional contact between vehicles at high-speed, is only used in those case and instances where the pursuing officer determines that the danger created by the fleeing suspect to the general public is HIGH, and that timely intervention may save innocent lives. Remember, contact between an officer's unit and the suspect's vehicle is either *intentional* or *unintentional.* Clearly, *ramming* is an intentional act. Ramming and PIT are intended by the officer to accomplish some type of termination or re-direction of the pursuit.
   i. PIT and TVI maneuvers are most effective between about 25 and 45 MPH.
   ii. Anything less than 25 mph won't work. There is not enough inertia to be effective.
      1. Over 45 mph and the reactions of the two vehicles at greater speeds are unpredictable.

6. When an officer terminates a pursuit, and/or trailing the officer should:
   a. Decrease speed to the posted limit or less;
   b. Turn-off all warning equipment such as audible siren and emergency signaling lights;
   c. Notify dispatch of the pursuit or trailing termination, location of the officer, and reason for the termination; &
   d. With caution, resume other duties.


## PURSUIT MANAGEMENT CONTINUUM:

To better understand the dynamics of any motor vehicle pursuit, the policy of the Chief, the associated decision-making process, and tactical options look at a pursuit

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

management continuum. Our Pursuit Management Continuum is based on several fundamental concepts:

1. Officers can disengage from pursuit or de-escalate the control mechanisms being used any time they reasonably believe it to be appropriate.

2. Control alternatives available in a pursuit assume officers and supervisors use proper tactics and reasonable decision-making and not take into consideration the worst possible result. While it is possible that lethal harm can result from the use of lower level control methods, it is not the officer's intended result. The actual outcome should have nothing to do with the reasonableness or unreasonableness of an officer's actions. The questions should be:

   a. Did the officer attempt to apply the technique or tactic correctly and judiciously; &

   b. Were the officer's intentions in good faith?

3. Escalation and de-escalation of the continuum is keyed to the level of pursuit causation factors at work and the escalating risk factors. Officers evaluate the totality of the circumstances in which they find themselves when making decisions.

4. Officers should attempt to stay at, or below, the control level that matches the pursuit level [i.e., *Level Two Pursuit = Level Two Control*]. The suspect's deliberate escalation of the *pursuit level* typically causes officers to consider escalating the *control level.*

5. Decisions regarding the use of particular pursuit control tactics should not be based solely on the likely liability exposure, but should give significant consideration to the degree of risk faced by the involved officers, and the general public.

6. As with other tactical considerations, officers should only utilize tactics and techniques for which they have been trained.

## Use of Force & Pursuit Management Continuum Relationships

To better understand the application of the Pursuit Management Continuum and how it can aid officers, review the Use of Force Continuum in 05.01 *Use of Force & Deadly Force.* The concept in each is to attempt an application of the least force necessary to bring the suspect into compliance.

Obviously no two scenarios are the same. A suspect might enter either the Use of Force Continuum or Pursuit Management Continuum at any level. Officers faced with each situation may likewise enter at any control level that is reasonable, based on the totality of the circumstances. Fortunately, for officers and the public, the great majority of offenders will safely yield at the mere presence of an officer. It is the criminal actor that does not apply good reason and yield that makes the associated decision making process difficult and dangerous for officers and the general public.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.18 Vehicular Pursuit - C - Prohibitive



PURSUIT MANAGEMENT CONTINUUM

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.18 Vehicular Pursuit - C - Prohibitive

**Pursuit & Control:**

To better understand the *Pursuit Management Continuum* on the previous page it is important to understand that the degree of risk of public harm can be classified at three levels, as can the techniques and tactics employed to control pursuits. Pursuits at a certain level reasonably justify use of control techniques from the corresponding control level or lower [i.e., *Level Two Pursuit = Level Two & Level One* Controls].

The various control techniques can be grouped as to their general traits and common elements. These are:

1. **Initial Interaction –** Techniques that represent a relatively low risk of injury to the officers and the public. Often naturally occurring, these techniques do not require any special resources or personnel.
2. **Active Intervention –** Techniques that require additional personnel, specialized equipment or training, and/or advanced planning. These tactics represent a greater degree of risk to officers and the public. Additionally, these techniques usually constitute *seizures* under the Fourth Amendment of the U.S. Constitution.
3. **Critical interdiction –** Techniques that represent the greatest degree of risk to officers. These techniques approach and contemplate the use of deadly force, and should only be undertaken when high levels of control are necessary.

**Control Levels:**

1. **Level 1 Pursuit/Level 1 Control –** A pursuit initiated to apprehend an individual fleeing after committing a simple traffic offense or less serious crime. Pursuit for these offenses can be justified, yet many of the more hazardous pursuit tactics should not be used, due to the minimal potential for public harm. Techniques and tactics that are generally acceptable in these instances are:
   a. Relaxed interval;
   b. Offset position;
   c. Reduced interval;
   d. Controlled deflation devices; &/or
   e. Stationary roadblocks.
2. **Level 2 Pursuit/Level 2 Control –** Pursuits that are initiated or continued for very hazardous traffic offenses such as driving while intoxicated, reckless driving, or felonies.  Either the originating offense or an offense that occurs during the pursuit, present a high level of danger to the public, but not so high that deadly force is routinely justified in the apprehension attempt. Level 2 control techniques are more aggressive in nature, and call for officer vehicles to move in front of a fleeing suspect. Techniques and tactics that are generally acceptable in these instances include Level 1 approaches, and:
   a. Rolling roadblocks;
   b. Boxing-in; &/or
   c. Controlled contact.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

3. **Level 3 Pursuit/Level 3 Control –** These pursuits are initiated or continued following an officer's perception that a life-threatening felony has just occurred that justifies the use of deadly force in the apprehension of the fleeing suspect. Examples include armed robbery, assault with a deadly weapon, attempted or actual assault with a motor vehicle, aggravated kidnapping, murder, etc. The offense may be the initiating cause for the chase or an observed suspect behavior during the chase. Level 3 control techniques can be extremely hazardous to the officers that attempt them and the general public, and should only be utilized in emergency situations where a human life is already at great risk. In essence, Level 3 control techniques are almost indistinguishable from the use of deadly force; therefore, officers considering their use should ask themselves if the death of the violator is acceptable as an outcome to the event. Techniques and tactics that are generally acceptable in these instances include Level 1 and Level 2 tactics, and:
   a. Uncontrolled contact; &
   b. Use of firearms.

## OTHER TACTICAL & OPERATIONAL CONSIDERATIONS:

### Inter-Jurisdictional Pursuits:

1. Pursuing officers notify communications when it is likely a pursuit will cross into neighboring jurisdictions or across Meridian, Lauderdale County or State lines.
2. Pursuit into a bordering state conforms to the laws of both states and any applicable inter-jurisdictional agreements.
3. When pursuits enter other jurisdictions, officers are governed by the policies of their own agencies, known inter-local agreements, and state law.
4. If necessary, request communications operators in other jurisdictions use *plain talk*. There should not be any use of *ten codes, local jargon,* or other coded communications; as other officers involved in the pursuit may not understand or respond to an unfamiliar coding system.

### After-Action Reporting:

1. All officers participating in a high-speed vehicle pursuit will file a written report or supplement the report of the primary officer, on the appropriate form detailing the circumstances, their actions, and observations. An after action report is filed whether an apprehension is made or not. Tracking all pursuits is an important element of the agency's training and policy planning process.
2. A copy of the post pursuit report is forwarded to the command staff for an internal review.
3. Supervisors and the training officer determine whether policy was followed and identify training deficiencies or areas needing attention.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.18 Vehicular Pursuit - C - Prohibitive

**Training:**

Officers who operate emergency vehicles will receive initial and periodic update training on the agency's pursuit policy and safe driving tactics. Only those officers trained on tire deflation devices, PIT, or TVI techniques or other equipment or termination techniques are authorized to deploy or attempt these maneuvers.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| **Subject:** Ride Along Policy | **Policy Number:** 4.19 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Civilian passengers are permitted in police vehicles only when specifically authorized for ride-along or when transported under official police business. Civilian observers may occasionally accompany law enforcement officers while on patrol in order to observe and learn about law enforcement procedures and practices. Civilian observers must be authorized by the Chief or designee. Employees who violate this policy are subject to disciplinary action, assume responsibility, and may be found to have personal liability for their actions.

**DEFINITION:**

- ***Public Information*** - Information that may be of interest to the general public regarding policy, procedures or events involving the agency or other newsworthy information that is not legally protected, does not unduly interfere with the mission of the agency, infringe upon the rights of a defendant or compromise the legitimate safety and privacy interests of officers, victims, witnesses or others.

**PROCEDURES:**

**Authorization Process- Ride Along:**
Any person or group wishing to participate in this program is referred to the Chief or designee for processing of a "Ride Along Program Application" and a "Ride Along Program Release of Liability Form." Both the application and form are processed, and based on information developed. The applicants are notified as to whether or not they are qualified to participate. In most situations, law-abiding citizens wishing to participate and who have completed all necessary requirements are granted that opportunity. Convicted felons or suspects in criminal activity are not allowed to participate. A criminal background check is performed on all applicants to verify criminal record.

**Civilian Rules- Ride Along:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures,  4.19  Ride Along Policy

If the civilian is approved to ride along with a sworn law enforcement officer, they are responsible for following the rules and regulations of the program to ensure a safe and enjoyable experience. The civilian rider will:

1. Not participate in the ride along program more than two (2) times in a calendar year;
2. Not ride with the same officer more than one (1) time in a calendar year;
3. Only ride with officers approved by the Chief;
4. Not be allowed to exit the police vehicle, at any time, to assist the officer on a call, except in officer down situations; &
5. Never carry a firearm or any other weapon while on a ride along.

**Officer Rules – Ride Along:**
The officer is to:

1. Explain the hazards associated with riding in a police vehicle;
2. Explain radio safety equipment including emergency radio procedures;
3. Ensure that the passenger wears a seat belt;
4. Ensure that the passenger exits the vehicle in a relatively safe location prior to participating in high-risk activities such as high-speed pursuit or response to "shots fired" calls; and notify communications of the location the ride along was left so that some arrangements can be made to assist with alternative transportation
5. Explain that the passenger may be required to testify as a witness to criminal activity observed during the ride-along.

**Media Ride Along:**
Media representatives must complete a "Ride Along Program Application", and a "Ride Along Program Release of Liability Form". The Chief reviews both documents and will approve or disapprove the applicant. If approved, individuals are allowed to ride along with a police officer approved by the Chief.

Representatives of the media are prohibited from:

1. Entering private residences or any other location where there is a reasonable expectation of privacy.  (Supreme Court case of Wilson v. Layne);
2. Assisting the officer on call except in officer down situations;
3. *Carrying a firearm or any other weapon while on the ride along; &*
4. *Releasing any information, photographs, or videotape to the general public unless regarded as public information, (as defined in this policy), by the agency.*
5. *Showing the faces of juveniles unless they have been involved in a serious felony crime or otherwise authorized by a higher command.*

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

## RIDE ALONG PROGRAM APPLICATION

All civilian personnel are required to complete the following application in order to participate in a ride along with a sworn police officer. At least two forms of identification must be presented, (including at least one government issued photo identification), with this application before any authorization is completed.

1. Full Name: _____
2. Drivers License Number and State: _____
3. Address:
   _____
   _____
   _____
4. Previous address:
   _____
   _____
   _____
5. Date of birth: _____
6. Social Security Number: _____
7. Place of employment: _____
8. Length of employment: _____
9. Previous employer: _____
10. Name of spouse: _____
11. Maiden name (if applicable): _____
12. Have you ever been arrested, and if so for what reason?
    _____
    _____
    _____
    _____
13. Nickname(s) used: _____
14. Number to call in case of emergency: _____
15. Current illnesses or medications: _____
16. Known allergies: _____
17. Blood type: _____

**RIDE ALONG PROGRAM RELEASE OF LIABILITY FORM**

I, (full name of civilian) _____ fully release the Meridian Public School District Campus Police Department of any liability resulting from any injury as a result of *ordinary negligence* that I might receive as a result of riding with a police officer in a police vehicle. I have been informed of the possible dangers associated with law enforcement work and understand that there are dangers involved in riding in a police vehicle for which a police officer is on patrol, serving school process, responding to various types of crimes or calls for service, and making physical arrests when necessary. I also agree to abide by all the rules associated with the ride along program. Rules include the following:

1. Riders will remain in the police vehicle at all times unless otherwise instructed by the officer with whom they are riding.
2. Riders will not communicate with anyone who is the subject of a police investigation, arrested, or otherwise involved in any police action.
3. Riders will not carry or attempt to use any type of weapon.
4. Riders will follow all instructions of the officer with whom they are riding.

Date: _____ Time: _____

Rider Name: _____

Signature of Rider: _____

Name of Officer arranging the ride along: _____

Signature of Officer arranging the ride along: _____

Name of Witness: _____

Signature of Witness: _____

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:**  Death or Serious Injury Notification | **Policy Number:** 4.21 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department officers follow established procedure to notify relatives, and responsible adults in cases of death or serious injuries to members of the public or officers.

**PROCEDURES:**

**Preparation – Notification:**
The following guidelines apply when next of kin or responsible adult notifications are to be made:

1. *Verify and confirm* the identity of the deceased and their next of kin.
2. All notifications must be made in person, with the exception of serious injuries where delay might prevent the family from arriving at the hospital before the injured person's death.
3. Try to separate small children to another room. Inform the responsible adult and then assist with the notification to the children.
4. Officers must provide immediate assistance to survivors without regard to time spent at the notification site.
5. Prior to contacting those to be notified, the assigned officers must gather and become familiar with information concerning the deceased or seriously injured person, to include:
   a. Details of the event; but not the graphic details of the victim's injuries.
   b. Name, age, identification details, and home address of the victim;
   c. Location of the body, if deceased; &
   d. Pertinent information regarding who and where contacts can be located.
6. The order of priority for notifying the family is: *spouse*, followed by *parents, brothers* or *sisters*, and then any *children*. Other relatives or responsible adults shall be notified if immediate family members are unavailable.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.21 Death or Serious Injury Notification

7. The party's *pastor, priest*, or *spiritual advisor* shall be notified if readily available and attempt to have them present at the time of notification. If the agency's chaplain is available, they may also be of assistance at notification.

8. When another law enforcement agency is to make the notification, request:
   a. Notification be made in person; &
   b. Verification when notification has been completed.

9. Officers should gather information regarding relatives to aid in communication in case relatives to be notified are:
   a. Elderly;
   b. Disabled or have medical problems;
   c. Visually or hearing impaired; or
   d. Not fluent in English.

10. Officers may not use the name of the deceased or seriously injured person over the radio or release the name to news media. The agency will designate a Public Information Officer for that purpose or a senior officer will release the news, but not until assured that relatives have been notified.

11. A male and female officer should be assigned to a death or serious injury notification if possible.

12. Personal effects of the deceased may not be delivered to survivors at the time of death notification.

**Making Notification:**

Once preparation for notification has been completed, the notification officers maintain the following guidelines regarding the actual notification:

1. Upon arrival at the residence or place of business, the notification officers will:
   a. Check accuracy of the chosen notification site;
   b. Request to speak to the next of kin;
   c. Identify themselves by name and agency;
   d. Verify the relationship to the deceased or seriously injured person; &
   e. Ask permission to enter the residence or location, and move to a place of privacy.

2. Reasonable effort is made to make the death or serious injury notification in the privacy of the home or location away from public view and hearing.

3. Prior to making notification, officers should bring family members together if possible.

4. There are no easy ways to deliver this message. Be empathetic and sympathetic but be direct. Don't try to smooth what can't be.

5. Address relatives in a straight-forward manner and:
   a. Avoid graphic aspects of the incident;
   b. Avoid the use of law enforcement jargon; &
   c. Refer to the deceased by first name.

6. Be prepared for unexpected responses from survivors to include hysteria and possible verbal or physical attack.

7. Provide survivors with sufficient time to regain composure before proceeding.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.21 Death or Serious Injury Notification

8. Avoid using such phrases as *I know how you feel* or *I know how hard this is for you.*
9. Provide survivors with pertinent information including:
   a. Disposition of the body;
   b. Location of personal effects;
   c. Identification requirements/procedures; &
   d. Notification officers' *names, address for* Meridian Public School District Campus Police Department and *contact phone numbers.*

**Providing Assistance and Referral:**

Notification officers may not leave upon completion of the notification until the following has been achieved:

1. Next of kin has received adequate support. The notification officers consider:
   a. Emotional reaction and the physical condition of the next of kin;
   b. Availability of other adults in the home;
   c. Whether infants or small children are receiving proper attention;
   d. Condition of the home environment (i.e.- evidence of excessive alcohol use or drug use, lack of means of financial support, shortage of food, problem with shelter, etc.); &
   e. The availability of a support system (for example: *friends, family, close neighbors, access to clergy, means of transportation*).
2. For those in need of shelter, transportation, food, or other support, provide numbers for local assistance agencies.
3. If requested, officers may provide confirmed additional information regarding the incident, if known at the time.
4. Remain alert to the possible need for medical assistance. When officers are aware of serious medical conditions in advance of notification, they should place a local medical response unit on alert.
5. Before leaving, the notification officers should be reasonably assured that survivors can take care of themselves and those they are responsible for.
6. Reasonable efforts are made for lone survivors to obtain support from family, friends, co-workers, neighbors, family clergy, or counselors.
7. Conduct a follow-up contact within 24 hours with any survivor when there is a concern for the survivor's well being.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Post-Shooting Incident | **Policy Number:** 4.22 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Law enforcement duties can often expose officers and support personnel to mentally painful and highly stressful situations that cannot be resolved through normal stress coping techniques. Unless adequately treated, these situations can cause disabling emotional, mental, and occasional physical problems. Officer-involved shootings resulting in death or serious bodily injury to citizens or fellow officers may trigger stress disorders. It is the policy of this agency to take immediate action, after traumatic incidents, to safeguard the mental health of all involved personnel.

**DEFINITIONS:**

- ***Post-Traumatic Stress Disorder*** - An anxiety disorder that can result from exposure to short-term severe stress or the long-term buildup of repetitive and prolonged milder stress.

- ***Officer-Involved Shooting Incident***- *A* line-of-duty incident where a shooting causes death or serious bodily injury to an officer or other person.

**PROCEDURES:**

**Handling of Officers at Scene of Shooting Incident:**
The supervisor on the scene of the incident will:

1. Request necessary medical assistance.
2. Move the officer(s) involved to a quiet location where a peer counselor may be available.
3. Prohibit use of caffeine, other stimulants, or depressants by the officer(s) involved, unless directed by medical personnel.
4. Interview the officer(s) involved regarding facts of the incident, although a more detailed debriefing will be conducted at a later time.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.22 Post-Shooting Incident

5. Notify the officer(s) involved that an investigation will occur concerning the incident, and that they may seek legal counsel.
6. Advise the officer(s) involved to . . . _refrain from discussing the incident with anyone, except a personal or agency attorney, union representative, or agency investigator, until the preliminary investigation is concluded._ Advise the officer(s) that . . . _only certain discussion, such as with their attorney, are subject to claims of privilege and that discussions may result in a waiver of certain legal protections._
7. Determine whether the circumstances of the incident require the officer's duty weapon be taken for laboratory analysis. When the duty weapon is taken, the supervisor will:
   a. Discretely take custody of the officer's weapon, &
   b. Replace the officer's weapon with another weapon, or advise the officer that it will be returned or replaced at a later time, as appropriate.
8. Allow the involved officer(s) to notify their families about the incident as soon as possible. When the officer(s) is unable to do so, an agency official personally notifies the family, and arrange for their transportation to the hospital.

**Post-Incident Procedures:**

All officers directly involved in the shooting incident are required to contact an agency-designated specialist for counseling and evaluation as soon as practical after the incident. Involved support personnel are also encouraged to contact the specialists after shooting incidents. After the counseling sessions, the _specialist_ advises the agency:

1. Whether it is in the officers' best interest to be placed on administrative leave or light duty, and for how long;
2. When the officer's duty weapon should be returned; &
3. The best-continued course of action going forward.

Meridian Public School District Campus Police Department will:

1. Remove involved officers from their duties, pending evaluation, while maintaining their availability for any necessary administrative investigations;
2. Encourage the families of the involved officers to take advantage of available counseling services;
3. Investigate the incident as soon as practical;
4. Brief other agency members concerning the incident to minimize rumors. Agency members are encouraged to show the involved officers their concern;
5. Respond to media inquiries, and release information regarding the incident as described in the Media Relations procedures;
6. Require each officer directly involved in the incident to re-qualify with their duty weapon prior to re-assignment to duty; &
7. Will re-evaluate the officer's demeanor and mental stability on a casual basis at least once a year or as deemed necessary.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.22 Post-Shooting Incident

Officers should:

1. Have personal, cell and other telephones answered by someone else for several days, if their names are released to the public; &
2. Not respond in news media attempts to talk to the officer at his residence or other job site.

**Daily Stress Recognition:**
Post-traumatic stress disorders may not arise immediately, and officers may attempt to hide problems. Supervisors are responsible for:

1. Monitoring the behavior of unit members for symptoms of the disorder; and
2. Ordering officers to seek assistance or counseling from a mental health specialist upon a reasonable belief that stress may be disrupting job performance.
3. Other officers who work with an officer who has been involved in an on duty shooting should be aware of any changes in behavior. This behavior change should be relayed to that officer's supervisor. Changes may be small and over a long period of time.

**Training:**
The agency provides employees with training pertaining to post-traumatic stress disorders on a regular basis. Supervisors are responsible for making information about the agency's peer counseling group and mental health services available to officers.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Blood Borne Pathogens & Other Infectious Diseases | **Policy Number:** 4.23 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department minimizes the risk of exposure to blood borne pathogens and other infectious diseases through the establishment and maintenance of recognized protocols and safety procedures.

**DEFINITIONS:**

- ***Bodily Fluids*** - Blood, semen and vaginal fluids or other secretions that might contain these fluids such as saliva, vomit, urine, or feces.

- ***Exposure Control Plan*** - A written plan developed by this agency and available to all employees that details the steps taken to eliminate or minimize exposure and evaluate the circumstances surrounding exposure incidents.

- ***Personal Protective Equipment*** - Specialized clothing or equipment worn or used by members for protection against the hazards of infection. This does not include standard issue uniforms and work clothes without special protective qualities.

- ***Universal Precautions*** - Procedures promulgated by the Centers for Disease Control (CDC) that emphasize precautions based on the assumption that all blood and bodily fluids are potentially infectious.

- ***Tuberculosis [TB]*** *-* A common and deadly infectious disease that is caused by mycobacteria, primarily *mycobacterium tuberculosis*. Tuberculosis most commonly affects the lungs (as pulmonary TB) but can also affect the central nervous system, the lymphatic system, the circulatory system, the genitourinary system, bones, joints, and even the skin. Other mycobacteria such as *Mycobacterium bovis*, *Mycobacterium africanum*, *Mycobacterium canetti,* and *Mycobacterium microti* can also cause tuberculosis, but these species do not

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

| Law Enforcement Policies and Procedures, 4.23 Blood Borne Pathogens & Other Infectious Diseases |
|---|

usually infect healthy adults. Over one-third of the world's population now has the TB bacterium in their bodies and new infections are occurring at a rate of one per second.

**PROCEDURES:**

The transfer of disease by exchange of bodily fluids is a serious occupational health risk to peace officers and other emergency personnel. Officers and employees of this agency follow recognized protocols and safety procedures in order to minimize this risk. When in doubt, officers and employees of the agency must seek professional assistance before knowingly exposing themselves to a known serious risk of infection.

AIDS, HIV, hepatitis B (HBV), hepatitis C (HCV), and other serious diseases can be contracted through exposure to infected blood and several types of bodily secretions. Employees of this agency are continuously provided with information and education on prevention of these diseases, provided up-to-date safety equipment and procedures that minimize their risks of exposure and to institute post-exposure reporting evaluation and treatment for all members exposed to these diseases.

Tuberculosis (TB) is again becoming more prevalent in our society and the newer strains are more drug resistant making them more difficult to treat. TB is spread through the air from one person to another. The bacteria are put into the air when a person with active TB disease of the lungs or throat coughs or sneezes. People nearby may breathe in these bacteria and become infected. Practicing good hygiene, Universal Precautions, use of PPE, and use of masks will greatly reduce the chance of contracting TB.

**Disease Prevention and Control Guidelines:**
1. This agency subscribes to the principles and practices for prevention of HIV and HBV exposure as detailed in the "universal precautions" prescribed by the CDC and the federal regulations of the Occupational Safety and Health Administration. Where otherwise not detailed in this policy, officers are guided by those practices and procedures.
2. Officers should assume that all persons are potential carriers of HIV or HBV.
3. No officer may refuse to arrest or otherwise physically handle any person who may carry the HIV or HBV virus when appropriate protective equipment is available.
4. Officers must use protective gear under appropriate circumstances unless its use would prevent the effective delivery of health care or public safety services or impose an increased hazard to the officer's safety or the safety of others.
5. Leather gloves or their protective equivalent must be worn when searching persons or places or when working in environments such as accident scenes where sharp objects and bodily fluids may be expected.
6. Searches of automobiles or other places should be conducted using a flashlight, mirror, or other devices where appropriate. After a cautious frisk of outer

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Page 2 of 8

Law Enforcement Policies and Procedures, 4.23 Blood Borne Pathogens & Other Infectious Diseases

garments, suspects should empty their pockets or purses and remove all sharp objects.

7. Needles must not be recapped, bent, broken, removed from a disposable syringe, or otherwise manipulated by hand.

8. Needles must be placed in, puncture-resistant, leak proof containers provided by the agency that are designated for biohazardous materials when collected as evidence, disposal or transportation purposes.

9. Officers must not smoke, eat, drink, or apply makeup while on active crime or accident scenes where bodily fluid spill could be expected.

10. Any evidence contaminated with bodily fluids must be completely dried, double bagged, and marked to identify potential or known communicable disease contamination.

11. Officers must not pick their noses, rub their eyes, or place their fingers in their mouth or ears, until after they've washed their hands.

**Custody and Transportation of Persons:**

1. When appropriate protective equipment is available, no officer may refuse to interview, assist, arrest, or otherwise physically handle any person who may have a communicable disease. Should an officer be involved in an incident where proper safety materials are not available; the officer immediately contacts a School Resource Officer and request assistance.

2. Officers must not put their fingers in or near the mouth of any conscious person. Officers utilizing protective gloves can, in life threatening situations, insert their finger in the mouth of an unconscious person to attempt to clear a blocked airway. This action should be performed in accordance with prescribed foreign body airway obstruction procedures.

3. When possible, persons with body fluids on their body or clothing are transported in separate vehicles from other individuals. The individual may be required to wear a suitable protective covering if he is bleeding or otherwise emitting bodily fluids.

4. During a transfer of custody, officers must discreetly notify support personnel that the suspect/victim has body fluids on the person or that the suspect/victim has said that he or she has a communicable disease. Care must be taken to insure that the information is given only to those who have a need to know.

5. When possible, suspects taken into custody with body fluids on their body or clothing, and not in need of medical attention, must be isolated from other persons in a designated holding area posted with an "Isolation Area-Do Not Enter" sign until clean up has been completed and a change of clothes has been provided.

6. Officers document on the appropriate arrest or incident form when a suspect taken into custody has bodily fluids on his person, or has stated that he has a communicable disease.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.23 Blood Borne Pathogens & Other Infectious Diseases

**Housekeeping:**

1. Supervisors and their employees are responsible for the maintenance of a clean and sanitary workplace and conduct periodic inspections to ensure that these conditions are maintained.
2. Supervisory personnel determine and implement written schedules as appropriate for cleaning and decontamination based on the location within the facility or work environment, the type of surface or equipment to be cleaned, the type of soil present and the tasks and procedures to be performed in the area.
3. All equipment and environmental and work surfaces must be cleaned and decontaminated after contact with blood and other potentially infectious materials.
4. Protective coverings used in laboratory, evidence custody, or enforcement operations for covering surfaces or equipment are removed or replaced as soon as possible following actual or possible contamination.
5. Bins, pails, and similar receptacles used to hold actual or potentially contaminated items are labeled as BIOHAZARD. These receptacles are decontaminated as soon as feasible following contamination and then inspected and decontaminated on a regularly scheduled basis.
6. Broken and potentially contaminated glassware, needles, or other sharp instruments must not be retrieved by hand but by other mechanical means and may not be stored in a manner that requires that they be retrieved manually.
7. Officers must remove clothing that has been contaminated with bodily fluids as soon as practical and with as little handling as possible. Any contacted skin area must be cleansed in the prescribed fashion.
8. Contaminated laundry and personal protective equipment must be bagged or containerized at the location where it is used in agency approved leak proof containers.
9. Personnel working in or supporting a criminalistics laboratory adhere to agency policy and procedure as well as the laboratory's policy and procedures.
10. Only employees specifically designated by the Chief may discard actual or potentially contaminated waste materials. Disposals conform to established federal, state, and local regulations.

**Disinfection of Skin Surfaces:**

1. Any unprotected skin surfaces that come into contact with bodily fluids must be thoroughly washed as soon as possible with hot running water and soap for at least one [1] minute then rinsed with an antiseptic solution before drying.
2. Alcohol or antiseptic towelettes or anti-bacterial gel may be used when soap and water are unavailable.
3. Disposable gloves should be removed inside out, with the contaminated side not exposed, and then the hands and forearms washed.
4. Skin surfaces are washed, showering if necessary, and mucous membranes flushed as soon as feasible following the removal of any clothing.
5. Hand lotion should be applied after disinfection to prevent chapping and to seal cracks and cuts on the skin.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.23 Blood Borne Pathogens & Other Infectious Diseases

6.  All open cuts and abrasions must be covered with waterproof bandages before reporting to duty.
7.  Other items such as handcuffs, etc., should be disinfected with a bleach solution (1-part bleach to 9 parts water), rubbing alcohol, or commercial disinfectant.
8.  Contaminated shoes and boots, including soles, should also be disinfected with an approved disinfectant. Extreme care should be taken to assure that contaminated footwear is not worn home or taken into a work area.

**Disinfection of Vehicle Surfaces:**
1.  Vehicle surface areas are disinfected whenever bodily fluids are spilled or after individuals with bodily fluid contamination are transported in an agency vehicle.
2.  A supervisor is notified and the vehicle taken to the service center as soon as possible.
3.  Affected vehicles must be immediately designated with the posting of an *Infectious Disease Contamination* sign upon arrival at the service center and while awaiting disinfection.
4.  Service personnel must remove any excess bodily fluids from the vehicle with absorbent cloths, paying special attention to any cracks, crevices, or seams that may be holding fluids.
5.  The affected areas should be disinfected using hot water and detergent or alcohol and allowed to air dry.
6.  Vehicles taken to a service center for scheduled washing and routine maintenance will, as part of that routine, be cleaned in the interior with an approved disinfectant.
7.  Non-disposable equipment and areas upon which bodily fluids have been spilled must be disinfected as follows:
    a.  Excess bodily fluids should be wiped up with approved disposable absorbent materials.
    b.  A freshly prepared solution of one-part chlorine bleach to 10 parts water or a fungicidal/ micro bactericidal disinfectant must be used to clean the area or equipment.

**Supplies:**
The agency is responsible for purchasing, storing, and issuing communicable disease prevention supplies to all personnel within the law enforcement agency. Officers are responsible for notifying the School Resource Officer in Charge, for the replacement of any item. All agency and emergency service vehicles are continuously stocked with:

1.  Disposable coveralls, aprons, and shoe covering in appropriate sizes;
2.  Disposable latex gloves and leather gloves;
3.  Puncture resistant containers and sealable plastic bags;
4.  Barrier resuscitation equipment, protective eye goggles, and surgical face masks;
5.  Disposable towelettes (70% isopropyl alcohol);
6.  Waterproof bandages;
7.  Absorbent cleaning materials;
8.  *Do Not Use - Possible Infectious Disease Contamination* signs;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.23 Blood Borne Pathogens & Other Infectious Diseases

9. Biohazard disposal bags;
10. Portable metal mirrors; &
11. Non-porous tongs.

**Vaccination, Exposure, Evaluation and Treatment:**

1. All members of this agency who may be at risk for occupational exposure to the hepatitis B virus are provided with the opportunity to take the HBV vaccination series at no cost within 10 working days of assignment to an occupationally exposed duty. The vaccination is provided unless the officer has previously received the vaccination or medical reasons contradict the procedure.

2. Any person who has unprotected physical contact with blood or other bodily fluids of another person while in the line of duty is considered to have been potentially exposed to HBV and/or HIV.

3. In cases of exposure, a supervisor is contacted who will complete appropriate on duty injury and medical forms and take appropriate steps to document the means and circumstances under which the exposure occurred.

4. Immediately after exposure, the officer proceeds to the designated health care facility for tests of evidence of infection and treatment of any injuries.

5. This agency ensures continued testing of the member for evidence of infection and provides psychological counseling as determined necessary by the health care official.

6. The members receive a copy of the health care provider's written opinion within 15 days of the evaluation and information on any conditions resulting from the exposure that require further evaluation or treatment.

7. Unless disclosure to an appropriate agency official is authorized by the officer or by state law, the officer's medical evaluation, test results, and any follow-up procedures remain confidential.

8. Any person responsible for potentially exposing a member of this agency to a communicable disease is encouraged to undergo testing to determine if the person has a communicable disease.

9. The person is provided with a copy of the test results and a copy is provided to the exposed agency officer. The officer is informed of applicable state laws and regulations concerning the disclosure of the identity and infectious status of the source individual.

10. Criminal charges may be sought against any person who intentionally exposes a member of this agency to a communicable disease.

11. Officers who test positive for HIV or HBV may continue working as long as they maintain acceptable performance and do not pose a safety and health threat to themselves, the public or other members of this agency.

12. This agency makes all decisions concerning the employee's work status solely on the medical opinions and advice of the agency's health care officials.

13. The agency may require an employee to be examined by the agency health care officials to determine if he is able to perform his duties without hazard to himself or others.

14. All members of this agency treat employees who have contracted a

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.23 Blood Borne Pathogens & Other Infectious Diseases

communicable disease fairly, courteously and with dignity.

**Legal Rights of Victims of Infectious Disease:**

1. When an officer mentions in a report that an individual has or may have a communicable disease, he writes *Classified - Contains Protected Medical Information Under HIPAA* across the top margin of the first page of the report. The School Resource Officer ensures that the above statement is on all reports by signing his signature upon review.
2. The Supervisor making press releases makes certain the medical information is not given to the news media. Under the Mississippi and Federal Health Insurance Portability and Accountability Act (HIPAA), medical records are exempt from disclosure.
3. All requests, including subpoenas, for copies of reports marked "Classified - Contains Protected Medical Information under HIPAA" is referred to the Meridian Public School District attorney for authorization to release the document. Prior approval is obtained from the Meridian Public School District attorney before advising a victim of sexual assault that the suspect has, or is suspected of having, a communicable disease.
4. All circumstances, not covered in this Policy, that may arise concerning releasing confidential or medical information regarding a victim, or suspected victim, or a communicable disease are referred directly to the Chief.
5. Any employee who divulges confidential or medical information in regard to a victim, or suspected victim, of a communicable disease is subject to punishment as authorized by state and federal law.

**Record Keeping:**

1. This agency's personnel function maintains an accurate record for each employee with occupational exposure that includes information on vaccination status; the results of all examinations, tests and follow-up procedures; the health care professional's written opinion; and any other germane information provided by the health care professional.
2. These health care records are retained in a secured area with limited access for the duration of the member's employment plus an established number of years thereafter and may not be disclosed or reported without the express written consent of the member or has required by law.

**Training:**

1. The training coordinator ensures that all members of this agency with occupational exposure are provided with a complete course of instruction on prevention of blood borne diseases prior to their initial assignment.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.23 Blood Borne Pathogens & Other Infectious Diseases

2. Affected employees receive annual refresher training and additional training whenever job tasks or procedures are modified in a manner that may alter their risk of exposure.

3. Trainees have access to applicable federal and state regulations pertaining to the regulation of blood borne pathogens.

4. The training coordinator completes records on member training to include dates and content of training sessions, names and qualifications of persons conducting the training and names of those persons successfully completing the training.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Off-Duty Conduct & Powers of Arrest | Policy Number: 4.24 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |

| Approval Authority<br>Title and Signature:  *Chief Ogie "Ricardo" Clayton* |
|---|

**POLICY:**

Peace officers are widely recognized in the community, even when not in uniform. Off-duty officers must always demonstrate courteous, professional behavior while in public. Off-duty officers should generally refrain from law enforcement activities; however, sworn officers are authorized to make arrests while off-duty under exigent or emergency situations.

**DEFINITIONS:**

- ***Off-duty -*** *Not* assigned or working a prescribed shift or duty. In the process of conducting personal business, leisure activities, or working for another person or business other.

- ***Personally Involved -*** *An* officer is considered to be <u>personally involved</u> when the off-duty officer, a family member, or a friend becomes engaged in a dispute or incident involving a personal matter with the person being arrested or any other person connected with the incident, or the officer is accepting money for law enforcement or security duties from other than this agency. This does not apply to situations where the police officer is a victim of crime.

**DISCUSSION:**

*Off-duty officers* are sometimes faced with criminal acts that they are neither equipped nor prepared to handle in the same manner as if they were on duty. *Off-duty officers* taking action in response to an *on-view crime* may actually confuse on-duty officers arriving on the scene which may lead to unnecessary injuries to officers or others. There have been many incidents where *off-duty officers* were mistaken for armed criminals. *Off-duty officers* should report observed crimes and allow on-duty officers to respond unless immediate action is needed to intervene to protect human life.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.24 Off-Duty Conduct & Powers of Arrest

Peace officers performing official acts under *color or law, and applying reasonably good judgment* may be immune from civil liability or criminal prosecution. However, this conditional protection does not extend to acts intended to cause injury or damage, or to those actions that the officer knew, or reasonably should have known, were in conflict with established law.

**PROCEDURES:**

**Guidelines for Off-Duty Conduct:**
Employees of Meridian Public School District Campus Police Department are considered *off duty* at any time other than during regularly scheduled working hours.

Employees are subject to call during their off-duty time, and are subject to emergency stand-by as deemed necessary by the Chief or designee.

*Off-duty officers* may carry approved off-duty weapons as authorized in the *firearms* policy. Officers may only use these weapons in compliance with the *use of force* policy.

**Off-duty responsibilities:**
*Off-duty* Meridian Public School District Campus Police Department *officers* have a responsibility to:

1. Immediately report any suspected or observed criminal activities to on-duty authorities;
2. Abide by all agency *policies and procedures* when affecting an arrest, or intervening in an altercation;
3. Carry agency credentials and badge at all reasonable times; &
4. Take immediate enforcement actions only to safeguard life or prevent felony property loss, or prevent escape of dangerous offenders.

**Permitted Off-Duty Arrests:**
*Off-duty officers* within the legal jurisdiction of this law enforcement agency may make arrests only when:

1. <u>Not</u> *personally involved* in the incident underlying the arrest;
2. There is an immediate need for the prevention of a serious crime or apprehension of a felony or violent suspect;
3. The crime requires a full custodial arrest;
4. In possession of appropriate police identification and badge; &
5. There are no on-duty officers present or capable of responding in a reasonable period of time.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.24 Off-Duty Conduct & Powers of Arrest

**Prohibited Off-Duty Arrests:**

Officers of this agency may not make an arrest *off-duty*:

1. When personally involved in the underlying incident;
2. When engaged in off-duty employment and the officer's actions are only in furtherance of the interests of the private employer;
3. As enforcement of a minor traffic regulation, code, or administrative matter;
4. When he/she has custody of minor children and is responsible for their safety and protection.

**Neighborhood Disputes:**

Officers must not intentionally become involved in or attempt to intervene in neighborhood quarrels or disputes involving their neighbors, friends, or relatives. Such disputes are *conflicts of interest.* Officers should avoid these situations, and contact the dispatcher and request uniformed personnel who have no bias to the outcome of the situation.

**Permitted Off-Duty Arrests When Working in Private Employment:**

When engaged in *off-duty* employment not associated with the police agency, the officer should not make arrests that solely or primarily serve the interests of the employer as opposed to the public in general. Officers should refer to the *off-duty employment* policy. Officers that are working an *off-duty* detail, which is approved and sanctioned by the agency, have full arrest powers and should make a lawful arrest when necessary.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Use of Agency Vehicles | Policy Number: 4.26 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department establishes guidelines for the proper use, care, and maintenance of all vehicles assigned to the agency.

**PROCEDURES:**

**Operation of Agency's vehicles:**

Vehicles owned by the Meridian Public School District and assigned to the agency are for official business only. This section does not preclude agency's employees from using Meridian Public School District vehicles for personal purposes incidental to official use (e.g., buying milk on way home from shift), but employees are prohibited from using Meridian Public School District vehicles for general personal business.

Vehicles are operated by agency employees only, except as necessary by mechanics or other service personnel performing maintenance or other work on the vehicle. For the purpose of this policy and procedure, Reserve and Special Officer's, performing duties for and at the request of the agency, are *employees.*

Unless an exception is granted, the operator of an agency vehicle notifies the Chief via text whenever the vehicle is in use and being operated for any purpose. The operator provides name/call number to the Chief and provides any other information required by proper notification procedure.

Agency vehicles are operated in accordance with all State traffic laws, Lauderdale County/City of Meridian ordinances, and policies and procedures of the Meridian Public School District Campus Police Department. Seat belts and shoulder straps must be worn by all operators and front seat passengers. Arrested Person(s) must be strapped in with seat belts whenever possible. Occupants also comply with state child restraint laws when feasible and applicable.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.26 Use of Agency Vehicles

Except under extreme emergencies, agency employees remove keys from the ignition and lock the doors on any unattended agency vehicle.

Officers who are assigned vehicles on a 24-hour a day basis must arrange with their supervisor for the vehicle to be available for use by others when the officer is unavailable for duty. Officers with *take home vehicles* will not conduct personal business or leisure activities in assigned vehicles. Such actions reflect poorly on the authority of the officer and the agency.

**Inspection and Maintenance of Agency's Vehicles:**
Officers search their vehicles at the beginning and end of their shift for weapons, evidence, contraband, or any property left by arrested person(s) or others.

Operators examine their vehicles at the beginning and end of their shifts for damage. Any damage observed is reported immediately to the supervisor. Any damage reported after the vehicle has been inspected and placed into service is considered to have occurred during the operator's tour of duty. Operators are responsible for the following:

1. Operators must check all fluid levels, belts, and hoses before beginning a shift.
2. Employees report any vehicle that is unsafe or in need of mechanical repairs immediately to their supervisor, who take appropriate corrective action through the chain of command.
3. An Employee assigned a vehicle is responsible for scheduling routine maintenance and service of the vehicle, including cleaning and washing of the vehicle.
4. Employees may not undertake any mechanical work on their own and must not alter or otherwise tamper with any of the vehicle's safety features.

**Accidents Involving Agency Vehicles:**
All crashes involving Meridian Public School District Campus Police Department vehicles are reported in compliance with applicable Meridian Public School District Governmental regulations.

All crashes involving Meridian Public School District Campus Police Department vehicles are reported to the Meridian Public School District; however, the accident investigation is conducted by another law enforcement agency having local or state police authority.

In the event the incident involves only agency vehicles and is so minor that, in the opinion of the supervising officer no investigation is necessary, the supervisor may elect to conduct their own investigation. In such cases, the accident report will be completed and submitted to the agency within twenty-four hours.

Crashes determined to be *preventable* under Meridian Public School District's Risk Management policy may result in sanctions by the agency to include the following:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.26 Use of Agency Vehicles

1. Within a 12-month period a driver's first preventable crash results in a written warning or reprimand.
2. A second preventable crash within the 12-month period results in a one-month suspension of the driver's take home vehicle. Alternatively, the officer may pay the first $500.00 of the deductible. The driver will attend a remedial driver's training.
3. A third preventable crash within the 12-month period results in a three-month suspension of the take home vehicle.
4. A fourth preventable crash results in the employee being assigned to a non-driving position.
5. The Chief, in his discretion, may impose other sanctions.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Mentally Ill Persons | **Policy Number:** 4.27 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Campus Police Department responds to situations involving mentally ill persons in a safe and efficient manner. Care is given to protect the public (MPSD Campus) in general, and officers and suspects in particular.

**DEFINITIONS:**

- ***Mental Illness*** - An illness, disease, or condition, other than epilepsy, senility, alcoholism, or mental deficiency, which substantially impairs a person's thought, perception of reality, emotional process, or judgment; or grossly impairs behavior as demonstrated by recent disturbed behavior.

- ***Substantial Likelihood of Serious Harm*** - *Conditions* where a person has threatened or attempted suicide or to inflict bodily harm on himself; has threatened or attempted homicide or other violent behavior; has placed others in reasonable fear of violent behavior and serious physical harm to them; or is unable to avoid severe impairment or injury from specific risks, and there is a substantial likelihood that such harm will occur unless the person is placed under involuntary treatment.

**PROCEDURES:**
There is no reason to assume that mentally ill suspects are any less of a threat to officers, themselves, or the public at large. Extreme caution is advised.

**Approaching Mentally Ill Persons:**
After gathering as much information as possible about the individual having or suspected of having a mental illness, two officers are dispatched to the scene. Upon arrival, officers should:

1. Park at least one building length away from the location of the alleged mentally ill person;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.27 Mentally Ill Persons

2. Establish an initial perimeter to prevent vehicular and pedestrian traffic through the area;
3. Walk slowly toward the scene from an angle rather than directly up to the front entrance, maintaining awareness of concealment areas for protection from gunfire;
4. Observe the scene for the following, to include:
   a. Verbal threats;
   b. Calls for help;
   c. Recent property damage or damage being committed;
   d. Presence of children;
   e. Number of occupants;
   f. Presence of animals; &
   g. Possible weapons.

**Communicating with Mentally Ill Persons:**

Proper communication skills are key in de-escalating a situation involving an individual having, or suspected of having, a mental illness. Remember, your goal is to control the situation. Therefore, officers of the agency will attempt to perform the following procedures when communicating with mentally ill subjects:

1. At least two officers are dispatched to the scene.
2. Upon arrival, only one officer communicates with the mentally ill subject and will:
   a. Speak in a clear and simple manner;
   b. Never be judgmental or taunting toward the subject;
   c. Assure the subject of his safety;
   d. Attempt to calm the individual by showing an understanding of his feelings;
   e. Encourage communication and allow the subject to vent his emotions;
   f. Ask one questions at a time and allow the individual adequate time to answer;
   g. Maintain eye contact and repeat the question, if the individual is distracted or confused by any question;
   h. Keep hands extended, palms open, and held in a non-threatening manner
   i. If a weapon is present, express to the individual "I want to help you with your problem, but I can't until you put down the weapon";
   j. Ask the subject to release any "detained" subjects [do not use the word "hostage"];
   k. Ask the individual to repeat any instructions back to ensure comprehension;
   l. Ask open-ended questions to avoid yes or no answers.
3. The other officer(s) or secondary officer, if available will try to;
   a. Communicate with family, friends, or neighbors regarding the mentally ill person for additional data and medical history of the subject.
   b. Remove friends, family, and neighbors from the scene if they are agitating the mentally ill person.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

4. All officers attempt to:
   a. Maintain a non-threatening posture and voice;
   b. Not deceive, stare, or ridicule mentally ill individuals;
   c. Not take verbal abuse personally;
   d. Avoid using force unless the individual becomes violent toward himself, officers, or others;
   e. Keep their weapon side away from the individual and firearm holstered unless intent and justified in its use;
   f. Work together to restrain the individual, if necessary.

Remember, hostility should not be met with hostility; but, rather, with carefully applied physical restraint. Mentally ill subjects do not react conventionally to orders. The use of a weapon must be restricted to defending your life and that of other persons. Think safety and treatment, not punishment and retribution. Mental illness sometimes creates a chemical imbalance in some individuals. This imbalance can cause adrenaline increases and enormous strength. Have enough officers readily available to assist with this type individual.

**Indicators of Mental Illness:**
At times, officers are faced with a situation in which no friends or family is available to provide insight into the medical or mental history of the individual in question. Therefore, officers must have the ability to pick up on verbal, environmental, and behavioral clues, which establish the mental state of the individual in question. These indicators include:

1. Verbal Cues:
   a. Illogical thoughts such as loose associations, grandiose ideas, ideas of persecution, and obsessive thoughts;
   b. Unusual speech patterns such as nonsensical speech or chatter, word repetition, extremely slow or rapid speech; &
   c. Verbal hostility or excitement such as talking excitedly or loudly, threatening harm, and argumentative or belligerent hostility.
2. Environmental cues:
   a. Strange decorations or inappropriate use of household items;
   b. Pack ratting and accumulating trash or waste matter; &
   c. Strange attachment to childish objects or unusually shaped items.
3. Behavioral cues:
   a. Wearing bizarre makeup, clothing, or clothing which inappropriate for the season;
   b. Strange posture or mannerisms such as constantly looking over their shoulder or maintaining an unusual position for a long period of time;
   c. Continuous pacing, agitation, waving of arms, hand gestures;
   d. Sluggish or repetitive movements;
   e. Responding to voices or objects that are not there;
   f. Confusion about or unawareness of surroundings;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.27 Mentally Ill Persons

      g.  Lack of emotional response;
      h.  Self-inflicted injury and/or property damage;
      i.  Facial expressions of sadness or grief; &
      j.  Inappropriate emotional reactions such as extreme mood swings.

**Custody of the Mentally Ill:**

When confronted with an individual whose behavior expresses that of mental illness, officers of the agency must seek the assistance of a licensed physician, psychologist, or other health care professional to determine the mental status of the individual.

If a physician is not present on the scene, the officer may contact the Mobile Crisis Response Unit. If such assistance is not readily available, statements of the individual, witnesses, family members, or the physical appearance of the scene itself [property damage, torn clothing, weapons, etc.] may be used to form a reasonable belief that the individual is mentally ill.

When a mentally ill person's behavior requires confinement in order to prevent him/her from personal harm, harming another person, or committing a crime, the officer will:

1. Take the individual into custody and immediately transport him/her to the nearest mental hospital or medical facility which receives mentally ill persons.  Have a second unit to follow if the need is suspected of continued violence.
2. Contact Single Point of Entry Facility
3. Make application for emergency admission, and turn the person over to hospital authorities.
4. Try to explain the advantage of the person voluntarily seeking help, rather than involuntary.

However, if an officer has no time to contact the Mobile Crisis Response Unit and must act immediately in order to prevent personal injury or extensive property damage, the officer will:

1. Immediately arrest the individual for any criminal conduct which he/she has committed including disorderly conduct and threats;
2. Immediately present the matter to the On-call Single Point of Entry Administrator;
3. Transport the individual to the Single Point of Entry Facility, or other emergency health care facility, make an application for emergency admission, and leave the individual with hospital authorities;
4. Have a second unit to follow when the need exists.
5. Notify the prosecutor that the individual has been committed.

In many cases, the prosecutor's office will dismiss the criminal charge once a commitment warrant is issued. Under no circumstances are mentally ill patients placed in a Jail facility that is not equipped and staffed to handle mentally ill patients.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 4.27 Mentally Ill Persons

**Transportation of the Mentally Ill by Meridian Public School District Campus Police Department Officers:**
Individuals taken into custody under the Emergency Commitment Law are transported to the hospital for evaluation. Hospitals receiving mentally ill persons have the responsibility to treat the patient for medical and psychological concerns. Officers are not required to accompany paramedics or maintain a presence at a receiving hospital, unless requested to do so by paramedics or hospital personnel. If an individual has not committed a crime and is not under arrest, he or she is free to leave once released from the hospital.

However, if an individual is transported to the hospital under an Emergency Commitment and has committed a criminal offense or a warrant check indicates an out-standing criminal warrant, the arresting officers must:

1. Charge the individual with a criminal offense and prepare an offense report;
2. Provide hospital personnel with a copy of the offense report;
3. Prepare a hold ticket for the arrested individual, maintaining the original at the Lauderdale County jail facility holding station;
4. Leave a copy of the hold ticket with hospital personnel to ensure transfer of the arrested individual after hospital release; &
5. Prepare an affidavit of arrest at Lauderdale County Justice Court.
6. Make arraignments for custodial care until the subject can be transported to the detention facility.

If referred to a mental institution by hospital staff, hospital personnel are responsible for transporting the individual to the institution. Meridian Public School District Campus Police Department forwards a copy of the offense report, hold ticket, and affidavit of arrest to hospital personnel. Upon arrival at the mental institution, transporting hospital personnel will leave a copy of the hold ticket at the institution and return the original to the jail facility. Upon receiving the hold ticket, Meridian Public School District Campus Police Department officers mark out the Emergency Commitment charge on the original offense report, leaving only the criminal charges, and appoint a booking number to the report affirming arrest after institutional release. Upon release from the mental institution, and assuming the individual is not referred back to the hospital, the individual is sent to the Lauderdale County jail facility.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Use of Force & Deadly Force / Response to Resistance | Policy Number: 5.01 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority<br>Title and Signature:   *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Human life is sacred. Protecting innocent human life is the most important mission of the Meridian Public School District Campus Police Department. Apprehending non-violent suspects and criminals is less important than protecting innocent human life, including the protection of the officer's own life.

Officers maintain a constant readiness and ability to act in instances where, in *their perception*, the use of force or deadly force may be appropriate. By maintaining readiness and capacity, officers reduce the likelihood of opposition and of the actual need for a forceful response of any kind. While *officer discretion* is critical, the need for accountability and control of police activities is necessary to limit abuses of authority. Officers only use the amount of force reasonably necessary to protect life and enforce the law under guidelines established by the Constitution of the United States, the Constitution of this State, established state and federal law, and as articulated in this policy and procedures manual.

It is the policy of the Meridian Public School District Police Department that officers will respond to a subject's resistance to control in accordance with the allowances and restrictions clearly established by applicable federal and state laws and case law effecting law enforcement. Officers of the Meridian Public School District Police Department will attempt to control a subject's resistance within those parameters allowed by clearly established applicable federal and state laws and applicable case law.

**DEFINITIONS:**

- ***Authorized weapon -*** A weapon approved by the agency and sanctioned for use by its officers. No weapon is authorized for carry or use by an officer unless the agency expressly approves it and the officer has demonstrated proficiency with the weapon type in accordance with agency guidelines.

-  ***Auxiliary weapons of availability -*** An officer may become separated from their

 **Formatted:** Bullets and Numbering

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.01 Use of Force & Deadly Force

agency issued firearm or intermediate weapons. Should this occur, the officer might have access to a *weapon of opportunity*, including but not limited to a flash light, citation holder, handcuffs, or any object that could be used as a weapon in the defense of self or another.

- ***Baton or expandable baton*** – **[NOT Used by MPSD PD]** An impact weapon capable of inflicting bodily injury by striking with a portion of the weapon. Batons are not authorized by this agency. Carrying or using saps, *Billy clubs,* or *slapjacks* is prohibited.

- ***Chemical weapon* – [NOT Used by MPSD PD]** Weapons capable of temporarily incapacitating a person through the controlled release of some chemical irritant or agent.

- ***Certification with weapon - Officer*** has demonstrated proficiency with a particular weapon, and been tested in its safe care and use. The officer is thereby authorized to carry and use this weapon in the performance of his/her official duties regardless of whether the officer is on-duty or off-duty. Without such certification, the officer may not carry or use this or a similar weapon.

- ***Deadly force -*** An action, with or without the use of a weapon, intended to cause death or serious bodily injury, or, the use of any object in a manner intended to cause death or serious bodily injury.

- ***Electronic Stun Device* – [NOT Used by MPSD PD]** Devices and weapons that use short bursts of electrical energy to temporarily incapacitate a person without the intent of causing death or serious bodily injury. The device may work by touching the combative individual with electrical probes or by shooting electrical probes from a handheld device.

- ***Exigent circumstances -*** Conditions that are of such urgency and seriousness as to justify a warrant less entry, search, or seizure by police when a warrant would ordinarily be required.

- ***Firearm -*** Any device designated, made, or adapted to expel a projectile through a barrel by using energy generated by rapidly expanding gases or any device readily convertible to that use; including all handguns, rifles, and shotguns.

- ***Force, non-deadly force, or less-lethal force*** - **Actions** not calculated under the circumstances to cause death or serious bodily injury.

- ***Knife -*** Any edged weapon that is designed to inflict serious bodily injury or death by

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.01 Use of Force & Deadly Force

stabbing, cutting, slicing, whether legal or illegal, and including swords, daggers, axes, hatchets, etc.

- ***Lateral vascular neck restraint [LVNR] [Not Used by MPSD PD]*** - A method or manner of restraining or controlling a person by physically restraining the person's neck from behind. The technique involves the initial restraint of a person through contact and control methods which may ultimately be used to incapacitate the person by rendering the person temporarily unconscious where the person refuses to submit to lesser levels of control.

- ***Less than lethal or intermediate weapons*** - Procedures or weapons designed to provide *force,* but usually *less than deadly force. Less than lethal* is sometimes referred to as *less-lethal* or *non-deadly force.* Regardless of the name, officers know that any force, especially when applied under dangerous, tense, uncertain, and rapidly evolving situations, may cause harm, serious bodily harm, or death, despite the best intentions of the officer.

- ***Physical strength and skill*** -   Any physical actions by one or more officers (e.g., holding, restraining, pushing, and pulling) which may include special skills (e.g., boxing, karate, and judo) but do not include the use of *deadly force* or any weapon.

- ***Probable cause*** - Sufficient reason, based upon known facts, to believe a crime has been committed or that certain property is connected with a crime. Probable cause must exist for a law enforcement officer to make an arrest without a warrant, search without a warrant, or seize property in the belief the items were evidence of a crime. *Probable cause* is often subjective, but if the police officer's belief or even hunch was correct, finding stolen goods, the hidden weapon, or drugs may be claimed as self-fulfilling proof of probable cause. Technically, probable cause has to exist prior to arrest, search, or seizure.

- ***Serious bodily injury*** - Harm that creates substantial risk of death, serious permanent disfigurement, or loss or impairment of any body function or organ.

**PROCEDURES:**

**Levels of Use of Force:**
Use of force or deadly force is controlled by the basic elements of <u>a reasonable officer's perception</u> and a <u>reasonable officer's response</u>. Officers may use only the level of force that is reasonably necessary to stop the perceived threat.

To better understand and explain *use of force* and force issues, officer *perceptions* and

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

| Law Enforcement Policies and Procedures, 5.01 Use of Force & Deadly Force |
|---|

officer *force options* are illustrated in the <u>*Use of Force Continuum*</u> or *force continuum* that is located on the last page of this policy. This chart illustrates five levels of *perception* and five corresponding levels of *response.* Officers must be familiar with, and know how to apply and explain this *continuum.* Refer to the <u>Use of Force Continuum,</u> at the end of this policy.

Officer's general perception and corresponding force options are:

- **Level 1 – (Compliant)** The suspect is perceived by the officer to be *compliant.* The appropriate level of response is *cooperative controls,* including *officer presence, hand signals, verbal commands and instructions, light touching* or *patting,* etc. In other words, cooperation at this level is a *two-way street.*

- **Level 2 – (Passively Resistant)** The suspect is perceived by the officer to be passively *resistant. The* appropriate level of response is *contact controls,* including *strong or forceful soft hand, hand and arm holds, pressured physical movement of the suspect, removal,* etc.

- **Level 3 – (Actively Resistant)** The suspect is perceived by the officer to be *actively resistant. The* appropriate response is *compliance techniques.* <u>This is the threshold for any reasonable officer to consider this suspect to be a potential threat to himself, the officer, or other citizens.</u> Compliance techniques may include *all reasonable* means to cause the *suspect to comply as soon as reasonably possible.* These techniques may include *use of use of restraints, forced movement, forcing a suspect's limbs behind his back, forcing a suspect down on the floor or against a wall, or using other forms of rough physical force, e*tc. Once suspects are perceived as actively *resistant*, officers should not relax care until the subject is fully secured.

- **Level 4 – (Assaultive & A Threat to Bodily Harm)** The suspect is perceived by the officer to be assaultive *– and a threat to bodily harm.* The appropriate level of response is immediate *defensive tactics.* The original assaultive behavior may have been directed at a fellow suspect, apparent victim, or the officer. *Defensive tactics* may include *hard hand techniques, or any other reasonable means available* at and hand to stop the aggression, defend against the attack, and bring the suspect into compliance. It is contemplated and understood that reasonable officers, while employing defensive tactics, may cause injury, serious injury, and in some isolated instances, death without intending such consequences.

- **Level 5 – (Assaultive & Serious Threat of Bodily Harm or Death)** The suspect is perceived by the officer to be *assaultive – serious bodily harm or death.* The appropriate level of response is *deadly force.* Deadly force includes firearms, knives, or any other means immediately available that a reasonable officer, in the same circumstance, would consider as potentially causing death or serious bodily injury.

**Tactics, Applications, & Officer's Perceptions:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.01 Use of Force & Deadly Force

- **Level 1 – (Compliant) No or Slight Apparent Potential for Harm**

     **Arrival & Presence:** Officer present at the scene. This includes proper voice and/or other identification, body language, and awareness by the subject that he is dealing with an officer of the law. This may also include presence of the officer's vehicle, seeing the officer in his uniform, hearing officer identification, etc. A reasoning person seeing and hearing these things will normally alter their behavior, and respond to the officer's instructions.

     **Interview Stance:** The officer adopts a stance outside his danger zone that provides appropriate protection and forms the basis of an effective physical response if attacked.

- **Level 2 – (Passively Resistant) Moderate Potential for Physical Harm**

     **Dialogue Between Parties:** A two way, controlled, non-emotional communications between the officer and the subject, aimed at a problem identification and/or resolution.

     **Verbal Direction:** Officer asks, advises, or commands subject to engage in, or refrain from, a specific action or non-action.

     **Soft Hand Techniques:** Officer may choose to employ some assistance in movement, compliance, or removal from the immediate scene.

- **Level 3 – (Actively Resistant) Moderate Potential for Physical Harm**

     **Restraint Devices:** Mechanical tools used to restrict a subject's movement and facilitate searching such as, handcuffs, flex cuffs, leg irons, belly chains, optional nylon restraining devices etc.

     **Chemical Agents Individual Protection Devices:** CS/OC spray agent used to subdue or bring a subject into compliance.

     **Transporters:** Techniques used to control and/or move a subject from point A to point B with the minimum effort by the officer or to gain and retain control over the subject.

     **Takedown:** Techniques that redirect a subject to the ground in a controlled manner to limit physical resistance and to facilitate the application of a restraint device, and to prevent intentional injury to the subject.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.01 Use of Force & Deadly Force

**Pain Compliance:** Techniques designed to force a subject to comply with an officer, as a result of the officer inflicting controlled pain upon specific points in the subject's body such as pressure point techniques.

- **Level 4 – (Assaultive & A Threat to Bodily Harm) Serious Potential for Physical Harm**

    **Electronic Stun Device:** Is a Level 4 application of force, when properly employed.  Such devices will not be used on persons suspected to have implanted medical devices such as pace makers or time medical dispensing mechanisms.

    **Incapacitation:** Techniques intended to stun or render a subject temporarily unconscious.  These techniques may be an impact weapon, such as a strike to a major nerve area, or lateral vascular neck restraint.

    **Intermediate Weapon:** Impact weapons that are primarily used to control a subject such as a baton, expandable baton, Taser®, and/or police canine.

    **Lateral Vascular Neck Restraint:** Should only be applied when other take-down and restraint procedures have failed. As with other Level 4 devices and techniques, only officers trained and practiced in the technique should attempt to apply it.

- **Level 5 – (Assaultive & Serious Threat of Bodily Harm or Death) High Potential for Great Bodily Harm or Death**

    **Deadly Force:**  Techniques and implements that by their very nature are known to cause death or serious injury. To employ deadly force officers must perceive that an imminent threat to their life or the life of another is present.

    **Firearm Special Munitions:**   Special munitions fired, launched, or discharged from a service handgun, shoulder weapon, or vehicle mounted weapon constitute a <u>Level 5</u> application of the use of force, and must be used with extreme care.  Although often referred to as *less-lethal*, officers know that the *less* refers to *less chance of causing death or serious bodily injury.* Special munitions rounds must not be deliberately fired or thrown at the face, chest, neck, or spine of any individual [For more information See: Policy 05.03 Special Munitions – Distraction Devices, & 05.04 Special Munitions – Less Lethal].

It is important to remember that almost all incidents faced by police are not scripted, easy to understand, or predictable as to outcome. Officers use their best effort to determine the

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.01 Use of Force & Deadly Force

threat level and apply the corresponding response. Time permitting, officers must use care in evaluating a suspect's actions and perceived threat level.  If there is reasonable doubt and time permits, seek assistance before acting. Justification for the use of force and deadly force must be limited to what is *known or reasonably perceived* by the officer at the time of the incident. Facts unknown at the time force is used should not be considered later to determine whether the force was justified.

Officers may not intentionally use more force than is necessary and reasonable under the circumstances. Officers may never use force in response to mere verbal provocation or abusive language directed at the officer. Officers must never use deadly force, except to protect his/her life, or the life of other human being.

**Application of Use of Force & Deadly Force:**
Application of *deadly force* and *force* are authorized by a peace officer only to achieve the following lawful objectives:

1. To defend self, or others against serious threats of serious bodily injury or death;
2. To stop dangerous felony flight, where there is serious imminent risk to the public of death or serious bodily injury;
3. To prevent roaming at large by obviously mad or vicious animals; to relieve animals so badly injured that it cannot reasonably survive from injuries causing prolonged suffering: &
4. To stop imminent damage to or theft of property, which by its removal or damage seriously threatens the life or safety of others.

Only when there is a reasonable expectation that altered or damaged property may place others in imminent risk of death or serious bodily injury is the application of *deadly force* appropriate to protect property. Some examples of the use of deadly force to protect property are stopping a suspect from setting a fire, or throwing a bomb; preventing serious damage to a bridge; stopping sabotage to railroad tracks; or deterring the use or theft of what appears to be a weapon of mass destruction, bomb, or other military equipment.

Application of *force* but not *deadly force* is authorized by a peace officer only to achieve the following lawful objectives:

1. To preserve the peace;
2. To defend themselves, or others against unlawful violence;
3. To prevent the commission of self-inflicted injury or suicide by any person;
4. To make lawful arrests or searches; to overcome resistance to such arrests or searches; and to prevent escape from custody;

5. To prevent or interrupt an intrusion on, or interference with the lawful possession of property; &
6. To prevent roaming at large by obviously mad or vicious animals, or to relieve

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.01 Use of Force & Deadly Force

animals so badly injured that it cannot reasonably survive from injuries causing prolonged suffering.

Before using any physical force against a suspect, beyond Level I officers must:

1. Have _probable cause_ to arrest that suspect;
2. State his intentions to arrest, and identify himself as a peace officer; &
3. State the reason for the arrest.

The amount and degree of force officers may use to achieve an objective takes into consideration the following issues:

1. Nature and seriousness of the offenses committed by the suspect;
2. The threat posed to other persons or the general public if the suspect's behavior continues;
3. Nature and seriousness of the risk of injury to the officer or others;
4. Age, physical condition, and behavior of the suspect;
5. Relevant actions by any third parties:
6. Physical conditions (e.g., visibility) at the scene:
7. Feasibility and availability of alternative actions: &
8. Opportunity and actual ability of the suspect to injure the officer, himself, or others.

Before officers use force (but not deadly force) when protecting a person from self-inflicted bodily injury [suicide attempt] or from uncontrollable circumstances, the officer must consider other available alternatives to protect that person from harm.

Officers may use unauthorized objects as weapons, or use weapons in unauthorized manners if emergency circumstances make it necessary to protect human life and prevent serious injury.

Officers may draw and ready any authorized weapons for use only when they reasonably anticipate that they may have to use such weapon(s).  This does not require officers to use the weapons.

**Use of Non-Deadly Force:**
Officers use physical strength, skill, and restraint devices, to apply non-deadly force only.

Officers have no obligation to _retreat_ or _back down_ before resorting to approved use of force, including deadly force. Officers may consider retreat or withdrawal where delay could make a more peaceable arrest, or stop, likely if such tactics would not increase risk to self or others. In some cases, an increased show of force may reduce the amount of force necessary to accomplish the officer's objective.

Officers may not attempt to affect arrests alone if there is substantial risk to self from the arrestee or another party unless there are no available reasonable alternatives.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.01 Use of Force & Deadly Force

Officers use handcuffs or other restraining devices on all arrestees unless it is obviously unnecessary or impractical (e.g. the elderly, young juveniles, amputees, crippled, injured, or other applicable subjects). Officers must take reasonable precautions to protect arrestees from injury caused by handcuffs or other restraining devices. Only restraining devices and techniques approved by the agency may be used.

Lateral Vascular Neck Restraints [LVNR] may only be used in a Deadly Force Situation by officers to restrain a person if the officer is trained in the proper techniques of applying and using LVNR and the officer has periodically demonstrated a proficiency in the use of such techniques. <u>Officers will not use a choke hold as a method of controlling or restraining a person</u>.

**Use of Deadly Force:**
Deadly force may not be used under the following circumstances:

1. As a warning or threat;
2. With the intent to maim or cripple a person;
3. On a person who has not caused or threatened to cause serious bodily injury or death to another person, including the officer;
4. On a person who simply flees or evades arrest;
5. At or from a moving vehicle, except in exigent circumstances, and only in an attempt to save human life;
6. Merely to prevent the destruction or theft of property; or
7. When the officer has any doubt as to the justification for using deadly force.

**Reporting Use of Force:**
Officers, who discharge a firearm, use chemical weapons, electronic weapons, impact weapons, special weapons, knives, or who cause bodily injury or death to other persons by use of force or deadly force must notify their direct supervisor immediately.

Officers are required to complete a written report detailing the circumstances surrounding the use of force incident. This written use of force report requirement must be met even though other required reports may have already covered the situation.

In incidents where officers cause serious bodily injury or death through the application of deadly force, they first call for medical assistance, secure the scene as well as possible, and then notify their direct supervisor. Upon arrival, the supervisor takes charge of the scene along with any investigation concerning the incident and report the incident to the Chief.

In incidents involving the use of force, all officers assist in every way possible with the investigation. Any report required by this policy receives executive review in an effort to:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.01 Use of Force & Deadly Force

1. Protect the integrity of the facts and the evidence;
2. Ensure that the officer's use of force complied with all appropriate state and federal laws, and agency policy;
3. Determine if the officer's use of force indicates a need for special counseling, training, or disciplinary action;
4. Determine whether the situation requires further action; &
5. Evaluate the need for additional or future, training.

**Reporting Requirements:**
The Chief must be notified immediately when any type of deadly force is used and there are resulting *serious physical injuries or death.*

Each officer who witnessed the incident or responded to the scene must complete a written report. These witness reports must be completed no later than the conclusion of the shift in which the incident occurred and filed with the Officer in Charge or Chief.

The officer(s) who actually used or employed the deadly force will be relieved of duty at the scene, and follow-up action handled in accordance post-shooting procedures. Refer to 04.22 Post-Shooting Incident.

All reports completed by the officers using force, other officers or witnesses must include the following:

1. A description of the events leading to the use of force or deadly force;
2. The original offense or *probable cause* for the stop or action;
3. An accurate description of the incident and reasons for employing force;
4. A description of the weapon or device used and the manner in which it was used;
5. A description of the injuries suffered, and the treatment given or received;
6. A list of all participants and witnesses to the incident; &
7. A copy of all incident reports compiled because of the incident.

The Chief formalizes criteria for reporting incidents. Reports of all injuries are filed in the central file and the employee's personnel record.

**Allegations Against Staff:**
The Chief, investigates all allegations of improper use of force & deadly force. In cases where possible criminal acts are involved, the appropriate law enforcement agency or prosecutor office must be notified.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.01 Use of Force & Deadly Force



**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Knives & Edged Weapons | Policy Number: 5.05 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority<br>Title and Signature:   *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Officers of Meridian Public School District Campus Police Department are authorized, but not required, to carry tactical knives and edged weapons for general service and defensive purposes. This policy is intended to instruct the officer in the acceptable use of the knife in common tasks and in defense of life.

**DEFINITIONS:**

- ***Edged weapon -*** Any blade for cutting, as in a tool or machine.

- ***Knife -*** An instrument for cutting, consisting of a sharp-edged metal or composite blade, fitted with a handle of some type.

- ***Immediate measure of defense -*** Taking action or using any implement to defend the officer's life or safety, or the life or safety of another, with implements or devices not normally intended to be weapons or issued as public safety equipment.

- ***Tactical folding knife -*** A knife with a hinged blade, designed primarily for tactical and defensive use.

- ***Tactical fixed-blade knife -*** Any tactical knife in which the blade and the grip or handle are permanently fused in some manner with a blade sharpened on one or more edges for cutting or stabbing.

**PROCEDURES:**

**Precautions:**
Officers are authorized to possess and use a tactical knife both on and off-duty. While in normal duty uniform or in civilian attire, officers may carry a *tactical folding knife* in a specifically designed holder on the duty belt or in a pocket. Folding tactical knife blades must not be casually visible to the public, except during intentional use by the officer.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.05 Knives & Edged Weapons

It is recognized that officers may have many needs for a knife, including both general work and for limited defensive purposes. While not considered to be a primary weapon of choice in a defense-of-life situation, officers may, under *extraordinary circumstances,* use a tactical knife in defense of their life and the lives of others.

**General Use:**

The officer uses reasonable care in the general use of the knife as a tool to prevent injury to the officer and others. General use of tactical knives may be employed in such actions as *cutting injured occupants out of seat belts, to release flex restraints in emergencies, to pry, open, cut,* etc.

The carrying and use of any knife by on and off-duty officers is done as unobtrusively as possible so as not to alarm any bystander. Officers must use the tactical knife in a safe and responsible manner, taking care not to exhibit or handle the knife carelessly.

**Defensive Use:**

Officers may use a tactical knife as a weapon of defense under extraordinary circumstances. Any use of a knife as a defensive weapon must be in compliance with policy 5.1 - *Use of Force & Deadly Force*, maintaining that use of a knife as a defensive weapon is a <u>Level 5</u> application of force.

Officers are cautioned that a tactical knife is primarily a cutting tool to assist them in their daily duties and is not intended to be a *primary weapon of defense.* Extraordinary circumstances, however, may dictate that the tactical knife be used as an *immediate measure of defense of life.*

The use of a tactical knife against an aggressive, life-threatening suspect can be employed only when the officer has an objective and reasonable belief that human life is in imminent danger of serious bodily injury or death, and this belief is based on the totality of the circumstances known to the officer at the time. Officers are cautioned that while any use of *deadly force* is a grave undertaking by police, the use of any knife against another human being may be viewed as an extraordinary defensive measure, and should be reserved for those extraordinary situations where defensive options are limited.

**Reporting Use of Force:**

Officers who cause bodily injury or death to other persons through the use of an edged weapon must first call for medical assistance, secure the scene as well as possible, and then notify their direct supervisor. Upon arrival, the supervisor takes charge of the scene, along with any investigation concerning the incident, and reports the incident to the Chief.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:**  Active Shooter Response | **Policy Number:**  5.06 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**   *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Police Department, in order to save innocent lives, recognizes the need for officers to deal swiftly and decisively during active shooter events. Responding officers are authorized to take immediate action to contain and if necessary, neutralize active shooters.

**DEFINITIONS:**

- ***Active shooter*** - An active shooter is an armed person who has used deadly physical force on other persons and continues to do so while having potential access to additional victims.

- ***Immediate action rapid deployment*** - The swift and immediate deployment of law enforcement personnel and resources to ongoing, life threatening situation where delayed deployment of personnel could otherwise result in death or great bodily injury to innocent persons. *Immediate action rapid deployment tactics* are not a substitute, nor the same as conventional response tactics to a barricaded gunman.

- ***Soft targets -*** Undefended targets to be destroyed. For example, a soft target would be an automobile, a house or assembly of people. Hardening a *soft target* can be achieved by employment of active security elements such as the presence of armed security or law enforcement officers; or passive elements such as Crime Prevention Through Environmental Design [CPTED], physical barriers, and locking systems. Soft targets selected by active shooters most often include public schools, colleges and universities, malls and major retail.

- **Suicide-by-COP** - Is a suicide method in which a criminal actor deliberately acts in a threatening or destructive way towards a law enforcement officer or others, with the intent of provoking a lethal response, such as being shot to death. Similar phrases include *death-by-cop*, *suicide-by-police*, and *officer-assisted-suicide*.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.06 Active Shooter Response

**DISCUSSION:**

It is not unusual for tactical teams to arrive at the scene of a barricaded incident and find that patrol personnel have contained the suspect within a secure perimeter. There is generally time for the tactical team to deploy their personnel without serious concern of the suspect(s) escaping. Once the incident has been isolated, time enables patrol and/or tactical personnel to formulate a structured and deliberate plan.

However, there are scenarios that require immediate action and rapid deployment of patrol personnel prior to the arrival of the tactical team. In these cases, delayed deployment could have catastrophic consequences. These scenarios often involve an ongoing . . . *shots fired or downed officer/citizen rescue*. It may also necessitate the immediate and rapid deployment of armed personnel to contain or prevent the escape of an armed and dangerous person(s).

Over the past several years the world has experienced a growing trend of mass homicide violence committed by individuals. These episodes have come to be termed active *shooter incidents* and are unique in that the behavior of the suspects is very different from that typically associated with other violent behaviors. Suspect(s) generally begin to shoot at numbers of people without warning.  In planning their attack, the active shooter will select soft targets. The motives for these behaviors include *political and religious agendas, rage, vengeance for perceived wrongs,* and *mental dysfunction*.

The incidents experienced across the country suggest that the typical police response involving containment, isolation, and negotiation is not adequate. Unlike most criminals, active shooters are likely to continue to use deadly physical force until intervention occurs or until the shooter decides to stop.

Unlike most law enforcement calls for service, an active shooter call and response, requires rapid response, quick evaluation of the situation, formulation of a plan, and tactical response to locate and contain the shooter. Initial officers arriving at the scene, will most often move to locate and contain the shooter, and rely on other arriving officers to rescue, move, and treat victims. The goal of intervention in active shooter incidents is to:

1.  Neutralize the threat(s) by neutralizing the shooter;
2.  Limiting access to potential victims; &
3.  Rescuing injured persons or potential victims.

These goals can be achieved by various means, up to and including, the timely and effective use of deadly physical force.

The active shooter response concept represents a shift in patrol response tactics, equipment needs, and command protocol. These situations require the initial officer responders arriving on the scene to have the authority and the capability to take aggressive

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 2 of 5

action without waiting for command staff or for the arrival of specialty units such as SWAT or Crisis Negotiators.

## CHARACTERISTICS OF AN ACTIVE SHOOTER:

The following is a list of characteristics commonly associated with active shooter suspects. This list was compiled from descriptions of past active shooters and not meant to be a comprehensive list describing all active shooters. Each active shooter situation is unique, however, it is helpful to know that an *active shooter:*

1. Prepare for the event.
2. May be prepared for a sustained confrontation with law enforcement or security officers.
3. Choose soft targets where there is a perception that people are disarmed and can not effectively respond.
4. Choose locations where potential victims are close at hand, such as schools, colleges, shopping malls, churches, theaters, and concerts,
5. Is intent on killing a number of people as quickly as possible.
6. Present a first indication of their presence when they begin to assault victims.
7. May act in the manner of a sniper, assaulting victims from a distance.
8. May also engage multiple targets while remaining constantly mobile.
9. Are not deterred or susceptible to containment or negotiation tactics.
10. Typically continue their attack despite the arrival of emergency responders.
11. Are often better armed and prepared than security and law enforcement officers.
12. Are not limited to the use of firearms in accomplishing their attacks on victims. They may use bladed weapons, vehicles, explosives, booby traps, body armor or any tool that, in the circumstance in which it is used, constitutes deadly physical force.
13. Historically have not attempted to hide their identity or conceal their attacks.
14. May employ some type of diversion.
15. May be indiscriminative in their violence or they may seek specific victims.
16. Usually have some degree of familiarity with the building or location they choose to occupy. In the case of school and college shootings, almost always attack fellow classmates.
17. Active shooter events are dynamic and may go in and out of an "active" status; a static incident may turn into an active shooter event or an active shooter may go "inactive" by going to a barricaded status without access to victims.
18. Escape is usually not a priority of the active shooter.
19. Active shooters may be suicidal, deciding to die in the course of their actions either at the hand of others or by self-inflicted wound. The original plan contemplates . . . suicide-by-COP.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.06 Active Shooter Response

## TACTICS:

The following seven [7] tactical tenets set general tactical response guidelines for active shooter incidents. Again, these incidents are sufficiently unique such that their effective handling can not be totally reduced to step-by-step procedures. This tactical discussion is not meant to limit conventional tactics which might be appropriate to a crisis situation. The significant factors regarding these that they represent a means of intervention available to officers when there is an elevated risk to bystanders and officers. The risk is acceptable in light of the potential these tactics have for saving lives.

Another significant aspect of the active shooter tactical doctrine is that officers arriving at the scene of an active shooter incident are authorized to intervene immediately, prior to the arrival of command personnel or special units.

1. **Goals** - The overall purpose of these tactics is to save lives and limit serious injuries. Important goals for law enforcement response to an active shooter event are *neutralization the attacker*, denying *access to additional victims*, and *rescuing injured victims and potential victims*.

2. **Assume Tactical Responsibility** – Upon arrival the first officer at the scene must take charge of the incident. If more than one officer arrives simultaneously, or as the scene develop tactical responsibility may be based on rank, expertise, or seniority. However, it must be made imminently clear to both communications centers and other officers, who are in-charge. An officer of superior rank who is on scene and fully briefed may ultimately assume *incident command*. Any change in *incident command* will be made known to dispatch and others immediately.

3. **Situational Analysis** - The officer taking charge must, based on what information is available, make a rapid situation analysis. The analysis will be continuous, taking into account new information as it is received. The first decisions are *whether the situation is an active shooter event, whether an opportunity exists for immediate intervention leading to accomplishment of one of the goals listed above*, and *how responding resources should be employed at the scene*. By their very nature, these decisions will need to be made within a few seconds on minutes, with incomplete data, and often unreliable and confusing facts. Officers placed in such a position, are simply expected to do the best they can with what is handed to them.

4. **Incident Command** - The first officer arriving on scene will initiate incident command. He/she will initiate the situation analysis and determine initial deployment of responding resources. This may involve deployment of resources as they arrive, by radio. Command personnel en route to the incident will monitor the radio to gain information, but shall not obstruct ongoing intervention. Any command personnel must be on scene and fully briefed before assuming responsibility of *incident command*.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 5.06 Active Shooter Response

5. **First Responder Tactical Intervention** - When responding to active shooter incidents, the concept of first responder tactical intervention allies. It is critical that all officers, supervisors, and command personnel are familiar with the definition of an *active shooter* as well as the tactics deemed appropriate for active shooter response and intervention. The traditional uniform responses of *contain, isolate, evacuate,* and *wait for SWAT and crisis negotiators* is not adequate in an active shooter incident. The first officer on scene will need to consider the following:

   a. **Containment -** First responder intervention is based on opportunity. Tactical intervention is the primary component of an active shooter response. Individual action is discouraged, as it is usually counterproductive to a coordinated, focused response to an active shooter event. However, in instances where officers are arriving at intervals, individual deployment and coordination via radio is the only practical option.

   b. ***Rescue/Contact Team*** - Rescue teams are usually in the form of officers with an identified element leader. Team movement will be in a controlled and disciplined tactical action under the control and direction of the element leader.

6. **Active Shooter Site Security -** No location associated with an active shooter will be considered secure until the incident commander declares it is so. Officers assigned to security functions will maintain positions until properly relieved.

7. **Special Weapons and Tactics (SWAT)** - When SWAT units are prepared to deploy, the initial responding officers may be relieved or redeployed by SWAT.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Hostage or Barricaded Suspect | **Policy Number:** 5.07 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

During hostage or barricaded subject incidents officers of Meridian Public School District Police Department first consider the protection of innocent life, and second, bringing about a peaceful resolution to the situation if reasonably possible without compromising officer safety, or the need to bring suspects to justice.

**DEFINITIONS:**

- *Active Shooter:* A person who is actively attempting to fire upon or otherwise seriously injure or kill one or more hostage(s), citizen(s), or officer(s).

- *Barricaded Subject:* Any individual who is reasonably believed to be a threat to commit serious bodily injury or death to hostages, officers or others in the community and who is in a stronghold position.

- *Hostage:* Any person held by another against his will by force or threat of force, expressed, or implied.

- *Incident Commander (IC) –* The senior officer at the scene or an officer given command of an incident that is experienced in managing this or similar tactical events.

- *540 Degrees of Awareness -* A tactical deployment concept where officers are aware of the necessity to observe their surroundings 360º horizontally, them, and 180º overhead. Having the effect of observing to their front, sides, rear, and overhead as they move tactically.

**PROCEDURES:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.05 Hostage or Barricaded Subject

**Objectives:**
During hostage or barricaded suspect incidents Meridian Public School District Police Department officers must:

1. Consider the lives and safety of officers, hostages, other involved civilians, and by-standers the primary factor;
2. Peacefully resolve the incident through communication with the suspect if possible;
3. Develop and maintain the ability to use alternative approaches to resolve incidents, if communications fail; &
4. Make every reasonable effort to affect the safe release of the hostages.

**School Resource Officers:**
School Resource Officers responding to hostage or barricaded subject incidents generally may not initiate tactical actions other than those necessary to protect the lives and safety of themselves or others. The exception is in instances where an *active shooter* is encountered. In such cases the necessity for immediate action to protect innocent life is paramount. As with any life threatening situation, the level of force employed must be consistent with this agency's use of force policy.

With the exception of active shooter incidents, once persons are moved to safety, officers must then:

1. Notify a supervisor of the incident and circumstances;
2. Contain and isolate the incident scene, establishing an *inner containment perimeter* to provide a reasonable degree of safety while maintaining contact with the incident scene;
3. As time and resources permit, establish an *outer containment perimeter* to control pedestrian and vehicular traffic into the area; &
4. Evacuate occupants of affected classrooms and buildings to a point beyond the outer perimeter.

**Incident Commander (IC):**
The first officer at the scene is in charge until command is transferred to a supervisor, and then the ranking officer at the scene is in charge until specifically relieved by a superior. An Incident Command Center should be activated and the incident operates under the I.C.C. The IC normally:

1. Evaluate the situation in an effort to determine how many suspects and/or hostages are involved, and if possible, determine how the suspect is armed;
2. Request assistance from the Special Response Team (SRT) or Special Weapons and Tactics (SWAT) unit, and the Hostage Negotiating Team;
3. Confirm that the SRT or SWAT is responding, and determine the estimated time required for the unit to assemble and prepare for action;
4. Delegate the tactical mission to the commander of the tactical response team;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.05 Hostage or Barricaded Subject

5.  Develop a communications and negotiations process and an emergency response team reaction;
6.  Establish an inner and outer perimeter, command post, tactical operations center, negotiations center, and a staging area for officers and others arriving for assignment;
7.  Assign a press center and an officer for press liaison;
8.  Verify that traffic and crowd control is established and that routes for emergency vehicles have been designated;
9.  Make provisions for recording personnel assignments and developing a chronological record of events at the command center and tactical operations center;
10. Ensure that necessary equipment from the fire department is made available at the staging area together with any other units or equipment such as canine teams, aviation, or marine units;
11. Ensure that emergency medical services are available at the site;
12. Request assistance or *standby* from support agencies such as fire/EMS as necessary or anticipated;
13. Identify and establish a staging area for support agencies and personnel to assemble. The staging area should be near the incident, but out of harms way;
14. Notify additional agencies with specialized teams in the immediate area, should the incident be prolonged and relief of personnel is essential to the operation; &
15. Contact the Federal Aviation Administration (FAA) and request for the airspace over the incident area to be closed to low-flying aircraft.

**SRT or SWAT Commander:**
The commander of the tactical response team assists the IC by:

1.  Determining equipment needs and assigning personnel to control and contain the inner perimeter;
2.  Designating marksmen and entry teams, if necessary;
3.  Ensuring that personnel manning the inner perimeter maintain firearms discipline and are provided with periodic relief by appropriate tactical response team members;
4.  Preparing appropriate logistical plans to include diagrams of the location in question;
5.  Ensuring the establishment of a tactical operations center, if necessary; &
6.  Maintaining contact with and keeping the command post informed of all developments and operations.

**Hostage Communications Team:**
The individual in charge of communicating with the barricaded subject will:

1.  Provide any requested assistance to the IC;
2.  Provide trained primary and secondary negotiators and, if available and necessary, a negotiations investigator;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.05 Hostage or Barricaded Subject

3. Obtain all pertinent information about the hostage taker, the hostages, hostage site, and other barricaded subjects;
4. Designate a location to interview witnesses, released hostages, and others; &
5. Debrief hostages following the incident.

**General Rules of Negotiation:**

When the negotiator attempts to make contact with the barricaded subject, he/she should:

1. Avoid soliciting demands;
2. Listen carefully for clues regarding the subject's emotional state;
3. Avoid bargaining or making concessions;
4. Reassure the subject that police will not storm the building;
5. Never offer the subject anything;
6. Minimize the seriousness of subject's crimes;
7. Never refer to people being held as *"hostages";*
8. Avoid tricks and try to be honest;
9. Never say *"No"* to a demand (you do not have to say *"Yes",* either);
10. Never make suggestions; &
11. Never use *"outsiders"* to talk to subjects.

**Psychological Services:**

Psychological services serve as a resource to the hostage communications team to:

1. Monitor communications between the negotiators and subjects and provide negotiators with assessments of effectiveness, recommended strategies, and other relevant information;
2. Assist in interviewing witnesses and debriefing hostages; &
3. Provide professional assistance to hostages, witnesses, and others as may be necessary.

**Use of Force:**

Officers are authorized to use reasonable force, including deadly force, to stop active shooters or suspects who pose immediate danger to officers, hostages, or the public. In exercising their discretion in these matters, officers are cautioned that their actions must conform to the agency's use of force, less-lethal weapons, and other policies and procedures.

**TACTICAL CONSIDERATIONS:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.05 Hostage or Barricaded Subject

## DEPLOYMENT CONSIDERATIONS – *ACTIVE SHOOTER VS. HOSTAGE / BARRICADE EVENT*:

Attempt to distinguish the difference between an *active shooter* and a *hostage/barricade situation*. At first glance a *hostage/barricade* and an *active shooter* call may look and feel very similar, but there are distinct differences for responding officers.

The main difference is that victims are currently being killed or attacked during an active shooter event, while a hostage/barricade event is more static. Take care as an active shooter situation can become a hostage/barricade event quickly and without warning and vice-versa. Here are some tactical considerations, if and when the situation changes.

**Hostage/Barricade Patrol Response:**
A practical patrol response to a barricade/hostage situation is defined with the 5-Cs:

- **C**ontain;
- **C**ontrol;
- **C**ommunicate;
- **C**all SWAT and negotiators; &
- **C**reate an immediate action plan.

Once this is accomplished, gather intelligence and prepare for transition to tactical operations. In such operations with good organization, time is generally on your side.

**Active Shooter Patrol Response:**
The concepts and principles of patrol response to an active shooter (homicides in progress), are based around the concept of inserting a team into a hostile environment with limited to no intelligence, and getting the team to the exact location of the shooter(s) as soon as practical. The team must thereby insert itself and move past un-cleared areas while providing team security from counter strikes. Guiding principles during these operations are based upon the following team movement axioms:

- Stay together as much as possible;
- 540° of coverage around the team;
- Communication;
- Work the angles;
- Threshold evaluations; &
- Move only as fast as you can shoot accurately and think

The rapid response of patrol officers to an active shooting has several advantages. By overwhelming the suspect(s) with effective tactics, the first responder(s) can:

- Isolate the suspect(s) from additional victims;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.05 Hostage or Barricaded Subject

- Distract the suspect's attention away from innocent victims, & place the suspect under duress; &
- Neutralize the suspect(s) as a threat.

The first responding patrol officers to an active shooter scene realize that it is not a realistic objective to save everyone trapped inside. The number one goal must be to mitigate the damage and save as many lives as possible.

The initial response of 2 or 3 officers to the scene to form a single Contact Team to enter the structure, must understand the inherent risks of doing so. Although this should not be your first typical response, first responders should be empowered to make the decision based upon the information available to them at the time.

The minimum number of Officers to form a Contact Team is two (2). The recommendation is to have a back-up, make sure that the $540^\circ$ of coverage is secured. The maximum number of officers on a Contact Team should not normally exceed five (5). If there are more than 5 officers on scene, then there should be an additional Contact Team or Rescue Team formed. Here are examples of tactical team formations:

- Two Men Teams:
  - *2 Man Tethered Formation* (Dynamic Movement); &
  - *2 Man Side-by-Side Formations* (Deliberate Movement).

- Three Men Teams:
  - *3 Man Tethered Formation* (Dynamic Movement); &
  - *3 Man Side-by-Side Formations* (Deliberate Movement).

- Four Man Teams:
  - *4 Man Diamond Formation* – Best suited for narrow environments, it is a smaller target and is best suited when team is moving rapidly toward an objective;
  - *4 Man "T" Formation* – Best suited for work at a slower moderate pace or larger hallways; &
  - *4 Man "Y" Formation* – Is best utilized when the team is traveling at a deliberate search speed, and for intersecting hallways.

- Five Man Teams:
  - *5 Man Double Rear Guard; &*
  - *5 Man Team Leader/Special Skill/Knowledge.*

All Teams consist of forward and rear security at all times, to support the $540^\circ$ coverage concept.

**Team Movement:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.05 Hostage or Barricaded Subject

### *Speed of Movement (Dictates Formation Used)*

***Stealth/Deliberate -*** *There are two scenarios in which this speed is useful:*
- First responders do not know the location of the suspect(s) and are conducting a deliberate search.
- First responders start to get close to the area where the suspect(s) may be located but the exact location is still unknown.

Stealth/Deliberate speed in not used when shots can be heard or the team has specific intelligence about the location of the suspect(s).

**_Dynamic/Direct to Threat -_** This speed of movement is used when the team has information as to the location of the suspect(s). Move as fast as you can shoot accurately and think, as a unit. The team must get to the shooter quickly to stop the killing.

**Putting It All Together:**

- Marshal available resources for rapid deployment to stop the killing;
- If neutralization of the threat is impossible, move to contain and isolate;
- Control the Scene and Gather Information;
- Communicate your actions and information gathered to all parties involved; &
- Direct responding officers to aid in rescue of wounded victims and hostages.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:**  Emergency Management | **Policy Number:** 6.01 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Police Department plans for emergencies including natural and technological disasters. Meeting this objective is accomplished by supporting the Meridian/Lauderdale County *Emergency Management Plans* and maintaining agency-specific emergency plans; training staff in their responsibilities and duties regarding these plans; and coordinating with other emergency service agencies.

**PROCEDURE:**

The National Response Framework is used to facilitate communications and coordinate multi-agency response during major emergencies. All Agency employees must be familiar with and follow National Incident Management System (NIMS) procedures during declared emergencies.

**Emergency Services Coordinator:**
The Chief acts as the Emergency Services Coordinator (ESC) whenever the community Emergency Management Plan is activated during emergencies or drills. The Chief is the primary liaison between the Incident Command System's Emergency Operations Center (EOC) and the Agency. The ESC may report to the Emergency Operations Center during declared emergencies or may work from the Agency or a field command post, depending upon the nature of the emergency according to the Emergency Management Plan.

**Emergency Management Plans:**
The Chief is responsible for providing Agency input to the Emergency Manager and assisting with development and review of emergency management plans, and integrating these plans into agency policies and procedures. These plans involve:

1. Bomb threats;
2. Hazardous Materials (Haz Mat) incidents;
3. Major fires;
4. Natural Disasters including floods, hurricanes, tornadoes, earthquakes, and

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 1 of 4

Law Enforcement Policies and Procedures, 6.01 Emergency Management

blizzards;
5. Explosion on or near Campus;
6. Hostage situations;
7. Medical Emergencies;
8. Major transportation accidents;
9. Interruptions in utility service;
10. Any act of terrorism against any governmental agency of the United State of America and/or its people;
11. Employee Work Stoppage;
12. Evacuation; &
13. Escape routes and movement.

**Contents:**
Each emergency management plan contains:

1. Discretionary reaction options for staff first becoming aware of the emergency.

2. Supervisory notification procedures to include the telephone numbers in the agency, at home, and cell number of:
   a. SRO
   b. SRO / OIC
   c. Chief, &
   d. Other personnel as specified in the individual plan.

3. Command responsibilities when supervisory personnel are unavailable, including:
   a. The first arriving officer on the scene assumes the responsibility of command, and remains in command, until relieved by a superior officer or qualified personnel of another agency, with training and special skills pertaining to the specific incident;
   b. A senior staff member on duty assumes command of the emergency until the arrival of Chief or designee;
   c. Chief or designee assumes charge for the duration of the crisis; &
   d. In the event of a prolonged crisis, a relief schedule for command staff will be established.

4. Establishing an emergency command post at the site which provides:
   a. Radio and telephone to staff;
   b. Sufficient space for tactical planning; &
   c. A safe area.

5. Emergency staff call-up procedures. Off-duty officers may be called in when additional support is needed.

6. Time keeping procedures established early in the crisis. As soon as possible, staff personnel are assigned specific duties in the emergency response.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.01 Emergency Management

7. Description of special equipment needs, depending on the type of emergency, and reliance on outside sources of equipment and personnel support may be involved.

8. The designation of staging areas for equipment and personnel and a designated coordinator for each location. This will aid in organization and help eliminate a large gathering in one location.

9. Description of special communication needs. Radio frequencies for local fire department and emergency services, monitors for civil defense or weather warnings are included.

10. Procedures for information release to the media. News releases are only done with the approval of the Chief, in coordination with the EOC.

A follow-up investigation and report is prepared for the Chief and SRO / OIC, including an assessment of the effectiveness of the plan and staff response.

**Training:**
Meridian Public School District Police Department employees receive emergency management plan instruction during:

1. Initial training;
2. Refresher training, not less than annually;
3. Updated training, if response plans change or are modified;
4. Specialty training for staff with critical roles; &
5. Joint or cross training with community and other government resources upon which the agency will draw in an emergency.

Training for emergencies is based on the plans developed at the direction of Chief, and carried out by the Training Officer.

**Review of Plans:**
Once developed, these plans are maintained in a ready status for reference, reviewed at least annually, or based on changes in response requirements for completeness and accuracy, and distributed to the:

1. Chief;
2. SRO /OIC; &
3. Meridian / Lauderdale County Fire Department & Emergency Medical Service.

Employees are required to review emergency plans at least annually, or based on changes in response requirements. New employees must familiarize themselves with the plans and their individual roles.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.01 Emergency Management

**Revision:**
Emergency plans are *living* plans and must be updated at least annually, or based on changes in response requirements, changing conditions, or as circumstances [e.g., new phone numbers or staff changes] dictate. As political and crime indicators dictate, plans are adjusted and added in an effort to keep pace with evolving threats.

When changes are made, all personnel must be trained in the updated plans.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

## EMERGENCY MANAGEMENT - HANDLING A CRISIS
### The First Thirty Minutes

The procedure followed in the first 30 minutes of a crisis is crucial in establishing how people perceive the crisis and their attitude about how it was handled. Here is a checklist to help you work through that crucial first 30 minutes.

1. Assign the appropriate person to handle the situation.

2. Understand the circumstances. Do not speculate.

3. Define the problem.

4. Consider all the options. Act decisively to ensure the safety and well-being of individuals, areas, and facilities that maybe affected.

5. Communicate with the staff.

6. Communicate with the media. In an emergency, the quickest way to reach the greatest number of people may be through the media.

7. Disseminate accurate information through the news media, key communicators, organization leaders, etc.

8. Change your telephone hotline message, if applicable. Keep this information as up-to-date as you can.

9. Ensure that all necessary officials have been notified.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Emergency Call-Out Procedure | **Policy Number:** 6.02 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>*Title and Signature:   Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

It is the responsibility of all employees of Meridian Public School District Police Department to work cooperatively and productively in response to emergency.

**PROCEDURES:**

**Notification of Chief:**
Dispatch notifies the Chief or designee concerning any major incident to include, but not limited to:

1. A police officer involved shooting;
2. Any serious physical injury to any officer or public employee;
3. Any homicide within the agency's jurisdiction;
4. Any crime or incident involving a "gang" or other groups of people who have the potential for violating the law;
5. Any serious crime against a federal, state, or municipal government and/or employee;
6. Any crime in which an officer of Meridian Public School District Police Department is a suspect;
7. Any civil unrest, natural disaster, or major accident;
8. Any crime so unusual that it would shock the conscience of the public; &
9. Any time that the SRO determines that it is necessary to have the Chief present.

**General Guidelines:**
It is the responsibility of the SRO on duty to utilize the services of specific agency personnel, depending on the circumstances of an emergency situation, to include:

1. A criminal investigation division or officer to investigate: **[MPSD PD SRO]**
   a. Homicides;
   b. Felony Battery offenses;
   c. Major Thefts or Burglaries;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.02 Emergency Call-Out Procedure

      d.  Robberies; or
      e.  Rape or sexual offenses.

2.  Patrol personnel for incidents involving, but not limited to: **[MPSD PD SRO]**
      a.  Civil unrest;
      b.  A natural disaster;
      c.  Any major accident; or
      d.  A search for missing persons.

3.  A tactical unit for incidents involving, but not limited to: **[MPD]**
      a.  A hostage situation;
      b.  Civil unrest;
      c.  In search efforts following a major accident or natural disaster; or
      d.  To execute a high risk felony search or arrest warrant.

4.  Canine [K-9] personnel for situations involving, but not limited to: **[MPD]**
      a.  Tracking suspects who have fled from major crime scenes;
      b.  Tracking suspects who have escaped from custody; or
      c.  Conducting drug searches.

5.  Upon an emergency call-out.  all personnel are required to:
      a.  Provide an approximate response time.
      b.  Be properly equipped for the particular incident.
      c.  Notify of any special circumstances they may have (i.e. illness, altering medications, use of alcohol, etc.)
      d.  Have had sufficient rest.

All personnel are required to have a home address, home telephone, cellular telephone and other emergency contact information on file with the department. All personnel are required to immediately update the department with any changes of these.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Civil Disturbances | Policy Number: 6.03 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority<br>Title and Signature: *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

The manner in which law enforcement officers deal with unruly crowds and illegal gatherings has direct bearing on their ability to control and defuse the incident and contain property damage, injury or loss of life. Officers of Meridian Public School District Police Department confronting civil disturbances follow the procedures of containment, evacuation, communication, use of force, and command and control as written in this policy.

**DEFINITION:**

- ***Civil Disturbance -*** An unlawful assembly that constitutes a breach of the peace or any assembly of persons where there is imminent danger of collective violence, destruction of property, or other unlawful acts.

- ***Incident Commander (IC) –*** The senior officer at the scene or an officer given command of an incident that is experienced in managing this or similar tactical events.

**PROCEDURES:**

The first officer to arrive on the scene of a civil disturbance does the following:

1. Observe the situation from a safe distance to determine if the gathering is currently or potentially violent.
2. Notify the communications center of the nature and seriousness of the disturbance, particularly, the availability of weapons and approximate number of participants. Request the assistance of a supervisor and any necessary backup and advice as to the present course of action. If approaching the crowd would not present unnecessary risk, instruct the gathering to disperse.
3. Attempt to identify crowd leaders and any individuals personally engaged in criminal acts.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.03 Civil Disturbances

The ranking officer at the scene is *Incident Commander (IC)*. The IC or other highest-ranking officer assuming command at the scene takes the following steps:

1. Assess the immediate situation for seriousness and its potential for escalation. If the disturbance is minor in nature and adequate resources are available, efforts should be made to disperse the crowd.
2. Establish the number of personnel and equipment necessary to contain and disperse the disturbance and relay this information to the communications center.
3. Where necessary, ensure that appropriate notification is made to outside agencies to include the fire department, rescue squads, state and local law enforcement agencies, agency officials, public information officer, the agencies legal advisor, and the local detention center.
4. Establish a temporary command post based on proximity to the scene, availability of communications, available space, and security from crowd participants.
5. Establish an outer perimeter sufficient to contain the disturbance and prohibit entrance into the affected area.
6. Ensure that, to the degree possible, innocent civilians are evacuated from the immediate area of the disturbance.
7. Ensure that surveillance points are established to identify agitators, leaders and individuals committing crimes, and to document and report on events as they happen. Photographic and videotape evidence of criminal acts and perpetrators is generated whenever possible.
8. Ensure establishment and sufficient staffing of a press area.

**Command Options:**

When adequate personnel and resources are in place, the IC establishes communications with leaders of the disturbance and discusses actions necessary to disperse the crowd. Should the crowd fail to disperse in the prescribed manner, the IC should be prepared to implement one of the following options:

1. ***Containment and dialogue*** - The objective of containment and dialogue is merely to disperse the crowd. In doing so, the IC should:
   a. Establish contact with crowd leader(s) to assess their intentions and motivation and develop a trust relationship; &,
   b. Communicate to the participants that their assembly is in violation of the law and will not be tolerated, that the agency wishes to resolve the incident peacefully, and that acts of violence will be dealt with swiftly and decisively.

2. ***Physical arrest*** - When appropriate, the IC orders the arrest of crowd leaders, agitators, or others engaged in unlawful conduct. In doing so, he/she:
   a. Ensures the appropriate use of tactical formations and the availability of protective equipment for officers engaged in arrest procedures;

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.03 Civil Disturbances

      b. Ensures the availability of transportation for arrestees; &,
      c. Ensures that a backup team of officers is readily available, should assistance be required.

3. ***Non-lethal force*** - When physical arrest of identified leaders and agitators fails to disperse the crowd, the IC may use non-lethal force to accomplish these ends. In so doing, the IC ensures that:
      a. A clear path of escape is available for those who wish to flee the area;
      b. The scene be turned over to the Meridian Police Department or Lauderdale County Sheriff's Department or State Law Enforcement; &,
      c. MPSD PD Officers remain or stay near the scene to serve in assist roles.

4. ***Use of deadly force*** - The use of deadly force in the control and disbursement of civil disturbances, as in all other circumstances, is governed by this agency's use-of-force policy. Specifically:
      a. Officers are permitted to use deadly force to protect themselves or others from what is reasonably believed to be an immediate threat of death or serious bodily injury.
      b. Particular caution should be taken when using firearms during civil disturbances. The arbitrary use of return fire in crowds is prohibited, and any return fire should be directed only at an armed suspect using deadly force.
      c. Where sniper fire is encountered or hostages taken, this agency's policy on hostage and barricaded subjects will be followed, if time permits.

**Mass Arrest:**

During the course of civil disturbances, it may be necessary to make arrests of numerous individuals over a relatively short period of time. In order for this process to be handled efficiently, safely and legally, the IC should ensure that:

1. An arrest team is designated to process all prisoners for purposes of transportation;
2. An adequate number of vehicles are made available to remove the prisoners to the detention center;
3. An adequate secure area is designated in the field for holding prisoners after initial booking and while awaiting transportation;
4. All arrested individuals are searched, photographed and properly identified prior to transportation to the detention center for formal booking;
5. All injured prisoners are provided medical attention prior to being booked;
6. All arrested juveniles are handled in accordance with this agency's procedures for the arrest, transportation, and detention of juveniles; &
7. All evidence and weapons taken from arrestees are processed in accordance with this agency's policy on the preservation and custody of evidence.

**Deactivation:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.03 Civil Disturbances

When the disturbance has been brought under control, the IC ensures that the following measures are taken:

1. All law enforcement officers engaged in the incident are accounted for and an assessment made of personal injuries;
2. All necessary personnel are debriefed, as required;
3. Witnesses, suspects, and others are interviewed or interrogated; &
4. All written reports are completed as soon as possible following the incident to include comprehensive documentation of the basis for the agency's response to the incident.

**Debriefing:**
Each supervisor conducts a debriefing with their respective squads or personnel. Each supervisor should then brief the Command Staff of their assessments who then have their own internal debriefing for administrative reasons.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Strikes & Labor Disputes | **Policy Number:** 6.04 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Police Department officers assigned to strikes and labor disputes must deal fairly with the involved parties, while upholding their sworn responsibilities to protect life, property, and the rights of those involved. The parties involved in a labor dispute have responsibilities, as well as rights. Strikers may assemble and demonstrate peacefully to bring attention to their cause, but they do not have the right to intimidate non-strikers, or to impede business and public passageways. Employers have the right to keep their businesses open and free from undue interference, intimidation, damage, or destruction. **[This Policy is in reference to Strikes On MPSD Campus Only]**

 **DEFINITION:**

- ***Incident Commander (IC)* –** The senior officer at the scene or an officer given command of an incident that is experienced in managing this or similar tactical events.

- ***Strike, Strike action*** - Is a work stoppage caused by a mass refusal by employees to perform work. A strike usually takes place in response to employee grievances.

**PROCEDURES:**

**Command Authority:**
Operational control of officers assigned to a labor strike is the responsibility of the Chief, or his designee. The *Incident Commander* (IC) of the strike detail contacts the business and labor unions involved to:

1. Inform them the police agency is aware of the strike (or impending strike), and advise them of agency policy relating to the enforcement of law and protection of personal and corporate rights;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.04 Strikes & Labor Disputes

2. Emphasize to the union the importance of a peaceful demonstration, that their right to legally assemble and protest will not be interfered with, so long as it does not interfere with the legal right of the company to transact business; &
3. State the agency's position on warning and arresting demonstrators and the need to maintain communication at all times between police personnel, management, and strike leaders.

If insufficient officers are available to man the strike detail, permission may be sought from the Chief, or designee, to request additional officers under this agency's mutual assistance agreement. In no case may non-sworn personnel, reserve, or auxiliary officers be utilized for strike details.

In determining manpower and equipment needs, the IC must consider:

1. The number of pickets, their attitude, and organization;
2. The number of non-strikers, anti-strikers, and bystanders;
3. Whether the company will attempt to stay open, and whether non-striking employees will attempt to enter the premises; &
4. The cooperation demonstrated by all parties involved in the strike.

**Duties and Responsibilities of Assigned Personnel:**

It is the responsibility of officers assigned to labor strikes to:

1. Protect life and prevent personal injury;
2. Protect the statutory and constitutional rights of all parties involved;
3. Protect personal and public property;
4. Maintain public peace;
5. Refrain from fraternizing or engaging in any unnecessary conversation with picketers, management personnel, or bystanders;
6. Refrain from entering the company property except to conduct necessary police acts;
7. Keep arrests for minor law violations to a minimum, controlling such conduct through conversation with picket captains, union representatives, or management personnel;
8. Warn picket captains or management representatives that violations of the law will result in arrest;
9. Refrain from arresting picketers for verbal abuse, if unaccompanied by threats against officers. Language that incites violence or other unlawful acts will form the basis for physical removal and/or arrest of those responsible; &
10. Discourage picketers from drinking alcoholic beverages, and seek supervisory approval prior to arresting persons who fail to abide with open container, public consumption, public inebriation, or related laws.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.04 Strikes & Labor Disputes

**Operation of Picket Lines:**

1. Officers are obligated to protect persons engaged in expressing their right to peacefully picket and persuade others to honor their picket line, as long as such persons do not violate statutes such as trespass, disturbance of the peace, or disorderly conduct.
2. Non-striking employees, customers, and members of the public have the right to enter and leave the site of the strike.
3. Officers take all reasonable measures to protect the rights of all parties. Attempts by either labor or management personnel to prevent the free exercise of these rights will first be brought to the attention of the appropriate strike captain or management supervisor.
4. Officers advise persons attempting to cross hostile or potentially hostile picket lines of the possible danger involved, and if appropriate, attempt to dissuade them of such action, advising they must follow police instruction, if they choose to cross.
5. Officers provide necessary breaches in picket lines to allow interested parties to cross, and personally escort pedestrian traffic across the line to a safe distance.
6. Vehicular traffic is provided access through picket lines after having been given appropriate warnings. The volume, rate of passage, and speed of vehicles crossing picket lines is determined by the IC.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| **Subject:** Bombs & Weapons of Mass Destruction | **Policy Number:** 6.05 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority** **Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Bomb and weapons of mass destruction [WMD] threats received by Meridian Public School District Police Department are regarded as valid and responded to accordingly. Response may include deployment of personnel and resources, as well as investigations.

**DEFINITIONS:**

- ***Bomb –*** An explosive device that generates and releases its energy very rapidly. The explosion creates a violent, destructive shock wave. Bombs cause destruction and injury to objects and living things within the blast radius by the crushing action of the shockwave (pressure) and by mechanical impact of fragments, including shards of the bomb casing (often called *shrapnel*) or objects from the surrounding area propelled by the blast. Also, bombs have been known to kill by the sound of the blast, by the sound waves causing pressure on the body in such a way that may wound and/or kill a human. Bombs have been used for centuries in both conventional and unconventional warfare. Most bombs do not contain more energy than ordinary fuel, except in the case of a nuclear weapon.

- ***Weapon of Mass Destruction [WMD]*** – A destructive device designed to cause mass or large numbers of causalities. Usually the device is one of five types consisting of *conventional explosive, nuclear, radiological, biological, or chemical.* Law enforcement have encountered all of these types of devices, with the exception nuclear, and it is known within law enforcement intelligence circles that transnational terrorists are attempting to locate and employ portable nuclear devices.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

| Law Enforcement Policies and Procedures, 6.06 Bombs & Weapons of Mass Destruction |
|---|

**PROCEDURES:**

**Planning:**
There are a number of factors that must be considered when planning a response to a bomb threat or threatened disaster. The preservation of life and property is a primary objective of this agency and is the most important consideration. There is no single course of action that will always be suitable. Each situation must be evaluated individually. Immediate and total evacuation of an area may appear to be the obvious solution; however, if handled incorrectly this can be both ineffective and dangerous. Planning is necessary so that the response is orderly and efficient.

The Lauderdale Emergency Management Agency is responsible for coordinating emergency services and establishing a control center for planning and initiating any action relating to bomb threats or other threats. This may involve a limited or full activation of the Meridian/Lauderdale *Incident Command Center* (ICC). The SRO or designee is the designated field commander for law enforcement and security purposes, and acts as the Initial *Incident Commander* (IC). Until arrival on the scene, the responsibilities of IC pass from the first responding, up the chain-of-command as more senior or experienced individuals arrive at the location.

**Control Responsibilities:**
Access to the ICC is limited to authorized emergency personnel who have a specific function at the center, and a *need to know*. A number of duties and procedures are the responsibility of control center staff as managed by the IC. These include:

1. Initiating a planned response to bomb threats and other potentially threatening disasters;
2. Notifying and coordinating the activities of other personnel;
3. Calling for assistance to other agencies, to include Explosive Ordinance Disposal (EOD), ATF, etc.
4. Releasing authorized information to the news media;
5. Evaluating factors for evacuation, search, and continuation of business;
6. Vulnerability and accessibility of target area;
7. Probable risks involved;
8. Determining potential courses of action including evacuation, selective evacuation, or no evacuation; &
9. Searches to be implemented.

**Receiving a Bomb Threat:**
A majority of bomb threats are made by telephone or fax, although bomb threats may occasionally be received in written note form or through the mail. All written material and any envelopes or containers should be treated as *physical evidence* and not subjected to any unnecessary handling.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

| Law Enforcement Policies and Procedures, 6.06 Bombs & Weapons of Mass Destruction |
|---|

Employees of the agency who receive bomb, WMD or disaster threats by telephone must abide by the following:

1. Maintain a calm, professional demeanor;
2. Stay on the phone and fully engaged in the conversation with minimal distractions;
3. Seek assistance and response from another employee by waving a piece of paper or colored flag overhead;
4. Maintain contact with the caller talking as long as possible;
5. Complete the Threat Checklist, which asks the caller a number of questions [See: Attachment I to this policy];
6. Do not use radio transmission equipment, or cellular phones, until authorized by a supervisor;
7. Immediately complete and submit a report of the incident to a School Resource Officer upon termination of the bomb threat; &
8. Do not use the telephone the call was received on until a communications technician has determined that the calling number cannot be identified.

**Evaluation &Search:**
It is appropriate to remember that the aims of the criminal or terrorist planting a bomb or destructive device may be to *actually cause destruction, to attract attention, use up valuable resources, or to draw officers and first responders to a specific location.*

Having evaluated the credibility of the threat, it is necessary to decide what action to take. This may include *search without evacuation, initiate a partial evacuation, or conduct a complete evacuation and search.* If the decision to evacuate is made, all non-essential persons must be evacuated to a location at least 1,000 feet from the area. Regardless of the extent of the evacuation, a physical search is always advisable.

**Covert & Overt Searches:**
Circumstances of a *partial* or *no evacuation* often necessitate a covert search. A covert search is conducted to avoid both panic and the interruption of business operations, and is normally executed by a few supervisory or management personnel, without arousing employee suspicions.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

| Law Enforcement Policies and Procedures, 6.06 Bombs & Weapons of Mass Destruction |
| --- |

In the event of a full evacuation, an overt search is performed. This is accomplished by asking all persons in the building to first conduct a *360° search* of their immediate area before exiting the building. In conducting this *360° search* those in the building are to look for anything out of the ordinary and report it. They are <u>not</u> to touch, handle, or open any suspected or questionable device or package. Once the *360° searches* are completed all non-essential personnel must evacuate the building, without carrying any objects or personal effects out of the building.

If during the process of a search a suspect device, box, sack, or other container is located, *do not touch it*, and do not assume it to be the only device. Rather, clear and secure the area, notify the control center, and continue searching the entire facility for other devices. If a prolonged search is unavoidable, the search team should be given a break period every three (3) hours. Six (6) hours is about the maximum time a search team can function effectively. In the event no explosive device is found, the decision to reenter is influenced mostly by the confidence in the search procedure.

**TACTICS:**

The following are tactical guidelines for conducting searches.

**Exterior or Public Area Search:**
Search begins at ground level extending outward from the building to some natural divider (curb or wall, usually 25 to 50 yards or paces). Close attention should be given to piles of leaves and refuse, shrubbery, trashcans, parked vehicles, and any public access areas.

**Building Search Procedures:**
If the agency does not have a bomb disposal or *Explosive Ordnance Disposal* (EOD) unit; personnel and equipment from a professional EOD, if available, is utilized in the disposal of bombs or explosives. Be aware that Bomb Disposal Technicians do not conduct searches for potential bombs. They respond to suspicious packages or devices once they have been located and render the item(s) safe. Agency personnel are responsible for following a number of procedures for safely searching for a suspected bomb. Special attention should first be given to utility rooms, waiting areas, rest rooms, and areas where access is unlimited. As a practical matter, search secured areas, where entry would be more difficult, last. Begin at the lowest level and work upward, making a complete search before changing floors. Also:

1. When first entering a room, remain completely calm and immobile. Listen for any unusual sounds. Many times such actions will pick up sounds indicating a device.

2. It is important to check all items within a facility when conducting a bomb search. These items include, but are not limited to:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.06 Bombs & Weapons of Mass Destruction

    a. Underneath chairs,
    b. In or on desks,
    c. In trash cans,
    d. Behind pictures,
    e. In or behind cabinets,
    f. Objects hanging on walls,
    g. In light fixtures,
    h. Any item suspended from the ceiling (heater ducts, ceiling fans), &,
    i. Inside suspended ceilings, if the building is so equipped.

3. Never assume or advise that an area is completely safe and free of any devices.

4. Do not medically treat injured persons at the scene except in unusual circumstances. Remove them as soon as possible to a secure location, at least 1,000 feet away from the incident location and turn them over to medical personnel.

5. Note license tags of all vehicles around or near the facility and initiate checks to determine if any of the vehicles are rented or stolen.

6. Photograph all casual observers or those that appear interested in the facility, and secure proper identification if possible.

7. If a suspected explosive device is found in an occupied building, evacuate the building immediately.

8. In a large building, mark the areas searched as you go and seal them. This will eliminate unnecessary searches of an area already searched and secured.

**Action to Be Taken Upon Location of a Suspected Explosive Device**:
If a suspected explosive device is located, leave it untouched. At no time will any unqualified officer attempt to move or render safe any suspected explosive device. Employees must evacuate at least 1,000 feet around the suspect device and request assistance from an experienced explosives agency or team. Upon arrival, the Bomb Technician and/or EOD instructions control operations as it relates to this incident location.

All responding emergency vehicles should be kept outside the perimeter. Private provider vehicles, such as those from gas, electric or telephone companies, should be assigned to a staging area, if possible so they can be easily called upon, as necessary. Using caution, secure the scene so later it can be processed by evidence recovery personnel. Leave bodies of bomb blast victims who are obviously deceased in place, to allow for the collection of debris that may have forensic value.

**Conclusion of a Bomb Threat:**

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.06 Bombs & Weapons of Mass Destruction

After a building has been searched, the supervising officer at the scene will notify the owner or person in charge of the building of the results of that search, complete required reports, and return police personnel to normal duties. In the event of an explosion, minimal information is given to the news media, and then only through approved channels.

In the event of a death, no names are released until the next of kin has been officially notified.

Control of the crime scene transfers to the investigation division, who gathers any available evidence. The investigation division may request additional specialized assistance in completing their investigation, as determined necessary by the senior staff supervisor on duty.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:**  Hostage or Barricaded Subject | **Policy Number:** 6.05 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

During hostage or barricaded subject incidents officers of Meridian Public School District Police Department first consider the protection of innocent life, and second, bringing about a peaceful resolution to the situation if reasonably possible without compromising officer safety, or the need to bring suspects to justice.

**DEFINITIONS:**

- ***Active Shooter:*** A person who is actively attempting to fire upon or otherwise seriously injure or kill one or more hostage(s), citizen(s), or officer(s).

- ***Barricaded Subject:*** Any individual who is reasonably believed to be a threat to commit serious bodily injury or death to hostages, officers or others in the community and who is in a stronghold position.

- ***Hostage:*** Any person held by another against his will by force or threat of force, expressed, or implied.

- ***Incident Commander (IC)*** – The senior officer at the scene or an officer given command of an incident that is experienced in managing this or similar tactical events.

**PROCEDURES:**

**Objectives:**

During hostage or barricaded suspect incidents Meridian Public School District Police Department officers must:

1. Consider the lives and safety of officers, hostages, other involved civilians, and by-standers the primary factor;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.05 Hostage or Barricaded Subject

2. Peacefully resolve the incident through communication with the suspect if possible;
3. Develop and maintain the ability to use alternative approaches to resolve incidents, if communications fail; &
4. Make every reasonable effort to affect the safe release of the hostages.

**Patrol Officers:**

Patrol officers responding to hostage or barricaded subject incidents generally may not initiate tactical actions other than those necessary to protect the lives and safety of themselves or others. The exception is in instances where an *active shooter* is encountered. In such cases the necessity for immediate action to protect innocent life is paramount. As with any life threatening situation, the level of force employed must be consistent with this agency's use of force policy.

With the exception of active shooter incidents, once persons are moved to safety, officers must then:

1. Notify a supervisor of the incident and circumstances;
2. Contain and isolate the incident scene, establishing an *inner containment perimeter* to provide a reasonable degree of safety while maintaining contact with the incident scene;
3. As time and resources permit, establish an *outer containment perimeter* to control pedestrian and vehicular traffic into the area; &
4. Evacuate occupants of affected classrooms and buildings to a point beyond the outer perimeter.

**Incident Commander (IC):**

The first officer at the scene is in charge until command is transferred to a supervisor, and then the ranking officer at the scene is in charge until specifically relieved by a superior. An Incident Command Center should be activated and the incident operates under the I.C.C.  The IC normally:

1. Evaluate the situation in an effort to determine how many suspects and/or hostages are involved, and if possible, determine how the suspect is armed;
2. Request assistance from the MPD or LCSD Special Response Team (SRT) or Special Weapons and Tactics (SWAT) unit, and the Hostage Negotiating Team;
3. Confirm that the SRT or SWAT is responding, and determine the estimated time required for the unit to assemble and prepare for action;
4. Delegate the tactical mission to the commander of the tactical response team;
5. Develop a communications and negotiations process and an emergency response team reaction;
6. Establish an inner and outer perimeter, command post, tactical operations center, negotiations center, and a staging area for officers and others arriving for assignment;
7. Assign a press center and an officer for press liaison;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.05 Hostage or Barricaded Subject

8. Verify that traffic and crowd control is established and that routes for emergency vehicles have been designated;
9. Make provisions for recording personnel assignments and developing a chronological record of events at the command center and tactical operations center;
10. Ensure that necessary equipment from the fire department is made available at the staging area together with any other units or equipment such as canine teams, aviation, or marine units;
11. Ensure that emergency medical services are available at the site;
12. Request assistance or *standby* from support agencies such as fire/EMS as necessary or anticipated;
13. Identify and establish a staging area for support agencies and personnel to assemble. The staging area should be near the incident, but out of harms way;
14. Notify additional agencies with specialized teams in the immediate area, should the incident be prolonged and relief of personnel is essential to the operation; &
15. Contact the Federal Aviation Administration (FAA) and request for the airspace over the incident area to be closed to low-flying aircraft.

## MPD and/or LCSD SRT or SWAT Commander:

The commander of the tactical response team assists the IC by:

1. Determining equipment needs and assigning personnel to control and contain the inner perimeter;
2. Designating marksmen and entry teams, if necessary;
3. Ensuring that personnel manning the inner perimeter maintain firearms discipline and are provided with periodic relief by appropriate tactical response team members;
4. Preparing appropriate logistical plans to include diagrams of the location in question;
5. Ensuring the establishment of a tactical operations center, if necessary; &
6. Maintaining contact with and keeping the command post informed of all developments and operations.

## Hostage Communications Team:

The individual in charge of communicating with the barricaded subject will:

1. Provide any requested assistance to the IC;
2. Provide trained primary and secondary negotiators and, if available and necessary, a negotiations investigator;
3. Obtain all pertinent information about the hostage taker, the hostages, hostage site, and other barricaded subjects;
4. Designate a location to interview witnesses, released hostages, and others; &
5. Debrief hostages following the incident.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 6.05 Hostage or Barricaded Subject

**General Rules of Negotiation:**

When the negotiator attempts to make contact with the barricaded subject, he/she should:

1. Avoid soliciting demands;
2. Listen carefully for clues regarding the subject's emotional state;
3. Avoid bargaining or making concessions;
4. Reassure the subject that police will not storm the building;
5. Never offer the subject anything;
6. Minimize the seriousness of subject's crimes;
7. Never refer to people being held as *"hostages";*
8. Avoid tricks and try to be honest;
9. Never say *"No"* to a demand (you do not have to say *"Yes",* either);
10. Never make suggestions; &
11. Never use *"outsiders"* to talk to subjects.

**Psychological Services:**

Psychological services serve as a resource to the hostage communications team to:

1. Monitor communications between the negotiators and subjects and provide negotiators with assessments of effectiveness, recommended strategies, and other relevant information;
2. Assist in interviewing witnesses and debriefing hostages; &
3. Provide professional assistance to hostages, witnesses, and others as may be necessary.

**Use of Force:**

Officers are authorized to use reasonable force, including deadly force, to stop active shooters or suspects who pose immediate danger to officers, hostages, or the public. In exercising their discretion in these matters, officers are cautioned that their actions must conform to the agency's use of force, less-lethal weapons, and other policies and procedures.

**<u>Unless otherwise dictated by the situation. The Meridian Police Department will take lead in a Hostage/Barricade Situation.</u>**

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**

**Policy 6.05 Bombs & WMD**
**Attachment I**
**Bomb Threat Questions**

The following questions should be asked of anyone calling in a bomb or mass destruction device threat. Do not expect that the caller will answer every question you ask. If asked, but not answered, continue to ask additional question, and keep the caller talking as long as possible.  Questions include:

1. When is the device going to explode?
2. Where is it now?
3. What does it look like?
4. What kind of bomb is it?
5. What type of explosive was use in making the bomb?
6. What will cause it to explode?
7. Did you place the bomb?
8. Why?
9. Where do you live?
10. What is your address?
11. What is your name?

During the progress of the call or immediately thereafter, try to answer the following questions yourself as best you can. Report the call to your superior.
1. Exact wording of the threat, colloquialisms, cursing, etc
2. Sex of caller
3. Race (sound of voice) dialect, accent,
4. Age, approximate (sound of voice)
5. Length of call
6. Any specifics about location of the threat (to indicate if the caller is an "insider," employee, patron, etc. or if it is a "general or non-specific threat.
7. Any background noises heard
8. Name of person receiving the call
9. Number at which call is received
10. Time the call was received
11. Date the call was received

After the call is terminated, **do not use the telephone** until a phone technician has determined that the calling number cannot be determined.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 1 of 1

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Crime Scenes | **Policy Number:** 7.01 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Police officers must understand and follow established procedures to effectively protect, collect and preserve evidence of a crime and conduct initial investigative and other essential tasks at crime scenes.

**DISCUSSION:**

The actions taken by patrol and investigative officers at crime scenes often determine the course and success of criminal investigations. Initial responding officers play a critical role by protecting evidence, rendering emergency services, and initiating investigations. Remember that the public, the courts, and other law enforcement agencies judge our agency by the manner in which we carry out what appear to be *mundane and routine* tasks at a crime scene.

The public is becoming ever mindful of the manner in which crime scenes should be handled and preserved. Key watchwords in crime scene management are *. . . get it all, get it right, get it recorded, and get it the first time.* Remember, there is no such thing as *going back to the crime scene,* after it is released back to the public. You can go back to the location, but the crime scene is gone!

**PROCEDURES:**

**Initial Response:**
Initial responding officers begin and continue the preliminary investigation until re-assigned by a superior officer, detective, or crime scene technician.

It is the responsibility of the initial responding officer(s) to:

1. Watch for individual suspects or vehicles that may be in flight while in transit to the crime scene;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.01 Crime Scenes

2. Verify that a crime has been committed and relay essential information to communications upon arrival;
3. Administer first aid and summon emergency medical assistance, if required and protect victims or others;
4. Arrest suspects, if possible. A decision to leave the crime scene to arrest or pursue a suspect is made based on weighing the immediate needs of victims and others against the safety of the public, if the suspect were allowed to escape;
5. Provide communications with the following information for broadcast:
   a. Nature of the crime committed;
   b. Description of perpetrators, mode, and direction of flight;
   c. Description of vehicles used by offenders and any accomplices;
   d. Whether firearms or other deadly weapons were used and descriptions of same; &
   e. Any support required at the crime scene.

6. Identify:
   a. Determine the identities of any witnesses to the crime and request for them to remain at the scene until they can be interviewed;
   b. The identities of any other persons who were present upon arrival at the crime scene;
   c. The license tags of vehicles parked near the crime scene and remain aware of suspicious persons on hand at or near the crime scene.
7. Provide supervisors and/or investigative personnel with complete information about the offense, possible modus operandi, and the measures taken by officers and others.

**Preservation of the Crime Scene:**
In order to preserve evidence at crime scenes, first responding officers will:

1. Enter the crime scene only for purposes of aiding victims or bystanders in need of immediate assistance, apprehending suspects, or securing the area. Officers must avoid touching, walking upon, or moving objects, or otherwise altering or contaminating the crime scene.
2. Immediately activate a crime scene log of who enters and leaves and what time they enter and leave the secured crime scene area. Inform anyone entering the secured crime scene area that they will be subject to subpoena and testimony in court proceedings as to what their involvement was with in the crime scene.
3. Define the boundaries of the crime scene including all areas that may reasonably be searched for evidence.
4. Consider the nature and seriousness of the crime and if necessary:
   a. Request backup assistance to restrict access to the crime scene and control any on-lookers;
   b. Erect barricade tape, rope or cordon off, lock or otherwise secure the immediate crime scene and restrict access to defined crime perimeters; &

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

  c. Record any alterations made at the crime scene due to emergency assistance to victims, the actions of persons reporting the crime, and handling of any items of evidentiary value or other actions.

5. Restrict persons from the crime scene who are not directly involved in the investigation. In the case of homicides or other major crimes the officer-in-charge (OIC) ensures that the identity of all persons entering the crime scene is recorded;

6. Approach homicides and other major crime scenes in a single defined line or path. This action limits destruction of footprints and other impressions, and contamination of scent trails that may be useful in canine searches.

7. The *place last seen* of a kidnapped or missing person should also be protected in a similar manner to the above.

8. Protect any areas or paths of travel that may be used in K9 tracking.

**Collection of Evidence:**

Initial responding officers at major crime scenes may not collect potential evidentiary value items unless absolutely necessary to protect the evidence from damage or destruction, or unless directed by the *Officer in Charge* (OIC). If directed by the OIC, officers may:

1. Clearly and completely document the *chain of custody* of all evidence beginning with initial collection, packaging, and labeling at the crime scene.

2. Search the crime scene in a manner or method prescribed by the OIC. Particular emphasis is placed on items that may help establish who, what, when, where, or how the crime was committed. This may include but is not limited to:
  a. Objects found in unexpected or unusual locations; &
  b. Weapons, tools, clothing, stains, blood spatters, fingerprints, footprints, tire or tool mark impressions, broken glass, fibers, soil or other items or substances.

3. Photograph, preserve, package, and label evidence.

**Interviewing Witnesses:**

The purpose of these interviews is to gather basic information about the crime at the earliest point possible in order to identify the perpetrator and establish the basis for the follow-up investigation. In addition to asking for positive details, officers ask potential witnesses such questions as . . . *is there anything unusual or different about this day or time period?*

Important tactics to consider in conducting interviews at or in the vicinity of the incident include:

1. Witnesses are identified and preliminarily interviewed as soon as possible.

2. The neighborhood surrounding the crime scene should be canvassed promptly in order to identify additional witnesses or others who may have some knowledge of

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.01 Crime Scenes

the crime or possible related events.

3. All people who have gathered at a crime scene as spectators should be recorded as to who they are, address, description, phone numbers etc.

4. Identification should be verified with some type of photographic identification. When possible, photograph or video record these people. Many times the perpetrator is identified through these recordings.

5. Use of a voice tape recorder of the conversation is helpful. Just inform them that they are being recorded.

6. When video taping is done in a crowd, there is no right to privacy unless the video is used in a manner of public broadcast or exploitation.

**Crime Scene Reporting:**

Officers conducting preliminary and follow-up investigations must complete appropriate reports in accordance with agency policy. At a minimum, reports include:

1. Date and time of arrival at the scene;

2. Any relevant weather or situational conditions such as the status of the crime scene upon arrival (e.g., fire, crowds, and initial observations);

3. How the crime was discovered and reported and the relationship of reporting individuals to victims or others if appropriate;

4. Identity of other officers or emergency personnel present upon arrival and those who responded to the crime scene thereafter;

5. Physical evidence discovered and the identity of the officers responsible for its collection (special note should be made of any valuables collected at the scene, such as currency or jewelry);

6. Name, address, and telephone number or other appropriate identification of witnesses to the crime;

7. Results of interviews with victims and witnesses to include in particular the identity or best possible description of suspects, method of operation, means of escape and any other pertinent identifying information;

8. Diagrams, sketches, photographs video tape or other similar information made at the scene or the identity of officers or civilians who made such recordings; &

9. Recommendations for further investigation such as the names of witnesses or others who may be able to provide additional information.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Robbery or Alarm Response | **Policy Number:** 7.02 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Armed robbery and burglary are serious crimes that pose serious risks to citizens and officers. Officers of Meridian Public School District Police Department respond to reports of these crimes with urgency in order to maximize safety for employees, bystanders, and officers, and to enhance the probability of arrest.

**DISCUSSION:**

Although statistics vary from jurisdiction to jurisdiction, we know that most *burglary alarms* are <u>false</u>, meaning that the signal received at the alarm or law enforcement office was not cause by an illegal entry. In some areas the false alarm rate is ±98%.

This is not the case with *hold-up alarms* at businesses. Hold-up alarms are more often that not real emergencies and <u>are dangerous</u> for officers and the public. Because of these realities, burglary alarms, received from an electronic monitoring device without confirmation of any kind are generally a lower priority dispatch call.  Hold-up alarms have a high priority, and require multiple officer response, if they are available.

**PROCEDURES:**

**Burglar Alarm - Normal Response:**
1.  When burglar alarms from School Buildings or an alarm companies are received:
    a.  Dispatch notifies the on-duty officers of the situation; do not notify the school of MPSD building site until the responding officers are on scene and request contact with the school or MPSD site. In many instances the telephone line is directly connected to an alarm company or agency. Upon a call to the location there may be a *busy signal* as the line is tied up transmitting data to the alarm monitoring center or vice-versa.
    b.  If there is confirming information, other than the alarm signal, two [2] units respond to the scene if reasonably available.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

    c. Officers first observe for suspicious activity and then make a tactical approach to the building.

    d. Officers may request communications to attempt contact by phone with the secretary of site administrator. If no crime is being committed, request that person to exit the building and make contact with an officer at a predetermined safe location.

    e. Responding officers identify themselves and their agency and determine whether there is a problem.

    f. Officers may not delay response to burglar alarm calls, but should not respond in "emergency mode" unless there is a significant probability that the crime is in progress. Officers may deactivate their audible sirens within a reasonable distance of the location, so as to not notify the perpetrators of approaching authority.

2. If there is no problem, the responding officers will:
    a. Advise dispatch of findings and/or lack thereof &
    b. Reset the alarm.

**Robbery Alarm Procedure - Robbery in Progress Response:**

The agency response to reported robberies must follow these guidelines:

1. Three [3] units should respond to the scene, if reasonably available, in emergency mode by activating warning lights and siren until within sight or sound of the location. Each unit maintains the following responsibilities:
    a. The first unit observes the most logical point of escape.
    b. The second unit observes a secondary point of escape.
    c. The third unit remains approximately a block away from the scene, with line-of-sight to assist any other units in stopping the suspects' vehicle, if escaping by motor vehicle.

2. Long guns are recommended on these calls.

3. The dispatcher confirms whether an armed robbery is actually in progress by pre-arranged signal with the business employee, if such arrangements have been made in advance between the agency and the business. If dispatch establishes communication by telephone, the business employee is asked to stay on the phone.

4. Upon arrival at the robbery location, officers remain out of sight as viewed from the location, until the dispatcher confirms that the robber has left the premises, or the suspect is observed. Many businesses train employees to get armed robbers out of the facility quickly and to lock the doors behind the subject(s) in order to prevent re-entry and reduce the potential for hostage situations. Officers may approach the building if there is a visible notice or other indication that the suspect(s) has left the interior of the building.

5. Normally officers should not approach or enter the building until instructed to do so by an employee, or dispatch communicating with employees.

6. Usually there is no attempt to arrest the individuals until they have left the building.

7. Officer's arriving at the location are responsible for:

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.02 Robbery or Alarm Response

      a.  Securing the crime scene, including all possible exits;
      b.  Identifying and obtaining information from witnesses; &
      c.  Informing other officers of information as it becomes available.

8.  Responding officers should remember that suspects may have left the scene and employees are unable to communicate with the officers.

9.  Responding officers immediately determine whether the suspect(s) left in a vehicle or on foot. If a vehicle was used, officers must obtain a description, direction of travel and occupant information. This information is given to the dispatcher for immediate broadcast. If the suspects left on foot, broadcast their description and last known direction of travel. Protect the escape route for K9 tracking.

10. An incident report is prepared on all calls made to any facility involving a holdup alarm wired direct into the agency.

**Robbery Response – Active Shooter:**

In the event a robbery or alarm response becomes an "active shooter" situation, responding officers should place priority in the following order:

1.  Innocent victims;
2.  The general public;
3.  Law enforcement & other safety personnel; &,
4.  Suspect(s).

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Criminal Investigation | **Policy Number:** 7.04 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Complaints of major violations of the law require investigations that are conducted in-depth by Meridian Public School District Police Department with attention to detail regardless of whether the investigation is preliminary or of a follow-up nature.

**PROCEDURES:**

**Preliminary Investigation:**
The preliminary investigation begins when the first law enforcement unit arrives at the scene of a crime or information is taken by an officer concerning a crime. The investigation continues until postponed or until transferred to another officer. The following officer responsibilities are part of the preliminary investigation and may vary according to the type of crime being investigated and the circumstances associated with the crime scene:

1. Provide aid to the injured;
2. Protect the crime scene to insure evidence is not lost or contaminated;
3. Determine if an offense has actually been committed, and if so, the exact nature of the offense;
4. Determine the identity of the suspect or suspects and effect an arrest if it can be accomplished either at the scene or through immediate pursuit;
5. Furnish other field units, descriptions, method, and direction of flight of suspects, and other relevant information concerning wanted suspects or vehicles;
6. Obtain complete identification of all witnesses;
7. Determine what information is known by the victim and each witness;
8. Determine, in detail, the exact circumstances of the offense;
9. Arrange for the collection of evidence;
10. Obtain written and signed statements from victim(s), witnesses, and from the suspect(s);
11. Determine the necessity and degree of follow-up surveillance of the crime scene; &

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Page 1 of 9

Law Enforcement Policies and Procedures, 7.04 Criminal Investigation

12. Accurately and completely record all pertinent information on the report forms.

The initial stages of all preliminary investigations, including crime scene processing, are conducted by school resource officers. The investigation of any serious crime may require the help of a MPD or LCSD criminal investigator.

As soon as a SRO concludes the preliminary investigation, the initial field report should be completed including all information obtained at the scene of the offense.

It is the responsibility of the SRO to ensure that an adequate and complete preliminary investigation has been made and to review, screen, and approve the report. The confirmation of SRO approval is required on each report. The Chief reviews the report.

**Follow-up Investigation:**
The follow-up investigation is an extension of the preliminary investigation. The purpose of the follow-up is to provide additional investigation in order to affect the arrest of an offender and/or recover stolen property. Officer responsibilities of the follow-up investigation include:

1. Identifying and apprehending offenders;
2. Collecting, documenting, and preserving physical evidence, arranging for the analysis and evaluation of the evidence, and reviewing the laboratory analysis of that evidence;
3. Recovering stolen property;
4. Conducting additional interviews of victims and witnesses, as required;
5. Interviewing and interrogating suspects, as required;
6. Obtaining additional information from law enforcement officers and informants;
7. Reviewing agency records and coordinating with adjoining agencies regarding other similar offenses to determine if other crimes may have been committed by the suspects;
8. Reviewing all information contained in the case file (preliminary investigation and earlier follow-up reports) concerning this offense;
9. Recording information obtained and preparing supplementary reports, as required;
10. Distributing information, as appropriate;
11. Planning, organizing, and conducting searches, if necessary;
12. Arranging for forensic interviews if applicable;
13. Preparing a case file folder;
14. Checking the suspect's local police record and criminal histories; &
15. Preparing the application for warrants.

**Assignment of SRO/Investigators:**
In assigning investigators for follow-up, agency management normally considers the following guidelines:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.04 Criminal Investigation

1. SROs normally conduct and complete the investigation of all non-criminal calls for police service and for misdemeanor or felony crimes not appropriate for referral to the criminal investigator.
2. A SRO/Criminal investigator may conduct follow-up investigations when one or more of the following conditions exists:
   a. Offense appears to be part of a pattern;
   b. Where sufficient evidence is recovered that could lead to or identify a potential suspect;
   c. When there is a known suspect to the crime;
   d. When articles of a crime are known to be, and can be, recovered;
   e. When follow-up investigations are required in widely separated locations outside this jurisdiction; &
   f. In all other instances as directed by agency management.

**Relationships with Prosecuting Attorney:**
The prosecuting attorney's office prosecutes felony and misdemeanor criminal cases in each court and for offenses committed in whole or in part within their jurisdiction.

Prosecutor offices usually manage a tremendous caseload. In order to support the prosecutor's staff, all personnel are required to:

1. Coordinate appointments in advance;
2. Be on time;
3. Have a subject for discussion planned in advance;
4. Present facts clearly, detailing the actual evidence and statements to support your contentions;
5. Clearly identify fact from your opinion; &
6. Keep conversations brief.

In every known contested case, misdemeanor or felony, the officer involved makes an appointment with the prosecuting attorney to discuss the case prior to trial.

During investigations, planning sessions, or pretrial stages, any questions of law or criminal procedure are addressed to the prosecuting attorney. Questions on law enforcement procedure are addressed to the Chief or designee.

Any criminal cases referred to the prosecuting attorney which result either in a decision of *declined to prosecute* or *dismissed* due to *law enforcement mishandling* must be reported by the prosecuting attorney or staff to the Chief immediately so they can be carefully reviewed and the appropriate corrective action taken.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.04 Criminal Investigation

**Serious Crimes - Criminal Investigator Response:**
A SRO/Criminal Investigator assigned to Meridian Public School District Police Department and/or a Mississippi police criminal investigator is on-call 24 hours each day to conduct the following investigations:

1. Deaths or serious injury of a violent or suspicious nature;
2. Actual or suspected sexual assault and other sex offenses
3. Armed robberies;
4. Burglaries where there is excessive or unusual loss (high dollar value, cash, jewelry, silver, etc.);
5. Major disasters (where investigators can assist in identification of victims);
6. Hostage situations;
7. Kidnappings, extortion;
8. Officer involved shootings;
9. Bombings; &
10. Any criminal offense or situation for which a *criminal investigator* should be immediately assigned.

In the event the criminal investigator on call is unavailable, the Chief or the OIC is contacted immediately for further guidance. If requested by the assigned criminal investigator, the dispatcher directs available patrol personnel to assist with protection of crime scene, traffic, crowd control, witness canvas, etc.

**TACTICS:**

**Use of Crime Checklist:**
Attached to this policy is a Crime Checklist that is used in addition to any other investigative tool or list in the conduct of the investigations. Investigators, regardless of seniority or rank, cover or attempt to cover each item on this list when conducting their investigations. Each item is addressed within the body of their written reports.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.04 Criminal Investigation

## CRIME INVESTIGATOR CHECKLIST

The following is a crime checklist. It contains questions, which should be addressed during the criminal investigation, as well as specific questions relating to different types of crimes. These lists are not intended to be all-inclusive, but serve as guides in doing actual investigations, preparing reports, and in supervisory review of such reports.

**General Investigative Questions:**

*Who is involved?*

1. Who is the victim?
2. Who is the suspect?
3. Who is a witness?
4. Who reported the case?

*What happened?*

1. What took place?
2. What offense was committed?
3. What are the elements of the offense?
4. What was the object of the attack?

*When did it happen?*

1. When in time did the occurrence take place?
   a. At what hour?
   b. On what day?
   c. In what month?
   d. In what year?
2. Was it day or night?
3. Was it clear or cloudy?
4. Was it foggy, misty, raining, smoggy, snowing, hailing, sleeting, etc.?

*Where did it happen?*

1. Where did the offense occur?
2. Where was the object of the offense?
3. Where is the object of the offense now?
4. Where was the object of the offense found?
5. Where was the perpetrator of the offense?
6. Where is the suspect now?
7. Where was the suspect when apprehended?
8. Over what area did the offense extend?

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.04 Criminal Investigation

9.  Where were the witnesses in relation to the crime scene?
10. Where are the witnesses now?

### How did it happen?

1.  How was the offense committed?
    a.  What preparation was made to commit the offense?
    b.  What was done to avoid detection?
2.  How was the property or person attacked?
    a.  What method was used to induce the victim to give up his property?
    b.  What means were used to overcome resistance of the victim?
    c.  What means or instruments were used in the perpetration of the offense?
3.  How did the offender act?
4.  How did the victim act?
5.  How did the situation assist in the commission of the offense?
6.  How did the offender enter and exit the crime scene?
    a.  What means of entry and exit were used?
    b.  What instruments were used for entry/exit?
7.  Ensure each element of the offense is covered in reports, statements, etc.

## Offenses Against Persons:

The offenses of robbery, assault, battery, murder, kidnapping, abduction, mayhem, sex offenses, and extortion are considered offenses against the person. The investigating officer should determine the following:

1.  What device, trick, ruse, or other method did the perpetrator use to gain access to the victim?
2.  What did the perpetrator say, using exact wording?
3.  What in detail did the perpetrator do?
4.  How did he/she act?
5.  What means did he/she use to commit the act?
6.  What preceded the offense?
7.  What was the victim doing immediately preceding and at the time of the offense?
8.  Were there any accomplices?
    a.  What did they look like?
    b.  What did the accomplices do in participation of the crime?
    c.  Did they arrive with the perpetrator?
    d.  Did they leave with the perpetrator?
9.  How did the perpetrator arrive and depart?
10. What other facts surrounding the occurrence could be used to identify the perpetrator and accomplices?
11. When all else fails, investigate the victim.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.04 Criminal Investigation

**Offenses Against Property:**

*Burglary*

1. Precisely what type of premise was entered?
2. Where was the point of entry?
3. Where was the point of departure?
4. What instruments were used to gain entry?
5. What was done to preserve evidence of entry and exit?
6. What acts were committed by the perpetrator at the scene?
7. Where were occupants of the premises?
8. How did the perpetrator arrive and depart?
9. Are there any other facts or acts that can be used to identify the perpetrator?
10. From what place was property stolen?
11. Were there occupants on the premises?
12. Where were they?
13. What means were used to take the property?
14. How did the victim discover the loss?
15. What means were used to distract attention of victims or persons in the vicinity?
16. How did the perpetrator arrive and depart?
17. Video, CCTV, or photos of crime or suspect?

*Fraudulent Checks [Such may constitute a request for MPD assistance]*

1. How were the checks written or otherwise prepared?
2. What type of paper was used?
3. How were the checks returned?
4. What purpose was to be served by check?
5. What claim was made by the passer to establish authenticity of check?
6. Was the victim able to note description of check passer?
7. What caused the victim to notice the worthless check?
8. What did the passer say when presenting the check to the victim?
9. What time of day was the check passed?
10. How did the check passer arrive and depart?
11. Are there any other pertinent facts?
12. Video, CCTV, or photo of transaction?

*Embezzlement [Such will be headed by MPD or LCSD]*

1. What property was the subject of the embezzlement?
2. What was the value of the property?
3. Who had ownership?
4. Who had possession of the property at the time of the conversion?
5. Under what circumstances was the property received or held?
6. How was the loss of the property discovered?

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.04 Criminal Investigation

7. Where was the property recovered?
8. Who had possession of the property at the time of recovery?
9. Video, CCTV, or photos of crime or suspect?

***Arson [Such will be headed by MPD/MFD Fire Investigator or State Fire Marshall]***

1. How was the fire reported?
2. Who reported the fire?
   a. Name
   b. Address
   c. Telephone number
   d. Occupation
   e. Description
   f. Circumstances causing person to note fire
3. When time was the fire discovered?
4. Who discovered the fire?
   a. Name
   b. Address
   c. Telephone number
   d. Occupation
   e. Description
5. Where was the person who discovered the fire?
6. How did he happen to be there?
7. What type of structure or property was set on fire?
8. Condition of the structure before the fire?
9. Was the building vacant, and if so, for how long?
10. Was the building inhabited?
11. Was a human being in the structure at the time of the fire?
12. Would an ordinary person have reason to know or suspect the building was inhabited?
13. Who occupies the building?
14. What type of business is carried on in the building?
15. How long has this business been at this location?
16. Insurance information on building and/or contents
17. Financial condition of business
18. Who owns the building?
    a. Name
    b. Address
    c. Age
    d. Description
    e. When acquired building
19. How was the fire started?
20. What materials, accelerants, and devices were used?
21. What was the value of the property destroyed?

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.04 Criminal Investigation

22. What were the findings of the arson investigator, of the fire department, and other agencies? Attach the reports as exhibits.
23. Was there a burning or charring as distinguished from mere scorching?
24. What evidence (traces on clothing of suspect or clue materials at the scene) is associated the suspect with the scene?
25. What actions of the suspect offered evidence of criminal intent?
26. Video, CCTV, or photos of crime or suspect?
27. Many times the actor may be in the crowd watching fire personnel work to put out the fire. Officers should observe the crowd for unusual activity.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and procedures**

| | |
|---|---|
| **Subject:** Missing Persons Investigations | **Policy Number:** 7.05 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:**  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Police Department exercises diligent care in the conduct of missing person inquiries and investigations.

**DISCUSSIONS:**

The effectiveness of statewide or National Crime Information Center [NCIC] communication networks depend on accurate and prompt entry data from local agencies that use these resources. This is especially important in *missing persons* cases. To ensure system effectiveness, it is also important to cancel entries when the missing person is located or assistance is no longer required.

Telecommunications operators making entries must use their best efforts to place accurate and complete information into the system without unreasonable delays.

**PROCEDURES:**

**General Guidelines - Missing Persons:**
The following guidelines apply to missing person's cases:

1. Officers receiving missing persons reports collect and evaluate information (pictures, descriptions, last seen data, and likely places to frequent, etc.), and investigate possible leads provided by the reporting person.
2. In situations involving missing juveniles, the investigating officer should take immediate action to confirm that the youth is missing (i.e. search of the residence, check schools, friend's homes, local stores, parks, etc.).
3. An entry/deletion form is completed to establish that missing persons are entered into the statewide or National Crime Information Center systems and subsequently deleted once located.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.05 Missing Persons Investigations

**Missing Persons – Receiving a Telephone Call:**
Officers receiving a *missing person* notification utilize the following procedures:

1. Interview the reporting person and evaluate the information received.
    a. If the information fits the following criteria [one or a combination of items may surface in the discretion of the officer] for a missing person, complete an *initial missing persons' report.* The criteria are:
        i. Person has not followed an established routine;
        ii. Person has not been heard from or seen in the last 24 hours;
        iii. Person left a child unattended or themselves is a juvenile;
        iv. Person has been despondent, depressed, or under stress recently;
        v. Person is physical or mentally disabled or has some form of dementia (senility, Alzheimer's, etc);
        vi. Reporting person is reasonably justified to suspect foul *play;* &
        *vii.* Other similar issues.
    **b.** If the information does not fit the criteria for a missing person, offer referrals to the person reporting the incident. **If in doubt, always make a report.**
2. Investigations and reports should include detailed information concerning last known location, associates, habits, locations frequented, clothing descriptions, etc. Investigating officers should determine the circumstances leading up to the disappearance and obtain a recent photograph of the missing person, if available.
3. Submit the initial report and a completed statewide or National Crime Information Center entry/deletion form to the appropriate official for review.
4. After review and approval, the reviewing authority forwards the report and the entry/deletion form to a certified statewide or National Crime Information Center operator or the Communications Center.
5. Operator receiving these documents enters the information into the system.  A copy of the entry printout is attached to the other documents submitted.
6. Operator making the entry submits all the stated documents to the proper investigative authority for further follow up investigation.

**Missing Person Entries:**
A missing person record may be entered into the statewide or NCIC for a person of any age for the following reasons:

1. Missing person is under proven physical/mental disability or dementia, thereby possibly subjecting self or others to personal and immediate danger.
2. Circumstances surrounding the missing person indicate a non-voluntary abduction or kidnapping.
3. Report regarding the missing person is declared un-emancipated.
4. Person is reported missing after a disaster.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 2 of 4

Law Enforcement Policies and Procedures, 7.05 Missing Persons Investigations

**Proper Documentation:**

When a person is declared missing, proper documentation verifying that fact must be established. Examples of acceptable documentation are:

1. Missing persons report, prepared as a result of investigation by a law enforcement officer.
2. Written statement from a physician or other authoritative source, which verifies a missing person's physical/mental disability.
3. Written statement from a parent, guardian, next of kin, or other authoritative source advising that the missing person is in danger or that their disappearance was not voluntary.

**Missing Person Deletions:**

When a missing person is located or information received requiring a state or National Crime Information Center deletion, the following procedures must be followed:

1. Officer locating the missing person or developing information that requires a deletion is responsible for completing the deletion process.
2. Reporting person or the family of the missing person is contacted and informed of the information obtained.
3. Officer locates the initial report and complete the state or National Crime Information Center deletion form attached to the report. If the initial report is unavailable, the officer must prepare a separate deletion form.
4. Officer submits the deletion form to a certified state or National Crime Information Center operator for deletion from the system.
5. Communications operator receiving notification that the missing person has been located, or that the investigating officer wants to clear or cancel the person, must follow state or National Crime Information Center guidelines and clear the entry from the system.
6. Once the entry has been deleted, the operator attaches a deletion print out to the submitted documents to be returned to the officer assigned to the investigation.
7. The assigned investigative officer signs the deletion form after reviewing the case circumstances and submits the form to the appropriate supervisor who also signs the deletion form. The officer completes a supplemental report detailing the information received that led to the deletion.
8. Once the missing person report is cleared, it is filed, along with all other documents, in accordance with Meridian Public School District Police Department policy on records.

**Wilderness searches [On or within 500 feet of MPSD Campus]:**

When circumstances indicate that the missing person may be "lost," or located in a remote area and is injured or disoriented, the primary SRO/Investigator, with approval of the Chief, may initiate a search effort. The agency serves as the lead agency in the search, and asks from support from other law enforcement agencies, fire, EMS and

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.05 Missing Persons Investigations

perhaps volunteer agencies as needed, depending upon the size of the search area and difficulty of terrain.

The OIC or his/her designee serves as the incident commander (IC) and operations are coordinated under the Incident Command System. The Incident Commander (IC) should be capable of:

1. Establishing objectives;
2. Establishing priorities;
3. Developing search strategies, objectives, and tactics;
4. Delegating responsibilities; &
5. Communicating effectively.

The keys to successful wilderness searches are limiting the search area and then looking for clues to the subjects' location. The Incident Commander (IC) will:

1. Consider intelligence from the initial investigation and attempt to determine the last known position of the search subject(s);
2. Assign a number of patrols to monitor the outside perimeter of the search area. (Many search subjects have been located when they walk to a road or trail);
3. Assign an investigator to check other locations where the subject(s) may be such as at home, at the home of acquaintances, bars, taverns, etc;
4. Protect any clues or evidence, including scent trails, at the Last Known Position (LKP) from disturbance or contamination;
5. Assign a small number of experienced/skilled persons (hasty team) to search the immediate area surrounding the LKP to look for evidence that may indicate direction of travel;
6. Request a trained canine with handler to attempt to track and locate the subject;
7. Request air reconnaissance assistance from law enforcement or civil aviation authorities;
8. Assign an officer or qualified civilian to remain with the family or friends of the missing subject in order to communicate search efforts and to continue gathering information that may be clues to the subject's location; &
9. Not allow a large number of individuals to conduct a "grid search" until other, more effective search techniques have been exhausted.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

## MISSING PERSON INVESTIGATIONS FORM

Name: _____ Date of Birth: _____

Sex: _____ Race: _____ Hair color: _____ Eye color: _____

Build: _____ Height: _____ Weight: _____

Complexion: _____

Clothing Description:

_____
_____
_____
_____
_____

Vehicle Description:

_____
_____
_____
_____

Summary of Disappearance:

_____
_____
_____
_____
_____
_____
_____
_____

Date/Time of Report: _____ Case#: _____

Reporting Officer Name & Badge #: _____

Signature of Reporting Officer: _____

Signature of Supervisor: _____

Date/Time entered into State/NCIC Database: _____

By: _____ Entry #: _____

Additional Information/Notes:

_____
_____
_____
_____
_____
_____
_____
_____

## STATE OR NATIONAL CRIME INFORMATION CENTER
### Missing Person Deletion Form

Deleted Name: _____

Deleted by: _____ Date/Time of Deletion: _____

Signature of Officer Requesting Deletion: _____

Case#: _____

Reason for Deletion:

_____
_____
_____
_____

Signature of Employee Making Deletion: _____

Signature of Supervisor: _____

Additional Information/Notes:

_____
_____
_____
_____
_____
_____
_____
_____

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| | |
|---|---|
| **Subject:** Domestic Abuse Investigations | **Policy Number:** 7.06 |
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Meridian Public School District Police Department reduces incidences and severity of *domestic abuse* whenever reasonably possibly. We attempt to identify victims of domestic abuse, protect them, and provide support through a combination of direct law enforcement intervention and referrals to community services. At the same time, training and supervision enhance officer safety when responding to *domestic abuse* calls for service.

**DEFINITIONS:**

- **Domestic Abuse:** Physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily harm, bodily injury or assault between family or household members; or criminal sexual conduct between family or household members, whether minors or adults. Sometimes referred to as *family violence, domestic violence, spousal abuse, wife abuse, husband abuse, family abuse,* and/or *child abuse.* Victims of domestic abuse may be adult or child, male or female.

- **Family or Household Members:** Spouses, former spouses, parents, children, and persons related by blood, persons who are presently or in the past have resided or cohabited together as a family, or having children in common although not living together regardless of gender.

**DISCUSSION:**

The outcome of a disturbed domestic relation is impossible to predict. Unlike *stranger on stranger* crimes, almost everyone involved in a domestic disturbance incident have a prior history with one another. The responding officer(s), no matter how well meaning and professional in their conduct, are often deemed as *interfering outsiders.* Do not assume that the complainant will appreciate your efforts. As a law enforcement officer

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.06 Domestic Abuse Investigations

use your *discretion to determine* the most reasonable course of action under emotional circumstances and within the law.

Complainants often want responding officer(s) to make the alleged offenders *behave,* but not *arrest him or her.* In other instances, the abusive pattern may have been occurring for some time and the victims are intimidated and fearful of retribution.

Responding officers are tested at every turn in a domestic disturbance call. Officers need to exercise extreme caution while dealing with both complainants and alleged offenders.

More troubling and difficult to handle are domestic disturbance calls involving law enforcement officers, or from family members of officers or agency employees. Officer discretion may become skewed or influenced by factors that are not readily apparent. If available, at least two officers shall respond to domestic violence calls for two reasons: to enhance officer safety, and to enhance objectivity.

## PROCEDURES:

### Dispatch Procedures:

Dispatchers receiving *domestic abuse* calls can provide the responding officers with vital information that could save the victim's and the officer's life. The dispatcher gives domestic abuse calls the same priority as any other potentially life-threatening call and when reasonably available, dispatches two officers to reported location.

**Dispatchers must not cancel law enforcement response to a domestic abuse complaint based solely on a follow-up call from the original complainant. Some form of secondary verification is required before the call for service may be cancelled.**

The dispatcher passes all critical information to responding officer(s) before arriving at the scene including:

1. Nature of the alleged conduct;
2. Has anyone sustained injury, and if so to what extent;
3. If the alleged offender is present and, if not, the actor's possible location;
4. If the alleged offender has left in a vehicle, what is the description and last direction or possible destination;
5. The alleged offender's description;
6. If weapons are involved in the incident;
7. Are there any weapons at the location;
8. If the alleged offender is under the influence of drugs or alcohol;
9. If there are children present; &
10. If any household member has undergone any recent traumatic experience such as *loss or job, death in the family*, etc.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.06 Domestic Abuse Investigations

**Responding Officer Procedures [On MPSD Campuses]:**
If the alleged offender is still at the scene of the incident, the responding officer(s) will:

1. Restore order by gaining control of the situation;
2. Take control of weapons used or threatened to be used in the crime;
3. Relocate the actors to a safe place, if weapons are at the location.
4. Assess the need for medical attention and call for assistance, as indicated;
5. Interview all parties; separating them to a point to eliminate contact, but not to a point that the officers can't see each other.
6. Interview any children separately. They don't know to lie.
7. Determine whether arrest(s) should be made or other actions taken. Should an arrest need to be made, separate the offender from children especially and other family members or associates before effecting the actual physical arrest whenever practical or as the situation in question dictates;
8. Collect and record evidence and when appropriate, take color photographs of injuries and property damage;
9. Inform communications that a copy of the 911 or telephone call recording will be needed as evidence and collect such tape to be turned in;
10. Complete offense or incident reports to document the response, whether or not a crime was committed or an arrest made;
11. Tell victims how to obtain a copy of the incident report;
12. Advise victims that a petition for relief may be filed with a magistrate of the county where the petitioner resides, where the alleged incident of abuse occurred, or where the respondent may be served;
13. Advise all parties about the serious and criminal nature of domestic abuse, its potential for escalation, and help that is available;
14. Arrest criminal offender if *probable cause* exists, and it is deemed appropriate;
15. Remain on the scene until satisfied that the threat has diminished;
16. Provide victim(s) with referral information for legal or social assistance and support; &
17. Turn in photographs and any evidence including tape recording of the initial phone call to the evidence officer or agency.

If the alleged offender has left the scene and in the judgment of the officer(s) a crime has been committed, the responding officer(s) will:

1. Conduct a search of the immediate area;
2. Obtain information from victim(s) and witnesses as to where the alleged offender might be;
3. Assess the need for medical attention and call for assistance, as indicated;
4. Interview witnesses, children separately and alone;
5. Determine if arrest(s) should be made, or other actions taken;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.06 Domestic Abuse Investigations

6. Collect and record evidence and when appropriate, take color photographs of injuries and property damage; tape recording of the initial phone call;
7. Complete offense or incident reports to document the response;
8. Tell victim(s) about how to obtain a copy of the incident report;
9. Advise victim(s) that a petition for relief may be filed with a magistrate, judge or other judicial officer of the county where the petitioner resides, where the alleged incident of abuse occurred, or where the respondent may be served;
10. Advise those present about the serious and criminal nature of domestic abuse, its potential for escalation, and help that is available;
11. Provide victim(s) with referral information for legal or social assistance and support; &
12. If evidence warrants and supports a criminal charge, refer the matter to the prosecuting attorney.

**Arrest Procedure:**

When officers have *probable cause* to believe a person has committed acts which constitute a crime under the domestic abuse laws of this state, the officer shall make an arrest. If the incident did not take place in the presence of the law enforcement officer, the officer must reasonably believe that the offense occurred within the past twenty-four (24) hours. Damage or disarray to any part of the classroom or surroundings and especially any marks or injuries on anyone, are signs of violence and an arrest shall be made at that time. Otherwise, the case is documented and referred for investigation.

**Responding to Calls Involving Law Enforcement Officers:**

This agency provides unbiased and impartial law enforcement services to all members of the community including family or household members of agency employees. To accomplish this task in relation to domestic disturbance calls, the Chief shall attempt negotiation with law enforcement agencies, with overlapping jurisdiction, to provide mutual support in responding to domestic disturbance calls involving agency staff.

If a domestic disturbance call for service is from a MPSD work site, family member, or employee or officer of this agency the dispatcher will:

1. Request response assistance from a law enforcement having overlapping jurisdiction;
2. Notify the on-duty supervisor immediately;
3. Notify the OIC;
4. Pass all critical information as listed above to the responding officer(s); &
5. Continue to monitor response progress and report to agency management.

In situations were response support is not available from other law enforcement agencies the dispatcher receiving the call will:

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.06 Domestic Abuse Investigations

1. Assign the on-duty supervisor and a second officer to respond to the call;
2. Notify the OIC;
3. Pass all critical information as listed above to the responding officer(s); &
4. Continue to monitor response progress, and report to agency management.

It is the policy of this agency not to provide any *professional courtesy, special consideration*, or *special treatment* to officers or employees of this agency who are alleged suspects in a domestic disturbance incident. In such instances, responding officers must follow the *responding officer procedures* and *arrest procedures* described above.

**Protection Order [Such will be handled by MPD or LCSD]:**
Individuals claiming, they have been victims of domestic abuse may submit a petition to a magistrate, judge or other judicial officer for relief, accompanied by an affidavit made under oath stating the specific facts and circumstances of the incident(s) and the specific relief sought. The clerk of the magistrate, clerk, or bailiff of the court, prosecutor, or other established individual normally provides the forms and assistance to help the petitioner with writing and filing of a petition. Acting upon the petition, the authorized officer of the court may issue a *temporary* or *permanent order of protection* for the victim(s), depending on the law and facts. If the order or cancellation is sent, the person responsible for service of civil process will immediately:

1. Ensure that the order of protection, temporary order of protection, or any modification or cancellation of such orders, is immediately entered into the state crime information center system.
2. At a minimum, the following information describing the subject of the order must be entered:
   a. Full name and date of birth;
   b. Race and sex;
   c. Driver's license number (and social security number if available);
   d. Last known address; &,
   e. Whether the order of protection, temporary order of protection, or any modification "has" or "has not" been served.
3. Place a priority on service of the protection order, temporary order of protection, or any modification of such order.
4. The order must be served to the offender personally or a copy of the order left at the subject's residence with a responsible aged resident, or by delivering a copy to an agent authorized to receive service of summons.
5. As service of the protection order is time-critical, this agency may not attempt service by certified or registered mail.  Information contained in and obtained from the state protection order registry is deemed confidential and is available only to courts, law enforcement, and prosecuting attorneys.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.06 Domestic Abuse Investigations

**Violation of a Protection Order:**

A person commits the offense of violation of a valid *order of protection* if the offender knowingly violates any condition of that order. Officers should arrest any alleged offender of a protection order, even if the violation did not take place in the presence of the officer as allowed by law

**No Contact Orders:**

Meridian Public School District Police Department enters each *no contact order* issued within this jurisdiction into the state crime information center system. The procedure for entering a *no contact order* is identical to the procedure for entering an *order of protection, temporary order of protection*, or any modification or cancellation of such orders.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| **Subject:** Overt Electronic Recording | **Policy Number:** 7.09 |
|---|---|
| **Issue Date: July 01, 2017** | **Revision Date:** |
| **Approval Authority**<br>**Title and Signature:** *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

The Meridian Public School District Police Department uses overt electronic surveillance techniques and equipment whenever reasonably necessary to deter crime and provide a record of events that might be used as evidence in a criminal case.

**DEFINITIONS:**

- ***Covert -*** An electronic device is *covert*, when it is hidden from normal view or otherwise secreted away, and at least one of the individuals to be recorded has a reasonable expectation of privacy. Examples of covert recording devices are body recorders or transmitters, miniature closed circuit television [CCTV], or parabolic microphones. For agency guidelines on covert surveillance see our policy 07.08 Covert Electronic Recording.

- ***Overt* surveillance -** Is the use of electronic or photographic equipment that is not hidden from general view, regardless of whether on not the suspect actually sees the monitoring device or knows of its' existence. Examples of overt surveillance devices include:

  - *CCTV mounted in hallways, parking lots, waiting rooms, etc;*
  - *Officers carrying a tape recorder in their hand or placing it on a table;*
  - *CCTV equipment mounted in a patrol car; or*
  - *Use of handheld video camera.*

- ***No or low expectation of privacy -*** In some instances residents have no or low expectation of privacy to include:

  - Officers recording telephone conversations where they are a party to the conversation;
  - Officers recording face-to-face conversations where they are a party to the conversation;

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.09 Overt Electronic Recording

- o Recording information at a crime scene;
- o Monitoring and recording public hall ways, elevators, rooms [less restrooms], of a public building, including agency facilities;
- o Monitoring and recording sobriety tests;
- o Recording of voluntary statements made by victims, witnesses, or suspects; &
- o Recording routine traffic stops with portable or fixed recording equipment.

**PROCEDURES:**

**Use of Recording Equipment:**

Officers may utilize during both routine and special investigation *overt recording equipment* when the recording equipment is generally in view or when there is *no or low expectation of privacy.*

*Overt recording equipment utilized by officers may be issued by the agency or carried as personal equipment. Such overt recording equipment may include:*

1. *Personal hand held tape recorders;*
2. *Personal handheld CCTV recorders;*
3. *CCTV mounted in agency hallways, interview rooms, and assembly areas;*
4. *CCTV or audio recording equipment installed in patrol cars; &*
5. *CCTV equipment installed in sobriety test rooms.*

**Personal Tape Recorders:**

Officers may carry and use personal tape recorders or portable video cameras. These devices have many administrative uses including note taking, dictating reports, or recording accident details. When using these devices officers may use their own discretion regarding retaining video or audiotape. If the tape can be used as criminal evidence the tape is saved and secured as any other evidence. Otherwise the tape may be used again after seven [7] days.

**Evidence and Recording Tape Rotation:**

Surveillance tapes from patrol units, agency CCTV installations, and other similar devices are maintained for thirty [30] days, before they are reused. Only tapes that lack evidentiary value are placed back in inventory and reused. Recordings that have evidentiary value are tagged and stored as any other evidence until the case is closed.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

**Meridian Public School District**
**Campus Police Department**
**Law Enforcement**
**Policies and Procedures**

| Subject: Juvenile Procedures | Policy Number: 7.13 |
|---|---|
| Issue Date: July 01, 2017 | Revision Date: |
| Approval Authority Title and Signature:  *Chief Ogie "Ricardo" Clayton* | |

**POLICY:**

Members of Meridian Public School District Police Department take steps to positively influence juvenile offenders and non-offenders whenever possible. Our staff is aware that juveniles are a protected class, and as such cannot surrender certain protection guaranteed by the State and U. S. Constitution.

**DEFINITIONS:**

- ***Juvenile Offender -*** A young person who has not yet attained the age at which he or she should be treated as an adult for purposes of criminal law who:

    o Violates a state or federal law, or municipal or local ordinance;
    o Engages in disobedient, immoral, or indecent behavior;
    o Is in need of treatment, rehabilitation, or supervision;
    o Has runaway from home or lawful place of residence without just cause;
    o Is beyond the control of parents or a legal guardian; or
    o Has been habitually truant or overtly defiant in school.

- ***Non-secure Custody -*** A condition under which a juvenile's freedom of movement is controlled by members of Meridian Public School District Police Department, and when the juvenile is allowed some freedom of movement and is not detainee in a cell or secured room.

- ***Responsible Adult:*** In the absence of the juvenile's parents or legal guardian, an adult with reasonable physical and mental capacities who is:

    o Responsible for the physical custody of a juvenile;
    o A relative or acquaintance of the juvenile's parents; or
    o Able to reasonably demonstrate supervision for the juvenile until parents, legal guardian, or next of kin can assume that responsibility.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

- o Is held in an unlocked, multi-purpose area, such as a report-writing room or office;
- o Is at no time handcuffed to any stationary object;
- o Is held only long enough to complete identification, investigation, processing, and then released to a responsible adult, transferred into a juvenile facility, or court; &
- o Is under continuous visual supervision until released.

- **Secure Custody -** A condition in which a juvenile is physically detained or confined in a locked room, set of rooms, or cell that is designated, set aside, or used for the specific purpose of securely detaining persons who are in law enforcement custody.

- **Status Offender -** A juvenile who is charged with an offense that would not be a crime if committed by an adult.

**PROCEDURES**:

**Conditions of Custody:**
**Juveniles, regardless of their detention status, are always separated by *sight and sound* from all adult witnesses, detainees, prisoners, or inmates. There are no exceptions to this policy. This policy applies at all times the juvenile is being detained, including transport.**

**Enforcement Alternatives:**
Officers dealing with juveniles in enforcement capacities may exercise reasonable discretion in deciding on appropriate actions. Alternatives that may be considered and employed include:

1. Release without further action;
2. Informal counseling, advising the youth of the consequences their actions;
3. Informal referrals to community services;
4. Referral to parents or a responsible adult;
5. Informal counseling of parents or a responsible adult;
6. Limited custody and a *station house warning*;
7. Issuance of a summons or complaint;
8. Arrest under non-secure custody; or
9. Arrest under secure custody.

**Enforcement Criteria:**
The following general guidelines may be used in determining the appropriate enforcement or crime deterrent action when dealing with juvenile incidents.

1. Referring juveniles to their parents or community resources may be appropriate

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.13 Juvenile Procedures

following release or informal counseling by the officer. Such action may be taken in incidents where property damage or personal injury is not involved, but intervention is necessary to avoid potential delinquent actions or when the youth has had no prior enforcement contacts. Examples of these incidents include, but are not limited to:

    a. Use of profanity;
    b. Loitering;
    c. Unlawful gathering; or
    d. Disorderly conduct.

2. Officers may elect to transport the youth home or direct him/her to return home and may make personal, telephone, or mail contact with the youth's parents or guardians to provide them with information and counseling on their child's actions; refer the youth to appropriate community service agencies with or without follow-up; or detain the youth at the station house until he/she is released to a parent or guardian, if the:
    a. Incident is of a serious or potentially serious nature;
    b. Youth is fully aware of the seriousness or potential seriousness of actions and/or is acting in alliance or collusion with others to commit such acts;
    c. Youth fails to cooperate or to positively respond to intervention efforts and directions;
    d. Youth has prior informal warnings for engaging in delinquent acts; or
    e. Youth's parents or legal guardian have apparently failed to provide appropriate control and supervision.

3. Officers may file delinquency charges against a juvenile when the act:
    a. Would be considered a felony, if committed by an adult;
    b. Involves deadly weapons;
    c. Is a serious or potentially life threatening gang-related offense;
    d. Involves assault;
    e. Occurs while the juvenile is on probation, parole or when there are charges pending or the juvenile is a repeat offender;
    f. Juvenile refuses to participate in diversion or intervention programs; or
    g. It has been determined that parental or other adult supervision is ineffective.

4. An officer may also take a juvenile into custody if the youth is lost, seriously endangered, or is a runaway. The following guidelines are followed for any juvenile reported as a runaway:
    a. Confirm juvenile as a runaway through agency reports, NCIC, or some other means.
    b. Take juvenile into custody and transport to the JuvenileCenter. If no agency reports or NCIC data exist, release the juvenile.
    c. If transported, the juvenile intake or probation officer is contacted for further direction such as incarceration or transport to a children's center.
    d. Complete an incident report.
    e. Copy all documents concerning juvenile contact and forward to Juvenile

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Page 3 of 7

Probation Officer.

f. Delete runaway from NCIC records. If the juvenile has been entered into NCIC by some other police agency, notify that agency for deletion of the entry. The police agency in question can also provide other useful information concerning the juvenile, and make further contacts as needed.

g. Notify parents or guardian of the juvenile's status and location.

5. In cases of alleged child abuse, officers will contact a MPD youth officer or their immediate supervisor in order to conduct an investigation of the complaint, unless probable cause justifies immediate action to protect child.

**Status Offenses:**

The following guidelines apply to all *status offenses* committed by juveniles:

1. Based on the seriousness and circumstances surrounding the offense, background, and demeanor of the juvenile and other relevant factors, an officer may release a juvenile to his/her parents, guardian, or another responsible adult. This is a matter of officer discretion.

2. Juveniles taken into custody for status offenses are frisked prior to being transported and may be handcuffed or restrained if, in the discretion of the officer, the juvenile poses a physical risk to the officer, themselves or others.

3. Officers pay particular attention to juveniles under the influence of alcohol or drugs to determine whether emergency medical services are warranted.

4. Held in *non-secure custody* as provided by state law and for the briefest time necessary to conduct identification, investigation, and related processing requirements to facilitate their release to a parent, responsible adult, or transfer to a juvenile facility.

5. Transportation of a juvenile in a caged vehicle is not secure custody.

6. Status offenders and other juveniles taken into *temporary non-secure custody* for non-criminal type offenses may not be fingerprinted or photographed for purposes of establishing or supplementing criminal records.

7. Status offenders in temporary custody will:

   a. Not be placed in a holding area within *sight or sound* of adult suspects or detainees;

   b. Be maintained under constant visual supervision;

   c. Have reasonable access to toilets and washing facilities;

   d. Be provided food if in need of nourishment to include any special diets necessary for health or medical purposes;

   e. Be provided any medication or necessary emergency first aid by a licensed doctor;

   f. Be provided with reasonable access to water or other beverages; &

   g. Be allowed reasonable access to a telephone.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.13 Juvenile Procedures

**Criminal Offenses:**

Juveniles who have committed, or have been accused of committing, criminal offenses are:

1. *Provided all appropriate warnings* (See Civil and Constitutional Warnings Policy) including Miranda and any agency, state, court ordered juvenile warnings, or Magistrate warnings (if required);
2. Subject to the same security requirements as adults and may be handcuffed or otherwise restrained as necessary during transport and processing; &
3. Fingerprinted and photographed. The fingerprint card and *mug shot* is marked *"Juvenile"* and maintained in this agency's central repository for such purposes, separate from adult fingerprints and mug shots and subject to *controlled dissemination.*

Juveniles placed in secure detention, whether in cells, locked rooms, or other locations, are:

1. **Separated by *sight and sound* from any incarcerated adults, and juveniles of the opposite sex;**
2. Informed of the estimated time they will be in detention;
3. Provided with constant auditory access to officers responsible for their supervision; &
4. Personally observed by supervisory personnel on both a routine and unscheduled basis no less than every thirty [30] minutes.

**Interrogation of Juveniles:**

1. **A juvenile in custody must not be questioned about an alleged criminal act without the presence of his parent, legal guardian, or attorney**.
2. In such instances, the juvenile and the adult are advised of their constitutional rights (Miranda warning) prior to interrogation.
3. Any statements made before Miranda or spontaneous before Miranda are useable. The suspect should be stopped at that time and advised of Miranda.
4. If, prior to or during questioning, the juvenile, his parents, or legal guardian express the desire to *speak with an attorney*, all questioning will cease and will not be renewed until an attorney, has been secured, and the attorney allows the questioning to continue.
5. In the absence of a parent or guardian, a juvenile may be questioned and may provide statements after a *magistrate* or other authorized judicial officer has provided warning to the juvenile.
6. Interrogation of juveniles should not extend over periods of time that could be considered unreasonable or harassing.
7. Interrogation should be conducted by one officer at a time whenever possible.
8. Officers should inform juveniles of the procedures that will be followed with regard to custody, release, and transport to another facility, or to a custody hearing.

**RESTRICTED LAW ENFORCEMENT DATA**

This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.13 Juvenile Procedures

**Juvenile arrested on warrant:**
When conducting warrant arrest of juveniles:
1. See and comply with items in Criminal Offenses Section, above; &
2. Advise juvenile of constitutional rights at first opportunity;
3. Take juveniles before the court that issued the warrant as soon as possible;
4. Contact a juvenile intake officer concerning the arrest, if after regular court hours or on a weekend;
5. Notify parents or guardian within 1 hour of arrest; &
6. Delete arrest warrant from agency records if entered into the NCIC.

If the arrest warrant was entered into the NCIC by some other police agency, contact that agency and advise of the arrest.

**Parental Liability:**
A parent or guardian may be liable for property damage done by a child in their care, custody, and for whom they exercise discipline, if the parent was negligent in their care, custody, and discipline; or the child willfully and maliciously damaged property.

**School Related Offenses:**
A child engaging in conduct that is considered a prosecutable offense on property owned by the Meridian Public School District or at a school-sponsored event is referred to the juvenile court for charges. The agency reports verbally to the superintendent of the child's school within 24 hours or on the next school day any instance of a child taken into custody for a criminal offense. A written notice is prepared and sent to the superintendent of the child's school within 7 days of the verbal notification.

**Emergency Medical Aid:**
Juveniles in custody who are believed to suffer from serious physical conditions or illnesses that require prompt treatment are referred to emergency medical services for evaluation and treatment. Officers have the authority to *consent to treatment* of a juvenile who is in need of immediate medical attention.

**Disclosure of Juvenile Records:**
Records of juveniles are _confidential_ and may not be disclosed to the public except for reporting **School Sponsored Event and/or On Campus** criminal activity of juveniles to a school superintendent. Records may be inspected by other law enforcement and juvenile justice agencies having legitimate reason to view the records. The records of juveniles missing from home may be forwarded to NCIC for dissemination nationwide. Any records or files pertaining to juveniles are sealed upon court order. Upon receipt of a court order, the agency forwards all records to the court, and deletes all index references. Records pertaining to juveniles are disposed of according to the approved records management schedule of the agency.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.

Law Enforcement Policies and Procedures, 7.13 Juvenile Procedures

**Record Keeping:**
Officers who select non-custodial alternatives or engage in informal enforcement contacts with juveniles must complete appropriate field interview and incident reports for each contact. These reports clearly identify the juveniles involved, the nature of the incident, and the rationale for the officer's disposition.

Juveniles taken into custody for criminal offenses are subject to the same reporting requirements as adults. Such reports are clearly marked *"Juvenile,"* maintained separately from adult arrest records, and are subject to state law regarding dissemination and access. A custody record is maintained with each juvenile arrest report that specifies:

1. Time juvenile entered *secure detention* and the duration of each detention;
2. Type of restraining device, if any, used;
3. Name of the officer responsible for visual supervision, and schedule of visual supervision, if the juvenile is placed in a locked room or cell;
4. Statement of the need for secure detention;
5. Confirmation that juvenile was provided all warnings; &
6. Time periods of any interrogation, and the officers, parents, legal guardian, or attorney present.

**Meridian Public School District's Call for Service:**

Incidents involving public order offenses committed by students, including disorderly conduct, disturbance/disruption of schools or public assembly, loitering, trespass, profanity, dress code violations, and fighting that does not involve physical injury or a weapon, shall be considered school discipline issues to be handled by school officials, rather than criminal law issues warranting SRO involvement, unless SRO involvement is necessary to protect the physical safety of students or school personnel, or public safety.

SROs and SSOs who witness a fight involving physical injury or the serious and immediate risk of physical injury shall employ age-appropriate conflict resolution techniques to de-escalate the situation whenever possible, and shall locate and refer the matter to school personnel at the earliest opportunity.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and will not be duplicated, disclosed, or discussed, without the written permission of this agency.  Data subject to this restriction is contained throughout this publication.