```
            UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                  EASTERN DIVISION


JOHN BARNHARDT, ET AL.                    PLAINTIFF


VS.                 CIVIL NO. 4:65-cv-01300-HTW-LRA


UNITED STATES OF AMERICA            INTERVENOR PLAINTIFF


VS.


MERIDIAN MUNICIPAL SEPARATE              DEFENDANT
SCHOOL DISTRICT



            SETTLEMENT AGREEMENT HEARING


       BEFORE THE HONORABLE HENRY T. WINGATE
            UNITED STATES DISTRICT JUDGE
                  JUNE 30, 2021
                JACKSON, MISSISSIPPI




    APPEARANCES:

    FOR THE PLAINTIFF:          MS. NATASHA MERLE
                                MS. KRISTEN JOHNSON
                                MR. JOHN CUSICK
    FOR THE INTERVENOR PLAINTIFF:  MS. NATANE SINGLETON


    FOR THE DEFENDANT:          MR. JOHN HOOKS
                                MR. JOHN COMPTON
                                MS. JAIME DOLE, PARALEGAL



    ALSO PRESENT:  HOWARD HAGWOOD, PBIS DIRECTOR
                   LAVONDA GERMANY, INCOMING PBIS DIRECTOR
                   AMY CARTER, PhD, SUPERINTENDENT



    REPORTED BY:  AMY KEY
                Registered Professional Reporter

            501 E. Court Street, Ste. 2.500
            Jackson, Mississippi  39201
                  (601) 608-4186
```

1          THE COURT:  Good morning.  This is Judge Wingate on

2     the line.  I heard Adam when he gave the roll call, so I have

3     the names of those who will be participating.  But what I don't

4     have is who will be speaking for the respective individuals and

5     individual parties.

6          So who will be speaking for the plaintiffs?

7          MS. MERLE:  Good morning, Judge.  This is Natasha

8     Merle.  I can speak for the plaintiffs.

9          THE COURT:  All right.  And who will be speaking for

10    Meridian Municipal Separate School District?

11         MR. HOOKS:  Good morning, Your Honor.  This is John

12    Hooks, and John Compton is also on the line.  He might have

13    some comments as well, Your Honor.

14         THE COURT:  Okay.  And, finally, I know who is

15    speaking for the United States because I don't have but one

16    person.

17         MS. SINGLETON:  Yes, Your Honor.

18         THE COURT:  All right.  Good morning, again.

19         MS. SINGLETON:  Good morning.

20         THE COURT:  Now, first of all, I have before me this

21    settlement agreement, and I see that all parties have signed

22    off on the settlement agreement.

23         Are there any questions with regard to this settlement

24    agreement?  I'll start with the plaintiffs.  Do y'all have any

25    questions about this settlement agreement or concerns about it?

1          MS. SINGLETON:  Your Honor, this is Natane Singleton.

2     I just wanted to clarify that it's a joint settlement agreement

3     between the private plaintiffs and the Meridian Public School

4     District.  The United States is not a party to the settlement

5     agreement.

6          THE COURT:  Okay.  And so on this joint settlement

7     agreement, I'm back at the plaintiffs still:  Are you satisfied

8     with this joint settlement agreement?

9          MS. MERLE:  Yes, Your Honor.  This is Natasha for the

10    plaintiffs.  Yes, we have no concerns about the settlement

11    agreement as we filed it in 2019 as being -- there are some --

12    we will have to discuss issues concerning the notice and the

13    dates proposed in the notice, as those dates will no longer

14    work.  But for the substance of the settlement agreement as

15    filed at that time, it's fine with the plaintiffs.

16         THE COURT:  And what about the Meridian School

17    District?

18         MR. HOOKS:  Good morning, Your Honor.  Again, this is

19    John Hooks.  We do not have any questions about it.

20         THE COURT:  All right.  Now, I do have some questions.

21    And I do have a court reporter here, and so I will have all of

22    this recorded so that we can make a record of my questions and

23    answers.

24         First of all, this Equity Assistance Center-South of

25    the Intercultural Development Research Association, where is

1  that located?

2       MR. HOOKS:  Your Honor, this is John Hooks.  I believe

3  that's in San Antonio, Texas.

4       THE COURT:  And what relationship does this entity

5  have with the parties here?

6       MS. MERLE:  Hi, Your Honor.  This is Natasha.  The

7  Institute has no -- I guess the entity is not the party and

8  does not have a relationship with the parties, with the

9  plaintiffs, or with the Meridian Public School District.  The

10  entity is an organization that provides resources and assists

11  school districts that are attempting to accomplish various

12  things in the school district.

13       THE COURT:  And what is the character of that entity?

14  Who owns it?  What kind of entity is it, et cetera?

15       MR. HOOKS:  Your Honor, this is John Hooks.  My

16  understanding of the Equity Center - and the Department of

17  Justice might speak to this more eloquently - it is a

18  federally-funded organization that exists somewhat

19  independently of the other divisions of government to provide

20  assistance to school districts that are attempting to achieve

21  various, what you might call, equity issues, and they have been

22  beneficial in helping school districts in a number of cases

23  that we've been involved in, Your Honor.

24       THE COURT:  So you're saying that that is a federal

25  agency?

1          MR. HOOKS:  Yes, sir.  I do believe that's the case.

2    They are a federal -- federally-funded agency.

3          THE COURT:  Has anyone contacted this agency with

4    regard to this settlement?

5          MR. HOOKS:  Dr. Carter -- Your Honor, Dr. Carter, our

6    superintendent, can speak to the facts that the Equity Center

7    came -- or was consulted at some point in the past about

8    whether they might be able to provide some type of assistance

9    to the district at some point.  I think the thought process,

10   Your Honor, was that the district was very far along already in

11   its efforts with regard to the PBIS discipline system and all

12   sorts of other things.  And because of their -- for a variety

13   of reasons, I don't know that the center provided ongoing

14   efforts in that regard.  I don't know that they were really

15   affected by or interested in, in any way, the settlement

16   agreement.

17         THE COURT:  How does one obtain the assistance of that

18   entity?  Is there an application process that requires any

19   payment, or is this some sort of assistance that is given

20   pro bono, et cetera?

21         MR. HOOKS:  Your Honor, this is John Hooks again.  I'm

22   sorry.

23         MS. MERLE:  Go ahead, John.

24         MR. HOOKS:  I was going to say our history, Your

25   Honor, with them is that they provide assistance, more or less,

1   without charge, except that in some instances, school districts

2   pay their expenses for travel or for overnight accommodations

3   and so on as part of various grants that they're funded

4   through.

5            THE COURT:  Okay.

6            MS. MERLE:  And, Your Honor, this is Natasha for the

7   plaintiffs, and I agree with what Mr. Hooks said, you know, in

8   saying that it's pro bono.  I believe - and maybe Dr. Carter

9   could speak more to this - that Dr. Johnson at -- at this

10  organization has been the contact for the school district in

11  working and, you know, talking to the school district about

12  what services could be provided, but we have not -- the

13  plaintiffs have not been included in those conversations.

14  Obviously, you know, it's the organization and the school

15  district coming together to see what services can be provided

16  to deal with some of the issues or to address some of the

17  issues.

18           THE COURT:  So.  What --

19           DR. CARTER:  Good morning.

20           THE COURT:  So what type of technical assistance is to

21  be expected from that organization?

22           DR. CARTER:  Good morning, Judge Wingate.

23           THE COURT:  Good morning.

24           DR. CARTER:  Go ahead, John.

25           MR. HOOKS:  No, you go ahead.

1              DR. CARTER:  Good morning, Judge Wingate.  I was about

2     to say Mr. Hagwood and I had a chance to fly to San Antonio to

3     meet with Ms. Johnson to discuss that very thing - the type of

4     technical assistance.  She was impressed with what the district

5     had accomplished thus far regarding the components of the

6     consent order and the deseg order, and we talked about

7     opportunities for professional development going forward.  And

8     as the attorneys have said, it would be a pro bono service to

9     the district when and if needed.

10             THE COURT:  And, again, can you put some flesh on this

11    skeleton and tell me more about this technical assistance?

12             DR. CARTER:  Yes, sir.  We discussed possibly having

13    some professional development that would center on any

14    component that the district identified regarding technical

15    support in the area of equity as needed, if needed, and when

16    needed; teacher recruitment, when and if needed; as well as any

17    of the components of the consent order or the desegregation

18    order that we deem necessary.

19             At the time that meeting took place in 2019, and so

20    the district at this point has a manner to support progress in

21    those areas.  So this little conversation that we had

22    post-pandemic, and, again, we're pleased to be able to show or

23    discuss growth in those areas and if there would be a need for

24    that technical assistance.  So it's great to know that the

25    district would have that support when and if needed.  I hope

1    that put a little more clarity before you, Your Honor.

2         THE COURT:  What other districts have been assisted by

3    this organization?

4         DR. CARTER:  Attorney Hooks, could you speak to that

5    question?

6         MR. HOOKS:  Your Honor, this is John Hooks.  I can

7    tell you that I have worked with the organization with regard

8    to the Choctaw County School District and, very briefly, in the

9    Winona-Montgomery Consolidated School District.  And there

10   might have been some conversations with regard to other

11   districts, but it would have been somewhat attenuated.

12        THE COURT:  So what did they do for those other

13   districts?  Can you --

14        MR. HOOKS:  What they offered is -- yes, sir.  In

15   Choctaw, they offered some assistance with regard to the

16   various items that Dr. Carter just enunciated.  I think there

17   were some opportunities for professional development.  They did

18   assist in looking at some aspects of the school district's

19   gifted program and maybe the discipline program as well.

20        THE COURT:  Okay.  And how long -- or how much time

21   did they consume in understanding the situation and then

22   providing what they consider to be practical solutions?  Over

23   what period of time did that occur with those other districts?

24        MR. HOOKS:  In Choctaw, Your Honor, I believe it

25   occurred over a -- I'm going to guess, Your Honor, over an

1    approximately six-month period, three to six months.  But in

2    Choctaw and in Winona-Montgomery, it's a different story

3    because those districts were not as far along as Meridian was

4    already when the Equity Center was consulted.

5            So when the Equity Center came in, it's my

6    understanding - and, again, Dr. Carter can correct me if I'm

7    wrong on this.  But my impression was, and what Dr. Johnson at

8    the Equity Center shared with me, was that the district was

9    already very advanced in what it was doing with regard to

10   responding to all of these issues and in complying with its

11   obligations under the consent decree, so that the type of

12   services that they ordinarily provide would have been somewhat

13   elementary for a district as advanced as Meridian was at that

14   time.

15           THE COURT:  Okay.  Let's go to another topic now.  I

16   noticed that the students to be screened for the gifted program

17   are students in the first grades and the third grades.  So

18   those are the only two grades that's going to be affected by

19   the gifted program; is that correct?

20           DR. CARTER:  Your Honor, those are the two grades

21   where we screen formally all students.  But any parent,

22   educator, or administrator can recommend that a student be

23   screened at any point for gifted services.

24           THE COURT:  At any grade?

25           DR. CARTER:  Yes, sir.  For grades K through eight.

```
1              THE COURT:  K through eight?

2              DR. CARTER:  The eighth grade, yes, sir.

3              THE COURT:  Is that in the agreement?

4              DR. CARTER:  It's actually in our code of conduct.

5    It's in our materials that are presented to parents.  In our

6    discussions with Dr. Johnson, we had talked about the

7    opportunity of making that information even more readily

8    available to parents than we were already doing.  So I would

9    have to go back and look at the order, and maybe the attorneys

10   could speak to that more if it's in there.  But I don't think

11   it identifies particular grade levels.  And please forgive me

12   if I'm speaking incorrectly.

13             THE COURT:  I don't see, or maybe I missed it, but I

14   don't recall reading anything that concerned any other grades

15   but the first grade and the third grade.

16             Can someone show me or point out to me where this

17   consent agreement advises about other grades and how a student

18   can manage to join the gifted program?

19             MS. MERLE:  Your Honor, this is Natasha for the

20   plaintiffs.  I think the agreement -- the agreement envisions a

21   second screening, which, I believe, is paragraph -- I've lost

22   it.  There was a second screening, I believe, at the third

23   grade -- I'm sorry -- paragraph 3.

24             THE COURT:  Yes, it's in paragraph 3.

25             MS. MERLE:  Yeah.  The district would implement a
```

```
1    second universal screening test at the beginning of the third

2    grade.  We did not -- Dr. Carter mentioned K through eight,

3    that a student can be screened and join the gifted program.  We

4    did not include that, but we did include that the district

5    would make it -- you know, promote more of this opportunity so

6    that parents could know that that is an op- -- that is an

7    option and opportunity for those students if they do not -- if

8    they're -- if they don't enter the program in the first grade;

9    or if they don't enter at the third grade when there is a

10   screening, the agreement envisions that the district would make

11   it publicly known or that -- you know, disseminate that

12   information to the parents.

13           THE COURT:  Disseminate what information?  That they

14   can seek to gain -- enter into the program even beyond the

15   third grade?

16           MS. MERLE:  So I think in paragraph 6 -- I'm sorry --

17   five and six --

18           THE COURT:  Five and six?

19           MS. MERLE:  Yeah.  So I think it's paragraph 6 that

20   mentions that the district will include -- their outreach would

21   include publication of the program, including how students may

22   be referred for gifted testing.  But you are correct, Your

23   Honor.  We don't have in there that that opportunity is

24   available to the students through the eighth grade.

25           THE COURT:  No, it's not.  That's why I asked the
```

 1   question, because a plain reading of the agreement only

 2   concerns the first grade and third grade for entry into the

 3   gifted program.  It doesn't say anything about any grades

 4   beyond that.

 5        And then I don't quite understand that if a student is

 6   allowed admittance into the gifted program in either the first

 7   or third grade, does that carry through -- all the way through

 8   the eighth grade, or is it just a one-year program?

 9        DR. CARTER:  Your Honor, it carries through to the

10   eighth grade.

11        THE COURT:  All right.  Now, that's not in here

12   either.  Now, is there some document that goes along with that

13   that would advise the parents that it carries through, that

14   once a student is in the program, that it carries through to

15   the eighth grade?  There's nothing in the document that says

16   it.

17        MR. HOOKS:  Amy, isn't that the procedure of the

18   district, though?  Once you're test -- once you test in for

19   gifted, you stay in as long as you want to?

20        DR. CARTER:  Yes, it is.  That's the procedure of the

21   district, yeah.

22        MR. HOOKS:  The gifted only goes to the eighth grade?

23        DR. CARTER:  Yeah.

24        THE COURT:  So where do we find that, then?

25        MR. HOOKS:  Well, it's not in a document, Your Honor.

1    It's just the way the -- it's the way the district's been

2    operating for years.

3              DR. CARTER:  And it's in our gifted procedural guide,

4    so we can make that available, Your Honor.

5              THE COURT:  Okay.  And then the gifted program.  Where

6    would I discover the contents of the gifted program?  That is,

7    what is so special about the gifted program beyond regular

8    classes?  Where would I find what would be taught to the gifted

9    students?

10             DR. CARTER:  Those standards are released from our

11   Mississippi Department of Education, so they're available

12   there, as well as they're available in our district.  So we can

13   provide you a copy of that as well, Your Honor, if you'd like.

14             THE COURT:  Yes, I would like to have a copy of that,

15   too.

16             DR. CARTER:  Yes, sir.  We'll take care of that.

17             THE COURT:  Then let's go to the next paragraph.  "All

18   teachers at the elementary level will complete a training

19   workshop."  Who is going to put that workshop together?

20             DR. CARTER:  At the district level, we have an

21   administrator that is responsible for oversight, along with

22   consultation from our Mississippi Department of Education.  So

23   there's technical assistance that we can seek from the State

24   Department, as well as we have a person in our district, as

25   well as gifted teachers that have experience that provide

1    professional training and support.

2             THE COURT:  Has anyone in the district undergone such

3    training already?

4             DR. CARTER:  Yes, sir.

5             THE COURT:  Have you gone through it?

6             DR. CARTER:  Actually reviewing the standards

7    themselves?  Yes, sir, I've seen the gifted standards.

8             THE COURT:  Okay.  Are these the gifted standards for

9    teachers and/or students?

10            DR. CARTER:  Yes, sir.

11            THE COURT:  Okay, then.  So talk to me about the

12   gifted standards for the students.

13            DR. CARTER:  The gifted standards for the students

14   speak to various types of activities that students will

15   participate over the course of the year.  Teachers develop

16   lesson plans on a weekly basis that are reviewed by

17   administrators.  It takes a deeper dive into diverse, advanced

18   thinking for students, as well as tasks, projects that students

19   complete over the course of the year.

20            THE COURT:  And the expected qualification of the

21   teachers, what would that be?

22            DR. CARTER:  Those teachers have to, number one, hold

23   a certification -- a regular certification, as well as an

24   endorsement in gifted.  So they have to be licensed by the

25   Mississippi Department of Education.

1          THE COURT:  And you say that is an endorsement for

2   gifted --

3          DR. CARTER:  Yes.

4          THE COURT:  -- teachers?

5          DR. CARTER:  Yes, sir.

6          THE COURT:  Okay.  And back to this test that the

7   students are to take in the first grade and the third grade,

8   when they are to be evaluated under this selective test.  Is

9   that test objective, or subjective, or is it a combination of

10  both?

11         DR. CARTER:  Well, it's, I would say, a combination of

12  both, because the first thing we do, the students are screened,

13  and we look at that screening with that, and we also look at

14  teacher recommendations to be able to determine if a kid hits a

15  certain test score, could you also look at that recommendation

16  of the teacher or the parent in making the decision that the

17  child is allowed to participate in gifted.

18         THE COURT:  This universal test, have you seen a copy

19  of that test?

20         DR. CARTER:  Not as -- as of recent.  Years ago I did,

21  when I was a school principal.  But I could get my hands on

22  that if I need to.

23         THE COURT:  I would like to see one.

24         DR. CARTER:  Yes, sir.

25         THE COURT:  And from what you remember of that test,

1   how objective was that test?

2          DR. CARTER:  The last time I saw it, I thought it was

3   pretty objective.  But I also have Ms. Germany on the call, who

4   is our element- -- our former elementary curriculum director.

5          Ms. Germany, can you speak to any components of the

6   test that you can recall?

7          MS. GERMANY:  From what I can recall, the test -- you

8   know, we know it's done one-on-one with students once they pass

9   certain assessments, but with that, it is objective, but the

10  students have to be able to work puzzles.  So it deals with

11  higher order of thinking, is one of the main objectives of it,

12  so how they handle that thinking kind of outside of the box.

13         THE COURT:  How do you ensure that the test is

14  poverty-proof?  Race-proof?  How do you ensure that the test

15  meets those standards?

16         MS. GERMANY:  Your Honor, I don't know if you're

17  directing that towards me.  This is LaVonda Germany.  I'm not

18  familiar with how that test is selected.  That would be from --

19  you know, from the director over the gifted department, so I

20  personally am not familiar with how that assessment is

21  selected.

22         THE COURT:  Does anyone have any statistics on the

23  prior selection of the various students as to -- as to

24  economics or race?

25         MS. MERLE:  Your Honor, this is Natasha for the

1    plaintiffs.  We do not -- I do not, I don't believe, have

2    current data on that.  I believe we had data on that a couple

3    of years ago when we were, you know, negotiating this

4    agreement.  And I could go back and pull that data, and I'm

5    sure Dr. Carter probably has the data available as well.

6           I think you also asked about economics or

7    poverty-related data, and we -- the plaintiffs have requested

8    that information, actually, and I believe the Court denied that

9    request.  So I do not have that data.

10          THE COURT:  Okay.  Well, what data do you have?  You

11   have just race data?

12          MS. MERLE:  Yes, we -- we did have race data.  I would

13   have to go back.  And I believe the most recent race data we

14   probably had was from 2018/2019 when -- because once the

15   agreement -- once we came to an agreement, we did not have that

16   data.  But we did have older year version -- or older years'

17   data.

18          THE COURT:  All right.  And further discussing the

19   tests, are the objective components of the tests in any way

20   reminiscent of the format for an ACT, SAT, IQ test?  Is it in

21   any way similar to any one of those or have any components from

22   any one of those tests?  I'm just talk- -- I know they won't be

23   the same type questions, I mean, because the questions on an

24   ACT, SAT would be too complicated.  But I'm just asking whether

25   it's the same type of format, as well as IQ?  Does anybody

1   know?

2         MR. HOOKS:  Your Honor, this is John Hooks.  My

3   understanding and my recollection - again, I'm not an educator;

4   I'm a lawyer - is that the test had components of it that were

5   more in the line and nature of puzzle-solving, of putting

6   puzzles together.  Now, I'm not, obviously, a psychometrist and

7   know exactly what that is seeking to do.  But my understanding

8   as a layperson, in terms of the way I interpreted what was

9   being explained to me, is that it's measuring all sorts of

10  things that are important to the gifted child in terms of

11  creativity and problem-solving and their perspective on

12  different things and so on.  I don't think that -- I didn't

13  understand it to be an IQ test, as much as it's an assessment

14  of the gifted capabilities of the child.

15        THE COURT:  Well, is -- is IQ taken into account on

16  admission to the gifted program?  Is that one of the assessment

17  factors?

18        DR. CARTER:  I think it's considered, but it's not the

19  sole factor.  It goes back to what Attorney Hooks was sharing,

20  basically to look at a child's thought process and their

21  ability to think critically, think creatively.  When I think

22  about the ACT and the PSAT, sometimes that's based on exposure

23  to certain content that's taught in a classroom versus you

24  could take a student on this particular test and look at their

25  approach to thinking and make a decision.  So when you're

1   looking at that component, along with teacher recommendations,

2   parent recommendations, there's a survey that the teachers

3   complete, a survey that the parents complete in order to be

4   able to make a determination of this child's ability to think

5   through -- or critically think through certain problems or

6   certain tasks that's put before them.

7          THE COURT:  Okay.  Doctor, let me ask you this

8   question:  What's your view of the IQ test?

9          DR. CARTER:  My personal view of the IQ test?

10         THE COURT:  Yes.

11         DR. CARTER:  I think it's valid when you're making

12  certain decisions regarding students, but I also think you have

13  to take into account a student's ability to think, to process.

14  When I look back over the years as a former school-level

15  administrator and now a district-level administrator, I

16  remember being in a school where at one point we did not have a

17  lot of minority students that were selected for the gifted

18  program.  And so the district at that time looked at not just

19  the critical thinking component, but could kids be gifted in an

20  artistic format?

21         And so I would have more students that would qualify

22  for gifted by looking at different components and their thought

23  process versus just their IQ.  And I think the district has

24  done a better job of that over the years.  So that's just my

25  personal view, Judge Wingate.  I'm sure you have some others on

1   the call that may be able to weigh in a little bit better than

2   I did.

3          THE COURT:  I am persuaded that IQ tests are not

4   necessarily indicative of critical thinking.  First of all, the

5   tests have been shown to be -- to be not really reflective when

6   it comes to certain groups of people or certain, for that

7   matter, poverty levels of people.

8          Next of all, the IQ is not a stable number; it moves.

9   Even though many take the position that an IQ test is a stable

10  number that follows a person throughout one's life, I disagree

11  because the IQ changes.  And one can take an IQ test at one

12  point in someone's life, and then later, after being exposed to

13  various stimulus in society, score significantly higher at a

14  later stage.

15         And, in addition, intelligence is not comprised solely

16  of what is the age of the IQ, because there's creativity IQ.

17         And, finally, the IQ test doesn't really perform all

18  of the tasks that most educators think it does perform.

19         So I was just asking:  What role would a format like

20  the ACT, SAT, and the aptitude, and IQ test play in a select --

21  in the selection of students for the gifted program?

22         Can -- well, Doctor, can you then send me the format

23  that Mississippi has used in the past for the selection of

24  gifted students?

25         DR. CARTER:  Yes, sir, I sure can.

1          THE COURT:  Okay.  And then we can look at it and have

2     a discussion on it.  Let me move on to another matter.

3          I see that students can be referred, and so I think

4     that's a good component.  And what I imagine is that any

5     teacher could refer a student for the gifted program; is that

6     correct?

7          DR. CARTER:  Yes, sir, that's correct.

8          THE COURT:  Okay.  What about a parent who

9     is disturbed that his or her child was not selected?  Is there

10    a mechanism to that?

11         DR. CARTER:  Yes, sir.  There is a process a parent

12    can use to contest or appeal an outcome of a test.  Yes, sir.

13         THE COURT:  Okay.  And is that in the program guide

14    describing the test?

15         DR. CARTER:  Yes, sir.  Those steps are available for

16    a parent where they can attest -- or contest the results.  Yes,

17    sir, that's available.

18         THE COURT:  Okay.  Let's move now to the magnet

19    program.  I understand that this technical assistance to be

20    provided by the entity I discussed before would chime in as to

21    whether the district would have the feasibility of developing a

22    magnet program.

23         Do you intend to look at any particular model as to

24    whether this district should employ a magnet program?

25         DR. CARTER:  Your Honor.  When we met with Dr. Johnson

 1    back in 2019, we had discussions about possible models.  We

 2    also returned and started looking at enrollment numbers, our

 3    declines and increase, as well as stabilization in schools.

 4    And so the goal was always to look at magnet opportunities, but

 5    to make sure we don't do it in a way that will work against

 6    minority students or students being enrolled in the district.

 7              THE COURT:  Are you familiar with any magnet schools?

 8              DR. CARTER:  Yes, sir, I am.

 9              THE COURT:  Are you familiar with the ones up in

10    Jackson?

11              DR. CARTER:  Yes, sir.

12              THE COURT:  What do you think about Bailey Magnet, for

13    instance?

14              DR. CARTER:  I'm sorry.  Could you say that again,

15    Your Honor?

16              What do you think about Bailey -- Bailey Magnet?

17              DR. CARTER:  The Bailey Magnet School, I am somewhat

18    familiar with that one.  I believe there is the Barack Obama

19    Magnet School as well in Jackson.

20              THE COURT:  Okay.  And what do you think about the

21    magnet schools in general that you have seen?

22              DR. CARTER:  The ones that I have seen, if you can

23    ensure that you pick programming that will give all students an

24    opportunity to tap into the genius within them or to explore

25    their interests, I think they're very beneficial for students.

1   What we don't want to do is look at magnet opportunities that

2   stifle or limit opportunities for students.

3           THE COURT:  Have you looked at IB programs?

4           DR. CARTER:  IB programs?  Not -- not as of late, no,

5   sir.

6           THE COURT:  All right.  Is there any time that you

7   looked at them?

8           DR. CARTER:  No, sir.

9           THE COURT:  Okay.  Do you have an overall impression

10  of the IB programs?

11          DR. CARTER:  I don't.

12          THE COURT:  All right.  Let's move on to the -- oh, in

13  this ninth paragraph, under "Magnet Program," it's mentioned

14  that the district shall conduct a community survey to

15  determine, among other things, what magnet theme would be most

16  attractive to the community.  What does that mean?  "Magnet

17  theme?"

18          DR. CARTER:  What the district intended to do was to

19  be able to find out, should we look more at workforce

20  opportunities, technical programs, artistic programs?  What

21  would be the programs that will assist in preparing our

22  students to have exploration opportunities, but as well as

23  possibly prepare them for opportunities of work that will pique

24  their interest in that particular area?

25          We have one of the strongest career technical programs

1  in East Mississippi and throughout our State.  So we had

2  discussions about:  Could we look at middle school programming

3  that could feed into those programs?  Meridian is also known as

4  an art community.  Could we look at programs that could feed

5  into those art opportunities?

6        So when we talk about "theme" programs, it is

7  exploration of where our students' interests would lie, what

8  programs could prepare them for better employment opportunities

9  in East Mississippi.  So that was what was meant by that

10 particular topic.

11       THE COURT:  So when you say looking at work

12 opportunities, are we talking about programs that are related

13 to trades, like automobile, mechanics, things like that?

14       DR. CARTER:  Yes, sir.  We wanted to look to see if we

15 were to look at engineering or technology programs, could some

16 of those programs feed into our high school opportunities for

17 our students as well.  Yes, sir.

18       THE COURT:  What about college preparatory?

19       DR. CARTER:  Definitely.  I'm sorry, Judge Wingate?

20       THE COURT:  Go ahead.

21       DR. CARTER:  I was going to say definitely an

22 opportunity as well.  We offer advanced placement courses, but

23 we also wanted to look at do we have students that are already

24 on a high school credit in middle school and that enter high

25 school and that could have opportunities to graduate from

1   Meridian High School with AA degrees along with their high

2   school diploma.

3          THE COURT:  Yeah, I saw that.  And I like that trend

4   that's being started around the State.

5          But on this magnet theme, would a student be

6   pigeonholed into one theme, or can a student pursue more than

7   one theme?

8          DR. CARTER:  The best thing would be to create a

9   program where students could pursue more than one theme.

10  That's why we did not want to look at servicing certain schools

11  on certain parts of town.  We wanted to really be able to look

12  at - because Meridian currently has three middle schools - how

13  could we create a program that would allow students to explore

14  initially and then pick multiple options and not be pigeonholed

15  to one particular theme or one particular career option or

16  choice or pathway.

17         THE COURT:  All right.  Let's move on now to something

18  else.  On the "Grow Your Own" teaching field program, have you

19  already in place anything similar to this type of a program

20  which aims to reach out to college students to interest them in

21  a teaching career?

22         DR. CARTER:  Yes, sir, we have.  We currently have a

23  Teacher Academy Program in our high school in our career and

24  technical programming.  So we start by encouraging students to

25  explore the teaching profession as early as the tenth and

1    eleventh grade.  And so students can earn a dual-enrollment

2    certification through that program and actually leave Meridian

3    High School and enter into our community college or our local

4    Mississippi State campus.  So that's one option that we pursue

5    with encouraging students to take that teacher academy route.

6          We also partner with local universities in our area -

7    Mississippi State, as well as William Carey - to consider

8    alternate route opportunities for teachers to become certified.

9          It's no secret that there is a shortage in finding

10   math educators, science educators.  And so we've been able to

11   encourage other professionals to consider becoming licensed

12   teachers in our area, and we're finding some success in that

13   particular area with the "Grow Your Own" program.

14         THE COURT:  I made a note about incentives.  What

15   incentives would you offer?  First of all, what incentives with

16   regard to competitive salary do you think would be offered?  I

17   know that's controlled by the State, but do you think that's

18   enough just in passing?

19         And, secondly, on this matter of incentives, are there

20   any plans to give those -- are there any requests -- are there

21   any matters on the drawing boards aimed at providing incentives

22   for those distressed areas, like math and science, and also for

23   male teachers?

24         DR. CARTER:  Your Honor, Meridian is leading the

25   State, I would say, in incentives.  We are blessed to have what

1    we call the Phil Hardin Foundation in our area, and they are a

2    foundation that supports us, after we write grants, in helping

3    us put teacher incentives in place.  We do everything from

4    signing bonuses up to $2,000 for educators that will join some

5    of our once harder-to-staff schools.  Thank goodness, here we

6    are, two years later after the pandemic started, and we are not

7    having the issues we had years ago with teacher recruitment.

8    So we do a $2,000 signing bonus.  We also do bonuses for

9    teachers who will agree to mentor young teachers.

10         We are continuing to look at ways to capitalize and

11   explore in making Meridian marketable as it relates to

12   incentives.  So we're doing signing bonuses now, and that's

13   proven to be successful for us.

14         THE COURT:  How do we compare with the southeast

15   average for pay for teachers?

16         DR. CARTER:  We are still one of the lowest in the

17   area.  I want to commend our legislatures for at least making

18   the investment and continuing to make the investment.  This

19   most recent teacher increase was for new teachers starting.  So

20   how -- LaVonda, we're up to what?  About 40,000 for a new

21   teacher now?

22         MS. GERMANY:  That is correct, Dr. Carter.

23         DR. CARTER:  But is still puts us at a disadvantage

24   being right next door to Alabama, where they are a little bit

25   above us.

```
 1              THE COURT:  How much above?

 2              DR. CARTER:  You're going to make me Google.

 3              THE COURT:  Okay.

 4              DR. CARTER:  I think at this time it's about 4,000,

 5   but I'm not sure if that's the exact number now.

 6              MR. HOOKS:  Judge Wingate, this is John Hooks again.

 7   I can -- Dr. Carter can speak to the fact, though, that

 8   Atlanta's salaries are what?  10- or 12,000 higher --

 9              DR. CARTER:  Yes, sir.

10              MR. HOOKS:  -- Dr. Carter?

11              DR. CARTER:  When I went to Alabama at one point, and

12   came back to Mississippi, I got a $6,000 increase.

13              THE COURT:  Okay.  Well, that's something that the

14   whole State has to work on.

15              DR. CARTER:  Yes, sir.

16              MR. HOOKS:  I think everybody on this call can agree

17   on that.  Absolutely.

18              THE COURT:  Yeah, I think so.

19              Now I want to ask you about this "social

20   justice-oriented district-based 'Grow Your Own,'" but I'm

21   asking about "social justice orientation."  What is that?  It's

22   mentioned in -- the first time it's mentioned is over here in

23   paragraph 13, that, "The District will continue to develop a

24   robust, exciting, and social justice-oriented district-based

25   'Grow Your Own' program."  But what is "social
```

1   justice-orientation?"

2           DR. CARTER:  We have a practice, Judge Wingate, where

3   we focus on restorative justice.

4           THE COURT:  I saw that one, too.

5           DR. CARTER:  So I apologize that I can't speak to the

6   social justice piece as much as I can speak to the new

7   educators coming to our district.  We spend a lot of time

8   pouring into them on the importance of ensuring that you are

9   building relationships with your students so that you can

10  understand their backgrounds, the gifts that they bring to the

11  classroom, as well as some of the challenges that they bring to

12  the classroom.

13          And so as an educator, how can you, as the adult,

14  create a learning environment where all students can be

15  successful, even when they make choices that are not always the

16  best choices?  So how do we create a practice of grace and

17  forgiveness for students when they make decisions that are not

18  favorable, and how do we repair the damage when those types of

19  things happen?  And that starts with the adults in the learning

20  environment.

21          THE COURT:  Okay.  That restorative practice is

22  mentioned under "Discipline," paragraph 23, and I have put a

23  question mark in both places where it appears under

24  "Discipline."  There might have been more than that.  Let me

25  see.  Hold up.  That's all I put on there, just those two

1  places -- well, no, it's on -- it's also in paragraph -- at the

2  end of paragraph 25, too.

3          But that is restorative -- restorative justice is to

4  work with students who have encountered difficulties with their

5  discipline and need some corrective models for behavior?  Is

6  that what this is?

7          DR. CARTER:  Yes, sir.  And those corrective models

8  aren't always punitive.  They're corrective models, again, that

9  will correct the behavior and help students take a better

10  approach to thinking through situations when they're faced with

11  those again, if again.

12          THE COURT:  Okay.

13          MR. HOOKS:  And, Your Honor, if I could add to that,

14  too.  This is John Hooks again.  I think that what we all see

15  that as is a potential avenue to decrease exclusionary

16  discipline among students.  So, for example, if a student is

17  upset and he calls his teacher, you know, an expletive or some

18  kind of inappropriate name, the thing might be for him to have

19  a brief period to cool down, and then give him the opportunity

20  to sit down with the teacher and apologize to him or her, as

21  opposed to being sent to out-of-school suspension or what have

22  you.  So that's the idea behind it, is it gives a further

23  opportunity for some alternative, other than a punitive measure

24  or a punishment that certainly would involve exclusionary

25  discipline.

1        THE COURT:  Okay.  Thank you.  The rest of the

2   agreement is self-explanatory, and I have no problems with

3   anything thereafter.  I don't necessarily have any problems

4   with what we've just mentioned.  I just wanted some explanation

5   on some things.

6        Now, this settlement agreement has to be, first,

7   looked over by the Court to determine whether the Court is

8   satisfied with it.  And I think that once you send me the other

9   information, that I won't have any problems with the settlement

10  agreement.  And then, next, the matter has to have a fairness

11  hearing.

12       So why don't we get a tentative time frame for the

13  fairness hearing?  Because I don't think that anything you

14  submit to me is going to derail the agreement.  I just think it

15  would give me some more education as to what is expected, and

16  then for the parties to put that information into the

17  guidebooks, like the one on the gifted program where people can

18  find this information out, and then there can be a reference to

19  those matters so that one would know where to find these things

20  that I've mentioned.

21       Now, what about the fairness hearing?  Who wants to

22  talk to me about the fairness hearing and the scheduling

23  therefor?

24       MR. HOOKS:  Your Honor, this is John Hooks again.  We

25  have worked out some tentative dates that you might have seen

1    earlier, and those dates are more or less the correct time

2    frame in terms of the sequencing.  We do think, in some

3    discussions that we were able to have among the parties prior

4    to this call, that proposing some dates in October to come

5    before the Court might be a good time for everybody given we've

6    got some personnel issues and so on that will make some

7    individuals unavailable until that time, and some other matters

8    too, including the fact that we want to -- or need to have some

9    opportunity to make these various publications, as the Court is

10   well aware, in the local newspapers, et cetera.  So that's,

11   essentially, a time frame that we've come up with that is

12   mutually beneficial for everyone and we put before the Court,

13   sometime in October.

14        THE COURT:  I'll work with you on that.  You know, I

15   would have approached all of this a whole lot sooner.  But I

16   don't know if you-all know, but I tried a lawsuit that lasted

17   for almost three months -- or two months down on the coast,

18   down in Gulfport, and then that plus the post-trial matters,

19   and then plus the COVID matters that shut us down.  Otherwise,

20   we would have done this a long time ago.

21        But I will work with you on the schedules that you

22   want, because now we are thawing out some.  So we have opened

23   our courthouse even more than we have in the recent months, and

24   I've had probably more trials than anybody during this time

25   period.  But I had to be careful on scheduling these matters,

1    and I tried mostly to do it by Zoom.  But those trials we had

2    in the courtroom had to be conducted, as you would recognize,

3    in a very cautious manner because of the fear of the

4    participants and also the fear of the Court that these

5    participants might come down with the virus.  So we've been

6    most cautious.

7         But I think that sometime in October is going to be

8    fine, anytime in October.  Do you have a specific date in

9    October?

10        MS. MERLE:  Your Honor, may I interject?  This is

11   Natane Singleton for the United States.  Just on that point,

12   sir, I know you mentioned holding hearings by Zoom.  And the

13   parties have actually spoken about this, and we are all okay

14   with the possibility of a virtual hearing.  Just so that you

15   know, the Federal Government is still closed.  We're not in the

16   office yet.  And so out of an abundance of caution, we're

17   respectfully requesting that option.  And just so you know,

18   Your Honor, we've had several hearings - you know, "we" being

19   the Federal Government of the United States - have had several

20   hearings virtually.  So I think, given that we're not even in

21   the office yet, out of an abundance of caution, we would

22   respectfully request that option here with you, sir.

23        THE COURT:  If you're not open and the Court sees that

24   the option is a practical and feasible one, then I'll certainly

25   go to that.  So I will pursue that, yes.

1          MS. SINGLETON:  I appreciate that, sir.  And if it

2    meant, you know, a hybrid where some people who are able to

3    travel -- I mean, as you know, we would need to travel as well,

4    so there's risks involved with that.  So then maybe for those

5    who didn't need to travel, if they felt comfortable, if the

6    Court wanted some sort of hybrid, that maybe the Court might

7    consider that as well.  But just from our perspective, we're

8    trying to be particularly cautious with the travel involved as

9    well.

10          THE COURT:  Yes.  And I want to look out for you on

11   that, too.  So --

12          MS. SINGLETON:  Thank you, sir.

13          THE COURT:  So we'll take all of these precautions,

14   and we have been doing this.  So we have not ramrodded just

15   full speed ahead recklessly, but we have our courtroom

16   decorated with all of these shields in here right now.  We have

17   these plastic shields in here for witnesses, for jurors, for

18   lawyers.  We have all kinds of whistles and bells in here.  And

19   so we have, at present, been successful in how we have tried to

20   handle things.

21          In addition, I have always -- during this time period,

22   I have submitted questionnaires to the participants on their

23   particular concerns, and so that is, who in the family might

24   have already contacted the virus?  Who feels that he or she

25   might be at high susceptibility of risk, et cetera?  So we've

1    done all of those things.  And so we would continue to do it.

2    And with regard to this hearing, we will continue to follow

3    protocols.

4            So well before October, I will have a sense of where

5    we are with regard to these particular perils, and I'll be back

6    in contact with you-all to make suggestions as to alternatives.

7    So thank you for bringing that up.  But we will endeavor to do

8    that, because we still have some criminal matters that we've

9    had to go forward on because of speedy trial considerations.

10   And so we have gone the Zoom route and every other route that

11   we could fashion in order to protect everybody but,

12   nevertheless, to reach those concerns under the speedy trial

13   considerations.  So I will definitely endeavor to make sure

14   everybody is safe.

15           So, now, let's talk about some dates.  Can we get back

16   to some dates in October?

17           MS. MERLE:  Your Honor, this is Natasha.  I don't mean

18   to belabor this point.  I think you mentioned that you would

19   get back to us closer in October or closer to the -- you know,

20   whatever dates we pick to see how we can do this via Zoom

21   and/or in person.  And I think for the notices that Mr. Hooks

22   mentioned, I think we'll have to give notice to the class

23   whether the hearing will be in person only or via Zoom.  So I

24   would flag that to the extent that we're going to have to maybe

25   put out these notices in September or -- yeah, in September --

1 late August/early September.  For class members, they're going

2 to need to know how they can join the hearing.

3         THE COURT:  You're saying by September?

4         MS. MERLE:  Yes.

5         John, do you remember?  I think we had proposed

6 mid-September for sending out these notices?  I can check that.

7 But the notices that the school district will put in the local

8 newspapers to tell the class about the hearings, I believe we

9 were going to put September 20th -- well, September -- in

10 mid-September, I believe.

11         THE COURT:  Mid-September?

12         MR. HOOKS:  Yes, sir.

13         THE COURT:  Okay.  What if I just get back to you at

14 the first of September?  How is that?

15         MS. MERLE:  That's -- that works for us.

16         THE COURT:  I mean, I just want to -- so I could tell

17 you how I view the risk factor and whether the risk factor is

18 such that we might need to look at the other alternative

19 instead of in-person hearings.

20         MS. SINGLETON:  That would be great, Your Honor.  This

21 is Natane Singleton again.  I just wanted to add, again, that

22 the risk factor would include getting on a plane, for those of

23 us who are not in Mississippi, and staying in hotels and those

24 sorts of things.  So I just wanted to flag that as well.

25         THE COURT:  Okay.  I will take all of that into

 1    consideration.  So the first of September.  Let's see.  Give me

 2    a date.

 3            THE CLERK:  September the 1st at 9:30, sir.

 4            THE COURT:  September the 1st at 9:30?  Is that okay

 5    for a telephone call?

 6            MS. MERLE:  Yes, Your Honor.

 7            THE COURT:  Is there anyone who is opposed to

 8    September 1st, 9:30, for the status conference at that time?

 9            MS. SINGLETON:  No, Your Honor.  No objection.

10            THE COURT:  Okay.  I hear no negatives.  So then on --

11            MR. HOOKS:  No objection, Your Honor.

12            THE COURT:  Okay.  So then on September the 1st, I'll

13    get back to you.

14            MR. COMPTON:  Your Honor, this is John Compton.  We

15    had -- the attorneys had tossed around some dates in October

16    for the fairness hearing.  Could we go ahead and kind of pencil

17    those in, and then the September meeting you can flesh out how

18    we're going to go forward in October?

19            THE COURT:  I can do that.  So what's the October date

20    you would like?

21            MR. HOOKS:  Your Honor, this is John again.  We had

22    looked at October the 12th or the 15th.

23            THE COURT:  The 12th or the 15th?

24            MR. HOOKS:  But we only need one day -- one of those

25    days, Your Honor.

1          THE COURT:  Okay.  One day between October 12th and

2     15th?

3          MR. HOOKS:  Yes, sir.

4          THE COURT:  All right.  If everybody would mark that

5     out, then we'll be in business as to the hearing date.  Does

6     anyone have a conflict on those dates?  October 12th through

7     15th?

8          I hear no negatives.

9          MS. MERLE:  No, Your Honor.

10         THE COURT:  All right.  I hear no negatives.

11         Now, we now have the date in September when I'll get

12    back to you to talk to you about the protocol, and then we have

13    the date set for the hearing.

14         There's one other matter that I want to especially

15    bring up.  And there are some motions that are still sitting on

16    my docket.  Now, I think all of these motions have been dealt

17    with, but I just want to be sure.  So there's a motion that's

18    filed by John Barnhardt.  It's at Docket No. 86, motion to

19    compel production of documents.  And there's a motion that's

20    filed in Docket No. 119, also by John Barnhardt, motion for

21    extension of time to complete discovery.

22         Are these motions now moot?  I'm speaking to --

23         MR. HOOKS:  Your Honor, this is John Hooks for the

24    school district.  I believe our discussions among counsel

25    previously indicated that those are moot now; is that correct,

1   Natasha?

2       MS. JOHNSON:  Yes, Your Honor.  This is Kristen

3   Johnson for the plaintiffs.  Yes, those motions at Docket 86

4   and Docket 119 are moot at this point.

5       THE COURT:  Okay.  Moot.  I'm going to do an order on

6   it.

7       MS. JOHNSON:  Yes.

8       THE COURT:  There's another one.  There's Docket

9   No. 148 that's also filed by Barnhardt, motion for protective

10  order.  Docket No. 148, is that also moot?

11      MR. HOOKS:  Yes, sir, I believe it is.  This is John

12  Hooks for the school district.

13      MS. JOHNSON:  Your Honor, this is Kristen Johnson --

14  sorry.  Go ahead.

15      MS. MERLE:  Sorry.  I thought, Your Honor, that you

16  had granted that motion and the district was -- that was the

17  discussion about the discipline files, and I thought we had had

18  a hearing previously where that was granted.  But either way,

19  Your Honor, it is now moot.

20      THE CLERK:  Okay.  So all of the documents -- so it

21  now is moot.  I've already ruled on it, but the motion itself

22  is now moot?

23      MS. MERLE:  Yes, Your Honor.

24      THE COURT:  Then there is Document No. 158, joint

25  motion for settlement agreement and authorization of notice.

1    That's what we're doing now.  And is that motion still

2    outstanding as a motion?

3            MS. MERLE:  Your Honor, this is Natasha.  I believe

4    so.  I think -- yes.  I think you would have to either grant or

5    deny it before we could go to the fairness hearing.  Is that

6    the motion you're referring to, Your Honor?

7            THE COURT:  That's correct.

8            MS. MERLE:  The one that's -- yes.

9            THE COURT:  I'm going to grant the motion.  I just

10   want the documents to explain some matters.  But at present, I

11   don't see any reason why I would not grant the motion.  I will

12   craft an order to explain this.

13           And then there is Document No. 160, and that's an

14   unopposed motion to lift the stay.  Now, are the parties still

15   in agreement to lift the stay so I can grant the motion?

16           MS. MERLE:  Yes, Your Honor.

17           MS. SINGLETON:  Yes, Your Honor.

18           MR. HOOKS:  Yes, Your Honor.

19           THE COURT:  And then, finally, there's Document

20   No. 161, and that's a motion to -- for withdrawal of attorney.

21   Is that motion still outstanding?

22           THE CLERK:  That was filed yesterday.

23           MR. COMPTON:  I believe that was just filed, was it

24   not?

25           THE COURT:  Yeah, it was filed --

1            MR. HOOKS:  I think that's the one, Natasha, you just

2    filed, right?

3            MS. MERLE:  I'm sorry, Your Honor.  Yes.  The motion

4    to withdraw those attorneys yesterday, yes, Your Honor, that's

5    still outstanding.

6            THE COURT:  Okay.  I have not had a chance to study it

7    yet.  Is there going to be a response to this?

8            MR. HOOKS:  No, sir, Your Honor.  This is John Hooks

9    for the school district.  We do not oppose that motion.

10            THE COURT:  Okay.  And you do not oppose it?

11            MR. HOOKS:  No, sir.

12            THE COURT:  I'm going to grant it then.  Now, let me

13    see about Docket No. -- let me see.

14            THE CLERK:  150.

15            THE COURT:  Yeah.  I've got to go to -- 119 is there.

16    One second.  So the next one is...

17        (SHORT PAUSE)

18            THE COURT:  All right.  Now, then, I need to go over

19    motions filed by an entity -- by Meridian.  140.  Motion to

20    deem its motion for unitary status as confessed as to the

21    Department of Justice, Docket No. 140.

22            MR. HOOKS:  Your Honor, this is John Hooks.  I think

23    at this point we did get an answer from the Department of

24    Justice that they do not oppose our motion, so I don't know

25    that the Court needs to move forward on that one, Your Honor.

1    We withdraw it.

2             THE COURT:  You're withdrawing the motion?

3             MR. HOOKS:  Yes, sir.

4             THE COURT:  Okay.  It is withdrawn.  Well, it was

5    filed by Meridian, now.  So then Mr. Hooks, you are withdrawing

6    it on behalf of Meridian, that's correct?

7             MR. HOOKS:  Yes, sir.

8             THE COURT:  Okay.  Withdrawn.  And then there's

9    Document No. 150, and that's a supplemental motion for

10   extension of time to complete discovery.  Is that now moot?

11            MR. HOOKS:  Yes, sir, it is moot.

12            THE COURT:  Okay.  That's moot.  I think there's only

13   one left, and that is Docket No. 53.  And that's a motion for

14   declaration of unitary status filed by Meridian.

15            MR. HOOKS:  Yes, sir.  I think that's the one we were

16   interested in keeping as our motion that we're moving forward

17   on.

18            THE COURT:  Motion for declaration of unitary status.

19   Okay.  So we're keeping that one, right?

20            MR. HOOKS:  Yes, sir.

21            THE COURT:  Okay.  Then we're keeping it.  Now, that

22   takes care of all the other motions.

23            Are there any other motions that are outstanding that

24   I did not mention?

25            All right.  I hear no negatives.

1        I will put orders in this afternoon on all of these

2   motions, including an order on the scheduling order.  So I will

3   do that this afternoon or first thing in the morning, but it

4   will be done then.

5        Now, is there anything else I need to discuss with

6   you-all at this point?  Anybody?

7        MR. HOOKS:  Your Honor, this is John hooks.  I don't

8   believe so, Your Honor.  But on behalf of the school district,

9   we will endeavor right away to get these items to you, as the

10  Court has requested.  But, also, the parties have gone ahead

11  and taken a look at, and agreed on, the various notices and

12  publications and so on.  So we will get those to you, Your

13  Honor, also so that when we meet on the 1st, we are able

14  expeditiously to get those notices out either later that day or

15  on the 2nd so that the time frame lines up with our hearing

16  date in October.  So that information, I'll just say, it will

17  be forthcoming.  So if you receive that from us, that will be

18  the reason why, Your Honor.

19       THE COURT:  Okay.  Now then --

20       MS. MERLE:  Your Honor, I --

21       THE COURT:  Who is speaking.

22       MS. MERLE:  I'm sorry.  This is Natasha.  I just had

23  one clarification question that I had for you, Your Honor.

24       THE COURT:  Okay.

25       MS. MERLE:  You asked earlier about district data.

 1    You were asking about race -- race data regarding the gifted

 2    students and, I believe, the economic data.

 3          Were you interested in the plaintiffs sending you the

 4    data that we had from 2018?  I checked, and the most recent we

 5    would have goes back to 2017/2018.  Are you interested in that,

 6    or is that something you wanted the school district to send to

 7    you?

 8          THE COURT:  Yes, send it.  Let me look at it.

 9          MS. MERLE:  Okay.

10          THE COURT:  So, yes, I'm interested in it.

11          MS. MERLE:  Okay, Your Honor.

12          THE COURT:  Well, have you sent this already?

13          MS. MERLE:  I'm sorry?

14          THE COURT:  Have you sent any of this already?

15          MS. MERLE:  No, no.  The -- no.  No, Your Honor.

16          THE COURT:  Okay.  Well, go ahead and send it then.

17    All right?  I just know you've sent a lot of material, and so I

18    just wanted to be sure that you haven't already sent it,

19    because I don't want to you do it twice if you've already sent

20    it.

21          All right.  Is there anything else from anyone then?

22          (No response)

23          THE COURT:  All right.  I thank you-all for the

24    conference.  I look forward to talking to you-all in September.

25    I'll talk to you then.

1          (Hearing Concluded)

1                    CERTIFICATE OF REPORTER

2

3          I, Amy Key, Official Court Reporter, United States

4     District Court, Southern District of Mississippi, do hereby

5     certify that the above and foregoing pages contain a full, true

6     and correct transcript of the proceedings had in the aforenamed

7     case at the time and place indicated, which proceedings were

8     recorded by me to the best of my skill and ability.

9          I certify that the transcript fees and format comply

10    with those prescribed by the Court and Judicial Conference of

11    the United States.

12

13         This the 19th day of July, 2021.

14

15               s/ _Amy Key_
                 Amy Key, RPR, CCR
16               Official Court Reporter

17

18

19

20

21

22

23

24

25