**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**JOHN BARNHARDT, ET AL.**                                                                    **PLAINTIFFS**

**and**

**UNITED STATES OF AMERICA**                                         **PLAINTIFF-INTERVENOR**

**v.**                                                     **CIVIL ACTION NO.: 4:65-CV-1300-HTW-LGI**

**MERIDIAN MUNICIPAL SEPARATE
SCHOOL DISTRICT, ET AL.**                                                     **DEFENDANTS**

**REPLY IN SUPPORT OF MOTION TO MODIFY DESEGREGATION PLAN
AND FOR EXPEDITED CONSIDERATION**

Meridian Public School District ("the District") submits the following reply in support of its Motion to Modify Desegregation Plan and for Expedited Consideration:

**I.**     **Facts and Background**

On August 9, 2019, the District and Private Plaintiffs ("LDF") jointly moved this Court to approve their settlement agreement. [Doc. 159]. The agreement contains a stipulation stating: "the District has complied with the letter and spirit of the desegregation orders and applicable law, eliminated the vestiges of past discrimination to the extent practicable, and achieved unitary status." [Doc. 158-1 at p.1]. At the time the agreement was reached, the prior year's enrollment numbers showed the District's student population was 91% African-American, 6% white, and 3% other ethnicities.

The settlement agreement obligates the District to take certain remedial measures. *Id*. at 2-7. With respect to student assignment, however, the agreement addresses only issues related to the District's gifted program. *Id*. at 2-3. It does not compel the District to retain current school configurations. *See id.* The agreement is signed by representatives

for LDF and the District. *Id*. The parties' motion to approve this agreement remains pending.

* * *

On or about May 26, 2022, Superintendent Amy Carter brought a serious issue before the Board of Education. Exhibit 2 – Affidavit of Superintendent Amy Carter. Three middle schools in the District served a population of less than 1,000 students at substantial cost to the taxpayers and, in the case of at least one of the middle schools, presented significant challenges to providing quality educational programming. *Id*. One of them, Carver Middle School, was experiencing particular difficulty recruiting certified teachers. *Id*. Indeed, *nearly half* of Carver's licensed teaching positions were vacant for the 2022-23 school year, despite the District's significant efforts to fill them. *Id*. Among these efforts, the District: (1) attended university recruitment fairs; (2) updated job postings and social media blasts regularly; (3) offered signing bonuses prior to the onset of Covid; (4) offered "finder's fees" to staff members who referred certified teachers to the District; (5) utilized William Carey University to encourage alternate route certifications; and (6) instituted a "Grow Your Own" program partnering with Jackson State University, Mississippi State University, the University of Mississippi, and William Carey. *Id*. These efforts earned the District praise from the Equity Assistance Center of the Intercultural Development Research Association ("IDRA"). *Id*. Unfortunately, they did not bear significant fruit in terms of filling vacant positions at Carver. *Id*.

As a result, Dr. Carter recommended the Board consolidate the District's three middle schools into two, reassigning Carver's students to Magnolia Middle School and Northwest Middle School, respectively. *Id*. The result of this plan is that Carver Middle

School will no longer be used as a school.[1]  *Id*.  Dr. Carter's recommendation was based solely on two factors: (1) Carver had the lowest student enrollment and (2) Carver had the highest number of teacher vacancies.  *Id*.  The Board voted to accept Dr. Carter's recommendation.  *Id*.; Exhibit 3 – Minutes of May 26, 2022 Meeting.

At the end of the 2021-2022 school district, the three middle schools had the following enrollment:

| SCHOOL | BLACK | WHITE | OTHER | TOTAL |
|---|---|---|---|---|
| Carver Middle | 262 (95.6%) | 5 (1.8%) | 7 (2.6%) | 274 |
| Magnolia Middle | 259 (88.7%) | 13 (4.5%) | 20 (6.8%) | 292 |
| Northwest Middle | 398 (92.6%) | 14 (3.2%) | 18 (4.2%) | 430 |

The projected middle school enrollment for 2022-2023 is:

| SCHOOL | BLACK | WHITE | OTHER | TOTAL |
|---|---|---|---|---|
| Magnolia Middle | 437 (93.2%) | 8 (1.7%) | 24 (5.1%) | 469 |
| Northwest Middle | 529 (92.2%) | 25 (4.3%) | 20 (3.5%) | 574 |

Exhibit 4 – MSIS Data.  At present, the District as a whole has a racial composition that is 91.9% black, 3.8% white, and 4.3% other races and ethnicities.  *Id*.

Following consolidation, the District is continuing to provide transportation for former Carver students before and after school.  Ex. 2.  The distances students must travel are minimally effected by the change.  *Id*.  Meridian is not a sprawling city.  In fact, bus routes from the old Carver zone to Northwest will be shorter in some instances.  *Id*.  Where

---

[1] The District's current plan is move the central office to the Carver campus.  This will serve the important function of uniting the District's offices in a single location, making it easier for parents to access administrators.  Ex. 2.

the distance is longer, the difference is less than two miles. *Id*. Similarly, students transferred from Carver to Magnolia will deal with a route increased by no more than 3.5 miles. *Id*. The District will also continue to provide transportation for extracurricular activities, after-school and summer remediation programs, and enrichment activities. *Id*.

Consolidating the District's middle schools also accomplishes several important educational objectives. The District now has three counselors at each school, offering students better access to emotional and social support. *Id*. Further, all middle school students now have access to licensed, qualified teachers for the entire year, rather than a rotating door of long and short-term substitutes for students at Carver. *Id*. Former Carver students will also have access to courses at Northwest and Magnolia that were not available at Carver. *Id*.

Likewise, the District understands additional support will be necessary to smooth rough spots in the transition. *Id*. Each middle school will be supported with six days of professional development to support transitioning counselors. *Id*. Teachers will receive Professional Development using Title funds and School Improvement Program funds, including Professional Development in English/Language Arts, math, science, and social studies through instructional specialists, academic coaches, and consultants. *Id*. Tutors will also be offered in core subject areas utilizing trained teacher assistants and retired teachers. *Id*.

Throughout the summer of 2022, the District provided citizens multiple opportunities to give input and express concerns regarding facilities upgrades and changes. Members of the Carver Coalition were in attendance at each of these meetings. *Id*. On June 8, 2022, Dr. Carter met with members of the Carver Coalition. *Id*. And on June 16, 2022, the

school board president, board secretary, and district administration also met with the Coalition to hear and address concerns about the consolidation. *Id*. Thereafter, on June 23, 2022, District administrators met with faith-based community leaders to seek their input on facilities upgrades and changes. *Id*. The District also hosted a series of community meetings on June 30, July 28, and August 2, 2022, to hear citizens' concerns and ideas regarding facilities upgrades and changes. *Id*.

## II.     Law and Argument

### A.     LDF's arguments contradict their prior stipulation that the District has eliminated the vestiges of past discrimination and is unitary.

LDF's response is patently inconsistent with its prior position in this litigation. LDF and the District previously negotiated, agreed to, and executed a settlement agreement stating that the District had met the requirements for unitary status. [Doc. 158-1]. A joint motion to approve that agreement and to grant unitary status to the District is currently pending Court approval. [Doc. 158]. Within the agreement, LDF expressly stipulated that the District had complied with "the letter and spirit of the desegregation orders and applicable law, eliminated vestiges of past discrimination to the extent practicable, and achieved unitary status." [Doc. 158-1]. The stated purpose of the settlement agreement was to "avoid the time, costs, and resources associated with further litigation." [Doc. 159, p. 1].

Yet LDF's objection is premised on the assertion that the District has *not* eliminated the vestiges of past discrimination and is not unitary. [Doc. 170, p. 3]. In making this argument, LDF both contradicts its prior stipulation and undermines the express objective of the settlement—to avoid the expenditure of further resources in litigation. This Court

should therefore enter the parties' previously submitted settlement agreement, granting the District unitary status and thereby excusing the District from seeking court approval to consolidate its middle schools.

> B. <u>This Court's review is limited to determining whether the consolidation of the District's middle schools will result in a recurrence of the dual school structure</u>.

In the alternative, this Court should grant the District's motion to modify the desegregation plan. In determining whether the proposed middle school consolidation is proper, this Court's review is narrowly defined. The desegregation order requires that any consolidation of schools be done in a manner that will prevent the recurrence of a dual school structure. [Doc. 87-2]. This Court's role, therefore, is not to act as a "super school board," for the purposes of deciding whether consolidation is in the best interest of students. *Lee v. Geneva County Bd. of Educ.*, 892 F.Supp.3d 1387, 1389 (S.D. Ala. 1995). Instead, this Court is confined to determining whether the proposed consolidation furthers the goal of disestablishing a dual school system. *See id*.

LDF, however, argues this Court must consider two additional factors because the consolidation will result in the closure of a predominantly black school: 1) whether the District has provided sufficient evidence to show its decision was not motivated by race, and; 2) whether black students are disproportionately burdened by the consolidation. *Harris by Harris v. Crenshaw County Bd. of Educ.*, 968 F.2d 1090, 1092-94 (11th Cir. 1992); *Arvizu v. Waco Indep. Sch. Dist.*, 495 F.2d 499, 501-502 (5th Cir. 1974). LDF is mistaken.

*Harris* and *Arvizu* are distinguishable from this case. In *Harris* and *Arvizu*, majority white school districts sought to close majority black schools. Thus, the issue confronting the courts in those cases was not only that the school to be closed was predominantly

black, but that black students were in the minority in their respective districts. *See id.* As a result, black students were necessarily burdened to a far greater extent by the closures than were non-black students. *See id.*

The same is not true here. The District has a black student population of nearly 92%. And each of the middle schools in the District had a student makeup in 2021-2022 reflective of the District's overall enrollment. As a result, the proposed consolidation will not disproportionately affect black students in a statistically significant way. There is no additional scrutiny due and owing to the consolidation of predominantly black schools in a school district where all schools are predominantly black.

Even if the District were required to prove its decision was not motivated by race, it has done so here. Where there is "an absence of proof in the record of racial motivation" in combination with "sound non-racial considerations for the closing[]," a school may be properly closed. *Mims v. Duval County Sch. Bd.*, 447 F.2d 1330, 1332 (5th Cir. 1971). LDF has not identified a discriminatory motive for the closure, whereas the District has provided several practical, non-racial reasons for it. Under the existing desegregation plan, consolidation is therefore proper.

  C. <u>Consolidation of the District's middle schools will not create racially-identifiable schools or otherwise result in re-segregation.</u>

LDF also complains that the consolidation of Carver with Northwest and Magnolia Middle Schools will result in a higher concentration of black students at Magnolia than before the consolidation. This, however, is not the measure for whether a school district's student assignment plan is constitutional. It is true that "racially identifiable" schools in former *de jure* districts are typically subject to a presumption that their racial imbalance is

a vestige of illegal segregation.  *Price v. Denison Indep. Sch. Dist.*, 694 F.2d 334 (5th Cir. 1982).  However, for a school to be "racially identifiable," courts in this circuit generally allow a deviation of at least 15 percentage points from the overall racial composition of the school district.  *See U.S. v. Nettleton Line Consolidated Sch. Dist.*, 2020 WL 5237806, at *11 n.6 (N.D. Miss. Sept. 2, 2020); *Thomas v. Sch. Bd. St. Martin Parish*, 544 F.Supp.3d 651, 666 (W.D. La. June 21, 2021) ("[a]ny school falling outside the +/- 15% standard is considered a racially identifiable school.")

The projected black student population of both consolidated middle schools is well within these boundaries.  Indeed, Magnolia's black student population is expected to be +1.3% of the District's black student population as a whole (91.9%), while Northwest will be +0.3% of the overall black student population.  Ex. 4.  Neither consolidated school will be "racially identifiable" as a matter of law.

Further, although the concentration of black students at the consolidated Magnolia Middle School will increase by roughly 5.5 percentage points, the overall concentration of black students at Magnolia will be *lower* than the concentration of black students at Carver Middle School last year (93.2% v. 95.6%).  Exs. 2, 3.  This means students transferring from Carver will be attending a school with a less concentrated black population and a higher percentage of non-black students than before (6.8% v. 4.4%).  *Id*.  These facts further demonstrate that consolidation will not result in the re-establishment of a dual school system.

Importantly, even if LDF proved consolidation created a racially-identifiable school, the District could overcome the presumption that this was a vestige of *de jure* segregation by showing that other factors motivated its decision.  As noted above, consolidation was

necessitated by both the need to use District resources wisely, and a teacher shortage the District worked hard to overcome. LDF has not offered any evidence that these motivations are false or pretextual. Notwithstanding their claim that Magnolia will now have a slightly higher percentage of black students, there is no evidence of a constitutional violation.

        D.      <u>The District is not legally responsible for demographic and other social changes in the geographical area the District encompasses.</u>

LDF also argues the District has unlawfully allowed "resegregation" to occur within the district. This argument is a red herring. The overall racial makeup of the District has no bearing whatsoever on the legal propriety of the proposed consolidation.

Moreover, there is no authority for the premise that a public school district is legally responsible for demographic changes or private choices that change the racial composition of the District as a whole. LDF cites no authority in support of its claim that public school districts are responsible for remedying the "large-scale departure of white school-aged children from a school district." [Doc. 170, p. 5].

LDF's argument also contradicts the pending settlement agreement. Therein, LDF stipulated that the District has, to the extent practicable, eliminated the vestiges of de jure segregation. [Doc. 158-1]. At the time the agreement was signed, the District's racial makeup was virtually identical to its racial makeup today (91% African-American, 6% white, and 3% other ethnicities). If the District had eliminated the vestiges of discrimination in 2019, LDF cannot reasonably contend that the racial makeup of the District today is proof of unconstitutional student assignment.

The "white flight" cases LDF cites also do not apply in this scenario. In *Davis v. E. Baton Rouge Par. Sch. Bd.*, 721 F.2d 1425, 1435 (5th Cir. 1983) and cases like it, the Court held a school district cannot resist a constitutional desegregation plan on the basis that white flight might result from it. *Id.* ("fear that white students will flee the system is no justification for shirking from the constitutional duty to desegregate…"). Those cases *do not* say a district must remedy white flight that has already occurred

    E.    <u>Consolidation of the District's middle schools does not disproportionally burden black students.</u>

As explained above, there can be no meaningful disproportionate impact on black students where Carver's percentage of black students was less than four percentage points greater than the District as a whole. There is little room for disproportionality when every school in the District is predominantly black.

Moreover, there are very few burdens imposed by the closure on any student, regardless of race. Transportation, for instance, is affected only in a minor way by the closure. Ex. 2. As explained above, some bus routes have lengthened, but by less than five miles. *Id.* Likewise, former Carver students may participate in the same athletics and extracurricular activities they enjoyed prior to consolidation. *Id.* Most importantly, the entire student population previously attending Carver will now have access to more courses and to a full schedule of licensed and qualified teachers. *Id.* These developments benefit, rather than burden, all students—including Carver's black student population.

**IV.**    **Conclusion**

For the reasons set forth herein and its original Motion, the District respectfully requests that this Court grant its motion to modify the desegregation order on an expedited

basis.  In the alternative, the District requests that this Court approve the previously submitted settlement agreement executed by the parties and subsequently enter an order declaring the District's motion moot.

    Respectfully submitted, this 10th day of August 2022.

**MERIDIAN PUBLIC SCHOOL DISTRICT**

    /s/  *Lindsey O. Watson*

OF COUNSEL:

John S. Hooks
MS Bar No. 99175
Lindsey O. Watson
MS Bar No. 103329
Adams and Reese LLP
1018 Highland Colony Parkway, Suite 800
Ridgeland, Mississippi 39157
Telephone: 601.353.3234
Facsimile: 601.355.9708
John.Hooks@arlaw.com
Lindsey.Watson@arlaw.com

And

John G. Compton
MS Bar No. 6433
Witherspoon & Compton
1100 23rd Avenue
P. O. Box 845
Meridian, Mississippi 39302
Tel: (601) 693-6466
Fax:  (601) 693-4840
jcompton@witherspooncompton.com

**CERTIFICATE OF SERVICE**

      I do hereby certify that on this date, I filed electronically the foregoing with the Clerk of this Court using the CM/ECF system which will send notification of filing to all registered counsel of record.

      Dated:  August 10, 2022.

                                                                              _/s/  Lindsey O. Watson_