UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


JOHN BARNHARDT                                    PLAINTIFF

v.                              CIVIL ACTION NO: 4:65cv1300

UNITED STATES OF AMERICA
                                      INTERVENOR PLAINTIFF



MERIDIAN MUNICIPAL SEPARATE
SCHOOL DISTRICT                                   DEFENDANT



TRANSCRIPT OF MOTION TO MODIFY DESEGREGATION PLAN AND FOR
EXPEDITED CONSIDERATION

THURSDAY, AUGUST 11, 2022

BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE


COURT REPORTER:

Fred W. Jeske, RMR, CRR
701 North Main Street, Suite 228
Hattiesburg, Mississippi  39401
(601) 255-6432
fred_jeske@mssd.uscourts.gov

1        APPEARANCES:

2        REPRESENTING THE PLAINTIFF BARNHARDT and PRIVATE
         PLAINTIFFS:
3
              JOHN SPENCER CUSICK, ESQUIRE
4             NATASHA MERLE, ESQUIRE
              NAACP Legal Defense &
5             Educational Fund, Inc. - New York
              40 Rector Street, 5th Floor
6             New York, NY 10006-1738
              212-965-2200
7             jcusick@naacpldf.org
              nmerle@naacpldf.org
8

9        REPRESENTING INTERVENOR PLAINTIFF:

10            ARIA VAUGHAN, ESQUIRE
              U. S. Department of Justice-CRT
11            950 Pennsylvania Avenue NW
              4CON, 10th Floor
12            Washington, DC 20530
              202-598-9629
13            aria.vaughan@usdoj.gov

14            NATANE SINGLETON, ESQUIRE
              U. S. Department of Justice
15            950 Pennsylvania Ave., NW
              Washington, DC 20530
16            202-307-6880
              natane.singleton@usdoj.gov
17

18

19

20

21

22

23

24

25

1        APPEARANCES CONTINUED:

2        REPRESENTING THE DEFENDANT:

3                JOHN G. COMPTON, ESQUIRE
                 Witherspoon & Compton, LLC
4                P. O. Box 845 (39202)
                 1100 23rd Avenue
5                Meridian, MS 39301
                 601-693-6466
6                jcompton@witherspooncompton.com

7                LINDSEY O. WATSON, ESQUIRE
                 Adams and Reese, LLP - Ridgeland
8                1018 Highland Colony Parkway
                 Suite 800
9                Ridgeland, MS 39157
                 601-292-0739
10               lindsey@wilbanksdowd.com

11

12                              -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  Roll:  John Compton and Lindsey Watson and

3    Jamie Dole appearing on behalf of Meridian School District.

4          We have John Cusick and Natasha Merle on behalf of

5    Barnhardt -- I'm sorry, Barnhardt and private plaintiffs, as

6    well as plaintiff Roscoe Jones.  And we have Attorneys Aria

7    Vaughan and Natane Singleton on behalf of the United States, as

8    well as appearing -- observing is Ms. Washington.

9          Can you give me your first name again.

10          MS. WASHINGTON:  Tracey.

11          THE CLERK:  Tracey Washington and Robert Markham on

12    behalf of the Carver Community Coalition, as well as Dr. Amy

13    Carter on behalf of the Meridian School District,

14    superintendent.

15          Did I miss anyone?

16          Thank you so much.  We should begin starting shortly.

17          THE COURT:  All right.  Call the case Terri.

18          THE CLERK:  Good afternoon again, everyone.  This is

19    Terri Barnes, Judge Wingate's courtroom deputy.

20          This is Barnhardt, et al., and United States, intervenor,

21    versus Meridian Municipal Separate School District, Cause No.

22    4:65cv1300.

23          We have attorney John Compton and Attorney Lindsey Watson

24    appearing on behalf of Meridian School District as well as

25    paralegal Jamie Dole.

1          On behalf of Barnhardt and private plaintiffs we have

2     Attorney John Cusick and Natasha Merle as well as appearing is

3     plaintiff Roscoe Jones.

4          On behalf of the United States, intervenor, we have

5     Attorneys Aria Vaughan and Natane Singleton.  Observing today

6     we have Ms. Tracey Washington and Mr. Robert Markham.

7          On behalf of the Carver Community Coalition as well as Dr.

8     Amy Carter on behalf of -- as superintendent of the Meridian

9     Public School District.

10              THE COURT:  Good afternoon.

11         Did we miss anyone on that roll call?

12         All right.  The answer appears to be no.

13         So then this is a status to see where we are presently and

14    how fast we can get to wrapping up this matter.

15         We had a conference call not too long ago wherein certain

16    matters were discussed.

17         I understand the plaintiffs have some objections to the

18    planned course of action, so can I hear from the representative

19    of the plaintiffs?

20              MR. CUSICK:  Your Honor, this is John Cusick on behalf

21    of private plaintiffs.

22              THE COURT:  All right.  Go ahead.

23              MR. CUSICK:  And so we appreciate the opportunity to

24    address the court today.

25         As we indicated at our last status concerns we had some

1    concerns about the procedural nature of the way that the

2    closure happened and then how it was presented to the court.

3        During that hearing we indicated that we were assessing

4    what if any options we were going to take on the proposed

5    motion and then we responded in opposition to that last Friday.

6        And I think, Your Honor, our concerns are straightforward

7    and simple that the District at this point, or the defendants

8    have not met their burden and we'd like to point out just two

9    particular points.  And so we raised already one evidentiary

10   objection to the defendant's release on Dr. Carter's affidavit

11   that was offered for the first time less than 24 hours ago in

12   their reply, if it's being offered for the truth of the matter

13   as inadmissible hearsay and which is relied upon in the reply

14   motion.

15       We do not, however, object to the extent the defendants

16   would like to offer that affidavit through the introduction of

17   Dr. Carter as a witness today and then subject to

18   cross-examination and an opportunity for that.

19       In that same vein, as we indicated, we'd also like the

20   opportunity after the presentation of evidence by the

21   defendants to then also have the opportunity to call community

22   members to address the impact on them.

23       And then, second, and we're happy to address any specific

24   questions Your Honor has or go in more detail to our briefing,

25   but at this point, again, it is not clear, based on the record,

1    that the evidence has been presented in a way that would meet

2    the District's burden that it has right now under the consent

3    order and that it has to show before closing the school.  From

4    our understanding they have gone forward and already closed

5    that school and are now seeking this court's permission to go

6    forward even though it's happened.

7         And so that, Your Honor, summarizing our primary thoughts

8    and how we would propose to proceed today but obviously we

9    defer to the court.  We're happy to answer any questions here

10   if you have any additional suggestions.

11             THE COURT:  So let's stay with your suggestions.  How

12   would you like to proceed with those suggestions here?

13             MR. CUSICK:  Sure, Your Honor.  We would first propose

14   that the defendants call Dr. Carter to the stand or the virtual

15   stand, if you will, to introduce her affidavit and any other

16   evidence that they are intending to seek through her.

17        And at that point that would give us an opportunity for

18   cross-examination of Dr. Carter after the direct, and we'd also

19   ask the defendants for any other evidence that they intend to

20   present that could be inadmissible hearsay or not admissible

21   otherwise, that they do so today to give everyone an

22   opportunity and the court to hear that evidence and an

23   opportunity for cross-examination from private plaintiffs or

24   any other party in this matter.

25        Afterwards, and after the presentation of that evidence,

1   we would propose the opportunity for private plaintiffs to call

2   to the stand at least one and no more than three potential

3   community members to discuss the impact of the motion and

4   closure on parents and students that the Carver School served.

5        And then afterwards, to Your Honor's initial point for the

6   status conference, we would be happy to then, after the full

7   presentation of evidence, address arguments on the motion and

8   any questions Your Honor might have throughout or during.

9        And so that's what private plaintiffs would propose, but

10  again defer to Your Honor as well as defendants and party

11  intervenors, United States, have any additional suggestions as

12  well.

13            THE COURT:  Let me hear from the defendants.

14            MR. COMPTON:  This is John Compton for Meridian Public

15  Schools, Your Honor.  We have no problem with having Dr. Carter

16  take the stand and testify as to the matters in her affidavit,

17  if that's what the court would like for the District to do.

18       The District would object to the community members

19  testifying on the impact on students and family members.  This

20  is not a -- this is really not a desegregation issue.  The

21  District is over 90 percent African American now, and the

22  court -- I don't think that's a decision for the court to make,

23  whether or not it's proper to close this school, since it has

24  no effect on desegregation, or there is no desegregation issue.

25       Thank you, Your Honor.

1          THE COURT:  Anybody else wish to be heard on this?

2    Amy Carter?

3       All right.  We are going to proceed along the lines

4    proposed by Mr. Cusick.

5       So then let's deal with the testimony of Dr. Carter.  And

6    so the defense is calling Dr. Carter; is that correct?

7          MR. COMPTON:  Yes.  Yes, Your Honor.

8          THE COURT:  We have a court reporter.  He is maybe not

9    viewable by all of you, but we do have a court reporter who is

10   party to the line.

11      So then let's make sure we keep our voices up so that Fred

12   can discern all the voices and the testimony.

13      So, counsel, why don't you go ahead then and begin your

14   examination of Dr. Carter.

15         MR. COMPTON:  Is she going to be sworn in, Your Honor?

16         THE COURT:  Yes.

17      And so, Terri, swear in Dr. Carter.

18         THE CLERK:  Would you raise your right hand.

19

20

21

22

23

24

25

1        AMY CARTER,

2        having been first duly sworn, testified as follows:

3                        DIRECT EXAMINATION

4   BY MR. COMPTON:

5   Q.   Dr. Carter, for the record, would you state your name.

6   A.   Yes.  My name is Amy Carter.

7   Q.   What is your current position?

8   A.   Superintendent, Meridian Public School District.

9   Q.   And how long have you been in that position?

10  A.   I have been in this position since 2016-2017 school year.

11  Q.   Did you have an opportunity to read and review an

12  affidavit dated yesterday?

13  A.   Yes, sir, I did.

14  Q.   Do you have that, a copy of that affidavit in front of

15  you?

16  A.   Yes, sir.

17  Q.   The information that is in that affidavit and sworn to you

18  being correct, is it still correct today?

19  A.   Yes, sir, it is.

20  Q.   Is this information that you have at your disposal as the

21  superintendent of the school district?

22  A.   Yes, sir.

23          MR. COMPTON:  Your Honor, we would tender the witness

24  for cross-examination.

25          THE COURT:  Okay.

1        Counsel?  Mr. Cusick?

2        MR. CUSICK:  Yes, Your Honor.  We anticipate that

3    certainly cross-examination might be a little slightly longer

4    than the direct was because we otherwise have only just

5    received this declaration less than 24 hours ago, and there are

6    several questions that deal with the foundation of some of the

7    points and assertions within it, as well as other documents

8    that were provided to that.  So we -- with this in mind, we

9    just ask the court's indulgence for a little bit more leeway

10   with this cross-examination so that we can get to these points

11   because we're not in the traditional bounds of formal discovery

12   where we might have had an opportunity to depose Dr. Carter or

13   had advance notice to go over this in the meantime.

14        THE COURT:  Go right ahead.

15        MR. CUSICK:  And one other issue, Your Honor, in

16   addition to Dr. Carter's affidavit we'd also like to propose

17   one additional exhibit.  It's a letter dated July 7th, 2022

18   that Dr. Carter sent to the private plaintiffs and the

19   Department of Justice.  And if it's easier, I'm happy to pull

20   that up on to the screen and then we can share a copy of it

21   with Your Honor after the hearing and the courtroom deputy, if

22   that works for you, or happy to proceed in whatever manner

23   that's necessary.  We just have a couple of questions and just

24   wanted to use this because it's the basis that informs how we

25   got here today.

1          THE COURT:  Handle the matter as best suits your

2    expected examination.

3          MR. CUSICK:  Thank you.

4          THE COURT:  Go ahead and start.

5            (Indistinct female voice.)

6          MR. CUSICK:  All right.  Go ahead.

7                         CROSS-EXAMINATION

8    BY MR. CUSICK:

9    Q.   Good afternoon, Dr. Carter.  It's good to see you again.

10   A.   Hello.  How are you this afternoon?

11   Q.   I'm good, thank you.

12        And so I'm just going to ask some questions about what was

13   included in the defendants' briefing, your declaration, and

14   then some of the conversations that we've had with you over the

15   past couple of weeks.

16        I want to begin and turn your attention first to a letter

17   that is dated July 7th from you to the United States Department

18   of Justice and the Legal Defense Fund.  Can you see that on

19   your screen okay?

20   A.   Yes.

21          MR. CUSICK:  And so I'm showing a copy of that

22   document that perhaps will be marked as Exhibit 1 for

23   identification purposes, Your Honor?  If that works.

24          THE COURT:  That's fine.

25        (Exhibit D-1 marked for identification only.)

1    BY MR. CUSICK:

2    Q.   Dr. Carter, do you recognize this document?

3    A.   Yes, I do.

4    Q.   And what is it?

5    A.   It is a letter that was crafted to the Department of

6    Justice and the Legal Defense Fund on the District's behalf.

7    Q.   When you say crafted, does that mean you wrote it?

8    A.   Yes.  Initially I wrote a letter to our attorneys, and

9    they in turn forwarded the letter to the Department of Justice

10   and the Legal Defense Fund.

11   Q.   And I'm now going to Page 2 of the PDF.  Is that your

12   signature at the bottom?

13   A.   Yes.

14   Q.   Is it fair to say that you sent this letter on behalf of

15   the District?

16   A.   Yes.

17   Q.   And I'll quickly just give you an opportunity to look at

18   the first page and then the second.  Is this a fair and

19   accurate copy of that letter?

20   A.   Yes.

21        MR. CUSICK:  Your Honor, we'd move this letter into

22   evidence.

23        THE COURT:  Any objection?

24        MR. COMPTON:  No, Your Honor.

25        THE COURT:  All right.  It is accepted into evidence

1   as, let's see, could this be P-1?

2          MR. CUSICK:  That works for us, Your Honor.

3          THE COURT:  All right.  Then P-1 is admitted.

4      (Exhibit P-1 admitted.)

5          THE COURT:  All right.  Go ahead.

6          MR. CUSICK:  Thank you.

7   BY MR. CUSICK:

8   Q.   Dr. Carter, this was the first time that the District

9   informed private plaintiffs of the decision to close Carver;

10  correct?

11  A.   According to the date on the letter, yes, sir.

12  Q.   At that point, on July 7th, the decision to close Carver

13  had already happened?

14  A.   The recommendation to close Carver had already been sent

15  to the Board of Trustees and the Board of Trustees at that time

16  had already approved the recommendation of the District.

17  Q.   And that was a recommendation you made?

18  A.   Yes, sir.

19  Q.   That was a recommendation you made on May 26th, 2022?

20  A.   Yes, sir.

21  Q.   And they voted unanimously to accept your recommendation?

22  A.   Yes.

23  Q.   By July 7th the District had already began to inform

24  parents of students' potential reassignment from Carver to one

25  of the other two middle schools; correct?

1    A.    Correct.

2    Q.    Similarly, they also had plans to hold open houses at the

3    two other middle schools for students from Carver; correct?

4    A.    Correct.

5    Q.    You began considering the option of potentially closing

6    Carver in approximately February of 2022; correct?

7    A.    In February of 2022 we started looking at teacher

8    vacancies.  We started looking at return number of contracts.

9    We spoke with the school administration at that time just to

10   see how the District can continue to support school

11   administration in the efforts to fill those vacancies.

12   Q.    Was the potential option to close Carver a consideration

13   at that time?

14   A.    As a school district with declining enrollment, we have

15   looked across the board at the possibility of consolidating

16   schools.  So at that time Carver was one of those schools that

17   we were looking at, along with any other school across the

18   District that had a number of vacancies.  The decision to close

19   Carver was not final until we got into late spring.

20   Q.    At that time were you considering closing or consolidating

21   one of the other two middle schools, either Magnolia or

22   Northwest?

23   A.    We had over the course of the last few years in watching

24   the declining enrollment with Magnolia, because their numbers

25   were declining as well.  We also looked at Carver's numbers.

1   We looked at Crestwood Elementary School.  We looked at Harris.

2   We've looked at schools across the District because of the

3   declining enrollment numbers.

4   Q.   Before your recommendation on May 26, did you meet with

5   parents or community members to outline your proposed

6   recommendation?

7   A.   No, we did not.  We were hoping that we would be able to

8   fill those vacancies and not have to do any consolidations at

9   this time.  We knew that there was a possibility that we would

10  be in a position to go forward with a school bond issue, and so

11  we had been advised that any type of closures or consolidations

12  could hurt those chances.  So it wasn't my intention or my

13  desire to close any school prior to going forward.

14          THE COURT:  Excuse me, Dr. Carter.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  We lost connection there for a moment.

17      I don't know if anybody else was affected, but do we have

18  everybody back on the line that was here before?

19          MR. CUSICK:  Or I'll ask it another way:  Are we

20  missing anybody now?  Your Honor, this is John Cusick on behalf

21  of private plaintiffs.  We're here, at least everyone else

22  looks visible, but Your Honor's screen went black.  I don't

23  know if you can hear us, but we cannot hear you if you're

24  trying to speak.  John Compton from Meridian Public School

25  District is still on the call.

1    (Discussion off the recrd about the court having a power
surge.)

2    THE COURT:  All right.  Let's go back on the record.

3    MR. CUSICK:  All right.

4    THE COURT:  And, Mr. Cusick, can you pick up from

5    where that spot was?

6    MR. CUSICK:  Yes.

7    THE COURT:  We're going to keep our IT guy here so

8    that we can try and make the necessary adjustments as fast as

9    possible.

10    I would do it, but I just want him to go ahead and show

11    his expertise at it.  And since, you know, we hire him for

12    this, then I want him to feel needed, so I won't go ahead and

13    apply, you know, my considerable knowledge to this matter

14    because he just told me not too long ago how to cut the machine

15    on.  But I'm a fast learner.  I at least cut it on now.

16    So -- well, maybe I didn't cut it on.  Keithfer, do I cut

17    it on?  He said I don't cut it on.  He's just a hater.

18    But anyway, let's move from that point on, Mr. Cusick,

19    okay?

20    MR. CUSICK:  Yes, Your Honor.

21    THE COURT:  Go ahead.

22    MR. CUSICK:  Happy to, Your Honor.

23    BY MR. CUSICK:

24    Q.   Dr. Carter, just to see if I recall.  I believe I had

25    asked you whether you sought any community input before making

1   your recommendation on May 26th to the board, and I guess I'll

2   ask the same question again.

3   A.   Yes, sir.  I was explaining prior to the disconnection

4   that it was not our intention to close any schools for the

5   2022-23 school year.  But as with any school district in the

6   state, the nation, many of us are facing challenges with

7   teacher shortages, and so in looking across the board I started

8   to see that I had a large number of vacancies at Carver Middle

9   School, along with it having the lowest enrollment of the

10   two -- of the three middle schools at the time.  And so in

11   meeting with the team we started saying if we could collapse

12   some of the required -- some of the classrooms, could we

13   possibly ensure that every child got a certified teacher in

14   front of them?  And so as time was going on and we continued

15   our recruitment efforts, late May was when I did make the

16   decision to recommend that Carver close.

17        So your question was originally, did we seek community

18   input prior to that decision?  No.  My goal was not to have to

19   make that decision.  Not for this school year.

20   Q.   You would agree it would have been helpful to inform

21   community members in making such an important decision like

22   closing the school before making a recommendation?

23   A.   It would have been ideal if we could have had a lift -- it

24   would have been ideal if we could have had some community

25   meetings.  Because you always want to involve your community

1    anytime you're making decisions regarding schools, anything

2    that impacts the public.

3        But I will say schools are in unique times right now.

4    Ideally we could be able to go out to the same community and

5    say, hey, we need 25, 30 teachers, and being in this community

6    as long as I have, I've done that.  I've reached out and said,

7    Hey, we need tutors, we need teachers, retired educators, but

8    COVID itself kind of had an impact on this and we just got to a

9    point where we went, we're responsible for educating children

10   and making sure we give them every equitable opportunity we can

11   to ensure that they get a quality education.  So to put a bunch

12   of substitutes, to continue to pull staff, stretch staff

13   thinner than they were already stretched, I started to question

14   what's more important?  And that's ensuring that kids get a

15   quality education from a qualified teacher.

16   Q.   Dr. Carter, but it would have been helpful for

17   transparency purposes to seek input from community members;

18   correct?

19   A.   What you're saying, transparency is what we pride

20   ourselves on.  We didn't hide anything.  We had conversations

21   at school board meetings.  So being able to -- if we had plenty

22   of time, I would have loved to have had a series of community

23   meetings.  I would loved to have been able to say, Hey, guys,

24   we have this, but again, it was trying to make sure we gave

25   every child a qualified teacher prior to the start of the

1   '22-23 school year.

2       I think I talked with the attorneys not long ago and I

3   shared, we still have declining enrollment and we're struggling

4   like other school districts are with vacancies.  So I would

5   love it if the next time we have to make a decision like this,

6   we can have a series of community meetings, and I shared that

7   would be my desire going forward.

8   Q.   Dr. Carter, my question was just it would have been

9   helpful for transparency purposes; correct?

10  A.   Yes.

11  Q.   And it would have been helpful because community members

12  might have had unique perspectives at the board or you might

13  not have been aware of regarding a school closure; correct?

14  A.   Those community members that have been involved in the

15  school district, yes.

16  Q.   And could you explain why it would be beneficial if you

17  were to make a similar decision on why you would want to have

18  community engagement?

19  A.   Well, ideally, any community, school districts are a

20  reflection of their community, I'll say that.  And so you

21  always want as much input and partnership and engagement as you

22  possibly can.  Sometimes you have to make tough decisions.  As

23  I shared with the attorneys, and I'll share with this

24  community, I'm a proud educator of Carver Middle School.

25  That's the reason I'm in Meridian Public School District.  So

1   if I had my choice, that would have not been the school I would

2   have closed simply because that is where I got my start in this

3   school district.  And I always pay homage to my principal who

4   is on call right now.

5       Forgive me for going in that direction, Judge, but I

6   needed to.

7       But ideally you want that engagement, you want that input,

8   but again it came down to these were dire times, we're trying

9   to make sure that every child had a quality teacher.

10  Q.   I'll pull it back on the screen.  I realize when we went

11  off for a moment that the letter had pulled down.  Can you see

12  that again, Dr. Carter?

13  A.   Yes, sir.

14  Q.   And here, on Page 2, the first sentence I've highlighted,

15  and it reads:  The board felt it was educationally sound and

16  made economic and practical sense to close one school, and if

17  you draw attendance zones to support one middle school across

18  the campuses, do you see that?

19  A.   Yes, sir.

20  Q.   Did you recommend at all during the conversation with the

21  board on the potential of closing one of the other two middle

22  schools?

23  A.   Would you repeat your question, sir?  I'm sorry.

24  Q.   Did you at all during your conversation with the board

25  propose or recommend closing one of the other two middle

1  schools instead of Carver?

2  A.   No, I did not.  I looked at the enrollment numbers, and I

3  looked at the proposed number of vacancies.

4  Q.   So I now want to go down for a moment to the paragraph

5  here at the end, the last sentence that reads the 2021-2022

6  enrollment data of each of the District's middle schools.  Do

7  you see that, Dr. Carter?

8  A.   Yes, sir, I do.

9  Q.   And then at this point if you go down to Carver Middle

10 School and all the way to the right of the column under Total

11 you see 274 students?

12 A.   Yes, sir.

13 Q.   And then if you go to Magnolia in the middle column and

14 then go all the way -- or the middle row, and then go all the

15 way to the last column you see it says 292 students?

16 A.   Yes.

17 Q.   And so when was this data produced for the letter dated

18 July 7th, 2022?

19 A.   This data was pulled by our data clerk in the District,

20 and so this information would have been pulled at some point

21 during the latter part of last school year.  I don't have an

22 exact date before me, I'm sorry.

23 Q.   And I know at one point we discussed your ability to teach

24 math, and so you'll have to help me if I mess up here.  But the

25 difference in enrollment between Magnolia and Carver is just 18

1  students?

2  A.    According to this data, yes, sir.

3  Q.    And this is school district data?

4  A.    Yes.

5  Q.    Do you have any reason to doubt its accuracy?

6  A.    No.

7  Q.    And then so in the next portion it says the projected

8  middle school enrollment for 2022-2023 is, and then there is a

9  table that follows.  Do you see that?

10  A.    Yes.

11  Q.    Could you explain the process for projecting middle school

12  enrollment?

13  A.    The process for projecting middle school enrollment is to

14  be able to plan for the number of teachers that you need at

15  each grade level and each subject to be able to look at the

16  amount of staff members that we need for each grade level.  So

17  you basically take the number of students that you have in a

18  current grade and you project or you roll that number of

19  students forward is what you do.

20      And so for us we were looking at vacancies not just at

21  Carver but at all three of our middle schools, and so looking

22  across the board at those vacancies, looking at the fact that

23  if we were to collapse the smallest middle school, we could

24  cover vacancies at the two other remaining middle schools with

25  certified teachers.  Because sometimes I would hit classrooms

1   or I would visit classrooms and I would see seven, eight, 10

2   kids in them, but there would be a sub in that particular

3   classroom.  And so in that building itself we would collapse

4   those classes and sometimes put the classes together which

5   would not result in any larger classrooms, but at least a child

6   would have a certified teacher before them.

7   Q.   And could you explain how the projections, I guess it

8   would be entering sixth graders, was determined, how you would

9   make those projections?

10  A.   I'm sorry.  They were determined by the previous number of

11  fifth graders that were projected to be promoted to sixth

12  grade.

13  Q.   And is it purely based on just the enrolled tenth graders

14  or is that -- are there any estimates?

15  A.   It's pretty much the enrolled fifth graders.

16  Q.   And I promise I'm not trying to have you do a math test

17  here, but if you add up the total in the 2021-2022 column for

18  Carver, Magnolia and Northwest, my calculation has it coming

19  out to 966 students for all three schools?

20       Do you have that as well?

21  A.   Oh, I didn't do the math.  I didn't realize I was

22  responsible for doing that.

23  Q.   I can represent to you --

24  A.   I was waiting on your next question.  I'm sorry.

25  Q.   I'm happy to represent that to you, but I also -- I know

1   that you have taught math, so I don't want to try to sneak

2   anything by.

3   A.   Attorney Cusick keeps reminding me, guys, and I shared the

4   example that because of COVID and shortage in teachers, there

5   was a day where I had to go as superintendent and teach a math

6   class, and I explained to him, I'm typically an English

7   teacher, so he keeps referencing that, and I think people on

8   the call know what he's referencing.

9        I'm sorry.  Go back to your question.  I'm sorry.  I

10  apologize.

11  Q.   Sure.  The total for Carver, Magnolia and Northwest for

12  the 2022 enrollment as of July 7th totals 967 students?

13  A.   Based on your math, I'll take it.

14  Q.   Sure.  And then the chart for 2022-2023, the total for

15  Magnolia is 469 students and the total for Northwest Middle is

16  574 students.  Do you see that?

17  A.   Yes, I do.

18  Q.   And that combines for 1,043 students; correct?

19  A.   Based on your math.

20  Q.   And so there is an increase of about more than 75 students

21  from the projections from 2021-2022 to 2022-2023.  Do you see

22  that?

23  A.   Based on your math, yes, sir.

24  Q.   Did you at all conduct any projections of whether those

25  increases would have had greater enrollment at Carver Middle as

1  opposed to Magnolia for 2022-2023?

2  A.   No.  Based on trend data, we have declining enrollments

3  that are showing up at the feeder schools that feed into

4  Carver.

5  Q.   Then is it possible that Carver for the 2022-2023 could

6  have had equal or more student enrollment than Magnolia?

7  A.   Based on the declining enrollment numbers that we tend to

8  see at those feeder schools, I would say, not looking at data

9  and not looking at any historical trend information, that that

10  wouldn't happen.

11  Q.   But it is possible?

12  A.   If I could look at the data I could tell you that, but

13  based on the trend information I wouldn't necessarily agree

14  with that statement, no, sir.

15  Q.   Do you have access to that data?

16  A.   Not right offhand, no.

17  Q.   Is that something you could produce to the court for those

18  trends and projections so we could make an assessment of what

19  the enrollment would be at Carver Middle School for 2022-2023?

20  A.   If the court requested that information, we could.

21  Q.   I'm going to pull down this document, and I don't know if

22  it's easier, Dr. Carter, for me to pull up your declaration or

23  if you have it in front of you, if that's easier, I'm happy to

24  do whatever works best.

25  A.   Whatever you prefer.  I can work with it either way.

1    Q.    Sure.  And so is there anything that you submitted in your

2    declaration that is new information that you could have not

3    otherwise provided in July of 2022?

4    A.    No, sir.

5    Q.    And so you could have submitted this same declaration in

6    July?

7    A.    I believe I could have.

8    Q.    I now want to turn to Page 4 of your affidavit, Paragraph

9    9.  This begins with Throughout the summer of 2022.  Do you see

10   that?

11   A.    Yes, sir.

12   Q.    And then the fourth sentence begins with On June 16th,

13   2022 the school board president, board secretary and district

14   administration also met with the coalition to hear and address

15   concerns about the consolidation.  Did I read that accurately?

16   A.    Yes, sir, you did.

17         And I want to clarify for you, attorney, as well as the

18   court, I was not in attendance at that meeting due to the death

19   of my father.  So there were district representatives there.  I

20   just was not one of them.

21   Q.    Sorry to hear.

22   A.    Thank you.

23   Q.    Even though you weren't there, would this have been the

24   first meeting that school officials and the board had with

25   community members regarding the recommendation to close Carver

1   Middle School?

2   A.   Right offhand, I don't know if that would have been the

3   first meeting.  I know there were meetings where the coalition

4   attended school board meetings.  I also met with a couple of

5   representatives from the coalition.  So I don't know if that

6   June 16th meeting would have been the first meeting.  I would

7   have to look at a time line to affirm that or deny it.

8   Q.   For drafting this paragraph, what did you go back to to

9   recall these dates?

10  A.   I went back to dates on my calendar.

11  Q.   And did you come across any dates on your calendar meeting

12  with community members about the closure?

13  A.   The dates that I included regarding the closure, regarding

14  Carver, regarding facility updates, those are the dates that I

15  included, yes, sir.

16  Q.   So it would be fair to say you did not come across any

17  meetings on your calendar before June 16th regarding --

18  A.   I didn't -- I'm sorry.

19       I didn't go back and include any board meetings of that

20  nature, no, sir.  I just included the meetings that I either

21  had knowledge of or the meetings that I attended.

22  Q.   Do you know how many board meetings there were between

23  May 26, the special board meeting, and June 16th?

24  A.   Oh, gosh.  Right offhand, I don't want to speak for the

25  record how many there were.

1    Q.   Would those have all been public meetings?

2    A.   Yes.

3    Q.   In the first part of the sentence it reads, Throughout the

4    summer of 2022 citizens had multiple opportunities to provide

5    input and express concerns regarding facilities upgrades and

6    changes.  Did I read that correctly?

7    A.   Yes.

8    Q.   And concerns regarding facilities upgrades and changes

9    were not focused on the Carver closure; correct?

10   A.   I started off those meetings, and I just simply called it

11   addressing the elephant in the room.  And so I felt like it was

12   important to go ahead and address what many people came to the

13   meeting to discuss.  So the first meeting I remember addressing

14   it.  The second meeting we had representatives there.  The

15   third meeting we had a very passionate discussion about it.

16   Q.   But the discussion primarily focused on upgrades to

17   Northwest and Magnolia middle schools; correct?

18   A.   As well as the rationale for the closure of Carver as well

19   as the upgrades to the other facilities, along with what

20   upgrades would come to Carver's building as well through ESSER

21   funding or COVID relief funds.

22   Q.   Including the building of a softball field at the high

23   school?

24   A.   Clarify your question, sir.

25   Q.   The discussions included the building of a softball field

1  at the high school?

2  A.   Yes, sir.  That was part of the facility upgrade

3  discussions, yes, sir.

4  Q.   And there was no discussion about potentially using funds

5  to address the teacher shortage instead of addressing

6  facilities upgrades; correct?

7  A.   None of the -- none of the funding sources that are

8  discussed can be used for personnel.  The COVID relief funds

9  can be used for upgrades or to HVAC.  The bond funds can only

10  be used for buildings.  So none of these funding sources can be

11  used for personnel.  And that was not the purpose of those

12  meetings.

13  Q.   Roughly, do you know how many students Magnolia holds?

14  A.   Roughly, you mean now?  Or roughly the enrollment data

15  show roughly around 280, 290ish.

16  Q.   And how about at Northwest?

17  A.   In Northwest, typically around four-something.  Again I

18  can go back to my numbers or the letter that you showed and

19  recite those exact if you need me to.

20  Q.   Do you recall how many renovations Carver has had over the

21  past 10 years?

22  A.   I know that Carver is the one school that has air

23  conditioning in the middle school gym, but right offhand I

24  can't tell you a list of renovations that have happened at

25  either of the middle schools.

1    Q.   Are you expecting upcoming renovations at either Magnolia

2    and Northwest schools?

3    A.   Yes.

4    Q.   And during those renovations do you anticipate students

5    being housed back at Carver Middle School?

6    A.   Possibly.

7    Q.   When will those occur?

8    A.   We're still working through those timelines and I'm not

9    exactly sure.

10   Q.   And so you'll have to reassign some teachers to Carver

11   during that period?

12   A.   What we will do is relocate an entire school if there is a

13   need to relocate students.   Relocate grades.

14          THE REPORTER:   I'm sorry.   Say that again.

15          THE WITNESS:   What we would have to do is relocate

16   particular grades or wings or students for a particular school

17   if the need arises.

18   BY MR. CUSICK:

19   Q.   And is if that need arises there is a possibility that

20   some students at either Magnolia or Northwest Middle School

21   will go to Carver for a certain portion of time?

22   A.   That's a possibility.   What we would do is relocate that

23   entire grade or that entire wing or school, if need be,

24   depending on the scope of the renovations, and depending upon

25   when they take place.

1  Q.   And I want to talk a little bit about the teacher shortage

2  that was discussed.  In your declaration you mentioned that's a

3  challenge for schools across the nation; correct?

4  A.   Yes.

5  Q.   Including district-wide in Meridian?

6  A.   Yes.

7  Q.   And I know in your declaration you outlined some steps

8  that the district has taken that will recruit teachers;

9  correct?

10  A.   Yes, sir.

11  Q.   When the teacher -- when the district recruits a teacher,

12  each teacher serves the district, not a particular school;

13  correct?

14  A.   Correct.

15  Q.   Is there a unique challenge to teachers being hired at

16  Carver compared to other middle schools?

17  A.   When you say a unique challenge, what do you mean,

18  exactly?

19  Q.   Is it harder to hire teachers at Carver Middle School as

20  opposed to Northwest or Magnolia?

21  A.   In some cases.  And that same challenge would be prevalent

22  at hiring teachers at Harris Upper compared to a Crestwood.

23  But I will say across the board we found that it tends to be a

24  struggle.  So we've offered signing bonuses, a finder's fee,

25  coverage of forces for teacher assistants to go back and become

1    certified.  Across our state we're not turning out as many

2    licensed teachers as we did years ago, and so we have been very

3    creative with partnering with Mississippi State and William

4    Carey to do what we call roll-your-own programs to be able to

5    recruit people that can come in and be part of Meridian Public

6    School District.  People who live in our city, people who are

7    committed to coming and staying and being here.

8    Q.   So is the teacher shortage equal among the three middle

9    schools for recruitment purposes?

10   A.   When you say the teacher shortage equals, I would say that

11   this past year we had vacancies at all three of our middle

12   schools in core subjects.  It just so happens that Carver had

13   the largest number of vacancies this past year.

14        The past two years, or the two COVID years, the State

15   Department waived requirements and allowed school districts to

16   allow people to teach on emergency license, and so as COVID

17   started to move away, school districts were working diligently

18   to support their educators in getting the requirements in place

19   to become licensed teachers.

20        So it just so happens as we went back and we looked at the

21   data, we saw that we had educators who could not meet that

22   requirement, or educators who relocated for personal reasons,

23   or educators who requested to transfer to other campuses for

24   whatever reason.

25   Q.   In your declaration in Paragraph 5 you talk about and you

1   state the district has had particular difficulty with teacher

2   recruitment at Carver Middle School.  Do you see that?

3   A.   Yes, sir, I do.

4   Q.   And so my question is why has there been a particular

5   difficulty with teacher recruitment at Carver Middle School?

6   A.   Well, I would say as with any school that struggles with

7   performance, sometimes it's challenging for an educator

8   committing and staying there.  Sometimes the engagement or the

9   environment from families is not as active as it may be in some

10  schools.  For us at Carver Middle School sometimes the

11  perception or the reputation may not always be as positive at

12  one middle school over the other.  And I'm saying these are

13  perceptions simply because I believe my children at Carver are

14  just as intelligent and amazing as the kids at the other two

15  middle schools, but sometimes you tend to fight perception.

16       I need to be blunt and say the perception of hiring

17  teachers to work in Meridian Public School District because of

18  a consent order tends to get in the way when we go to

19  recruitment fairs.  Sometimes there are discussions where

20  people will say You don't want to go to Meridian, they've got

21  that federal thing over there.  And we've had to counter that

22  and educate people regarding what that is and how it doesn't

23  hinder what we're trying to do to educate children.

24  Q.   So I heard you say three factors for the reason why it's

25  particularly difficult, performance, engagement and

1  perceptions?

2  A.   Yes.

3  Q.   Do I have that right?

4  A.   Yes, sir.

5  Q.   And so engagement, do you mean engagement with members of

6  the community?

7  A.   No, I mean engagement on behalf of parents being actively

8  engaged in supporting their children, making sure they get

9  there on time, making sure when teachers phone and they need

10  support, that they're there.  And I'm not being fearful about

11  parents, so I don't want people on this call to get off this

12  and say Dr. Carter was criticizing parents on the call.  That's

13  not what I'm saying.  I'm just saying sometimes it's easier

14  when you're working in the elementary school or you're

15  perceived to work on a certain side of town that the support is

16  more prevalent than it is on the other sides of town.

17  Q.   So just to be clear, one issue why it's particularly

18  difficult with teacher recruitment is because of the perception

19  that there is less engagement with parents at Carver Middle

20  School?

21  A.   Yes, that could be one, yes, sir.  That is one.

22  Q.   And when you said "side of town," what were you referring

23  to?

24  A.   Well, sometimes there are perceptions in a community that

25  people tend to think if you live on certain sides of town, that

1   resources are more plentiful, or if you live on certain sides

2   of town and you're educated on certain sides of town, that the

3   quality of education is better.  So, again, I believe these are

4   perceptions.

5   Q.   Is there a perception that the quality of education at

6   Carver is not equal to the other two middle schools?

7   A.   I think it would be -- it would depend on who you talked

8   with or who you spoke with sometimes.  That may be a

9   perception.  We've tried to ensure that the same opportunities

10   are available for our children at Carver as the other two

11   middle schools.  We've worked diligently to try to make sure

12   that course offerings are no different, that reports are no

13   different.  We transferred teachers into Carver just to make

14   sure that there were not situations where courses were offered

15   on one side of town and not the other side of town.  So we work

16   diligently to make sure that we don't feed into those

17   perceptions of the school district.

18   Q.   Is there a perception that the side of town Carver serves

19   is not as affluent as other parts?

20   A.   Yes, sir.

21   Q.   And that's shared by teachers?

22   A.   No.  Not from my standpoint.  I would say no.

23        And, again, being a teacher at Carver, I saw no

24   difference.  And I try to ensure that my staff members don't

25   either.

1   Q.   I heard you mention that the district has offered signing

2   bonuses for district hires; is that right?

3   A.   Yes.

4   Q.   And those were offered prior to the onset of COVID, too;

5   correct?

6   A.   Yes.

7   Q.   And that's ongoing now?

8   A.   Yes.  And at times it's as funding is available, yes, sir.

9   Q.   How much has the district paid out for signing bonuses to

10  the extent --

11  A.   That's information -- I'm sorry.  That's information I

12  don't have readily available in front of me.

13  Q.   Do you know how many teachers are hired as a result of a

14  signing bonus?

15  A.   Again, that's information I don't have in front of me.

16  Q.   Would this be information you would be willing to provide

17  the court?

18  A.   Sure.

19  Q.   Do you recall any teachers being hired as a result of a

20  signing bonus?

21  A.   Yes.

22  Q.   Do you recall any of them being hired and working at

23  Carver?

24  A.   Yes.

25  Q.   Do you recall how many?

1    A.    No.

2    Q.    In the last year, how many teachers have you reassigned to

3    Carver?

4    A.    Because we're on the record, I wouldn't want to give a

5    number.  I can recall one in particular because it impacted

6    math.  And, again, that's my favorite example of when I go into

7    Carver with the math students.  So I can't recall most

8    recently -- or the last teacher I reassigned was a math

9    educator, but I can't recall the exact number, no.

10   Q.    Just have a few more different categories to go through,

11   Dr. Carter.  I want to now focus on transportation, which is

12   described in Paragraph 6 of your affidavit.

13         Let me know when you have that up.

14   A.    I do.  I have it available.

15   Q.    And in the second sentence you claim that the distances

16   these students must travel has been minimally affected.  Do you

17   see that?

18   A.    Yes, sir.

19   Q.    Did you conduct any analysis to assess the impacts of

20   travel on students?

21   A.    I got with the transportation department, and what we

22   wanted to know is the number of buses.  We also wanted to know

23   the distance, at this point the number of bus stops.  We just

24   wanted to make certain that we didn't place any undue burden or

25   hardship on our students that may have walked to Carver at one

1  time but now be transported by bus.

2  Q.   Is that a yes, that you conducted assessments?

3  A.   Yes, I would say yes.  When you said analysis, I didn't

4  want to agree to something that we may not have done, so I gave

5  you particular examples of what we looked at regarding

6  transportation.

7  Q.   And those are all written somewhere?

8  A.   When you say written, I can jot them down for you.  There

9  would have been dialogue or conversation back and forth to make

10  sure that we weren't leaving any stones unturned.

11  Q.   Is there some documentation memorializing all those combos

12  and assessments that you and other individuals were making

13  regarding transportation?

14  A.   Estimated miles, number of students on buses, bus numbers,

15  bus stops, yes.  If that's what you're referring to, I can

16  provide that information for you.

17  Q.   That's something you would provide to the court as well?

18  A.   Yes, sir, I can.

19  Q.   In addition to looking at bus stops, number of buses,

20  estimated miles, did you have any conversations with students

21  or community members for how transportation might impact their

22  ability to go to and from school?

23  A.   That came up as a part of some of the discussions in the

24  community meetings, so the goal again was to make sure we could

25  address any concerns.  One of the concerns that came up was how

1   would you ensure that students are transported for after-school

2   programs or for extracurricular?  And so we made certain.  The

3   district had already had a system in place for after-school

4   transportation for students in remedial or tutorial services

5   after school.  So we made certain that we could cover any

6   student athletes, you know, in our -- and I'll just say it, in

7   our city students walking after practices or late evenings is

8   not always the smartest, so we have coaches that drive our

9   students home after practices when they need transportation.

10  So we wanted to make sure that all of those pieces were in

11  place.  We didn't want a student not to participate in the

12  extracurricular activity because they didn't have

13  transportation.

14  Q.   Are all those protocols and policies written down and

15  memorialized?

16  A.   They're just practices that a good district does.  I mean,

17  our coaches know, they take our kids home.

18  Q.   How many coaches, for example, coach the football team?

19  A.   Let me think.  For the record, middle school football?

20  Maybe two.  But I don't want to for the record speak because I

21  don't have that information in front of me about the number of

22  coaches.

23       But typically it's more than one, for sure.  Assistant

24  coach, coach, other positions, depending on the sport.

25  Q.   You referenced having conversations during community

1  meetings; correct?

2  A.   Yes, sir.  And taking feedback at those community meetings

3  regarding concerns, yes, sir.

4  Q.   But that was after the fact of you making the

5  recommendation?

6  A.   Yes.  We had already made the recommendation in May, yes.

7  Q.   So just for clarification, there was no input from

8  community members regarding the impacts on them before the

9  recommendation was made?

10  A.   No, not from community.  Those meetings were held this

11  summer.

12  Q.   You would agree that a number of students in Meridian walk

13  to school; correct?

14  A.   A small number, yes.

15  Q.   That includes students at Carver; correct?

16  A.   Correct.

17  Q.   And a number of students live close to Carver and have

18  been able to walk to school; correct?

19  A.   When you say a number, I would say we have some students

20  that live close to Carver and walk to Carver, yes.

21  Q.   And the school has a number of public housing units within

22  a couple of blocks of the school; correct?

23  A.   Yes, as all of our schools do.

24  Q.   Some of those students now would be unable to walk to

25  school as a result of the consolidation; correct?

1    A.    Correct.  They'll be transported by bus, yes, sir.

2          At some point it's my desire to transport all of the

3    children who desire to have transportation.  Right now we don't

4    transport if they live within a mile of the school, but for

5    safety purposes we would like to put them all on buses and make

6    that available for families.

7    Q.    So you mentioned that the district had to redo the bus

8    routes; correct?

9    A.    Just for the students that attend Carver, yes, sir.

10   Q.    Was there any factors or criteria that the district used

11   as they were redoing bus routes?

12   A.    Basically the transportation director got with the

13   software company, and they made the recommendations based on

14   the routes.

15         We at the first day of school had one, maybe two calls of

16   students who said a bus stop was too far from their home, so we

17   made those adjustments and will continue to make those

18   adjustments for our families as we're made aware of situations

19   like those.

20   Q.    Are you aware whether some Carver students have to walk

21   further to catch a bus than Northwest or Magnolia students?

22   A.    Not to my knowledge, no.  I mentioned that we did get one,

23   maybe two calls.  I know we got two, of a parent who said the

24   bus was four blocks from their home, and the transportation

25   director made that adjustment the first day of school.  And we

1   pushed the stop closer to the home because, again, this was not

2   to cause any hardship to our families, so we'll do what we need

3   to do to accommodate as they make us aware.

4   Q.   Have you become aware of some former Carver students now

5   having to walk more than a mile to catch a bus?

6   A.   Not to my knowledge, other than just the two that we were

7   made aware of.  But we will continue to touch base with

8   families and make sure they know we're prepared to make any

9   adjustments as needed.

10   Q.   Are you aware of some former Carver students being told

11   there isn't a bus in their area yet?

12   A.   No, I'm not aware of that.

13   Q.   In your declaration it is -- the sentence that begins on

14   the last line of Page 2, it says, Students reassigned from

15   Carver to Magnolia have a route increase by no more than

16   3.5 miles.  Do you see that?

17   A.   Yes.

18   Q.   Did you make this calculation?

19   A.   No.  That calculation was provided to me by our

20   transportation department.

21   Q.   Do you know whether students who live in the Western

22   Garden Apartments will have to travel more than 3.5 miles?

23   A.   I don't know right offhand.  I'd have to look.  Wouldn't

24   have a problem Googling it now if I needed to.

25   Q.   So I know we talked a little bit about extracurricular

1    activities.  Outside of coaches providing opportunities for

2    students, if a practice or game goes late, has the district

3    taken steps to have buses available for students who were

4    previously at Carver, for them to go back?

5    A.   Yes, sir.  That is how we transport any students in

6    extracurricular activities, by bus.  So yes, buses are

7    available.

8    Q.   How many buses?

9    A.   I don't know right offhand.  It depends on number of

10   sports at the time, which sports are going back and forth.

11   Each one of the sports have a bus assigned to them at the time

12   to transport their students as needed.

13   Q.   What time are the buses available?

14   A.   They're available after school from whatever time the

15   coaches meet.

16   Q.   And so the buses' availability is dependent upon the

17   coaches' requests?

18   A.   It's dependent on whatever time coach ends his or her

19   practice, yes, sir.

20   Q.   And now I want to talk about Paragraphs 7 and 8 in your

21   affidavit, Dr. Carter.  And specifically in Paragraph 7 it

22   explains how consolidation has allowed the district to

23   accomplish certain goals.  Do you see that?

24   A.   Yes, sir, I do.

25   Q.   And as one, you mentioned the ability to hire three

1  counselors at both Magnolia and Northwest Middle School;

2  correct?

3  A.   Correct.

4  Q.   You would have also been able to hire three counselors at

5  two schools if Carver had remained open in either Magnolia or

6  Northwest if the school is consolidated; correct?

7  A.   Would you repeat your question?  I'm sorry.

8  Q.   You would also have been able to hire three counsels --

9  counselors at two middle schools, including Carver, if instead

10 Magnolia or Northwest Middle School was consolidated; correct?

11 A.   Correct.

12 Q.   And in the second portion you say all middle school

13 students now have access to licensed quality teachers for the

14 entire year; correct?

15 A.   Correct.

16 Q.   This, too, would be true if Carver remained open and

17 either Magnolia or Northwest Middle School was consolidated;

18 correct?

19 A.   Correct.

20 Q.   And then the last one says former Carver students have

21 access to courses at Magnolia and Northwest that were not

22 available at Carver; correct?

23 A.   Correct.  And by licensed teachers, yes, sir.

24 Q.   And if Carver remained open and absorbed resources from

25 either Magnolia or Northwest, that statement would also be

1  true, that they would have access to courses that were

2  previously at Magnolia or Northwest Middle School?

3  A.   Correct.  As long as we were operating two middle schools.

4  Q.   And now if you just want to take a moment to just review

5  for yourself Paragraph 8.

6      Please let me know when you have had an opportunity to

7  review that, Dr. Carter.

8  A.   I have.

9  Q.   And all of these additional supports for a smooth

10  transition would have been available to students transitioning

11  from Magnolia or Northwest if Carver absorbed one of those

12  through consolidation; correct?

13  A.   As long as we were operating fewer middle schools, yes.

14  Q.   And so all the benefits in Paragraphs 7 and 8 would have

15  applied equally to Carver if that school had remained open and

16  absorbed either Northwest or Magnolia Middle School; correct?

17  A.   Correct.  Yes.

18  Q.   Just a few final questions, Dr. Carter.

19      As of Monday Carver Middle School has been officially

20  closed?

21  A.   As of Monday Carver Middle School is not housing students,

22  no.

23  Q.   And students are now being assigned based on the

24  attendance zone maps that you provided to the court?

25  A.   Yes, sir.

1          MR. CUSICK:  Those are all the questions I have.

2     Thank you again, Dr. Carter.  And appreciate the court's

3     indulgence for allowing me to have that flexibility.

4          THE COURT:  All right.  Any additional questions to

5     the witness?

6          MR. COMPTON:  John Compton for the school district.

7     No, Your Honor.  We'd ask that the affidavit of Dr. Carter be

8     admitted into evidence.

9          THE COURT:  Any objection?

10         MR. CUSICK:  No objection.

11         THE COURT:  To the introduction of the document?

12    There is no objection, so the document will be admitted, but I

13    thought that was P-1.  Wasn't that P-1?

14         MR. COMPTON:  That was the letter that Mr. Cusick had,

15    Your Honor.

16         THE COURT:  All right.  So what document are you

17    talking about now?

18         MR. COMPTON:  The affidavit that was attached to the

19    defendants' reply in support of motion to close Carver School.

20         THE COURT:  Okay.  That's what exhibit number?

21         MR. COMPTON:  D-1.

22         THE COURT:  All right.  D-1.

23       There is no objection to D-1?

24         MR. CUSICK:  No, Your Honor.

25         THE COURT:  All right.  D-1 is admitted.

1            (Exhibit D-1 admitted.)

2            THE COURT:  Now, any other questions to Dr. Carter?

3            MR. COMPTON:  None by the school district, Your Honor.

4    John Compton.

5            THE COURT:  Okay.  Thank you.

6            MR. CUSICK:  John Cusick, none by private plaintiffs.

7            THE COURT:  Okay.

8            MS. VAUGHAN:  Aria Vaughan for the United States, none

9    from us.

10            THE COURT:  All right.  Then on your suggestion as to

11    proceeding, Mr. Cusick, you said that you wanted to explore

12    other evidence that might bear on this matter.  What evidence

13    are you talking about?

14            MR. CUSICK:  That's right, Your Honor.  Any other

15    evidence that the defendants intend on introducing for the

16    purposes of this motion, we would just ask that they would

17    present it, if there is anything else, through witnesses, but

18    other than that, Your Honor, we have at least one community

19    member that we would seek to have a brief direct examination of

20    about the impact of the closure and offer that into evidence.

21            THE COURT:  So let me turn to the defense first, to

22    inquire whether the defense has any more evidence to bear on

23    this matter.

24            MR. COMPTON:  No, Your Honor.

25            THE COURT:  Okay.  Then let's move on to -- well, any

1    other party has any other matters that bear on this matter?

2              MS. VAUGHAN:  Nothing from the United States, Your

3    Honor.

4              THE COURT:  I saw you shaking your head, but you

5    didn't say anything.  Okay.

6         Now, then, so that brings us up now to the witness.

7         Mr. Cusick, you said you have one witness.

8              MR. CUSICK:  Yes, Your Honor.  My colleague, Natasha

9    Merle I'll turn to, who will be conducting that direct

10   examination.

11             THE COURT:  All right.  Is counsel ready to conduct?

12             MS. MERLE:  Yes.  Good afternoon, Your Honor.  This is

13   Natasha Merle.

14             THE COURT:  Good afternoon.

15        Who will be the witness?

16             MS. MERLE:  I want to first to start with Ms. Jennifer

17   Dove.  I know she was having issues with her child in picking

18   up her child from school, but, Ms. Jennifer, if you're

19   available now, can you turn on your camera?

20        And if not, Your Honor, we'll move to the next the witness

21   until Jennifer is available.

22        Jennifer, are you available?

23             MS. LOVE:  Yes, I am.

24             MS. MERLE:  Can you hear me?

25             THE COURT:  Are you on the telephone?

1    MS. LOVE:  Yes, ma'am.  Can you hear me?

2    MS. MERLE:  Yes, I can hear you.  Can you hear her,

3 Your Honor, as well?

4    THE COURT:  I can.

5    MS. LOVE:  Okay.

6    MS. MERLE:  You're freezing up.

7    THE COURT:  Ms. Merle, you want to start your

8 examination then?

9    MS. MERLE:  Yes.  Do you want to swear in the witness,

10 Your Honor?

11    THE COURT:  That's why I was asking are you ready to

12 start with her.

13    MS. MERLE:  Yes, sir.

14    THE COURT:  Okay.  Then, Terri, swear in the witness.

15                    JENNIFER DOVE,

16    having been first duly sworn, testified as follows:

17    THE COURT:  Say it again.  I heard part of that.

18    THE WITNESS:  Yes, sir.

19    THE COURT:  Okay.  Ms. Merle, you ready to start.

20    MS. MERLE:  Yes, Your Honor.  Thank you.

21                  DIRECT EXAMINATION

22 BY MS. MERLE:

23 Q.   Jennifer, can you introduce yourself to the court, please?

24 A.   My name is Jennifer Dove, and my son was recently in the

25 sixth grade at Carver Middle School.

1   Q.   And so you reside in the City of Meridian then?

2   A.   Yes, ma'am.

3   Q.   And you said your son was a student at Carver?

4   A.   Yes, ma'am.

5   Q.   And what school is your son assigned to now?

6   A.   Magnolia Middle School.

7   Q.   And did your son start attending Magnolia Middle School on

8   Monday when the school year started?

9   A.   Yes, ma'am, he did.

10  Q.   And were there -- did you or your son -- were there any

11  transportation difficulties for his attendance -- or this week,

12  going to Magnolia?

13  A.   On Monday, as I got ready -- I took him to school Monday

14  morning, and I went in the office, I waited for at least about

15  30 minutes, and then the assistant principal came out because I

16  was having transportation issues from him getting to the house

17  to Magnolia.  And so the assistant principal, she finally came

18  out and she had told me he was going to have to walk to South

19  Washington Court to catch the bus, which was not going to be

20  safe, and that was going to be like a 20-minute walk for him.

21  Q.   And so --

22  A.   And so they told me that I had to move.

23  Q.   Jennifer, are you still there?  I think we lost her.

24       Jennifer?

25  A.   Yes, ma'am.  Can you hear me?

1    Q.    Yes.

2    A.    Sorry about that.

3          And they told me I had to go to the superintendent office

4    so I went to the superintendent office, but the superintendent,

5    when they wasn't letting no one in on Monday, so they told me

6    to call back at 3:00 o'clock Wednesday.  So I just went back up

7    to the school, and when I went back up to the school she was --

8    the assistant principal was still telling me the same thing.

9    So I dropped him off Tuesday, and so Tuesday when they got out

10   of school, she was like he going to have to ride the bus with

11   the high school students, which was fine with me, but he

12   still -- is still from my house to Davis Port, that's still

13   like maybe two or three blocks where he have to go and catch

14   the bus at.

15   Q.    So just backing up a little bit.  So on Monday was there a

16   bus to come pick up your son?

17   A.    No, ma'am.

18   Q.    Okay.  And so -- and then on Tuesday there was also not a

19   bus to come pick up your son?

20   A.    No, ma'am.  I dropped him off.

21   Q.    And then am I correct that you said you were informed that

22   for your son to get the bus, he would have to walk.  You said

23   it was about a 20-minute walk to get the bus?

24   A.    Yes, ma'am.

25   Q.    Okay.  And is it your current understanding that your son

1  will have a bus, but he'll ride the bus with the high school

2  students?

3  A.   Yes, ma'am, now.

4  Q.   Okay.  And were you -- when did you learn that Carver was

5  closing?

6  A.   Maybe it was about the middle of July when I really found

7  out.

8  Q.   Okay.

9  A.   Because I don't really be active on social media.  And

10  they say that's where they had it located at.

11  Q.   Okay.  So you didn't hear from the school other than

12  through social media?

13  A.   That would be it, yes, ma'am.

14  Q.   And did you have concerns -- or what was your -- how did

15  you feel about Carver closing?

16  A.   Well, it was kind of, because I was -- it put me in the

17  middle of a hard rock because I do traveling nursing, and so

18  then by that point I had to try to find someone to take my son

19  to -- back and forth to school, when Forest say he was close to

20  home and he had a ride to take him to school and pick him up.

21  Q.   And then was there -- did you have any feelings about

22  Carver closing?  Was it important the school remain open to you

23  for any reason?

24  A.   Well, it really was because I --

25           THE REPORTER:  I can't understand her.  I'm sorry.

1    Please speak into your phone.

2              THE COURT:  Would you repeat that, please?

3    A.   I said that I have been to that school, I have sisters and

4    brothers and nieces and nephews that have been to Carver, so

5    that was my history thing.  Because when I graduated from high

6    school in 2003, they ended up closing Kate Griffin.  So I had a

7    history with Kate Griffin also.  So here it is now another

8    school closing that I have history with.

9              MS. MERLE:  Okay.  That's all we have for Ms. Dove.

10   Thank you very much.

11        I don't have any further questions, Your Honor.

12             THE WITNESS:  Yes, ma'am.

13             THE COURT:  Okay.  Then any cross-examination of this

14   witness?

15             MR. COMPTON:  Yes, Your Honor.  John Compton for the

16   school district.

17                        CROSS-EXAMINATION

18   BY MR. COMPTON:

19   Q.   Ms. Dove, how did your son -- how was he transported to

20   school last year?

21        Ms. Dove?

22             THE REPORTER:  Looks like she's muted.

23   A.   Okay.  I'm sorry about that.  I didn't know I was muted

24   still.  But he was a car rider because by us staying on Davis

25   Street, they're saying that that was close to Carver, so it

1   wasn't a bus that picks up.

2   Q.   Were you within a mile of the school when you lived on

3   Davis Street?

4   A.   The school was like maybe three -- two, two or three miles

5   at the most.  I'm two or three miles at the most from Carver.

6   Q.   And they didn't provide a bus for you last year?

7   A.   No, sir.  They have never provided a bus over this way.  I

8   never understood that.

9   Q.   Okay.  All right.

10          MR. COMPTON:  I have no further questions, Your Honor.

11          THE COURT:  Any additional questions?

12          MS. VAUGHAN:  This is Aria Vaughan for the United

13   States.  No questions from us.

14          THE COURT:  Okay.  All right.  Is there another

15   witness?

16          MS. MERLE:  Yes, Your Honor.  I would like to call

17   Ms. Tracey Washington.

18          THE COURT:  Miss Casey Washington?

19          MS. MERLE:  Ms. Tracey.

20          THE COURT:  Tracey.  All right, Ms. Tracey Washington.

21          THE WITNESS:  Yes.

22          THE COURT:  Ms. Washington, are you on the line?

23      Yes, I see.  Okay.  You can start the questioning.

24          MS. MERLE:  Okay.

25      Ms. Washington, can you introduce yourself?

1      THE REPORTER:  She needs to be sworn in first.

2      THE COURT:  That's right.  She needs to be sworn in.

3    Terri, would you swear her in?

4      THE CLERK:  Would you raise your right hand, please.

5                    TRACEY WASHINGTON,

6    having been first duly sworn, testified as follows:

7                    DIRECT EXAMINATION

8    BY MS. MERLE:

9    Q.   Thank you, Ms. Washington.  Can you introduce yourself to

10   the court, please.

11   A.   My name is Tracey Washington and I am with the Carver

12   Community Coalition here in Meridian, Mississippi.

13   Q.   And do you reside in Meridian, Mississippi?

14   A.   Yes, I do.

15   Q.   And what is the Carver Community Coalition?

16   A.   The Carver Community Coalition is a group of concerned

17   citizens, parents, retired teachers and former students of

18   Carver that actually formed when we were notified via media

19   that Carver was scheduled to be closed with the consolidation

20   of the middle schools in Meridian Public School District.

21   Q.   Okay.  And so the organization, the Carver Community

22   Coalition, had formed in about June -- May or June of this year

23   then?

24   A.   Yes, in June.

25   Q.   Okay.  And can you describe again your membership.  I know

1    you mentioned that it's some former students.  Can you describe

2    your membership for the Carver Community Coalition?

3    A.   It's a cross-section of the community.  We have parents,

4    we have residents of the neighborhood.  There are retired

5    teachers, other community stakeholders, and, you know, we're

6    open to anyone in the community that would like to be a part,

7    that have concerns about the closing of Carver.

8    Q.   And when you say community, what area of town do most of

9    your members reside, or where are they located?  Where do they

10   pool from?

11   A.   Well, the majority of the members of the coalition -- it's

12   from all over the city of Meridian, but we do have a number of

13   them that reside in the proximity of the school.  Within the --

14   Carver is represented in Ward -- they represent students in

15   Ward 3 and Ward 4, yes.

16   Q.   And when the coalition learned of the closing of Carver,

17   what was the first thing the coalition, that your organization,

18   did?

19   A.   Well, when we initially found out about the closure, there

20   were a lot of questions and concerns from the community.

21   Mrs. Melba Clark Payne actually wrote a letter to Dr. Carter

22   sharing some of those concerns and requested to have a meeting.

23   Q.   And did you have a meeting, or did the coalition have a

24   meeting with Mrs. -- with Dr. Carter?

25   A.   Well, Mrs. Clark Payne and myself had a meeting with

1    Dr. Carter, yes.

2    Q.    And when was that meeting?

3    A.    That meeting was June -- June 6th or -- June 6th, I think.

4    Q.    Okay.  During that meeting, what was discussed?

5    A.    Well, we addressed the letter that Mrs. Clark Payne had

6    written, and Dr. Carter explained that the reason for closing

7    the school was that there was declining enrollment, as she had

8    said earlier, and also that they were unable to fully staff

9    Carver for the upcoming school year.

10   Q.   Was there any conversation -- was there any conversation

11   concerning declining enrollment throughout the District as a

12   whole?

13   A.   It wasn't necessarily discussed at that meeting.  We were

14   particularly concerned about -- about Carver, and which it was

15   I think common knowledge that there was a general enrollment

16   decline across the district, yes.

17   Q.   Okay.  And was there any conversation at this meeting then

18   about the teacher shortage and any ways to address that?

19   A.   Not at that meeting.  Dr. Carter was aware that the

20   coalition was having a meeting of members actually later that

21   evening, so she was -- had opportunity -- she was unable to

22   attend, but she did want to speak to us so that we would be

23   able to, you know, let the group know that we had talked to her

24   and that she had given her reasons for her recommendation to

25   the board.

1   Q.   Was this any conversation concerning closing any of the

2   other two middle schools on the other side of town?

3   A.   No.  The decision was that Carver was closed.

4   Q.   Okay.  After that meeting, what did the coalition -- or

5   what did you do?

6   A.   Later that evening we did have a meeting, that initial

7   meeting with the coalition, and we relayed Dr. Carter's

8   response, and the coalition decided that there were still more

9   questions that we did not have answers to and felt that the

10  community should be able to ask the questions.  So we decided

11  to move forward and have a community-wide meeting where we

12  invited parents and any community residents to be able to share

13  their concerns.  We did also invite representatives from the

14  school board, and there were -- Sally Gray and Ron Turner

15  represented the school board.  Dr. Carter was not present, as

16  she had said earlier, and there were other members from the

17  district, from administration.

18  Q.   And did you testify a minute ago that in the audience

19  there were parents and retired -- or who was in the audience?

20  Was it parents or other people as well?

21  A.   There were -- there were parents, aunts, uncles,

22  grandparents.  A lot of them had either children that were

23  scheduled to go to Carver or some of them had actually gone to

24  Carver themselves.  Also, residents who live in the area that

25  were also concerned what was going to happen with the building

1    if the school closed.  So we had -- there were a little over a

2    hundred people in attendance, but that was inclusive of the --

3    also of the administration members that attended.

4    Q.   And at that meeting were concerns about closing Carver

5    raised?

6    A.   Yes, there were.  A number of concerns.  Parents were

7    concerned about transportation, as was mentioned.  They were

8    also concerned about safety for the students and being able to

9    get to whatever school they were going to be going to back and

10   forth.  We had asked and made them aware.  They did not know

11   that Carver was the newest of the three middle schools, so

12   there was some concern or question why Carver was the one that

13   would be closed because it was not as old and did not need as

14   much repair as Northwest or Magnolia.

15        There was concern about no community engagement, and that

16   the decision was unilateral.  They did not ask for any input or

17   any parents.

18        Dr. Carter had shared that there was -- she had a focus

19   group with some students, but the parents were concerned that

20   she didn't copy any parents.  That how could students then be

21   allowed to make that kind of -- to have that kind of impact on

22   the decision?

23        And we just were -- Carver actually -- closing Carver

24   would leave no middle school on the west or the south end of

25   town.  So we were concerned that there would be no middle

1   school that would represent really half of the city.  And the

2   parents were concerned that they would -- why would the school

3   on, you know, the black side of town be closed and then they

4   would leave the other two schools, which are two miles apart,

5   open?  And that is considered to be more of where the white

6   residents of Meridian live.

7   Q.   So I want to break that up a little bit.

8   A.   Okay.

9   Q.   You said that concerns concerning why Carver, when it was

10  one of the newest of the middle -- or it was the newest of the

11  schools.  Was that -- did the district or the board have any

12  response to that?

13  A.   No, not to that.  Not to that issue.

14  Q.   You said there was also raised why close Carver, which is

15  the only so school that serves the south and west side of town

16  when there's two schools near each other on the northeast side

17  of town.  Was there any response from the school district or

18  school board about that?

19  A.   Not regarding that direct question.

20  Q.   You also mentioned that there was concern about why there

21  was any community involvement expressed, you know, why the

22  community didn't have an opportunity to weigh in.  Was there

23  any response from the school district or the school board as to

24  that?

25  A.   Mrs. Gray did respond to that question, as president of

1   the school board.  She did mention that -- she said that she

2   took full responsibility as president of the board, that they

3   did not consult the community, but if they had to do it any

4   other way, that they would still make the same decision.

5   Q.   Did that -- was there any discussion about closed -- was

6   there any discussion about possibly closing Magnolia or

7   Northwest during this meeting?

8   A.   No.  The only reasons that were given were consistently

9   the same, that there were -- it was declining enrollment, and,

10  also, they didn't have enough certified teachers.

11  Q.   And was it discussed whether -- if one school had to be

12  closed to pool resources, why that couldn't be one of the two

13  schools near each other on the northeast side of town?

14  A.   It was -- we did ask -- well, one of the parents -- one of

15  the attendees did ask that, why the district was not able to

16  reallocate resources if they closed another school than to just

17  move -- to keep Carver open than to just move those -- move

18  those teachers and that staff so that Carver would then -- we

19  would still have two fully staffed schools.  But, you know, the

20  difference between the two schools with the projected

21  enrollment was not that great, but we were just told that

22  Carver was chosen because they had the lowest projected

23  enrollment.

24  Q.   After this -- I'm sorry.  Was this the first meeting -- as

25  far as you are aware, was this the first meeting that the

1   school district or the school board had with the community

2   about the closing of Carver Middle School, as far as you're

3   aware?

4   A.   As far as I'm aware, because we -- Carver Community

5   Coalition actually organized that meeting, and we extended the

6   invitation for them to attend.

7   Q.   And as far as you're aware, has there been any follow-up

8   to address the concerns that was raised at that meeting by the

9   school district or the school board?

10  A.   The specific questions that we asked, that I reiterated

11  earlier, were not specifically addressed.  Again, because

12  the -- there were bond presentation meetings, that was end of

13  June, June 28th, and then there was one at the end of July, and

14  then the August 2nd, but -- that Dr. Carter had mentioned.

15  There she did actually say that, you know, we were -- she

16  addressed the elephant in the room as far as Carver is

17  concerned, but the architect actually ran the presentation, so

18  there really was no discussion about Carver since it was not

19  included with renovations for the bond issue.

20  Q.   And you mentioned that community members or the

21  coalition -- I'm sorry.  You mentioned that the coalition

22  thought it would have been important for the school district to

23  consult the community, is that accurate, before the closure?

24  Isn't that accurate?

25  A.   Definitely.  Because Carver -- Carver is an institution,

1  Carver Middle School is an institution for the black community

2  of Meridian.  And as far as -- and the community of Meridian.

3  And there really was no -- there was no discussion, there was

4  no input, they didn't ask nor to say we're considering closing,

5  would you -- you know, there was no -- they did not let us know

6  that there was any issue of a teacher shortage.  I mean, there

7  had not been any type of outreach to the community as far as

8  the concerns that Dr. Carter had shared.

9  Q.   And so if the school district had reached out to the

10  community perhaps as a community meeting, as an example, do you

11  think that would have made a difference?

12  A.   Well, they would have provided some transparency.  I know

13  that there had been times that community members have assisted

14  in recruiting professionals to move to Meridian.  I'm sure it

15  would not have been any different if there was the need to

16  recruit teachers.  We have had -- and current doctors here,

17  they recruit, recruit doctors and lawyers and other

18  professionals to come here.

19      There is a vast network of community of members in our

20  community who would be able to reach out and to, you know, use

21  those contacts.  But, again, there was no -- no outreach was

22  made to the community.

23  Q.   And why, why is Carver important to the coalition and to

24  the community?

25  A.   Well, as I said, it is -- Carver actually was the black

1    junior high school, you know, when we were operating the two

2    districts.  The district actually authorized a black junior

3    high school to be built.  The school was authorized in 1959 and

4    the building -- the school was built in '66; the students moved

5    in in '67.  So it is -- it has meant a lot to that community.

6         We have many -- and as far as the citizens who say that

7    it's weird, you know, just emotionally attached to the building

8    is really what it represents to us, and the fact that it is

9    servicing an entire half of the town.  And most of those

10   students currently do reside in public housing.

11   Q.   Okay.  Does your organization, the Carver Community

12   Coalition, does it have any plans, you know, whether the court

13   decides the school can close or that the school has to remain

14   open, does your organization have any plans for Carver going

15   forward?

16   A.   Well, the district made the determination that Carver will

17   be used for a central office, but our organization is

18   definitely deciding that we will continue really to be -- to be

19   a watchdog and a supporter of the district and the school

20   board.  We have of a lot of concerns, particularly that there

21   is no representative on the school board who comes from Ward 3

22   or Ward 4, which is where Carver resides.  And that is

23   something that we would take up with the mayor, but there are a

24   lot of concerns.

25        And we also, with us having a number of retired teachers,

1  they have offered to -- to be able to be of assistance to any

2  of the schools that are in the west and south side areas.  So

3  after, you know, we -- you know, there was a bond election, so

4  now that that's over, we're going to kind of shift in reaching

5  out to the district and the other principals for that.

6  Q.    Thank you, Ms. Washington.

7          MS. MERLE:  That's all I have, Your Honor.

8          THE COURT:  All right.  Any questions from anyone else

9  to her?

10         MR. COMPTON:  Yes, Your Honor.  John Compton with the

11  school district.

12                       CROSS-EXAMINATION

13  BY MR. COMPTON:

14  Q.    Ms. Washington, how many members are in the coalition?

15  A.    We have on average about 25 people that have attended our

16  weekly meetings.  We have an additional number of supporters

17  who are unable to attend weekly meetings that we keep in touch

18  with via telephone and text.

19  Q.    And of this group, how many are current parents of

20  students that would be attending Carver?

21  A.    Of the group -- of the group that's currently attending or

22  that are just interested members that participate that come

23  weekly?

24  Q.    Yes, ma'am.

25  A.    Okay.  We probably -- there are at least 10.

1    Q.   Okay.  Did you attend Carver?

2    A.   I did not.

3    Q.   Okay.  And you previously testified that your group, the

4    coalition, wants to support the Meridian Public School

5    District; is that correct?

6    A.   Could you repeat that, please?

7    Q.   I said in your previous testimony you stated that the

8    coalition wants to support the Meridian Public School District.

9    A.   That is correct.

10   Q.   But isn't it true that your coalition actively opposed the

11   recent bond election?

12   A.   We most certainly did because of the lack of transparency

13   in how the bond was put out to the -- the information from the

14   bond was not forthcoming to the community, and the fact that

15   even though it was for capital improvements, there was no --

16   there were no measures or any discussion of academics, and that

17   is apparently a major concern to the community.

18   Q.   Did you attend any of the meetings that were held for

19   discussions on the bond issue?

20   A.   Yes, I did.

21   Q.   How many of those meetings did you attend?

22   A.   Two of the three.

23   Q.   Okay.  And Magnolia Middle School has always been a black

24   majority school, has it not?

25   A.   That's -- I am not aware if it has always been a majority

1   black school.

2   Q.   It's in a minority neighborhood, is it not?

3   A.   It is -- it is in a minority neighborhood; however, it

4   also pulls from students that are right outside of the

5   neighborhood.  There are a number of white residents that

6   live -- or that did -- that lived in that area, that were zoned

7   for Magnolia.

8   Q.   But before -- do you know that before desegregation that

9   Magnolia was the school for African American students?

10  A.   I am well aware, yes.

11  Q.   Okay.

12          MR. COMPTON:  I have nothing further, Your Honor.

13          THE COURT:  Did the bond issue pass or fail?

14          MR. COMPTON:  It passed, Your Honor, with I believe

15  68 percent support.

16          THE COURT:  And when was that?

17          MR. COMPTON:  That was held this past Tuesday.

18          THE COURT:  And was there an organized resistance to

19  the bond?

20          MR. COMPTON:  I saw television ads and billboard ads

21  paid for by the Carver Coalition.

22          THE COURT:  And what was the stated and intended

23  purpose of the bond issue?

24          MR. COMPTON:  Dr. Carter probably can speak to it

25  better than I can, Your Honor.  But it was different upgrades,

1    security.  There is going to be a baseball and softball complex

2    built on Meridian High School campus.  There is no baseball or

3    softball facility for Meridian High School students.  They use

4    Parks and Recreation facilities.  But this will be on the high

5    school campus.

6       And if you want more particular information, I'm sure

7    Dr. Carter will be able to provide that.

8              DR. CARTER:  Your Honor, if I may.

9              THE COURT:  Dr. Carter.

10             DR. CARTER:  Yes, sir.  The bond issue will also cover

11   upgrades to our client labs, to our media, library media

12   centers, to our auditoriums, to our playgrounds on all of our

13   elementary campuses.  The last time the District issued a bond

14   issue was back in 2008, and the average age of our buildings

15   range between 50 and 60 years old.  So the goal again is to

16   upgrade our facilities across the district, with the number one

17   priority being safety and security, and the second part, of

18   course, along with safety being academics, and then the third

19   part is being athletic facilities on campus.

20             THE COURT:  What is the amount of the bond issue?

21             DR. CARTER:  It's a 34 million-dollar no tax increase

22   bond issue.

23             THE COURT:  34 million?

24             DR. CARTER:  Yes, sir.

25             THE COURT:  Payable over how long?

1         DR. CARTER:  I'm sorry, Your Honor.  I didn't hear

2    your question.  I apologize.

3         THE COURT:  Payable over how long?

4         DR. CARTER:  Paid for over how long?

5         THE COURT:  Payable over how long?

6         MR. COMPTON:  Your Honor, I believe it can be paid

7    over 20 years.  We have not gotten to that point as far as

8    issuing the notes or about how long the notes will be, but I

9    believe they can be up to 20 years.

10        DR. CARTER:  Yes, sir.  That's correct.  And the

11   district paid off --

12        THE COURT:  Is that what's contemplated, that the

13   notes could be issued and payable over 20 years at the most?

14        MR. COMPTON:  That's correct.

15        DR. CARTER:  Yes, sir.

16        THE COURT:  Okay.  Thank you.

17      Any other questions?

18      Well, let me hear from Ms. Washington.

19        THE WITNESS:  Yes.

20        THE COURT:  Let me hear from you on this matter.

21      Do you oppose the bond issue?

22        THE WITNESS:  Yes.  Yes, we did.

23        THE COURT:  Okay.  And why was that?  Besides

24   transparency, what were the other reasons?

25        THE WITNESS:  Well, we were -- there seemed to have

1    been, just from my point of view, that there was a plan in

2    place that with Carver closing they would allow -- the bond

3    would allow to renovate two schools.  So there was no place for

4    Carver in the bond renovation.  So our, our coalition was

5    concerned that Carver was being, was being -- basically they

6    had already closed the school and weren't even thinking about

7    the fact, without us having gone through this process, of them

8    being allowed to do it.

9         There were concerns with the -- just the items the

10   district had stated that they did have funds, that they would

11   still go ahead and do the upgrades that were needed but at a

12   slower pace even if the bond did not pass.  So we were

13   questioning the necessity of a bond so large.

14        We felt as though the district was also misleading to the

15   public when they said that there was a no tax increase, when

16   actually they were just substituting one tax with another

17   because they had just paid off the final payment on the bond

18   from 2008 or '09, and then for the rush to go ahead and have

19   this bond election would mean that taxes would not be allowed

20   to go down, that it would just continue on to, again, having

21   this -- a new tax, substituting one tax for another, and this

22   one would be for 20 years.  So those were some of the other

23   concerns that we had, in addition to the transparency, from the

24   district.

25             THE COURT:  Did the bond receive support primarily

1   from one area, as opposed to the resistance of the bond?  In

2   other words, was the support slash resistance concentrated?

3           THE WITNESS:  Your Honor, if you're talking about from

4   different precincts, I think that it actually passed in every

5   precinct minus one.  There is the -- the district actually, you

6   know, put out that this bond was for the kids and that this was

7   for athletics, and you would be able to allow to have -- that's

8   the, in our speaking to the community, why they were supporting

9   the bond.  It was because they wanted to have a new baseball

10  field, and they felt like athletics was the most important.

11  They -- you know, there was not -- we did -- we did actively

12  campaign against them, yes.  We had billboards and television

13  commercials, but the -- there was a concern or there was a

14  general push at the last week that this was -- this was for the

15  kids.  The housing authority actually went on television and

16  had a press conference with their -- the managers of the public

17  housing, which, you know, again the majority of Carver's

18  residents -- the majority of the students at Carver are in

19  public housing, but they went on to say that they were in favor

20  of the bond, as if to say that people -- everyone that resided

21  in public housing was in favor of it, which was not necessarily

22  true.

23          THE COURT:  Okay.  All right.  Any other questions to

24  Mrs. Washington?  Anybody?

25          MS. MERLE:  I just have a brief redirect for

1   Ms. Washington, just one or two questions, Your Honor, if I

2   may.

3          THE COURT:  Okay.  Go ahead.

4          MS. MERLE:  Thank you, Your Honor.

5                    REDIRECT EXAMINATION

6   BY MS. MERLE:

7   Q.   Ms. Washington, you were asked about -- by Mr. Compton

8   whether you went to Carver Middle School.  Do you remember that

9   question?

10  A.   Yes, I do.

11  Q.   And you said you did not go to Carver Middle School?

12  A.   I did not go to Carver.  I did not attend Carver.  My

13  family has a long tradition and history with Carver.  My mother

14  was actually the first secretary at Carver when it was

15  established in 1959, and she taught there for a decade.  My

16  brother attended Carver.  And, you know, we have been involved

17  in the community.  My church is in that neighborhood.  And the

18  family business that I co-own is also in the west side of town.

19  So I -- I did not attend Carver myself, but I have a strong

20  relationship and affinity to this side of town.

21         MS. MERLE:  That's all I have, Your Honor.

22         THE COURT:  Are there any other witnesses?

23         MS. MERLE:  Yes, Your Honor.  Just a very short.

24  Mr. Markham, I just had a handful of questions.

25         THE COURT:  All right.  Who is the witness?

1          MS. MERLE:  Mr. Markham.

2          THE COURT:  You're breaking up on the last name.

3    What's the last name?

4          MS. MERLE:  Markham.

5          THE COURT:  Okay.  Mr. Markham.  All right.  Swear in

6    Mr. Markham.

7          THE CLERK:  Would you raise your right hand.

8                          ROBERT MARKHAM,

9       having been first duly sworn, testified as follows:

10         THE COURT:  All right.  You may proceed.

11                        DIRECT EXAMINATION

12   BY MS. MERLE:

13   Q.   Good afternoon, Mr. Markham.  Could you please introduce

14   yourself for the court?

15   A.   My name is Robert Markham.  I live in Meridian.

16   Q.   And are you part of any organizations in Meridian?

17   A.   I'm a member of the NAACP and also a member of the

18   Meridian Concerned Citizen Coalition.

19   Q.   When you say the Meridian Concerned Citizens Coalition do

20   you mean the Carver Community Coalition?

21   A.   Right.

22   Q.   And have you ever worked for the school district, the

23   Meridian Public School District?

24   A.   Yes, ma'am.  I worked for 40 years at Meridian Public

25   Schools.

1  Q.   And what were your positions at -- in the Meridian Public

2  School District?

3  A.   I came here as a chemistry teacher, chemistry and biology

4  teacher.  And I worked two years at Harris High School during

5  college.  I was transferred involuntarily to Northwest Junior

6  High School for one year.  Then I was transferred involuntarily

7  to Meridian High School for one year.  And then I was

8  transferred to Kate Griffin for 13 years involuntarily.  And

9  assistant principal at Carver Middle School.  I was assistant

10  principal for three years, and for 16 years as principal.  And

11  finally at the end of my career at central office as deputy

12  superintendent.

13  Q.   When did you retire?  I'm sorry.  And after you were

14  deputy superintendent, did you retire from the school district?

15  A.   Well, I was kind of pushed out and retired.

16  Q.   And what year was that?

17  A.   2007.

18  Q.   And you said you were principal at Carver for how many

19  years?

20  A.   Sixteen.

21  Q.   And where is Carver located within the City of Meridian?

22  A.   Carver is located at 900 44th Avenue, surrounded by

23  housing projects and delapidated homes.  I had mire [sic] from

24  Highland Park, shopping centers within walking distance,

25  baby-sitters within walking distance, fast-food places,

1   restaurants, Chinese restaurants, and churches on every block,

2   almost.  And you had a housing project that has a bridge that's

3   in the back housing project that leads to the back door of

4   Carver.  So there are three housing projects that's within

5   walking distance of Carver.  That's J.T. Davis, Frank Berry

6   Court and the Carousel Place.  All three of those were within

7   five minutes walking distance.

8   Q.   And do you know, where is Northwest and Magnolia Middle

9   School located within the city of Meridian?

10  A.   Northwest and Magnolia are both on the east and north side

11  of town.  Carver is on the west and south side.

12  Q.   And are there any differences between the communities

13  where these schools are located?

14  A.   At Carver, on the west and south side, serve mostly black

15  students at this time.  Once upon a time there was about 50/50.

16  Magnolia and Northwest in a different area, the northeast,

17  served mostly white and black.  Probably now it's high

18  percentage of black, but it was in a much better location as

19  far as housing and probably people with high incomes.

20  Q.   And did you have -- did you learn at some point that

21  Carver was being closed?

22  A.   I didn't get the question.

23  Q.   Did you learn at some point that Carver Middle School was

24  being closed?

25  A.   Yes.

1    Q.   And did you have any concerns about the closing of Carver?

2    A.   I had a lot of concerns about the closing of Carver.

3    Q.   And what were those?

4    A.   Well, I wanted to know why Carver.  And that's the

5    question I asked, when Carver was the last school built in the

6    district.  In 1966 it was built.  And I understand it was built

7    to maintain freedom of choice, separate but equal.  When you

8    had -- they tore down Harris and the old Carver and the junior

9    college, and they're left with enough kids to go to high

10   school, and -- at Brady High School, and kids to go to

11   community college at Meridian High School.

12        And Carver was built for the kids in this area.  They were

13   black.  And during integration everything changed.

14        But Carver stood here, and people then, on this side of

15   town, on the north -- on the south and west side of town

16   assumed that this was their school because the Carver that they

17   had was torn down, the high school was torn down, the junior

18   college was torn down and hauled away.  So this was their

19   school, replaced, and so it was kind of hard for me to see why

20   that the last school built in the district was being used for

21   the central office.  Because these kids came, and most black

22   students who pass have little always saw that the kids had what

23   they needed, whether they had anything or not.

24        So it's kind of selfish for me to see why the central

25   office would think a school that's the most modern school built

1  for kids in the district, take it for themselves, when the

2  school was built with an amphitheater, boys gym, girls gym,

3  science labs, forest room and just a lot of rooms.  Why would

4  you take that from kids and use it for central office?

5  Q.   Do you know, Mr. Markham, is Carver the largest of the

6  three middle schools?

7  A.   I don't know about the size, but I do know that it's

8  probably -- it could accommodate 6-, 700 kids.

9  Q.   Okay.  And when you were employed at the school district

10  as a teacher, were you assigned to different schools?

11  A.   As I said, I was brought here to teach chemistry and

12  biology, at Harris and at junior college.  After two years I

13  was sent to Northwest.

14  Q.   And was that, when you were sent, was that voluntary or

15  was that involuntary?

16  A.   Well, that was involuntarily.  I didn't know what

17  Northwest was at the time.  That was a couple days before the

18  school year opened, I was told that they needed a science

19  teacher there, and they needed a black science teacher over

20  there.  And the school attorney now was one of my students,

21  Mr. Compton there.  One of my students at Northwest, in

22  1969-70, I believe.  Mr. Compton?

23  Q.   And did you have an understanding that the school district

24  could reassign you involuntarily, as -- as needed?

25  A.   Well, you know, you have to go around the district.  You

1   had just one choice since I been here.  It used to be, I don't

2   know about now, but it used to be a little clause in the

3   contract that says school may change for bettering the Meridian

4   public school, meaning wherever they needed you, you can go as

5   you want to or you can resign.

6       So I needed to work, so I went wherever they told me to

7   go.

8   Q.    And my last question for you, Mr. Markham:  Why is Carver

9   important to you, to the community in that area?

10  A.    Well, it's important because the people on this side of

11  town think that's their school.  And it's being closed because

12  it belonged to them.  And they can't figure out why the newest

13  school is being used as central office.  And the only thing --

14  and this school been renovated within the last, say, maybe

15  eight years, because the school burned.  This is the only

16  school that has recognition from the U.S. Department of

17  Education, that being a national recognized school of

18  excellence, and a drug -- a nationally recognized drug-free

19  school.  And having both awards in the same year.  So why close

20  a nationally-recognized school and leave the other two to be

21  renovated when this school does not need renovation?  Nothing

22  but a new roof.

23          MS. MERLE:  Thank you.  I think -- before I wrap up, I

24  think maybe we lost Mr. Compton, so I don't want to continue

25  questioning until we see him back.

1          THE COURT:  How would you like to proceed then?  I

2     don't see him.  He's not on my screen.

3          MS. MERLE:  Ms. Watson --

4          THE WITNESS:  Hello, Your Honor.

5          THE COURT:  Okay.  Maybe that's him.  All right.  We

6     have Ms. Watson.

7          MS. WATSON:  Yes, he's trying to rejoin right now.

8     Something happened and he inadvertently kicked off on his

9     internet connection.  He's in the process --

10         THE COURT:  Well, now, who is the lady right below

11    Mr. Markham?

12         MS. MERLE:  I see Dr. Carter, and then Ms. Watson and

13    then Jamie Dole.

14         THE COURT:  Ms. Singleton?  Okay.  All right.  Now,

15    how many more witnesses do you have, Ms. Merle?

16         MS. MERLE:  After Mr. Markham, we're done, Your Honor.

17         THE COURT:  Okay.  What person whose name you just

18    called, did you intend to call him?

19         MS. MERLE:  No, sir.  There's no more witnesses.  I

20    think Ms. Watson is an attorney for the school district.  Jamie

21    Dole is a paralegal for the school district, and then Natane

22    and Aria are attorneys for the DOJ.

23         THE COURT:  Okay.  So you have no more witnesses?

24         MS. MERLE:  No, Your Honor.

25         THE COURT:  And now for the school board, did the

1   school board have any more witnesses?

2          MS. WATSON:  Your Honor, this is Lindsey Watson for

3   the school district.  I'm not sure if Mr. Compton had planned

4   to ask any more questions of anyone.

5       Can I have the court's indulgence for just five minutes?

6          THE COURT:  Well, he's back on now.

7          MS. WATSON:  Okay.  Good.

8          MR. COMPTON:  I'm back on now.  I don't know what

9   happened, Your Honor.

10         THE COURT:  Well, okay.

11      Now, did you have any more witnesses?

12         MR. COMPTON:  Well, I didn't hear Ms. Merle's -- last

13  thing I heard was Mr. Markham, I have one last question, and I

14  didn't hear what the question was or the answer.

15         THE COURT:  Would you repeat the question, Ms. Merle.

16         MS. MERLE:  Yes.

17  BY MS. MERLE:

18  Q.   Mr. Markham, why is Carver important to you, to the

19  community?

20  A.   Well, Carver is important to the community because, as I

21  said before, Carver Middle School, George Washington Carver

22  Middle School has the name of historical black America.  And

23  it's the only school that has a black American name.  And this

24  school was put in a black neighborhood surrounded by poor kids

25  and poor parents.  And since the departure of the other middle

1   school, junior college, and this school was built in the place

2   of that, they assumed that this is their school.  And we

3   couldn't figure out why the last school built in the district,

4   the newest school, the most modern school with the most modern

5   facilities, that needs no renovations, it having been renovated

6   after a small fire a few years ago, why would you close this

7   school and give it to central office?  Or better still, central

8   office take it.  And it's the only school over here in this

9   district and leave two on the east and north side of town and

10  you don't have a school over here that's secondary.

11      So when kids finish the fifth grade, they have no

12  secondary school over here.  And this is half of the city.

13  Q.   And I believe earlier, when Mr. Compton got taken off, you

14  had mentioned that the school had -- was the only school that

15  had two awards.  Can you talk about that?

16  A.   Yeah, the school district in 1988-'89, Carver Middle

17  School received the national school -- was recognized by the

18  U.S. Department of Education as a National School of Excellence

19  and National Drug-Free School.  And they couldn't -- they

20  didn't believe our application because of our location and the

21  kind of kids that we had.  So they had a visit from Washington

22  to come down and check us out.  And they have saw the bridge

23  between the back doors of the housing project and the back

24  doors of the school, and the location of the school, surrounded

25  by housing projects.  So in most cases that's a drug-infested

1   school.  But there were no drugs in this school.

2       And they looked for community involvement.  We had over 70

3   businesses that was involved with this school.  They gave

4   rewards to students who did well.  We had programs for kids who

5   did well after school and before school.  Kids who couldn't

6   read well, who couldn't compute well or write well.  We

7   encouraged them to stay after school and before school.

8   Q.   And do you know if any other school or any of the other

9   middle schools have received such awards or recognitions, as

10  far as you are aware?

11  A.   Well, now we had -- we were two -- Carver was one of two

12  schools in the whole nation that received both awards in the

13  same year.  But now we had one elementary school, called Marion

14  Park, that received the Elementary School of Excellence.

15  Meridian High School received the award, the School of

16  Excellence award.  And Kate Griffin received both awards.  Kate

17  Griffin is also closed.  And Marion Park is an alternative

18  school.

19      So you've got three -- you've got four schools that have

20  received national schools of excellence, and three of them --

21  well, now, with Carver, we've got Carver and Kate Griffin who

22  received that award, are both closed.

23      Marion Park is an alternative school.  So the only one

24  that's standing tall now is Meridian High School.

25      I know you didn't ask that, but for your information.

1          MS. MERLE:  Thank you, Mr. Markham.

2      That's all the questions I have, Your Honor.

3          THE COURT:  Any questions to Mr. Markham from anybody

4  else?

5      All right.  And was any party expect or intend to call any

6  additional witnesses?  Anybody?

7          MR. COMPTON:  Your Honor.

8          THE COURT:  Yes.

9          MR. COMPTON:  John Compton with the school district.

10  I would like to call Dr. Carter back, and just ask her one or

11  two short questions.

12          THE COURT:  Go ahead, call her.

13      I've thought about asking her a question myself.  But go

14  ahead and call her.

15                          AMY CARTER,

16      having been previously duly sworn, testified further as

17  follows:

18                      DIRECT EXAMINATION

19  BY MR. COMPTON:

20  Q.    Okay.  Dr. Carter --

21  A.    Yes.

22  Q.    -- you're still under oath.

23      What's the total of white students in Meridian Public

24  School District?

25  A.    Mr. Compton, the figure I have is 176.  Only 176 white

1    students.

2    Q.    And how many of those are in middle school?

3    A.    Only 32.

4              MR. COMPTON:  Okay.  I have no further questions, Your

5    Honor.

6              MR. CUSICK:  Your Honor, this is John Cusick for

7    private plaintiffs.  No redirect based on Mr. Compton's

8    questions.

9              THE COURT:  Okay.  Mr. Cusick, you are still

10   maintaining your objection to the closure, are you not?

11             MR. CUSICK:  That's correct, Your Honor.  I'm happy,

12   if any additional explanation is necessary based on today's

13   evidence that isn't already captured within our opposition

14   brief.

15             THE COURT:  Now -- and, Mr. Compton, you still are

16   supportive of the closure; is that correct?

17             MR. COMPTON:  That's correct, Your Honor.

18             THE COURT:  And let me turn to the United States.

19       What position does the United States take?

20             MS. VAUGHAN:  Your Honor, the United States does not

21   oppose the District's motion.  We really see this as a dispute

22   between the private plaintiffs and the district.

23             THE COURT:  So you do not see a discriminatory animus

24   here of any kind?

25             MS. VAUGHAN:  Your Honor, based on the information

1   that the District provided, we do not.

2          THE COURT:  So at this point are you neutral or are

3   you in support of the District?

4          MS. VAUGHAN:  Your Honor, we don't oppose the

5   District's motion.  So in that sense we, you know, support the

6   District's efforts to close the school.  That said, there was a

7   lot of very important testimony that we also heard today for

8   the first time, and so we support the court making a full

9   assessment of all the information that's been put forward by

10   both parties.

11          THE COURT:  So does that mean that you are neutral or

12   that you are supporting the District?

13          MS. VAUGHAN:  Your Honor, what I can say is that we

14   don't oppose.  That's what I'm authorized to say.

15          THE COURT:  Okay.  So you're not authorized to say

16   anything more than that; is that correct, Ms. Vaughan?

17          MS. VAUGHAN:  No, sir, I'm not.

18          THE COURT:  Okay.  Does not oppose.

19       Not supportive, necessarily; not neutral, necessarily.  Is

20   that it?

21          MS. VAUGHAN:  Yes, Your Honor.  We do not oppose the

22   motion.

23          THE COURT:  Okay.  Now, with regard to any legal basis

24   for the position of the parties, do the parties wish to

25   supplement their response with any legal authority?

1       I'll start off with Mr. Cusick.

2           MR. CUSICK:  No, Your Honor.  We would just address,

3   and this is covered already in our briefing, but to

4   Mr. Compton's point to begin today's hearing, that there is not

5   a desegregation issue here.  As this court is aware, that the

6   school district is still under a consent order, and under that

7   consent order they still bear the burden and have a

8   constitutional obligation to further desegregation efforts, and

9   that extends to decisions like closing a school, as the Supreme

10  Court has explained, is one of the most important functions a

11  local school board or authority can do, and so we just want to

12  correct that point that was addressed today in the beginning,

13  and happy to talk through any of the three factors that we've

14  discussed based on today's evidence.

15          THE COURT:  And then with regard to legal authority

16  beyond the decree itself, do you have any that you wish to

17  submit?

18          MR. CUSICK:  The cases that we're relying upon are the

19  same that were included in our opposition brief, and I'm happy

20  to cite any of those, but they're otherwise all covered in our

21  briefing.

22          THE COURT:  And let me turn to Mr. Compton.

23      And, Mr. Compton, do you have any legal authority that you

24  wish to expound upon, not right now, but just tell me whether

25  you have any legal authority that you wish to submit.

1          MR. COMPTON:  None, Your Honor, other than what's

2    contained in our reply in support of the motion.

3          THE COURT:  Okay.  And Miss or Mrs. Vaughan -- which

4    one is it?  Is it Miss Or Mrs.?

5          MS. VAUGHAN:  Miss.

6          THE COURT:  Okay.  And Ms. Vaughan, you are -- you

7    didn't submit a brief, though, did you.

8          MS. VAUGHAN:  No, Your Honor.  We submitted a response

9    that indicated that we did not oppose, but we don't have

10   further legal authorities to bring to the court's attention

11   today.

12         THE COURT:  Okay.  Then thank you.

13          Finally, relative to a court decision on this matter,

14   Mr. Cusick, what kind of time frame would you suggest beyond

15   which would be prejudicial to the interests of your clients?

16   So I would have some idea of when you would contend that

17   prejudice would attach to any delay in a decision on this

18   matter.

19         MR. CUSICK:  Yes, Your Honor.  We -- we would assert

20   that there is already prejudice to the client we serve because

21   the district was obligated to seek approval before essentially

22   closing Carver Middle School.  That's why they sought this

23   court's approval and should have done that well before the

24   May 26th decision.  That's also why we're on an extremely

25   accelerated time line where had other decisions been made there

1    could have been a full opportunity for community engagement,

2    for the parties to discuss these issues and for a full

3    assessment of all information that might have been relevant.

4         You've already heard Dr. Carter mention a series of

5    conversations, documents, data that was relied upon for her

6    affidavit as it related to transportation burdens and otherwise

7    that we also would ask be submitted to the court so there is a

8    full evidentiary record in making its assessment, and so, Your

9    Honor, again, right now our clients and the communities we

10   serve are prejudiced because the district is under a consent

11   order and they were obligated to seek approval before moving

12   forward with the closure of Carver Middle School.

13             THE COURT:  Mr. Compton?

14             MR. COMPTON:  Your Honor, the desegregation order does

15   not prevent the school district from closing a school.  It

16   only -- it only needed to seek court approval on changing the

17   attendance zone lines.

18        We have closed schools and absorbed them within existing

19   elementary zones earlier, so -- but we thought that there would

20   be no opposition since we have the pending motion for unitary

21   status where it was stipulated that the district had achieved

22   unitary status.

23        So we didn't think there was an issue.  We were doing what

24   we thought was in the best interests of the students, and

25   that's why the district took the action that it did.

1     So that's our response.

2          THE COURT:  Mr. Cusick, what about that?  That at this

3     juncture your clients had agreed that unitary status had been

4     achieved?  So how would that then bear upon this particular

5     motion?

6          MR. CUSICK:  Sure, Your Honor.  That's an inaccurate

7     description because it is a proposed settlement agreement, and

8     that it's stipulated could be used in support of a finding for

9     unitary status.

10     Your Honor, you'll note that the district's motion is

11     separate for unitary status as opposed to the settlement

12     agreement.  And Your Honor also is aware that the settlement

13     agreement alone could not achieve unitary status.  This court

14     would need to conduct a fairness hearing to, among other

15     factors, consider those.

16     It's our position at this time that we still maintain that

17     settlement agreement and know that it is a pending motion

18     before the court, but we would ask that this court first rule

19     on the closure, to see if at all anything within those terms

20     would be impacted.  But, again, to Your Honor's initial

21     question, it is a -- and the explicit test could be used in

22     support of a finding.  We, as private plaintiffs, could not

23     stipulate to unitary status.  That's a decision that the court

24     has to make, as well as other parties, including party

25     intervenors, who would also be engaged in those processes as

 1    well.

 2            THE COURT:  But at this juncture you have stated that

 3    you and your parties are in agreement that there is,

 4    preliminarily, a determination of unitary status, isn't that

 5    so?  Contingent upon the outcome of a fairness hearing in

 6    support.  Is that so?

 7            MR. CUSICK:  Yes, Your Honor.  The stipulation does

 8    say that the settlement agreement will support a finding of

 9    fact, which was submitted I think now more than before the

10    government shut down three years ago, and so -- but outside of

11    that, we were not under the impression that any schools would

12    be closed, and so we would first ask this court to rule on the

13    motion for the closure of Carver Middle School, and then at

14    that time, if at all anything implicates the settlement terms,

15    if the court makes a determination, we would do so, but to Your

16    Honor's initial question, that's what the settlement agreement

17    stipulates to, that it will support a finding, and that's ECF

18    158-1.

19            THE COURT:  Are you saying that you're reserving the

20    right to reject the unitary status that previously you agreed

21    to?

22            MR. CUSICK:  Again, Your Honor, we've agreed that the

23    settlement agreement would support a finding.  We reserve the

24    right, to the extent that if this or any other determinations,

25    if there are more school closures or other issues that arise

1    before that motion, that certainly could impact that, which is

2    why we are hoping that the court will first rule on the motion

3    for this closure to see if at all anything that could change

4    the terms of those agreements.

5             THE COURT:  Well, let me change the wording of the

6    question.

7       Are you saying that you have reserved the right to abandon

8    your earlier position if you have a distasteful ruling from the

9    court on this particular point of the school closing?

10            MR. CUSICK:  Just to make sure I understand your

11   question, I would answer yes, that we do reserve the right to

12   the extent that the proposed settlement, which again is a

13   proposal at all is implicated by a court ruling one way or

14   another.  This is something that we would have to consult with

15   our clients about because it is a motion before the court, and

16   so the answer is yes, we do reserve the right, and that would

17   be something that we would engage the district in because this

18   is a proposed settlement agreement that has not been ruled on

19   yet.

20            THE COURT:  And thus you are saying that this closure

21   may be a material change that would empower you to withdraw

22   from the settlement, is that it?

23            MR. CUSICK:  Yes, Your Honor, that's correct.

24            THE COURT:  Okay.  And what says you, Mr. Compton, on

25   that point?  That depending upon this court's ruling, that

```
1    under Mr. Cusick's position on this, that a contrary ruling

2    from the court could undo the settlement?

3              MR. COMPTON:  I'm not surprised, Your Honor, but we

4    would go forward with trying to move forward for the court to

5    declare unitary status.  We don't feel like the closure of this

6    school has changed -- changed the district in any way since

7    2019 when the proposed settlement agreement was presented to

8    the court.

9              THE COURT:  Okay.  Now, I do have one question I want

10   to ask Dr. Carter.

11      Dr. Carter?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  You're still under oath.

14             THE WITNESS:  Yes, sir.

15             THE COURT:  You're still under oath, and I need to

16   revisit you.

17

18

19

20

21

22

23

24

25
```

1                              AMY CARTER,

2          having been previously duly sworn, testified further as

3     follows:

4                          FURTHER EXAMINATION

5     BY THE COURT:

6     Q.    In view of Mr. Markham's testimony, because I did not hear

7     at this juncture a response to the factors that he submitted in

8     support of opposition to the closure of Carver and he submitted

9     a number of factors that have not been fully discussed.  Now,

10    did you make a list of those factors?

11    A.    No, sir, I didn't.  But I think if I had to recall a few

12    of them, I could.

13    Q.    You said what now?  You say you could or could not?

14    A.    I could recall a few of them.  I don't know if I would get

15    them all, but I could recall a few of them.

16    Q.    Okay.  Well, I have a list.  I took some notes.  And he

17    stated, first of all, that Carver is named after a prominent

18    black historical figure, George Washington Carver.

19          Did that figure anywhere in the discussion involving

20    closure?

21    A.    No, it was not, but it was all -- it was included in the

22    discussion of repurposing the building.  So if the building

23    becomes the central office, it will be known as the George

24    Washington Carver central office or administrative building.

25          Judge Wingate, right now when a parent comes to central

1    office, if they have needs, they have to go to three, possibly

2    four locations in the city because central office is spread

3    out.  So if they're coming to meet with someone about

4    instructional curriculum, they have to go to one building.  If

5    they're coming to have assistance about food service, they have

6    to go on another side of town.  If they're coming to get help

7    about transportation, they go to another building.

8         So the goal of being able to centralize central office,

9    putting them in one location, will allow parents to have a

10   one-stop shop and not necessarily have to try to go all over

11   town to get assistance when they need it.

12        But the building will be named George Washington Carver

13   Administrative Building, or what have you, so that we can

14   protect that history in our city.

15   Q.   Okay.  And he also stated that this building is located in

16   the black neighborhood.  Is this the only school that's located

17   in the middle of the black -- a black neighborhood?

18   A.   No, sir, it's not.  There are multiple schools in our

19   district that are located in the heart of black neighborhoods.

20   It was said earlier that Carver Middle School serves a large

21   number of housing projects.  All of our schools serve a large

22   number of housing projects.  Actually, Magnolia served the

23   largest number with where they're located.

24        All of our schools right now are educating a majority of

25   African American students in majority African American

1  neighborhoods because, again, we only educate 176 white

2  students pre-K through 12.  So our neighborhood demographics

3  have changed tremendously.

4  Q.   Next, he commented that this present building, George

5  Washington Carver School, was built to take the place of an

6  older school with the same name, and therefore it had some

7  history.  Any response on that?

8  A.   Yes, sir, it does have history.  Anytime you have a school

9  that's named after a prominent African American, that's history

10 you want to preserve and you want to protect.

11 Q.   He also said that this was the most modern school.  Is

12 that also true?

13 A.   Carver Middle School was the last school built in Meridian

14 Public School District; however, it was the middle school at

15 that time that was built without an auditorium.  They did build

16 it with an amphitheater, which is a smaller space that could be

17 used if you want to do productions, but ultimately the square

18 footage of Carver is smaller than the two middle schools by

19 pretty close to 15-, 20,000 square feet.  It can hold 700

20 students, but the other two middle schools can hold a larger

21 number.

22      Honestly, Judge Wingate, if I were going to build a really

23 good school with taxpayers' dollars, I would have built one

24 middle school, but I didn't think the climate of our city was

25 ready for multiple closures at one time.

1   Q.    Okay.  And then he commented that this school was the only

2   one to receive two awards, two nationally-recognized awards.

3   A.    Yes, sir, back in 1998.  And that was our bragging point

4   as a faculty and a staff and a family, when I worked at Carver,

5   and it's still a bragging point for us and will be memorialized

6   as a part of that building's history.

7         There was other schools in our school district that have

8   received national recognition.  The actual school district

9   received recognition when we were called to the White House

10  back in -- a few years ago, I can't remember exactly, but we

11  were recognized for our work with PBIS and for our work with

12  Restorative Genesis.

13        So I could go down the list and name awards that Meridian

14  Public School District has received, but I still say it's

15  important to preserve those awards that were received at Carver

16  and not allow that history to be lost.

17  Q.    Did -- this is not something that Mr. Markham mentioned,

18  but are the other schools, including Carver, given letter

19  grades for competence?

20  A.    Yes, sir.  All schools are given letter grades.

21  Q.    And what's the letter grade for Carver?

22  A.    The last accountability ratings were given back in

23  2008-2009, and Carver was rated as a D, low-performance school.

24  It had improved from an F, but historically the trend data

25  showed that it was a failing school.

1    Q.   What about the other schools?

2    A.   The other schools, Magnolia Middle School was rated as a

3    successful school, and Northwest Middle School was rated as low

4    performing.

5    Q.   So the overall district score was what?

6    A.   The overall district score was just shy of successful on

7    the last accountability rating.  It was 20 points from a C but

8    it was rated a D.

9    Q.   It was 20 points from a C?

10   A.   Yes, sir, from successful.  But it was rated a D, yes,

11   sir.

12   Q.   But rated a D.  So what is it currently rated as?

13   A.   The last ratings, it was rated as a D, the entire

14   district.

15   Q.   A D?

16   A.   Yes, sir.

17   Q.   A D as in delta?

18   A.   A D as in delta.

19   Q.   And what do you attribute that to?

20   A.   From any perspective, Judge Wingate, is everything from

21   spreading your resources too thin.  It is trying to ensure that

22   you have quality teachers placed in grade levels across the

23   board.  It's ensuring that you have dedicated educators.  It's

24   ensuring that you can meet the needs of your students as it

25   relates to academic services, instruction, curriculum, and so

1    we have been doing what we can as a district to ensure that we

2    move our students forward.  Unfortunately, we're all coming on

3    the heels of COVID, so we're still feeling some of that

4    learning loss, but as we've looked at projection trends and

5    data, we have already zoned in on areas that we have to focus

6    on in order to ensure that we move Meridian forward.

7        And unfortunately this closure helps with that because I

8    can honestly say for the first time my middle schools, the two

9    remaining middle schools, are staffed with certified teachers.

10   Q.   What is the average ACT score?

11   A.   The average ACT score in Meridian ranges at 14.

12   Q.   At 14?

13   A.   Yes, sir, 14.  A composite at 14.  We've seen some

14   increases as far as individual subsets in scores, because we

15   have been working diligently to, number one, expose our

16   students to ACT supports earlier, exposing them to the testing

17   earlier, and, more importantly, exposing them to services that

18   the district is offering through ACT coaches.  So we're excited

19   about the gains that we're seeing with individual students and

20   the supports we're putting in place, but we continue to work on

21   trying to make sure we move that composite.  It's up from last

22   year, it's just not up to the satisfaction that I or my

23   community would expect.

24   Q.   What was it last year?

25   A.   Last year, the average composite was 13.

1    Q.    Those students take that test generally in what year?

2    A.    They typically take it in 11th grade, but we've done a

3    better job of trying to expose them to preACT testing.

4    Sometimes kids just get worked up with test anxiety, Judge

5    Wingate, and so our goal is try to create environments where

6    our children know they're just as capable of doing well on

7    standardized tests, ACT tests, but more importantly, it's

8    exposure.

9    Q.    Why do they take it generally in the 11th?  Why not before

10   the 11th grade?

11   A.    Well, the state requires that every junior takes the ACT,

12   but we as a district have been working on exposing students to

13   it as early as middle school.  We actually have what they call

14   preACT tests that you can actually do at elementary school.

15   So, for us, we have been in the process of exposing children

16   and parents to it sooner, so that it's not this burden or this

17   monster that they fear, but that they can actually start taking

18   it more in ninth grade, tenth grade, and we are seeing

19   individual students come up as we continue to focus in this

20   area and expose students to it sooner.

21   Q.    Do you have a counselor who is earmarked especially

22   towards improving the ACT scores?

23   A.    Yes, sir.  We have counselors.  We have educators as well

24   that are assigned that task.  This year we added additional

25   counselors, so we have fewer students that each counselor is

1    responsible to assist or supervise in that area, but we do have

2    one, our graduation counselor, that spends the bulk of her day

3    and her time working in that area, working on ACT, working on

4    access to financial aid, college opportunities, scholarships,

5    so on and so forth.

6    Q.   So what has she set as a goal overall for the students --

7    A.   For our particular --

8    Q.   -- as far as achievement on the test?

9    A.   Yes, sir.  For us, we are striving to at least get to the

10   state average, which is a 17.  That's the typical composite

11   score at the state level.  And so we're striving with

12   individual students to be able to look at, if you didn't do

13   well on the reading portion or the math portion or the science

14   portion, let's look at the areas that we can zone in to try to

15   improve or increase your composite overall.

16   Q.   And the school, or the counselors in particular, help the

17   students to perform on subsequent tests by ordering the test

18   they have just taken?

19   A.   Yes, sir.

20   Q.   Do y'all order the test?

21   A.   Yes, sir.

22   Q.   You can order -- pardon me?

23   A.   Yes, sir, we can --

24   Q.   You can order out of the generally four tests that are

25   provided, you can order at least one of the tests, sometimes

1   they give you two.  And that would give you not only the test

2   that was taken, but also the correct grade -- the correct

3   answers.  Then you can teach from that.  Do you all do that?

4   A.   Yes, sir.  We've started that trend as well here.

5   Q.   When did you start that?

6   A.   We actually started it last school year.

7   Q.   Okay.  I have a court-watch program where I have kids come

8   in to my court, my court, and I program to them during the

9   summers.  And I have, oh, summer -- well, summer before last,

10  before COVID, I had 120 students, and before that somewhere

11  around a hundred.  But I sort of worked with them on these

12  particular matters through that, where they can take the ACT

13  and then order the ACT test itself with the correct answers,

14  then they can study from that.

15       In the past in that program, I have had students who have

16  taken that test starting in the eighth grade, and taken it as

17  many times as they could in the eighth grade, ninth grade,

18  tenth grade, eleventh grade, and then first semester of twelfth

19  grade, one student in particular came to me and wanted to know

20  how could he sue the ACT, because he knew that he had made a

21  36, he said.  And he only made a 35.  And so therefore he said

22  he wanted to sue them.  And I wanted to know why he was so

23  convinced that he had made a 36.  And he said because ever

24  since the eighth grade I've kept all my tests and gone over

25  them, and would you believe I received and took a test the

1   first part of my twelfth grade year, and it was the same test I

2   had taken before, so I knew every answer in the test.  So I

3   know I made a perfect score, and they only gave me a 35, so I

4   want to sue.

5       Well, he didn't end up suing, but the point there is, is

6   that he had taken that test so many times, he actually ended up

7   with the same test as a senior.  And therefore he got

8   scholarships all over the country.

9       And a number of students, not as zealous as that, take

10  that test a number of times, and also order the test so that

11  they can study the prior test as well as the answers.  I gave a

12  speech at one time down at Hattiesburg where they had

13  supposedly 100 of the best counselors in the state, and I asked

14  the question, how many of you know how you can get the answers

15  to the ACT test, so that your students can study it for the

16  next test?  And out of 100 counselors, only three knew the

17  answer.

18      That's why I was asking are you well aware of that.  So

19  you say as of last year, you all had started doing that?

20  A.   Yes, sir, we have.

21  Q.   You don't give the SAT, do you?

22  A.   No, sir.  Not as often, no, sir.

23  Q.   Why not?

24  A.   Well, we spend a lot of time working on the ACT and we are

25  focusing on the graduation or the exit exams that students have

104

1    to pass.  It's available for our students, and we have had

2    conversations about it, so it's not like a student can't take

3    it if they don't want to, but many of our students are really

4    focused on ACT because that's what the colleges that they tend

5    to apply to recognize more.

6    Q.   What about the national merit exam?

7    A.   Yes, sir.

8    Q.   You have to take the pretest in the tenth grade and then

9    take the test again in the eleventh, and if you qualify as a

10   finalist, then you take it again in the twelfth and you get

11   scholarships all over.

12        Now, most schools don't give the National Merit.  Do you

13   all get it?

14   A.   Yes, sir, we do.  We have had some National Merit

15   semi-finalists and some finalists to graduate over the past few

16   years.

17   Q.   Really?

18   A.   Yes, sir.

19   Q.   And where did they go to school?  Did they get full

20   scholarships?  Pardon?

21   A.   I was going to say if you asked me where they went to

22   school, I couldn't tell you in particular, but I can tell you

23   in the last few years as a part of our end-of-year awards, I

24   have been pleased to celebrate some of our students that have

25   been recognized in that area.

1   Q.   Well, what about national achievement?

2   A.   Not as much.

3   Q.   National achievement is a component of national merit.

4   A.   Yes, sir.

5   Q.   So those students who score well but not high enough to be

6   a national merit finalist can also be a national achievement.

7   They can't be both.  But if they become a national merit

8   finalist, then that is the highest achievement that they can

9   garner.  But if they don't quite reach that plateau, they can

10   be afforded status as national achievement.  They also have

11   national achievement for Hispanics now, too, and some other

12   ethnic groups.

13       So national achievements, at one time that was well

14   respected.  Well, it still is well respected.  At one time

15   Harvard gave more scholarships for national achievement for

16   African Americans than anybody, and then Florida A&M took that

17   lead to that, and they give a full scholarship for national

18   achievement.

19       And I have been dismayed because the schools do not give

20   the national merit now.  Most schools don't.  And they need to.

21   But they have to advise the students that you have to take the

22   preSAT in the tenth grade in order to be eligible to take that

23   test in the eleventh grade.  Then they can qualify for it.

24       Now, we're back to these other points, and go back to

25   Mr. Markham's list here.  I think I have maybe one or two more.

1    He said that because of the closure of Carver, that now

2  there is no school on that side of town.  Is that so?

3  A.   There are two elementary schools.  We have West End

4  Harris, lower and upper, and we have Oakland Heights on that

5  side of town.

6  Q.   Were all these factors that I have gone over with you from

7  Mr. Markham's testimony taken into account when the decision

8  was made to close Carver?

9  A.   As a former employee of Carver, and I have to honestly say

10  I may not even be in Meridian had it not been for Mr. Markham

11  who said, Come on, little girl, teach for me.  I considered the

12  history of Carver, I considered the side of town.  What I

13  wrestled with, Judge Wingate, was putting a bandaid on a bigger

14  issue and putting subs and continuing to spread our resources,

15  and then holding my kids at Carver to the same standard as I

16  was my other kids in the district, and that just, in my

17  opinion, as an educator, was not fair.  So in the end it's

18  about equitable resources for our children and trying to make

19  sure that even in the middle of a national teacher shortage,

20  that we are giving the children in Meridian, Mississippi the

21  same opportunities and the equitable education as we would any

22  child in any part of the country.  So, yes, these factors were

23  considered, some of them were, but in the end my job is to try

24  to do the best I can to educate our children in the best

25  environment.

1                        ROBERT MARKHAM,

2          having been previously duly sworn, testified further as

3     follows:

4     BY THE COURT:

5     Q.   Mr. Markham, do you have anything that you would like to

6     say on these points?

7     A.   I'm still trying to figure out why you want to spend money

8     and renovate other schools when you don't have to spend money

9     on Carver, to renovate it, because it's the latest school

10    built, and you renovated it after the fire a couple years ago.

11         And it's the only school on this side of town that when

12    you get to the fifth grade, you got to go to the other side of

13    town to go to school, after fifth grade.  I don't think that's

14    fair.

15         And I don't think it's fair to take a modern school for

16    the central office.  But I'm not making those decisions.  I'm

17    not the superintendent, nor the board.

18         But I think it should be considered.  And when the public

19    on this side of town look at it, they can't see to find us

20    either.  Because this school, as I said before, it was in place

21    at the old Carver, in place of the high school that was torn

22    down, in place of a junior college that was torn down, and this

23    was the school, Carver School, for this community.

24         Now they have no secondary school in this community.  And

25    I bet you a hundred years from now there won't be another

 1   school built on this side of town.

 2   Q.   I have to ask you one more question, because of the way

 3   you testified on direct examination.  You testified about your

 4   career and how you were moved at least three times

 5   involuntarily.  You made a point of that.

 6        So when you were moved involuntarily from one school to

 7   another --

 8   A.   Yes.

 9   Q.   -- what basis are you suggesting was the reason why you

10   were moved?  Are you saying that that was the basis of some

11   discrimination?  Because the way you described it, you said

12   that you were at School A and you says then you were moved

13   involuntarily.  And then you moved to a second school for one

14   year, and then you were moved involuntarily.  And then you said

15   that you were moved a third time and you were moved

16   involuntarily.

17        And eventually you got to be principal.  You didn't tell

18   me whether you wanted to be principal.

19        Now, are you saying that these involuntary moves had some

20   dark motives behind those moves?  Or it's just simply a matter

21   that you didn't request it and some folk wanted you to go to a

22   place they needed you?  So what are you saying?

23   A.   I can tell you what was explained to me.  Dr. Todd and

24   Mr. Reed was over the school district at that time.  So when he

25   called me to the office two days before school started, he told

1   me that he wanted me to go to Northwest because Northwest

2   needed some professional black men and women to work at

3   Northwest, because they had seen only garbage men, yardmen,

4   maids, et cetera.  So I went to Northwest for a year.

5        After that year they needed a chemistry teacher at the

6   high school.  And my background was chemistry, so involuntarily

7   they sent me to the high school, Meridian High School, to teach

8   chemistry and general science.

9        The next year they needed somebody -- needed a teacher at

10  Kate Griffin to teach general science, eighth and ninth grade.

11       My background was general science, chemistry, biology, so

12  they moved me to Kate Griffin involuntarily.

13       So I applied for the assistant principalship at Carver

14  after I received my administrative degree.  And for three years

15  I served as assistant principal.

16       Then the principalship came available after the principal

17  retired.  I applied for the principalship.  And after 16

18  years -- well, 19, after assistant principal and principal at

19  Carver, I was tapped on the shoulder to come be the deputy

20  superintendent at central office for four years.

21       So the only two -- the only -- I applied for two

22  positions, one to come to Meridian and one as assistant

23  principal.

24  Q.   Okay.  Thank you.

25

                              AMY CARTER,

1          having been previously duly sworn, testified further as

3   follows:

4   BY THE COURT:

5   Q.    Now, finally, Dr. Carter, there was some material you were

6   going to send me?

7   A.    Your Honor, I believe Attorney Cusick or John mentioned

8   that there were some items that he was requesting for clarity

9   purposes.

10  Q.    That's right.  Uh-huh.  And what about that?  Is there a

11  problem sending those materials to me?

12  A.    No, sir.

13  Q.    Okay.

14  A.    I just need to make sure I have a list of them.

15  Q.    Okay.  Then send those materials to me.  They need to be

16  sent.  And I am going to get a transcript of this session here,

17  and from that and from the papers that have been filed in this

18  matter, I will rule on the motion.  Then after that we'll

19  proceed with a fairness hearing, if we get to that point, if

20  the parties are still saying that there is some agreement on

21  the unitary status.

22       So I will give myself -- oh, let's see -- I have to get

23  the transcript as well as those materials and study all of

24  that, and so I would -- I have some trials coming up, but I

25  would say within the next three weeks or so I should have an

1    opinion out on this matter.  Maybe before that, if some of the

2    trials go away.

3       Now, with that, is there anything else that I need to take

4    at this time?  From plaintiffs, since you spoke first, is there

5    anything else that I need to take up at this time?

6          MS. MERLE:  Your Honor, this is Natasha for

7    plaintiffs.  I appreciate you giving us information about the

8    proposed time line for the decision.  I would just raise, and I

9    think Mr. Cusick touched on it briefly, that the school

10   district has currently closed Carver, and so for the next few

11   weeks Carver would remain closed, and I wanted to know if the

12   court had any direction concerning that, since the court hadn't

13   ruled on the motion yet, and since the school district

14   nevertheless went ahead with closing the school.  Just so we

15   can --

16          THE COURT:  You are asking -- say that again.  Are you

17   asking if I have what, Ms. Merle?

18          MS. MERLE:  Yes, Your Honor.  Just asking if you have

19   any direction concerning that so that we can inform clients,

20   because currently Carver is closed, and so if it's -- you know,

21   we're going to be waiting these weeks for the court to get to

22   us, as I understand it, I just wanted to know if there was any

23   further direction about the school closure since the district

24   has gone ahead and closed the school.  Anything to share with

25   clients or parents whose kids -- whose children originally were

1  slated for Carver.

2           THE COURT:  I don't -- the only motion I have is a

3  motion that challenges the closure of the school.  And I'm

4  going to rule on that particular motion.  So I can't see

5  anything else at this juncture that's before me on that

6  particular matter.  And I'm going to move on as soon as I get

7  the items I just stated, and then I'll make a ruling on it.

8           MS. MERLE:  Understood, Your Honor.  Thank you.

9           THE COURT:  Now, so Mr. Compton?

10          MR. COMPTON:  Yes, Your Honor.

11          THE COURT:  Is there anything further to take up at

12 this time?

13          MR. COMPTON:  The parties had talked about a date for

14 a fairness hearing, but I guess we need to wait and see what

15 the ruling of the court is, because the plaintiffs may back out

16 of the settlement agreement.  So I guess that would be --

17 wouldn't be right to set a hearing date.

18          THE COURT:  Well, I agree, because of the statement

19 Mr. Cusick made, that they're reserving the right since there

20 is no finality yet on this matter.

21          MR. COMPTON:  Right.

22          THE COURT:  That they're reserving the right to

23 determine if they were going to adhere to that prior position

24 as to an agreement.  And so that is, too, is going to be a

25 factor that is going to push the court as fast as possible to

1  get these matters done.

2         MR. COMPTON:  Okay.  Your Honor --

3         THE COURT:  But the key is going to be to get the

4  information that I am awaiting, and to get a transcript from my

5  overworked court reporter, you know, who has been very

6  diligent, and -- as he always is, to transcribe.  And notice he

7  did not even request a recess.  So we're going to go forward on

8  that.

9         MR. COMPTON:  All right.  Your Honor --

10        THE COURT:  Is there anything else?

11        MR. COMPTON:  Your Honor, I have one.

12        THE COURT:  Is there anything else?

13        MS. MERLE:  I have one thing.  I don't know if you

14  would want to hear from Dr. Carter, if the court were to rule

15  against the school district's motion, how long it would take to

16  get Carver put back together.

17        THE COURT:  Well, since I have to consider all

18  alternatives, then -- and a brief statement then, Dr. Carter,

19  how long would it take?

20        DR. CARTER:  Your Honor, it would be disruptive to the

21  children and the educators who have worked to transition

22  smoothly this year.  We have been in school four days now, and

23  I have been in those buildings, and I'm watching the students

24  and the educators.  They are bonding.  We would have to

25  completely dismantle those two middle schools, to separate back

1    into three, and I don't have the staff to educate them in three

2    buildings.

3        So at this point, to disrupt them would mean I would have

4    to pull on some of those retired educators in the community,

5    who say that they are available.  We would be back where we

6    were before.  We would have children in classrooms for the sake

7    of a building but wouldn't necessarily have all of those

8    buildings staffed.  Because I was able to combine classes

9    across those buildings.  We did not have excessively large

10    numbers, and so it would be completely disruptive to the

11    students.

12        But if the court ordered that, I would figure out how to

13    make it happen.

14        THE COURT:  Now, Mr. Markham suggested, by his

15    testimony, that one of the other schools be closed.  What about

16    that?

17        DR. CARTER:  And so what we would do at this point is

18    pick up another school, would place them in a smaller building

19    with no auditorium.  We would have to figure it out, if that's

20    what the court ordered.  And we would have to explain that that

21    was the decision that we have to follow.  I just think it would

22    be disruptive to students.

23        We're looking at a decision regarding what's good for the

24    adults compared to what's good for students.  And so to disrupt

25    the students and place them out of the environments that

1    they're now becoming accustomed to, I would do whatever I'm

2    ordered to do by the court, I just think it would be disruptive

3    to the students and staff members right now.

4            THE COURT:  Mr. Markham, isn't that what you were

5    suggesting, that close one of the other schools?

6            MR. MARKHAM:  Yes.  She mentioned the auditorium now.

7    We used the gym.  That was the gymnatorium.

8            THE COURT:  Okay.

9            MR. MARKHAM:  Since 1966 we used the gymnatorium.

10           THE COURT:  Okay.  Anything else, Ms. Cusick?

11           MS. MERLE:  Your Honor, could I just briefly touch on

12   this since Dr. Carter brought in some new information?  I would

13   just highlight for the court's consideration that the

14   disruption that Dr. Carter is alluding to is the result of the

15   school district's actions, and that the plaintiff should not be

16   prejudiced because the school district took their action

17   without first consulting the plaintiffs or this court.  And so

18   I understand that there would have to be some moving around and

19   perhaps some disruption.  I think the parties could figure out

20   a way to do it in a way that wasn't disruptive, but I don't

21   think the fact that the school district took steps without

22   court approval to weigh in their favor, for keeping the school

23   open if the court decides that that is not appropriate.

24           DR. CARTER:  Your Honor, if I may.  The district did

25   not know that it was acting outside of its rights to make a

1  decision regarding educating children.  Or I'll say as

2  superintendent I didn't.  So let me speak on my behalf.  But

3  I'll close with that.  I apologize.

4         THE COURT:  Okay.  Thank you.

5      Mr. Cusick, and then Mr. Compton.

6      Mr. Cusick, anything else?

7         MR. CUSICK:  Nothing else, Your Honor.

8      Thank you.

9         THE COURT:  All right.  And, Mr. Compton, anything

10  else?

11         MR. COMPTON:  No, Your Honor.  Thank you.

12         THE COURT:  All right.  And I thank all y'all for the

13  spirited conversation on this important matter, and the court

14  will endeavor to acquire the extra information and make a

15  ruling as fast as possible.

16      It probably is going to be before that three-week mark

17  that I talked about, but I just said that in order to give a

18  target to shoot for.  But I am confident that I will have

19  something for you then.

20      So thank you all very much.

21      And, Fred, let me know later how fast it is that you could

22  get the transcript.

23      And I thank you for being so patient, Fred, as you always

24  are.

25      So thank y'all very much.  I'm disconnecting.

1         Bye now.

2              MS. MERLE:   Thank you.

3              MR. CUSICK:   Thank you, Your Honor.

4         (Proceedings concluded at 4:40 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

118

CERTIFICATE OF COURT REPORTER

      I, Fred W. Jeske, RMR, CRR, Official Court Reporter for the United States District Court for the Southern District of Mississippi, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

      I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

S/*Fred W. Jeske*____

FRED W. JESKE, RMR, CRR
OFFICIAL COURT REPORTER